UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

Case No. 16-1065

RANDALL J. HATLEE and RONALD L. SWIFT

Plaintiffs-Appellants,

vs.

ASHLEIGH OLDS,

Defendant-Appellee.

On Appeal From the United States District Court

For the District of Colorado

The Honorable Raymond P. Moore, United States District Judge

D.C. No. 13-cv-02469-RM-MJW

APPELLANTS' APPENDIX

VOLUME I-PAGES 1-272

Brice A. Tondre

215 S. Wadsworth #500
Lakewood, CO 80226

303-296-3300

TABLE OF CONTENTS

Civil Docker for Case No. 1:13-CV-02469-RM-MJW................................1-23

Plaintiffs' First Amended Complaint and Jury Demand.........................24-36

Final Pretrial Order..................................................................................37-70

Defendant Olds' Motion for Summary Judgment...................................71-90

Exhibit N..............................................................................................91-94

Plaintiffs' Memorandum in Opposition to Defendant Olds' Motion for

    Summary Judgment........................................................................95-272

    Exhibit 1.................................................................................106-110

    Exhibit 2.................................................................................111-117

    Exhibit 3.................................................................................118-119

    Exhibit 4.................................................................................120-123

    Exhibit 5.................................................................................124-126

    Exhibit 6.................................................................................127-128

    Exhibit 7.................................................................................129-130

    Exhibit 8.................................................................................131-132

    Exhibit 9.................................................................................133-134

    Exhibit 10...............................................................................135-138

    Exhibit 11...............................................................................139-140

    Exhibit 12...............................................................................141-142

    Exhibit 13...............................................................................143-150

    Exhibit 14...............................................................................151-155

Exhibit 15.................................................................................156-158

Exhibit 16.................................................................................159-160

Exhibit 17.................................................................................161-162

Exhibit 18.................................................................................163-166

Exhibit 19.................................................................................167-169

Exhibit 20.................................................................................170-174

Exhibit 21.................................................................................175-176

Exhibit 22.................................................................................177-182

Exhibit 23.................................................................................183-188

Exhibit 24.................................................................................189-201

Exhibit 25.................................................................................202-210

Exhibit 26.................................................................................211-223

Exhibit 27.................................................................................224-236

Exhibit 28.................................................................................237-245

Exhibit 29.................................................................................246-254

Exhibit 30.................................................................................255-269

Exhibit 31.................................................................................270-272

Plaintiffs' Memorandum in Opposition to Motion for Partial Summary

Judgment Regarding Damages...............................................273-288

Exhibit 32.................................................................................289-290

Exhibit 33.................................................................................291-312

Exhibit 34.................................................................................313-315

Exhibit 35.................................................................................316-324

Exhibit 36……………………………………………………………325-326

Supplemental Memorandum in Opposition to Documents 63,64,65and 66..327-328

Exhibit 37……………………………………………………………..329-333

Exhibit 38……………………………………………………………334-337

Exhibit 39……………………………………………………………338-344

Exhibit 40……………………………………………………………345-353

Exhibit 36 (signed)……………………………………………………...354-357

Defendant Olds' Reply Brief in Support of Motion for Summary

Judgment…………………………………………………………..358-373

Defendant Olds' Separate Statement of Undisputed Material Facts in

Support of Motion for Summary Judgment…………………………374-417

Motion to Supplement the Record With Respect to Summary Judgment

Motions Number 61,64,65and 66……………………………………418-421

Exhibit 42……………………………………………………………422-423

Exhibit 43……………………………………………………………424-432

Exhibit 44……………………………………………………………433-447

Order………………………………………………………………...448-495

Stipulation of Dismissal of All Claims Against Park County Defendants….496-497

Order………………………………………………………………...498-499

Final Judgment………………………………………………………...500-501

Notice of Appeal………………………………………………………502-503

ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13-cv-02469-RM-MJW

Hatlee et al v. Hardey et al
Assigned to: Judge Raymond P. Moore
Referred to: Magistrate Judge Michael J. Watanabe
Cause: 42:1983 Civil Rights Act

Date Filed: 09/10/2013
Date Terminated: 02/11/2016
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Randall J. Hatlee**

represented by **Brice A. Tondre**
Brice A. Tondre, P.C.
215 South Wadsworth Boulevard
#500
Lakewood, CO 80226-1566
303-296-3300
Fax: 303-238-5310
Email: briceatondrepc@msn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald L. Swift**

represented by **Brice A. Tondre**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cindy Hardey**
*TERMINATED: 02/05/2016*

represented by **Andrea M. Bronson**
Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303-298-8603
Email: a_bronson@fsf-law.com
*TERMINATED: 06/23/2014*

**Andrew R. McLetchie**
Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303-298-8603
Fax: 303-298-8748
Email: a_mcletchie@fsf-law.com
*ATTORNEY TO BE NOTICED*

**Joel James Fulton**
Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303−285−9319
Email: J_Fulton@fsf−law.com
*ATTORNEY TO BE NOTICED*

**Timothy Peter Schimberg**
Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303−298−8603
Fax: 303−298−8748
Email: t_schimberg@fsf−law.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bobbi Priestly**
*TERMINATED: 02/05/2016*

represented by  **Andrea M. Bronson**
(See above for address)
*TERMINATED: 06/23/2014*

**Andrew R. McLetchie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel James Fulton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Peter Schimberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Monte Gore**
*TERMINATED: 02/05/2016*

represented by  **Andrea M. Bronson**
(See above for address)
*TERMINATED: 06/23/2014*

**Andrew R. McLetchie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel James Fulton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Peter Schimberg**
(See above for address)

2

*ATTORNEY TO BE NOTICED*

**Defendant**

**Fred Wegener**
*TERMINATED: 02/05/2016*

represented by **Andrea M. Bronson**
(See above for address)
*TERMINATED: 06/23/2014*

**Andrew R. McLetchie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel James Fulton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Peter Schimberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ashleigh Olds**
*TERMINATED: 09/29/2015*

represented by **Adam Joseph Goldstein**
White &Steele, P.C.
600 17th Street
Dominion Towers
Suite 600N
Denver, CO 80202−5406
303−296−2828
Fax: 303−296−3131
Email: agoldstein@wsteele.com
*ATTORNEY TO BE NOTICED*

**John M. Lebsack**
White &Steele, P.C.
600 17th Street
Dominion Towers
#600N
Denver, CO 80202−5406
303−296−2828
Fax: 303−296−3131
Email: jlebsack@wsteele.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/10/2013 | 1 | | COMPLAINT against All Defendants (Filing fee $ 400, Receipt Number 1082−3527796), filed by Randall J. Hatlee, Ronald L. Swift. (Attachments: # 1 Civil Cover Sheet)(Tondre, Brice) (Entered: 09/10/2013) |
| 09/10/2013 | 2 | | |

3

| | | | Case assigned to Judge Raymond P. Moore and drawn to Magistrate Judge Michael J. Watanabe. Text Only Entry (dbera, ) (Entered: 09/10/2013) |
|---|---|---|---|
| 09/10/2013 | 3 | | Magistrate Judge Consent Form issued. (dbera, ) (Entered: 09/10/2013) |
| 09/11/2013 | 4 | | ORDER REFERRING CASE to Magistrate Judge Michael J. Watanabe. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non–dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. Entered by Judge Raymond P. Moore on 9/11/2013. (Text Only Entry) (rmsec ) (Entered: 09/11/2013) |
| 09/11/2013 | 5 | | ORDER Setting Scheduling/Plannign Conference. Scheduling/Planning Conference is set for 11/4/2013 at 10:00 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. By Magistrate Judge Michael J. Watanabe on 09/11/13. (alvsl) (Entered: 09/11/2013) |
| 09/12/2013 | 6 | | SUMMONS REQUEST as to Diedrich, Gore, Priestly, Wegener, Hardey by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Attachments: #1 Summons, #2 Summons, #3 Summons, #4 Summons)(Tondre, Brice) (Entered: 09/12/2013) |
| 09/13/2013 | 7 | | SUMMONS issued by Clerk. Magistrate Judge Consent Form previously issued at 3 . (Attachments: #1 Summons, #2 Summons, #3 Summons, #4 Summons) (alvsl) (Entered: 09/13/2013) |
| 10/10/2013 | 8 | | Unopposed MOTION to Reset *Scheduling Conference* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 10/10/2013) |

| 10/10/2013 | 9 | · | MEMORANDUM regarding 8 Unopposed MOTION to Reset Scheduling Conference filed by Randall J. Hatlee, Ronald L. Swift. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 10/10/2013. (Text Only Entry) (rmsec ) (Entered: 10/10/2013) |
| 10/10/2013 | 10 | · | MINUTE ORDER granting 8 Motion to Reset. Scheduling Conference is now set for 11/21/2013 01:30 PM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. by Magistrate Judge Michael J. Watanabe on 10/10/2013. (trlee, ) (Entered: 10/10/2013) |
| 10/15/2013 | 11 | | MOTION to Dismiss Party by Defendant Ashleigh Olds Diedrich. (Attachments: # 1 Proposed Order (PDF Only))(Lebsack, John) (Entered: 10/15/2013) |
| 10/15/2013 | 12 | · | MOTION to Amend/Correct/Modify *a Name Change* by Defendant Ashleigh Olds Diedrich. (Attachments: # 1 Proposed Order (PDF Only))(Lebsack, John) (Entered: 10/15/2013) |
| 10/17/2013 | 13 | | Unopposed MOTION to Reset *Scheduling Conference* by Defendant Ashleigh Olds Diedrich. (Attachments: # 1 Proposed Order (PDF Only))(Lebsack, John) (Entered: 10/17/2013) |
| 10/17/2013 | 14 | | MEMORANDUM regarding 13 Unopposed MOTION to Reset Scheduling Conference filed by Ashleigh Olds Diedrich. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 10/17/2013. (Text Only Entry) (rmsec ) (Entered: 10/17/2013) |
| 10/17/2013 | 15 | · | MINUTE ORDER granting 13 Motion to Reset. Scheduling Conference is now set for 12/3/2013 11:00 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. by Magistrate Judge Michael J. Watanabe on 10/17/2013.(trlee, ) (Entered: 10/17/2013) |
| 10/18/2013 | 16 | · | NOTICE of Entry of Appearance *of Timothy P. Schimberg* by Timothy Peter Schimberg on behalf of Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener (Schimberg, Timothy) (Entered: 10/18/2013) |
| 10/18/2013 | 17 | | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Proposed Order (PDF Only))(Schimberg, Timothy) (Entered: 10/18/2013) |

| 10/18/2013 | 18 | | NOTICE of Entry of Appearance of *Andrea M. Bronson* by Andrea M. Bronson on behalf of Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener (Bronson, Andrea) (Entered: 10/18/2013) |
| 10/21/2013 | 19 | | ORDER granting 12 Motion to Amend/Correct/Modify. Caption of the case on all future pleadings shall be changed to replace Ashleigh Olds Diedrich with Ashleigh Olds. SO ORDERED by Judge Raymond P. Moore on 10/21/2013. (Text Only Entry)(rmsec ) (Entered: 10/21/2013) |
| 10/21/2013 | 20 | | ORDER granting 17 Motion for Extension of Time to Answer or Otherwise Respond (All Defendants). Defendants shall have up to and including Tuesday, November 5, 2013, by which to move or otherwise respond to the Complaint. SO ORDERED by Judge Raymond P. Moore on 10/21/2013. (Text Only Entry)(rmsec ) (Entered: 10/21/2013) |
| 11/01/2013 | 21 | | BRIEF in Opposition to 11 MOTION to Dismiss Party filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 11/01/2013) |
| 11/01/2013 | 22 | | AMENDED COMPLAINT and *Jury Demand* against All Plaintiffs, filed by Randall J. Hatlee, Ronald L. Swift.(Tondre, Brice) (Entered: 11/01/2013) |
| 11/07/2013 | 23 | | CERTIFICATE of *Review* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 11/07/2013) |
| 11/15/2013 | 24 | | REPLY to Response to 11 MOTION to Dismiss Party filed by Defendant Ashley Olds. (Lebsack, John) (Entered: 11/15/2013) |
| 11/15/2013 | 25 | | MOTION for Extension of Time to *Respond to Amended Complaint* by Defendant Ashley Olds. (Attachments: # 1 Proposed Order (PDF Only))(Lebsack, John) (Entered: 11/15/2013) |
| 11/15/2013 | 26 | | ANSWER to 1 Complaint by Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener.(Schimberg, Timothy) (Entered: 11/15/2013) |
| 11/18/2013 | 27 | | ORDER denying 25 Motion for Extension of Time. Motion will granted upon compliance with Local Rule 6.1.E. and Court's Practice Standards IV.E.2. SO ORDERED by Judge Raymond P. Moore on 11/18/2013. (Text Only Entry)(rmsec ) (Entered: 11/18/2013) |
| 11/18/2013 | 28 | | ORDER denying as moot 11 Motion to Dismiss |

| | | | |
|---|---|---|---|
| | | | Party. by Judge Raymond P. Moore on 11/18/2013.(trlee, ) (Entered: 11/18/2013) |
| 11/18/2013 | 29 | | MOTION to Amend/Correct/Modify 27 Order on Motion for Extension of Time, 25 MOTION for Extension of Time to *Respond to Amended Complaint* by Defendant Ashley Olds. (Attachments: # 1 Proposed Order (PDF Only))(Lebsack, John) (Entered: 11/18/2013) |
| 11/18/2013 | 30 | | ORDER granting 29 Motion to Amend/Correct/Modify. SO ORDERED by Judge Raymond P. Moore on 11/18/2013. (Text Only Entry)(rmsec ) (Entered: 11/18/2013) |
| 11/19/2013 | 31 | | MOTION to Dismiss Party *from Amended Complaint* by Defendant Ashley Olds. (Attachments: # 1 Proposed Order (PDF Only))(Lebsack, John) (Entered: 11/19/2013) |
| 11/26/2013 | 32 | | Proposed Scheduling Order by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 11/26/2013) |
| 12/03/2013 | 33 | | COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Scheduling Conference held on 12/3/2013. Discovery due by 6/30/2014. Dispositive Motions due by 7/31/2014. Proposed Pretrial Order due by 9/24/2014. Final Pretrial Conference set for 10/1/2014 09:00 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. Court Reporter: FTR − Ellen E. Miller. FTR: Courtroom A502. (mjwcd) (Entered: 12/03/2013) |
| 12/03/2013 | 34 | | SCHEDULING ORDER: Entered by Magistrate Judge Michael J. Watanabe on 12/3/2013. (mjwcd) (Entered: 12/03/2013) |
| 12/10/2013 | 35 | | BRIEF in Opposition to 31 MOTION to Dismiss Party *from Amended Complaint* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 12/10/2013) |
| 12/20/2013 | 36 | | REPLY to Response to 31 MOTION to Dismiss Party *from Amended Complaint* filed by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 12/20/2013) |
| 03/20/2014 | 37 | | UNOPPOSED MOTION to Amend/Correct/Modify Scheduling Order by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) Modified on 3/20/2014 to correct text (trlee, ). (Entered: 03/20/2014) |

| 03/20/2014 | 38 | | MEMORANDUM regarding 37 Third Party MOTION to Amend/Correct/Modify Scheduling Order filed by Randall J. Hatlee, Ronald L. Swift. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 3/20/2014. (Text Only Entry) (rmsec ) (Entered: 03/20/2014) |
| 03/21/2014 | 39 | | MINUTE ORDER granting 37 plaintiffs' Unopposed Motion to Modify Scheduling Order. Scheduling Order 34 is amended. Discovery due by 8/29/2014. Dispositive Motions due by 9/30/2014. Final Pretrial Conference 10/1/2014 09:00 AM is vacated. Proposed Pretrial Order due by 11/18/2014. Final Pretrial Conference reset for 11/25/2014 10:00 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. By Magistrate Judge Michael J. Watanabe on 3/21/2014.(emill) (Entered: 03/21/2014) |
| 06/20/2014 | 40 | | NOTICE of Withdrawal of Andrea M. Bronson as Counsel for Defendants Cindy Hardey, Bobbi Priestly, Monte Gore and Fred Wegener by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener (Bronson, Andrea) (Entered: 06/20/2014) |
| 06/20/2014 | 41 | | MOTION to Withdraw as Attorney by Andrea M. Bronson for Defendants Cindy Hardey, Bobbi Priestly, Monte Gore, and Fred Wegener by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Proposed Order (PDF Only))(Bronson, Andrea) (Entered: 06/20/2014) |
| 06/20/2014 | 42 | | MEMORANDUM regarding 41 MOTION to Withdraw as Attorney by Andrea M. Bronson for Defendants Cindy Hardey, Bobbi Priestly, Monte Gore, and Fred Wegener filed by Cindy Hardey, Monte Gore, Fred Wegener, Bobbi Priestly. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 6/20/2014. (Text Only Entry) (rmsec ) (Entered: 06/20/2014) |
| 06/23/2014 | 43 | | MINUTE ORDER granting 41 Motion to Withdraw as Attorney. Attorney Andrea M. Bronson terminated. By Magistrate Judge Michael J. Watanabe on 6/23/2014.(trlee, ) (Entered: 06/23/2014) |
| 08/19/2014 | 44 | | Unopposed MOTION for Order to Modify Scheduling Order by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 08/19/2014) |

| | | | |
|---|---|---|---|
| 08/20/2014 | 45 | | MEMORANDUM regarding 44 Unopposed MOTION for Order to *Modify Scheduling Order* filed by Randall J. Hatlee, Ronald L. Swift. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 8/20/2014. Text Only Entry (cpear) (Entered: 08/20/2014) |
| 08/20/2014 | 46 | | MINUTE ORDER granting 44 Unopposed Motion to Modify Scheduling Order, by Magistrate Judge Michael J. Watanabe on 8/20/2014. Discovery due by 10/31/2014. Dispositive Motions due by 12/1/2014. Proposed Pretrial Order due on or before 1/20/2015. Final Pretrial Conference set for 1/26/2015 09:30 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. (slibi, ) (Entered: 08/20/2014) |
| 10/30/2014 | 47 | | Unopposed MOTION for Extension of Time to *Extend Discovery Cutoff for Limited Purpose* by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 10/30/2014) |
| 10/30/2014 | 48 | | MEMORANDUM regarding 47 Unopposed MOTION for Extension of Time to *Extend Discovery Cutoff for Limited Purpose* filed by Ashleigh Olds. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 10/30/2014. (Text Only Entry) (rmsec ) (Entered: 10/30/2014) |
| 10/30/2014 | 49 | | MINUTE ORDER granting 47 Unopposed Motion by Defendant Olds to Extend Discovery Cutoff For Limited Purpose. Scheduling Order 34 is amended to extend the discovery cutoff to 11/30/2014 for the sole purpose of finishing the deposition of Dr. Jena Questen and conducting the depositions of Martin Van Poolen, Kirsten LeBeau, Chet Lawrence, and Peter Petlach. All other discovery shall be completed by 10/31/2014. Discovery, as specified, due by 11/30/2014. By Magistrate Judge Michael J. Watanabe on 10/30/2014.(emill) (Entered: 10/30/2014) |
| 11/14/2014 | 50 | | MOTION for Order to *Set Settlement Conference* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 11/14/2014) |
| 11/17/2014 | 51 | | ORDER granting 50 Motion for settlement conference. Magistrate Judge Watanabe is authorized to conduct a settlement conference in this case. By Judge Raymond P. Moore on 11/17/2014.(tscha, ) (Entered: 11/17/2014) |
| 11/17/2014 | 52 | | MINUTE ORDER Settlement Conference set for |

| | | | |
|---|---|---|---|
| | | | 1/7/2015 01:30 PM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. Deadline to submit Confidential Settlement Statements 12/30/2014, as set forth in the order, by Magistrate Judge Michael J. Watanabe on 11/17/2014. (emill) (Entered: 11/17/2014) |
| 11/18/2014 | 53 | | MINUTE ORDER Settlement Conference 1/7/2015 01:30 PM is vacated. Settlement Conference reset for 1/22/2015 01:30 PM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. Deadline to submit settlement statements is 1/15/2015. By Magistrate Judge Michael J. Watanabe on 11/18/2014. (emill) (Entered: 11/18/2014) |
| 11/20/2014 | 54 | | Unopposed MOTION to Amend/Correct/Modify 46 Order on Motion for Order, *to Extend Dispositive Motion Deadline* by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 11/20/2014) |
| 11/20/2014 | 55 | | MEMORANDUM regarding 54 Unopposed MOTION to Amend/Correct/Modify 46 Order on Motion for Order, *to Extend Dispositive Motion Deadline* filed by Ashleigh Olds. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 11/20/2014. (Text Only Entry) (rmsec) (Entered: 11/20/2014) |
| 11/20/2014 | 56 | | MINUTE ORDER granting 54 Unopposed Motion by Defendant Olds to Extend Dispositive Motion Deadline, by Magistrate Judge Michael J. Watanabe on 11/20/2014. Dispositive Motions Deadline is extended to 12/15/2014. (slibi, ) (Entered: 11/20/2014) |
| 11/24/2014 | 57 | | Unopposed MOTION for Extension of Time to *Extend Dispositive Motion Deadline* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Proposed Order (PDF Only))(Schimberg, Timothy) (Entered: 11/24/2014) |
| 11/24/2014 | 58 | | MEMORANDUM regarding 57 Unopposed MOTION for Extension of Time to *Extend Dispositive Motion Deadline* filed by Cindy Hardey, Monte Gore, Fred Wegener, Bobbi Priestly. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 11/24/2014. (Text Only Entry) (rmsec ) (Entered: 11/24/2014) |
| 11/24/2014 | 59 | | MINUTE ORDER granting 57 Park County Defendants' Unopposed Motion to Extend Dispositive Motion Deadline. Scheduling Order 34 is amended. Dispositive Motions as to all parties due by 12/15/2014. By Magistrate Judge Michael J. |

| | | | |
|---|---|---|---|
| | | | Watanabe on 11/24/2014.(emill) (Entered: 11/24/2014) |
| 12/15/2014 | 60 | | NOTICE of Entry of Appearance by Adam Joseph Goldstein on behalf of Ashleigh OldsAttorney Adam Joseph Goldstein added to party Ashleigh Olds(pty:dft) (Goldstein, Adam) (Entered: 12/15/2014) |
| 12/15/2014 | 61 | | MOTION for Summary Judgment by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 12/15/2014) |
| 12/15/2014 | 62 | | STATEMENT re 61 MOTION for Summary Judgment *of Undisputed Material Facts* by Defendant Ashleigh Olds. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M Part 1, # 14 Exhibit M Part 2, # 15 Exhibit M Part 3, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T, # 23 Exhibit U, # 24 Exhibit V)(Lebsack, John) (Entered: 12/15/2014) |
| 12/15/2014 | 63 | | MOTION for Judgment on the Pleadings *Pursuant to Fed.R.Civ.P. 12(c) re Plaintiffs' Official Capacity Claims* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Schimberg, Timothy) (Entered: 12/15/2014) |
| 12/15/2014 | 64 | | MOTION for Summary Judgment *re Plaintiffs' Third Claim for Relief* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Exhibit A, # 2 Separate Statement of Undisputed Material Facts)(Schimberg, Timothy) (Entered: 12/15/2014) |
| 12/15/2014 | 65 | | MOTION for Summary Judgment *re Individual Capacity Claims* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Separate Statement of Undisputed Facts)(Schimberg, Timothy) (Entered: 12/15/2014) |
| 12/15/2014 | 66 | | MOTION for Partial Summary Judgment *re Damages* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit H, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit K, # 11 Exhibit |

| | | |
|---|---|---|
| | | L, #_12_ Exhibit M, #_13_ Exhibit O, #_14_ Exhibit P, #_15_ Exhibit Q, #_16_ Exhibit R, #_17_ Exhibit S, #_18_ Exhibit T, #_19_ Separate Statement of Undisputed Material Facts)(Schimberg, Timothy) (Entered: 12/15/2014) |
| 01/03/2015 | 67 | BRIEF in Opposition to 61 MOTION for Summary Judgment filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Attachments: #_1_ Exhibit 1 through 5, #_2_ Exhibit 6 through 10, #_3_ Exhibit 11 through 15, #_4_ Exhibit 16 through 20, #_5_ Exhibit 21 through 25, #_6_ Exhibit 26 through 28, #_7_ Exhibit 29 through 31)(Tondre, Brice) (Entered: 01/03/2015) |
| 01/03/2015 | 68 | BRIEF in Opposition to 66 MOTION for Partial Summary Judgment *re Damages* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Attachments: #_1_ Exhibit Exhibits 1 through 5, #_2_ Exhibit Exhibits 6 through 10, #_3_ Exhibit Exhibits 11 through 15, #_4_ Exhibit Exhibits 16 through 20, #_5_ Exhibit Exhibits 21 through 25, #_6_ Exhibit Exhibits 26 through 28, #_7_ Exhibit Exhibits 29 through 31, #_8_ Exhibit Exhibits 32 through 33, #_9_ Exhibit Exhibits 34 through 36)(Tondre, Brice) (Entered: 01/03/2015) |
| 01/03/2015 | 69 | BRIEF in Opposition to 63 MOTION for Judgment on the Pleadings *Pursuant to Fed.R.Civ.P. 12(c) re Plaintiffs' Official Capacity Claims* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 01/03/2015) |
| 01/03/2015 | 70 | BRIEF in Opposition to 64 MOTION for Summary Judgment *re Plaintiffs' Third Claim for Relief* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 01/03/2015) |
| 01/03/2015 | 71 | BRIEF in Opposition to 65 MOTION for Summary Judgment *re Individual Capacity Claims* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 01/03/2015) |
| 01/05/2015 | 72 | Supplemental Memorandum in Opposition to 63 MOTION for Judgment on the Pleadings *Pursuant to Fed.R.Civ.P. 12(c) re Plaintiffs' Official Capacity Claims*, 65 MOTION for Summary Judgment *re Individual Capacity Claims*, 66 MOTION for Partial Summary Judgment *re Damages*, 64 MOTION for Summary Judgment *re Plaintiffs' Third Claim for Relief* filed by Plaintiff Ronald L. Swift. (Attachments: #_1_ Exhibit 37, #_2_ Exhibit 38, #_3_ Exhibit 40, #_4_ Exhibit 39)(Tondre, Brice) Modified title on 1/6/2015 (alowe). (Entered: 01/05/2015) |
| 01/05/2015 | 73 | Supplemental Memorandum in Opposition to 61 |

| | | | MOTION for Summary Judgment filed by Plaintiff Ronald L. Swift. (Attachments: #_1 Exhibit 37, #_2 Exhibit 41−1, #_3 Exhibit 41−2, #_4 Exhibit 41−3)(Tondre, Brice) Modified title on 1/6/2015 (alowe). (Entered: 01/05/2015) |
|---|---|---|---|
| 01/06/2015 | 74 | | MOTION to Amend/Correct/Modify 46 Order on Motion for Order, *to Modify Scheduling Order* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 01/06/2015) |
| 01/06/2015 | 75 | | MEMORANDUM regarding 74 MOTION to Amend/Correct/Modify 46 Order on Motion for Order, *to Modify Scheduling Order* filed by Randall J. Hatlee, Ronald L. Swift. Motion referred to Magistrate Judge Michael J. Watanabe. Entered by Judge Raymond P. Moore on 1/6/2015. (Text Only Entry) (rmsec ) (Entered: 01/06/2015) |
| 01/07/2015 | 76 | | MINUTE ORDER granting 74 Plaintiffs' Unopposed Motion to Modify Scheduling Order. Scheduling Order 34 amended. Final Pretrial Conference 1/26/2015 09:30 AM is vacated. Final Pretrial Conference reset for 3/30/2015 09:30 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. By Magistrate Judge Michael J. Watanabe on 1/7/2015.(emill) (Entered: 01/07/2015) |
| 01/12/2015 | 77 | | RESPONSE to 66 MOTION for Partial Summary Judgment *re Damages*, 61 MOTION for Summary Judgment *Olds* filed by Plaintiff Ronald L. Swift. (Tondre, Brice) (Entered: 01/12/2015) |
| 01/15/2015 | 78 | | MINUTE ORDER: At the request of counsel, the Final Pretrial Conference 3/30/2015 09:30 AM is vacated. Final Pretrial Conference re−set for 3/31/2015 01:30 PM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. By Magistrate Judge Michael J. Watanabe on 1/15/2015. (emill) (Entered: 01/15/2015) |
| 01/20/2015 | 79 | | AMENDED ORDER REFERRING CASE to Magistrate Judge Michael J. Watanabe. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including |

| | | | discovery and other non−dispositive motions, (4) conduct a pretrial conference and enter a pretrial order, and (5) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. Entered by Judge Raymond P. Moore on 1/20/2015. (Text Only Entry) (rmsec ) (Entered: 01/20/2015) |
|---|---|---|---|
| 01/20/2015 | 80 | | MEMORANDUM regarding 63 MOTION for Judgment on the Pleadings *Pursuant to Fed.R.Civ.P. 12(c) re Plaintiffs' Official Capacity Claims* filed by Cindy Hardey, Monte Gore, Fred Wegener, Bobbi Priestly. Motion referred to Magistrate Judge Michael J. Watanabe Entered by Judge Raymond P. Moore on 1/20/2015. (Text Only Entry) (rmsec ) (Entered: 01/20/2015) |
| 01/20/2015 | 81 | | REPLY to Response to 61 MOTION for Summary Judgment filed by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 01/20/2015) |
| 01/20/2015 | 82 | | REPLY to Response to 61 MOTION for Summary Judgment *Statement of Undisputed Material Facts* filed by Defendant Ashleigh Olds. (Attachments: # 1 Exhibit W, # 2 Exhibit X)(Lebsack, John) (Entered: 01/20/2015) |
| 01/20/2015 | 83 | | MOTION to Clarify *re this Court's Civil Practice Standards or in the Alternative*, MOTION for Leave to by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Proposed Order (PDF Only))(Schimberg, Timothy) (Entered: 01/20/2015) |
| 01/20/2015 | 84 | | REPLY to Response to 66 MOTION for Partial Summary Judgment *re Damages* filed by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Exhibit A − Separate Statement of Undisputed Material Facts)(Schimberg, Timothy) (Entered: 01/20/2015) |
| 01/20/2015 | 85 | | REPLY to Response to 65 MOTION for Summary Judgment *re Individual Capacity Claims* filed by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Exhibit A − Separate Statement of Undisputed Material |

| | | | Facts)(Schimberg, Timothy) (Entered: 01/20/2015) |
|---|---|---|---|
| 01/20/2015 | 86 | | REPLY to Response to 64 MOTION for Summary Judgment *re Plaintiffs' Third Claim for Relief* filed by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Exhibit A – Separate Statement of Undisputed Material Facts)(Schimberg, Timothy) (Entered: 01/20/2015) |
| 01/20/2015 | 87 | | REPLY to Response to 63 MOTION for Judgment on the Pleadings *Pursuant to Fed.R.Civ.P. 12(c) re Plaintiffs' Official Capacity Claims* filed by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Schimberg, Timothy) (Entered: 01/20/2015) |
| 01/21/2015 | 88 | | ORDER granting 83 Motion to Clarify Regarding the Court's Civil Practice Standards or in the Alternative Motion for Leave. Defendants' Motions for Summary Judgment (ECF Nos. 64, 65 and 66) are hereby accepted as filed as of December 15, 2014. By Judge Raymond P. Moore on 1/21/2015.(tscha, ) (Entered: 01/21/2015) |
| 01/22/2015 | 89 | | MINUTE ENTRY for proceedings held before Magistrate Judge Michael J. Watanabe: Settlement Conference held on 1/22/2015. No settlement was reached. (emill) (Entered: 01/23/2015) |
| 01/23/2015 | 90 | | RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE Recommending 63 County Defendants' Motion for Judgment on the Pleadings Pursuant to Fed.R.Civ.P. 12(c) Regarding Plaintiffs' Official Capacity Claims be DENIED, by Magistrate Judge Michael J. Watanabe on 1/23/2015. (emill) (Entered: 01/23/2015) |
| 01/26/2015 | 91 | | MOTION for Hearing/Conference re 62 Statement,, 66 MOTION for Partial Summary Judgment *re Damages,* 61 MOTION for Summary Judgment , 64 MOTION for Summary Judgment *re Plaintiffs' Third Claim for Relief,* 65 MOTION for Summary Judgment *re Individual Capacity Claims* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 01/26/2015) |
| 01/26/2015 | 92 | | MOTION to Supplement *Summary Judgment Record with Respect to Doc. Nos. 61, 64, 65 and 66* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Attachments: # 1 Exhibit 42, # 2 Exhibit 43, # 3 Exhibit 44)(Tondre, Brice) (Entered: 01/26/2015) |
| 01/27/2015 | 93 | | ORDER denying 92 Motion to Supplement, without prejudice, for failure to comply with Local Rule 7.1.A (Duty to Confer) with leave to refile after |

| | | | |
|---|---|---|---|
| | | | conferral and advising the Court as to whether the motion is opposed/unopposed. SO ORDERED by Judge Raymond P. Moore on 1/27/2015. (Text Only Entry)(rmsec) (Entered: 01/27/2015) |
| 01/27/2015 | 94 | | ORDER denying 91 Motion for Hearing/Conference. Upon consideration of the Motion 91 and Court file, the Motion 91 is denied without prejudice. SO ORDERED by Judge Raymond P. Moore on 1/27/2015. (Text Only Entry)(rmsec ) (Entered: 01/27/2015) |
| 01/29/2015 | 95 | | MOTION to Supplement *Summary Judgment Record* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Attachments: # 1 Exhibit 42, # 2 Exhibit 43, # 3 Exhibit 44)(Tondre, Brice) (Entered: 01/29/2015) |
| 01/29/2015 | 96 | | MINUTE ORDER: Upon consideration of the Motion 95 , any response to the Motion is due by Thursday, February 5, 2015, and any reply is due by Thursday, February 12, 2015. SO ORDERED by Judge Raymond P. Moore on 1/29/2015. (Text Only Entry) (rmsec ) (Entered: 01/29/2015) |
| 02/05/2015 | 97 | | RESPONSE to 95 MOTION to Supplement *Summary Judgment Record* filed by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 02/05/2015) |
| 02/05/2015 | 98 | | RESPONSE to 95 MOTION to Supplement *Summary Judgment Record* filed by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Schimberg, Timothy) (Entered: 02/05/2015) |
| 02/06/2015 | 99 | | OBJECTION to 90 Report and Recommendations *on County Defendants' Motion for Judgment on the Pleadings* filed by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Schimberg, Timothy) (Entered: 02/06/2015) |
| 02/12/2015 | 100 | | REPLY to Response to 95 MOTION to Supplement *Summary Judgment Record Responses are 97 and [98* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 02/12/2015) |
| 02/20/2015 | 101 | | Plaintiffs' Reply to Objection of the Park County Defendants 99 to the Report &Recommendation of USMJ 90 by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) Modified on 2/20/2015 to correct text (tscha, ). (Entered: 02/20/2015) |
| 02/27/2015 | 102 | | MOTION for Leave to *File Reply Brief in Support of their Objection to Report and Recommendation 90* RECOMMENDATION OF UNITED STATES |

| | | | MAGISTRATE JUDGE re 63 MOTION for Judgment on the Pleadings *Pursuant to Fed.R.Civ.P. 12(c) re Plaintiffs' Official Capacity Claims* filed by Cindy Hardey, Monte Gore, Fred Wegener, Bobbi Priestly, 99 Objection to Report and Recommendations by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Proposed Document Park County Defendants' Reply in Support of its Objection to the Magistrate's Report and Recommendation)(Schimberg, Timothy) (Entered: 02/27/2015) |
|---|---|---|---|
| 03/27/2015 | 103 | | Proposed Pretrial Order *by All Parties* by Defendant Ashleigh Olds. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Lebsack, John) (Entered: 03/27/2015) |
| 03/31/2015 | 104 | | ORDER Setting Case for Trial by Judge Raymond P. Moore on 3/31/15. A 10−day Jury Trial set is for 2/1/2016 09:00 AM in Courtroom A 601 before Judge Raymond P. Moore. A Trial Preparation Conference is set for 1/6/2016 at 09:00 AM before Judge Raymond P. Moore. (dkals, ) (Entered: 03/31/2015) |
| 03/31/2015 | 105 | | COURTROOM MINUTES for proceedings held before Magistrate Judge Michael J. Watanabe: Final Pretrial Conference held on 3/31/2015. Defendants' Oral Motions granted as set forth on the record. Final Pretrial Order entered. Court Reporter: FTR − E. E. Miller. FTR: Courtroom A502. (emill) (Entered: 03/31/2015) |
| 03/31/2015 | 106 | | FINAL PRETRIAL ORDER Entered by Magistrate Judge Michael J. Watanabe on 3/31/2015. (Attachments: # 1 Plaintiff Witness List, # 2 Defendant Park County Witness List, # 3 Plaintiff Exhibit List, # 4 Defendant Park County Exhibit List) (emill) (Entered: 03/31/2015) |
| 04/14/2015 | 107 | | OBJECTION/Appeal of Magistrate Judge Decision 106 to District Court by Plaintiffs Randall J. Hatle, Ronald L. Swift. (Attachments: # 1 Exhibit Exhibit 1)(Tondre, Brice) Modified on 4/14/2015 to add linkage (tscha, ). (Entered: 04/14/2015) |
| 04/28/2015 | 108 | | RESPONSE to 107 Objection/Appeal of Magistrate Judge Decision *to the Order of USMJ Watanabe Striking Failure to Train and Ratification Claims from the Pretrial Order* filed by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Schimberg, Timothy) (Entered: 04/28/2015) |

| 09/04/2015 | 109 | | Utility Setting/Resetting Deadlines/Hearings: A 10-day Jury Trial is scheduled to commence on 2/1/2016 at 09:00 AM in Courtroom A 601 before Judge Raymond P. Moore pursuant to 104 Order entered on 03/31/2015. Text Only Entry (athom, ) (Entered: 09/04/2015) |
| 09/29/2015 | 110 | 24 | ORDER. 31 Motion to Dismiss Party is GRANTED in part and DENIED in part as moot. 61 and 65 Motions for Summary Judgment are GRANTED. 64 Motion for Summary Judgment is DENIED. 66 Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. 95 Motion to Supplement is DENIED. The 90 Recommendation of the United States Magistrate Judge is APPROVED and ADOPTED. 63 Motion for Judgment on the Pleadings is DENIED. 99 Objections to the Recommendation are OVERRULED. 107 Objection to the Order of USMJ Watanabe is DENIED. 102 Motion for Leave is GRANTED. All as indicated in the attached Order. By Judge Raymond P. Moore on 09/29/2015. (athom, ) (Entered: 09/30/2015) |
| 10/13/2015 | 111 | | Proposed Bill of Costs by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 10/13/2015) |
| 10/14/2015 | 112 | | NOTICE of Entry of Appearance by Andrew R. McLetchie on behalf of Monte Gore, Cindy Hardey, Bobbi Priestly, Fred WegenerAttorney Andrew R. McLetchie added to party Monte Gore(pty:dft), Attorney Andrew R. McLetchie added to party Cindy Hardey(pty:dft), Attorney Andrew R. McLetchie added to party Bobbi Priestly(pty:dft), Attorney Andrew R. McLetchie added to party Fred Wegener(pty:dft) (McLetchie, Andrew) (Entered: 10/14/2015) |
| 10/14/2015 | 113 | | Unopposed MOTION for Extension of Time to *File a Motion for Summary Judgment Regarding Official Capacity Claims* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Proposed Order (PDF Only))(McLetchie, Andrew) (Entered: 10/14/2015) |
| 10/14/2015 | 114 | | ORDER granting 113 Motion for Extension of Time to File. SO ORDERED by Judge Raymond P. Moore on 10/14/2015. (Text Only Entry)(rmsec ) (Entered: 10/14/2015) |
| 10/15/2015 | 115 | | MOTION for Summary Judgment *of Defendant Sheriff Wegener Regarding the Remaining Official Capacity Claims Pursuant to The Court's September 29, 2015 Order* by Defendant Fred Wegener. |

| | | | |
|---|---|---|---|
| | | | (McLetchie, Andrew) (Entered: 10/15/2015) |
| 10/26/2015 | 116 | | STATEMENT re 111 Proposed Bill of Costs *and Objections to Bill of Costs* by Defendant Ashleigh Olds. (Lebsack, John) (Entered: 10/26/2015) |
| 10/26/2015 | 117 | | RESPONSE to 115 MOTION for Summary Judgment *of Defendant Sheriff Wegener Regarding the Remaining Official Capacity Claims Pursuant to The Court's September 29, 2015 Order* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Attachments: # 1 Index to Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20)(Tondre, Brice) (Entered: 10/26/2015) |
| 10/27/2015 | 118 | | NOTICE of Clerk's Provisional Award of Costs. Costs Taxed in amount of $5,556.44 against Plaintiffs Randall Hatlee and Ronald Swift. This amount will be entered as the clerks award at the conclusion of the case on entry of Final Judgment. (ebutl) (Entered: 10/27/2015) |
| 11/18/2015 | 119 | | ORDER granting 115 Motion for Summary Judgment as to Defendant Sheriff Wegener. it is ORDERED that Defendant Sheriff Wegeners Motion for Summary Judgment Regarding the Remaining Official Capacity Claims Pursuant to the Courts September 29, 2015 Order 115 is GRANTED. The only claims remaining before the Court in this matter are one claim against Officer Hardey in her individual capacity under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations relating to the seizure of certain of Plaintiffs horses and Plaintiffs breach of contract claim, by Judge Raymond P. Moore on 11/18/2015.(cthom, ) (Entered: 11/18/2015) |
| 11/18/2015 | 120 | | ORDER re: Trial Schedule. It is ORDERED that the parties to this case are to file submissions with this Court within seven days from the date of this Order explaining how many days will be needed for trial given the current status of this case. Submissions may be no longer than two pages in length, by Judge Raymond P. Moore on 11/18/2015. (cthom, ) (Entered: 11/18/2015) |
| 11/25/2015 | 121 | | JOINDER re 120 Order, *Joint Submission per Order of November 18, 2015* by Defendants Cindy Hardey, Fred Wegener. (Schimberg, Timothy) (Entered: |

| | | | |
|---|---|---|---|
| | | | 11/25/2015) |
| 12/01/2015 | 122 | | MINUTE ORDER: Pursuant to the filing of the Joint Submission Per Order of November 18, 2015 [Doc. 120] the Court has determined that only 5 days will be needed for trial. Therefore, the jury trial presently set for February 1, 2016 through February 12, 2016 is RESET for February 1, 2016 through February 5, 2016, before Judge Raymond P. Moore in Courtroom A601 on the Sixth Floor of the Alfred A. Arraj United States Courthouse located at 901 19th Street, Denver, Colorado. Counsel are reminded that on the first day of trial to a jury, counsel are expected to be present at 8:30 a.m. to go over any final matters before the commencement of trial.SO ORDERED by Judge Raymond P. Moore on 12/1/2015. (Text Only Entry ) (rmsec ) (Entered: 12/01/2015) |
| 12/21/2015 | 123 | | Joint MOTION for Extension of Time to *File Jury Instructions* by Defendants Cindy Hardey, Fred Wegener. (Attachments: # 1 Proposed Order (PDF Only))(Schimberg, Timothy) (Entered: 12/21/2015) |
| 12/21/2015 | 124 | | ORDER granting 123 Motion for Extension of Time re: Jury Instructions. The parties shall have through and including Thursday, December 31, 2015, by which to provide jury instructions to the Court, by Judge Raymond P. Moore on 12/21/2015.(cthom, ) (Entered: 12/21/2015) |
| 12/31/2015 | 125 | | First MOTION for Extension of Time to *File a Motion in Limine* by Defendants Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # 1 Exhibit Exhibit A, # 2 Proposed Order (PDF Only))(Schimberg, Timothy) (Entered: 12/31/2015) |
| 12/31/2015 | 126 | | Proposed Jury Instructions by Defendants Cindy Hardey, Fred Wegener. (Schimberg, Timothy) (Entered: 12/31/2015) |
| 12/31/2015 | 127 | | Proposed Voir Dire by Defendants Cindy Hardey, Fred Wegener. (Schimberg, Timothy) (Entered: 12/31/2015) |
| 12/31/2015 | 128 | | NOTICE *of Filing Jury Instructions, Verdict Form and Witness and Exhibit Lists* by Plaintiffs Randall J. Hatlee, Ronald L. Swift (Attachments: # 1 Jury Instructions–Stock, # 2 Jury Instructions–Case Specific, # 3 Verdict Form, # 4 Witness List, # 5 Exhibit List)(Tondre, Brice) (Entered: 12/31/2015) |
| 12/31/2015 | 129 | | Witness List by Defendants Cindy Hardey, Fred Wegener. (Schimberg, Timothy) (Entered: 12/31/2015) |

| 12/31/2015 | 130 | | Exhibit List by Defendants Cindy Hardey, Fred Wegener. (Schimberg, Timothy) (Entered: 12/31/2015) |
|---|---|---|---|
| 01/04/2016 | 131 | | Unopposed MOTION to Vacate *Pre−Trial Conference* by Defendants Cindy Hardey, Fred Wegener. (Attachments: # 1 Proposed Order (PDF Only))(Schimberg, Timothy) (Entered: 01/04/2016) |
| 01/04/2016 | 132 | | ORDER granting 131 Defendant's Unopposed Motion to Vacate the Pre−Trial Conference. The trial preparation conference currently scheduled in this matter for 1/6/2016 is VACATED. The parties are DIRECTED to contact Chambers telephonically on or before 1/8/2016 to reschedule this hearing. The parties are to contact each other to set up a conference call prior to jointly calling Chambers at 303−335−2784. SO ORDERED by Judge Raymond P. Moore on 1/4/2016. Text Only Entry(cpear) (Entered: 01/04/2016) |
| 01/07/2016 | 133 | | RESPONSE to 125 First MOTION for Extension of Time to *File a Motion in Limine* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Attachments: # 1 Exhibit 1)(Tondre, Brice) (Entered: 01/07/2016) |
| 01/08/2016 | 134 | | MINUTE ORDER. Trial Preparation Conference RESET for 1/21/2016 at 01:00 PM in Courtroom A 601 on the sixth floor of the Alfred A. Arraj United States Courthouse located at 901 19th Street, Denver, Colorado, before Judge Raymond P. Moore. SO ORDERED by Judge Raymond P. Moore on 1/8/2016. (Text Only Entry) (rmsec ) (Entered: 01/08/2016) |
| 01/12/2016 | 135 | | NOTICE of Entry of Appearance by Joel James Fulton on behalf of Monte Gore, Cindy Hardey, Bobbi Priestly, Fred WegenerAttorney Joel James Fulton added to party Monte Gore(pty:dft), Attorney Joel James Fulton added to party Cindy Hardey(pty:dft), Attorney Joel James Fulton added to party Bobbi Priestly(pty:dft), Attorney Joel James Fulton added to party Fred Wegener(pty:dft) (Fulton, Joel) (Entered: 01/12/2016) |
| 01/15/2016 | 136 | | REPLY to Response to 125 First MOTION for Extension of Time to *File a Motion in Limine* filed by Defendant Cindy Hardey. (Attachments: # 1 Exhibit A)(Schimberg, Timothy) (Entered: 01/15/2016) |
| 01/15/2016 | 137 | | MOTION to Strike *Plaintiff's Expert Witness Dr. Jena Questen* by Defendant Cindy Hardey. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit |

| | | | |
|---|---|---|---|
| | | | Exhibit B, #_3 Exhibit Exhibit C, #_4 Exhibit Exhibit D, #_5 Proposed Order (PDF Only) Proposed Order)(Fulton, Joel) (Entered: 01/15/2016) |
| 01/20/2016 | 138 | | MINUTE ORDER. The Trial Preparation Conference set for 1/21/2016 at 1:00 PM in this matter is hereby VACATED. SO ORDERED by Judge Raymond P. Moore on 1/20/2016. (Text Only Entry) (rmsec ) (Entered: 01/20/2016) |
| 01/21/2016 | 139 | | NOTICE of Settlement by Plaintiffs Randall J. Hatlee, Ronald L. Swift (Tondre, Brice) (Entered: 01/21/2016) |
| 01/21/2016 | 140 | | MINUTE ORDER In light of 139 Notice of Pending Settlement, Dismissal Paper due by 2/5/2016. Jury trial set before Judge Moore 2/1/2016 through 2/5/2016 is vacated. By Magistrate Judge Michael J. Watanabe on 1/21/2016. (emill) (Entered: 01/21/2016) |
| 02/05/2016 | 141 | | STIPULATION of Dismissal of Party *Cindy Hardey, Bobbi Priestly, Monte Gore, Fred Wegener* by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 02/05/2016) |
| 02/05/2016 | 142 | | Party Bobbi Priestly, Fred Wegener, Monte Gore and Cindy Hardey terminated pursuant to 141 the notice of dismissal or stipulation to dismiss filed in this case Text Only Entry (cthom, ) (Entered: 02/08/2016) |
| 02/11/2016 | 143 | | ORDER dimissing as moot 125 Motion for Extension of Time to File and 137 Motion to Strike. Claims and causes of action asserted against Defendants Cindy Hardey, Bobbi Priestly, Monte Gore, and Fred Wegener in their individual and official capacities are dismissed with prejudice. Each party to pay their own costs and fees. The Clerk shall enter judgment in favor of Defendant Ashley Olds pursuant to the 110 Order entered on 9/29/2015. Entered by Judge Raymond P. Moore on 2/11/2016. (cpear) (Entered: 02/11/2016) |
| 02/11/2016 | 144 | 72 | FINAL JUDGMENT in favor of Defendant Ashleigh Olds and against Plaintiffs, Randall J. Hatlee and Ronald L. Swift. Entered by the Clerk of the Court on 2/11/2016. (cpear) (Entered: 02/11/2016) |
| 02/18/2016 | 145 | | Costs Taxed in amount of $ 5556.44 against Plaintiffs Randall J. Hatlee and Ronald L. Swift (cthom, ) (Entered: 02/18/2016) |
| 02/24/2016 | 146 | 74 | NOTICE OF APPEAL by Plaintiffs Randall J. Hatlee, Ronald L. Swift (Filing fee $ 505, Receipt |

| | | | Number 1082−4845000) (Tondre, Brice) (Entered: 02/24/2016) |
|---|---|---|---|

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COME the Plaintiffs, Randall J. Hatlee and Ronald L. Swift, by and through their

attorney, Brice A. Tondre, and for their first amended complaint against Defendants named

hereinafter state as follows:

### PARTIES

1.      Plaintiff, Randall J. Hatlee ("Mr. Hatlee"), was at all relevant times engaged in

horse ranching in Park County, Colorado

2.      Plaintiff Ronald L. Swift ("Mr. Swift") was at all relevant times engaged in horse

ranching in Park County, Colorado.

3.      Defendant Cindy Hardey ("Deputy Hardey") was at all relevant times a law

enforcement officer employed by the Park County Sheriff's Office.

1

24

4.     Defendant Bobbi Priestly, who held the rank of Sergeant ("Sgt. Priestly"), was at all relevant times a law enforcement officer employed by the Park County Sheriff's Office and was the supervisor of Deputy Hardey.

5.     Defendant Monte Gore, who was the Undersheriff ("Undersheriff"), was at all relevant times a law enforcement officer employed by the Park County Sheriff's Office and was the supervisor of Deputy Hardey and Sgt. Priestley.

6.     Defendant Fred Wegener ("Sheriff Wegener") was at all relevant times the duly elected sheriff of Park County, Colorado. Sheriff Wegener is sued in both his official capacity and his individual capacity. He was involved in the investigation and decisions to seize Plaintiffs' property and prosecute them which are the subject of this action. The office of the sheriff was party to a contract with Plaintiffs which was breached.

7.     Defendant Ashleigh Olds, D.V.M. ("Dr. Olds") is a licensed veterinarian whose baseless statements to the other Defendants, animal cruelty activists and the news media resulted in the seizure of Plaintiffs' property and their prosecution.

## JURISDICTION

8.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1367 in that two of the causes of action alleged herein arise under the laws and constitution of the United States and the other causes of action are so related to the federal causes of action that they form part of the controversy under Article III of the United States Constitution.

## FACTS COMMON TO ALL CLAIMS

9.     On February 13, 2012, Routt County officer Dawn Smith called Defendant Priestly and reported that, while conducting a follow-up at the Echo Valley Ranch of a matter

2

25

which resulted in a mare and a colt being brought to Echo Valley Ranch, she noted that seven of the other horses were very thin.

10.     On February 14, 2012, Defendant Priestley informed Defendant Hardey of the report from Routt County officer Smith. Defendant Hardey arranged to do a welfare check of the horses at the Echo Valley Ranch on February 16, 2012.

11.     On February 16, 2012, Defendants Hardey and Olds and Agent Smith arrived at Echo Valley Ranch. Defendant Olds was there to aid Agent Smith with the seizure of Bear and Defendant Hardey was there to conduct a welfare check of the other horses. Defendant Hardey found that seven of the horses were thin and that 34 were in good condition, that one of the seven thin horses was down and under the care of a veterinarian and that the seven thin horses had hay and water available.

12.     Bear was to be transported to Defendant Olds' clinic for evaluation and treatment. Defendant Olds demanded that the seven thin horses be ordered seized by Defendant Hardey and taken to Dr. Olds' clinic for evaluation. Without factual basis or investigation, Defendant Olds stated that the seven thin horses had been starved, mistreated and were suffering from neglect. Defendant Olds made this demand these statements without conducting the requisite evaluation of the horses pursuant to the Henneke Body Condition Scoring System, without interviewing Messrs. Hatlee and Swift with respect to their belief regarding why the seven horses were thin, without contacting the veterinarian for the herd and without developing a differential diagnosis, all of which was below the standard of care for a veterinarian.

13. Dr. Olds statement that the seven thin horses and Bear had been starved, mistreated and were suffering from neglect was below the standard of care for a veterinarian. She failed to

3

26

establish a differential diagnosis and evaluate each potential cause of the condition of the eight

horses. Faced with a herd of 40 horses, 32 of which are in excellent condition, starvation,

mistreatment and neglect had to be low on the differential list of any reasonably trained

veterinarian. Dr. Olds purports to have ruled out botulism in Bear but did nothing to rule out

other toxic causes of the condition of the eight horses. This was below the standard of care for a

veterinarian. Making a report to the Park County Sheriff's Office that the eight horses were

starved, mistreated and suffering from neglect was without reasonable cause to know or suspect

that the statement was true. Ultimately, after reasonable professional investigation, it was

determined that the probable cause of the illness of the seven horses was the consumption of

toxic weeds.

14.     Dr. Olds was acting under color of state law, to wit C.R.S. §12-64-121, when she

made the false statements to the Sheriff's Office.

15.     Dr. Horton, the herd veterinarian, was of the opinion that much more

analysis had to be done before a conclusion as to what was causing the condition of the

seven horses could be reached.

16.     Defendant Olds' demands were reported to Defendant Priestley who instructed

Defendant Hardey to tell Defendant Olds to leave with the horse being seized by Agent Smith.

17.     Defendant Priestly then conferred with Kate Anderson, D.V.M., a Colorado

Department of Agriculture veterinarian, Scott Dutcher, chief investigator with the Bureau of

Animal Protection, Dr. Britt of Rocky Top Veterinary Services and Defendant Hardey, all of

whom agreed that the appropriate thing to do was to issue a notice of warning and leave the

seven horses in the care of the Plaintiffs, giving Plaintiffs thirty days to demonstrate that the

4

27

horses were not being mistreated. Defendant Hardey did not believe that leaving the horses with Plaintiffs would endanger them and, based upon unanimous agreement, issued the warning.

18.     Defendant Olds was infuriated by the decision to allow the seven horses to remain under the care of Messrs. Hatlee and Swift. After returning to her clinic, Dr. Olds contacted Channel 7 News and Harmony HorseWorks and made her unsubstantiated claims of animal cruelty for the purpose of generating an outcry from Harmony Horse Works, a major client of Dr. Olds. Her intent was to cause an outcry which would force the Sheriff's Office to seize the seven horses and place them in Dr. Olds' care. Her unsubstantiated claims were broadcast on the evening and night of the day after she made the demand for seizure of the seven horses. Dr. Olds on February 16, 2012 at 4:35 p.m. by e-mail to Defendant Hardey again made the still unfounded statement that the horses were suffering from a "very clear cut case of starvation and malnutrition"

19.     When Harmony HorseWorks became aware of the consensus decision of the Park County Sheriff's Office and the Department of Agriculture, in reliance on the opinions of and at the urging of Defendant Olds, it mounted an outcry demanding that the horses be removed from the management of the Plaintiffs. In the words of Harmony HorseWorks on February 18, 2012, "wait and see what happens after the email blast goes out." This outcry was directed at Defendants Wegener and Gore, the sheriff and undersheriff, who succumbed to the political pressure and asked Defendants Priestly and Hardey to arrange for removal of the six horses from Echo Valley Ranch. One of the horses died on February 16, 2012, from an abscess of the heart which was established by necropsy to not be the result of malnutrition or neglect.

20.     In consideration for agreeing to move the six horses into protective custody, the

5

Sheriff's Office, acting through Defendants Wegener, Gore, Priestly and Hardey, agreed to allow the horses to remain under the management and control of Plaintiffs for 30 days, thus allowing them to demonstrate that they were not abusing or neglecting the horses. The Sheriff's Office hoped and believed that this agreement would satisfy the activists and relieve it of the need to head off a nasty and potentially violent confrontation.

21.      On February 19, 2012, Defendant Hardey requested that Plaintiffs place the six horses in protective custody. The Plaintiffs agreed to place them in the custody of Kirsten LeBeau.

22.      The protective agreement did not satisfy Harmony HorseWorks, which was emboldened by the unsupported conclusions of Dr. Olds. Harmony HorseWorks continued to cry out for the Park County Sheriff's Office to seize the six horses. Defendant Olds joined in the outcry and advocated prosecution of Plaintiffs for animal cruelty. Defendant Hardey remained of the opinion that leaving the horses with the owners would not endanger them.

23.      On February 21, 2012, Defendant Priestley received a call from Dr. Horton, D.V.M., Plaintiffs' treating veterinarian who told her that it was not clear what caused the weight loss in the six horses and that a lot of testing needed to be done in order to determine the cause.

24.      On February 22, 2012, Defendant Hardey, at the direction of Defendants Wegener Gore and Priestley, who again succumbed to the political pressure, sought and received a warrant to seize the six horses from Plaintiffs. Defendant Hardey's affidavit in support of the request for a warrant was a breach of the protective custody agreement and failed to inform the judge who issued the warrant of material facts. The affidavit failed to inform the judge who issued the warrant: (1) that there was an agreement to leave the horses in the care and custody of the

6

19

Plaintiffs for 30 days in order to allow them to demonstrate that the horses were not neglected;
(2) that two veterinarians and a Department of Agriculture official agreed that the agreement was
reasonable; (3) that the horses were well treated at the facility where they were housed; (4) that
the horses were not in danger where they were housed; and (5) that the true intent of the seizure
was to silence the protestations of Dr. Olds and Harmony HorseWorks. The judge who presided
over the prosecution of the Plaintiffs found that the omissions were material, made in bad faith
and would have led to refusal to issue the warrant if disclosed to the issuing judge.

      25.     Defendants Priestly, Gore and Wagener, despite their knowledge that seizure of
the horses was not permissible under the facts or the law, directed Defendant Hardey to obtain a
warrant. They undertook this approach in hopes that it would prevent Harmony HorseWorks and
its followers from taking matters into their own hands which they were threatening to do if the
Sheriff's Office did not act to their satisfaction. Said Defendants failed to take the proper course
of prosecuting those who were threatening a breach of the peace. This was an attack on the
innocent to avoid prosecuting the guilty.

      26.     On February 23, 2012, Defendants Hardey and Priestly executed the warrant and
issued summonses charging each Plaintiff with animal cruelty. Both the warrant and the
summonses were without probable cause to believe that the crime of animal cruelty had been
committed.

      27.     Seizure of the six horses deprived Plaintiffs of evidence material to their
avoidance or defense of a charge of animal cruelty.

      28.     During the course of the seizure which was from February 23, 2012 until April 10,
2012, one of the seized horses, Echo, was permanently disabled as a result of being overfed

30

alfalfa.

29.     During the course of the prosecution of the charges against the Plaintiffs the court

held that the warrant authorizing the seizure of the six horses was in violation of applicable

Colorado law, without probable cause and was procured by bad faith omissions. The court

ordered the horses returned to Plaintiffs and suppressed all evidence which was the fruit of the

seizure.

30.     Throughout the course of the investigation and prosecution the Sheriff's Office

deviated from its usual and customary practice of refusing to disclose the fruits of its

investigation to anyone other than the District Attorney and the defendant. The Sheriff's Office

provided documents to Harmony HorseWorks for fundraising projects and to prepare a

documentary film in which Defendant Olds broadcast her baseless claims and supported the fund

raising efforts of Harmony HorseWorks. This was done for the political benefit of Sheriff

Wagener the District Attorney.

31.     The charges against the Plaintiffs were tried to a jury which found them not guilty.

### FIRST CLAIM FOR RELIEF

32.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 31 above.

33.     At all times relevant to the claims asserted herein, each Defendant was acting

under color of state law.

34.     The Defendants, acting in concert, obtained a warrant which they used to seize the

six horses owned by Plaintiffs. The warrant was issued without probable cause in that it was

based on material omissions in violation of the Fourth Amendment to the United States

8

Constitution. Obtaining a warrant under these circumstances was a clearly established violation of the Fourth Amendment to the Constitution of the United States.

35.     Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to recover damages caused by the violation of their rights not to have their property unreasonably seized in violation of the Fourth Amendment to the United States Constitution. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover their attorney's fees and costs incurred in prosecuting this action.

36.     The unreasonable seizure of Plaintiffs' property severely injured them emotionally and caused them severe humiliation, embarrassment and loss of their good reputation.

37.     As a direct and proximate result of the conduct of the Defendants herein Plaintiffs have suffered emotional injuries, economic and non-economic damages, embarrassment and humiliation and loss of their good reputation.

38.     The conduct of the Defendants was in reckless and callous indifference to Plaintiffs' federally protected rights justifying the award of punitive damages.

## SECOND CLAIM FOR RELIEF

39.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 38 above.

40.     At all times relevant to the claims asserted herein, each Defendant was acting under color of state law.

41.     The conduct set forth above constitutes malicious prosecution of Plaintiffs by each of the Defendants in that it was done knowing it was without probable cause and was being done for political and economic purposes. As such, their conduct was malicious. The misconduct reaches constitutional proportions because the Defendants utilized misstatements and

omissions of material facts in order to initiate and continue the legal process to attempt to take Plaintiffs' property and their freedom. It was clearly established that malicious prosecution under color of state law is a violation of the Fourth Amendment to the Constitution of the United States

42.     The prosecution of Plaintiffs was terminated in their favor on the merits.

43.     Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to recover damages caused by the violation of their rights not to be maliciously prosecuted on the basis of false statements and material omissions in violation of the Fourth Amendment to the United States Constitution. Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover their attorney's fees and costs incurred in prosecuting this action.

44.     The malicious prosecution of Plaintiffs severely injured them emotionally and caused them severe humiliation, embarrassment and loss of their good reputation.

45.     As a direct and proximate result of the conduct of the Defendants herein, Plaintiffs have suffered emotional injuries, economic and non-economic damages and embarrassment, humiliation and loss of their good reputation.

46.     The conduct of Defendants was in reckless and callous indifference to Plaintiffs' federally protected rights justifying the award of punitive damages.

### THIRD CLAIM FOR RELIEF

47.     Plaintiffs incorporate by reference the allegations contained in paragraph 1 through 46 above.

48.     On February 19th, 2012, the Park County Sheriff's Office entered into an agreement with Plaintiffs to place the six horses in protective custody. This agreement was to protect Plaintiffs and their horses during the thirty days which Plaintiff were given by the Notice

10

of Warning to rectify the condition of the six horses and show that their condition was not due to neglect.

49.     Sheriff Wegener and/or Undersheriff Gore authorized the contract in order to satisfy Dr. Olds and Harmony HorseWorks, silence their outcry, relieve the Sheriff's Office from criticism by them and prevent a breach of the peace which was being threatened.

50.     On February 23, 2013, the agreement was breached by the Park County Sheriff's Office which caused the horses to be seized.

51.     This seizure deprived Plaintiffs of the opportunity to rectify the condition of the six horses and demonstrate that their condition was not caused by neglect.

52.     The breach resulted in the Plaintiffs' horses being seized and the Plaintiffs being charged with animal cruelty, a charge of which they were found not guilty.

53.     As a consequence of the breach, Plaintiffs suffered economic damages.

### FOURTH CLAIM FOR RELIEF

54.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 53 above.

55.     The criminal case was brought against the Plaintiffs and six of their horses seized on the basis of statements made by Defendant Olds which caused an outcry that resulted in the seizure and prosecution. Throughout the prosecution, Defendant Olds pressed the Park County Sheriff's Office and District Attorney to persist in the prosecution despite knowing that her claim that seven horses had been the subject of cruelty was without foundation and was done for her economic benefit. Dr. Olds harbored a grudge against Mr. Swift because he refused her request that he recommend her services to horse owners who patronized his feed store.

11

34

56.     Defendant Olds' statements were false and unfounded and therefore without probable cause.

57.     Defendant Olds was motivated by malice in that her motive was other than to bring justice to persons she thought had committed a crime. She was economically motivated.

58.     The criminal case ended in favor of the Plaintiffs.

59.     As a direct and proximate result of Defendant Olds' conduct Plaintiffs suffered economic and non-economic damages, embarrassment, humiliation and loss of their good reputation.

60.     The conduct of Defendant Olds was willful, wanton and reckless justifying the award of punitive damages.

WHEREFORE, Plaintiffs prays that the Defendants be cited to appear and answer herein and that upon trial of this matter Plaintiffs be awarded judgment for the damages found by the trier of fact, both compensatory and punitive, that they be awarded their attorney's fees and costs incurred in prosecuting this action, pre and post judgment interest allowed by law and that they be granted such other and further relief as the Court deems appropriate in the circumstances.

**PLAINTIFF DEMANDS TRIAL TO A JURY GUARANTEED BY THE
CONSTITUTION OF THE UNITED STATES AND PRESERVED BY RULE 38 F.R.C.P.**

/s/ Brice A. Tondre

_____

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado   80226
Telephone:  303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com

12

35

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true an correct copy of the foregoing was served on counsel for the Defendants this 1st day of November, 2013, addressed as follows:

Timothy P. Schimberg
t_schimberg@fsf-law.com

Andrea M. Bronson
a_bronson@fsf-law.com

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre

13

36

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

## FINAL PRETRIAL
## ORDER

### 1. DATE AND
### APPEARANCES

A pretrial conference was held in this matter on March 31, 2015, at 1:30 p.m. Plaintiffs

were represented by Brice A. Tondre. Defendants Hardey, Priestly, Gore and Wegener were

represented by Timothy Schimberg. Defendant Olds was represented by John Lebsack.

### 2. JURISDICTION

The Court possesses jurisdiction in this matter pursuant to 28 U.S.C. § 1343 and 1367.

### 3. CLAIMS AND DEFENSES

a. Plaintiffs' Claims

Plaintiffs claim that all Defendants, while acting under color of state law, violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution by causing Plaintiffs' to be seized and by causing Plaintiffs to deprived of their rights under contracts with the Sheriff without due process and by causing them to be prosecuted without probable cause.

Plaintiff also claims that there was a failure to train Hardey and a ratification of Hardey's conduct.

Plaintiffs also claim that the Sheriff's Office breached its contract with the Plaintiffs and that Defendant Olds maliciously caused Plaintiffs to be prosecuted and caused the prosecution to be continued.

On February 16, 2012, Defendant Cindy Hardey went to Echo Valley Ranch to investigate a report of skinny horses. Hardey reported her findings to her supervisor, Bobbi Priestly, who contacted Kate Anderson, D.V.M., Britt Stubbelfield, D.V.M., and Scott Dutcher, chief State animal control investigator, and related to them the findings of Officer Hardey. After a thorough discussion, there was a unanimous agreement that it was in the best interests of the horses to issue a Notice of Warning and leave the horses at Echo Valley Ranch. The notice of warning provided that Plaintiffs would have thirty days to put weight on the skinny horses.

Defendant Ashleigh Olds, a veterinarian, went to the ranch at the same time. She was asked by Barbara Wright of Harmony HorseWorks to go to the ranch and pick up one of the

2

skinny horses on behalf of Routt County. Olds demanded that the other six skinny horses be seized. Without following the standard of care with regard to diagnosis, Olds aggressively asserted that the seven horses had been starved. Officer Priestly instructed Hardey to tell Olds to take the one horse she was there to remove and leave.

Captain Sven Bonnelycke, head of Park County Animal control, considered Olds to be unprofessional and instructed Hardey and Priestly to have the horses evaluated by an independent veterinarian. Hardey and Priestly recklessly failed to do so.

The decision to leave the six horses at Echo Valley Ranch infuriated Olds and Wright who embarked on a publicity campaign designed to force the Park County Sheriff to seize the six horses.

By February 19, 2012, the uproar generated by Olds and Wright reached a level which caused the Sheriff's Office to be fearful for the safety of Plaintiffs and their horses. In order to discharge the duty of the Sheriff to protect Plaintiffs and their horses, Undersheriff Gore asked Priestly to attempt to obtain Plaintiffs' agreement to place the horses in protective custody. Priestly asked Hardey to attempt to negotiate an agreement with Plaintiffs. Plaintiffs agreed on the condition that they would not be prosecuted if they demonstrated during the thirty day period of the agreement that they had not neglected the six horses.

On February 19, 2012, the six horses were moved to the ranch of Martin VanPoolen and Kirsten LeBeau where they were housed indoors. This caused the uproar to grow even louder. The threats continued. It became clear that the only thing which would quiet the uproar was seizure of the horses. On February 21, 2012, Undersheriff Gore contacted Olds to inquire if she would take temporary custody of the horses if they were seized. She responded that she would.

3

39

On February 22, 2012, Hardey obtained a warrant to seize the horses. On February 23, the horses were seized and Plaintiffs were charged with animal cruelty. Olds, Wright, Ferraro and Courtney were jubilant.

On April 10, 2012, the judge presiding over the criminal case found that the warrant had been obtained by Hardey's bad faith failure to disclose material facts and ordered the horses returned.

The order renewed the uproar. Undersheriff Gore assured Olds, Wright, Ferraro and Courtney that he was with them in their desire for an aggressive and successful prosecution. In his words, "I am with you."

Justice was done, Plaintiffs were acquitted.

Plaintiffs seek the following damages:

| | |
|---|---|
| Legal fees to defend criminal case | $ 85,234.17 |
| Lost income | 850,000.00 |
| Lost value of feed store | 180,000.00 |
| Humiliation, embarrassment, indignity, public disgrace and loss of reputation | 2,000,000.00 |
| Punitive damages | 2,000,000.00 |
| Attorney's fees and costs for prosecuting this case | TBD |

**Defenses of Cindy Hardey, Bobbi Priestly, Monte Gore and Fred Wegener**

**(hereafter referred to as PCSO Defendants)**

PCSO Defendants took humane measures and did the right thing in removing six horses from the Echo Valley Ranch, managed by Plaintiff Swift, in February, 2012.

In mid-February, 2012, PCSO was contacted by Routt County Sheriff's Office – Animal Control Officers as well as Sheriff Wiggins, concerning the condition of the horses

4

observed by the ACOs on February 13, 2012 at Echo Valley Ranch ("EVR"). In checking on two horses released to the care and custody of Mr. Hatlee, the Routt County ACOs found out that one horse had passed away weeks before, without notice to them. The other horse that was the subject of their welfare check, was in "deplorable" condition, was emaciated, recumbent in a stall filled with muck, feces and urine. The Sheriff reported that "the animal has been seriously abused once again." It was further reported that there were other horses at EVR exhibiting the same or similar conditions and he requested that PCSO look into the matter.

Defendant ACO Hardey performed a welfare check on February 16, 2012, and personally observed the conditions reported by Routt County. Dr. Ashleigh Olds was also present, at the behest of Routt County, to remove the above-referenced recumbent colt. Due to the emaciated and extremely thin condition of other horses on the EVR property, Ms. Hardey issued a Notice of Warning. Based upon the conditions she observed, an investigation ensued. Based upon Plaintiffs' representation that the horses were under the care of a licensed veterinarian, state representatives opined that with careful observation, the horses might stay at the ranch. Subsequently, PCSO was advised that the horses exhibiting an emaciated state were not under the care and treatment of a licensed veterinarian.

PCSO not only heard from Routt County, but also from Dr. Olds following up on her visit to the ranch on February 16. In no uncertain terms, Dr. Olds opined that the horse she removed was the subject of a "very clear cut case of starvation and malnutrition." She also informed PCSO that other horses appeared to be suffering from neglect as well.

Contemporaneously with the transfer, the PCSO Defendants communicated with the alleged treating veterinarian who opined that regardless of the cause of the condition of the horses, the Plaintiffs had waited far too long to take action for the horses' care, evaluation and

5

41

treatment. This information was the motivating factor for ACO Hardey to prepare an affidavit in support for the seizure of the six horses involved. Based upon the totality of circumstances and information provided to Hardey, she had more than a reasonable suspicion that some horses at Echo Valley Ranch had suffered from neglect and animal cruelty. Upon rescuing the horses and transferring them to an equine center, improvement in the horses' condition was observed almost immediately based upon a regiment of proper feed, hay and water. Those caring for the removed horses and a well-respected veterinarian who was providing veterinary care, opined that the horses exhibited signs of starvation/malnutrition.

PCSO began receiving a multitude of communications from horse owners in the Evergreen area expressing a wide range of emotion and innuendo as to what they might do. Undersheriff Gore, assessing the situation, to include the potential for violence and/or aggressive acts by either the local horse owners or the Plaintiffs, suggested a transfer of the emaciated horses to an undisclosed location. Plaintiffs agreed and moved six horses.

While the horses were transferred from Echo Valley Ranch, Plaintiffs and the Animal Control Office agreed that the measure was for the protection of the horses. PCSO Defendants submit that the agreement to do so does not rise to the level of an enforceable contract due to the lack of consideration, but does reflect the objective of these Defendants to provide a safe environment for both horses and the Plaintiffs.

PCSO did not succumb to any public pressure. Rather, through skillful communication by PCSO, a tense and perhaps injurious situation had been diffused. This included attendance at a fundraiser in Evergreen where none of the PCSO representatives made any presentations, but rather appeared in appreciation for the fact that money generated was going to assist in paying for the veterinary care, treatment and boarding of the removed horses.

6

42

In April, 2012, a bond hearing was conducted in the county court. County Court Judge Green found that there was probable cause that animal cruelty/neglect had occurred at Echo Valley Ranch, but that there was no exigent circumstances for the horses to remain at another facility. Per the court's Order, the horses were returned to Echo Valley Ranch. Following that hearing, District Attorney Thom LeDoux took over the prosecution. He did not succumb to political pressure either and based upon his own independent professional judgment and, as an elected official of the State of Colorado, made a decision to continue the prosecution believing that the evidence was sufficient to convict the Plaintiffs of animal cruelty. PCSO Defendants had no role in the decision making regarding further prosecution.

PCSO Defendants submit that Plaintiffs do not, and cannot, support the alleged damage claims and that the discovery process supports the fact that the Plaintiffs never had a sufficient amount of money to purchase the quality and quantity of hay necessary for the sizeable herd of horses at the ranch.

PCSO Defendants submit that they are clothed with qualified immunity and that the Plaintiff's claims asserted against them are barred. They assert that their conduct was motivated in good faith and in accordance with Colorado law. That their actions were objectively reasonable in light of the totality of circumstances and it was the conduct of the Plaintiffs themselves in allowing the horses to become emaciated and in poor physical condition that necessitated appropriate action being taken. Defendants also assert that the Plaintiffs have failed to mitigate their damages, if any. That their damages, if any, were caused by their own acts or omissions. That for some of the claims Defendants Wegener, Gore and Priestly had no personal participation. They assert that there was not a legally binding agreement by and between PCSO and the Plaintiffs. They assert probable cause existed to believe that the Plaintiffs had committed the offense of cruelty to animals.

7

*[handwritten annotation]* PC50 Defendants Affirmative Defense That plaintiffs Alleged Injuries and DAMAGES, if Any, were the Result of The conduct of Third-parties over whom

*[right margin handwritten, vertical]* limited to the extent of contesting any and all of these Defenses in

43

*[Handwritten annotations:]* PC50 Defendants Affirmation Defense 9. Plaintiffs Failed to Mitigate Damages, if any. Defendant Olds Joins in All Affirmative

*[Left margin handwritten:]* MX file 3-31-15

**Defenses of Dr. Olds**   *[Handwritten:]* Defenses by PC50 Defendants

Dr. Olds is a veterinarian who came to the plaintiffs' Echo Valley Ranch on February 16, 2012, at the request of the Routt County Sheriff's Office to assist the Park County Sherriff's Office in the seizure of a horse named Little Bear that was under the jurisdiction of Routt County. At the ranch, Dr. Olds observed eight horses in very poor physical condition (Bear and Maggie in the barn, and six horses in pens outside the barn). Dr. Olds had a reasonable basis to suspect that those horses showed signs consistent with starvation and neglect. Based on her observations at the ranch, Dr. Olds in good faith informed Officer Hardey of Park County that the eight horses appeared to be suffering from neglect. She did not make any false statements or provide any incorrect information about the horses or the plaintiffs. She did not instigate a public outcry against the plaintiffs. Her conduct did not fall below the standard of care. She was not motivated by political or economic factors. Dr. Olds was not acting under color of state law. Dr. Olds is entitled to qualified immunity from civil liability. Dr. Olds is also entitled to statutory immunity under C.R.S. § 12-64-121(4) (2013). The good faith of Dr. Olds shall be presumed pursuant to C.R.S. § 12-64-121(4) (2013). Because Dr. Olds had a reasonable suspicion that the horses had been victims of animal cruelty, she cannot be liable for malicious prosecution.

## 4. STIPULATIONS

1. Plaintiffs were each charged with four misdemeanor counts cruelty to animals in violation of C.R.S. 18-9-202(1)(a)

2. Plaintiffs were acquitted of all charges against them at a trial in February 2013.

3. On February 16, 2012, the horse known as Bear or Little Bear was taken

*[Handwritten bottom right:]* 44

from plaintiffs' ranch to defendant Olds' veterinary hospital.

4. Six of Plaintiffs' horses were seized by the Park County Sheriff's Office on February 23, 2012.

5. Defendants note that additional stipulations were set forth by the parties in the Case Management Order previously entered by the Court. Defendants believe that these stipulations should still be in effect.

6. Defendant Olds contends that the facts set forth in Defendant Olds' separate Statement of Undisputed Material Facts (ECF #62) that were not denied or responded to by Plaintiffs in ECF #73-2, 73-3 and 73-4 should be considered undisputed. Plaintiffs do not stipulate to this.

7. The Park County Defendants contend that the facts set forth in their Statements of Undisputed Material Facts (ECF #64, 65 and 66) that were not denied or responded to by Plaintiffs should be considered undisputed. Plaintiffs do not stipulate to this.

## 5. PENDING MOTIONS

Plaintiffs' Motion to supplement the Record with Respect to Summary Judgment Motions Number 61, 64, 65 and 66 [#95], opposition thereto [#97] and [#98] and a reply in support of the motion to supplement [#100].

PSCO's Motion for Summary Judgment Regarding Plaintiffs' Third Claim for Relief [Doc. 64]; Motion for Judgment on the Pleadings Regarding Official Capacity Claims [Doc. 63]; Motion for Summary Judgment Regarding Individual Capacity Claims [Doc. 65];

and Motion for Leave to File a Reply Brief in Support of the Objection to the Magistrate's Recommendation [Doc. 102].

Defendant Olds' Motion to Dismiss Claims Against Her in Amended Complaint filed November 19, 2013 (ECF No. 31); Plaintiff's Memorandum in Opposition to Motion to Dismiss filed December 10, 2013 (ECF No. 35); Reply in Support of Motion to Dismiss filed December 20, 2015 (ECF No. 36).

Defendant Olds' Motion for Summary Judgment filed December 15, 2014 (ECF No. 61); Plaintiff's Memorandum in Opposition filed January 3, 2015 (ECF No. 67); Defendant Olds' Reply in Support of Motion for Summary Judgment filed January 20, 2015 (ECF No. 81).

## 6. WITNESSES

Attached hereto as Exhibit A is Plaintiffs' list of witnesses.

Attached hereto as Exhibit B is PCSO Defendants' list of witnesses

**a.      Nonexpert witnesses to be called by Defendant Olds:**

>      (1)      Witnesses who will be present at trial (see Fed. R. Civ. P. 26(a)(3)(A))
>
>>           a.   Ashleigh Olds, DVM (also listed below as an expert).  Dr. Olds will testify about the request for her to go to Echo Valley Ranch on February 16, 2012; her observations at the ranch; her care of Bear; her communication with Officer Hardey; and all issues relating to the claims against her.  She is expected to testify in person.
>
>      (2)      Witnesses who may be present at trial if the need arises (see Fed. R. Civ. P.

46

26(a)(3)(A))

    a. Troy Murdock. He went to Echo Valley Ranch on February 16, 2012, and observed the condition of Maggie, Bear, and the six horses. He cared for Bear when he was taken to Aspen Creek Veterinary Hospital. He is expected to testify in person.

    b. Dawn Smith (also listed below as an expert). She is an animal control officer with the Routt County Sheriff's Office who will testify regarding her observations of Little Feather and Bear while they were in Routt County and after they were moved to Echo Valley Ranch. She will also testify about her communication with the Park County Sheriff's Office. She is expected to testify in person.

    c. Cindy Del Valle (also listed below as an expert). She is an animal control officer with the Routt County Sheriff's Office who will testify regarding her observations of Little Feather and Bear while they were in Routt County and after they were moved to Echo Valley Ranch. She will also testify about her communication with the Park County Sheriff's Office. She is expected to testify in person. She is expected to testify in person.

    d. Defendant Cindy Hardey. She was an animal control officer with the Park County Sheriff's Office. She observed the condition of the horses at Echo Valley Ranch on February 16, 2012. She investigated the incident and issued misdemeanor animal cruelty charges to plaintiffs. She is expected to testify in person.

    e. Defendant Bobbi Priestly (also listed below as an expert). She is a

47

sergeant in the animal control department of the Park County Sheriff's Office. She was involved in the investigation and filing of charges against plaintiffs. She is expected to testify in person.

f. Defendant Monte Gore. He is Undersheriff of Park County. He was involved in the investigation and filing of charges against plaintiffs. He is expected to testify in person.

g. Defendant Fred Wegener. He is sheriff of Park County. He is expected to testify in person.

h. Jenny Plutt. She is a corporal in the Park County Sheriff's Office. She was at Echo Valley Ranch on February 16, 2012, observed the condition of the horses, and took photos. She is expected to testify in person.

i. Thom LeDoux (also listed below as an expert). He is District Attorney of the 11th Judicial District of Colorado. He prosecuted the charges against the plaintiffs. He is expected to testify in person.

j. Rod Cameron. He is a farrier who lives in Golden, Colorado. He did farrier work on horses at Echo Valley Ranch and observed the condition of the horses there, including Bear, in January 2012. He is expected to testify in person.

k. Rhonda Cameron. She is the spouse of Rod Cameron and handles his business records, including the records of his visit to Echo Valley Ranch in January 2012. She is expected to testify in person.

l. Melinda Liverant. She lives in Bailey, Colorado. She will testify about her observations of Mr. Swift's care of horses and his reputation

12

48

in the community. She is expected to testify in person.

m. Barbara Wright. She is chairman of the board of Harmony
HorseWorks which is a horse rescue. Routt County contacted her to
help with the seizure of Bear. She observed Bear after he was taken to
Aspen Creek Veterinary Hospital. She is expected to testify in person.

n. Scott Toppin, DVM, Littleton Equine Hospital. He was involved in
the care of the six horses after they were taken to Harmony
Equine/Dumb Friends League. He will testify about his observations
of the horses. He is expected to testify in person.

o. Bruce Carpenter. 303-838-7688, Cell 303-519-9173. 202 CR 1034,
Bailey, CO 80421. He has sold hay to Mr. Swift. He will testify about
an incident where Mr. Hatlee was taking Mr. Carpenter's hay from Mr.
Carpenter's truck without authorization. He is expected to testify in
person.

p. Peter Petlak. He is a friend of the plaintiffs who will testify about his
observation of horses at Echo Valley Ranch and his discussions with
Mr. Hatlee about the feeding of horses at Echo Valley Ranch. He is
expected to testify in person.

q. Any witness necessary for impeachment.

r. Any witness necessary for rebuttal.

(3) Witnesses where testimony is expected to be presented by means of a
deposition and, if not taken steno graphically, a transcript of the pertinent portions of
the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B).

a. None at this time.

13

49

b.   **Expert witnesses to be called by Defendant Olds:**

(1)   Witnesses who will be present at trial (see Fed. R. Civ. P. 26(a)(3)(A))

   a.   Ashleigh Olds, DVM. She is a veterinarian who will testify about her observations at Echo Valley Ranch on February 16, 2012, and her involvement with the investigation by the sheriff's office. She is expected to testify in person.

(2)   Witnesses who may be present at trial (see Fed. R. Civ. P. 26(a)(3)(A))

   a.   Jenifer R. Gold, DVM. She is a veterinarian who will testify as an expert witness as set forth in her reports. She is expected to testify in person.

   b.   Dr. Richard Leone, DVM. He is a veterinarian who will testify as an expert witness as set forth in his reports. He is expected to testify in person.

   c.   Amy Murdock, DVM. She is a veterinarian who provided care and treatment for Bear when he came to Aspen Creek. She is expected to testify in person.

   d.   Shannon Harland, DVM. She is a veterinarian who provided care and treatment for Bear when he came to Aspen Creek. She is expected to testify in person.

   e.   Lois Toll, DVM. She is a veterinarian who will testify as an expert witness as set forth in the expert disclosures. She cared for the six horses after they were taken to Harmony Equine/Dumb Friends League. She is expected to testify in person.

   f.   Michael H. Gotchey, DVM. He is a veterinarian who will testify as an

14

50

expert witness as set forth in the expert disclosures  He observed Bear while in Routt County and he provided information to the Routt County animal control officers about the condition of Bear.  He is expected to testify in person.

g.  Dawn Smith.  She is an animal control officer with the Routt County Sheriff's Office who will testify as set forth in the expert disclosures. She will testify regarding her observations of Little Feather and Bear while they were in Routt County and after they were moved to Echo Valley Ranch.  She will also testify about her communication with the Park County Sheriff's Office.  She is expected to testify in person.

h.  Cindy Del Valle.  She is an animal control officer with the Routt County Sheriff's Office who will testify as set forth in the expert disclosures. She will testify regarding her observations of Little Feather and Bear while they were in Routt County and after they were moved to Echo Valley Ranch.  She will also testify about her communication with the Park County Sheriff's Office.  She is expected to testify in person.

i.  Garret Leonard.  He is manager of Harmony Equine/Dumb Friends League and will testify about the care of the six horses in question in February-April 2012.  He is expected to testify in person.

j.  Bobbi Priestley.  She is an animal control officer with the Park County Sheriff's Office.  She will testify as set forth in her deposition and the expert disclosures by the Park County defendants.  She is expected to testify in person.

k.  Thom LeDoux.  He is the District Attorney for the 11th Judicial District.

15

51

He will testify as set forth in the disclosures by the Park County

defendants. He is expected to testify in person.

J. Matthew Giacomini. He is a lawyer who will testify regarding the

reasonableness of the claimed damages for attorney fees in the

underlying case. He is expected to testify in person.

(3) Witnesses where testimony is expected to be presented by means of a

deposition and, if not taken steno graphically, a transcript of the pertinent portions of

the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B).

a. None at this time.

## 7. EXHIBITS

(1) Plaintiff(s): Attached hereto as Exhibit C is Plaintiffs' list of exhibits.

(2) Defendant(s): Attached hereto as Exhibit D is PCSO Defendants' list of exhibits

**Defendant Olds:**

B-1. Photos of Bear taken in Routt County.

B-2. Photos of Bear taken on February 13, 2012.

B-3. Photos of Bear taken on February 16, 2012.

B-4. Photos of Bear taken after February 16, 2012.

B-5. Photos of Maggie taken on February 16, 2012.

B-6. Photos of Chance taken on February 16, 2012.

B-7. Photos of Chance taken at Dumb Friends/Harmony Equine Center.

B-8. Photos of Echo taken on February 16, 2012.

B-9. Photos of Echo taken at Dumb Friends/Harmony Equine Center.

16

B-10.    Photos of Fiona taken on February 16, 2012.

B-11.    Photos of Fiona taken at Dumb Friends/Harmony Equine Center.

B-12.    Photos of Lena taken on February 16, 2012.

B-13.    Photos of Lena taken at Dumb Friends/Harmony Equine Center.

B-14.    Photos of Midnight taken on February 16, 2012.

B-15.    Photos of Midnight taken at Dumb Friends/Harmony Equine Center.

B-16.    Photos of River taken on February 16, 2012.

B-17.    Photos of River taken at Dumb Friends/Harmony Equine Center.

B-18.    Photos of groups of horses taken on February 16, 2012.

B-19.    Photos of pens and water tanks at Echo Valley Ranch on February 16, 2012

B-20.    Photos taken by Dr. Olds at Echo Valley Ranch on February 16, 2012.

B-21.    Timberline Equine treatment records for the Six Horses.

B-22.    Timberline Equine treatment records for Bear.

B-23.    Timberline Equine treatment records for Maggie.

B-24.    Necropsy Report on Maggie.

B-25.    Timberline blog post April 26, 2012.

B-26.    Dr. Horton email May 5, 2012.

B-27.    Statement of the Veterinarian-Client-Patient Relationship.

B-28.    Hatlee court history.

B-29.    Aerial photo of Echo Valley Ranch.

B-30.    Aerial photo of Echo Valley Ranch, larger scale.

B-31.    Portions of the Park County Sheriff's Office Records.

B-32.    Records of Bear at Aspen Creek Veterinary Hospital.

B-33.    Dr. Olds email and summary of findings, February 16, 2012.

17

53

B-34.    Written declaration by Dr. Olds.

B-35.    Troy Murdock letter.

B-36.    Littleton Equine Records for the Six Horses.

B-37.    Dr. Toll report, May 23, 2012.

B-38.    Chart of weight gain of 6 horses

B-39.    Horse Body Condition Score Chart

B-40.    Exhibits necessary for rebuttal.

B-41.    Exhibits necessary for impeachment.

    (3)    Other Parties:

b.    Copies of listed exhibits must be provided to opposing counsel and any *pro se* party no later than 30 days before trial. The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

## 8. DISCOVERY

Discovery has been completed.

## 9. SPECIAL ISSUES

None at this time.

## 10. SETTLEMENT

Undersigned counsel certify:

a.    Counsel for the parties and any *pro se* party met in person on

January 22, 2015, to discuss in good faith the settlement of the case.

18

54

b. The participants in the settlement conference, included counsel, party representatives, and any *pro se* party.

c. The parties were promptly informed of all offers of settlement.

d. Counsel for the parties and any *pro se* party do not intend to hold future settlement conferences.

e. It appears from the discussion by all counsel and any *pro se* party that there is little possibility of settlement

f. Counsel for the parties and any *pro se* party considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11. OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case.

## 12. EFFECT OF FINAL
## PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice. The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order. In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

19

55

## 13. TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

1.    Trial is to a jury

2.    Estimated trial time is ten days

3.    Trial will be in Denver

4.    There are no other orders pertinent to the trial proceedings.

DATED this ___31 st___ day of ___MARCH___, 20 15.

BY THE COURT

_Michael J. Watanabe_
Michael J. Watanabe
U.S. Magistrate Judge
District of Colorado

20

56

APPROVED:

/s/ Brice A. Tondre
Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado 80226-1566
Telephone: 303-296-3300
ATTORNEY FOR PLAINTIFF

/s/ Timothy P. Schimberg
Timothy P. Schimberg & Flanagan, P.C.
1640 Grant Street, Suite 150
Denver, CO 80203
Telephone: 303-298-8603
ATTORNEY FOR THE DEFENDANTS
HARDEY, PRIESTLY, GORE and
WEGENER

/s/ John Lebsack
John Lebsack
White & Steele, P.C.
600 17th Street, Suite 600N
Denver, CO 80202
Telephone: 303-296-2828
ATTORNEY FOR DEFENDANT OLDS

21

57

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

JUDGE RAYMOND P. MOORE

Case No. 13-cv-02469-RM-MJW          Date: March 31, 2015

Case Title: HATLEE et al v. HARDEY et al

PLAINTIFFS' WITNESS LIST

| WITNESS | ESTIMATED DATE(S) AND LENGTH OF TESTIMONY |
|---------|-------------------------------------------|

## A. NON-EXPERT WITNESSES WHO WILL BE PRESENT AT TRIAL

Darren Gabbert will be called to testify regarding his production of the video Little Big Man and the events leading to its production.

Cindy Hardey will be called to testify regarding all aspects of her involvement in the events complained of in this case.

Kirsten LeBeau will be called to testify regarding the subject horses while in her custody, the videos of the horses and the impropriety of the seizure..

Martin VanPoolen will be called to testify regarding the subject horses while in his custody, the videos of the horses and the impropriety of the seizure

Bobbi Priestly will be called to testify regarding all aspects of her involvement in the events complained of in this case and her responsibility for training Cindy Hardey.

Monte Gore will be called to testify regarding all aspects of his involvement in the events complained of in this case, his responsibility for supervision and discipline of Priestly and Hardey and his basis for concern for the safety of Plaintiffs and their horses.

# EXHIBIT   A

Fred Wegener will be called to testify regarding all aspects of his involvement in the events complained of in this case and the responsibility for training, supervision and discipline of Hardey, Priestly and Gore.

Sven Bonnelycke will be called to testify regarding all aspects of his involvement in the events complained of in this case and the responsibility for training, supervision and discipline of hardey and Priestly.

Barbara Wright will be called to testify regarding her involvement in the seizure of Little Big man and the publicity campaign to have Plaintiffs prosecuted and their horses seized.

Shelley Ferraro will be called to testify regarding her involvement in the publicity campaign to have Plaintiffs prosecuted and their horses seized.

Eugene Ferraro will be called to testify regarding his involvement in the publicity campaign to have plaintiffs prosecuted and their horses seized.

Monica Courtney will be called to testify regarding her involvement in the publicity campaign to have Plaintiffs prosecuted and their horses seied.

Ashleigh Olds, D.V.M. will be called to testify regarding all aspects of her involvement in the events complained of in this case.

Ronald Swift will be called to testify regarding all aspects of the management of the horse herd at Echo Valley Ranch and the damages caused by his prosecution and the seizure of his horses.

Randall Hatlee will be called to testify regarding all aspects of the management of the horse herd at Echo Valley Ranch and the damages caused by his prosecution and the seizure of his horses.

Cheryl Otto will be called to testify regarding management and feeding of the horse herd, the publicity campaign and its effect on Plaintiffs.

Helen Cook will be called to testify regarding threats she received at the feed store, the effect the publicity campaign had on the feed store and its effect on Plaintiffs.

## B. NON-EXPERT WITNESSES WHO MAY BE PRESENT AT TRIAL

Kate Anderson, D.V.M. may be called to testify regarding her involvement in the decision to issue a notice of Warning and allow the horses to remain at Echo Valley Ranch.

Scott Dutcher may be called to testify regarding her involvement in the decision to issue a Notice of Warning and allow the horses to remain at Echo Valley Ranch.

Britt Stubbelfield, D.V.M. may be called to testify regarding his involvement in the decision to issue a Notice of Warning and allow the horses to remain at Echo Valley Ranch.

Amy Murdock, D.V.M. may be called to testify regarding the circumstances surrounding her interview by Chanel 7 News.

John Casanova may be called to testify regarding the propriety of Plaintiffs' ranch management practices.

Terri Miller may be called to testify that Plaintiffs' care of the subject horses was consistent with normal ranching practices.

Chet Lawrence may be called to testify regarding his observation of care and feeding practices at Echo Valley Ranch.

Bill Moen may be called to testify regarding his observation of care and feeding practices at Echo Valley Ranch.

Dr. Robert K. Colwell may be called to testify regarding his observation of the management of the horse herd at Echo Valley Ranch.

## C. EXPERT WITNESSES WHO WILL BE PRESENT AT TRIAL

Jena Questen, D.V.M. will be called to testify to the probable cause of the horses being skinny and that Dr. Olds did not have a reasonable basis to claim that the horses' condition was caused by cruelty.

A.R. Horton, D.V.M. will be called to testify that Dr. Olds' claims that the six horses were suffering from cruelty was without a reasonable scientific basis. She will also testify to threats she received from Wright, Ferraro and Olds' husband. She will testify to unusual signs and symptoms which required much investigation before reaching a conclusion regarding what was causing the horses' problems. She will described the diagnostic plan which was planned when the horses were seized. She will testify that the seizure prevented the carrying out the diagnostic plan

Fay Burton, D.V.M. will testify to the same subject matter as Dr. Horton.

Darrell Campbell will testify to the reasonableness of his charges for defense of the criminal charges against Plaintiffs.

## D. EXPERT WITNESSES WHO MAY BE PRESENT AT TRIAL

Lois Toll, D.V.M. may be called to testify regarding her care and treatment of the six horses during the period the were seized and her observation of the horses after they returned to Echo Valley Ranch..

Scott Toppin, D.V.M. may be called to testify regarding his care and treatment of the six horses during the seizure period.

Alan Swartz may be called to testify regarding the prevalence and control or toxic weeds at Echo Valley Ranch.

Laura Wilhelm, D.V.M. may be called to testify to her article in Serenity entitled Anemia and your Horse.

Witnesses listed by other parties

Witnesses needed for authentication

Witnesses needed for impeachment

# EXHIBIT B

## PARK COUNTY DEFENDANTS' (HARDEY, PRIESTLY, GORE & WEGENER) "WITNESSES" TO NO. 6 OF THE FINAL PRETRIAL ORDER

a.  List the non-expert witnesses to be called by each party. List separately.

   (1)   Witnesses who will be present at trial (see Fed. R. Civ. P. 26(a)(3)(A)):

   a.  Cindy Hardey. Contact information has been previously disclosed. Ms. Hardey will testify as to her visits to the Echo Valley Ranch in 2012. This will include why she went and what she personally observed. She will discuss the investigation that she performed, the persons that she spoke with and her decision regarding the application for a search warrant to issue. She will testify as to the condition of the horses that she personally observed. She will testify as to the health and recovery of the horses once removed from Echo Valley Ranch. Ms. Hardey will testify that her affidavit in support of the search warrant was not made in bad faith and the county court did not use that phrase in characterizing it. She will testify as to her motivations and decision making which were to protect the horses involved.

   b.  Sergeant Bobbi Priestly. Contact information has been previously disclosed. Sgt. Priestly will testify as to her knowledge of the events that occurred in February, 2012 and the ensuing months. She will testify as to her role as an animal control officer with the Park County Sheriff's Office. She will testify in accordance with her reports and as to her personal recollection of the events as they transpired to include removal of the horses, the care and treatment of the horses while away from Echo Valley Ranch and the recovery process prior to their return.

   c.  Undersheriff Monte Gore. Contact information has been previously disclosed. Undersheriff Gore will testify as to the communications he received in regards to the condition of the horses at the Echo Valley Ranch that eventually were removed. He will testify as to the reasons for removing the horses from Echo Valley Ranch and eventually to the Harmony Equine Center. He will testify as to communications received from the horse community in the

Evergreen, Colorado area. He will testify that his actions or conduct were not related to any type of "political pressure."

d.   Sheriff Fred Wegener.   Contact information has been previously disclosed.   Sheriff Wegener will testify as to his knowledge of the events resulting in a welfare check performed by Cindy Hardey of some horses at the Echo Valley Ranch in February, 2012. He will testify as to his knowledge of the condition of the horses per reports that he reviewed as well as what he heard in a telephone conversation with veterinarian, Fay Burton.   He will testify in accordance with the records previously provided.

e.   Ashleigh Olds, DVM.   It is anticipated that Dr. Olds will testify concerning the request that she go to Echo Valley Ranch on February 16, 2012 at the behest of Routt County Sheriff's Office. She is expected to testify as to her observations at the ranch, the conditions of the horses that she personally observed.

f.   Peter Petlak.   34396 High Vue Drive, Pine, Colorado.   It is anticipated that Mr. Petlak will testify in person concerning his past friendship with the Plaintiffs, his observations of their treatment of horses, that as a result of being financially strapped, the quality and quantity of hay was not what it should have been. He will testify in accordance with his deposition testimony.

(2)   Witnesses who may be present at trial if the need arises (see Fed. R. Civ. P. 26(a)(3)(A)):

a.   Deputy Dawn Smith. Deputy Smith is an animal control officer with the Routt County Sheriff's Office.   It is anticipated that she will testify regarding her personal observations of horses Little Feather and Bear while they were in Routt County and after they were moved to the Echo Valley Ranch.   She will testify about her personal observations of Bear in February, 2012 as well as personal observations of some of the other horses at the Echo Valley Ranch property.   She will testify that her personal observations led to her contacting the Park County Sheriff's Department to report the horses were extremely thin/emaciated.

b.   Deputy Cindy Del Valle.   Deputy Del Valle is an animal control officer with the Routt County Sheriff's Office.   It is anticipated that she will testify regarding her personal observations of horses Little Feather and Bear while they were in Routt County and after they were moved to the Echo Valley Ranch.   She will testify about her personal observations of Bear in February, 2012 as well as personal observations of some of the other horses at the Echo

2

Valley Ranch property. She will testify that her personal observations led to her contacting the Park County Sheriff's Department to report the horses were extremely thin/emaciated.

c. Thom LeDoux, the District Attorney of the Eleventh Judicial District of Colorado. He was the lead prosecutor in the misdemeanor case against the Plaintiffs. He will testify that it was his decision to continue prosecution of the Plaintiffs because there was a good faith basis and a reasonable belief that animal neglect/abuse had occurred at Echo Valley Ranch.

d. Corporal Jenny Plutt. Cpl. Plutt is an employee of the Park County Sheriff's Office. She was present at Echo Valley Ranch on February 16, 2012. She will testify as to her personal observation of the condition of several of the horses. She will be able to identify photographs and what they depict.

e. Barbara Wright. Ms. Wright is the Chair of the Board of the Harmony Horse Works in Evergreen, Colorado. It is anticipated she will testify concerning the contact by Routt County Sheriff's Office to assist in the seizure of a horse named Bear. It is anticipated she will testify as to Bear's condition upon her observation of the Aspen Creek Veterinary Hospital. It is anticipated that she will testify as to the recovery process of Bear and Bear's condition within weeks/months of removal from Echo Valley Ranch.

f. Bruce Carpenter. Address unknown. It is anticipated that Mr. Carpenter will testify as to his knowledge of the report of theft of hay from his trailer by Mr. Hatlee and ensuing discussions regarding same.

g. Deb Wilke, Harmony Equine Center in Franktown, Colorado. She will testify as to the condition of horses removed from Echo Valley Ranch and Kirsten LeBeau's facility to Harmony Horse Works. It is anticipated that she will testify as to the recovery process of the horses and their condition upon return.

h. Garret Leonard, Harmony Equine Center in Franktown, Colorado. He will testify as to the condition of horses removed from Echo Valley Ranch and Kirsten LeBeau's facility to Harmony Horse Works. It is anticipated that he will testify as to the recovery process of the horses and their condition upon return.

i. Troy Murdoch. It is anticipated that he will testify as to his personal observations and recollections of Echo Valley Ranch as it existed

3

64

on February 16, 2012 when he went there to assist Dr. Olds. He will testify as to transporting Bear to the Aspen Creek Veterinary Hospital, what was done upon arrival, and the care treatment evaluation of Bear at Aspen Creek Veterinary Hospital.

j.     Amy Murdoch, DVM. Dr. Murdoch will testify as to Bear's condition upon arrival at Aspen Creek Veterinary Hospital and Bear's recovery process.

k.     Scott Toppin, DVM. Associated with Littleton Equine Hospital. He was personally involved in the care of six horses removed from Echo Valley Ranch and taken to Harmony Equine/Dumb Friends League in Franktown, Colorado. He will testify concerning his personal observation of the horses and their condition as well as their recovery process.

l.     Any witness identified and endorsed by Defendant Ashleigh Olds, DVM.

(3)     Witnesses where testimony is expected to be presented by means of a deposition and, if not taken steno graphically, a transcript of the pertinent portions of the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B).

a.     None anticipated at this time.

b.     List the expert witnesses to be called by each party. List separately:

(1)     Witnesses who will be present at trial (see Fed. R. Civ. P. 26(a)(3)(A)):

a.     Richard Leone, DVM. He is a veterinarian and a rancher who will testify as an expert witness as set forth in his reports provided to counsel. He is expected to testify in person.

(2)     Witnesses who may be present at trial (see Fed. R. Civ. P. 26(a)(3)(A)):

a.     Matt Giacomini, Esq. Springer & Steinberg, P.C., 1600 Broadway, Ste. 1200, Denver, CO 80202. A lawyer. Will testify regarding the reasonableness and necessity of the attorneys' fees as claimed damages by Plaintiffs in the underlying misdemeanor case. He is expected to testify in person.

b.     Ashleigh Olds, DVM. A veterinarian who will testify regarding her observations at Echo Valley Ranch on February 16, 2012. She will testify as to her assessment of those horses she observed. She will testify as to the transport of Bear to Aspen Creek Veterinary Hospital, as well as the care, treatment and evaluation of Bear

65

while there. She will talk about Bear's recovery process and what happened to Bear. It is expected that she will testify in person.

c. Amy Murdoch, DVM. Please see above.

d. Courtney Diehl, DVM. A veterinarian who observed Bear while he was in Routt County.

e. Jenifer Gold, DVM. A veterinarian retained by Dr.Olds. It is anticipated that she will testify as an expert witness consistent with her reports in this matter.

f. Michael Gotchey, DVM. A veterinarian in Steamboat Springs, Colorado (Steamboat Veterinary Hospital). Dr. Gotchey will testify as an expert witness as set forth in the Defendants' Disclosures. He observed Bear while in Routt County. He provided information to Routt County Animal Control Officers concerning the conditions of Bear. It is anticipated that he will testify that botulism is not a proper diagnosis given the reported condition of Bear.

g. Thom LeDoux. Please see above.

h. Lois Toll, DVM. A veterinarian at the Littleton Equine Hospital. She will testify as set forth in the Defendants' Expert Disclosures. She will testify as to her personal knowledge and observation of six horses that were removed from Echo Valley Ranch and transported from the LeBeau ranch to Harmony Equine/Dumb Friends League. She will discuss tests given, test data, the recovery process and the condition of the horses the last time she saw them.

(3) Witnesses where testimony is expected to be presented by means of a deposition and, if not taken steno graphically, a transcript of the pertinent portions of the deposition testimony. See Fed. R. Civ. P. 26(a)(3)(B).

a. None anticipated at this time.

5

66

Appellate Case: 15-1063 Document: 01019613796 Date Filed: 05/26/2016 Page: 2 of 2

CASE CAPTION: HATLEE et al v. HARDEY et al

CASE NO.: 13-cv-02469-RM-MJW

EXHIBIT LIST OF: PLAINTIFFS

# EXHIBIT   C

| Exhibit | Witness | Brief Description | Stipulation | Offered | Admitted | Refused | Court Use Only |
|---------|---------|-------------------|-------------|---------|----------|---------|----------------|
| 1 | | Aerial photo of barn and pen area | | | | | |
| 2 | | Hardey's 2/16 report | | | | | |
| 3 | | Notice of Warning | | | | | |
| 4 | | Olds 2/16-17 e-mails to Hardey | | | | | |
| 5 | | Dr. Horton's differential diagnosis of Maggie | | | | | |
| 6 | | Anemia and Your Horse, Serenity 12/2014 | | | | | |
| 7 | | Wright's 2/16 e-mail to Gore | | | | | |
| 8 | | Wright's 2/18 e-mail to Drs. Horton and Burton | | | | | |
| 9 | | Wright's 2/18 intent to cause an e-mail blast | | | | | |
| 10 | | Wright's BEARCAT posting | | | | | |
| 11 | | Priestly's report of 2/16 events | | | | | |
| 12 | | Priestly's report of 2/16-21 evwnts | | | | | |
| 13 | | Protective custody agreement | | | | | |
| 14 | | 2/21-22 series of e-mails leading to seizure | | | | | |
| 15 | | Affidavit for seizure warrant | | | | | |
| 16 | | Seizure video | | | | | |
| 17 | | Olds 2/24 victory e-mail | | | | | |
| 18 | | Little Big Man Video | | | | | |

Παγε 2

| Exhibit | Witness | Brief Description | Stipulation | Offered | Admitted | Refused | Court Use Only |
|---------|---------|------------------|-------------|---------|----------|---------|----------------|
| 19 | | 24 photos of horses upon return | | | | | |
| 20 | | Priestly e-mail re order to return horses | | | | | |
| 21 | | Olds e-mail re order to return horses | | | | | |
| 22 | | Gore's response to #21 | | | | | |
| 23 | | Littleton Equine Medical Center Records | | | | | |
| 23 | | Horton/Burton 4/20 Pinecam posting | | | | | |
| 24 | | Darrell Campbell fees | | | | | |
| 25 | | Dr. Olds records re Bear | | | | | |
| 26 | | Drs. Horton and Burton records | | | | | |
| | | Documents listed by Defendants | | | | | |
| | | Documents needed for impeachment | | | | | |
| | | | | | | | |

# EXHIBIT D

## PARK COUNTY DEFENDANTS' (HARDEY, PRIESTLY, GORE & WEGENER) "EXHIBITS" TO NO. 7 OF THE FINAL PRETRIAL ORDER

a.  List the exhibits to be offered by each party and identify those to be stipulated into evidence. This list should be specific enough so that other parties and the court can understand, merely by referring to the list, each separate exhibit which will be offered. General references such as "all deposition exhibits "or" all documents produced during discovery" are unacceptable.

(2)  Defendants:

| No. | Description |
|-----|-------------|
| A-1 | Park County Sheriff's Office ("PCSO") Offense Report (0066-83) |
| A-2 | PCSO Case Report 2012000142 (including any reference to photographs or audioclips) – J. Plutt 2/16/12 (0084-85) |
| A-3 | PCSO Case Report 2012000142 (including any reference to photographs or audioclips) – Bobbi Priestly's notes (0086-93) |
| A-4 | PCSO Case Report 2012000142 (including any reference to photographs or audioclips) – Priestly (0094-96) |
| A-5 | Email Scott Dutcher to PCSO regarding photos of Spencer |
| A-6 | Veterinary records of Ashleigh Olds, DVM / Aspen Creek Veterinary Hospital regarding Bear/Spencer |
| A-7 | All records from Harmony Equine Center / Dumb Friends League relating to the removed horses that were transferred to its location in Franktown |
| A-8 | All veterinary records of Littleton Equine (deposition exhibit 110) |
| A-9 | Timberline Equine blog post (deposition exhibit 8) |
| A-10 | Seven photographs of "Maggie" and one of "Bear" taken February 16, 2012 (deposition exhibit 18) |
| A-11 | Plaintiffs' discovery responses (deposition exhibit 50) |
| A-12 | Dr. Horton email May 5, 2012 (deposition exhibit 10) |
| A-13 | Email Garret Leonard of Harmony Equine Center to Ms. Hardey dated May 16, 2012 |
| A-14 | All photos taken while the removed horses were at Harmony Equine Center |
| A-15 | PCSO Offense Report – 2012000142 (including any reference to photographs or audioclips) (121-122 of exhibit 66) |
| A-16 | PCSO 2012000142 (including any reference to photographs or audioclips) – Dr. Toll's report and photographs of 2/27 – 44-46-35 (139-140 of exhibit 66) |
| A-17 | Compendium of photographs identified as "evidence images" PCSO |

69

| | 2012000142 (149-288 of exhibit 66) |
|---|---|
| A-18 | Photograph of Little Feather/Bear (Spencer) – Olds Disclosure 150-151-167 |
| A-19 | Photograph of Bear/Little Big Man/Spencer upon arrival at Aspen Creek Veterinary Hospital February 16, 2012 |
| A-20 | Photograph of Bear/Little Big Man/Spencer on June 11, 2012 |
| A-21 | A demonstrative exhibit illustrating a weight chart regarding the horses removed from Echo Valley Ranch and on subsequent welfare checks at Harmony Equine Center |
| A-22 | Photographs (Olds Disclosures 175-186) |
| A-23 | Aerial photographs of Echo Valley Ranch (deposition exhibits 51 and 52) |
| A-24 | Court history of Randall Hatlee (deposition exhibit 49) |
| A-25 | Evidence images of Maggie (deposition exhibit 53) |
| A-26 | Email and summary of findings authored by Dr. Olds, DVM, February 16, 2012 (deposition exhibit 71) |
| A-27 | Photos of Chance (deposition exhibits 73 and 74) |
| A-28 | Photos of River (deposition exhibits 75, 76, and 77) |
| A-29 | Photo of Little Feather and Bear (deposition exhibit 54) |
| A-30 | Photo of Bear taken February 13, 2012 (deposition exhibit 55) |
| A-31 | Photo of Bear taken February 16, 2012 (deposition exhibit 56) |
| A-32 | Photos of Midnight (deposition exhibits 57 and 58) |
| A-33 | Photos of Lena (deposition exhibits 59 and 60) |
| A-34 | Photos of Fiona (deposition exhibits 61 and 62) |
| A-35 | Photos of Echo (deposition exhibits 63 and 64) |
| A-36 | Photos of horses (deposition exhibits 65-72) |
| A-37 | Photos taken by Dr. Olds at Echo Valley Ranch – February 16, 2012 |
| A-38 | Photos of pens and water tanks at EVR (deposition exhibits 93-95) |
| A-39 | Troy Murdoch letter (deposition exhibit 99) |
| A-40 | Declaration of Dr. Olds, DVM (deposition exhibit 98) |
| A-41 | All exhibits from these Defendants' pending Motions for Summary Judgment |
| A-42 | Chart of Henneke body scores regarding the removed horses as well as Bear |
| A-43 | Photos taken of Chance, Echo, Fiona, River, Midnight, Lena at the Dumb Friends / Harmony Equine Center (deposition exhibits as well as disclosures) |
| A-44 | Cumulative and chronological photos of Bear at Aspen Creek Veterinary Hospital taken on February 16, 19, 20, 21, 22 and March 1, 7, 14 and May 1, 2012 (Olds' disclosures) |
| A-45 | Notice of Warning |
| A-46 | Protective Custody Agreement |
| A-47 | Exhibits necessary for impeachment |
| A-48 | Exhibits necessary for rebuttal |
| A-49 | Any exhibit listed by the other Defendant |

70

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants

---

### DEFENDANT OLDS' MOTION FOR SUMMARY JUDGMENT

---

Defendant Ashleigh Olds ("Dr. Olds"), through her counsel John Lebsack and Adam

Goldstein, moves for summary judgment on the claims against her in the Amended Complaint

[*Docket #22*] pursuant to Fed.R.Civ.P. 56. In support, Dr. Olds states as follows:

### INTRODUCTION

This case stems from misdemeanor charges of animal cruelty against Plaintiffs. Dr. Olds

observed Plaintiffs' dangerously-skinny horses and reported her suspicions of animal cruelty to

the Park County Sheriff's Office. The Sheriff's Office initially declined to charge Plaintiffs and

seize the horses, but it did so six days later after further investigation with other witnesses

yielded additional information.

1

71

Plaintiff's 42 U.S.C. §1983 claims against Dr. Olds fail because Dr. Olds was not a state actor. Even if she was, Dr. Olds enjoys qualified immunity. Plaintiff's state law malicious prosecution claim against Dr. Olds fails because Dr. Olds enjoys statutory immunity for her report of suspected animal cruelty. Even without statutory immunity, Plaintiffs' malicious prosecution claim fails as a matter of law because Dr. Olds was merely a witness with probable cause to suspect that a crime had been committed.

## UNDISPUTED MATERIAL FACTS[1]

This case arises from misdemeanor charges of animal cruelty against plaintiffs. Dr. Olds is a licensed veterinarian and the owner of Aspen Creek Veterinary Hospital. (SOF 1, 3). Dr. Olds is board certified in equine medicine and 95% of her practice focuses on horses. (SOF 2, 3). The other defendants in this case worked for the Park County Sheriff. (SOF 5). Dr. Olds is not and never was an employee or agent of Park County. (SOF 6). Dr. Olds' involvement in this matter began on February 15, 2012. (SOF 7, 24). Other than acting as a witness in connection with Plaintiffs' animal cruelty criminal case, Dr. Olds' material involvement in this matter ended on February 16, 2012.

Plaintiff Swift lives on property known as Echo Valley Ranch, located in Park County. (SOF 8). Plaintiff Hatlee works with Swift at Echo Valley Ranch. (SOF 9). Dr. Olds' lone visit to Echo Valley Ranch in connection with this matter occurred on February 16, 2012. (SOF 10).

---

[1] The following statement of undisputed material facts presents a narrative summary. All of the material facts set forth herein are also set forth (with citation to authority) in Dr. Olds' separate Statement of Undisputed Material Facts In Support of Motion for Summary Judgment, per the Court's July, 2014 practice standards. While Dr. Olds' separate Statement of Undisputed Material Facts set forth all of the relevant undisputed material facts at issue, this summary tells the story in a brief, chronological and narrative form for the Court's convenience.

2

At that time, Plaintiffs Hatlee and Swift each owned several horses living at Echo Valley Ranch. (SOF 11). Plaintiffs' horses included six overly-skinny horses named Lena, Chance, Echo, Fiona, River, and Midnight (hereinafter referred to as "The Six Horses"). (SOF 11). Other horses owned by third parties were also present at Echo Valley Ranch, including a down and emaciated mare named "Maggie" and an overly-skinny and down horse named "Bear" (a/k/a "Little Big Man," n/k/a "Spencer"), (SOF 12).[2] It is undisputed that Maggie, Bear, and The Six Horses were too skinny on February 16, 2012. (SOF 13-16, 30-34, 36-41).

Dr. Olds' involvement in this case began on February 15, 2012 when she was asked if her clinic would be willing to care for a horse that Routt County was impounding. (SOF 7, 24). The horse was Bear. Bear (and his mother, Little Feather) were the subject of an animal cruelty case pending in Routt County against Plaintiff Hatlee's ex-wife. (SOF 17). Bear and Little Feather were cared for by Plaintiffs at Echo Valley Ranch but remained under Routt County's jurisdiction. (SOF 18). On February 13, 2012, Deputies Del Valle and Smith of the Routt County Sheriff's Office went to Echo Valley Ranch to check on Bear and Little Feather. (SOF 19). Upon arrival, Deputies Del Valle and Smith learned that Little Feather was dead, and they observed Bear in "deplorable" condition. (SOF 20-21). Photos of Bear taken on 16, 2012 are attached as **Exhibit L**. Deputies Del Valle and Smith also observed The Six Horses on the property in similar deplorable condition. (SOF 22). Photos of The Six Horses taken on February 16, 2012 are attached as **Exhibit M**. As a result of this visit, Routt County (i) ordered the seizure of Bear; and (ii) reported The Six Horses to the Park County Sheriff's Office. (SOF 23).

---

[2] "Bear" has been known by several different names, including "Little Big Man" and "Spencer." For purposes of simplicity, the horse is referred to herein as "Bear."

3

On February 15, 2012, Dr. Olds was called and asked if she would accept and care for a horse being seized by Routt County. (SOF 24). Later, Dr. Olds was asked if she would bring her trailer, accompany the Park County officers that were seizing the horse on Routt County's behalf, and then transport the horse from the scene to her hospital. (SOF 25). Dr. Olds agreed, and on February 16, 2012, she met with Park County Officials at the Bailey Substation accompanied by her vet assistant Troy Murdock. (SOF 26). It wasn't until then that Dr. Olds learned that Bear was being seized from Echo Valley Ranch. (SOF 26).

Deputies Plutt and Hanning of the Park County Sheriff's Office went to Echo Valley Ranch to serve the Routt County seizure warrant. (SOF 27). Dr. Olds and her vet assistant accompanied them to take possession of the horse after his seizure. (SOF 28). Park County Animal Control Officer Cindy Hardey also went to the Echo Valley Ranch that day to perform a welfare check on The Six Horses that had been reported a few days earlier by Routt County Officer Smith. (SOF 29).

When Dr. Olds and the others arrived at Echo Valley Ranch, they found Bear down, extremely thin, covered in urine/manure and unable to stand on his own. (SOF 30). Hatlee and Swift concede that Bear was too thin and had difficulty getting up on his own. (SOF 13, 32). Dr. Olds and Officer Hardey next saw an emaciated, down, and sore-covered mare named "Maggie." (SOF 33). It is undisputed that Maggie died a day or two later. (SOF 35). Photos of Maggie taken on February 16, 2012 are attached as **Exhibit K**. Finally, Officer Hardey and Dr. Olds saw The Six Horses. (SOF 36). It is undisputed that The Six Horses were too thin on February 16, 2012. (SOF 13, 36-37, 41). It is also undisputed that the horses were found in dirty pens with empty food bins and empty or frozen-over water buckets. (SOF 36, 42).

Based on her observations, Dr. Olds suspected that Bear, Maggie, and The Six Horses were victims of starvation and malnutrition. (SOF 44). She reported her suspicions to Officer Hardey at the scene and discussed with her the potential seizure of the horses. (SOF 46-49). Although disputed, some witnesses suggest that Dr. Olds "demanded" that all of the horses be seized. Despite this, it is undisputed that Officer Hardey decided not to seize The Six Horses on February 16, 2012. (SOF 52). Instead, Officer Hardey issued Plaintiffs a Notice of Warning. (SOF 52). Dr. Olds and her assistant loaded Bear into the trailer and left.[3] (SOF 57). When she left, Dr. Olds already knew that Park County did not plan to seize The Six Horses that day. (SOF 58). Dr. Olds was present at Echo Valley Ranch for approximately 30-45 minutes. (SOF 59).

After returning to her facility, Dr. Olds made further observations and wrote a report to Officer Hardey memorializing all of her observations, in hopes that it would be "useful in obtaining an order to seize the remaining horses and/or get permission to euthanize the down mare." (SOF 65). A copy of Dr. Olds' February 16, 2012 correspondence is attached as **Exhibit N.**

In the days that followed, the Park County Sheriff's Department was inundated with telephone calls about the horses from people who were upset over the situation, and as a result Undersheriff Gore became concerned over talk about an attempt to rescue the horses at Echo Valley Ranch. (SOF 66). As a result, Undersheriff Gore suggested moving the horses to an

---

[3] After Bear was nursed back to health, he was adopted by a third party. (SOF 101). Plaintiffs did not own Bear and claim no interest in him following his February 16, 2012 seizure. Because Plaintiffs did not own Bear and because the seizure was ordered by Routt County rather than Park County, the seizure of Bear is not a part of Plaintiffs' improper seizure claim in this case. *See* #22, ¶ 34.

undisclosed location to try to diffuse the situation. (SOF 66). On February 19, 2012, Plaintiffs agreed to move The Six Horses to another location, and Plaintiffs signed a written agreement in this regard. (SOF 67). Dr. Olds played no role in the decision to move the horses. (SOF 69).

Cindy Hardey of the Park County Sheriff's Office continued her investigation even after the horses were moved on February 19, 2012. (SOF 70). Specifically, on February 22, 2012, Hardey spoke to Plaintiffs' veterinarian, Dr. Horton of Timberline Equine Veterinary Services. (SOF 71). Timberline had provided veterinary services to Plaintiffs at various points in time. (SOF 72). Although Timberline provided veterinary services for Maggie in the days before she died, the last time Timberline had previously seen or treated any of The Six Horses was: Fiona – Never; Lena – Never; Echo – August 2010; Midnight – September 2010; River – October 2010; Chance – October 2010. (SOF 73-74). Timberline had no veterinarian-client-patient relationship with The Six Horses as of February 16, 2012. (SOF 75).

Dr. Horton observed The Six Horses on February 20, 2012, after they had been moved from Echo Valley Ranch. (SOF 76). Dr. Horton found the horses to be extremely thin and grossly anemic. (SOF 77-78). During a February 22, 2012 phone call with Officer Hardey, Dr. Horton said that Plaintiffs should have sought assistance for The Six Horses sooner. (SOF 79-81). Specifically, Dr. Horton told Officer Hardey that "Regardless of why the horses were thin, someone should have noticed and at least called and started the investigating earlier. . . . Those horses were let go far too long." (SOF 79-81).

After speaking with Dr. Horton on February 22, 2012, Officer Hardey decided to charge Plaintiffs with animal cruelty and seize The Six Horses (SOF 85). Her decision was based on all of her investigation, including the opinion provided by Dr. Horton that the horses were let go far

6

too long. (SOF 85-86). The charges issued by Officer Hardey at the time only concerned The

Six Horses, and not Bear. (SOF 87-89). [4] The Six Horses were seized by Park County on

February 23, 2012 (SOF 91). Dr. Olds played no part in the drafting, reviewing or approval of

the Park County Sheriff's seizure application, affidavit, or summonses and complaints.

(SOF 92-93). Dr. Olds played no role in the seizure of the horses on February 23, 2012.

(SOF 94). The Six Horses were never taken to Dr. Olds' facility, and Dr. Olds played no role in

their assessment or care following their seizure. (SOF 95-96).

     Dr. Olds in good faith suspected (and continues to suspect) that Bear and The Six Horses

were starved and/or neglected by Plaintiffs. (SOF 97). Indeed, Bear displayed a voracious

appetite while at Dr. Olds' hospital, and he quickly put on weight and otherwise responded to

treatment that largely consisted of basic feed and water. (SOF 63). While Dr. Olds agreed with

the Park County Sheriff's Office's decision to seize the horses and charge Plaintiffs, Dr. Olds'

role was limited to that of a witness. Plaintiffs allege that Dr. Olds expressed her opinions as

part of the so-called "public outcry," but there is no evidence that she did so as a state actor or

under color of law.

     Plaintiffs' amended complaint in this action asserts three claims against Dr. Olds.

*See* #22. In summary, those claims are (1) violation of 42 U.S.C. §1983 because of improper

seizure of The Six Horses based on a defective warrant, (2) violation of 42 U.S.C. §1983 because

of malicious prosecution for animal cruelty, and (3) a state law malicious prosecution claim.

*See* #22. As discussed below, all of these claims against Dr. Olds fail as a matter of law.

---

[4] Several months later, the charges were amended by the Park County District Attorney's Office
to include a charge of animal cruelty for Plaintiffs' alleged cruelty to Bear prior to Routt
County's February 16, 2012 seizure. (SOF 90).

## ARGUMENT

### I.    Standard of Review.

Federal law governs the Court's standard for summary judgment. *Hill v. Allstate Ins. Co.*, 479 F.3d 735, 739 (10th Cir. 2007). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

A party asserting that a fact cannot be genuinely disputed must support the assertion by: (A) citing to particular parts of material in the record; or (B) showing that the materials cited do not establish the presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Where the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim that the non-movant is obligated to prove. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Stated differently, Dr. Olds can satisfy her burden at the summary judgment stage by identifying a lack of evidence on an essential element of Plaintiffs' claims. *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). In response, Plaintiffs may not rest solely on the allegations in the pleadings but instead must designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. If Plaintiffs fail to produce sufficient competent evidence to establish their claims, Dr. Olds is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322-23.

With respect to Plaintiffs' state law malicious prosecution claim, Colorado law governs the substantive elements upon which the claim is based. *Miller v. Cudahy Co.*, 858 F.2d 1449,

8

1457 (10th Cir. 1988). State substantive law governs who bears the burden of proof, what facts

are material, what issues must be determined, the elements that must be proved and the standard

of proof to apply. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis*

*Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). In evaluating a motion for

summary judgment, the court must view the evidence "through the prism of the substantive

evidentiary burden." *Anderson*, 477 U.S. at 254.

## II.    Plaintiffs' § 1983 Claims Against Dr. Olds Fail Because She Did Not Act Under Color of State Law.

Plaintiffs' first claim against Dr. Olds is based on 42 U.S.C. §1983 for the allegedly

improper seizure of The Six Horses. Plaintiffs' second claim against Dr. Olds is based on

42 U.S.C. §1983 for alleged malicious prosecution. But Dr. Olds did not seize The Six Horses,

and Dr. Olds did not prosecute Plaintiffs for animal cruelty. Dr. Olds was merely a witness, and

she was not affiliated with Park County in any way. Thus, Dr. Olds is entitled to summary

judgment on these claims.

A claim under § 1983 must allege deprivation of a constitutional right <u>committed under</u>

<u>color of state law.</u> *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Guinn v.*

*Farmers Ins. Co.*, 563 Fed. Appx. 653, 654 (10th Cir. 2014) (emphasis added); *see also Lay v.*

*Otto*, 530 Fed. Appx. 800, 802 (10th Cir. 2013)(the "under color of state law" element is a

jurisdictional requisite for a § 1983 claim). "The under-color-of-state-law element of § 1983

excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id.*

(internal quotations omitted). State action requires *both* an alleged constitutional deprivation *and*

that the party charged must be a person who may fairly be said to be a state actor. *Am. Mfrs.*

*Mut. Ins. Co.*, 526 U.S. at 50 (italics in original). "The only proper defendants in a Section 1983

9

79

claim are those who represent the state in some capacity." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995); *Kirby v. Dallas County Adult Probation Dept.*, 359 Fed. Appx. 27, 35 (10th Cir. 2009).

The mere fact that an individual is subject to state regulation does not by itself convert her action into that of the state for purposes of the Fourteenth Amendment. *Id.*; *see also Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52. A "private individual does not engage in state action simply by availing herself of a state procedure....[T]he use of a state procedure does not become state action simply because the person using the procedure is a licensed professional." *Scott v. Hern*, 216 F.3d 897, 906-907 (10th Cir. 2000). "The existing law provides that, in general, private persons do not become state actors when they report problems or concerns to appropriate state agencies. The Tenth Circuit has also recurrently concluded that citizens who make reports to the police are not state actors." *Ball v. Div. of Child & Family Servs.*, 2012 U.S. Dist. LEXIS 83125, at *5-6 (D. Utah June 14, 2012) (citations omitted). Stated differently, "the mere furnishing of information to police officers who take action thereon does not constitute joint action under color of state law which renders a private actor liable under § 1983." *Lee v. Town of Estes Park*, 820 F.2d 1112, 1115 (10th Cir. 1987); *citing Benavidez v. Gunnell*, 722 F.2d 615 (10th Cir. 1983).

Additionally, when a private party gives testimony in open court in a criminal trial, that act is not performed "under color of law," and all witnesses are absolutely immune from civil liability based on their testimony in judicial proceedings. *Briscoe v. LaHue*, 460 U.S. 325, 326, 328-330 (1983); *Worrell v. Henry*, 219 F.3d 1197, 1204 (10th Cir. 2000). This absolute immunity applies even with respect to alleged conspiracies to commit perjury. *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir. 1994).

80

It is beyond dispute that Dr. Olds did not obtain the seizure warrant for The Six Horses; the Park County Sheriff's Office did. Likewise, Dr. Olds did not charge Plaintiffs with animal cruelty; the Park County Sheriff's Office did. Dr. Olds did not prepare, review, or approve the charges, the warrant, or the seizure affidavit in any way. While Dr. Olds advocated for the seizure, she played no role in the seizure of The Six Horses. There is simply no evidence that Dr. Olds participated in the seizure of the Six Horses or the bringing of charges against Plaintiffs.

Dr. Olds went to Echo Valley Ranch on February 16, 2012 to transport Bear pursuant to a Routt County seizure request. There is no evidence that Dr. Olds performed any law enforcement or prosecutorial actions at any time. It is undisputed that Deputies Plutt and Hanning served Plaintiffs with the Routt County seizure document; not Dr. Olds. What's more, Plaintiffs did not own Bear, and the seizure of Bear is not a subject of this case. *See* # 22, ¶ 34.

Dr. Olds' role in connection with the seizure of The Six Horses and the bringing of charges was merely that of a witness. Dr. Olds witnessed evidence of suspected animal cruelty and reported it to the Park County Sheriff's Office. Reporting suspected crime to law enforcement does not turn the witness into a state actor, and Plaintiffs can cite no authority to the contrary.

Furthermore, it is undisputed that the Park County Sheriff's Office did not seize The Six Horses or file charges against Plaintiffs at Dr. Olds' urging on February 16, 2012. Instead, that day the Park County Sheriff's Office merely served Plaintiffs with a Notice of Warning and allowed The Six Horses to stay at Echo Valley Ranch. It was not until several days later, after Officer Hardey performed further investigation and obtained additional information (most

81

notably from Dr. Horton in the February 22, 2012 phone call) that the Park County Sheriff's Office charged Plaintiffs and seized The Six Horses.

Plaintiffs' suggestion that Dr. Olds was part of the so-called "public outcry" demanding that Park County seize The Six Horses fails to state a cognizable § 1983 claim. Even assuming Dr. Olds spoke out as part of the public outcry, there is no evidence that she did so on behalf of the state or under color of state law. A private citizen can exercise her First Amendment rights, express her opinions and urge government officials to act without turning into a "state actor" acting under color of state law.

Plaintiffs' only allegation of Dr. Olds as a state actor refers to C.R.S. § 12-64-121. *See* #22, ¶14. This statute requires a veterinarian to report suspected animal cruelty to the appropriate authorities:

> A licensed veterinarian who, during the course of attending or treating an animal, has reasonable cause to know or suspect that the animal has been subjected to cruelty in violation of section 18-9-202, C.R.S., or subjected to animal fighting in violation of section 18-9-204, C.R.S., shall report or cause a report to be made of the animal cruelty or animal fighting to a local law enforcement agency or the bureau of animal protection.

C.R.S. § 12-64-121(1) (2013).[5] As set forth above, however, a private citizen's mere compliance with state law does not turn the citizen into a state actor. *Gallagher*, 49 F.3d at 1447; *Kirby*, 359 Fed. Appx. At 35; *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52. The statute does not authorize veterinarians to take action on behalf of the government — it instead merely requires a <u>reporting</u>

---

[5] The crime of animal cruelty includes the following: "A person commits cruelty to animals if he or she knowingly, recklessly, or with criminal negligence…deprives of necessary sustenance,… allows to be housed in a manner that results in chronic or repeated serious physical harm,…or otherwise mistreats or neglects any animal, or causes or procures it to be done, or, having the charge or custody of any animal, fails to provide it with proper food, drink, or protection from the weather consistent with the species, breed, and type of animal involved, or abandons an animal." C.R.S. 18-9-202(1)(a) (2013).

to state authorities. There is nothing in the statute that suggests a veterinarian, by reporting to law enforcement, becomes a co-actor with law enforcement. The making of a report under the statute does not constitute a seizure or a filing of charges. While a private citizen's report can arguably lead to a seizure of property or prosecution *by others*, the report itself does not violate any constitutional rights. *See e.g., Brayman v. United States*, 96 F.3d 1061, 1066 (8th Cir. 1996) (alleged defamation or injury to reputation by itself does not state a constitutional deprivation).

## III.   Plaintiffs' § 1983 Claims Against Dr. Olds Fail Because She Is Entitled to Qualified Immunity.

Even assuming for argument that Dr. Olds somehow qualifies as a "state actor," Plaintiffs' § 1983 claims against her fail because Dr. Olds is entitled to qualified immunity. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent and those who knowingly violate the law." *Stanton v. Sims*, 134 S.Ct. 3, 4-5 (2013); *citing Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). Even assuming Dr. Olds acted under color of state law, she is nonetheless entitled to qualified immunity from civil liability unless her actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id., see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity is determined based on an objective standard, and bare allegations of malice are insufficient. *Harlow*, 457 U.S. at 817-818. It is for the Court to determine whether the right

13

83

at issue was 'clearly established' at the time of the defendant's alleged misconduct, but existing precedent must have placed the statutory or constitutional question beyond debate. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Stanton*, 134 S.Ct. at 5; *Ashcroft*, 131 S.Ct. at 2083.

There is no basis to contend that a reasonable person would have known that Dr. Olds' actions violated clearly established statutory or constitutional rights. At most, Plaintiffs suggest that Dr. Olds made a mistaken report of animal cruelty and then participated in a publicity effort to apply political pressure on the sheriff's office. Even assuming this was a violation of the Plaintiffs' rights, it was not a violation of clearly established rights of which a reasonable person would have known. Plaintiffs offer no evidence that Dr. Olds violated any clearly established law or constitutional right, and their § 1983 claims therefore fail as a matter of law.

## IV. Plaintiffs' State Law Malicious Prosecution Claim Against Dr. Olds Fails As A Matter Of Law Because She Is Entitled to Statutory Immunity.

Plaintiffs' final claim against Dr. Olds is for malicious prosecution under Colorado common law. Plaintiffs contend that The Six Horses were seized and the criminal case was brought against them based on Dr. Olds' statements that the horses were starved, mistreated, and suffering from neglect.

Plaintiffs' state law malicious prosecution claim fails as a matter of law because Dr. Olds' statements are privileged under Colorado law. Colorado law imposes both duties and protections for licensed veterinarians in regard to reporting animal cruelty. As set forth in Section II above, state law requires veterinarians to report suspected animal cruelty to local authorities. C.R.S. § 12-64-121(1) (2013). Corresponding to this duty to report is immunity for making such reports in good faith:

14

84

> A licensed veterinarian who in good faith reports a suspected incident of animal
> cruelty or animal fighting to the proper authorities in accordance with subsection
> (1) of this section shall be immune from liability in any civil or criminal action
> brought against the veterinarian for reporting the incident.

C.R.S. § 12-64-121(4) (2013). That section also creates a presumption of the veterinarian's good

faith:

> In any civil or criminal proceeding in which the liability of a veterinarian for
> reporting an incident described in subsection (1) of this section is at issue, the
> good faith of the veterinarian shall be presumed.

To apply this statutory immunity, there are four elements: (1) Dr. Olds must be a

licensed veterinarian (2) who reported in good faith (3) a suspected incident of animal cruelty

(4) to the proper authorities. There is no dispute about elements 1, 3, and 4: Dr. Olds is a

licensed veterinarian, her alleged statements concerned an incident of animal cruelty, and she

made statements to the Park County Sheriff's Office.

As for the second element of applying the immunity, Plaintiffs cannot offer sufficient

evidence to overcome the statutory presumption of good faith. Dr. Olds in good faith suspected

(and continues to suspect) that Bear and The Six Horses were starved and/or neglected by

Plaintiffs. It is undisputed that Bear and The Six Horses were too skinny on February 16, 2012.

Even Plaintiffs admit as much. While Plaintiffs may disagree about the *cause* of Bear's and

The Six Horses' skinny condition, the fact of the horses' condition is not in dispute. It is

undisputed that Bear was down, unable to stand on his own, and covered in urine/manure on

February 16, 2012. Dr. Olds also saw Maggie down, emaciated, and covered in sores. It is

undisputed that the pens were dirty, the food bins were empty, and the water buckets were frozen

over during Dr. Olds and Officer Hardey's visit on February 16, 2012. Even Plaintiffs' own

veterinarians, Dr. Horton and Dr. Burton, believe that these horses "were let go far too long" and

85

that Plaintiffs should have sought intervention sooner. Finally, Dr. Olds was told by Swift that several horses at Echo Valley Ranch had already died. These undisputed facts more than establish that Dr. Olds had reasonable cause to suspect that Bear and The Six Horses had been subjected to cruelty and/or neglect. Plaintiffs simply cannot offer sufficient evidence of bad faith to overcome the statutory presumption and the undisputed evidence outlined herein.

Plaintiffs suggest that Dr. Olds committed malpractice and failed to conduct a thorough differential diagnosis, but these allegations are irrelevant. The relevant inquiry is not whether Dr. Olds satisfied a professional duty of care or rendered a correct final diagnosis. Instead, the relevant question is merely whether Dr. Olds had a reasonable good faith basis to <u>suspect</u> that the horses had been subjected to cruelty or neglect. C.R.S. § 12-64-121. The undisputed sight of emaciated, down horses in filthy pens with no food and frozen water is sufficient to satisfy this low statutory standard of a good faith report of *suspected* animal cruelty.

## V. Plaintiffs' State Law Malicious Prosecution Claim Against Dr. Olds Fails As A Matter Of Law Even In The Absence of Statutory Immunity.

Even without considering Dr. Olds' statutory immunity, Plaintiffs' malicious prosecution claim against her fails because Plaintiffs cannot prove the essential element of lack of probable cause.

To prevail on a claim for malicious prosecution, the following elements must be satisfied: (1) the defendant contributed to bringing a prior action against the plaintiff; (2) the prior action ended in favor of the plaintiff; (3) no probable cause; (4) malice; and (5) damages. *Hewitt v. Rice*, 154 P.3d 408, 411 (Colo. 2007); *Thompson v. Hiwan Ridge Dev. Co., Inc.*, 84 P.3d 496, 503 (Colo. 2004); *Lounder v. Jacobs*, 205 P.2d 236, 238-239 (Colo. 1949). Lack of probable cause is an indispensable element. *Id.*; *see also Montgomery Ward and Co. v. Pherson*, 272 P.2d

86

643, 645 (Colo. 1954) ("The existence of probable cause is alone sufficient to relieve a defendant of a charge of malicious prosecution").

Whether a given set of facts or circumstances amounts to probable cause is a question of law for the Court. *Gurley v. Tomkins*, 30 P. 344, 439 (Colo. 1892); *Montgomery Ward*, 272 P.2d at 646. The usual standards of human judgment and conduct determine what is and what is not probable cause. *Lounder*, 205 P.2d at 239; *Montgomery Ward*, 272 P.2d at 645. Where the conceded or substantially undisputed facts and circumstances under which the prosecution was carried on do not show a want of probable cause, the Court should take the responsibility of directing a verdict in favor of the defendant. *Montgomery Ward*, 272 P.2d at 646; *citing Gurley*, 30 Pac. 349. It is only where there is a dispute as to the existence of those facts which are relied upon as constituting probable cause that the matter is to be determined by the jury. *Konas v. Red Owl Stores, Inc.*, 404 P.2d 546, 548 (Colo. 1965); *Montgomery Ward*, 272 P.2d at 646.

In defining probable cause for purposes of malicious prosecution, the Colorado Supreme Court has stated:

> [a defendant] must form his judgment from outside appearances; and if those appearances, although they have belied the facts, furnished a reasonable ground of suspicion and were of such a nature as to warrant a person of ordinary caution, in coming to the conclusion that a crime had probably been committed, the defendant, by following the appearances, and acting upon the conclusion to which they led, incurred no liability to the plaintiff."

*Konas*, 404 P.2d at 548, *quoting Florence Oil & Refining Co. v. Huff*, 59 P. 624 (Colo. 1900). Stated differently, to constitute probable cause it is only necessary that there be a belief held in good faith in the guilt of the accused, and that such belief be reasonable and prudent. *Konas*, 404 P.2d at 548.

17

87

Case 1:13-cv-02469-RM-MJW  Document 61  Filed 12/15/14  USDC Colorado  Page 18 of 20

The defendant may have had probable cause for the filing of the charges even though the
accused is later acquitted or subsequent events prove the charges to be erroneous. *Montgomery
Ward*, 272 P.2d at 508. Any citizen who has reasonable grounds to believe that the law has been
violated has the right to cause the arrest of the person whom he honestly and in good faith
believes to be the offender, and, if she has reasonable grounds for his belief and acts thereon in
good faith, she shall not be subjected to damages merely because the accused is not convicted.
*Id.* This is particularly true when the proceeding at issue was instituted by and with the approval
of the district attorney:

> If the [district attorneys], who are appointed on account of their legal learning,
> consider that a given state of facts is sufficient evidence of probable cause, how
> can the private citizen be said to be in fault in acting upon such facts, and how can
> the state condemn him to damages for so doing?

*Id.*, at 647-648.

In the case at bar, the undisputed materials facts were sufficient to furnish Dr. Olds with
reasonable suspicion that a crime had probably been committed. The summary of facts outlined
in Section IV above were sufficient to provide Dr. Olds with probable cause to suspect animal
cruelty. Because Dr. Olds had a sufficient basis to form her reasonable good faith belief in
suspecting Plaintiffs had committed animal cruelty, Plaintiffs' malicious prosecution claim fails
as a matter of law.

As discussed in Section IV above, Plaintiffs' allegations of malpractice and failure to
perform a differential diagnosis are irrelevant. The relevant issue is not whether Dr. Olds "got it
right" or whether there were other possible explanations for Dr. Olds' observations. Instead, the
question is merely whether the undisputed materials facts provided Dr. Olds with a reasonable
good faith basis to suspect that a crime had likely been committed. Plaintiffs can offer no

88

evidence to the contrary in light of the undisputed fact that the horses were emaciated, down, filthy, and lacking in available food and water upon Dr. Olds February 16, 2012 visit to Echo Valley Ranch.

### CONCLUSION

Plaintiffs contend that Dr. Olds was wrong in her suspicions of animal cruelty, and Plaintiffs are mad that Dr. Olds advocated for the seizure and then testified against them. Even assuming that all of this is true, these facts do not create triable § 1983 claims or a triable state law malicious prosecution claim against Dr. Olds. Dr. Olds did not seize The Six Horses, Dr. Olds did not charge Plaintiffs with animal cruelty and Dr. Olds reported her suspicions in good faith. For these reasons, the Court should grant Dr. Olds summary judgment and dismiss the claims against her pursuant to Fed.R. Civ.P. 56.

DATED this 15th day of DECEMBER, 2014.

s:/John Lebsack
John Lebsack
Adam Goldstein
WHITE AND STEELE, P.C.
600 17th Street, Suite 600N
Denver, Colorado 80202
(303) 296-2828
Fax No.: (303) 296-3131
jlebsack@wsteele.com

89

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of December, 2014, a true and correct copy of the foregoing was e-served via CM/ECF to the following:

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado 80226
*briceatondrepc@msn.com*

Timothy P. Schimberg
Fowler Schimberg & Flanagan, P.C.
1640 Grant St., Ste. 300
Denver, CO 80203
*t_schimberg@fsf-law.com*

s/Becky Kongs
Becky Kongs
WHITE AND STEELE, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO 80202
Telephone: (303) 296-2828
Fax: (303) 296-3131
bkongs@wsteele.com

90

# EXHIBIT N

Page 1 of 1

⚠ You forwarded this message on 2/17/2012 3:45 PM.

Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Cindy Hardey**

| | | |
|---|---|---|
| From: | aolds@aspencreeklac.com [aolds@aspencreeklac.com] | Sent:  Thu 2/16/2012 4:35 PM |
| To: | Cindy Hardey | |
| Cc: | | |
| Subject: | letter of statement | |
| Attachments: | 📄 animal control letter.pdf(1MB) | |

Officer Hardey:

I have attached a letter with a summary of the findings today. Hopefully this will be useful in obtaining an order to seize the remaining horses and/or get permission to euthanize the down mare. If she dies, I would recommend a necropsy at CSU to confirm whether she died of starvation vs. botulism. The little gelding that we took today is doing OK, although he went down in the trailer and was too weak to get up when he got to the hospital. We had to run IV fluids, Iv dextrose, calcium, and hydrate him for several hours before we could assist him to a standing position. He appears very hungry and has ben eating non-stop since he got here. His blood work shows extreme anemia among other problems. He is not showing any signs of botulism and to me appears to be a very clear cut case of starvation and malnutrition.

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

PARK CTY DEFS_000933

92

Ashleigh Olds Diedrich
Aspen Creek Veterinary Hospital
23605 Oehlmann Park Rd
Conifer, CO 80433
(303) 697-4864
www.aspencreeklac.com

February 16, 2012

To whom it may concern:

Today I was asked by Park County Animal Control and Routt County Animal Control to attend the seizure of a 2 year old gelding. The gelding was located at Echo Valley Ranch in Bailey, Colorado at the time of seizure.

On arrival, the gelding was laying down in a very dark and filthy stall. He did not appear able to rise on his own despite encouragement. The footing in the stall was thick with manure, urine and mud. He was caked in manure and mud. His body condition score was 1/9 on the Henneke scale. I estimate his weight at 500 lbs. After multiple attempts to get him to stand, I was called away to examine another very thin horse that was recumbent in the upper area of the same barn. When I returned, a ranch hand had gotten this gelding up and had him tied to a truck. He was then loaded into a trailer and transported to Aspen Creek Veterinary Hospital for further evaluation and treatment. During the trailer ride, the horse layed or fell down from weakness and rode the rest of the way down in the trailer. On arrival at the vet hospital, he was too weak and uncoordinated to stand on his own. He was lifted and carried into a stall Bloodwork revealed severe anemia, elevated white blood cell count, dehydration, low calcium levels, and various other abnormalities. After treatment with IV fluids, IV dextrose, IV calcium, IV antibiotics, and intramuscular vitamin injections (vitamin B complex and Vitamin E/selenium) my staff was able to assist the gelding to a standing position. He has shown great interest in food and water since arrival and has a voracious appetite. At this time my professional assessment is that the gelding is suffering from extreme malnutrition and starvation. He is not showing any signs of botulism or other neurological disorder. He is extremely small for his age, likely as a result of malnutrition. As a result of suspected starvation he is at risk for death due to "re-feeding syndrome" which can cause heart failure, kidney failure, and sudden death as a starved animal is returned to normal nutrition. On a long term basis he is at risk for orthopedic joint disease and cartilage disruption (OCD, bone cysts, etc.) due to improper nutrition during his prime growing years.

It is worth noting that during the examination of the property, an adult female horse was recumbent in the upper area of the barn. This was a black mare. She was roughly a body condition score 1/9. She had been down since Saturday (5 days) per the owner. When we initially arrived, Ron Swift indicated to the animal control officers that the horse was dead. When I examined her I noted that she was breathing. He then admitted that she had been down for 5 days. He claims that she could sit up and drink and eat every two hours, but I was unable to get her into a sternal or sitting position. The mare was covered in severe pressure sores on her face, shoulders, and hips. She could paddle her legs and struggle to move,

but could not even get into a sitting position. She had reduced tail tone, but normal eyelid tone, tongue tone, and facial tone. The owner claimed that she was being "treated" for either tick paralysis or botulism. I asked what the treatment was, and he indicated that there was no treatment. He claimed to be rolling the mare every 2 hours from side to side. My personal opinion on examination of the horse is that she was not necessarily showing any evidence of botulism or tick paralysis, but more likely is suffering from malnutrition and starvation. I also believe that a horse that is recumbent should either be euthanized or transported to a hospital facility for more intensive care such as anti-inflammatories, IV fluids and nutritional support, antibiotics, wound care for the pressure sores, and intermittent slinging. A horse that remains down for days on end is a severe risk for aspiration pneumonia, dehydration, sepsis from pressure sores, lung collapse, colic, and many other complications.

There were also two other adult horses on the property that were extremely thin. One was a sorrel and white paint mare. She had a frozen water tank and no food in her pen on arrival. I would grade her body condition score a 1.5/9. There was another black mare in another pen who also had frozen water, no food in her pen, and a body condition score of 1.5/9.

In a separate pen there were 4 yearling foals. There was a chestnut, a grulla, a bay, and a palomino of unknown sexes. They all ranged from a 1.5-2/9 body condition score. They did not have any feed in their pen and their water tank was frozen.

In my opinion these horses all appear to be suffering from starvation and malnutrition. The owner did not seem to acknowledge the severity of the problem, which is concerning to me that anything will be done to help them. There was very little hay noted on the property at the time of exam, and no feed in any of the pens despite it being 11:00 am. The owner noted that they hadn't had breakfast yet. All of the horses nickered and whinnied as we walked by as if hungry. I have grave concerns for the remaining thin horses, as Ron Swift admitted that several other horses had already died.

If you have any further questions regarding this matter, please feel free to contact me.

Sincerely,

Ashleigh Olds Diedrich, DVM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT OLDS' MOTION FOR SUMMARY JUDGMENT [#61]

---

NOW COME the Plaintiffs, Randall J. Hatlee and Ronald L. Swift, by and through their

attorney, Brice A. Tondre, and for their memorandum in opposition to Defendant Olds' motion

for summary judgment [#61] state as follows:

### INTRODUCTION

Defendant Ashleigh Olds ("Dr. Olds") is a doctor of veterinary medicine licensed to

practice by the State of Colorado. Dr. Olds' baseless statements to the other Defendants, animal

rights activists and the news media resulted in the seizure of Plaintiffs' property and their

prosecution. (Amended Complaint [#22] para. 7).

The questions presented by Dr. Olds' motion for summary judgment [#31] are:

A. Was Dr. Olds acting under color of state law?

1

95

B.  Is Dr. Olds entitled to assert the defense of qualified immunity to the claims pursuant

to 42 U.S.C. §1983?

C.  Is Dr. Olds entitled to statutory immunity from the common law malicious

prosecution claim?

D.  Did Dr. Olds have probable cause to advocate institution and continuation of

prosecution of Hatlee and Swift?

In this jurisdiction the Court typically does not dismiss a complaint without giving the

plaintiff an opportunity to amend. *Hall v. Bellmon*, 935 F.2d 1106, 1109-1111 (10th Cir. 1991

## ARGUMENT AND AUTHORITY

### Dr. Olds was acting under color of state law.

Dr. Olds purports to have been acting as she did pursuant to the mandate of C.R.S. §13-

64-121which provides in relevant part:

> (1) A licensed veterinarian who, during the course of attending or treating an animal, has reasonable cause to know or suspect that the animal has been subjected to cruelty in violation of section 18-9-202…shall report or cause a report to be made of the animal cruelty…to a law enforcement agency or the bureau of animal protection.
>
> (2) A licensed veterinarian shall not knowingly make a false report of animal cruelty…to a local law enforcement agency or to the bureau of animal protection.
>
> (3) A licensed veterinarian who wilfully violates the provisions of subsection (1) or (2) of this subsection commits a class 1 petty offense, punishable as provided in section 18-1.3-503 C.R.S.
>
> (4) A licensed veterinarian who in good faith reports a suspected incident of animal cruelty…to the proper authorities in accordance with subsection (1) of this section shall be immune from liability in any civil or criminal action brought against the veterinarian for reporting the incident. In any civil or criminal proceeding in which the liability of a veterinarian for reporting an incident described in subsection (1) of this subsection is at issue, the good faith of the veterinarian shall be presumed.

2

96

This section mandates reporting and gives the reporting veterinarian immunity if the report is made in good faith. The report is not the act of citizen informant. It is the act of a co-actor with animal control officers mandated by state law.

Veterinarians are a prime source for detection of animal cruelty. Because of their education, training and experience they are well equipped to reach a scientific conclusion that an animal had probably been subjected to cruelty. As such they are part of the investigative team charged with the responsibility of detecting and prosecuting animal cruelty and thus an investigative arm of the state. The "reasonable cause" requirement of the statute requires that the veterinarian make an informed decision, not an unsupported guess. Reasonable cause is the same as probable cause.

Here, a report by Dr. Olds was not necessary. The skinny horses had already been reported by Agent Smith. It was a publicity stunt by Dr. Olds to endear her to horse lovers who were clients or potential clients. Her conduct throughout the case was that of an advocate for the seizure of Plaintiffs' horse and their prosecution.  One who causes the initiation or continuation of a seizure and/or prosecution on false premises, if done under color of state law, violates the Fourth Amendment and the common law. *Pierce v. Gilchrist*, 359 F.3d 1279, 1295-96 (10th Cir. 2004).

Agent Smith merely reported to Defendant Priestly that she saw 7 skinny horses wh en she was at the ranch. Priestly requested that Defendant Hardey investigate. Hardey investigated and after discussing her findings with Priestly, two veterinarians and a state animal cruelty investigator, a consensus decision was reached that the horses were not in danger and that Plaintiffs should be given 30 days to show that the horses were sick, not mistreated. Exhibits 1, 2

3

97

and 3).

What we have here is Park County animal control, the Department of Agriculture, Dr. Britt and Drs. Horton and Burton, all of believed that further investigation was necessary and Dr. Olds who was advocating seizure and prosecution without probable cause to believe that a crime had been committed. Exhibits 1, 2, 3, 5, 17, 22 and 23)

Because of the public outcry which Dr. Olds was able to incite, the unsupported allegations of Dr. Olds were accepted by the Sheriff's Office Defendants who believed further investigation was necessary. Due to the public pressure incited by Dr. Olds, a conspiracy to seize and prosecute without probable cause was formed, thus making Dr. Olds a state actor.

The facts clearly demonstrate that Dr. Olds was not acting in good faith and did not have reasonable cause to suspect animal cruelty. Dr. Olds steadfastly asserted that the horses were intentionally starved by the Plaintiffs and steadfastly refused to even consider that they may be sick rather than starved. No veterinarian supported her approach. In fact, Dr. Olds did not follow her own diagnosis protocol (Exhibit 31pp.31-32) and her clinic's protocol (Exhibit 12).

Animal Control Officer Dawn Smith from the Routt County Sheriff's Department visited Echo Valley Ranch to perform a check on Bear, a horse under Routt County's care and custody. Officer Smith reported to Defendant Gore who reported to Defendant Priestly that during her visit to the ranch she noticed seven very thin horses.

On February 16, 2012, Defendant Hardey went to the ranch to do a welfare check. On that same date Officer Smith, accompanied by Dr. Olds, went to the ranch for the purpose of seizing Bear and taking it to Dr. Olds' clinic for evaluation and treatment.

While on the ranch Dr. Olds noted that seven of the horses were thin and that one was

4

98

down and under the care of a veterinarian. Without any evaluation, examination or investigation of the seven horses Dr. Olds stated that the seven horses had been starved, mistreated and neglected and demanded that Defendant Hardey seize the seven horses and take them to Dr. Olds clinic for evaluation and treatment. Defendant Hardey communicated the demand to Defendant Priestly who instructed Defendant Hardey to tell Dr. Olds to take Bear and leave the premises. (Exhibits 1amd 2).

Dr. Olds had no reasonable basis to know or suspect that the seven horses had been subjected to cruelty. In fact, Dr. Olds' demand was below the standard of care for a veterinarian. She did not even begin to develop a differential diagnosis before making her unfounded claims of criminal conduct by the Plaintiffs. (Exhibit 26).

Defendant Hardey evaluated the seven horses, noted they had food and water available, and noted that the other 34 horses on the ranch were in good condition. Defendant Hardey advised Defendant Priestly, two veterinarians and an animal control investigator of her findings. They reached a consensus decision that the horses were safe and to leave the horses in the care and custody of the Plaintiffs. (Exhibits 1 and 2).

The consensus decision to leave the horses in the care and custody of the Plaintiffs infuriated Dr. Olds. After she learned of the consensus decision Dr. Olds again told Defendant Hardey that the horses were suffering from a very clear cut case of starvation and malnutrition. (Exhibit 4).

After her demands were again refused, Dr. Olds embarked on a campaign to bring pressure to bear on the Sheriff's Office in order to cause the horses to be seized and the Plaintiffs to be prosecuted. Dr. Olds allowed her unfounded claims to be broadcast over Chanel 7 News

and encouraged Harmony HorseWorks to embark upon a public outcry that the horses be seized and the Plaintiffs be prosecuted. Based upon Dr. Olds opinion and request, Harmony HorseWorks embarked upon a publicity campaign which was successful. There were threats to take Plaintiffs' horses away from them and threats to injure Plaintiffs.

Defendants Priestly, Gore and Wagener, despite their knowledge that seizure of the horses was not permissible under the facts or the law, directed Defendant Hardey to obtain a warrant. They undertook this approach in hopes that it would prevent Harmony HorseWorks and its followers from taking matters into their own hands which they were threatening to do if the Sheriff's office did not act to their satisfaction. Said Defendants failed to take the proper course of prosecuting those who were threatening a breach of the peace. This was an attack on the innocent to avoid prosecuting the guilty.

The threats which caused the Defendants Hardey, Priestly, Gore and Wagener to seize the horses and institute prosecution of the Plaintiffs were a direct outgrowth of the unfounded claims of Dr. Olds and her promotion of the public campaign which led to their action.

The Sheriff's Office succumbed to the pressure and obtained the Plaintiff's agreement to move the horses. When that did not quell the public outcry, the Sheriff's Office breached its contract with the Plaintiffs by seizing the horses and instituting prosecution of Plaintiffs.

The Defendants Hardey, Priestly, Gore and Wagener agreed to the demands of Dr. Olds in order to quell the public outcry, despite any legal basis to do so. This constitutes a conspiracy between them and Dr. Olds to violate Plaintiffs' rights under the Fourth Amendment.

The warrant to seize the horses was obtained through material omissions. It was later determined that the warrant was illegal. The jury acquitted the Plaintiffs of the charges of animal

6

100

cruelty. Dr. Olds was the only Veterinarian who testified for the prosecution.

A more complete discussion of the pressure exerted by Dr. Olds and her followers and how it affected the Sheriff's Office is presented in Plaintiffs' responses to the four dispositive motions of Defendants Wegener, Gore, Priestly and Hardey.

Dr. Olds is considered to have been acting under color of state law under the joint participation theory announced in *Lugar v. Edmondson Oil Company, Inc.*, 457 U.S. 922 (1982) and/or the conspiracy theory announced in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) and discussed further in *Dennis v. Sparks*, 449 U.S. 24 (1980) and *Tower v. Glover*, 467 U.S. 914 (1984).

In *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) the Court reviewed the theories under which private individuals are considered to be state actors. The relevant discussion is found at 1453-1457 under the heading "Joint Action". Cited in the discussion is *Wagenmann v. Adams*, 829 F.2d 196, 209-211 (1st Cir. 1987) which affirmed a finding that a private citizen was a state actor because of evidence that he exerted influence over a police investigation which led to the illegal arrest and incarceration.

Each member of the conspiracy is liable for all of the overt acts performed by all members of the conspiracy. Hence, Dr. Olds is responsible for procuring issuance of the warrant and commencement continuation of the prosecution.

Here Dr. Olds incited a public campaign designed to cause the other Defendants to seize the horses and prosecute the Plaintiffs. In the words of Harmony HorseWorks on February 18, 2012, "wait and see what happens after the email blast goes out." (Exhibit 8).The basis for the email blast was the unfounded statement of Dr. Olds that the horses were suffering from a very

7

clear cut case of starvation and malnutrition which the Sheriff's office was doing nothing about.

The public campaign incited by Dr. Olds caused the other Defendants to agree to Dr. Olds' unfounded demands. Thus the Joint Action began.

The Exhibits to this memorandum portray the conspiracy. Contained in the Separate Statement of Material Facts is a summary of the content and significance of each Exhibit.

There can be no doubt that procuring a warrant with an affidavit which fails to disclose material facts is a violation of the Fourth Amendment. *DeLoach v. Bevers*, 922 F.2d 618, 621-622 (10th Cir. 1990); *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991).

There also can be no doubt that malicious prosecution by state actors is a violation of the Fourth Amendment. *Pierce v. Gilchrist*, 359 F.3d 1279 (2004).

Dr. Olds knew by virtue of her training and experience as a veterinarian that without investigation her allegations of animal cruelty were unfounded. The other Defendants also knew the allegations were unfounded which is the reason for the agreement to evaluate the horses for 30 days while they remained in Plaintiffs' custody and care. Therefore, all Defendants knew that there was no reasonable basis to seize the horses or prosecute the Plaintiffs without completion of an investigation. Dr. Horton, Plaintiffs' veterinarian, was of the opinion that much more analysis had to be done before a conclusion as to what was causing the condition of the seven horses could be reached. (Exhibits 17, 22 and 23).

Failure to complete the investigation was a violation of the Fourth Amendment. *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010); *Cortez v. McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007).

Dr. Olds asserts that she cannot be held liable for a violation of the Fourth Amendment

8

102

and common law malicious prosecution because she did not and could not obtain a warrant or commence a prosecution.

Her assertion is debunked by *Pierce v. Gilchrist*, 359 F.3d 1279, 1291-1294 (10th Cir. 2004) which points out that §1983 applies "not only to a person who 'subjects' but also to any person who 'causes to be subjected'…any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

An action for malicious prosecution can be brought against the one who procures the issuance of a warrant or the institution of a prosecution as well as the one who institutes them. Restatement, Second, Torts: § 653.

Dr. Olds did, in fact, cause the warrant to be issued and the prosecution to be commenced by the publicity campaign based upon her unfounded statements that the horses had been starved, mistreated and neglected.

**Dr. Olds is not entitled to qualified immunity.**

Dr. Olds claims she is entitled to assert a qualified immunity defense. She relies on *Filarsky v. Delia,* 132 S.Ct. 1657 (2012). Filarsky was an attorney hired by a fire department to conduct an investigation of the conduct of an employee. The court held he was entitled to qualified immunity because the nature of his engagement was similar to part time employment.

The nature of Dr. Olds' involvement is far different from that of Filarsky. The other Defendants were co-conspirator of Dr. Olds who acted in a fashion purposely calculated to cause the other Defendants to seize Plaintiffs' horses and prosecute them. Dr. Olds accomplished the conspiracy by inciting public outcry for the seizure and prosecution. This is not a situation which situates Dr. Olds for the same immunities as an employee of the Sheriff's Office. Hence, *Wyatt v.*

9

103

*Cole*, 504 U.S. 158,168-169 (1992) which denies applicability of qualified immunity to the private actor, is the appropriate authority. It holds that private persons who conspire with state officials to violate constitutional rights are not entitled to a qualified immunity defense.

**Dr. Olds is not entitled to statutory immunity.**

The statutory immunity granted by C.R.S. §13-64-121 does not apply to §1983 claims. *See, Martinez v. California*, 444 U.S. 27, 284 n.8 (1980); *Howlett v. Rose*, 496 U.S. 356, 376-77 (1990); *Felder v. Casey*, 487 US. 131, 139 (1988).

Nor does the statutory immunity require dismissal of the common law malicious prosecution claim. The facts alleged support the conclusion that there was not a good faith basis for Dr. Olds' accusations.

**Dr. Olds did not have probable cause to advocate prosecution and its continuance.**

Lack of a good faith also defeats the existence of probable cause. A reasonable veterinarian would not make the assertions made by Dr. Olds because she had no scientific basis. She ignored her own protocols for making a diagnosis. That is unreasonable.

Exhibit 26 details why Dr. Olds was not acting reasonably, in good faith or with probable cause.

## V. CONCLUSION

10

104

It is respectfully submitted that, based on the foregoing, the motion for summary judgment must be denied.

/s/ Brice A. Tondre

_____

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado   80226
Telephone:  303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this the 3rd day of  January, 2015, a true and correct copy of the foregoing document was electronically  filed with the Clerk of Court using the CM/ECF system which will send notification of the filing to the following:

Timothy P. Schimberg
t_schimberg@fsf-law.com

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre

_____

11

*105*

# EXHIBIT 1

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

On February 16, 2012, at approximately 7:30AM, Deputy B. Sears asked me if I wanted to meet a Veterinarian at the Bailey Substation at 9:00AM, for Routt County. Deputy Sears said the veterinarian was going to be seizing a colt, per court order at the Echo Valley Ranch and needed an officer from our county to company her. I scheduled Park County Sheriffs Corporal J. Plutt and Deputy N. Hanning to accompany me with the court documents for removal of the colt.

At approximately 9:00AM, Doctor Ashleigh Olds, D.V.M. arrived at the Bailey Substation. From there Dr. Olds and I cleared the Bailey Substation and responded to a near by parking lot and waited for Cpl. Plutt and Deputy Hanning's arrival. At approximately 9:50AM, Cpl. Plutt and Deputy Hanning arrived and we all responded to 1640 Park County Road 70, Bailey, Colorado, also known as Echo Valley Ranch.

Upon arrival I spoke with Swift. I advised Swift I was there because Routt County had gotten a court order to remove one of the colts on his property. I also told Swift that I had received a complaint from Smith stating he had seven horses at a health score of a 2, using the Henneke Body Scoring Technique. I asked Swift if I could take Dr. Olds to see the colt. Swift took Dr. Olds, her assistant and I to the colt that was located in the low level of the barn. The colt was lying in the horse stall and was unable to get up off the ground. A male party that worked at the ranch was in the horse stall with the colt trying to get the colt to stand on his feet. The male party identified himself as:

### S- Randall Hatlee (DOB 07/23/1959)

While Hatlee and Dr. Olds where trying to get the colt named Bear- aka "Little Big Man", (Bay/ dark brown in color,) to stand on his feet, I asked Cpl. Plutt to take pictures of all the horses on the property. After asking Plutt to take pictures of the horses I walked back to where the colt was laying. While in the lower level of the barn I heard a loud stomp on the upper level floor. I asked Swift what that noise was Swift advised me that he had his Drum Mare named "Maggie", upstairs lying down on a pad and wood chips because she was really sick. I asked Swift if I could go see "Maggie". Swift took Cpl. Plutt, Dr. Olds and I up to the upper part of the barn. While in the upper part of the barn I observed "Maggie" lying on a pad with wood chips under the pad. "Maggie" was skinny and had wounds all over her body from being stuck on the ground and not being able to get off of the ground. Cpl. Plutt took pictures of "Maggie" (see attached pictures.) The wounds were located on "Maggie's" left and right side of her body and on "Maggie's" head (see attached pictures.) I did a visual body score on "Maggie", scoring "Maggie" at a 2.5 to a 3, using the Henneke Body Score Technique. I have been certified in Cruelty to Animal Investigations for over six years and have had over 4000 hours of training to include experience in the field of rating animals using the Henneke Body Score Technique.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE

CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

I asked Swift why "Maggie" was so sick. Swift said he did not know why "Maggie" was lying in the pasture on February 10, 2012, when he noticed her. Swift said that Hatlee and he went out to the pasture made a lift to get the horse off the ground and pulled her to the barn. Swift said he called the Veterinarian Dr. Horton, from the Timberline Equine Veterinary Services, and had her come to the ranch to see what was wrong with "Maggie." I asked Swift to call Dr. Horton on his person cellular so I could speak with her about "Maggie." While on the telephone with Dr. Horton I asked her when she had received a telephone call from Swift in reference to "Maggie" being down. Dr. Horton said she had received a telephone call from Swift on February 11, 2012, and responded solo. Dr. Horton felt that "Maggie" had a disease or had a neurological problem.

I told Dr. Horton that I was not comfortable with leaving "Maggie" just lying in the barn. Dr. Horton said she gave Swift and Hatlee instructions for "Maggie" and if at any time the horse appeared to be going down hill from there then they needed to put "Maggie" down, (humanely euthanize.) I asked Dr. Horton if she would email me a statement of everything she did medically on "Maggie." Dr. Horton believed "Maggie" could possibly have Botulinum Toxicity (a poison that attacks the neurological system) or Tic Paralysis. Dr. Horton gave Swift and Hatlee de-wormer and had Hatlee place an order for medication to help with the Botulinum Toxicity.

After speaking with Dr. Horton I walked back to the barn where I observed the colt to be standing outside of the barn tied to the truck located on the driveway. Dr. Olds and her assistant untied "Bear" from the truck and walked him to their trailer where "Bear" was placed.

When Dr. Olds returned from loading "Bear," Dr. Olds looked at me and asked if we could speak in private. Dr. Olds and I walked over to the side of the barn and she expressed her feeling about "Maggie." Dr. Olds felt that Maggie was suffering and she needed to be humanly euthanized. I told Dr. Olds that I had spoken to Dr. Horton about the horses' condition and Swift was aware of her condition. If Swift needed to humanely euthanized "Maggie" he would. Dr. Olds asked me if I had seen the condition of the other horse located on the ranch. Dr. Olds and I walked down to the lower level of the barn where the outside corrals were located and the other horse could be viewed.

I observed a horse named "Lena, (Swift's horse) Lena was very emaciated her bones were protruding on her Withers, Loin, Point of hip and Tail head (see attached pictures.) I visually scored "Lena" at a 2 to 2.5 using the Henneke Body Score Technique. "Lena" was a Sorrel Paint Mare, white and orange brown in color.

I then walked over to a horse that I could see on the other side of the driveway. The horses name was "Midnight, (Swift's horse)" "Midnight" was very emaciated her bones were protruding on her Withers, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "Midnight" at a 2 to 2.5 using the Henneke Body Score Technique. "Midnight" was a Breeding Stock Mare, brown in color. The brown is so dark she might be mistaken as black.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE

CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | 2/16/2012 |

There were other horses in corrals next to the horses listed but they were not emaciated, or skinny for that matter. Dr. Olds and I walked to the far outside corral located at the back of the ranch. There were four yearlings in the corral. Their names were as follows:

"Fiona, (Swift's horse)" – Palomino, Grade Filly gold in color. "Fiona" was very emaciated her bones were protruding on her Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "Fiona" at a 1.5 to 2 using the Henneke Body Score Technique.

"Echo, (Hatlee's horse)" – Grullo, Grade Stud brown and grey in color. "Echo" was very emaciated his bones were protruding on his Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "Echo" at a 1.5 to 2 using the Henneke Body Score Technique.

"River, (Hatlee's horse)" – Bay, Grade Gelding black and brown in color. "River" was very emaciated his bones were protruding on his Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "River" at a 1.5 to 2 using the Henneke Body Score Technique.

"Chance, (Hatlee's horse)" – Sorrel, Grade Gelding brown in color. "Chance" was very emaciated his bones were protruding on his Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "Chance" at a 1.5 to 2 using the Henneke Body Score Technique.

. asked Swift how old his colts and fillies were, he replied that they were around one to two years of age. I asked Swift why they were so skinny he said he believed there was something going on with all of his horses. Swift believed the horses all had Botulinum Toxicity. While I was speaking to Swift about his horses I was approached by Dr. Olds and she suggested I remove all the horses from the Ranch.

After Dr. Olds left the ranch I responded back to where "Maggie" was located. Cpl. Plutt, Deputy Hanning, Swift and Hatlee were trying to get "Maggie" to roll over. Cpl. Plutt and I took a rope that had been placed on "Maggie's" legs and pulled the rope until "Maggie" was rolled over. Once "Maggie" was rolled over Hatlee and I placed grain bags behind "Maggie." "Maggie could not hold herself up. Hatlee gave "Maggie" some grain and water. "Maggie" drank the water and ate her grain.

Swift and Hatlee advised me that they feed "Maggie" every two hours and have been rolling her over every two hours as requested by Dr. Horton. I decided to fill out a "State Notice of Warning" for all the horses in question. Which I issued to Swift and Hatlee regarding the poor health and welfare of some of their horses.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

The State Notice of Warning Stated:

- There are four yearlings that scored a 1.5 using the Henneke Body Score Technique.
- Lena and Midnight scored visually at a 1.5 on the Henneke Body Score Technique.
- You will have a month from today to gain HEALTHY weight on the 6 horses.
- Animal Control will be doing routine visits every two days for the next two to three weeks to monitor "Maggie" black Drum Mare, and all 6 horses in question.
- If there is an issue with any horse Animal Control will be advised (notified.)
- If you fail to rectify the Condition of the Animals in question you maybe charged.
- Note, Animal Control will be monitoring the health of all animals every 2 days for the next 2 weeks.

While filling out the State Notice of Warning, Swift and Hatlee advised me that they needed to go feed the rest of the herd. I asked Swift and Hatlee where they would like me to put the State Notice of Warning. Hatlee stated I could just set the State Notice of Warning in the driver seat of his truck. I signed the State Notice of Warning and because either Swift or Hatlee were present I placed their copy on the driver seat of Hatlee's truck and cleared the residence.

At approximately 4:00PM, I received an email from Dr. Olds. Dr. Olds was successful in getting "Bear" to her facility and had to give "Bear" I.V- fluid before she could get "Bear" out of the trailer. According to Dr. Olds "Bear" had fallen down in the trailer while transporting him to the clinic.

Dr. Old email reads:

- **"Officer Hardey: I have attached a letter with a summary of the findings today. Hopefully this will useful in obtaining an order to seize the remaining horses and/or get permission to euthanize the down mare. If she dies, I would recommend a necropsy at CSU to confirm whether she died of starvation vs. botulism. The little gelding that we took today is doing OK, although he went down in the trailer and was too weak to get up when he got to the hospital. We had to run IV fluids, Iv dextrose, calcium, and hydrate him for several hours before we could assist him to a standing position. He appears very hungry and has been eating non-stop since he got here. His blood work shows extreme anemia among other problems. He is not showing any signs of botulism and to me appears to be a very clear cut case of starvation and malnutrition." (See attached documents for further information.)**

I also received an email from Dr. Horton reference the condition of "Maggie. Dr. Horton stated she did not examine the six other horses on the ranch at the time she was called out. Dr. Horton was only there to tend to "Maggie."

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

# EXHIBIT 2

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

I received a call from Deputy Hardey stating that some of the horses on the property were in good condition and others were in a compromised condition. Deputy Hardey was most concerned about a Drum Mare named "Maggie" that was down and unable to rise. This horse was currently under veterinarian care and had been prior to our arrival according to Deputy Hardey. The veterinarian that was treating the horse identified as "Maggie" was Dr. Horton, DVM and Dr. Burton, DVM both certified doctors of veterinarian medicine and co-owners of Timberline Equine Veterinary Services. I was advised the horse had been down since February 10, 2012 and the owner had called his veterinarian's immediately to treat the horse.

Deputy Hardey stated that the other horses on the property that were thin were four young horses between one and two years of age. The three colts and one filly were all scored visually at 1.5 or 2 the Henneke Body Condition Scoring System by Deputy Hardey. The Henneke Body Condition Scoring System is an objective system used by palpating six areas on a horse for deterioration of muscle mass and or atrophy of fatty tissue. The score of "1"; is described as extremely emaciated and no fatty tissue can be palpated the horse is in danger of death. A score of "9" is described as; extremely fat and obese and could also be in danger of death. Deputy Hardey stated that the," Babies looked bad and they were very thin." I was also told that a mare named "Midnight" who was approximately thirteen years old and her daughter another mare named "Lena" were thin as well. The two older mares were scored visually by Deputy Hardey at a 2 or a 2.5.

Deputy Hardey advised me that Swift had hay and water available for the horses and she had spoken with his veterinarian Dr. Horton about "Maggie". I was told the other veterinarian that was at the ranch a Dr. Ashley Olds, DVM that was assisting Routt County in seizing the colt was certain the horses on the property were being mistreated and suffering from nothing more than neglect.

Deputy Hardey advised me that according to Dr. Horton, DVM she was concerned that "Maggie" was suffering from some medical illness such as Tic Paralysis, Botulism Toxicity, or a neurological condition. Dr. Horton did confirm that she was contact by Swift to treat the horse named "Maggie" on February 11, 2012. Dr. Olds, DVM was almost demanding according to Deputy Hardey and insistent on Park County seizing all of the horses. I advised Deputy Hardey to have Dr. Olds leave with the horse they were ask remove under court order.

I contacted **Dr. Kate Anderson, DVM with Colorado Department of Agriculture, State Veterinarians Office** on her cellular telephone. I explained the facts as I understood them to Dr. Anderson, DVM. She stated that if the owner had his veterinarian caring for the horse that was down and tests were being run she was comfortable with us just monitoring the situation for now. I also contacted **Scot Dutcher, Chief Investigator with the Bureau of Animal Protection** and advised him of the case our agency was investigating.

I then placed a telephone call to another independent veterinarian that our office has used in other cases. I contacted **Dr. Britt, DVM with Rocky Top Veterinary Services.** DR. Britt, DVM agreed with Dr. Anderson, DVM and stated that if the owner was treating the horse that was down that was an educational step in the right direction. Dr. Britt stated to see what some of the test results were before we took immediate action. Dr. Britt,

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 155

112

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

I received a call from Deputy Hardey stating that some of the horses on the property were in good condition and others were in a compromised condition. Deputy Hardey was most concerned about a Drum Mare named "Maggie" that was down and unable to rise. This horse was currently under veterinarian care and had been prior to our arrival according to Deputy Hardey. The veterinarian that was treating the horse identified as "Maggie" was Dr. Horton, DVM and Dr. Burton, DVM both certified doctors of veterinarian medicine and co-owners of Timberline Equine Veterinary Services. I was advised the horse had been down since February 10, 2012 and the owner had called his veterinarian's immediately to treat the horse.

Deputy Hardey stated that the other horses on the property that were thin were four young horses between one and two years of age. The three colts and one filly were all scored visually at 1.5 or 2 the Henneke Body Condition Scoring System by Deputy Hardey. The Henneke Body Condition Scoring System is an objective system used by palpating six areas on a horse for deterioration of muscle mass and or atrophy of fatty tissue. The score of "1"; is described as extremely emaciated and no fatty tissue can be palpated the horse is in danger of death. A score of "9" is described as; extremely fat and obese and could also be in danger of death. Deputy Hardey stated that the," Babies looked bad and they were very thin." I was also told that a mare named "Midnight" who was approximately thirteen years old and her daughter another mare named "Lena" were thin as well. The two older mares were scored visually by Deputy Hardey at a 2 or a 2.5.

Deputy Hardey advised me that Swift had hay and water available for the horses and she had spoken with his veterinarian Dr. Horton about "Maggie". I was told the other veterinarian that was at the ranch a Dr. Ashley Olds, DVM that was assisting Routt County in seizing the colt was certain the horses on the property were being mistreated and suffering from nothing more than neglect.

Deputy Hardey advised me that according to Dr. Horton, DVM she was concerned that "Maggie" was suffering from some medical illness such as Tic Paralysis, Botulism Toxicity, or a neurological condition. Dr. Horton did confirm that she was contact by Swift to treat the horse named "Maggie" on February 11, 2012. Dr. Olds, DVM was almost demanding according to Deputy Hardey and insistent on Park County seizing all of the horses. I advised Deputy Hardey to have Dr. Olds leave with the horse they were ask remove under court order.

I contacted **Dr. Kate Anderson, DVM with Colorado Department of Agriculture, State Veterinarians Office** on her cellular telephone. I explained the facts as I understood them to Dr. Anderson, DVM. She stated that if the owner had his veterinarian caring for the horse that was down and tests were being run she was comfortable with us just monitoring the situation for now. I also contacted **Scot Dutcher, Chief Investigator with the Bureau of Animal Protection** and advised him of the case our agency was investigating.

I then placed a telephone call to another independent veterinarian that our office has used in other cases. I contacted **Dr. Britt, DVM with Rocky Top Veterinary Services. DR. Britt, DVM** agreed with Dr. Anderson, DVM and stated that if the owner was treating the horse that was down that was an educational step in the right direction. Dr. Britt stated to see what some of the test results were before we took immediate action. Dr. Britt,

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

DVM offered to look at some photographs of the downed mare and give any additional ideas if possible. DR. Britt, DVM told me that he had two Botulism Toxicity cases in the Guffey area and according to him those cases are not very common.

I called Deputy Hardey back and asked her what she thought she should do in this case. Deputy Hardey stated that she was concerned the horse named "Maggie" was suffering and needed to be euthanized. Deputy Hardey also stated she was comfortable based on the information I had relayed from Dr. Anderson, DVM, DR. Britt, DVM and Scot Dutcher with serving a State Notice of Warning. She was going to monitor the horses and leave them in the care of the owners at this point.

Deputy Hardey stated that Swift was asking to speak with me on her telephone about the horse named "Maggie". I spoke with Swift about the horses on the telephone at that time briefly. I asked Swift why the young horses were in such bad shape and Swift stated that he did not bring them in soon enough. Swift said, "You caught me on the babies Bobbi I screwed up, Helen had a heart attack and I have had a lot going on and I blew it." I asked him if "Maggie" was suffering and if she needed to be put down. Swift stated that he would put her down if he needed to. Swift said, "She still eats and drinks, she still has fight in her and as long as she has fight I will fight along side of her, you know me Bobbi I will do the right thing here." I was advised by Swift that something was going on with his herd, "Midnight" was thin and she always loses weight in the winter and I was well aware of that. His veterinarians think there is some disease problem but it is not a starvation issue. I asked Swift what the sores were all over "Maggie's" body and he explained it me that the sores were pressure sores from lying down. He stated that the veterinarian said it was just like "bed sores" that elderly people get from not being able to get up. That is why the doctors asked the horse be moved every two hours.

Deputy Hardey stated she had Corporal Jenny Plutt take several photographs and she would meet with me after she completed a State Notice of Warning. The agreement was the six horses that were standing would be checked weekly and expected to show signs of improvement within a thirty day period. The downed mare known as "Maggie" while under veterinarian care would also be monitored by Park County Animal Control every other day. Any changes in the horses' conditions were to be reported to authorities immediately.

I contacted Scot Dutcher again and asked him about the possibility of the horses having Botulism and he advised me that typically if a horse had Botulism it hits them hard and the horse will die as a result of the toxin. I confirmed this with Dr. Britt on the two cases he tried to treat the previous year. Dr. Britt stated the two cases he saw the horses were not thin; the horses tongue was flaccid. Dr. Britt explained that Botulism Toxicity causes the horse to lose control of the muscles it needs to chew and swallow. The horse will drool not only from its mouth but also from the nostrils. The horse will also seem weak all over. In advanced stages the horse will collapse and begin jerking its legs as if trying to run while lying down. Death soon follows the later stages. The horse in this case has some similar symptoms. Dr. Britt stated he was supportive of leaving the horses at the property and officials monitoring to care of the animals, until some of the test results were in.

156

| Officer's Signature & Number | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|
| Sgt. B. Priestly #9522 | | |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Dr. Britt stated he would be glad to go and examine the horse. The only thing he would suggest he would give the owner would be if the mare was not standing on her own within twenty-four to forty –eight hours he would recommend euthanasia.

I asked Dr. Britt about the possibility of Tic Paralysis and he was reserved about this even being a possibility. He stated he has never seen a case in Colorado, but that does not mean anything. He felt the time of the year was a factor and ticks are usually out in the spring season not the winter. I asked what the symptoms of Tic Paralysis are and he stated coordination loss, which would lead to paralysis of the legs and chest muscles.

On February 17, 2012 I was contacted by Deputy Hardey and advised that "Maggie" was deceased and that Timberline Equine Veterinary Services had arranged a necropsy with Colorado State University. The necropsy was to determine the horse's cause of death.

On February 19, 2012 I received a telephone call from Under sheriff Gore at my residence. The Under sheriff advised me that he had received several telephone calls from the Public Information Officer for State of Colorado's Department of Agricultures Office. He was very concerned for the safety of the owners of the horses and the horses themselves. The Under sheriff stated that he had been on the telephone all morning and the emails and telephones calls were very concerning to him. He asked if I could make arrangements to move the horses. I advised the Under sheriff that I would see if the owners would agree to move the horses into protective custody on a temporary basis.

Deputy Hardey contacted Swift and Hatlee and they did agree to move the horses. I completed a written agreement that was signed by Hatlee, Swift and Deputy Hardey. This agreement was turned over to Deputy Hardey and has been placed in the case file.

The horses were moved from the Echo Valley Ranch and transported by Swift and Hatlee. The horses were moved to a private ranch in Park County and housed in an enclosed barn. The horses were provided with veterinarian care by Timberline Equine Veterinary Services while at this location. I assisted with unloaded the horses and accessing them once they were taken off of the trailers. I noticed that the younger horses back legs were quivering when they walked. The horses were given hay and water before we left the area. Hatlee was concerned about one of the young colts named "Chance". Hatlee advised us that the colt had been collapsing frequently and that he was unable to rise on his own.

On February 21, 2012 at approximately 10:30 AM, I received a call from Dr. Horton, DVM. Dr. Horton called and stated that she had some preliminary results on the necropsy that was done on "Maggie". I recorded a portion of this conversation (see attached audio disk). Under sheriff Monte Gore and Sheriff Fred Wegener were both in the office for the conversation with Dr. Horton.

Dr. Horton stated:

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly #9522 | | | Page ____ | of ____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Rabies was the first thing that was tested for and that test came back negative. The spinal cord was removed and there was a lesion found. This was an abnormality according to Dr. Horton. Dr. Horton stated that the death of this horse was not the owners fault.

The most significant thing was an abscess in the wall in the heart. The abscess was blocking the blood flow and new channels were being made to allow blood flow. There was a infection in the bones. She would contact Deputy Hardey with the final results.

Dr. Horton stated she would do a blood draw on the other six horses. If the weakness persists it could be an electrolyte problem. The colt named "Chance" was showing some neurological symptoms such as cranial nerve functions and sensory functions and no reaction to nostril sensations. He was given a Body Condition Score 1/9 and a heart murmur was found.

On the mare named "Midnight" she scored her at a 3/9. "Echo" was scored at a 1/9, "Fiona" was 2/9, "River" was 1/9, and "Lena" was a 1 or 2/9. The fact was all of these horses were too thin and Swift was told that. She was contacted to first respond to the ranch and treat "Maggie" on February 11, 2012. When she went out to the location to do the blood draw on the other six horses the caretaker told her the horses were urinating frequently in small amounts. Dr. Horton stated she did not observe this herself while she was there. The care taker also advised her that "Chance" was leaning on his left side and again she stated that she did not observe this on her visit.

Dr. Horton stated that she was in no hurry to jump to conclusions in this case as it is not a clear cut case at all. However, if an owner sees that horses are experiencing rapid weight lose it is their responsibility to contact a veterinarian rather than just letting it go.

I asked Dr. Horton if she cared for the younger horses at all. She advised me that she had castrated a couple of them a year or two ago and she had seen them visually when they were tiny babies. That was the only treatment she had provided. She stated that she was informed that a couple of the babies were rescued from a feedlot and she thought "Chance" may have one of those babies.

I asked Dr. Horton if she had anything to do with treating the colt that was seized and the mare (mother of that colt) that had died. Dr. Horton stated that she had not seen the colt recently or the mare. She said that her practice was contacted by Routt County Animal Control to oversee their care when they arrived in Park County and to castrate the colt. The last time they had seen the horses was on June 28, 2011. Routt County Animal Control was placed on a No Service basis due to failure to pay.

Dr. Horton stated she went to treat and examine "Maggie" by herself on February 11, 2012 and Dr. Burton and her both went to check the horse on February 13, 2012. Dr. Horton stated that the other horses were not even evident to her on the day the colt was seized. She never even saw them at all and she wanted that to be made perfectly clear.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | 2012000142 |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

I asked Dr. Horton if she felt getting the hay at the Echo Valley Ranch tested would be a good idea and she stated that she thought that would be helpful.

Sheriff Wegener had one question for Dr. Horton. He asked if she thought Swift did not call a vet sooner because he was an older rancher and he thought he could take care of things himself. Dr. Horton told the Sheriff that she felt that would fit Swift. Dr. Horton stated that Swift had a lot of confidence in his experience as a horseman, he has some strongly held values as to how they should be doctored and what is appropriate. She also said that Swift was going through some very difficult personal circumstances and he was very overwhelmed. Dr. Horton stated that with these issues it is still not an excuse to notice horses with body conditions this low.

Dr. Horton then asked about death threats and harassing phone calls. She stated that she had received some harassing telephone calls from a lady named Shelly Ferrero. Dr. Horton stated she does not read Pinecam and she was basically told if she wanted any clients in the area she would convince Swift to relinquish the horses. She was under the impression that Shelly had some connection to Dr. Ashley Olds and Aspen Creek Large Animal Clinic. She called Dr. Olds and advised her that she had not seen the colt that was seized for several months but, she wanted to pass on any information she had on the seized colt. She advised Dr. Olds that Swift had told her the colt had needed assistance standing up for four to six weeks prior to having been seized. Dr. Horton stated she had no idea who had custody of the horse or who was responsible for the horse. The Sheriff told her to report the harassing telephone calls to the proper authorities. Dr. Horton told us that in her opinion she believed that this case was at fork in the road. She believed the horses would need to have further diagnostic testing done which would be expensive or the horses should be euthanized. Swift was not going to be able to afford all of the diagnostic testing that needed to be done.

On February 23, 2012 I assisted Deputy Cindy Hardey in removing the six horses named on a search warrant from a property located at 1401 Park County Road 77. We had no issues in loading any of the horses except one colt named "Chance". He went down in the trailer which means he collapsed when we tried to load him into the trailer. This is the same colt that was sick and was collapsing daily. After all the horses were loaded we responded immediately to the Park County Jail to get blankets and see if we could get the colt up with some assistance with extra man power. After approximately fifteen minutes we were able to get the colt up and standing on all four legs. We left the county and responded to a undisclosed location to meet a veterinarian.

Upon arrival to the facility where the six horses will be kept and cared for, we met the veterinarian who will be caring for the horses while in our custody. The veterinarian identified herself as:

**IP/ Dr. Lois Toll, DVM**

159

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

# EXHIBIT 3

**COLORADO DEPARTMENT OF AGRICULTURE**
**BUREAU OF ANIMAL PROTECTION**
**700 KIPLING ST., SUITE 4000**
**LAKEWOOD, CO 80215-5894**

## NOTICE of WARNING

Case Number: _2013000142_    Date: _2-16-2012_    Time: _1200_ ⊛/p.m.

Warning Issued To: _Ron Swift_    Tele: _303-908-2957_

Driver's License: _____    Date of Birth: _____

Address: _Fern Valley Ranch_    S.S.# _____

City: _Bailey_    State: _Co_    Zip: _80421_

Animal Description: _Th-BRD Grizzle Horse Dog_    F ___ M ___

Animal Name: Quarter horse "Magic" (down) cat    F ___ M ___

_Sorel, Bay, Palomino, Grulla_  Horse _X_    F _X_ M _Y_

_Ma = Quarter horse / ther BRD Middle_  other    F ___ M ___

Our agent has discovered that you are allowing to exist or contributing
to a condition which could constitute a violation of Colorado law. To
avoid further action, this condition must be corrected by _/  /_
The violation found by the agent was:
    "Abandon" means the leaving of an animal without adequate provisions for the
    animal's proper care by its owner, the person responsible for the animal's care
    or custody, or any other person having possession of such animal.

    "Mistreat or Mistreatment" means every act or omission which causes, or
    unreasonably permits the continuation of unnecessary or unjustifiable pain or
    suffering.

    "Neglect" means failure to provide food, water, protection from the elements,
    or other care generally considered to its normal, usual, and accepted for an
    animal's health and well-being consistent with the species, breed, and type of
    animal.

_X_ Other _There are the 4 yearlings that score visually a 1.5 on Henneke body s-_

Action Necessary to Comply: _to a midnight same visually a 1.5 on Henneke Body s,_
_You will have a month from today to gain HEALTHY weight on the 6 horses. Animal control_
_within doing routine visits every two days for the next two weeks to monitor "Alige" Back_
_Drone Mare, and all 6 horses in question. If there is an issue with any horse Animal Control w-_
_be abuse (notified) monitored if you fail to rectify the condition ___ in question you_

Our Agent will do a follow up visit on or about: _3 / 16 / 2012_  may be every.
Thank you for your cooperation in this matter. Note: Animal control will be monitori
Posted to Door _X_  Issued in Person _X_  Date _2 / 16 / 2012_ Time: _1220hrs_ the health
                                                                of Animal
                                                    every 2 day for the next
| SIGNATURE BOX | | 2 weeks |

INVESTIGATOR: _L. Hardy_  923 ·    _PCSO_
            Signature        ISSUING AGENCY
TELEPHONE: _719-256-4380_

RECIPIENT OF NOTICE: _____
            Signature                    49

## This is a legal document

docN: BAPWARN
Distribution: White-Recipient  Yellow-Issuing Agency  Pink-State Office
                        Swift, Ronald 12M44, Hatlee, Randall 12M44
                        Discovery 49                    ole/129

119

Appellate Case: 16-1065   Document: 01019620890   Date Filed: 05/16/2016   Page: 124

# EXHIBIT 4

Page 1 of 1

---

**ⓘ You forwarded this message on 2/17/2012 3:50 PM.**

**Cindy Hardey**

| | | |
|---|---|---|
| From: | aolds@aspencreeklac.com [aolds@aspencreeklac.com] | **Sent:** Fri 2/17/2012 1:24 PM |
| To: | Cindy Hardey | |
| Cc: | | |
| Subject: | RE: letter of statement | |
| Attachments: | | |

I also wanted to let you know that we did contact the Botulism Laboratory at the New Bolton Center in Pennsylvania (this is the national expert on botulism). We discussed the case histories of the horses and also discussed sending samples of feed, blood, or feces for testing. The head veterinarian there said that based on the exam findings that I noted, there is no way that the cause of the illness in the the horse we have or the down horse could be botulism. Neither have tongue paralysis and this one can eat fine, he is just weak from malnutrition. We can send samples of feed to be tested if the owner of the horses continues to insist that is is botulism, or the wounds on the down mare can also be cultured for botulism, but the veterinarian seemed to think it was a waste of time since the symptoms don't fit with botulism.

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

---

**From:** "Cindy Hardey" <CHardey@parkco.us>
**Sent:** Friday, February 17, 2012 8:29 AM
**To:** aolds@aspencreeklac.com
**Subject:** RE: letter of statement

Dr. Olds,

Thank you so much,.

---

Deputy C. Hardey
719-836-4380

---

From: aolds@aspencreeklac.com [mailto:aolds@aspencreeklac.com]
Sent: Thu 2/16/2012 4:35 PM
To: Cindy Hardey
Subject: letter of statement

Officer Hardey:

I have attached a letter with a summary of the findings today. Hopefully this will useful in obtaining an order to seize the remaining horses and/or get permission to euthanize the down mare. If she dies, I would recommend a necropsy at CSU to confirm whether she died of starvation vs. botulism. The little gelding that we took today is doing OK, although he went down in the trailer and was too weak to get up when he got to the hospital. We had to run IV fluids, Iv dextrose, calcium, and hydrate him for several hours before we could assist him to a standing position. He appears very hungry and has ben eating non-stop since he got here. His blood work shows extreme anemia among other problems. He is not showing any signs of botulism and to me appears to be a very clear cut case of starvation and malnutrition.

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

---

PARK CTY DEFS_000299

121

Ashleigh Olds Diedrich
Aspen Creek Veterinary Hospital
23605 Oehlmann Park Rd
Conifer, CO 80433
(303) 697-4864
www.aspencreeklac.com

February 16, 2012

To whom it may concern:

Today I was asked by Park County Animal Control and Routt County Animal Control to attend the seizure of a 2 year old gelding. The gelding was located at Echo Valley Ranch in Bailey, Colorado at the time of seizure.

On arrival, the gelding was laying down in a very dark and filthy stall. He did not appear able to rise on his own despite encouragement. The footing in the stall was thick with manure, urine and mud. He was caked in manure and mud. His body condition score was 1/9 on the Henneke scale. I estimate his weight at500 lbs. After multiple attempts to get him to stand, I was called away to examine another very thin horse that was recumbent in the upper area of the same barn. When I returned, a ranch hand had gotten this gelding up and had him tied to a truck. He was then loaded into a trailer and transported to Aspen Creek Veterinary Hospital for further evaluation and treatment. During the trailer ride, the horse layed or fell down from weakness and rode the rest of the way down in the trailer. On arrival at the vet hospital, he was too weak and uncoordinated to stand on his own. He was lifted and carried into a stall. Bloodwork revealed severe anemia, elevated white blood cell count, dehydration, low calcium levels, and various other abnormalities. After treatment with IV fluids, IV dextrose, IV calcium, IV antibiotics, and intramuscular vitamin injections (vitamin B complex and Vitamin E/selenium) my staff was able to assist the gelding to a standing position. He has shown great interest in food and water since arrival and has a voracious appetite. At this time my professional assessment is that the gelding is suffering from extreme malnutrition and starvation. 'He is not showing any signs of botulism or other neurological disorder. He is extremely small for his age, likely as a result of malnutrition. As a result of suspected starvation he is at risk for death due to "re-feeding syndrome" which can cause heart failure, kidney failure, and sudden death as a starved animal is returned to normal nutrition. On a long term basis he is at risk for orthopedic joint disease and cartilage disruption (OCD, bone cysts, etc.) due to improper nutrition during his prime growing years.

It is worth noting that during the examination of the property, an adult female horse was recumbent in the upper area of the barn. This was a black mare. She was roughly a body condition score 1/9. She had been down since Saturday (5 days) per the owner. When we initially arrived, Ron Swift indicated to the animal control officers that the horse was dead. When I examined her I noted that she was breathing. He then admitted that she had been down for 5 days. He claims that she could sit up and drink and eat every two hours, but I was unable to get her into a sternal or sitting position. The mare was covered in severe pressure sores on her face, shoulders, and hips. She could paddle her legs and struggle to move,

PARK CTY DEFS_000297

122

but could not even get into a sitting position. She had reduced tail tone, but normal eyelid tone, tongue tone, and facial tone. The owner claimed that she was being "treated" for either tick paralysis or botulism. I asked what the treatment was, and he indicated that there was no treatment. He claimed to be rolling the mare every 2 hours from side to side. My personal opinion on examination of the horse is that she was not necessarily showing any evidence of botulism or tick paralysis, but more likely is suffering from malnutrition and starvation. I also believe that a horse that is recumbent should either be euthanized or transported to a hospital facility for more intensive care such as anti-inflammatories, IV fluids and nutritional support, antibiotics, wound care for the pressure sores, and intermittent slinging. A horse that remains down for days on end is a severe risk for aspiration pneumonia, dehydration, sepsis from pressure sores, lung collapse, colic, and many other complications.

There were also two other adult horses on the property that were extremely thin. One was a sorrel and white paint mare. She had a frozen water tank and no food in her pen on arrival. I would grade her body condition score a 1.5/9. There was another black mare in another pen who also had frozen water, no food in her pen, and a body condition score of 1.5/9.

In a separate pen there were 4 yearling foals. There was a chestnut, a grulla, a bay, and a palomino of unknown sexes. They all ranged from a 1.5-2/9 body condition score. They did not have any feed in their pen and their water tank was frozen.

In my opinion these horses all appear to be suffering from starvation and malnutrition. The owner did not seem to acknowledge the severity of the problem, which is concerning to me that anything will be done to help them. There was very little hay noted on the property at the time of exam, and no feed in any of the pens despite it being 11:00 am. The owner noted that they hadn't had breakfast yet. All of the horses nickered and whinnied as we walked by as if hungry. I have grave concerns for the remaining thin horses, as Ron Swift admitted that several other horses had already died.

If you have any further questions regarding this matter, please feel free to contact me.

Sincerely,

Ashleigh Olds Diedrich, DVM

# EXHIBIT 5

⊙ You replied on 2/16/2012 4:24 PM.

**Cindy Hardey**

| | | | |
|---|---|---|---|
| **From:** | F BURTON [horseydoc@msn.com] | **Sent:** | Thu 2/16/2012 3:04 PM |
| **To:** | Cindy Hardey | | |
| **Cc:** | | | |
| **Subject:** | 4 yr old Blk Drum mare Echo Valley Ranch | | |
| **Attachments:** | | | |

Dear Officer Hardey,

Ron Swift is a regular client of Timberline Equine Veterinary Services. We were first summoned to examine Maggie, a 3 to 4 year old black Shire cross mare, for this condition on Saturday afternoon, 2/11/12. Dr. Burton was unavailable for this call, so I responded solo. Approaching the ranch, I saw Maggie down in the pasture amidst a group of people and vehicles. Maggie was attempting to rise but was unable to succeed. On exam, I found Maggie alternating between right lateral and sternal recumbency. Heart rate was noted to be within normal limits, but irregular in rhythm, suggesting a marked sinus arrythmia and potentially second degree AV block. Respiratory rate was initially elevated at approximately 40, but later slowed significantly to 12 to 18. Mucous membranes were pale pink and moist and CRT was less than 2 seconds. Temperature was 98.0. Her mentation alternated between BAR (bright, alert, responsive) and somnolent. When not exhibiting somnnolence, she demonstrated a vigorous appetite and normal cranial nerve function, including tongue retraction. Maggie demonstrated some motor function of her forelimbs, but with a flaccid character that was clearly abnormal. Hypotonia was noted in all four limbs. Tail tone, anal tone and perineal reflex were all noted to be present, but decreased. Muscle tremors were noted in the right brachium and left thigh. Body condition score was noted to be 2/9. No signs of external trauma were noted. The owner and several others were attempting to lift Maggie with the aid of a small tractor, which I stopped immediately, owing to the risk of an improper lift resulting in injury to the patient. During my observations, Maggie ceased attempting to rise and came to prefer right lateral recumbency.

At this point, my presumptive diagnosis was botulinum toxicity, predicated primarily on the flaccid paresis/paralysis and the relatively normal mentation. Underlying my assessment of my exam findings and observations was knowledge of two other strikingly similar cases in the near vicinity in recent weeks and the fact that two of these animals were fed hay from big round and/or square bales, which are known to present an increased risk of botulinum contamination. Horses are exquisitely sensitive to botulinum toxin making it all but impossible to definitively confirm due to low levels of the toxin in blood and GI contents. The only treatment for botulism is nursing care, time and hope. Antitoxin is available, but without a definitive diagnosis, the risks may exceed any potential benefits. On my advice and with my assistance, Maggie was moved out of the snow and into the barn on a sled. Owner was advised to place Maggie on deep bedding and to turn her every 2 hours. He was advised to provide alfalfa hay and water ad libitum. Owner asked repeatedly about lifting Maggie in a sling, which I discouraged owing to not only the logistical difficulty of properly and safely operating a sling, but also serious complications associated with pressure points created by the sling. Maggie's size exacerbates these complications. Furthermore, slings are really only appropriate when an animal is able to support some of their own weight,and this was not the situation with Maggie. I advised that it would be best to attempt to manage her "down".

Other differential diagnosis included, in no particular order; 1. mosquito bourne encephalitides (WEE, EEE, WNV) 2. tick paralysis 3 . EHV  4. Rabies 5. trauma 6. malnutrition 7. myopathies 8. Wobbler syndrome 9. hypocalcemia 10. Toxic plant ingestion.  None were an obvious or convincing match to the clinical picture Maggie presented.

Owner called frequently with updates on Maggie's condition, indicating improvement in alertness and the ability to urinate and defecate. He reported that she was resting in sternal recumbency at least half of the time.

The above summarizes events of Saturday, February 11, 2012.

A. R. Horton, DVM, MS

Subsequent to this, attempts were made to gather further information from colleagues at the State Veterinarian's office, Colorado State University and Littleton Equine Medical Center as well as references.

Consideration was given to testing, but due to a combination of the costly nature of testing and the lack of sensitive and specific tests available for many of the conditions on the list of differentials, none has been performed as yet.

Mr. Swift called on Monday, describing Maggie moving her limbs while laying on her side. On further questioning, she was alert and seemed oriented to Mr. Swift after these episodes, but there was some concern that he could have observed seizure activity. Because of this concern, both of us went to the ranch to re-examine Maggie.

Maggie was on deep wood shavings with bales of hay placed around her and a heat lamp overhead. She had a temperature of 100.8 , a pulse of 48 with pronounced sinus arrhthmia and a respiratory rate of approximately 20. Gut sounds were normally present. Mucous membranes were pink and moist with a normal CRT. She could still retract her tongue. Her attitude was quiet and she was somewhat somnolent, but she has been eating and drinking. Her anal tone was decreased to absent. She had passed a normal

PARK CTY DEFS_000931

(Ex 6)

125

quantity of soft manure. The soft character of the stool was attributed to the change in her diet to alfalfa hay. A single spot of normal-colored urine was present in the bedding, and she was not dribbling urine. We did observe the limb motion described by the owner and concluded that it was not pathologic, but simply an attempt to get comfortable, and probably indicated a need to be turned. We also discussed the inevitability of bedsores and made some suggestions to mitigate that eventuality.

Consultations with colleagues did not yield any new avenues to pursue, as the general assessment was that the signs did not fit particularly well with any one diagnosis. Tick paralysis, however, was not mentioned by any of our colleagues.
Interestingly, consultation of a toxicology reference did confirm that tick paralysis does occur in horses and the clinical signs were quite consistent with Maggie's. It was also noted by Mr. Swift that Bear, another horse on the ranch that had shown similar signs, had begun to improve after being coincidentally dewormed with ivermectin, which would have affected any parasite taking a blood meal.

Given these circumstances, the decision was made to treat for tick paralysis with ivermectin and Equi-Spot, a topical permethrin product.

In the meantime, Maggie has shown more inclination to move her limbs. Given this change, attempts were made to arrange for a sling to be brought to the property with the intent of determining if Maggie could support even a portion of her weight. If she can, the sling can be used to intermittently. If not, she must continue to be managed down. Euthanasia has not been recommended at this point due to the fair prognosis of tick paralysis. The appearance of bed sores is not unexpected, nor are they evidence of abuse or neglect, and steps are being taken to treat this problem.

A.R. Horton DVM, MS

Fay Burton, DVM

PARK CTY DEFS_000932

126

# EXHIBIT 6

-----Original Message-----
From: Harmonyhorsewrks@aol.com
Date: Fri, 17 Feb 2012 21:28:54 -0500 (EST)
Subject: Starving Horses Bailey, CO

Mr. Roehr,

I wanted you to see the slide show of the horse that was delivered to Aspen Creek
Veterinary Hospital on Feb. 15. I was there and took most of the photos of Little Big
Man. These are not the worst of the photos of the horses you have declared OK to
stay where they in their hair-raising circumstances. This is a huge mistake as their
lives are in danger. Water and hay cannot bring them back to health and there is
probably no truth in the statement that they have botulism. Have tests been done?
Do the symptoms match the disease. Have you contacted a botulism expert? Please
take a look and reconsider. For horses to be in this dire a condition, the situation
must have been going on for months. This decision does not seem right nor does it
fit the needs of the horses.

http://pix.kg/p/416168114214%3A811361237/scl

These slideshow photos show the 2 year old colt, weighing about 300 lbs. instead of
700 or more, who was hauled in on Feb. 16 under the Routt County impound. He
wears a foal's blanket in the slideshow! The other horse to be impounded along with
him by Routt County had already died. Who is not seeing what we are seeing here?
You can see the other horses in his herd at the end of the slideshow may be in even
worse condition. On the Henneke scale, they seem less than 1. I have rescued and
rehabilitated horses for 10 years and find these horses to be among the worst I have
ever seen. To have a government official explain to one of our board members that
the horses are not starving seems bizarre.

Little Big Man was unable to stand up in the trailer and in his clinic stall. He was
hauled up to a standing position this morning for the first time and stood eating. Tell
me this is not starvation. Are we all blind? Botulism tests are being run on him so
that we won't be dealing with theoretical diagnoses anymore. Even if it is botulism,
does it make sense to leave horses lying on the ground with sores down to their
bones for days on end? This is "failure to thrive" in the classical sense of the
definition and any vet or official who says these horses are not starving is in
complete denial. You have given them a death sentence. We have foster and
adoptive homes lined up for them if the miracle of their removal from this toxic
environment and their subsequent healing should ever take place.

We appeal to your office to reconsider this decision by you and Mr. Wegener and to
remove these horses to a safe and healing environment where they can be properly
cared for and brought back to condition. Don't let any more of these horses die. Too
many have already died on this property in Bailey. What is compassion except to see
yourself clearly in these animals and respect their right to well-being? Let us take
our role as their stewards seriously and cease being their persecutors.

Barbara Wright
Harmony HorseWorks
Horse Sanctuary & Therapy Center
501(c)(3) Nonprofit Corp.

# EXHIBIT 7

| Subj: | **Little Big Man's Herd** |
| Date: | 2/18/2012 3:24:50 PM Mountain Daylight Time |
| From: | Harmonyhorsewrks@aol.com |
| To: | burton@timberlineequine.com |
| *Sent from the Internet (Details)* | |

Hello Drs. Hudson and Burton,

I don't know if you remember me. We met a couple of years ago at Anchorage Farms at Chris's place when I gave a talk on Equine Stress Control Therapy and you made a presentation. I think you had just moved into the area back then.

Our appeal to you is a simple and direct one, one that could almost immediately discreate all the problems around the emaciated herd at Ron Swift's Echo Valley property.

We have a fund set up for the horses for their medical care. We have JeffCo HEAT standing by to evacuate them. We have veterinarians ready to offer discounted services for the rehabilitation of the horses. We have adoptive homes ready to take them in once they are fit for transfer. All we need is your help in convincing Mr. Swift to release them quietly and without any brouhaha and the entire burden of dealing with the controversy will disappear. The state will be out of it, threatened lawsuits will disappear, you can continue your good practice unimpeded and the media will leave everyone alone, not to mention the fact that the horses will be given a chance to thrive. I can't think of a better scenario for everyone involved.

Unfortunately, it would be up to you two to gain Mr. Swift's approval. We hope you are willing and up to it. I am happy to help any way our sanctuary can. Can you let me know what you think? Holding the welfare of the horses in our hearts, we are:

Barbara Wright
**HARMONY HORSEWORKS**
*Horse Sanctuary & Therapy Center*
*501(c)(3) Nonprofit Corp.*
13639 Elsie Road
Conifer CO 80433
(303) 816-0766
harmonyhorsewrks@aol.com
www.harmonyhorseworks.com
www.barbarawrightart.com
**MAKE ROOM FOR A HORSE IN YOUR HEART!
MAKE ROOM FOR A HORSE IN YOUR ART!**

**http://www.iGive.com/HarmonyHorseworks**
When you register with iGive and shop online through the iGive portal, a percentage of the sale is donated to Harmony HorseWorks when you indicate us as the charity of your choice.

Harmony HorseWorks is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY used to heal spooky, anxious and nervous horses and Equestrian Performance Coaching (EPC) using PEAT energy psychology for the fearful rider. We are a Colorado non-profit corporation in good standing and a tax exempt 501[c][3] corporation (DLN 17053235026024) since February 23, 2004. FEIN 20-0763702.

# EXHIBIT 8

Print



**Date:** February 18, 2012 9:32:13 AM MST
**To:** STOP_HORSE_CRUELTY@yahoogroups.com
**Subject:** Fwd: re Bailey

From: Harmonyhorsewrks@aol.com
To: TCourt5096@aol.com, greenrivertroutfarm@yahoo.com, stevestoddard@earthlink.net
CC: jre@theanimallawcenter.com, lauraallen@animallawcoalition.com, emk@idausa.org,
kdane@hsus.org, cnclmark@gmail.com, arthur_kane@kmgh.com,
alan.prendergast@westword.com, rachelle@vectorair.net, aleta.t.wagner@lmco.com,
cricketgurl@gmail.com, patamadre@aol.com
Sent: 2/18/2012 5:51:08 A.M. Mountain Standard Time
Subj: Re: re Bailey

Monika,

I share your frustration. Because this is so bizarre, Routt County obviously being
compassionate and seeing the starvation and Park County playing blind, it could be
something is going on behind the scenes that we do not know about. It could be
budgetary, too. Dawn Smith at Routt County, who called me with this travesty, asked me if
I knew the Henneke scale. Of course, I answered. She said the one being pulled out
under their court order was a negative 1 and we were helping her because he would die on
the way back to Steamboat. Well, you saw the photos of him when he arrived in the trailer
at our vet's. She was right. One of our board members called Park County animal control
and was told by the officer the horses are not starving. When things go this wrong, it is
about money usually, not the welfare of the animals.

We'll wait and see what happens after the email blast goes out. The reporters who came
out to interview me and our vet were in complete disbelief about what was playing out, but
as you can see from the article on the Channel 7 web site, they are just reporting facts. We
copy them on our correspondence to keep them aware the situation is not dead yet. You
can click on the link.

http://www.thedenverchannel.com/news/30486436/detail.html

Barbara Wright
Harmony HorseWorks
*Horse Sanctuary & Therapy Center*
*501(c)(3) Nonprofit Corp.*
13639 Elsie Road
Conifer CO 80433
(303) 816-0766
harmonyhorsewrks@aol.com
www.harmonyhorseworks.com
www.barbarawrightart.com
**MAKE ROOM FOR A HORSE IN YOUR HEART!**
**MAKE ROOM FOR A HORSE IN YOUR ART!**



**http://www.igive.com/HarmonyHorseworks**
When you register with iGive and shop online through the iGive portal, a percentage of the
sale is donated to Harmony HorseWorks when you indicate us as the charity of your
choice.

Harmony HorseWorks is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY used to heal
spooky, anxious and nervous horses and Equestrian Performance Coaching (EPC) using PEAT energy
psychology for the fearful rider. We are a Colorado non-profit corporation in good standing and a tax exempt
501[c][3] corporation (DLN 17053233026024) since February 23, 2004. FEIN 26-0763702.

123

101/129

EXHIBIT 9

13639 Elsie Road
Conifer CO 80433
(303) 816-0766
harmonyhorsewrks@aol.com
www.harmonyhorseworks.com

http://www.chronofhorse.com/forum/showthread.php?p=6148528 5/23/2012

-----------------------------------------------------------------

**Feb. 19, 2012, 07:45 PM**

**BEARCAT** ●
Advanced

Join Date: Jun. 24, 2004
Location: South Park
Posts: 1,775

⌐ **Just received this update on Little Man**

...does not sound good for the others...

"He's up and walking around (in the vet clinic) for the first time in many weeks. He
may have been down for as long as 6 weeks. 3 we know for sure. This is a miracle and
we pray it continues. His eyes are brighter, his ears prick and are alert, and he nuzzles
your hand when you come into his stall. Still very weak and not animated, compared
to a healthy horse, he proves that this is not neurological and is starvation. There was
never a question in our minds. If only we could get to the other 5 (the mare on the
ground with body sores died) we will have accomplished a miracle. This photos were
taken by the Ferraros who are helping with lobbying Officialdom to move on this
travesty.

I received a call from Dr. Courtney Diehl who used to work at Aspen Creek vet. She
remembers 3 or 4 years ago in the November timeframe going out to that hell hole
and trying to save a foal frozen into the snow. She worked for many hours but could
not bring him back. The foal was starving. Imagine how many horses have suffered
and died there since. She is up in Steamboat where Little Big Man originated and
remembers treating him and knew his dam. She offered her help in any way, including
funds and adoption homes saying Steamboat has money. Indeed.

Anyway, this is a bit of good news in a week that has been hard on horse lovers in our
community.

Bad news is that the remaining horses have been moved, this news from the the State
Vet's office, and we assume it was the owner who moved them since they are private
property and the State doesn't have the legal right to move them, yet. If that is the
case, they are probably already dead.

Barbara

Barbara Wright
Harmony HorseWorks"





134

# EXHIBIT 10

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| Case Report Number |
|---|
| **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Dr. Britt stated he would be glad to go and examine the horse. The only thing he would suggest he would give the owner would be if the mare was not standing on her own within twenty-four to forty –eight hours he would recommend euthanasia.

I asked Dr. Britt about the possibility of Tic Paralysis and he was reserved about this even being a possibility. He stated he has never seen a case in Colorado, but that does not mean anything. He felt the time of the year was a factor and ticks are usually out in the spring season not the winter. I asked what the symptoms of Tic Paralysis are and he stated coordination loss, which would lead to paralysis of the legs and chest muscles.

On February 17, 2012 I was contacted by Deputy Hardey and advised that "Maggie" was deceased and that Timberline Equine Veterinary Services had arranged a necropsy with Colorado State University. The necropsy was to determine the horse's cause of death.

On February 19, 2012 I received a telephone call from Under sheriff Gore at my residence. The Under sheriff advised me that he had received several telephone calls from the Public Information Officer for State of Colorado's Department of Agricultures Office. He was very concerned for the safety of the owners of the horses and the horses themselves. The Under sheriff stated that he had been on the telephone all morning and the emails and telephones calls were very concerning to him. He asked if I could make arrangements to move the horses. I advised the Under sheriff that I would see if the owners would agree to move the horses into rotective custody on a temporary basis.

Deputy Hardey contacted Swift and Hatlee and they did agree to move the horses. I completed a written agreement that was signed by Hatlee, Swift and Deputy Hardey. This agreement was turned over to Deputy Hardey and has been placed in the case file.

The horses were moved from the Echo Valley Ranch and transported by Swift and Hatlee. The horses were moved to a private ranch in Park County and housed in an enclosed barn. The horses were provided with veterinarian care by Timberline Equine Veterinary Services while at this location. I assisted with unloaded the horses and accessing them once they were taken off of the trailers. I noticed that the younger horses back legs were quivering when they walked. The horses were given hay and water before we left the area. Hatlee was concerned about one of the young colts named "Chance". Hatlee advised us that the colt had been collapsing frequently and that he was unable to rise on his own.

On February 21, 2012 at approximately 10:30 AM, I received a call from Dr. Horton, DVM. Dr. Horton called and stated that she had some preliminary results on the necropsy that was done on "Maggie". I recorded a portion of this conversation (see attached audio disk). Under sheriff Monte Gore and Sheriff Fred Wegener were both in the office for the conversation with Dr. Horton.

Dr. Horton stated:

| Officer's Signature & Number | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|
| Sgt. B. Priestly #9522 | | |

Rev. 6/98
N

Form: PCSO-

84
136

# PARK COUNTY SHERIFF'S OFFICE

## CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Rabies was the first thing that was tested for and that test came back negative. The spinal cord was removed and there was a lesion found. This was an abnormality according to Dr. Horton. Dr. Horton stated that the death of this horse was not the owners fault.

The most significant thing was an abscess in the wall in the heart. The abscess was blocking the blood flow and new channels were being made to allow blood flow. There was a infection in the bones. She would contact Deputy Hardey with the final results.

Dr. Horton stated she would do a blood draw on the other six horses. If the weakness persists it could be an electrolyte problem. The colt named "Chance" was showing some neurological symptoms such as cranial nerve functions and sensory functions and no reaction to nostril sensations. He was given a Body Condition Score 1/9 and a heart murmur was found.

On the mare named "Midnight" she scored her at a 3/9. "Echo" was scored at a 1/9, "Fiona" was 2/9, "River" was 1/9, and "Lena" was a 1 or 2/9. The fact was all of these horses were too thin and Swift was told that. She was contacted to first respond to the ranch and treat "Maggie" on February 11, 2012. When she went out to the location to do the blood draw on the other six horses the caretaker told her the horses were urinating frequently in small amounts. Dr. Horton stated she did not observe this herself while she was there. The care taker also advised her that "Chance" was leaning on his left side and again she stated that she did not observe this on her visit.

Dr. Horton stated that she was in no hurry to jump to conclusions in this case as it is not a clear cut case at all. However, if an owner sees that horses are experiencing rapid weight lose it is their responsibility to contact a veterinarian rather than just letting it go.

I asked Dr. Horton if she cared for the younger horses at all. She advised me that she had castrated a couple of them a year or two ago and she had seen them visually when they were tiny babies. That was the only treatment she had provided. She stated that she was informed that a couple of the babies were rescued from a feedlot and she thought "Chance" may have one of those babies.

I asked Dr. Horton if she had anything to do with treating the colt that was seized and the mare (mother of that colt) that had died. Dr. Horton stated that she had not seen the colt recently or the mare. She said that her practice was contacted by Routt County Animal Control to oversee their care when they arrived in Park County and to castrate the colt. The last time they had seen the horses was on June 28, 2011. Routt County Animal Control was placed on a No Service basis due to failure to pay.

Dr. Horton stated she went to treat and examine "Maggie" by herself on February 11, 2012 and Dr. Burton and her both went to check the horse on February 13, 2012. Dr. Horton stated that the other horses were not even evident to her on the day the colt was seized. She never even saw them at all and she wanted that to be made perfectly clear.

| Officer's Signature & Number | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|
| Sgt. B. Priestly #9522 | | |

Rev. 6/98
N

Form: PCSO-

90

137

## PARK COUNTY SHERIFF'S OFFICE

### CONTINUATION SHEET

| | | | Case Report Number |
|---|---|---|---|
| | | | **2012000142** |
| Initial Offense Classification | | Subject | Date of Report |
| **Cruelty to Animals** | | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

I asked Dr. Horton if she felt getting the hay at the Echo Valley Ranch tested would be a good idea and she stated that she thought that would be helpful.

Sheriff Wegener had one question for Dr. Horton. He asked if she thought Swift did not call a vet sooner because he was an older rancher and he thought he could take care of things himself. Dr. Horton told the Sheriff that she felt that would fit Swift. Dr. Horton stated that Swift had a lot of confidence in his experience as a horseman, he has some strongly held values as to how they should be doctored and what is appropriate. She also said that Swift was going through some very difficult personal circumstances and he was very overwhelmed. Dr. Horton stated that with these issues it is still not an excuse to notice horses with body conditions this low.

Dr. Horton then asked about death threats and harassing phone calls. She stated that she had received some harassing telephone calls from a lady named Shelly Ferrero. Dr. Horton stated she does not read Pinecam and she was basically told if she wanted any clients in the area she would convince Swift to relinquish the horses. She was under the impression that Shelly had some connection to Dr. Ashley Olds and Aspen Creek Large Animal Clinic. She called Dr. Olds and advised her that she had not seen the colt that was seized for several months but, she wanted to pass on any information she had on the seized colt. She advised Dr. Olds that Swift had told her the colt had needed assistance standing up for four to six weeks prior to having been seized. Dr. Horton stated she had no idea who had custody of the horse or who was responsible for the horse. The Sheriff told her to report the harassing telephone calls to the proper authorities. Dr. Horton told us that in her opinion she believed that this case was at fork in the road. She believed the horses would need to have further diagnostic testing done which would be expensive or the horses should be euthanized. Swift was not going to be able to afford all of the diagnostic testing that needed to be done.

On February 23, 2012 I assisted Deputy Cindy Hardey in removing the six horses named on a search warrant from a property located at 1401 Park County Road 77. We had no issues in loading any of the horses except one colt named "Chance". He went down in the trailer which means he collapsed when we tried to load him into the trailer. This is the same colt that was sick and was collapsing daily. After all the horses were loaded we responded immediately to the Park County Jail to get blankets and see if we could get the colt up with some assistance with extra man power. After approximately fifteen minutes we were able to get the colt up and standing on all four legs. We left the county and responded to a undisclosed location to meet a veterinarian.

Upon arrival to the facility where the six horses will be kept and cared for, we met the veterinarian who will be caring for the horses while in our custody. The veterinarian identified herself as:

### IP/ Dr. Lois Toll, DVM

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ | |

Rev. 6/98
N

# EXHIBIT 11

This is an agreement between Ronald Swift, Kirsten Le Beau and the Park County Sheriff's Office regarding six horses that are involved in a current case.

These six horses have not been confiscated, seized, or surrendered. These six horses have been moved from Echo Valley Ranch and placed in Protective Custody only.

Ronald Swift will be responsible for all cost of care for these horses including feed, and veterinarian care and Park County is not liable for any costs related to the care of these horses while they are in Protective Custody.

The six horses removed from Echo Valley Ranch are described as:

Ron 1- "Midnight" Breeding Stock Paint Mare- 13/14 Years old.
Ron 2- "Lena" Sorrel Paint Mare
Randy 3- "Echo" Grullo Grade Gelding
Randy 4- "River" Bay Grade Gelding
Kay 5- "Chance" Sorrel Grade Gelding- SICK
Ron 6- "Fiona" Palomino Grade Filly

_If test results from Necropsy on Drum Mare indicate starvation was a factor in mares death charges may be filed against horse owners and at risk horses may be impounded at a later date if no other contributing factors are present other than neglect._

Date 2-19-2012

Deputy _Cindy R C Hartley  9525_

Owner _____

Owner _____

Owner _____

Owner _____

Caretaker _____

Caretaker _____               56

# EXHIBIT 12

Community Advertorial

The opinions expressed in advertorials are those of the advertiser only
and do not represent the opinions of Colorado Serenity.



**THEHORSEDOCS**

Laura WILHELM, DVM

Aspen Creek Veterinary Hospital

# Anemia and Your Horse

This month's article was submitted by Laura Wilhelm, DVM, of Aspen Creek Veterinary Hospital. Aspen Creek Veterinary Hospital services dogs, cats and livestock in addition to excellent care for horses. Their state of the art facility in Conifer provides hospitalization, critical care, surgery, advanced dentistry and after-hours emergency service. Their doctors are also available for house calls/farm calls. Aspen Creek's veterinary staff have many years of experience and various areas of expertise to provide the best in veterinary care. For more information about Aspen Creek Veterinary Hospital, please visit www.aspencreeklac.com or visit us on facebook!

In the scientific sense, anemia refers to a lack of healthy red blood cells (RBCs). This is not helpful in understanding the significance of anemia in terms of overall physical well-being. The most important job of the red blood cell is carrying oxygen from the lungs to cells throughout the body. A true lack of red cells means a decrease in the ability to deliver oxygen to tissues. This is particularly important here at altitude, where there is 5 percent less oxygen than at sea level.

As veterinarians, we find ourselves confronting anemia on a regular basis. We are often led to draw blood for a complete blood count based on the horse's history along with our physical exam. Some of the signs we see include poor hair coat, weight loss, failure to gain weight, chronic colic, fatigue and pale gums. Many of these signs can also be signs of other problems; anemia is often a result of another disease process. In order to treat anemia, we must first determine the cause.

There are three major mechanisms or categories for anemia: overall blood loss, decreased red cell production and increased red cell destruction. Each mechanism has subcategories

to further narrow the possible reasons. Though these guide us in our diagnosis of an underlying reason, they do not always lead to a straightforward answer. The size and physiology of equines only adds to the challenge of diagnosis and treatment for anemia.

The first category, excessive blood loss, can be the simplest to diagnose if the loss is external. Usually, the patient presents with some sort of hemorrhage and a history of trauma. The horse may have an obvious laceration, with blood pouring from an artery, or a severe nosebleed. Stemming the blood loss through pressure and/or closure of the wounds is the first step. In extreme cases, we do transfuse blood from a donor horse. Luckily for us, the average horse can lose 10-12 liters of blood and survive.

Internal bleeding produces the same effect but is a little harder to diagnose. Acute internal hemorrhage may be brought on by such things as a uterine artery tear post foaling, a tremendous blow to the abdomen or thoracic (chest) cavity, or rupture of an internal mass. There are also more insidious causes, such as an overburden of parasites or undetected gastric or colonic ulcers. These do not generally result in

large amounts of blood loss all at once, but they can create lesions that leak blood faster than the body is able to replace it. Definitive diagnosis of such lesions is difficult and often requires a thorough and expensive work up. When appropriate, we make informed decisions using conservative and less expensive tests, such as fecal review for the presence of parasites and/or blood.

The increased destruction of red blood cells (hemolysis) occurs as the immune system targets red blood cells for early removal from the circulatory system. Some diseases change the red blood cells, making them targets for the immune system. Blood parasites, some bacterial infections, toxins like red maple, cancers and equine infectious anemia virus all attach to or alter the RBCs, leading to their early demise. This typically hits quickly, and the bone marrow is not equipped to produce enough blood cells to make up for the loss.

Decreased red cell production occurs when the bone marrow is not forming and releasing an adequate number of functional red cells. This may result from unhealthy marrow (as in cases of cancer), nutritional deficiencies or as a product of chronic disease. In horses, primary marrow malfunction is rare but can be induced by some toxins and medications as well as cancers. Most equines

> "Solving the puzzle of anemia can be quite a diagnostic challenge."

today do not have true deficiencies in vitamins or minerals. The marrow in horses with a low grade bleed may not have a primary iron deficiency, but all available iron goes towards making new RBCs. That said, iron supplementation is often part of the treatment of anemia. Chronic diseases such as cancers, organ compromise, long standing pneumonia and many others can also result in an anemia.

To complicate matters further, a healthy horse can have a slightly low red cell count and be considered normal. Horses are fairly unique, in that they have the ability to store a large amount of red cells in their spleen. This reserve allows for a fast increase in their ability to move oxygen to tissue should they need to escape the local mountain lion. Unfortunately, this reserve is not always visible in routine bloodwork of a calm healthy horse.

Solving the puzzle of anemia can be quite a diagnostic challenge. As equine veterinarians, we look not only at the blood values and the microscopic appearance of red cells, but also at the presentation of the horse. A sick horse with a mild to moderate anemia is much more concerning than an apparently healthy horse with a mild anemia. A thorough history, routine bloodwork and a comprehensive physical exam are invaluable in determining the origin and an appropriate treatment for an anemic horse.

# EXHIBIT 13

| From: | Monte Gore |
|-------|-----------|
| To: | aolds@aspencreeklac.com; Bobbi Jo Priestly |
| Subject: | RE: horses |
| Date: | Wednesday, February 22, 2012 12:32:44 PM |

Thank you so much. I will let you know how it goes.

Monte

**From:** aolds@aspencreeklac.com [mailto:aolds@aspencreeklac.com]
**Sent:** Wednesday, February 22, 2012 11:23 AM
**To:** Monte Gore
**Subject:** horses

So I have conferred with my practice manager here and our hospital would be willing to house, feed, and treat all 6 horses at no cost to the sheriff's department until more permanent arrangements can be made. We have space for them and a host of volunteers who would be willing to donate time to help with their care. We would donate veterinary services for the initial evaluation period and to make sure that the horses are healthy enough to be moved to other rescues or foster homes.

Rod Cameron (farrier) has volunteered to trim feet and perform hoof care at no cost to all of the horses.

We already have several donations of grain and vitamin supplements, and could potentially obtain more from local owners and the feed stores if we had possesion of the horses and were free to ask/advertise the need.

JEFFCO HEAT has agreed to transport all the horses on short notice if needed.

The owner of Broce Ranch in Evergreen has volunteered to help house horses on a temporary basis if needed. In the summer they have a huge lush pasture.

I know Barbara Wright from Harmony Horse Works has already received a donation of $1500, and I suspect that much more could be raised if we were given the go ahead to publicly ask for and accept donations.

I have not been in contact with Barbara Wright today, but she previously indicated to me that she had offers from various horse rescues in the area that each could take 1-2 of the horses until permanent homes could be found for them.

So there are plenty of resources available for the immediate future of the horses and I have no doubt that permanent homes could be found based on the amount of publicity that has been generated.

If there is anything else that I can do for you, please feel free to let me know. If you do end up getting permission for surrender, please let us know ASAP and we can start getting accomodations ready.

Sincerely,

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

| From: | Shelley Ferraro |
|---|---|
| To: | Harmonyhorsewrks@aol.com; TCourt5096@aol.com; "Tamara "; "Joe and Ingrid"; "LISSCOJAN HALLADAY"; "Ashleigh Olds, DVM"; aolds@aspencreeklac.com |
| Subject: | FW: Bailey Horse kept in secret |
| Date: | Thursday, February 23, 2012 8:29:08 AM |

Please read below

-----Original Message-----
From: Bobbi Jo Priestly [mailto:BPriestly@parkco.us]
Sent: Wednesday, February 22, 2012 2:31 PM
To: shelley@shelleysdesigns.com
Subject: FW: Bailey Horse kept in secret

From: Monte Gore
Sent: Wed 2/22/2012 2:27 PM
To: Bobbi Jo Priestly
Cc: Rose Avey; 'Lee Phillips'; Sven Bonnelycke
Subject: RE: Bailey Horse kept in secret

Dear Shelley,

I am in receipt of your email; I can understand your frustration. I can
assure you the horses are being treated medically, and are being fed. Our
code enforcement officers are checking on them as well. I have not refused
any help from our community and have put things in motion to obtain
donations for the continued care and treatment of these horses. I agree
with you that this is a horrific situation, and we are working overtime to
complete a very comprehensive criminal investigation. We are working
diligently on this case. I can tell you straight up, we aren't on a power
trip. I would encourage you to share this information, I have been
providing press releases to the media and I have talked to the media about
this situation on several occasions, we are not being secretive, I will ask
my assistant to add all of you to our email list so that you will receive
press-releases, for this case only. I hope this helps.

Please do not hesitate to contact me for any reason.

Undersheriff Monte Gore

Olds Disclosure Documents Page 13

145

From: Bobbi Jo Priestly
Sent: Wednesday, February 22, 2012 7:23 AM
To: Monte Gore
Subject: FW: Bailey Horse kept in secret
Importance: HI

From: Shelley Ferraro [mailto:shelley@shelleysdesigns.com]
Sent: Tuesday, February 21, 2012 7:30 PM
To: Bobbi Jo Priestly; Harmonyhorsewrks@aol.com; aolds@aspencreeklac.com;
'Ashleigh Olds, DVM'; TCourt5096@aol.com; 'Tamara '; 'Tracey Egolf'; 'Tracy
Vroom'; 'Lightcap, Christi'; 'DVM Kimberly D. Brewster';
farviewhorserescue@comcast.net; 'Shirley hoffman'; 'Joe and Ingrid';
'Jennifer Reba Edwards'; 'Anderson, Kate'; 'Roehr, Keith'; 'LISSCOJAN
HALLADAY'; nancy@bustersnaturalpetsupply.com; 'TANYA Buck'; 'Shirley
hoffman'; 'Sydney Burt'; 'Sandy Jones'; 'Valerie Traina'
Subject: Re: Bailey Horse kept in secret
Importance: High

Sergeant B. Priestly,

Why don't you people do yourself a favor instead of continuing to shoot your
self in the foot. The community wants to know that the precious horses are
getting intense medical care in a animal hospital. They want to know the
horses are getting iv's and are being rehydrated and given electrolytes,
water and food. Why do you continue to refuse to the help the community in
knowing that these little horses are safe and are truly in competent care.
It's pretty simple, get over your power trip and settle this horrific
situation down, or your just going to continue to get jammed by the public,
this isn't going away anytime soon............if you don't know already this
is all over the country and people are watching and ready to take more
action.

Shelley Ferraro

Olds Disclosure Documents Page 14

146

| From: | Monte Gore |
| To: | aolds@aspencreeklac.com |
| Subject: | RE: horses |
| Date: | Thursday, February 23, 2012 2:32:25 PM |

Thank you...I hope it calms everything down as well. There is still a lot of mis-information out there.

Monte

**From:** aolds@aspencreeklac.com [mailto:aolds@aspencreeklac.com]
**Sent:** Thursday, February 23, 2012 11:42 AM
**To:** Monte Gore
**Subject:** RE: horses

I have attached a spread sheet from Harmony Horse Works listing confirmed and potential resources. Please let me know if there is anything else that I can do. I was very pleased with the statement that you released to Shelly Ferraro/email list - I hope that it will calm down some of the hysteria. :)

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

**From:** "Monte Gore" <MGore@parkco.us>
**Sent:** Wednesday, February 22, 2012 12:33 PM
**To:** aolds@aspencreeklac.com, "Bobbi Jo Priestly" <BPriestly@parkco.us>
**Subject:** RE: horses

Thank you so much. I will let you know how it goes.

Monte

**From:** aolds@aspencreeklac.com [mailto:aolds@aspencreeklac.com]
**Sent:** Wednesday, February 22, 2012 11:23 AM
**To:** Monte Gore
**Subject:** horses

So I have conferred with my practice manager here and our hospital would be willing to house, feed, and treat all 6 horses at no cost to the sheriff's department until more permanent arrangements can be made. We have space for them and a host of volunteers who would be willing to donate time to help with their care. We would donate veterinary services for the initial evaluation period and to make sure that the horses are healthy enough to be moved to other rescues or foster homes.

Rod Cameron (farrier) has volunteered to trim feet and perform hoof care at no cost to all of the horses.

We already have several donations of grain and vitamin supplements, and could potentially obtain more from local owners and the feed stores if we had possesion of the horses and were free to ask/advertise the need.

JEFFCO HEAT has agreed to transport all the horses on short notice if needed.

The owner of Broce Ranch in Evergreen has volunteered to help house horses on a temporary basis if needed. In the summer they have a huge lush pasture.

I know Barbara Wright from Harmony Horse Works has already received a donation of $1500, and I suspect that much more could be raised if we were given the go ahead to publicy ask for and accept donations.

I have not been in contact with Barbara Wright today, but she previously indicated to me that she had offers from various horse rescues in the area that each could take 1-2 of the horses until permanent homes could be found for them.

So there are plenty of resources available for the immediate future of the horses and I have no doubt that permanent homes could be found based on the amount of publicity that has been generated.

If there is anything else that I can do for you, please feel free to let me know. If you do end up getting permission for surrender, please let us know ASAP and we can start getting accomodations ready.

Sincerely,

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

**From:** Monte Gore
**To:** aolds@aspencreeklac.com
**Subject:** Press Release
**Date:** Thursday, February 23, 2012 5:46:33 PM
**Attachments:** sheriff letterhead II.doc

| From: | Monte Gore |
|---|---|
| To: | aolds@aspencreeklac.com; Bobbi Jo Priestly |
| Subject: | RE: horses |
| Date: | Wednesday, February 22, 2012 12:32:44 PM |

Thank you so much. I will let you know how it goes.

Monte

---

**From:** aolds@aspencreeklac.com [mailto:aolds@aspencreeklac.com]
**Sent:** Wednesday, February 22, 2012 11:23 AM
**To:** Monte Gore
**Subject:** horses

So I have conferred with my practice manager here and our hospital would be willing to house, feed, and treat all 6 horses at no cost to the sheriff's department until more permanent arrangements can be made. We have space for them and a host of volunteers who would be willing to donate time to help with their care. We would donate veterinary services for the initial evaluation period and to make sure that the horses are healthy enough to be moved to other rescues or foster homes.

Rod Cameron (farrier) has volunteered to trim feet and perform hoof care at no cost to all of the horses.

We already have several donations of grain and vitamin supplements, and could potentially obtain more from local owners and the feed stores if we had possesion of the horses and were free to ask/advertise the need.

JEFFCO HEAT has agreed to transport all the horses on short notice if needed.

The owner of Broce Ranch in Evergreen has volunteered to help house horses on a temporary basis if needed. In the summer they have a huge lush pasture.

I know Barbara Wright from Harmony Horse Works has already received a donation of $1500, and I suspect that much more could be raised if we were given the go ahead to publicly ask for and accept donations.

I have not been in contact with Barbara Wright today, but she previously indicated to me that she had offers from various horse rescues in the area that each could take 1-2 of the horses until permanent homes could be found for them.

So there are plenty of resources available for the immediate future of the horses and I have no doubt that permanent homes could be found based on the amount of publicity that has been generated.

If there is anything else that I can do for you, please feel free to let me know. If you do end up getting permission for surrender, please let us know ASAP and we can start getting accomodations ready.

Sincerely,

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

# EXHIBIT  14

From:       TCourt5096@aol.com
To:         aolds@aspencreeklac.com
Subject:    Re: Fw: Press Release
Date:       Saturday, February 25, 2012 1:27:50 PM

Dear Dr. Olds,

Thanks for writing and taking the time. I appreciate it. I will call Gore and ask if we will raise money, how it will be spent. I networked this case last week from the East to the West Coast, and if I send something out, it goes viral, I have a lot of connections. I doubt without the publicity and the public's pressure, this would have had the same outcome. It's always the same old...
Anyway, I wish the horses were at your clinic too. I only hope they are cared for by someone who knows what they are doing. I don't buy the excuses and hope the guy does get punished, yet we also know from experience, it may be just a misdemeanor not a felony. His attitude proved he should not have horses in the first place. Help is always available, one just needs to ask. I wish AC would advertise the existence of the local hay bank more, so many folks don't know it exists.
I have some friends who play open mic at the Ice House every Thursday. I thought that would be a good group who might come together to raise funds. But I will not rush into it now. I'll try to call Gore and see what his input is.
Thanks again for writing - and thanks for being there and caring.
Monika

In a message dated 2/24/2012 7:06:50 A.M. Mountain Standard Time, aolds@aspencreeklac.com writes:

Monika:

I don't know too much more than you do at this point. When I was out there, there was the down horse that died, and then there were 4 yearlings that looked terrible! and two adult horses a paint and a black mare that were also very very skinny. I believe that these 6 horses were seized. I don't have them and I don't know where they are. I suspect they were taken south to a rescue or vet hospital in salida, buena vista, or woodland park just to get them out of the area for now. I would strongly suggest talking with undersherrif Monte Gore before proceeding with any advertising or fundraising efforts. I have spoken with him several times and if you are reasonable with him I think you will find him very reasonable to talk to. He genuinely cares about the horses and wants to get them to caring homes eventually. He could answer the questions about what the needs of the horses are and how any money raised will be spent. I do think these are important questions to get answers to before undertaking any major fundraising efforts. I also know that eventually he hopes to adopt them out, but as I am sure you are aware, if the owner refuses to surrender the horses they can't be legally adopted out until the owner is convicted in court, otherwise there is always the possibility of him suing to get them back. However, once they are more healthy and all of their details are known (age, sex, and medical conditions, etc.) they may be able to be placed in foster homes in various rescues or private homes. At this point I don't think funds should go to Harmony. We were initially hoping that the horses might come to my hospital or Harmony (we both offered care for free to the sheriff's department), but at this time is doesn't appear to be the case. I believe that the one little guy in our hospital is taken care of for the time being financially. Undersheriff Gore's cell phone is at the bottom of the press release.

Thank you for all of your help. Barb at Harmony really got the publicity going in this and everyone else helped keep the fire on. I don't know if this would have been taken seriously without all the public pressure. Hopefully the end result will be that justice is served and the horses are homed where they will be FED!

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co

| From: | TCourt5096@aol.com |
| To: | aolds@aspencreeklac.com |
| Subject: | Re: Fw: Press Release |
| Date: | Saturday, February 25, 2012 2:57:24 PM |

I just wrote to Gore. He was pleasant on the phone. Maybe his hands are tied too.... aren't they all sometimes in these hierarchic structures ..

Anyway, I was warned by some not to send any funds to his office. That they are corrupt etc. - he told me the funds would go to vet bills... yet they do not disclose any vet or info. Kind of strange. I can't collect funds like that. People want to know the whole story.

I told him about the local hay bank of Juliana Lehmann. www.horsefoodbank.org

I know that good horse folks know about these things. It is the hillbillies and crooks such as Swift who don't because they shouldn't have horses in the first place.

I am not sure what to do now in regards to a fundraiser. I feel open communication is really needed here between authorities and the public.

M

In a message dated 2/25/2012 2:30:45 P.M. Mountain Standard Time, aolds@aspencreeklac.com writes:

> If you send me the information on the hay banks I can post it....most of our
> clients know about it and any of them that have skinny horses are educated
> about good care and nutrition as well as resources such as the food
> banks....we don't let our clients starve their horses and do nothing about
> it....... I do feel like there are some people who abuse the system and
> probably don't need the help as much as others... oh well.....also one of the
> main hay bank groups here actively pushes people to use a different vet even
> though we have offered to discount services if paid through the hay bank (for
> teeth and such).....
>
> Connected by DROID on Verizon Wireless
>
>
> -----Original message-----
>
> **From:** TCourt5096@aol.com
> **To:** aolds@aspencreeklac.com
> **Sent:** Sat, Feb 25, 2012 20:27:41 GMT+00:00
> **Subject:** Re: Fw: Press Release
>
> Dear Dr. Olds,
>
> Thanks for writing and taking the time. I appreciate it. I will call Gore and ask if we
> will raise money, how it will be spent. I networked this case last week from the East
> to the West Coast, and if I send something out, it goes viral, I have a lot of
> connections. I doubt without the publicity and the public's pressure, this would have
> had the same outcome. It's always the same old...
> Anyway, I wish the horses were at your clinic too. I only hope they are cared for by
> someone who knows what they are doing. I don't buy the excuses and hope the guy
> does get punished, yet we also know from experience, it may be just a misdemeanor
> not a felony. His attitude proved he should not have horses in the first place. Help is
> always available, one just needs to ask. I wish AC would advertise the existence of
> the local hay bank more, so many folks don't know it exists.
> I have some friends who play open mic at the Ice House every Thursday. I thought

that would be a good group who might come together to raise funds. But I will not rush into it now. I'll try to call Gore and see what his input is.
Thanks again for writing - and thanks for being there and caring.
Monika

In a message dated 2/24/2012 7:06:50 A.M. Mountain Standard Time, aolds@aspencreeklac.com writes:

Monika:

I don't know too much more than you do at this point. When I was out there, there was the down horse that died, and then there were 4 yearlings that looked terrible! and two adult horses a paint and a black mare that were also very very skinny. I believe that these 6 horses were seized. I don't have them and I don't know where they are. I suspect they were taken south to a rescue or vet hospital in salida, buena vista, or woodland park just to get them out of the area for now. I would strongly suggest talking with undersherrif Monte Gore before proceeding with any advertising or fundraising efforts. I have spoken with him several times and if you are reasonable with him I think you will find him very reasonable to talk to. He genuinely cares about the horses and wants to get them to caring homes eventually. He could answer the questions about what the needs of the horses are and how any money raised will be spent. I do think these are important questions to get answers to before undertaking any major fundraising efforts. I also know that eventually he hopes to adopt them out, but as I am sure you are aware, if the owner refuses to surrender the horses they can't be legally adopted out until the owner is convicted in court, otherwise there is always the possibilty of him suing to get them back. However, once they are more healthy and all of their details are known (age, sex, and medical conditions, etc.) they may be able to be placed in foster homes in various rescues or private homes. At this point I don't think funds should go to Harmony. We were initially hoping that the horses might come to my hospital or Harmony (we both offered care for free to the sheriff's department), but at this time is doesn't appear to be the case. I believe that the one little guy in our hospital is taken care of for the time being financially. Undersheriff Gore's cell phone is at the bottom of the press release.

Thank you for all of your help. Barb at Harmony really got the publicity going in this and everyone else helped keep the fire on. I don't know if this would have been taken seriously without all the public pressure. Hopefully the end result will be that justice is served and the horses are homed where they will be FED!

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

---

**From:** TCourt5096@aol.com
**Sent:** Thursday, February 23, 2012 10:26 PM
**To:** aolds@aspencreeklac.com
**Subject:** Re: Fw: Press Release

Thanks. Can this be shared ? I am trying to help raise funds, but am not

sure anymore what I can release and not. This is a very weird situation, not releasing info on the whereabouts. I was hoping they were with you. How many died ? I do not want to mess up any progress, but to raise funds without knowing as to how they are used... I do not want to lose my reputation as a credible person.
Should funds be sent to Harmony or the Sheriff, or both ? I am confused.
Monika

In a message dated 2/23/2012 10:20:32 P.M. Mountain Standard Time, aolds@aspencreeklac.com writes:

Here is the latest. There are 6 horses. 2 adults
And 4 yearlings

*Connected by DROID on Verizon Wireless*

-----Original message-----

**From:** Monte Gore <MGore@parkco.us>
**To:** aolds@aspencreeklac.com
**Sent:** Fri, Feb 24, 2012 00:46:31 GMT+00:00
**Subject:** Press Release

# EXHIBIT 15

STATE OF COLORADO )

COUNTY OF PARK    )

AFFIDAVIT FOR
A SEARCH
WARRANT

In support of the issuance of a SEARCH WARRANT to search:

Horses were moved on February19, 2012, at approximately 4:00PM, with owners permission and assisted by Park County Animal Control to location known as: 1401 Park County Road 77, Jefferson, Park County, Colorado, 80453, ALSO KNOWN AS, T08 R75 S16 NW4, SLASH 6, LOT 06: Information obtained from the Park County Assessors Office.

### Kirsten Le Beau.

I, Park County Code Enforcement Deputy Cindy Hardey, am a Deputy Sheriff for the Park County Sheriff's Office, and have been employed with this office since 2003. I have been a Code Enforcement Officer for over 8 years, and have over 4000 hours as a Commissioned Agent with the State of Colorado. I, Deputy C. Hardey, being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On February 14, 2012, at approximately 11:00AM, in Park County, Colorado, Sergeant B. Priestly called me on my cellular telephone on my day off and advised me that she had received a telephone call from a Routt County Animal Officer. The officer identified herself as:

### RP- Dawn Smith (Routt County Animal Control)

Sgt. Priestly said there were seven horses at the Echo Valley Ranch that were scored at a 2 using the Henneke Body Score Technique, on a scale from 1 to 9, 1 being emaciated and 5 being ideal. The mare and colt on the ranch were reported as being emaciated if not diseased. At that point I advised Priestly that I would be scheduling a welfare check on all animals on the ranch. The Echo Valley Ranch located at 1649 Park County Road 70, Bailey, Park County, Colorado, is care taken by a male party identified as:

### S- Ronald Swift

On February 16, 2012, at approximately 7:30AM, Deputy B. Sears asked me if I wanted to meet a Veterinarian at the Bailey Substation at 9:00AM, from Routt County. Sears said the veterinarian was going to be seizing a colt at the Echo Valley Ranch and needed an officer from our county to accompany her. I scheduled Corporal J. Plutt and Deputy N. Hanning to accompany me with the court documents for removal of the horse.

At approximately 9:00AM, Doctor Ashleigh Olds DVM arrived at the Bailey Substation. Olds and I cleared the Bailey Substation and responded to the Rustic Square and waited for Plutt and Hanning's arrival. At approximately 9:50AM, Plutt and Hanning arrived and all unites cleared the Rustic Square. All unites responded to Echo Valley Ranch.

Upon arrival I observed six very emaciated horses. I visually scored the horses to be a 1 to 1.5 using the Henneke Body Score Technique. There were four horses located in the back corral. I asked Swift how old the horses were and he stated the horses were one to two years of age. The yearling's (Echo, River, Chance and Fiona), had a heated water trough full of water and hay in the lean-to. Their Spinous process, Tailhead (pinbones), Ribs and Hook bones were projecting prominently. I also observed two a mares (Midnight and Lena), in separate corrals with heated water trough full of water and hay on the ground. The horses were also visually scored as 1 to 1.5 using the Henneke Body Score Technique. Their Spinous process, Tailhead (pinbones), Ribs and Hook bones were projecting prominently. I asked Swift why his horses were so skinny. Swift believed the horses were suffering from a disease or a neurological disorder.

FEB-22-2012 17:24 From:DISTRICT COURT CHAFE 719 539 6281    To:17198362992    P.2/5
Feb-22-2012 16:14 From:    To:719 539 6281    P.4

Swift said he feeds the horses two times a day and had given all of his horses their shots for the year. The colt named "Chance" is not well and could possibly die. I spoke with Swift's veterinarian Doctor Horton, from Timberline Equine Veterinarian Hospital, who believes that Swift waited to long to rectify the problem and could have avoided the situation. I believe if Swift had noticed the horses' condition sooner they would not be in the condition they are in today. Based on the above statement I believe the horses were neglected.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following: All of the inside and outside structures on the property and seize "Midnight"- Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grullo Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade Gelding horse, "Fiona"- Palomino Grade Filly horse, located on the property.

The property to be searched for, and seized if found, is:
( )    Stolen or embezzled OR
(X)    Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
(X)    Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_____
AFFIANT

Subscribed and sworn to before me this ___ day of ___ , 2012

_____
JUDGE

62

Swift, Ronald 12M44, Hatlee, Randall 12M43    34/129
Discovery 62

158

# EXHIBIT 16

**From:** TCourt5095@aol.com
**To:** aolds@aspencreeklac.com
**Subject:** Re: Fw: Press Release
**Date:** Saturday, February 25, 2012 1:56:20 PM

I just had a good conversation with Mr. Gore. He seems to be alright. I told him what I do in my spare time and he will release the info on the local hay bank in his next press release. I told him that I feel many people who are in over their heads or need help and don't know where to ask... they do not know help is available or hay banks exist. I will submit some info to him and he seemed glad to hear from me...

Let's hope. He may be one good individual in a crop of others who may not be what they appear to be or who knows. I like to plant a seed of communication and trust to expand my work.

The moneys will pay vet bills he said, if we will raise funds. If any extra moneys are left, it will go to AC Control Budget.

First now I have to see if I can get it all organized and the musicians will partake.

Thanks for your help and good advice.
Monika

In a message dated 2/24/2012 7:06:50 A.M. Mountain Standard Time, aolds@aspencreeklac.com writes:

> Monika:
>
> I don't know too much more than you do at this point. When I was out there, there was the down horse that died, and then there were 4 yearlings that looked terrible! and two adult horses a paint and a black mare that were also very very skinny. I believe that these 6 horses were seized. I don't have them and I don't know where they are. I suspect they were taken south to a rescue or vet hospital in salida, buena vista, or woodland park just to get them out of the area for now. I would strongly suggest talking with undersheriff Monte Gore before proceeding with any advertising or fundraising efforts. I have spoken with him several times and if you are reasonable with him I think you will find him very reasonable to talk to. He genuinely cares about the horses and wants to get them to caring homes eventually. He could answer the questions about what the needs of the horses are and how any money raised will be spent. I do think these are important questions to get answers to before undertaking any major fundraising efforts. I also know that eventually he hopes to adopt them out, but as I am sure you are aware, if the owner refuses to surrender the horses they can't be legally adopted out until the owner is convicted in court, otherwise there is always the possibility of him suing to get them back. However, once they are more healthy and all of their details are known (age, sex, and medical conditions, etc.) they may be able to be placed in foster homes in various rescues or private homes. At this point I don't think funds should go to Harmony. We were initially hoping that the horses might come to my hospital or Harmony (we both offered care for free to the sheriff's department), but at this time is doesn't appear to be the case. I believe that the one little guy in our hospital is taken care of for the time being financially. Undersheriff Gore's cell phone is at the bottom of the press release.
>
> Thank you for all of your help. Barb at Harmony really got the publicity going in this and everyone else helped keep the fire on. I don't know if this would have been taken seriously without all the public pressure. Hopefully the end result will be that justice is served and the horses are homed where they will be FED!
>
> Ashleigh Olds, DVM
> Aspen Creek Veterinary Hospital
> Conifer, Co
> www.aspencreeklac.com

# EXHIBIT 17

161

IHR-01-2012 WED 04:00 PM LHPP CHIPPELL TUCKER          FHA NO. 303 740 7300          r. 04

Print                                                             Page 1 of 1

**Subject:** investigating heart murmurs

**From:** F BURTON (horseydoc@msn.com)

**To:** randall.hatlee@yahoo.com;

**Date:** Tuesday, February 28, 2012 10:02 PM

Dear Randy,

As per my exam of Chance, River, Echo (Blue), Fiona, Dash, Lena and Midnight of 2/20/12, I determined that in addition to very low body condition scores Chance and Echo demonstrated what I assessed to be grade 4/6 holodiastolic murmurs and tachycardia, Fiona demonstrated a grade 2/6 diastolic murmur and tachycardia, and Lena demonstrated tachycardia. Consultation with Dr. Adams at the Cardiology service at the veterinary teaching hospital at CSU revealed no known association between low body condition scores and diastolic murmurs. Blood work on these patients indicates a significant degree of anemia, which is the likely cause of, or is a contributor to the noted tachycardia. With all due respect to my esteemed colleague who is the current attending veterinarian, it would be my advice and recommendation that these horses exhibiting diastolic heart murmurs be evaluated by the cardiology service at the James L. Voss Veterinary Teaching Hospital in Fort Collins, CO. In particular, it is my professional opinion that investigation of these murmurs warrants a full echocardiogram performed by professionals with specialty training in echocardiography. Arangements for these exams to be performed were being made when seizure of the animals took place. I feel the best chance at a proper and accurrate understanding of these murmurs and any potential role they play in these animals' condition requires following through with that diagnostic plan.

A. R. Horton, DVM, MS

209

49/104

12-03-07 16:07 28212          303 740 7300 >Swift, Ronald 12M44 Hatlee, Randall 12M43          P 4/4
Discovery 209

162

# EXHIBIT 18

Case 1:13-cv-02469-RM-MJW    Document 67-4    Filed 01/03/15    USDC Colorado    Page 6 of 16

AGREN BLANDO COURT REPORTING & VIDEO INC.

61

1  that being the email presented to her by Dr. Old. That
2  being the information directly relayed to Cindy Hardy
3  by Dr. Horton. The email presented by Dr. Old involved
4  a horse that was in the care and custody of these two
5  Defendants. That horse that was in the care and
6  custody of these two Defendants, in the opinion of
7  Dr. Olds, appeared very hungry and had been eating
8  non-stop since being removed to a different location.
9  Blood work showed anemia for that horse, the horse was
10 not showing signs of botulism, and it appeared to
11 Dr. Olds to be a very clear cut case of starvation on
12 the part of these Defendants as it relates to that
13 separate horse.
14      Subsequent to that information, Cindy Hardy,
15 the investigator, received information from Dr. Horton.
16 Among that information was that the blood work results
17 on the six subject horses was consistent with anemia.
18 That being, in the opinion of Cindy Hardy as presented
19 here today, consistent with the idea that simply that
20 these horses were being malnourished. In addition,
21 Dr. Horton directly opined to Cindy Hardy that it was
22 her opinion, her position, that the horses had been
23 left out to pasture for too long without there being
24 sufficient supplemental feed provided, and that is how
25 they came to be in the very poor condition that they

AGREN BLANDO COURT REPORTING & VIDEO INC.

62

1  were observed in.
2      All of that information, Judge, when taken
3  as a whole -- which is the Court's obligation here
4  today -- gives rise to objective probable cause to
5  believe that these horses had been mistreated by these
6  two Defendants, and to believe that if these two horses
7  were not seized as a result of that mistreatment their
8  health was in serious danger.
9      As a result, Cindy Hardy took the appropriate
10 action, took the action that was proper and appropriate
11 under the facts, and we ask this Court to confirm that
12 there was, in fact, objective probable cause for the
13 seizure of these horses in this matter. Thank you.
14      THE COURT: Okay, thank you everyone. I
15 appreciate the thorough presentation. The Court is
16 facing quite a dilemma right now, and it will become
17 apparent to the parties why I believe it's a dilemma in
18 just a moment. The case hinges on whether or not
19 Officer Hardy had probable cause to believe that the
20 animals were endangered if they remained in the
21 Defendants' care. And that sub-issue rarely is
22 presented as thoroughly as it has today. In fact, I've
23 never seen it addressed to this extent before. We've
24 instead focused generally on the cost of care to bond
25 the animals once the lawful order to seize the animals

AGREN BLANDO COURT REPORTING & VIDEO INC.

63

1   has been approved by a Court. And for the record
2   again, I am not the judge who signed this search
3   warrant which authorized seizure of the animals.
4       Now the problem I'm faced with is that the
5   search warrant authorizes animal control to seize the
6   animals, but the search warrant contains no information
7   regarding a belief that the animals were endangered if
8   they were to remain in the Defendants' care. The
9   information in the search warrant simply focuses on
10  whether there was probable cause to believe that they
11  had been neglected, and Officer Hardy clearly relied on
12  that warrant and the information therein to reach her
13  determination that these animals needed to be seized to
14  protect them from ongoing neglect.
15      What we get into today are some additional
16  factors whereby the Defendants had brought the animals
17  in from pasture, that they were being looked at by a
18  veterinarian, that animal control initially informed
19  the Defendants that they would have thirty days to turn
20  around the condition of the horses through proper care
21  under the supervision of the licensed veterinarian.
22      Most of the evidence presented by the State
23  today focuses on whether or not the animals were
24  suffering neglect, causing their emaciated state. But
25  very little evidence has been presented by the State as

AGREN BLANDO COURT REPORTING & VIDEO INC.

64

1   to why these horses, if they were to remain in the
2   Defendants' care under the watchful eye of a licensed
3   veterinarian and frequent visitation by animal control,
4   why that wouldn't suffice to determine if the animals'
5   condition were improving.
6       The search warrant obtained by Officer Hardy
7   was preceded by the information from one of the
8   veterinarians indicating that they believed that it was
9   neglect causing the starvation. However, that did not
10  indicate that the animals in their current situation,
11  when they had been removed to the barn and were being
12  cared for specifically, whether the neglect was
13  ongoing. And that's what this statute is intended to
14  prevent, ongoing neglect and suffering of the animals,
15  and requiring removal to provide the appropriate care.
16  We have not heard anything from the State to indicate
17  that the animals were not receiving the appropriate
18  care once the Defendants were made aware of the fact
19  that they were being underfed or malnourished.
20      It's a difficult issue because Defendants in
21  a criminal action are presumed innocent. Animal
22  control has their duty to make sure the animals are not
23  suffering while the charges are pending. So the Court
24  does have to find a balance. What I have not seen
25  today is evidence that these horses absolutely had to

166

65

1  be removed to prevent their being endangered. As

2  reluctant as I am to say so, I think the prior judge

3  did err in authorizing a seizure of the animals without

4  any evidence that their removal was necessary to

5  curtail any ongoing neglect. Perhaps additional

6  information could have been included in the warrant

7  indicating what the current care of the animals was, so

8  it's hard to second guess based on that, but hearing

9  now that these animals were being treated while in the

10  care of the Defendants by a licensed veterinarian, that

11  animal control actually had recommended that they

12  remain in the Defendants' care for up to thirty days to

13  see if their condition improved, and the official

14  report recommending that one of the veterinarians was

15  supportive of leaving the horses at the property of the

16  Defendants until test results were in, the Court is

17  simply left to conclude that the animal control

18  officers did not have probable cause to believe that

19  the animals were endangered by remaining in the care of

20  the Defendants, since they had taken steps to remedy

21  the health issue of the animals. Obviously, I'm not

22  ruling on whether or not neglect took place. The Court

23  does find that the officer had probable cause to

24  believe that the animals suffered from animal cruelty,

25  but the Court finds that the animal control officer did

66

1  not have probable cause to believe that the animals

2  would suffer ongoing animal cruelty and would be

3  endangered if they were left in the care of the

4  Defendants, specifically due to the fact the Defendants

5  had made remedial measures and got a vet to look at the

6  animals, and had authorized animal control to visit

7  every other day to check on the welfare of the animals.

8  So the Court's ruling will be that the animals be

9  returned to the care of the Defendants during these

10  proceedings, and obviously animal control will have the

11  authority to inspect the animals, and if their

12  condition starts to degrade then that would indicate

13  that they would have probable cause to re-seize the

14  animals based on their condition deteriorating in the

15  Defendants' care. But at this time the Court does

16  order that the animals be returned to the Defendants.

17  Mr. Campbell, how much in the bond has actually been

18  paid by your clients?

19      MR. CAMPBELL: They've paid the first month,

20  and that was just -- that was the amount that was set.

21  I think it was seven hundred and twenty dollars.

22      MALE: Fourteen hundred and forty dollars.

23      MR. CAMPBELL: Fourteen hundred and forty for

24  the total.

25      THE COURT: What I would request is a written

EXHIBIT 19

| From: | Monte Gore |
|---|---|
| To: | aolds@aspencreeklac.com |
| Subject: | RE: |
| Date: | Wednesday, April 11, 2012 12:05:17 PM |

I'm sorry I had a friend commit suicide yesterday and I have been dealing with that. I will get with Sgt. Priestly and Lt. Bonnelycke and our county attorney to analyze a strategy for going forward. We are there with you.

Monte

---

**From:** aolds@aspencreeklac.com [mailto:aolds@aspencreeklac.com]
**Sent:** Wednesday, April 11, 2012 10:43 AM
**To:** Monte Gore
**Subject:**

Mr Gore:

Thanks for the updates on the Swift/Hatlee case. I am as appalled as everyone else as to how this can happen. I am very concerned that the case is not being presented to its maximum effectiveness based on the results and some of the comments in this last email from Bobbi Priestly. Specifically some of my concerns are as follows:

1. Does the DA have any horse experience and knowledge? How about the judge?

2. Did the judge know that 7 horses already died on the property of "mysterious causes" suspected to be malnutrition/starvation? How is that not probable cause that more will die if returned?

3. Was the evidence presented of pictures and weights of the horses before and after seizure - ie some horses gainde over 100 lbs in a very short period of time with simple food and water. Chance and Little Big man couldn't even stand on their own.

4. Was any evidence presented about the fact that "Spencer - Little Big Man" and his dam were already returned to the custody and care of these men after a Routt county judge made a similar decision that they weren't in danger after an animal cruelty verdict..... and the result was that the mare died and the the colt almost died? He was literally on the brink of death when we took custody of him and he was on the property and being cared for by Ron and Mr. Hatlee.

5. Why hasn't there been any follow up with the witnesses that I gave you for witness statements - ie. Rod Cameron the farrier who witnessed the poor care and condition of the horses 3 weeks prior to the seizure. He today reported that he still hasn't been contacted. Also I have never been asked to present a statement of my findings on the horses that were seized - only the one that came into our hospital.

6. The judge commented that the horses were "under care of a licensed veterinarian" - however Dr. Faye Burton of Timberline Equine told my practice manager that she had never specifcally examined, treated, or performed any diagnostic testing on those 6 horses that were taken. Mr. swift had never asked for nor paid for any care for them. Has Mr. Swift provided evidence that those horses specifcally were actually under any sort of care - or has his vet just stated that they look after those horses.... I would want to see hard facts such as invoices and medical records proving that those 6 horses specifically were being cared for, because they WEREN'T......

I am sorry to pester you with this as I am sure that you are very busy, but the public is already going bananas and this is about to errupt into another media storm. It looks terrible on Park County as if there is either corruption and the "good ol boys club" going on and that Ron Swift and Mr. Hatlee have

friends pulling strings for them, or that the judges are simply too lenient on animal abusers. IF there is anything that I can do to help, please let me know as I am totally disgusted over this ruling.....

Sincerely,

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreekiac.com

169

# EXHIBIT 20

**From:** Teresa DeAnda
**To:** TCourt5096@aol.com; tracey@egolfinteriors.com; joeingrid@live.com; horseteacher@gmail.com; lisscolan@q.com; jre@theanimallawcenter.com; glock1020@gmail.com; babishs@msn.com; jack2bad@hotmail.com; brdiedrich@aspencreeklac.com; aolds@aspencreeklac.com; bserske@forensic-investigators.com; cricketduke@gmail.com; kimberlybrewster.dvm@hotmail.com; dsmith2@co.routt.co.us; horsegoal52@aol.com; farviewhorserescue@comcast.net; greenrivertroutfarm@yahoo.com; hlview.acres@prodigy.net; jflinch@habitatforhorses.org; kelmini16@yahoo.com; loplngalong@msn.com; mhl99@msn.com; nancy@bustersnaturalpetsupply.com; rmgray52@msn.com; sydburt@hotmail.com; shari@centex.net; cranioconnection@gmail.com; tamara@woofshoofs.com; vtraina2002@yahoo.com
**Subject:** Re: Starved horses going back to Ron Swift
**Date:** Wednesday, April 11, 2012 12:34:48 PM

Sorry Bobbi ..seems so wrong...hang in there. Will pray for the situation. Teresa (Streams of Eden)

T-Mobile. America's First Nationwide 4G Network

TCourt5096@aol.com wrote:

>
>
>
>
>
>_____
> From: MGore@parkco.us
>To: shelley@shelleysdesigns.com, Harmonyhorsewrks@aol.com,
>TCourt5096@aol.com, kirt.kvv2@gmail.com
>Sent:  4/11/2012 10:07:21 A.M. Mountain Daylight Time
>Subj: FW: Horse case  update
>
>
>
>FYI...latest info I  have.
>Monte
>
>
>_____
>
>From: Bobbi  Jo Priestly
>Sent: Tuesday,  April 10, 2012 2:15 PM
>To:  Monte  Gore
>Subject: Horse  case  update
>US,
>
>This is a very difficult email for  me to write. While, at the Bond
>Hearing today I was not sure  what was going to happen and I am appalled as to
>what did  happened.  The Judge ruled to give the horses back to the owners.  I
>do not know why this happened.  We had probable cause on the warrant  to
>seize the horses, but the Judge stated that he thought since the  owners had a
>licensed veterinarian treating the horses prior to the seizure we should
>have left them there. We, the Sheriff's Office, are going to be  responsible
>for all the bills and have been ordered to pay the  owners back for what
>they would have paid to care for the horses out the  bond all ready posted.
>
>I think the District Attorney  should have mentioned the facts of the case
>better.  The fact  that Maggie died was only brought up briefly and this
>should have been  driven home.  A horse died on the property and Chance the
>sickest of  the six seized was unable to rise without assistance.  It was not
>driven  home that the only thing that the horses have been given is food and
>water to improve.  I simply can not believe this has happened.  We will be

>at the ranch weekly I assure you keeping a close eye on the horses. If
>the horses start to drop weight we will seize them again. So many facts that
>jump out at me were not brought up at this "Preliminary Hearing" as that
>is what it was.

>
>We have NEVER lost a case and I am not about to start now!

>
>Bobbi

>
>
>
>
>
>
>In a message dated 4/11/2012 10:15:38 A.M. Mountain Daylight Time,
>TCourt5096@aol.com writes:

>
>According to prominent animal attorney Madeline Duncan the first step
>would be to get the entire transcript of the hearing to see what evidence was
>presented.
>According to her there is a judicial performance board that oversees
>judges. I don't have that contact . Pressure to the court must be applied - to
>see on what bases this decision was made. Perhaps the Attorney General ought
>to be notified as well. _Attorney.General@state.co.us_
>(mailto:Attorney.General@state.co.us) . Channel 7emailed me they will try to talk to the judge.
>Please keep me posted, I have to go to work.

>
>Monika

>
>
>In a message dated 4/10/2012 5:52:42 P.M. Mountain Daylight Time,
>shelley@shelleysdesigns.com writes:

>
>Everyone,

>
>Judge Green in Park County awarded the starved horses back to Ron Swifts.
>We have to do something now. This can't happen again to these poor
>horses.

>
>
>

Olds Disclosure Documents Page 227

172

simply can not believe this has happened. We will be at the ranch
weekly I assure you keeping a close eye on the horses. If the
horses start to drop weight we will seize them again. So many facts
that jump out at me were not brought up at this "Preliminary
Hearing" as that is what it was.

We have NEVER lost a case and I am not about to start now!


Bobbi

In a message dated 4/11/2012 12:35:33 P.M. Mountain Daylight Time, terrollies@msn.com writes:

Sorry Bobbi ..seems so wrong...hang in there. Will pray for the situation. Teresa (Streams of
Eden)

T-Mobile. America's First Nationwide 4G Network

TCourt5098@aol.com wrote:

>
>
>
>
>
> _____
> From: MGore@parkco.us
>To: shelley@shelleysdesigns.com,  Harmonyhorsewrks@aol.com,
>TCourt5098@aol.com, kirt.kvv2@gmail.com
>Sent: 4/11/2012 10:07:21 A.M. Mountain Daylight Time
>Subj: FW: Horse case  update
>
>
>
>FYI...latest info I  have.
>Monte
>
>
>_____
>
>From: Bobbi  Jo Priestly
>Sent: Tuesday,  April 10, 2012 2:15 PM
>To:  Monte Gore
>Subject:  Horse  case update
>US,
>
>This is a very difficult email for me to write. While, at the Bond
>Hearing today I was not sure  what was going to happen and I am appalled as to
>what did  happened. The Judge ruled to give the horses back to the owners. I
>do not know why this happened. We had probable cause on the warrant  to
>seize the horses, but the Judge stated that he thought since the  owners had a
>licensed veterinarian treating the horses prior to the seizure we should
>have left them there. We, the Sheriff's Office, are going to be  responsible
>for all the bills and have been ordered to pay the  owners back for what
>they would have paid to care for the horses out the  bond all ready posted.

>
>I think the District Attorney should have mentioned the facts of the case
>better. The fact that Maggie died was only brought up briefly and this
>should have been driven home. A horse died on the property and Chance the
>sickest of the six seized was unable to rise without assistance. It was not
>driven home that the only thing that the horses have been given is food and
>water to improve. I simply can not believe this has happened.  We will be
>at the ranch weekly I assure you keeping a close eye on the  horses. If
>the horses start to drop weight we will seize them again. So many facts that
>jump out at me were not brought up at this "Preliminary Hearing" as that
>is what it was.
>
>We have NEVER lost a case and I am not about to start now!
>
>Bobbi
>
>
>
>
>
>
>In a message dated 4/11/2012 10:15:38 A.M. Mountain Daylight Time,
>TCourt5096@aol.com writes:
>
>According to prominent animal attorney Madeline Duncan the first step
>would be to get the entire transcript of the hearing to see what evidence was
>presented.
>According to her there is a judicial performance board that oversees
>judges. I don't have that contact . Pressure to the court must be applied - to
>see on what bases this decision was made. Perhaps the Attorney  General ought
>to be notified as well. _Attorney.General@state.co.us_
>(mailto:Attorney.General@state.co.us) . Channel 7emailed me they will try to talk to the
judge.
>Please keep me posted. I have to go to work.
>
>Monika
>
>
>In a message dated 4/10/2012 5:52:42 P.M. Mountain Daylight Time,
>shelley@shelleysdesigns.com writes:
>
>Everyone,
>
>Judge Green in Park County awarded the starved horses back to Ron Swifts.
>We have to do something now. This can't happen again to these poor
>horses.
>
>
>

# EXHIBIT  21

**WRITTEN DECLARATION**

Date: April 28, 2012
Name: Barbara Wright
Address: 13639 Elsie Road
Conifer, CO 80433
(303) 816-0766

I, Barbara Wright, hereby make the following statement of my own free will. No threats or promises have been made to me to induce me to make this statement and if called upon as a witness in any criminal or civil proceeding, I will testify honestly and competently to the matters stated herein.

On February 18, 2012 I wrote the attached email to Drs. Horton and Burton at Timberline vets, regarding the Bailey horses in the Ron Swift case, and Dr. Burton called me that day in response to it.

I asked her if she and Dr. Horton would be willing to come out to the Aspen Creek Veterinary Hospital in Conifer where Little Big Man, the impounded Routt County colt, was being treated by Dr. Ashleigh Olds and her staff. This way, they could see for themselves that no neurological conditions existed in him and he was responding to a sound refeeding program and that he was starved. I said the same invitation had been extended to her by Brian Diedrich, manager of the clinic in another telephone conversation with Dr. Horton, and I was extending it again. They would be able to see first-hand his improvement and confirm that it was starvation and not a neurological condition. She declined saying they could not do that.

I then asked her to consider going to their client, Swift, and ask him to surrender the horses to us or allow us to purchase them outright with no questions asked, avoiding legal proceedings. I said we had money and trailers available. Again, she said, "We cannot do that." I said it was really worth a try but she again said no.

My next question was why they had not reported the condition of the horses to the appropriate human and animal health agencies since the horses were obviously seriously compromised, especially since they believed it was a neurological or wasting disease condition. I mentioned that Dr. Horton had told Brian Diedrich that back in August 2011, he had been told by them to water and feed his horses. She said that they did not interfere with their client and asked him to self-correct and self-police caretaking of his animals. It was not their policy to interfere.

I then asked her why they thought the seriously deteriorated, in some cases near-death, condition of the horses was due to neurological conditions since Little Big Man did not manifest any. She stated they had ruled out botulism at that point but were considering tick worm paralysis or some kind of wasting disease transmitted by other animal life in the environment. She said they had seen this wasting disease in the area. She said they were consulting with other vets and had come to the conclusion that the disease was neurological. I asked her if tests had been done on the horses but she did not say.

333

176

# EXHIBIT 22

### In the Matter Of:

## HATLEE vs. HARDEY

13-cv-02469-RM-MJW

## FAY E. BURTON, D.V.M.

*April 16, 2014*



ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

FAY E. BURTON, D.V.M.
HATLEE vs. HARDEY

April 16, 2014
129—132

Page 129

1 to be telling you by its mannerisms?
2     A.  It's -- I guess you could say it's the
3 evaluation of the horse that you can't put a number
4 on such as a temperature.
5     Q.  Then you get to the objective approach.
6 What is that?
7     A.  That would be your data, like the pulse
8 rate, the temperature, the respiration rate.
9     Q.  And then the next thing you do is make
10 an assessment, and that's -- that includes the
11 differential diagnosis, correct?
12     A.  Often, yes.
13     Q.  Now I want you to look in the exhibit
14 book at Exhibit 6.  This is an email from Dr. Horton
15 to Cindy Hardey.  Does that reflect the standard
16 practice of you and Dr. Horton in the analysis of the
17 problems that's presented?
18     MR. SCHIMBERG:  I'm not sure I
19 understand what you are getting at.
20     Q.  (BY MR. TONDRE) Well, what I'm getting
21 at is does that in black and white show how you
22 approach a problem from a reasonable veterinary
23 standard?
24     MR. LEBSACK:  Object to the form.
25     MS. BRONSON:  Join.

Page 130

1     A.  It looks to be that.
2     Q.  (BY MR. TONDRE) And in this note,
3 you're specifically -- or Dr. Horton is specifically
4 evaluating Maggie; is that correct?
5     A.  Yes.
6     Q.  Now, Dr. Olds, without evaluating
7 Maggie, without getting any sort of subjective
8 history, jumped to the conclusion that she should be
9 killed.  Is there a reasonable veterinary basis to do
10 that without conducting any sort of examination?
11     MR. LEBSACK:  Object to the form.
12     MS. BRONSON:  Object to the form of the
13 question.
14     A.  Well, it's practice before making
15 recommendations to do anything, generally collect a
16 history, and then at that point typically a
17 discussion with the owner is held.  You might give
18 them some options, discuss any questions they might
19 have about the findings, and then the owner usually
20 tells you what they want to do based on that.
21     MR. LEBSACK:  I need to move to strike
22 the question as contrary to rule 30, and it should
23 not be part of the record.
24     MR. TONDRE:  That's a new one.

Page 131

1 took place on February 16th -- or no.
2     When did the analysis of Maggie take
3 place that's reported in this note?  Is it
4 February 11, 2012?
5     A.  It looks like February 11th is the
6 first part.  Then I think this next visit is probably
7 the 13th of February.
8     Q.  Now, is there any mention anywhere in
9 this Exhibit 6 of the prospect of euthanizing Maggie?
10     A.  I don't believe we considered that on
11 this visit.
12     Q.  What's the difference between
13 malnourishment and starvation?
14     A.  Starvation would really be an end
15 point.  Malnourishment is simply less than an ideal
16 amount of nutrients.
17     Q.  When you say "starvation is an end
18 point," what do you mean by that?
19     A.  Well, I think it could be used to refer
20 to that the horse died from starvation.  It could
21 also mean that the horse is actually not eating
22 anything at all.
23     Q.  Well, do you believe it was reasonable
24 to say that the horses at Echo Valley Ranch were
25 starved?

Page 132

1     A.  Well, I'm not there on a day-to-day
2 basis, so I can't tell you what was fed and when, but
3 I did not have suspicion that they were not being
4 fed.
5     Q.  What was it that caused you and
6 Dr. Horton to contact Dr. Knight?
7     A.  The clinical signs that we had noted,
8 and I -- not necessarily just for Maggie, but in
9 general, did not seem -- well, let me back up.
10     I'd been involved in many, many animal
11 control cases over the years.  And I had not seen
12 this constellation of signs or heard them described
13 by another veterinarian, and so because this was not
14 just a simple case; that these signs were not really
15 explained by just malnourishment, I wanted to look
16 for potential either contributing or other causes.
17     Q.  What is the constellation that you saw
18 and you considered unique?
19     A.  Well --
20     MR. LEBSACK:  Objection to the form.
21     A.  -- for example, the report that Bear
22 was not able to stand without assistance, the
23 evaluated heart rates, the heart murmurs that were
24 diastolic.  There had been a report that the horses

FAY E. BURTON, D.V.M.
HATLEE vs. HARDEY

April 16, 2014
133–136

Page 133

1 Curt, and that there were deficits in conscious
2 proprioception. I believe that was Chance. He had
3 hind limb weakness. He had a cranial nerve
4 abnormality. Those things just -- I had never
5 observed them in another group of horses that were
6 malnourished, and they seemed quite odd to me.
7     Q. It was a complex problem that needed
8 in-depth analysis to come to a conclusion; is that a
9 correct statement?
10     MS. BRONSON: Object to form.
11     MR. LEBSACK: Objection to form.
12     A. I think that's a fair statement.
13     Q. (BY MR. TONDRE) Now, you had occasion
14 to review some statements -- written statements by
15 Dr. Olds; is that correct?
16     A. Yes.
17     Q. And in those written statements, there
18 were comments about the condition of Maggie; is that
19 correct?
20     A. Yes.
21     Q. Now, you had an opportunity to observe
22 Maggie just a few days before the only time Dr. Olds
23 saw Maggie, which was February 16, 2012. How did
24 what she reported in her written reports compare to
25 what you saw in your examination of Maggie? Were

Page 134

1 there any contradictions?
2     A. She gave her body condition score of
3 one. She was scored by myself, Dr. Horton, and the
4 folks up at CSU as a two. She commented on the sores
5 being very severe, the sores from being down, the
6 sores on her skin. And as I recall in the necropsy
7 report, they felt they were -- I think they called
8 them erosions, or the language was that they were
9 fairly superficial.
10     Q. What was the cause of death of Maggie
11 as reported in the necropsy?
12     A. She had an aneurysm in the aorta.
13 It -- I believe it had some bacteria within it, but
14 my understanding is that the primary cause of death
15 was an aneurysm.
16     Q. Is there any relationship between
17 malnutrition and aneurysm of the heart?
18     A. No, not that I'm aware of.
19     Q. You said that bracken fern was a good
20 fit for the condition that was observed in the horses
21 at Echo Valley. What was it about the bracken fern
22 symptoms that were similar to what you saw at Echo
23 Valley?
24     MR. LEBSACK: Objection to form.
25     A. Well, weight loss is mentioned by

Page 135

1 Dr. Knight. He mentions also a decreased appetite.
2 Neurologic symptoms are possible because thiamin is
3 required for energy metabolism. Tachycardia and
4 anemia I believe are also mentioned.
5     Q. (BY MR. TONDRE) Is there a treatment
6 for it?
7     A. Parenteral vitamin B injections,
8 meaning not oral, either intramuscular or intravenous
9 and changing the feed source to one that is certain
10 not to contain bracken fern.
11     Q. Is vitamin B an appetite enhancer?
12     A. I think that's what a lot of
13 veterinarians would tell you. Whether it's for sure
14 or not, I'm not certain. I know a lot of
15 veterinarians use it that way.
16     Q. Was there any indication that vitamin B
17 was being used at -- by Littleton Equine while the
18 horses were at that facility?
19     A. As I recall, Chance got some vitamin B
20 in a parenteral fashion. I don't know how much.
21     Q. Was there also some evidence that the
22 horses at -- when they were in the care of Littleton
23 Equine were being given antibiotics?
24     A. As I recall, at least one of them had
25 gotten some antibiotics.

Page 136

1     Q. Do you have any understanding as to
2 what that was for?
3     A. I believe Chance had an elevation in
4 his white cell count.
5     Q. Now, there's been a suggestion through
6 an oblique question that bracken fern doesn't grow in
7 Colorado. And what I want to ask you is does all hay
8 come from Colorado?
9     A. Well, no, of course not.
10     Q. Is there a potential for bracken fern
11 to be included in bales of hay?
12     A. Yes. It is known to be sometimes dried
13 and baled with hay.
14     Q. And is it toxic after it's dried?
15     A. Yes.
16     Q. You said you've been involved in animal
17 cases. Approximately how many?
18     A. It would be hard to put a number on it.
19     Q. Were those in Colorado or in Oregon or
20 where?
21     A. California and Colorado. I don't
22 recall any from Oregon.
23     Q. What -- what was the nature of your
24 involvement in the California cases?
25     A. The animal control agency would call me



🚹 You replied on 2/16/2012 4:24 PM.

**Cindy Hardey**

| From: | F BURTON [horseydoc@msn.com] | Sent: | Thu 2/16/2012 3:04 PM |
|---|---|---|---|
| To: | Cindy Hardey | | |
| Cc: | | | |
| Subject: | 4 yr old Blk Drum mare Echo Valley Ranch | | |
| Attachments: | | | |

Dear Officer Hardey,

Ron Swift is a regular client of Timberline Equine Veterinary Services. We were first summoned to examine Maggie, a 3 to 4 year old black Shire cross mare, for this condition on Saturday afternoon, 2/11/12. Dr. Burton was unavailable for this call, so I responded solo. Approaching the ranch, I saw Maggie down in the pasture amidst a group of people and vehicles. Maggie was attempting to rise but was unable to succeed. On exam, I found Maggie alternating between right lateral and sternal recumbency. Heart rate was noted to be within normal limits, but irregular in rhythm, suggesting a marked sinus arrythmia and potentially second degree AV block. Respiratory rate was initially elevated at approximately 40, but later slowed significantly to 12 to 18. Mucous membranes were pale pink and moist and CRT was less than 2 seconds. Temperature was 98.0. Her mentation alternated between BAR (bright, alert, responsive) and sommnolent. When not exhibiting sommnolence, she demonstrated a vigorous appetite and normal cranial nerve function, including tongue retraction. Maggie demonstrated some motor function of her forelimbs, but with a flaccid character that was clearly abnormal. Hypotonia was noted in all four limbs. Tail tone, anal tone and perineal reflex were all noted to be present, but decreased. Muscle tremors were noted in the right brachium and left thigh. Body condition score was noted to be 2/9. No signs of external trauma were noted. The owner and several others were attempting to lift Maggie with the aid of a small tractor, which I stopped immediately, owing to the risk of an improper lift resulting in injury to the patient. During my observations, Maggie ceased attempting to rise and came to prefer right lateral recumbency.

At this point, my presumptive diagnosis was botulinum toxicity, predicated primarily on the flaccid paresis/paralysis and the relatively normal mentation. Underlying my assessment of my exam findings and observations was knowledge of two other strikingly similar cases in the near vicinity in recent weeks and the fact that two of these animals were fed hay from big round and/or square bales, which are known to present an increased risk of botulinum contamination. Horses are exquisitely sensitive to botulinum toxin making it all but impossible to definitively confirm due to low levels of the toxin in blood and GI contents. The only treatment for botulism is nursing care, time and hope. Antitoxin is available, but without a definitive diagnosis, the risks may exceed any potential benefits. On my advice and with my assistance, Maggie was moved out of the snow and into the barn on a sled. Owner was advised to place Maggie on deep bedding and to turn her every 2 hours. He was advised to provide alfalfa hay and water ad libitum. Owner asked repeatedly about lifting Maggie in a sling, which I discouraged owing to not only the logistical difficulty of properly and safely operating a sling, but also serious complications associated with pressure points created by the sling. Maggie's size exacerbates these complications. Furthermore, slings are really only appropriate when an animal is able to support some of their own weight, and this was not the situation with Maggie. I advised that it would be best to attempt to manage her "down".

Other differential diagnosis included, in no particular order; 1. mosquito bourne encephalitides (WEE, EEE, WNV) 2. tick paralysis 3 . EHV 4. Rabies 5. trauma 6. malnutriton 7. myopathies 8. Wobbler syndrome 9. hypocalcemia 10. Toxic plant ingestion. None were an obvious or convincing match to the clinical picture Maggie presented.

Owner called frequently with updates on Maggie's condition, indicating improvement in alertness and the ability to urinate and defecate. He reported that she was resting in sternal recumbency at least half of the time.

The above summarizes events of Saturday, February 11, 2012.

A. R. Horton, DVM, MS

Subsequent to this, attempts were made to gather further information from colleagues at the State Veterinarian's office, Colorado State University and Littleton Equine Medical Center as well as references.

Consideration was given to testing, but due to a combination of the costly nature of testing and the lack of sensitive and specific tests available for many of the conditions on the list of differentials, none has been performed as yet.

Mr. Swift called on Monday, describing Maggie moving her limbs while laying on her side. On further questioning, she was alert and seemed oriented to Mr. Swift after these episodes, but there was some concern that he could have observed seizure activity. Because of this concern, both of us went to the ranch to re-examine Maggie.

Maggie was on deep wood shavings with bales of hay placed around her and a heat lamp overhead. She had a temperature of 100.8 , a pulse of 48 with pronounced sinus arrhthmia and a respiratory rate of approximately 20. Gut sounds were normally present. Mucous membranes were pink and moist with a normal CRT. She could still retract her tongue. Her attitude was quiet and she was somewhat somnolent, but she has been eating and drinking. Her anal tone was decreased to absent. She had passed a normal

PARK CTY DEFS_000931

Ex 6

181

quantity of soft manure. The soft character of the stool was attributed to the change in her diet to alfalfa hay. A single spot of normal-colored urine was present in the bedding, and she was not dribbling urine. We did observe the limb motion described by the owner and concluded that it was not pathologic, but simply an attempt to get comfortable, and probably indicated a need to be turned. We also discussed the inevitability of bedsores and made some suggestions to mitigate that eventuality.

Consultations with colleagues did not yield any new avenues to pursue, as the general assessment was that the signs did not fit particularly well with any one diagnosis. Tick paralysis, however, was not mentioned by any of our colleagues. Interestingly, consultation of a toxicology reference did confirm that tick paralysis does occur in horses and the clinical signs were quite consistent with Maggie's. It was also noted by Mr. Swift that Bear, another horse on the ranch that had shown similar signs, had begun to improve after being coincidentally dewormed with ivermectin, which would have affected any parasite taking a blood meal.

Given these circumstances, the decision was made to treat for tick paralysis with ivermectin and Equi-Spot, a topical permethrin product.

In the meantime, Maggie has shown more inclination to move her limbs. Given this change, attempts were made to arrange for a sling to be brought to the property with the intent of determining if Maggie could support even a portion of her weight. If she can, the sling can be used to intermittently. If not, she must continue to be managed down. Euthanasia has not been recommended at this point due to the fair prognosis of tick paralysis. The appearance of bed sores is not unexpected, nor are they evidence of abuse or neglect, and steps are being taken to treat this problem.

A.R. Horton DVM, MS

Fay Burton, DVM

PARK CTY DEFS_000932

182

# EXHIBIT 23

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

     Plaintiffs,

         vs.



CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

     Defendants.

------------------------------------------------

DEPOSITION OF ALLYSON RENÉ HORTON, DVM
March 27, 2014

------------------------------------------------

                        Deposition location:
                        9998 Havekost Road,
                        Conifer, Colorado 80433

ALSO PRESENT:   Jennifer R. Edwards, Esq.
                (For Dr. Horton)
                Randall Hatlee
                Ronald Swift
                Ashleigh Olds, DVM

# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 · Denver, Colorado 80203
303-825-6119 · 1-800-962-3345 · FAX 303-893-8305
www.averywoods.net

184

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 202

MS. BRONSON: Object to form.
A. A variety of explanations. It would be that these horses were lower in the hierarchy and were -- only got whatever hay that the others didn't want, the poor quality hay that may have toxic weeds in it. It could be that they just happened to get the parts of the hay that had the toxic weeds in it. I don't have a definitive explanation. I have possibilities.
Q. (BY MR. TONDRE) Did you make an assessment with respect to the 30-plus unaffected horses?
A. I'm not sure I understand what you are asking for.
Q. Well, did you assess any horses other than these six?
A. I assessed a horse on February 11th that I'm not at liberty to discuss. At that time out in the pasture, I noticed the horses that were around us. Most were in acceptable body condition score.
Q. Just visually?
A. Just visually.
Q. When did Chance first exhibit any signs of losing weight?
A. I don't know.

Page 203

Q. When did Echo first exhibit any signs of losing weight?
A. I don't know.
Q. When did Fiona first exhibit any signs of losing weight?
A. I don't know.
Q. When did River first exhibit any signs of losing weight?
A. I don't know.
Q. When did Lena first exhibit any signs of losing weight?
A. I don't know.
Q. When did Midnight first exhibit any signs of losing weight?
A. Midnight had exhibited a previous episode of weight loss that was resolved with extracting a tooth. That was approximately a year before.
Q. When?
A. It was in the preceding year.
Q. Okay. And that was being caused by tooth?
A. She was unwilling to eat because of pain from a loose incisor.
Q. Did you have to call a dentist?

Page 204

A. I am the dentist.
MR. SCHIMBERG: You are looking at her.
Q. (BY MR. TONDRE) I'm curious, what did you do to her teeth? Fit her with dentures?
A. No. She simply -- she had one incisor that was loose and painful, and we pulled it. And I don't recall if on that date we floated her teeth or not. Horses' teeth are somewhat different than people's teeth. They can develop sharp points that are irritating to the cheek on the uppers and the tongue on the lowers, and they will often interfere with the horse being able to eat comfortably. I don't recall if we did that procedure or not on that day, but we did pull a loose and painful incisor, and when she recovered from the sedation, she ate.
Q. Had she lost a considerable amount of weight before you performed that procedure?
A. A noticeable amount.
Q. What was her body score?
A. I don't recall.
Q. Got a guess?
A. A guess?
Q. I don't -- don't guess. If you --
MS. EDWARDS: Object to form.
A. Yeah, not less than four.

Page 205

Q. (BY MR. TONDRE) All right. How long had she had that condition with her tooth before you were called out to look at it.
A. The owners reported a few days.
Q. She lost considerable weight in a few days?
A. She did.
MS. BRONSON: Object to form.
Q. (BY MR. TONDRE) One of the things I think I heard in responses with respect to -- is that tests were negative for botulism. Did I hear that wrong?
A. You did not.
Q. How do you know whether -- what test is there for botulism?
A. You can -- the test for the toxin -- I'm not really well versed on the intricacies of what tests are available. I, after speaking with Dr. Heckendorf, Dr. Gehring, and Dr. Toppin, it was the consensus that the test is not particularly useful because horses are so exquisitely sensitive to the toxin that they can be fatally effected by nearly undetectable levels.
Q. So the test is by no means absolute, correct?

52 (Pages 202 to 205)

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 206

1     A.  That's correct.
2     Q.  So you can't say that it's negative;
3  you can just say that it's not positive, right?
4     A.  That would be for the lab to answer.
5     Q.  In any event, it's not 100 percent
6  sure; is that correct?
7     A.  Not in my mind.
8     Q.  If I wanted to ask somebody from a lab
9  how reliable this test is, who would you suggest I
10  talk to?
11     A.  The botulinum toxin laboratory that CSU
12  sent the samples to.
13     Q.  Okay.  One word I haven't heard
14  mentioned today is malabsorption.  What is that?
15     A.  Malabsorption is a disorder where
16  nutrients are present in the digestive tract, but due
17  to disease, damage, other problems, the gut is not
18  able to take up the nutrients in the ingesta.
19     Q.  Is malabsorption a potential result of
20  ingestion of toxins?
21     MS. BRONSON:  Object to form.
22     A.  There are -- there are toxins that
23  through a variety of actions on the gut will result
24  in nutrients not being absorbed.
25     Q.  (BY MR. TONDRE)  What's the difference

Page 207

1  between starvation and malnutrition?
2     MR. LEBSACK:  Objection to the form.
3     MS. BRONSON:  Asked and answered.
4     A.  Starvation has negative connotations
5  that nutrition is being denied; the animal is not
6  being given food.  Malnutrition can result from
7  improper food or an inability to utilize the food.
8     Q.  (BY MR. TONDRE)  What was your
9  impression of the feeding program when you analyzed
10  the horses on February 20, 2012.
11     MR. LEBSACK:  Objection to the form.
12     MS. BRONSON:  Join.
13     A.  What I observed --
14     Q.  (BY MR. TONDRE)  Yes, ma'am.
15     A.  -- when I did that exam is that the
16  horses were being given unfettered access to
17  free-choice hay of good quality, and I was satisfied
18  that that was an acceptable feeding program at the
19  time.  That was a good transition program for them.
20     Q.  Do you know what the feeding program
21  was at Echo Valley Ranch on February 15, 2012?
22     A.  Roughly.  I don't know specifics.
23     Q.  What do you understand -- and what is
24  the basis of your knowledge?
25     A.  I was told by Mr. Swift that horses --

Page 208

1  these horses had been brought in separated from the
2  herd because they had been noticed to have lost
3  weight; that they had been given extra feed in the
4  manner of hay and concentrates like grain.
5     Q.  Was that appropriate?
6     A.  It wasn't inappropriate.  It was a good
7  place to start.
8     Q.  If a horse has ingested toxins, how
9  long does it take those toxins generally to clear the
10  system?
11     MS. BRONSON:  Object to form,
12  foundation.
13     A.  Depends on the toxin.
14     Q.  (BY MR. TONDRE)  Is there a range of
15  expectations.
16     A.  It's extremely variable.
17     Q.  Is there any medication you can give to
18  treat toxins?
19     A.  Depends on the toxin.
20     Q.  Will they ultimately clear?
21     A.  Depends on the toxin.  Some will.  Some
22  won't.
23     Q.  You mentioned Anthony P. Knight and his
24  book on weeds.
25     A.  Yes.

Page 209

1     Q.  Did I understand you to say you talked
2  to him?
3     A.  Yes.
4     Q.  Well --
5     A.  Well, I should clarify the "we."  The
6  practice talked to him.  I believe it was actually
7  Dr. Burton personally who spoke to him.
8     Q.  Do you know -- do you have an
9  understanding as to what they discussed, or should I
10  defer that question to Dr. Burton?
11     A.  She did relate to me their
12  conversation, but perhaps it would be best if you
13  asked her directly.
14     Q.  Well, since we are not going to talk to
15  her today, tell me generally what you recall.
16     A.  We inquired as to whether he had any
17  idea what toxins might be at play.  He suggested
18  sage.  He agreed with us that hoary alyssum was not a
19  good fit.  He suggested that we go out and walk the
20  pasture and look for what's out there, but that if --
21  if whatever toxic weed was in the hay, that it was
22  long gone and we would never find it.
23     Q.  So if, for example, bracken fern was in
24  the hay, it wouldn't lose its potency because it is
25  no longer growing?

53 (Pages 206 to 209)

186

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 210

1 A. It does not lose its potency when it's
2 dried.
3 Q. Maybe you answered this and I just
4 don't remember. Do you have any knowledge of any
5 testing that was done on the hay at --
6 A. I don't.
7 Q. You said that the horses might have
8 benefitted if you had been called earlier. How much
9 earlier?
10 A. I don't know that I could give a time
11 frame. But I think it would have been prudent once
12 horses started to drop below a body condition score
13 of three that that probably should have been a red
14 flag.
15 Q. And what would you have recommended?
16 A. I don't know.
17 Q. And you don't know when they started
18 dropping their weight?
19 A. No.
20 Q. So you really can't comment on that,
21 can you?
22 MR. LEBSACK: Objection to the form.
23 A. No.
24 Q. (BY MR. TONDRE) Is it professionally
25 reasonable to -- or let me rephrase it.

Page 211

1 In your opinion, would it have been
2 professionally reasonable to, without doing any
3 testing or creating differential diagnosis, to reach
4 the conclusion that the cause of the condition was
5 starvation?
6 MR. LEBSACK: Objection to the form.
7 MS. BRONSON: Object to form.
8 A. I -- I would have trouble answering the
9 question in that form.
10 Q. (BY MR. TONDRE) Okay. Well, let me ask
11 it this way: Confronted with six horses that had
12 diminished body weight, is it professionally
13 reasonable to reach a conclusion without considering
14 all the possibilities for the condition?
15 MR. LEBSACK: Objection to the form.
16 MS. BRONSON: Object to form.
17 A. No. You have a duty to the horses to
18 establish that there is not a medical reason for
19 their weight loss.
20 Q. (BY MR. TONDRE) Now, I have here an
21 email which you sent to Officer Hardey. It's Park
22 City -- or Park County defendants document
23 No. 000300.
24 MR. LEBSACK: What is the date of it?
25 MR. TONDRE: Dated February 16, 2012.

Page 212

1 MR. LEBSACK: It's Exhibit 6.
2 MR. TONDRE: Oh, thank you.
3 Q. (BY MR. TONDRE) This email is based
4 upon your visit to the farm on -- what was it,
5 January something or other?
6 A. February 11, 2012.
7 Q. February 11, five days before the visit
8 by Dr. Olds and Dawn Smith?
9 A. Yes.
10 MS. BRONSON: Object to form.
11 Q. (BY MR. TONDRE) And you had the
12 opportunity to evaluate the horse at that point in
13 time, correct?
14 A. The horse we evaluated was not one of
15 the six that was later removed.
16 Q. I understand. But in your analysis of
17 that horse, you came to a differential diagnosis,
18 correct?
19 MS. EDWARDS: Object. Privileged.
20 A. Yeah. I'm afraid --
21 MR. TONDRE: It's not privileged
22 anymore.
23 MS. EDWARDS: I'll instruct you not to
24 to answer.
25 Q. (BY MR. TONDRE) Get Exhibit 6 before

Page 213

1 you.
2 A. I have it.
3 Q. Did you write that?
4 A. Yes.
5 Q. And you sent it to Cindy Hardey?
6 A. Yes.
7 Q. And at Cindy Hardey's request?
8 A. Yes.
9 Q. And you sent it on the day of the visit
10 to -- the date that Dr. Olds visited?
11 A. That's the date on the exhibit.
12 Q. All right. You state in this email,
13 "Horses are exquisitely sensitive to botulism or --
14 MS. EDWARDS: I wish I had a copy of
15 it.
16 MR. SCHIMBERG: Here.
17 Q. (BY MR. TONDRE) -- "making it all but
18 impossible to definitely confirm due to low levels of
19 toxin in the blood and GI contents. The only
20 treatment for botulism is nursing care, time, and
21 hope."
22 What did you base that statement on?
23 MR. LEBSACK: Well, I'm going to wonder
24 why I wanted to ask about this, but I couldn't.
25 MS. EDWARDS: No. Absolutely. No. I

54 (Pages 210 to 213)

187

## Page 218

foundation.

A. Widely accepted as a neurologic sign. There are other conditions that can produce quivering and trembling. That's certainly not exclusive.

Q. (BY MR. TONDRE) Did you think that drawing blood from the six horses was an important diagnostic thing to do?

A. For botulinum testing?

Q. For anything, just to diagnose the condition that the horses were in.

A. I think that the complete blood count and the chemistry panels were useful. I did not think that the botulinum testing was useful at all.

Q. You were in no hurry to jump to a conclusion regarding the six horses, were you?

A. I try never to rush to a conclusion, but in that case, I could not even if I wanted to. My experience told me that the signs that I was seeing in some of those horses could not be explained simply by inadequate food intake.

Q. You believed that at that juncture the case of those six horses was at a fork in the road, correct?

MR. LEBSACK: Objection to form.

MS. EDWARDS: Objection.

## Page 219

A. I'm not sure...

Q. (BY MR. TONDRE) You believed that those six horses needed to have further diagnostic testing before reaching a conclusion, correct?

A. I believe further investigation was needed.

Q. Is it your practice to do visual body scoring?

A. That is part of how we body score a horse.

Q. Just part?

A. It depends on whether they have a winter coat or not.

Q. You said you received a call from Mr. Swift in which he informed you that Bear was having difficulty rising?

A. Yes.

Q. Do you recall approximately when that was?

A. That was in the fall that preceded February of 2012, so the fall of 2011.

Q. Can you pinpoint it any better than that?

A. I'm afraid I can't.

Q. What was the weather like?

## Page 220

1    A. It was clear, bright, sunny day.
2    Q. What was that winter like?
3    A. I don't recall.
4    Q. Did you get any information from
5    Mr. Swift other than that Bear was having difficulty
6    rising?
7    A. No.
8    Q. Was it at that point you said you
9    wouldn't provide any services because you hadn't been
10   paid by Routt County?
11   A. No. No. At first he did not identify
12   the horse as Bear. But later in the conversation, it
13   came up, and we did not refuse treatment. I believe
14   I said something to the effect that he needs to be
15   seen by someone, and it was not requested of us that
16   we come examine him.
17   Q. Look at Exhibit No. 12. You say in the
18   one, two, three -- fifth paragraph, "We have worked
19   with many animal control offices in many states, and
20   we have never experienced such lack of
21   professionalism. It is a disappointment that your
22   office is willing to sacrifice what could be a solid
23   working relationship that could benefit not just the
24   Hatlee horses but others as well."
25   How many different jurisdictions have

## Page 221

1    you worked with regarding animal control?
2    A. I have been licensed in good standing
3    in three states: California, Oregon, and Colorado.
4    In California, I worked with Stanislaus County Animal
5    Control and Lassen County Animal Control. In Oregon,
6    I worked primarily with Deschutes County Animal
7    Control, and in Colorado, I have worked primarily
8    with Jefferson County Animal Control.
9    Q. And what is it about the animal control
10   in Routt County that caused you to say it lacked
11   professionalism?
12   A. They reneged on their commitment to us.
13   Q. You think that placed the horses in
14   danger?
15   A. Well --
16   MS. BRONSON: Object to form.
17   A. -- I think it means that we are
18   unwilling to work with them in the future. They also
19   failed to respond to any of our communications
20   regarding that.
21   Q. (BY MR. TONDRE) Is it any excuse that
22   Dawn Smith was on medical leave?
23   A. No. She should have made some other
24   officer aware of her caseload, and somebody should
25   have been picking up the slack.

56   (Pages 218 to 221)

AVERY WOODS REPORTING SERVICE, INC.    (303) 825-6119

188

# EXHIBIT 24

FRED WEGENER - JULY 24, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
and RONALD L. SWIFT,

Plaintiffs,

vs.



CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
and ASHLEIGH OLDS,

Defendants.

-----------------------------------------------------------

DEPOSITION OF FRED WEGENER
July 24, 2014

-----------------------------------------------------------

                          Deposition location:
                          9998 Havekost Road
                          Conifer, Colorado 80433

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado 80226

                              For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado 80202

                              For the Defendant, Olds.

**AVERY WOODS REPORTING**
455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

190

FRED WEGENER - JULY 24, 2014

Page 6

1    Q  When did you become post certified?
2    A  1988.
3    Q  Now directing your attention to the year
4    2012, what was -- what were involved with your duties
5    as sheriff?
6    A  Keep the peace, run the jail, I was
7    also -- I'm also the -- by default, the fire marshal
8    for any unincorporated area of the county not covered
9    by fire protection district, civil service, code
10   enforcement. That's pretty much it probably.
11   Q  Whom did you supervise?
12   A  The undersheriff.
13   Q  Anyone else?
14   A  No.
15   Q  Who was in charge of training at Park
16   County in 2012?
17   A  Training, just training in general or --
18   Q  Well, let me -- let me -- yeah, it's a
19   broad question.
20       What sort of training does the
21   sheriff's -- did the sheriff's office provide to its
22   employees during the year 2011, 2012, that area?
23   A  Oh. Well, they get -- you know,
24   firearms, they get arrest control, they get
25   Intoxilyzer, I think I had Tasers at 2012, so they

Page 7

1    would have gotten Taser, those that want to be
2    certified. They get any legal updates from the
3    district attorney's office, they'll come in and do
4    that, and I think that was in 2012, they did a class,
5    it was '11 or '12.
6        Then they get whatever specialized
7    training they'll get through their sergeants, they may
8    apply for -- oh, if they are going to an armor school
9    or they're going to go to a -- nonlethal shotgun course
10   or weapon course or baton school or something like
11   that, they may apply and they may do that, but that
12   would be out of county.
13   Q  Is the training provided to animal
14   control officers different than the training provided
15   to other deputies?
16   A  Yes. The deputies probably only get --
17   you know, they'll get, you know, your criminal code
18   and -- and that sort of training. The code enforcement
19   officers get that; but then they also go to the state,
20   they become animal protection agents; so they'll get
21   training there, and they will get specialized training
22   through their supervisor. Sergeant Priestly, she has
23   been through various courses. So they'll get training
24   through her. So --
25       But they'll still get the arrest control

Page 8

1    and the firearms through the department.
2    Q  Now, was Cindy Hardey in 2011 and 2012 an
3    employee of the sheriff's office?
4    A  Yes.
5    Q  Who was responsible for training her in
6    the preparation of search warrant affidavits?
7    A  Her supervisor would have covered that
8    during her FTO.
9    Q  And that would be Sergeant Priestly?
10   A  Correct.
11   Q  Does -- did the sheriff's office in 2012
12   have an internal affairs section?
13   A  Yes.
14   Q  And who was involved in that?
15   A  It would -- well, it depends on what
16   subdivision the complaint is out of. So it's like --
17   I'll have either Captain Bonnelycke or Captain Muldoon
18   will take care of those -- like I said, depending upon
19   what division they come from.
20   Q  Who would be responsible for conducting
21   an internal affairs investigation of an animal control
22   officer?
23   A  It would either have been Captain Muldoon
24   or Captain Bonnelycke.
25   Q  All right. And what precipitates an

Page 9

1    investigation by internal affairs?
2    A  Some sort of complaint about a violation
3    of policy.
4    Q  What was your involvement during the
5    months of February and March of 2012 in the
6    investigation leading up to the seizure of horses from
7    Mr. Hatlee and Mr. Swift?
8    A  Probably minimal. I got the -- Sheriff
9    Wiggins sent me the email about an issue regarding some
10   horses that were being kept out at Echo Valley Ranch.
11   And so I just directed Bobbi to look into it, whatever
12   help they needed.
13   Q  Do you remember any other involvement?
14   A  I remember we had some issues with the
15   folks that were getting a little excited about us
16   making sure we're doing a proper investigation. So the
17   undersheriff took care of doing media releases and
18   whatnot, trying to work on appeasing those folks.
19   Q  What's the policy or what was the policy
20   in 2012 in the Park County office in -- regarding any
21   disclosure of investigative materials to third parties?
22   A  When they do their press release --
23   especially if there's an active investigation going on,
24   they are supposed to run that by the DA's office so we
25   don't run into issues of something's disclosed that's

3  (Pages 6 to 9)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

FRED WEGENER - JULY 24, 2014

Page 10

1  going to be used in preparation for prosecution.
2      Q  Now, when do you first recall -- well,
3  let me -- do you recall there being a concern for the
4  safety of the horses of Mr. Hatlee and Mr. Swift at
5  some point in the investigation?
6      A  Concern for the safety of the horses?
7  Yeah, and I'm trying to remember; it had something to
8  do with a threat that somebody had made.  So they were
9  a little worried about that.  I'm trying to remember,
10  it was an email that they had got from somebody.
11      But the tone of it was such that it -- I
12  guess, that it raised folks' concern about somebody
13  doing something stupid.
14      Q  Did you become aware that the horses were
15  moved because of the fear of criminal conduct from some
16  of these so-called concerned citizens?
17      A  Yeah, that's correct.
18      Q  What investigation was made into the
19  threats that were being made?
20      A  I think they -- well, I think they took
21  precautions just to make sure that it doesn't -- that
22  it didn't materialize.
23      Q  Well, isn't it a crime to threaten bodily
24  harm or injury to property?
25      A  Well, if -- yes, it would be menacing,

Page 11

1  correct.
2      Q  What investigation was made into making a
3  case of menacing against the threatening, concerned
4  citizens?
5      A  You know, I -- I don't know.  I mean I
6  don't know if it ever rose to the level that they could
7  actually get a case to the DA.  That's about all I
8  could say about that.
9      Q  Are you aware that -- that one of your
10  deputies did recommend prosecution?
11      A  Yeah, if there was something to
12  prosecute, I'm sure he could have, yes.
13      Q  All right.
14      A  But do I have personal knowledge?  No, I
15  don't remember if they did that, no.
16      Q  All right.  Now during 2012, was there
17  any sort of controversy between your office and the
18  district attorney's office?
19      MR. SCHIMBERG:  Object to form.  Go
20  ahead.
21      A  I'm trying to remember, that was after
22  the election, there was -- yeah, there probably was.  I
23  had sent a letter to the DA trying to -- I don't know,
24  offer him an olive branch of peace after the election
25  was over because we had supported another candidate in

Page 12

1  the election.  He won, so it's pretty much all over,
2  so...
3      Q  (BY MR. TONDRE)  Wasn't there public
4  accusations by you or someone in your office that the
5  DA was not adequately prosecuting cases that your
6  department made?
7      A  Well, I think there was -- yeah, there
8  were accusations made that we had seen a lot of cases
9  that we couldn't figure out why they didn't -- or at
10  least an attempt to prosecute them.  But that's all you
11  can do.
12      Q  Who was making those accusations?
13      MR. SCHIMBERG:  Object to form.  Go
14  ahead.
15      A  Well, I think the undersheriff had made
16  some accusations to -- from -- from our office.
17      Q  (BY MR. TONDRE)  How about you?
18      A  No.  I -- I wouldn't make them in the
19  public, I'd just call him up and ask him.
20      Q  Did you privately complain to the
21  district attorney's office?
22      A  Yes.
23      Q  Do you recall approximately when that
24  was?
25      A  2012.  I couldn't give you -- I don't

Page 13

1  know exactly when.
2      Q  2012 was an election year for the
3  district attorney, correct?
4      A  Correct.
5      Q  And the election would have been in
6  November 2012, right?
7      A  Yes.  Correct.
8      Q  So the accusations, if you want to call
9  them that, were occurring in the year 2012, correct?
10      A  Correct.
11      Q  Had they been occurring before that?
12      A  Yes.
13      Q  And did this dissatisfaction by the
14  sheriff's office reach the public media?
15      A  Well, in our community, probably.
16      Q  Were you involved in any respect in the
17  decision to seize the horses?
18      A  No.  Huh-uh.  Not to -- not to seize
19  them.  I usually leave all the animal control stuff to
20  that division there.  They're very good at what they
21  do.
22      Q  So that would be left to Sergeant
23  Priestly?
24      A  Sergeant Priestly and her supervisors,
25  uh-huh.

4  (Pages 10 to 13)

192

FRED WEGENER - JULY 24, 2014

Page 14

1  Q  Who is her supervisor?
2  A  At that time, I'm trying to remember if
3  it was Kevin Hancock or if it was Captain Bonnelycke,
4  one of the two would have been her supervisor.
5  Q  If memory serves me, I think it was
6  Captain Bonnelycke.
7  A  Bonnelycke. That sounds about right.
8     MR. SCHIMBERG: I think that's right.
9  A  I had to change at one point, and I can't
10  remember when that was.
11  Q  (BY MR. TONDRE) At some point, a decision
12  was made to take Cindy Hardey off the case as lead
13  investigator, did you have any involvement in that
14  decision?
15  A  You know, it could have been. I know
16  when the case reached a certain complexity, it was
17  decided to bring in a more seasoned investigator, and I
18  think that could have been the time when Bobbi was
19  brought in.
20  Q  Well, the testimony to date has been that
21  Hardey was replaced because of accusations that she was
22  too friendly to Swift. Do you remember that?
23     MR. SCHIMBERG: Object to form.
24     MR. LEBSACK: Form.
25  A  Too friendly?

Page 15

1  Q  (BY MR. TONDRE) Yeah.
2  A  I don't think that would be grounds to
3  remove somebody. I think if they could be objective --
4  I've known Ron for years. But I mean, I don't -- I
5  don't think about somebody being too friendly.
6     But I think the objectivity, I think you
7  have to look at -- you know, look at that. But I
8  think -- I think our biggest thing was probably getting
9  somebody with all the rigmarole that was on the
10  internet and all that, that we really wanted to get
11  somebody in there that had a lot more -- like I say,
12  was a little more seasoned about dealing with such big
13  events. And Bobbi had done -- we'd done the buffalo
14  deal and we'd done the Vern Wagner deal, so she had a
15  lot of knowledge.
16  Q  Now do you expect a person who's -- well,
17  first of all, let me ask you this: Have you had
18  experience in seeking warrants for search and seizure?
19  A  Oh, yeah.
20  Q  Where did you receive your training?
21  A  Well, it would have been either -- either
22  through CLETA which is the Colorado Law Enforcement
23  Training Academy, through the various DAs, that I've
24  had over the years. Dave Thorson who is now the
25  District Court judge. Steve Rich who is a deputy DA.

Page 16

1  Ray Slaughter, the federal magistrate. Stuff like
2  that. I would have gotten -- we would have gone over
3  the -- how to prepare a warrant.
4     MR. TONDRE: What is that noise?
5     MR. SCHIMBERG: I think it's his phone.
6     THE DEPONENT: My phone vibrates.
7     MR. SCHIMBERG: I was feeling it, not
8  seeing it.
9  Q  (BY MR. TONDRE) Do you have any knowledge
10  as to what training Cindy Hardey had in obtaining
11  search and seizure warrants?
12  A  She would have gotten some from her
13  supervisor. I believe they would have gotten some from
14  the district attorney's office. As to who, I -- I
15  don't know right off the top of my head that would have
16  been; but usually they either prepare warrants, go over
17  there and -- and get on-the-job training when they're
18  turned down or -- and you know, then the DA talks to
19  them about what needs to be included in it. But
20  they -- they do get some experience writing those
21  warrants.
22  Q  What's the legal definition of probable
23  cause?
24     MR. SCHIMBERG: Object to form. Go
25  ahead. Based on what you know, Sheriff.

Page 17

1  A  Probable cause to -- for a warrant or
2  probable cause for an arrest.
3  Q  (BY MR. TONDRE) Probable cause for an
4  arrest warrant which leads to a written arrest?
5  A  Sure, I mean if you have, you know,
6  reasonable suspicion that individuals were engaged in
7  some sort of conduct that constitute a violation of
8  law, that you're looking at evidence that you need
9  to -- in order to prove the case, or in some cases,
10  disprove the case, you're going to apply for a warrant
11  to go in and obtain that evidence.
12     I think one of the biggies about our
13  system is that as soon as the investigator or the
14  deputy draws up the warrant, then they are going to go
15  by the DA's office and have a review there before they
16  actually go out and serve it.
17  Q  How's the DA expected to know -- or let
18  me ask it a different way.
19     Is there any way for the DA to know what
20  the officer who's seeking a warrant is leaving out of
21  the warrant?
22     MR. SCHIMBERG: Object to form. Go
23  ahead.
24  A  Well, hopefully, they're not leaving
25  anything out of the warrant. And by looking at the

5 (Pages 14 to 17)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

193

FRED WEGENER - JULY 24, 2014

Page 22

1    A  To her not knowing those things?
2    Q  (BY MR. TONDRE) Yeah, whose responsibility
3  is it for her not knowing the definition of probable
4  cause?
5    A  Well, I -- first of all, I would be
6  surprised that she didn't know what probable cause is.
7    Q  Let me tell you this, she testified to it
8  under oath that she didn't know the definition of
9  probable cause.
10    A  Did she?
11    MR. SCHIMBERG:  Object to the form.  Go
12  ahead.
13    A  Well, that would be disappointing.
14    Q  (BY MR. TONDRE) And she also testified
15  under oath that she did not know it was a violation of
16  the fourth amendment to fail to disclose -- fail to
17  include material facts.
18    MR. SCHIMBERG:  Object to form,
19  characterization.  Go ahead.
20    A  So what would be the question?
21    Q  (BY MR. TONDRE) The question is:  Who is
22  responsible for that?
23    A  Well, she received training in how to do
24  that.  Now, whether or not she applied that training, I
25  have no idea.

Page 23

1    Q  Well, was any investigation made into her
2  training and experience and state of mind after the
3  judge ruled that evidence would not be admissible
4  because of the bad faith of Cindy Hardey in obtaining a
5  warrant without fully disclosing the facts?
6    MR. SCHIMBERG:  Object to form.  Go
7  ahead.
8    A  Yeah, I think they went back and looked
9  and said you know what, how come you left this out.  I
10  asked her why she left it out.  And hopefully --
11    Q  (BY MR. TONDRE) Who did that?
12    A  -- correct it,
13    Her supervisor did.  I think her
14  supervisors did.
15    Q  Well, Bobbi Priestly testified she didn't
16  question her.  Who else would have questioned her?
17    A  Captain Bonnelycke.
18    Q  Would there be a report with respect
19  to the investigation --
20    A  To question --
21    Q  -- of why she did the warrant in the way
22  she did?
23    A  No.  There would have been just a
24  sit-down and a review of what transpired.
25    Q  Do you recall any criticism being made by

Page 24

1  anyone in the department of her conduct?
2    A  Yeah.  I mean, there was criticism about
3  the fact that the warrant had -- didn't have
4  information in it.  So -- and then of course, how to
5  remedy that problem.
6    Q  This is a deputy who had been in your
7  employ for eight years, right?
8    A  Correct.
9    Q  Wasn't this a pretty gross situation?
10    MR. SCHIMBERG:  Object to form.
11    A  No.  It was a mistake.
12    Q  (BY MR. TONDRE) What do you mean "it was a
13  mistake"?
14    A  She didn't put that in.  And she should
15  have and she realized that later.
16    Q  Well, what was her excuse for not putting
17  it in?
18    A  She -- at the time, she just did not put
19  it in.  And I don't -- I don't know.
20    Q  Well, how do you explain her testimony
21  that she didn't know it was a violation not to put it
22  in?
23    MR. SCHIMBERG:  Object to form.
24    MR. LEBSACK:  Same.
25    MR. SCHIMBERG:  Foundation.

Page 25

1    A  I don't know.
2    Q  (BY MR. TONDRE) Are you aware that Monte
3  Gore, Bobbi Priestly, Captain Bonnelycke, and Cindy
4  Hardey attended a fundraiser for the people who were
5  advocating -- fund-raiser being sponsored by the people
6  who were advocating the prosecution and conviction of
7  Mr. Hatlee and Mr. Swift?
8    MR. SCHIMBERG:  Object to form.
9  Foundation, characterization.  Go ahead.
10    A  I knew they attended a fund-raiser.
11    Q  (BY MR. TONDRE) Did you know what the
12  fund-raiser involved?
13    A  Something about raising money for vet
14  bills for one of the horses.
15    Q  Do you know who the people were that were
16  sponsoring the fund-raiser?
17    A  No.  Not off the top of my head.
18    Q  Do you know that Monte Gore supplied
19  investigative materials for their use at the
20  fund-raiser?
21    MR. SCHIMBERG:  Object to form.  Go
22  ahead.
23    A  No.
24    Q  (BY MR. TONDRE) Is that proper conduct?
25    MR. SCHIMBERG:  Object to form.  Go

7  (Pages 22 to 25)

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

194

FRED WEGENER - JULY 24, 2014

**Page 26**

1  ahead.
2      A. No.
3      Q  (BY MR. TONDRE) Why is it not proper
4  conduct?
5      A  Well, he shouldn't be --
6      MR. SCHIMBERG:  Same objection.  Go
7  ahead.
8      A  Sorry.
9      MR. SCHIMBERG:  Not a problem.
10     A  You should have -- I mean, if there was
11 anything provided, it should have gone through the DA's
12 office to make sure it wasn't going to be used in the
13 prosecution.
14     Q  (BY MR. TONDRE) What I'm interested in is
15 what was the policy of the sheriff's office as a
16 result -- what was the policy of the sheriff's office
17 regarding disclosing investigative materials that were
18 being -- that were part of an ongoing investigation?
19     MR. SCHIMBERG:  Asked and answered, go
20 ahead.
21     A  Yeah.  I was going to say I think I
22 already asked -- answered it.  But they are not
23 supposed to.  It's supposed to be information that goes
24 through the district attorney's office before it's
25 released.

**Page 27**

1      Q  (BY MR. TONDRE) Are you aware that Monte
2  Gore participated in a propaganda film regarding --
3  there was quite the -- that was quite defamatory of
4  Hatlee and Swift that was distributed throughout the
5  world --
6      MR. LEBSACK:  Form.
7      MR. SCHIMBERG:  Join.
8      Q  (BY MR. TONDRE) -- during the course of
9  the investigation?
10     MR. SCHIMBERG:  Form, foundation.  Go
11 ahead.
12     A  No.
13     Q  (BY MR. TONDRE) Is that proper conduct by
14 a member of your department?
15     MR. LEBSACK:  Same.
16     MR. SCHIMBERG:  Object to form,
17 foundation.  Go ahead.
18     A  No.
19     Q  (BY MR. TONDRE) Are there written policies
20 regarding the release of investigative information by
21 the department?
22     A  Yes.
23     Q  Where would that written policy be found?
24     A  In the policy manual.
25     Q  And as best you can recall, Sheriff

**Page 28**

1  Wegener, what -- what does that policy prohibit?
2      A  Well, just like I said before, it would
3  prohibit you releasing information that could be
4  detrimental to the prosecution of a case.  It would
5  require that you contact the district attorney's office
6  before releasing anything to the media, just so that
7  we're not doing that.
8      Q  Can you think of any valid reason for
9  releasing investigative materials to the so-called
10 concerned citizens who were crying out for the heads of
11 Hatlee and Swift?
12     MR. SCHIMBERG:  Object to form.  Go
13 ahead.
14     MR. LEBSACK:  Same.
15     A  No.  I --
16     Q  (BY MR. TONDRE) Did you have any contact
17 with the so-called, quote, air quotes, concerned
18 citizens?
19     A  No.
20     Q  Were you aware of the extent of the
21 publicity that was being devoted to this case?
22     MR. SCHIMBERG:  Object to form.
23     A  I knew it was on the -- the internet.
24 But that's about all I knew.
25     Q  (BY MR. TONDRE) Do you have a name on

**Page 29**

1  Pinecam?
2      A  Do I have a name on Pinecam?
3      Q  Yeah.  Or whatever you call it, a
4  posting, I don't know what you call those things.
5      A  Well, I think the sheriff's office might
6  have a deal.  But nay, I don't -- I don't get on
7  Pinecam.
8      MR. SCHIMBERG:  Don't know what you are
9  missing, Sheriff.
10     MR. TONDRE:  He's going to run right out
11 and get one.
12     THE DEPONENT:  I stay off of those
13 things.
14     Q  (BY MR. TONDRE) Now, I'm stepping back a
15 minute.  You said that Captain Bonnelycke probably
16 talked to Cindy Hardey about this.  Would that have
17 been considered an internal affairs investigation?
18     A  I don't think at that time, I don't
19 think -- no.  I don't believe it was.
20     Q  All right.  Now do you know for a fact
21 that that occurred?
22     A  If there was an issue with the warrant,
23 which I do know there was, then they would have talked
24 about it, yes.
25     Q  All right.  Would that have included --

8  (Pages 26 to 29)

195

FRED WEGENER - JULY 24, 2014

**Page 30**

1  would anyone had been included in the discussion other
2  than Ms. Hardey and Captain Bonnelycke?
3      A  He could have brought her supervisor in
4  or he could have talked to her directly.
5      Q  Do you have any sort of regular periodic
6  meetings in your -- in your office in which the overall
7  operation of the sheriff's department is -- is
8  discussed?
9      A  Back in 2012, I think we would have had
10  probably monthly staff meetings.
11      Q  Who would that include?
12      A  Anybody from the rank of sergeant on up.
13      Q  Are there written minutes kept of those
14  meetings?
15      A  No.
16      Q  Are they recorded in any fashion?
17      A  No.
18      Q  What -- what subjects are discussed
19  generally?
20      A  The day-to-day operations of the
21  sheriff's office.
22      Q  If the undersheriff was concerned about
23  the safety of Mr. Swift, Mr. Hatlee, and their horses,
24  would that be a subject as a result of, quote,
25  concerned citizens? Would that be a subject you would

**Page 31**

1  expect to be discussed at the monthly staff meetings?
2      A  No.
3      Q  Why not?
4      A  Because that would be something that if
5  it was going on, would -- they would come right to me
6  on, wouldn't wait for me to --
7      Q  Did they come to you and say we're
8  concerned about the safety of Mr. Hatlee -- Mr. Hardey
9  (sic), Mr. Swift, and their horses?
10      A  Boy -- I'm sorry. Were they concerned
11  about the horses and something getting at the horses,
12  yes, they did come to me about that.
13      Q  All right. And what was your solution?
14      A  They were going to move the horses.
15      Q  Why not just arrest the people that
16  are -- who were menacing?
17      MR. SCHIMBERG: Object to form.
18  Foundation.
19      A  At the time, we didn't have a -- an
20  individual that I think that they directly said was
21  going to do something. More along the lines of they
22  had kind of a feeling given the attitude of the
23  individuals that something might transpire.
24      Q  (BY MR. TONDRE) Well, they had direct
25  threats on the internet. You didn't know that?

**Page 32**

1      A  Direct -- you mean direct threats to
2  Mr. Swift or Mr. Hatlee?
3      Q  No. Direct threats to the sheriff's
4  department and hey, if you guys don't do something,
5  we're going to take it into our hands. That was the
6  nature of the threat.
7      MR. SCHIMBERG: I missed the question
8  though, Brice, I'm sorry.
9      Q  (BY MR. TONDRE) Are you in the business of
10  just protecting animals and not people?
11      MR. SCHIMBERG: Object to form.
12  Argumentative, go ahead.
13      A  No. We protect people too.
14      Q  (BY MR. TONDRE) All right. Why didn't you
15  investigate threats of bodily and property injury when
16  they -- when they were brought to the -- directly to
17  the attention of the sheriff's office.
18      A  Well, we did do an investigation.
19      Q  And who did you investigate?
20      A  That's what I am trying to figure out. I
21  mean, did an investigation on -- on the horses, I
22  guess, I don't know what the threat is that you're
23  talking about.
24      Q  On February the 19th, 2012, this is
25  page 89 of the sheriff's office discovery.

**Page 33**

1      MR. SCHIMBERG: Should we take just a
2  second to grab it so we can see it? What exhibit is
3  that, Mr. Tondre?
4      MR. LEBSACK: 66.
5      MR. SCHIMBERG: That sounds right to me.
6  Let's just see how good my -- page what?
7      MR. TONDRE: Page 89.
8      MR. SCHIMBERG: Thanks. See you needed
9  your glasses.
10      THE DEPONENT: I thought I was going to
11  need them.
12      Q  (BY MR. TONDRE) What I'm referring to
13  Sheriff Wegener, is paragraph No. 4 which says: "On
14  February 19, 2012, I received a telephone call from
15  Undersheriff Gore at my residence." This is Bobbi
16  Priestly speaking. "The undersheriff advised me that
17  he had received several telephone calls from the Public
18  Information Officer for the State of Colorado
19  Department of Agriculture's office. He was very
20  concerned for the safety of the owners of horses and
21  the horses themselves. The undersheriff stated he had
22  been on the telephone all morning and the emails and
23  telephone calls were very concerning to him."
24      Were you aware that Undersheriff
25  Gore was concerned about the safety of the owners

9  (Pages 30 to 33)

FRED WEGENER - JULY 24, 2014

Page 34

1  and the horses?
2       MR. LEBSACK: Object to the form.
3       MR. SCHIMBERG: Join.
4       A That's what it says.
5       Q (BY MR. TONDRE) No. But is this something
6  you as sheriff in February 19, 2012, was aware of?
7       A That they said yeah, they were concerned.
8  That's why they -- in the next paragraph why they
9  agreed to move the horses.
10      Q That's an unhealthy atmosphere to have
11 going on in your jurisdiction, isn't it, people --
12 people have to be in fear of their lives because of
13 some threats?
14      MR. SCHIMBERG: Object to form.
15 Argumentative.
16      A Yeah, I don't -- I don't see that, I'm
17 sorry.
18      Q (BY MR. TONDRE) You don't see that it's
19 something you should be concerned about?
20      A No. I'm sorry. Where does it say that
21 there was a threat? I guess I'm missing that.
22      Q Well, I don't know how else you can read
23 it. He was concerned for the safety of the owners and
24 the horses themselves.
25      A Okay.

Page 35

1       Q That doesn't tell you there's a threat
2  going on?
3       A Well, it says -- then it says in the next
4  paragraph they acted upon it and moved the horses.
5       Q So you moved the -- you moved the victim,
6  you don't -- you don't go after the perpetrator, is
7  that the practice in Park County?
8       MR. SCHIMBERG: Object to form.
9       A No. I mean, if there had been a threat
10 against somebody, if you're going to go shoot them or
11 you are going to go punch them out or whatever, then we
12 acted upon it.
13      Q (BY MR. TONDRE) Did you check and see
14 what -- what the nature of the communications were that
15 led Undersheriff Gore to be concerned?
16      A I'm sure if -- if there was some sort of
17 a specific threat, they would have acted upon it.
18      Q How specific does it have to be, you have
19 to fire a shot?
20      A No. I mean you have to make a threat
21 against somebody.
22      Q Well, are you -- are you aware that they
23 made a threat -- that Shelley Ferraro made a threat
24 against Dr. Horton?
25      A No. I'm not.

Page 36

1       Q So -- look at -- you can't look at it. I
2  got it.
3       I want you to take a look at Exhibit 67
4  and 68. First of all -- take a look at them. Familiar
5  yourself -- familiarize yourself with them, and my
6  question to you is: Were you aware of those as they
7  were being entered in to?
8       A I have been handed what I believe is the
9  notice of warning.
10      Q Right.
11      MR. SCHIMBERG: That's 67.
12      A And then 68 is the last page with the
13 signatures.
14      MR. LEBSACK: Actually --
15      MR. SCHIMBERG: Actually 68, take a look,
16 Sheriff. It's -- it's not related to 67. Excuse me,
17 Mr. Tondre. If you don't want me telling him that.
18      Q (BY MR. TONDRE) No. 67 and 68 --
19      A Are different?
20      MR. SCHIMBERG: Yeah.
21      Q (BY MR. TONDRE) Yeah.
22      A Oh, okay.
23      Q One is the notice of warning and 68 is
24 the agreement to move the horses.
25      A Okay. Okay.

Page 37

1       Q And did you -- are you aware -- were you
2  aware of Exhibit No. 67 before it was done?
3       A No.
4       Q When did you become aware of it?
5       A Right now.
6       Q Okay. And were you aware of Exhibit
7  No. 68 at the point in time when it was done?
8       A Only -- I've never seen it. I just
9  remember them telling me that there was an agreement.
10      Q Okay.
11      A That must be it.
12      Q Now, Exhibit No. 67, purports to be
13 signed on behalf of PCSO, which I assume is the Park
14 County Sheriff's Office. Did Cindy Hardey have
15 authority to enter -- or to issue that notice of
16 warning?
17      A Well, she is an agent for the state. Now
18 where do you see that she signed it on behalf of the
19 Park County Sheriff's Office?
20      Q Down under signature box.
21      MR. SCHIMBERG: Issuing agency.
22      A Yeah.
23      Q (BY MR. TONDRE) Is that a warning that was
24 issued on behalf of the Park County Sheriff's Office?
25      A Yes. They do.

10  (Pages 34 to 37)

AVERY WOODS REPORTING SERVICE, INC.    (303) 825-6119

FRED WEGENER - JULY 24, 2014

| Page 38 |
|---|

1  Q  All right. And she had the authority of
2  the Park County Sheriff's Office to enter into that
3  notice of warning?
4  A  Yes.
5  Q  Now --
6  A  It would have been from training she
7  received.
8  Q  Exhibit No. 68. It says this is an
9  agreement between Ronald Swift, Kirsten LeBeau, and the
10  Park County Sheriff's Office regarding six horses that
11  were involved in a current case. And it is signed by
12  Deputy Hardey and Mr. Hatlee and Mr. Swift.
13      Did Cindy Hardey have the authority to
14  enter into that agreement?
15  A  Yes.
16  Q  How many conversations did you
17  participate in in which Dr. Horton was a party?
18  A  All right. I give. Who's Dr. -- what
19  was it?
20  Q  Horton?
21  A  Who's Dr. Horton?
22  Q  Dr. Horton is a veterinarian who provided
23  veterinary services to Mr. Hatlee and Mr. Swift.
24  A  None that I recall.
25  Q  Let me show you page 78 out of your

| Page 39 |
|---|

1  discovery. Is it in that book?
2      MR. SCHIMBERG: Yeah, it's part of
3  Exhibit 66.
4  Q  (BY MR. TONDRE) Okay. The last paragraph.
5  "On February 21, 2012, at approximately 10:30 a.m., I
6  received a call from Dr. Horton, DMV. Dr. Horton
7  called and stated she had some preliminary results on
8  the necropsy that was done on 'Maggie.' I recorded a
9  portion of the conversation, see attached audio disk,
10  Undersheriff Monte Gore and Sheriff Fred Wegener were
11  both in the office for the conversation with
12  Dr. Horton."
13  A  Okay.
14  Q  Do you remember that?
15  A  No. I don't.
16  Q  So you -- you can't testify that you were
17  there for that, can you?
18  A  I can remember -- and I just --
19  apparently, I don't remember Dr. Horton. If she says I
20  was there, I guess I was there. So...
21  Q  Well, just keep in mind that's --
22  question whether she's telling the truth or not.
23      MR. SCHIMBERG: Object. Object to form.
24  Q  (BY MR. TONDRE) Do you ever remember -- do
25  you ever remember asking Dr. Horton or any veterinarian

| Page 40 |
|---|

1  any questions about Mr. Swift?
2  A  No. I -- I don't recall.
3  Q  Now, you -- you stated earlier that
4  you've known Mr. Swift for quite some time; is that
5  right?
6  A  Yes.
7  Q  And how have you known him?
8  A  Just casual acquaintance, he used to own
9  Pizza Et Cetera on top of the hill.
10  Q  Do you know anything about his
11  capabilities as a horse rancher?
12  A  No. I don't.
13  Q  Did you ever have a question in your mind
14  as to whether Mr. Swift had not called a veterinarian
15  because he had a high opinion of his ability to deal
16  with problems in horses?
17      MR. SCHIMBERG: Object to form.
18  A  Boy, repeat that question again.
19  Q  (BY MR. TONDRE) My question: Did the
20  thought ever cross your mind during the course of this
21  investigation early on that Mr. Swift felt he didn't
22  need to call a vet because of his high ability in
23  dealing with problems in horses?
24  A  So you're asking me to speculate on his
25  ability to deal with horses?

| Page 41 |
|---|

1  Q  No. No. What I'm -- what I'm asking you
2  is whether you had in your mind a thought that maybe
3  Mr. Swift didn't call a veterinarian with respect to
4  the horses because he had a high ability of his -- his
5  qualifications to take care of the issue?
6  A  No.
7  Q  Does the sheriff's office have a website
8  where if someone wants to send you an email they could
9  send it directly to you?
10  A  Yes.
11  Q  Do you recall receiving in mail -- emails
12  directed to you during the course of the Hatlee and
13  Swift matter?
14  A  Directed -- who. No. I don't -- I don't
15  recall.
16  Q  All right. What -- I realize it's been a
17  while, but what's -- what's your sense as you sit here
18  today as to what was going on publicity wise in
19  connection with this case? Was it heated? What -- how
20  would you characterize it?
21  A  You know, I've -- we've had the -- we had
22  the buffalo case where they -- folks went down and shot
23  all the buffalo on this guy's property. And
24  everybody -- there's outcry on cruelty to animals.
25      This rose to that same level, where I had

11 (Pages 38 to 41)



**Page 42**

1 a lot of people from all over the place that were --
2 kind of zeroing in on the fact that these horses,
3 thought, had been mistreated and weren't taken care of
4 properly; and they wanted somebody to take care of it.
5     Q    Were you aware what precipitated the
6 removal of the horses was a specific set of threats
7 that said if you don't take those horses away from
8 Hatlee and Hardey -- Hatlee and Swift, we're going to
9 do it?
10     A    Yeah, that's the reason why we had the
11 horses moved.
12     Q    Isn't that a prosecutable offense to make
13 that kind of threat?
14         MR. SCHIMBERG:  Asked and answered.  Go
15 ahead.
16     A    A prosecutable offense?
17     Q    (BY MR. TONDRE)  Yeah.
18     A    I'm not a prosecutor, I don't know.
19     Q    Well, is it a chargeable offense by a
20 fair-minded law enforcement officer to charge somebody
21 with a crime for making a threat that if the -- if the
22 sheriff doesn't take the horses, we will?
23     A    Well, I don't think -- if it had been put
24 that way, probably, yes.  But it wasn't put that way.
25     Q    Well, let's assume it was put that way.

**Page 43**

1 Is that something that should have been charged?
2         MR. SCHIMBERG:  Object to form.
3     A    If the sheriff doesn't take them, we
4 will?
5     Q    (BY MR. TONDRE)  Right.  The outcry was --
6 let me put it in perspective.  The outcry from early
7 on, starting with Dr. Olds, was get the horses off of
8 the Echo Valley Ranch.
9         And when Cindy Hardey entered into the
10 warning agreement and left the horses at Echo Valley
11 that's when the outcry started, get the horses off the
12 ranch or we'll take them ourselves.  Is that something
13 that should have been investigated by your department
14 if somebody in your department knew about it?
15         MR. LEBSACK:  Form.
16         MR. SCHIMBERG:  Object to form,
17 foundation, go ahead.
18     A    Sure.
19     Q    (BY MR. TONDRE)  Why?
20     A    Well, I mean, first of all, yeah, I mean
21 did they have the opportunity?  Could they actually do
22 it?  I'm sure all of that is looked at.  I mean, if
23 somebody's making that threat and live in California,
24 do they really have the opportunity to do it in
25 Colorado?

**Page 44**

1     Q    How about if they are making that threat
2 and they're in Park County?
3     A    If they are in the Park County, yeah,
4 they would have -- then they'd be in the proximity, so
5 they would probably carry out that threat.
6     Q    And if they are making that threat in --
7 if it's coming from Jefferson County, what would you
8 do?
9         MR. SCHIMBERG:  Object to form.
10     A    Same thing, I mean, you want to get ahold
11 of them, you find out.
12     Q    (BY MR. TONDRE)  Would that be something
13 you could investigate, or would you have to refer to
14 Jefferson County sheriff?
15     A    Oh, no, we could investigate it.
16     Q    You could investigate it?
17     A    Sure.
18     Q    Since the threat is being made in --
19     A    My county.
20     Q    -- Park County, they've fired across the
21 line?
22     A    But would it be a threat?  I don't know.
23     Q    Is it a threat that if you don't do
24 something, we will?
25     A    I think it's a -- a concern.

**Page 45**

1         MR. TONDRE:  Why don't we take a break.
2         MR. SCHIMBERG:  Sure.
3         (Recess was taken from 10:55 a.m. to
4 11:10 a.m.)
5     Q    (BY MR. TONDRE)  Okay.  Sheriff Wegener, is
6 it fair to say that the sheriff's office bowed to
7 public pressure in this matter?
8     A    Oh, I don't think so.
9     Q    Let me read to you from page 119 of
10 Exhibit 66.  I think it's Exhibit 66.  What happened to
11 the book?
12         MR. SCHIMBERG:  I have it.
13         MR. TONDRE:  Sheriff, that's -- he
14 stiffed the exhibits, take him in.
15         MR. SCHIMBERG:  This is Jeffco.  What
16 page?
17         MR. HATLEE:  I can solve that problem
18 too.
19         MR. TONDRE:  I think it's exhibit -- oh,
20 119.
21         THE DEPONENT:  Oh, right there.  You
22 opened up right to it.
23         MR. SCHIMBERG:  There you go.
24     Q    (BY MR. TONDRE)  First paragraph of
25 Exhibit 19 reads: "On May 16, 2012, I was notified by

12  (Pages 42 to 45)

AVERY WOODS REPORTING SERVICE, INC.    (303) 825-6119

199

FRED WEGENER - JULY 24, 2014

Page 50

1   obtain a search or arrest warrant?
2       MR. SCHIMBERG: Object to form. Go
3   ahead.
4       A   The legal basis?
5       Q   (BY MR. TONDRE) Yes.
6       A   Well, they're still a peace officer by
7   definition if they're acting in their scope of their
8   duties. So if I appoint them as a deputy sheriff, then
9   they can obtain -- they would have the same rights as
10  any other deputy sheriff.
11      Q   Was Cindy Hardey a deputy sheriff?
12      A   Yes.
13      Q   Did she have -- did she have the legal
14  right to execute a warrant?
15      A   Yes.
16      Q   Did you ever read Cindy Hardey's
17  testimony which led to the judge holding she acted in
18  bad faith?
19      MR. SCHIMBERG: Object to form. Go
20  ahead.
21      A   Yeah, I may have looked at it. I -- I
22  can't recall it all, but...
23      Q   (BY MR. TONDRE) When did you look at it?
24      A   A year ago, maybe, two years ago.
25  Whenever the case -- the decision came out. I looked

Page 51

1   at the Judge's ruling and how that was worded.
2       Q   Does the name Eugene Ferraro mean
3   anything to you?
4       A   That was one of the emails that the
5   undersheriff had received.
6       Q   Who else do you remember the undersheriff
7   receiving emails from?
8       A   I can't recall those -- the names. I --
9   I know there was a vet that he had talked with. Yeah,
10  and I can't remember specific names.
11      Q   Was the vet Dr. Olds?
12      A   Like I, say I can't remember the
13  specifics of it.
14      Q   How about the name Barbara Wright, does
15  that mean anything to you?
16      A   No. I don't recall -- remember that
17  name.
18      Q   How about the name Monika Courtney?
19      A   I remember that name.
20      Q   What do you remember about that name?
21      A   I just remember that -- somebody saying
22  that name.
23      Q   In the buffalo case, what were the
24  charges?
25      A   I think cruelty to animals. Various -- I

Page 52

1   mean, I don't remember every charge.
2       Q   If I go out here and shoot an elk, is
3   that cruelty to an animal?
4       A   Actually, if you shoot an elk that would
5   be hunting out of season.
6       Q   How about if I am shooting in the season?
7       A   That would depend if your license is in
8   the area.
9       Q   What I'm struggling with is -- isn't
10  shooting somebody's buffalo more of a crime of injury
11  to their property rather than animal cruelty?
12      MR. SCHIMBERG: Object to form. Go
13  ahead.
14      A   Yeah. Like I say, I don't recall
15  exactly.
16      Q   (BY MR. TONDRE) Okay. Fair enough. Does
17  the name Harmony HorseWorks mean anything to you?
18      A   I think -- yes. I think there was
19  something about Harmony HorseWorks.
20      Q   Was it your impression that Undersheriff
21  Gore was attempting to appease the persons' responsible
22  for the public outcry?
23      MR. SCHIMBERG: Object to form. Go
24  ahead.
25      A   I guess what do you mean by -- he was

Page 53

1   attempting to appease them?
2       Q   (BY MR. TONDRE) Yeah.
3       A   I think that he was trying to, you know,
4   help get information out to them that we were, in fact,
5   prosecuting the case -- or excuse me, investigating the
6   case and that we were trying to get the DA's office a
7   prosecutable case.
8       Q   And just how would you be doing that? By
9   going to a fund-raiser?
10      MR. SCHIMBERG: Object to form.
11      Q   (BY MR. TONDRE) Or giving them
12  investigative materials?
13      MR. SCHIMBERG: Same objection.
14      A   Like I say, he shouldn't be giving them
15  investigative materials.
16      Q   (BY MR. TONDRE) You have no recall of ever
17  talking to Dr. Horton or Dr. Burton; is that correct?
18      A   Well, I've -- when you showed me that
19  thing, I guess -- I do recall Dr. Horton, I guess was
20  the one that I was in a conference call that we had
21  actually listened to at the office.
22      Q   Oh, so you do remember?
23      A   Well, I can recall that we had a
24  conference call, yes.
25      Q   Do you remember anything you said during

14 (Pages 50 to 53)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

200

FRED WEGENER - JULY 24, 2014

| Page 54 |
|---|

1  that conversation?
2      A  I -- I think I answered something --
3  question about Mr. Swift, but I -- as far as being a
4  rancher, that's...
5      Q  What do you know about Mr. Swift's
6  experience as a rancher?
7      A  This -- just that he has been a rancher
8  for a while.  He has had horses for a while.
9      Q  What's his reputation before he was
10  prosecuted by your office?
11      A  Gosh.  Just that he had horses, I mean, I
12  don't know as far as reputation.  I'm not -- like I
13  said, I'm not in those circles or talk to all those
14  people about horses; so I don't know.
15      I think when he lived on Quackie, I know
16  they had horses there.
17      Q  Now Sergeant Priestly said in her report
18  on page 91 which we talked about that you asked
19  if Dr. Horton thought Swift did not call a vet sooner
20  because he was an older rancher and he thought he could
21  take care of things himself.  Do you remember asking
22  that question?
23      A  Yeah, I could have.
24      Q  What caused -- what would -- if you did,
25  what caused you to ask it?  What were you searching

| Page 55 |
|---|

1  for?
2      A  Because I've had other individuals do the
3  same thing.
4      Q  Well, did you direct that they make an
5  investigation as to what his qualifications were to do
6  so?
7      A  Whose qualifications, I'm sorry?
8      Q  Mr. Swift.
9      A  No.  I just know that, you know, we have
10  individuals that have -- if they have been doing it a
11  long time.  I know we had the Vern Wagner case; Vern
12  Wagner was the same thing.  Somebody who has been doing
13  it a long time, so more apt to try older methods or
14  whatnot.
15      Q  You lost that case too didn't you?
16      A  I -- well, yeah.  Recently overturned, I
17  guess.
18      Q  Well, the jury threw out everything but
19  one count, the judge threw out the last count, right?
20      A  On the appeal, the judge threw it out,
21  you're correct.
22      Q  Did you direct anybody to make an
23  investigation into Mr. Swift's qualifications to handle
24  the situation out at Echo Valley?
25      A  No.

| Page 56 |
|---|

1      Q  Are you familiar with the Tenth Circuit
2  authority that requires an investigation into all
3  aspects of the case before obtaining an arrest warrant?
4      MR. SCHIMBERG:  Object to form.
5      Q  (BY MR. TONDRE)  Or a seizure warrant?
6      MR. SCHIMBERG:  Object to form.
7  Foundation.  Go ahead.
8      Q  (BY MR. TONDRE)  Cortez versus Cauley
9  (phonetic)?
10      MR. SCHIMBERG:  Thank you.
11      A  Cortez versus Caley, no.  I'm not.
12      Q  (BY MR. TONDRE)  Aren't you charged with --
13  you and -- and all of the deputies in your office are
14  charged with knowledge of the legal opinions of the
15  United States Court of Appeals for the Tenth Circuit;
16  is that right, sir?
17      MR. SCHIMBERG:  Object to form.  Go
18  ahead.
19      A  Well, I think, you know, you try and get
20  information, yes.
21      Q  (BY MR. TONDRE)  A seizure without adequate
22  investigation is a violation of the fourth amendment;
23  do you understand that?
24      MR. SCHIMBERG:  Object to form.
25      A  Yes.

| Page 57 |
|---|

1      MR. SCHIMBERG:  Legal conclusion.
2      Q  (BY MR. TONDRE)  Do you recall during the
3  course of that conversation, telephone conference that
4  you participated in, that Dr. Horton expressed the
5  opinion that the case was at a fork in the road with
6  respect to determination of the cause of the condition
7  of the horses and that much more analysis needed to be
8  done?
9      MR. LEBSACK:  And -- form.
10      MR. SCHIMBERG:  Join.
11      A  No.
12      Q  (BY MR. TONDRE)  If that sort of
13  information had been stated by Dr. Horton, it should
14  have been investigated, correct, sir?
15      A  Well, I think there was additional
16  investigation done, yes.
17      Q  That investigation wasn't done before the
18  seizure was undertaken, was it?
19      MR. SCHIMBERG:  Foundation.  Go ahead.
20      A  I think there was -- there was some done
21  but I think there was some done afterwards.
22      Q  (BY MR. TONDRE)  Yeah.  What's the
23  difference between starvation and malnutrition?
24      MR. SCHIMBERG:  Object to form.
25  Foundation.

15  (Pages 54 to 57)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

201

# EXHIBIT 25

MONTE GORE - JUNE 24, 2014

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

 **COPY**

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER,
and ASHLEIGH OLDS,

Defendants.
-------------------------------------------------------------
DEPOSITION OF MONTE GORE
June 24, 2014
-------------------------------------------------------------
Deposition location:
825 Clark Street Road
Fairplay, Colorado

APPEARANCES:

Brice A. Tondre, Esq.
BRICE A. TONDRE, P.C.
215 South Wadsworth Boulevard, #500
Lakewood, Colorado  80226

For the Plaintiffs.

John Lebsack, Esq.
WHITE and STEELE, P.C.
Dominion Towers
600 17th Street, Suite 600N
Denver, Colorado  80202

For the Defendant, Olds.

## AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

203

Page 2

1    APPEARANCES (CONTINUED):
2    Timothy P. Schimberg, Esq.
     FOWLER, SCHIMBERG & FLANAGAN, P.C.
3    1640 Grant Street, Suite 300
     Denver, Colorado 80203
4              For Park County.
5
6    Also present: Ronald L. Swift; Randy Hatlee; and Bobbi
     Priestly
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           The deposition of MONTE GORE, called
2    for examination by the Plaintiffs, was taken in
3    the offices of Park County, 825 Clark Street,
4    Fairplay, Colorado, commencing at 3:31 p.m., on
5    the 24th day of June, 2014, before Linda L.
6    Frizzell of Avery/Woods Reporting Service, Inc.,
7    455 Sherman Street, Suite 250, Denver, Colorado
8    80203, Registered Professional Reporter, Certified
9    Shorthand Reporter, and Notary Public in and for
10   the State of Colorado, pursuant to the Federal
11   Rules of Civil Procedure.
12           I N D E X
13   EXAMINATION OF MONTE GORE          PAGE
14   BY MR. TONDRE              4
15           INITIAL
     PREVIOUSLY MARKED EXHIBITS:       REFERENCE
16
     66  Park County Records           8
17
18
19
20
21
22
23
24
25

Page 4

1                MONTE GORE,
2    being first duly sworn to state the truth, the whole
3    truth, and nothing but the truth, testified under oath as
4    follows:
5                EXAMINATION
6    BY MR. TONDRE:
7        Q  State your name, please, sir.
8        A  Monte Kevin Gore.
9        Q  And your occupation, Mr. Gore?
10       A  I'm the undersheriff of the Park County
11   Sheriff's Office.
12       Q  What are the duties of the undersheriff?
13       A  Basically, I'm second in command, and I
14   supervise all the divisions under -- in the Park County
15   Sheriff's Office.
16       Q  What -- what is involved in your
17   supervision of the animal cruelty division?
18       A  That's one of the divisions under my
19   command, but primarily I leave the animal control
20   issues to Captain Bonnelycke and Sergeant Priestly.
21       Q  What's your educational background?
22       A  Excuse me?
23       Q  What's your educational background?
24       A  I graduated with honors from St. John's
25   University with a 4.0 GPA. I graduated from the

Page 5

1    Colorado Law Enforcement Officer -- or Law Enforcement
2    Academy with a GPA of 4.0. I'm a graduate of the US
3    Department of Justice National Institute of Corrections
4    Academy. I'm a graduate of the County Sheriffs' of
5    Colorado Command School. Let me see.
6            I'm graduate of Basics SWAT school. I'm
7    a graduate of advanced SWAT school. I'm a graduate of
8    the FBI National Academy out of Quantico and graduated
9    with a 4.0 GPA. I have --
10       Q  How long have you been with the Park
11   County Sheriff's office?
12       A  Since September 1st of 2000.
13       Q  St. John's, is that in New York?
14       A  No. Louisiana.
15       Q  Oh, okay. Has your entire career been in
16   law enforcement?
17       A  It has.
18       Q  What was your first law enforcement job?
19       A  Detention deputy sheriff for the Otero
20   County Sheriff in La Junta.
21       Q  And how long were you in that position?
22       A  From 1981 to I believe May of 1984.
23       Q  And what was next?
24       A  I tested for and placed number one for
25   the Weld County Sheriff's office and worked there from

## Page 6

1  1984 until I think 1988.
2      Q  19 what?
3      A  '8.
4      Q  '88. What was your position at Weld
5  County?
6      A  I was hired into the jail, and I think I
7  was promoted several times to the rank of proficient
8  correctional officer 2.
9      Q  What was your next position?
10     A  Moved to the mountains and got a job for
11  the Summit County Sheriff's Office in Breckenridge,
12  Colorado, in 1988 -- excuse me, 19- -- hold on. '84.
13     Q  '88?
14     A  Hold on. Otero, 1981-'84. '84 to '88.
15  Yeah, 1988, moved up through the ranks to captain. And
16  was recruited by the Park County Sheriff's Office in
17  2000, they were starting a jail; and tested for the
18  position of jail administrator, captain; was selected
19  in that testing procedure; and have been with Park
20  County since September 2001 to present.
21     Q  Are you post certified?
22     A  I am.
23     Q  When did you become post certified?
24     A  1992. I also have probably thousands of
25  hours in training as far as an incident management,

## Page 7

1  leadership, law enforcement as a PIO, management,
2  strategic planning, leadership. Pretty much the whole
3  gamut.
4      Q  What -- what was involved in -- did you
5  have to -- did you have to attend any sort of course of
6  study in order to obtain your post certification?
7      A  Yes.
8      Q  What -- what did you attend?
9      A  The law enforcement training academy in
10  Golden.
11     Q  When did you do that?
12     A  1992.
13     Q  And that was what, nine months, six
14  months?
15     A  Something along those lines.
16     Q  And when did you become undersheriff?
17     A  Towards the end of 2005.
18     Q  Until you became post certified, you were
19  involved with jail facilities?
20     A  Correct. And I also went to a detention
21  officer academy, I think in 1991 or 1981.
22     Q  What involvement did you have in the
23  decision to file animal cruelty charges against
24  Mr. Hatlee and Mr. Swift?
25     A  I don't think I had any involvement of --

## Page 8

1  in the filing of the charges.
2      Q  What, if any, involvement did you have in
3  the drafting of the affidavit that Cindy Hardey did in
4  order to obtain a -- a seizure and search warrant?
5      A  None.
6      Q  As you know, there was some testimony
7  this morning about a telephone call you made to Bobbi
8  Priestly on February 19th. We're going to hand you
9  an exhibit that has been marked Exhibit 66, you can
10  look at this if it makes any difference to you or not.
11     But on page 89 of that exhibit, it says:
12  "On February 19, 2012 I received a telephone call from
13  Under sheriff Gore at my residence. The Under sheriff
14  advised me that he had received several -- several
15  telephone calls from the Public Information Officer for
16  the State of Colorado's Department of Agriculture
17  Office."
18     It's the -- the fourth paragraph on that
19  page.
20     MR. SCHIMBERG: Yeah, just so you know,
21  Brice, because you were reading, we were getting our
22  way to 89.
23     A  Yeah, if you can start over again.
24     MR. TONDRE: Sure.
25     MR. SCHIMBERG: Or just focus us.

## Page 9

1      Q  (BY MR. TONDRE) Read -- read that
2  paragraph to yourself, and then I'll ask you some
3  questions about it.
4      MR. SCHIMBERG: Where were you reading?
5      A  Beginning: "On February 19th"?
6      Q  (BY MR. TONDRE) "On February 19th, 2012 I
7  received a telephone call."
8      MR. SCHIMBERG: Thanks.
9      A  Okay.
10     Q  (BY MR. TONDRE) Do you recall making
11  that -- or did you make the telephone call referenced
12  there?
13     A  Yes.
14     Q  And do you recall from whom you received
15  telephone calls that promoted you to make this call?
16     A  I was inundated with telephone calls.
17  I'm not specifically sure who all called me.
18     Q  How about emails, were you receiving
19  emails also?
20     A  I was.
21     Q  Did you have -- would they come to the
22  general sheriff's number or was there an animal control
23  number; do you know?
24     A  As I recall, Sergeant Priestly informed
25  me that the animal control folks were being inundated

3  (Pages 6 to 9)

Page 10

1   with calls. And were -- were for the most part
2   dysfunctional dealing with the amount of telephone
3   calls that they were receiving. So I took that as the
4   PIO for the department, I took -- started taking those
5   calls.
6       Q   What's a PIO?
7       A   Public information officer.
8       Q   Oh, okay. Now, you say you were
9   inundated. You got any estimate as to how many emails
10  and telephone calls you received?
11      A   A bunch. More than I've ever received on
12  any other case.
13      Q   Did you get any sense of what the -- I
14  take it the callers and the writers weren't calling to
15  thank you for anything, were they?
16      A   You know, I ended up listening to a lot
17  of folks. People were very upset over the situation.
18  I diffused a lot of the folks and talked to them, spent
19  hours on the phone. And as a result of some of that
20  communication, I did become concerned -- as I recall,
21  the most significant thing that I became concerned
22  about was that there was talk or information or
23  statements that there might -- that there was possibly
24  going to be a -- an attempt at horse rescue at the Echo
25  Valley Ranch.

Page 11

1       Q   Did you make any effort to identify the
2   makers of those calls?
3       A   A lot of the folks made anonymous calls
4   and left messages. A lot of the information that I
5   received, I didn't -- as I recall, I didn't get a
6   serious-type threat. It was more concern that we
7   needed to avoid a potential problem.
8           That's when I contacted Sergeant Priestly
9   and suggested that she contact Mr. Swift and Hatlee and
10  see if we could move the horses to an undisclosed
11  location. And I thought that that would diffuse the
12  situation.
13      Q   Did it?
14      A   It did. Most certainly.
15      Q   Wasn't there an outcry about moving the
16  horses rather than seizing them?
17          MR. SCHIMBERG: You know, let me object
18  to form. Go ahead and answer.
19      A   I'm not sure I understand your question,
20  Mr. Tondre.
21      Q   (BY MR. TONDRE) Well, what I'm searching
22  for is did -- did you receive any complaints that --
23  complaints about the fact that the horses had been
24  moved to a secret location rather than seized by the
25  county?

Page 12

1       A   I believe that's correct. I think, I --
2       Q   Now, when did you first -- well, let me
3   ask this: Do you have any knowledge of how the word
4   got out regarding the incident -- the incident that
5   occurred on February 16th, particularly the welfare
6   check, the well-being check of -- made by Officer
7   Hardey?
8       A   As I recall, I think that there was a --
9   a news story on Channel 7.
10      Q   To your knowledge, did anybody in the
11  sheriff's office contact the Channel 7 folks?
12      A   No.
13      Q   Did you ask Cindy Hardey to tell
14  Mr. Hatlee and Mr. Swift if the news people contact
15  them to just say no comment?
16      A   No.
17      Q   Do you have any impression as to how the
18  newspeople got ahold of the information that there had
19  been a warning given to Hatlee and Swift?
20      A   Not that I recall.
21      Q   Is it fair to say the only people that
22  had knowledge of what went on out there were Hatlee,
23  Swift, the sheriff's people and -- and Ashleigh Olds?
24          MR. LEBSACK: Objection to form.
25      A   In what -- the new one went -- what

Page 13

1   happened -- what happened when?
2       Q   (BY MR. TONDRE) On February 16th, the
3   visit when it was decided to give a warning to Hatlee
4   and Swift?
5       A   So Hatlee and Swift were given a warning
6   and why -- do I have any recollection how that
7   occurred?
8       Q   No, no, no. What I'm searching for is:
9   Do you know of any person who had knowledge of what
10  occurred out on Echo Valley Ranch that day other than
11  Mr. Swift, Mr. Hatlee, the sheriff's department people,
12  and Ashleigh Olds?
13      A   I don't believe so.
14      Q   All right. At some point in time, you
15  issued a press release. Do you recall that?
16      A   I do.
17      Q   Do you recall why you issued the press
18  release?
19      A   Well, I think we were being inundated
20  with -- with calls from media, and I think we responded
21  to -- to that. That's typically what we do.
22      Q   Now were you concerned for the safety of
23  Mr. Hatlee and Mr. Swift?
24      A   I was concerned about the safety for
25  everybody involved. And when I say that, that would be

4   (Pages 10 to 13)

Page 14

1  Hatlee, Swift, and any would-be horse rescuer.
2      Q  To your knowledge, was there ever a -- an
3  investigation made with respect to any of the
4  threatened conduct?
5      A  As I recall, the information that I
6  received was more along the lines of people being
7  upset. People wanting to do a horse rescue, people
8  were upset with -- with the sheriff's office. I don't
9  think that there was a serious enough threat that would
10 have reached the threshold of menacing.
11     Q  Do you have a deputy by the name of Jeff
12 DeBerry?
13     A  I do.
14     Q  Do you know if he investigated a menacing
15 claim?
16     A  To my knowledge, Jeff DeBerry
17 investigated a harassment report and this was sometime
18 later. One of the attendees at -- at one of the
19 hearings, I think after the hearing, had stopped by
20 Mr. Swift's door and made some disparaging comments.
21     I think a call was made wanting this
22 person -- I think her name was Mary Ellen Irvine,
23 investigated for harassment; and I think Jeff DeBerry
24 investigated that case.
25     Q  Do you know what the result of the

Page 15

1  investigation was?
2      A  I was informed that Steve Sullivan, the
3  deputy DA, felt that this was more tit for tat going on
4  and didn't want to look at it -- or didn't want to
5  pursue the case after it was presented to him by Jeff
6  DeBerry.
7      Q  The district attorney was running for
8  election at that time, wasn't he?
9      A  That's correct.
10     Q  Do you know if there were any other
11 investigations for harassment or menacing in connection
12 with this matter?
13     A  At the same court hearing, I know I was
14 contacted by Mr. Kerrigan. Him and I had somewhat of a
15 heated conversation. This was an emotionally charged
16 situation on both sides. And I think he had pointed to
17 a vehicle that had come to court, it was driven by Gene
18 Ferraro, and it was missing a front license plate.
19     And he wanted to have that investigated.
20 And I called local authorities, and I believe
21 Mr. Ferraro was given a summons.
22     Q  This was over not having a front license
23 plate?
24     A  That's correct.
25     Q  Let me make sure I understand.

Page 16

1  Somebody -- somebody reported Gene Ferraro for not
2  having a front license plate?
3      A  Mr. Kerrigan who is a friend of
4  Mr. Hatlee and Swift.
5      Q  I see. How much contact did you have
6  with Gene Ferraro during the course of this matter?
7      A  You know, I had -- I think they met at my
8  office on one occasion. And I think that there were a
9  lot of emails that went back and forth over the course
10 of time with Mr. Ferraro. And I think I talked to him
11 at the horse function in Evergreen.
12     Q  The fundraiser?
13     A  The fundraiser.
14     Q  I'll come to that in a minute.
15     MR. SCHIMBERG:  Figured. I think we know
16 each other's outlines now.
17     A  You come to that on a lot of occasions.
18     Q  (BY MR. TONDRE)  Did -- how would you
19 characterize Mr. Ferraro's demeanor in connection with
20 this matter?
21     A  As we went through this process, people
22 were initially angry, they were frustrated; and I think
23 that they kind of lashed out. They did not trust the
24 sheriff's office. As I communicated with these folks,
25 eventually, I think we gained some credibility with

Page 17

1  them. And I would characterize them and everybody
2  pretty much as -- I see them as stakeholders. They
3  were on opposite sides, they were very passionate about
4  this case. And they were very interested in this case.
5      Q  In an email, sent -- well, first of all,
6  do you know Barbara Wright?
7      A  Yes.
8      Q  And how do you know her?
9      A  She is one of the horse advocates.
10     Q  Did you know of her before this Hatlee
11 and Swift case?
12     A  I did not.
13     Q  In an email she said the Ferraros are
14 helping with lobbying officialdom to move on this
15 travesty. Would you characterize the Ferraros as
16 "lobbying officialdom"?
17     A  As I recall at the onset, I think the
18 Ferraros were very upset. They felt there was a
19 travesty going on here. They didn't trust the
20 sheriff's office.
21     As we continued to move forward, and I
22 think, eventually, we were able to communicate on a --
23 on a better basis.
24     MR. SCHIMBERG:  Listen to the question,
25 would you.

5  (Pages 14 to 17)

207

Page 22

1    A  I believe -- well, I'll let you finish.
2        (Mr. Tondre conferring with
3    Mr. Hatlee outside hearing of reporter.)
4    Q  (BY MR. TONDRE) Who was the warrant served
5    on?
6    A  I think we gave -- or I gave the
7    paperwork to Kirstin and talked to her for some time.
8    Q  What involvement did you have with
9    loading the animals?
10    A  As they were loading the animals, I know
11   I think the small one appeared pretty weak; and I think
12   I ended up --
13    Q  Was that Chance?
14    A  I'm not sure which one it was.
15    Q  But it was the one that was in the worse
16   shape?
17    A  It was one that was in very bad shape.
18   And I think I ended up helping push him into the
19   trailer.
20    Q  Did you have any discussions with
21   Mr. Hatlee regarding moving that horse?
22    A  No.
23    Q  Did you have a veterinarian look at that
24   horse to see whether it was safe to move him?
25    A  No.

Page 23

1    Q  So who made the decision that it was safe
2    to move that horse?
3    A  That decision was made by Sergeant
4    Priestly, and I supported that decision.
5    Q  And what was your basis that supported
6    that -- for supporting that decision?
7    A  I have faith in Sergeant Priestly based
8    on my experience with her.  She knows what she's doing,
9    she's competent, and I trust her.
10    Q  Who's in charge in the sheriff's
11   department of handling disciplinary matters with
12   respect to employees of the sheriff's department?
13    A  Well, that would depend on the employee
14   of the sheriff's office.
15    Q  I'm speaking specifically with respect to
16   Cindy Hardey, who would be responsible for disciplining
17   for misconduct?
18        MR. SCHIMBERG: Let me object to form.
19   Go ahead and answer.
20    A  That would be her immediate supervisor in
21   this case.
22    Q  (BY MR. TONDRE) That would be Bobbi
23   Priestly?
24    A  Sergeant Priestly, that's correct.
25    Q  And she's the person designated by the

Page 24

1    sheriff to handle discipline with respect to animal
2    cases?
3    A  She would be the person designated by the
4    sheriff to discipline or commend folks under her direct
5    supervision.
6    Q  And what's the disciplinary process in
7    the sheriff's department?
8        MR. SCHIMBERG: Object to form.  Go
9    ahead.
10    A  We have a policy and procedure manuals
11   which lay out disciplinary procedures depending on the
12   type of discipline that needs to be meted out to a
13   person.  A lot of times discipline can take the course
14   of a simple -- even a verbal talking to or written
15   counseling or written reprimand up to suspension and
16   termination.
17    Q  (BY MR. TONDRE) Is filing a bad faith
18   affidavit a disciplinary matter?
19        MR. SCHIMBERG: Object to form.
20   Foundation.  Go ahead.
21    A  I don't consider this to be a bad faith
22   on the part of Cindy Hardey.  I feel that the bad faith
23   decision made by Judge Green is speculation on his
24   part.
25        MR. TONDRE: As a civil rights lawyer,

Page 25

1    let me tell you I'm thankful the cops don't decide
2    what's good faith.
3        MR. SCHIMBERG: That's inappropriate,
4    Brice.
5        MR. TONDRE: It may be inappropriate but
6    I'll make my statement.
7        MR. SCHIMBERG: Well, you've made it.
8    There's nothing we can do about that.  Questions and
9    answers, please.
10    Q  (BY MR. TONDRE) Now you were disappointed
11   by the verdict, weren't you?
12    A  I was.
13    Q  You stated that for all the world to hear
14   in the media, right?
15        MR. SCHIMBERG: Object to form.
16   Foundation.
17    A  I -- I might have.  I might have made a
18   statement.
19    Q  (BY MR. TONDRE) Why were you disappointed?
20    A  I felt and feel that your clients abused
21   and neglected those horses.
22        MR. TONDRE: And as a civil rights
23   lawyer, I'm thankful you don't decide those matters,
24   the juries do.
25        MR. SCHIMBERG: Oh, come on.  Strike the

7  (Pages 22 to 25)

208

MONTE GORE - JUNE 24, 2014

| Page 26 | Page 28 |
|---|---|

**Page 26**

1 editorial comment.
2     Q (BY MR. TONDRE) Now why did you attend and
3 ask three members of the sheriff's department to attend
4 with you a fundraiser for people who were advocating
5 taking of Hatlee and Swift's horses?
6     MR. LEBSACK: Objection to the form.
7     MR. TONDRE: Form and foundation. Go
8 ahead.
9     A We were invited to the fundraiser. And I
10 actually felt that the fundraiser was a positive
11 endeavor by the horse advocates simply because that
12 diverted their attention from other issues and caused
13 their attention to be focused on a fundraiser project
14 in another county with very limited attendance.
15     Q (BY MR. TONDRE) The fundraiser was
16 dedicated to the Bailey horses; wasn't it?
17     A The fundraiser was a fundraiser to, I
18 think, pay vet bills.
19     Q How much time did you spend at the
20 fundraiser?
21     A I would estimate 45 minutes to an hour.
22     Q Now, did you provide Barbara Wright with
23 investigative materials developed in the Hatlee and
24 Swift case?
25     A Can you be more specific?

**Page 27**

1     Q Did Barbara Wright ask you for
2 information about the investigative materials in the
3 Hatlee and Swift case?
4     A Can you be more specific as to what the
5 materials were?
6     Q Well -- well, let me just ask it this
7 way: Did you provide any materials to Barbara Wright
8 for use at the fundraiser?
9     A I'm trying to think, so give me a minute.
10     MR. SCHIMBERG: You know, for my own
11 good, would you read the question back, please. I
12 don't think I have an objection, but I want to hear it
13 again.
14     (Whereupon, the question at page 27,
15 line 6, was read by the reporter.)
16     MR. SCHIMBERG: Are you waiting for
17 Mr. Tondre?
18     A I am.
19     MR. SCHIMBERG: Or do you have an answer?
20 I think we're waiting for your answer, but I shouldn't
21 speak for others.
22     A I think what you are referring to is
23 horse pictures. And I did release some horse pictures.
24 I'm not sure if it was for the fundraiser or to -- I
25 know my goal was to alleviate concerns with the public

**Page 28**

1 and with the horse advocates that the horses were being
2 taken care of.
3     Q (BY MR. TONDRE) Well, did you happen to
4 see those pictures when you went to the fundraiser?
5     A I'm not sure.
6     Q Did you see a slide show that was
7 presented at the fundraiser?
8     A I did not observe a -- a slide show, but
9 I did see the slides I think were being shown at one
10 end of the fundraiser.
11     Q Did you hear any presentations that were
12 made by anyone?
13     A No.
14     Q Did you see any poster boards that were
15 around discussing the Bailey starving horses?
16     A No.
17     Q Did you stand up in front of the gathered
18 crowd and be introduced?
19     A I wouldn't call it being introduced to a
20 crowd.
21     Q What would you call it?
22     A I think I was introduced to individuals.
23     Q By whom were you introduced?
24     A I don't recall.
25     Q Who handles open records and requests in

**Page 29**

1 the sheriff's office here?
2     A Typically, if we get a -- an open records
3 request, that will go through the administration; and
4 typically we'll consult with our county attorney.
5     Q Isn't the typical response and the policy
6 of the sheriff's department not to disclose information
7 regarding an ongoing -- ongoing investigation and cite
8 the Criminal Justice Act in support for that?
9     A Can you repeat the question?
10     Q Sure. Isn't it the standard procedure of
11 the sheriff's office, the Park County Sheriff's office
12 in response to an Open Records Act and Criminal Justice
13 Act Request for Information, to respond we will not
14 release information from an ongoing investigation and
15 cite the Criminal Justice Act?
16     A That can be our response.
17     Q Before sending those pictures out to
18 Barbara Wright, did you consult with the county
19 attorney?
20     A I believe I consulted with Steve
21 Sullivan.
22     Q And what did Mr. Sullivan tell you?
23     A That that was okay.
24     Q Did it cross your mind that in 2012 his
25 boss was up for election?

8 (Pages 26 to 29)

209

MONTE GORE - JUNE 24, 2014

Page 30

1      A  I was aware that his boss was up for
2  election.
3      Q  Now, is it your usual practice to consult
4  with the district attorney's office on -- well, first
5  of all, was this a followup records act request?
6      MR. SCHIMBERG:  You've lost me, Brice,
7  I'm sorry.  What's the -- what's --
8      Q  (BY MR. TONDRE)  Was Barbara Wright's
9  request for photographs --
10     MR. SCHIMBERG:  All right.  Got you,
11 thanks.
12     Q  (BY MR. TONDRE)  Was Barbara Wright's
13 request for photographs a formal Open Records Act,
14 Criminal Justice request?
15     A  I don't think so.
16     Q  Are you aware that Barbara Wright used
17 those pictures to raise money at the horse expo?
18     A  I believe -- yeah, I'm aware of that.
19     Q  Did you -- how did you learn about that?
20     A  I believe through emails and
21 communication with the district attorney's office.
22     Q  What's your veterinary background?
23     A  Very limited.
24     Q  Have you talked with Mr. Hatlee and
25 Mr. Swift -- well, first of all, do you have any

Page 31

1  knowledge of Mr. Swift's and Mr. Hatlee's handling of
2  the developing problems with those horses?
3      MR. LEBSACK:  Object to the form.
4      MR. SCHIMBERG:  Join.
5      A  The information that I received about
6  Hatlee and Swift was reported to me by animal control.
7      Q  (BY MR. TONDRE)  By who?
8      A  By animal control.
9      Q  Yeah.  So you got to rely on basically
10 Cindy Hardey, right?
11     A  Well, Cindy Hardey and Sergeant Priestly.
12     Q  First time Sergeant Priestly was to the
13 facility or saw any of the animals is when you seized
14 them, right?
15     A  I'm sorry, can you repeat the question?
16     Q  Sure.  Isn't it true that the first time
17 Bobbi Priestly saw those animals was when they were
18 seized on February 23rd?
19     A  I'm not sure if that is a true statement.
20     Q  How many other instances can you think of
21 where you gave investigative materials to some outside
22 interests?
23     A  Off the top of my head, I can't remember.
24 But I would restate that I did it with the permission
25 and authorization of Steve Sullivan, the deputy DA.

Page 32

1      Q  There was a lot of criticism of Steve
2  Sullivan also, wasn't there?
3      A  There was criticism.
4      Q  He was replaced by Mr. LeDoux because of
5  the criticism that was leveled at him for losing the
6  suppression hearing; isn't that right -- or the bond
7  hearing, I should say --
8      MR. SCHIMBERG:  Object to form and
9  foundation.
10     Q  (BY MR. TONDRE)  -- or did the horses
11 return?
12     MR. SCHIMBERG:  Excuse me, sorry, same
13 objection.
14     A  I don't know if your statement is true or
15 not or why the district attorney took over the case.
16     Q  (BY MR. TONDRE)  Why -- did you have any
17 involvement in the decision to remove Cindy Hardey as
18 the lead investigator in the Hatlee and Swift case?
19     A  I did.
20     Q  What was -- what was your reason for
21 being involved in that?
22     A  As I recall, we did get criticism that
23 there was a relationship with Cindy, and I think this
24 was -- that she had -- that she had known Mr. Swift for
25 several years.  And that she was perhaps not being

Page 33

1  objective.
2      The second reason that I decided to have
3  Sergeant Priestly take over the case as she has more
4  experience in dealing with these kind of cases than
5  Cindy had.
6      Q  Let me see if I understand.  It's okay to
7  placate one side, but you don't want anybody favoring
8  the other side; is that the picture you're painting,
9  Mr. Gore?
10     MR. SCHIMBERG:  Object to form.
11     MR. LEBSACK:  Same.
12     MR. SCHIMBERG:  Argumentative.  Go ahead.
13     MR. TONDRE:  You bet and it's a closing
14 argument.
15     A  I'm not sure.  Well, actually I don't
16 agree with your statement.
17     MR. TONDRE:  Oh, good.  That's all I
18 have, thank you.
19     MR. SCHIMBERG:  Thank you, guys.  John?
20     MR. LEBSACK:  I have no questions.
21     (Whereupon, at 4:17 p.m. the
22 deposition was concluded.)
23
24
25

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

210

# EXHIBIT 26

Condensed Transcript

In the Matter Of:

HATLEE vs. HARDEY

13-cv-02469-RM-MJW

JENA QUESTEN

*November 10, 2014*

*VOLUME II*



800.211.DEPO (3376)
*EsquireSolutions.com*

212

JENA QUESTEN VOLUME II
HATLEE vs. HARDEY

November 10, 2014
268—271

Page 268

1    A  I did do those, and I did not see
2 anything abnormal there.
3    Q  Okay.  Just give me an example of how you
4 do a cranial nerve exam?
5    A  So you would look, for example, if the
6 pupils are dilating to lights, if the eyes are tracking
7 normally, if one nostril is drooping and the other's
8 not.
9    Q  See if they had anything to drink?
10    A  Yeah, exactly.
11    Q  Okay.  How about muscle symmetry?
12    A  Yes.
13    Q  How --
14    A  I would look for that and if I noted
15 anything abnormal, I would make a note of that.
16    Q  Is that visual observation as opposed to
17 some test or something?
18    A  Virtual and palpation.
19    MR. SCHIMBERG:  Okay.  I hate to give up.
20 But I'm going to.  Thank you for your time.
21        EXAMINATION
22 BY MR. TONDRE:
23    Q  Dr. Questen, there was a mention in your
24 testimony of the horses being delivered with no
25 halters?

Page 269

1    A  Yes.
2    Q  What's the significance of that?
3    A  Well, the significance of that is it's
4 very dangerous for people to be traveling with horses
5 in a horse trailer with no halters.  For example, if
6 they were to have a flat tire or get in an accident or
7 whatever reason, you might have to stop on the side of
8 the road where there's no facilities to contain these
9 animals if you had to get them off the trailer in an
10 emergency, it would be negligent to not be able to
11 control them in some manner.
12    Q  Would you say that transporting those
13 horses without halters would be a violation of the
14 cruelty animals statute?
15    MR. SCHIMBERG:  Objection.  Outside the
16 scope of her endorsements.
17    MR. TONDRE:  I didn't bring up the
18 halters.
19    MR. SCHIMBERG:  I know that.  I'm just
20 entering my objection.  Thanks.
21    A  I -- I wouldn't know anything about that
22 other than I do believe that if somebody driving a
23 truck and trailer gets pulled over, I think that it is
24 a requirement to have a halter in order to lead for
25 that animal.

Page 270

1    Q  (BY MR. TONDRE)  Now, you talked about the
2 importance of a history in reaching a diagnosis and a
3 conclusion --
4    A  Yes.
5    Q  -- did you not?
6        Did you see anywhere where Ashleigh Olds
7 or any of the experts that have been hired by the
8 defendants in this case, did a thorough history of how
9 the animal -- how the horses were fed prior to the time
10 they were brought in from the pastures?
11    A  No.
12    Q  Wouldn't that be important to know?
13    A  Yes.
14    Q  Why?
15    A  So that it could help you to make an
16 accurate diagnosis of what's going on with the animals.
17    Q  That's part of the process of reasoning
18 to the best inference; isn't it, Dr. Questen?
19    MR. LEBSACK:  Form.
20    A  Yes.
21    MR. SCHIMBERG:  Join.
22    Q  (BY MR. TONDRE)  And is reasoning to the
23 best inference sort of another name for differential
24 diagnosing?
25    A  Yes.

Page 271

1    Q  And if I understood you -- you've come to
2 the conclusion that the most likely cause or the best
3 inference as to what caused the skinniness in the
4 horses was some toxin; is that correct?
5    A  That's correct.
6    Q  And do you stand by all the opinions that
7 you set forth in Exhibits 102, 106, and 107?
8    A  Yes.
9    Q  Now, I want to inquire about -- would you
10 expect those horses to have gained weight if they had
11 been left at Echo Valley for the six weeks that they
12 went to the Littleton Clinic?
13    MR. SCHIMBERG:  Object to form.
14    A  I think they would have been treat --
15 yes.  Yeah.  I think they would have gained weight
16 because nothing much was done other than some
17 antibiotics and some fluids and some food.
18    Q  (BY MR. TONDRE)  Now, you said that you
19 were not -- you were not aware of what was going on --
20 you were asked the question about what was going on in
21 Ashleigh -- Ashleigh Olds' mind other than her calling
22 these horses starved.  And you said you didn't know
23 what was going on in her mind.  Shouldn't it be in her
24 notes, if she was being a careful veterinarian?
25    A  Yes.

ESQUIRE
S O L U T I O N S

JENA QUESTEN  VOLUME II
HATLEE vs. HARDEY

Page 272

1        MR. LEBSACK:  Form.
2        Q  (BY MR. SCHIMBERG) In fact, isn't that the
3 standard of care to record in your notes what's going
4 on in your mind about the animal you're treating?
5        A  When you're doing medical records, yes.
6        Q  Now, the reporting statute deals with
7 veterinarians who are in the course of attending or
8 treating an animal.  Was she attending or treating
9 animals at Echo Valley Ranch as near as you could tell?
10        A  No.
11        Q  Now, based upon what you've seen in this
12 case, did Dr. Olds have reasonable cause to know or
13 suspect that the -- than the eight horses were
14 knowingly, recklessly, or with criminal negligence
15 deprived of necessary sustenance?
16        MR. TONDRE:  Form.
17        A  No.
18        Q  (BY MR. TONDRE) Now, it was -- there was
19 talk a bit about transporting the horses.  And the
20 statute provides that it's animal cruelty to -- animal
21 cruelty to carry an animal in or upon -- upon any
22 vehicle in a cruel or reckless manner.
23        Now, how would you classify taking for
24 example, Bear, putting him in a trailer and pulling him
25 away which causes him to fall to the -- to the base of

Page 273

1 the trailer, to the bottom of the trailer, and
2 transport him over very rough roads for a significant
3 distance, would you classify that as cruel to Bear?
4        MR. LEBSACK:  Form.
5        A  I don't know -- I don't have any
6 documentation of the specifics of how that horse was
7 transported; but I know if you have a horse that's
8 ataxic, and having neurological symptoms, is very weak,
9 and having a hard time standing; it would be completely
10 inappropriate to put that horse in a trailer without
11 either slinging them if you're afraid that they cannot
12 stand on their own; or having the back of the trailer
13 very, very padded, so that the animal doesn't injure
14 itself in the course of transport.
15        Q  (BY MR. TONDRE) That would be true with
16 respect to horses in that condition that were taken
17 to -- by Park County when they seized the horses,
18 correct?
19        MR. SCHIMBERG:  Object to form.
20        Q  (BY MR. SCHIMBERG) Did you see any videos
21 which demonstrated the loading of a horse, that it was
22 inappropriate to transport when Park County seized the
23 animals?
24        A  I don't recall seeing videos of the
25 animals being loaded for transport.

Page 274

1        Q  All right.  Did you see in the records
2 that -- was it Chance?
3        MR. SWIFT:  Chance.
4        Q  (BY MR. TONDRE) That Chance was
5 transported laying down in the trailer?
6        MR. SCHIMBERG:  Object to form.
7        A  I don't recall reading or seeing that.
8 Maybe you can --
9        MR. SWIFT:  It's in the Littleton.
10        Q  (BY MR. TONDRE) It says:  Very thin and
11 weak.  Arrived in a trailer.  Got him up with
12 assistance.  He fell again, and come -- in coming out
13 of the trailer, but was helped back up and walked to
14 ICU.
15        Is it appropriate -- is it animal cruelty
16 to transport a horse in that condition?
17        MR. LEBSACK:  Can you tell me which page
18 you just read from, this is from Exhibit?
19        MR. TONDRE:  It's page 3 of 12.
20        MR. LEBSACK:  So Exhibit 110 page 3 of 12
21 for Chance?
22        MR. TONDRE:  For Chance.
23        MR. LEBSACK:  Thank you.
24        A  Certainly without taking special care
25 beyond what's normal and ordinary transporting a horse

Page 27[5]

1 to make sure that animal arrives safely and without
2 being further injured.
3        Q  (BY MR. TONDRE) It would be animal cruelty
4 to do that; wouldn't it?
5        A  Yes, yes.
6        MR. LEBSACK:  Object to form.
7        Q  (BY MR. TONDRE) Let me read you something
8 from Olds' disclosure document page 29.  Dr. Olds in an
9 email to Monika Courtney writes:  Thank you for all of
10 your help.  Barb at Harmony really got the publicity
11 going in this, and everyone else helped keep the fire
12 on.  I don't know if this would have been taken
13 seriously without all the public pressure.  Hopefully,
14 the end result will be that justice is served and the
15 horses are homed where they will be fed.
16        Is that appropriate conduct for a
17 veterinarian?
18        MR. LEBSACK:  Form.
19        A  That did not sound appropriate.
20        Q  (BY MR. TONDRE) Is that one of the emails
21 that you were referring to that caused you to testify
22 that -- or to write in your report that she acted
23 inappropriately?
24        A  Yes.
25        Q  And would it add to that to know that



JENA QUESTEN VOLUME II
HATLEE vs. HARDEY

November 10, 2014
276—279

Page 276

1  Barb at Harmony HorseWorks was the person that arranged
2  for Ashleigh Olds to go pick up Bear?
3      A  Can you ask the last one again?  Now, I
4  am getting the hang of it now.
5          (Whereupon, the question at page
6  275, line 25, was read by the reporter.)
7          MR. LEBSACK:  Form.
8      A  I'm not sure how to answer your question.
9      Q  (BY MR. TONDRE) Well, she's thanking Barb
10 with the help for the publicity, right?
11     A  Correct.
12     Q  And does it add to your belief that it's
13 inappropriate when the person advocating the publicity
14 is the one that was involved with Ashleigh Olds in
15 picking up the horse?
16     A  I'm not sure because I don't know who
17 would have originally asked her to come pick up the
18 horse.  So I'm not sure how to answer your question.
19     Q  And the first person that -- assume with
20 me that Ashleigh Olds communicated to Barbara Wright
21 that she believed that the horses were starved and
22 that's how the publicity campaign got started.
23     A  Okay.
24     Q  Is that appropriate?
25         MR. LEBSACK:  Form.

Page 277

1      A  That would be inappropriate; but yes, I
2  agree with you so far.
3      Q  (BY MR. TONDRE) Does toxic ingestion cause
4  malnutrition?
5          MR. SCHIMBERG:  Object to form.
6      A  It could.  If it was a toxin that -- that
7  interfered with the horse's ability to absorb
8  nutrients.
9          MR. TONDRE:  That's all I have.  Thank
10 you.
11         FURTHER EXAMINATION
12 BY MR. LEBSACK:
13     Q  I just want to wrap up a few real fast
14 hopefully.
15         When I asked you to look for emails such
16 as that -- that email that was just discussed by
17 Mr. Tondre, I asked you to look at Exhibit 108 which is
18 that big thick part of your file that was copied?
19     A  Yeah.
20     Q  And I wanted to make sure that
21 Exhibit 109 has your treatment notes, right?
22     A  Right.
23     Q  So there wouldn't be any kind of emails
24 in that Exhibit 109?
25     A  There should not be, no.

Page 278

1      Q  Okay.  Could you just flip through there,
2  there is nothing in there that are emails, right?
3      A  Right.
4      Q  Okay.  So if there are emails that you
5  used to form the basis of your opinions, it would be in
6  Exhibit 108, correct?
7      A  It would be.  But this was not prepared
8  by me, this is copies, and this was hole punched and
9  handed to me.
10     Q  I understand.  But if it is a complete
11 copy of your --
12     A  Yes.
13     Q  -- file --
14     A  Yes, yes.
15     Q  -- and I'm assuming that it was because
16 the court reporter copied it, the emails would be in
17 that Exhibit 108?
18     A  Correct.
19     Q  And again about -- about your knowledge
20 about what Dr. Olds may have thought, the only
21 information you have about what Dr. Olds was thinking
22 or what she did, would be documents in that Exhibit 108
23 prepared by Dr. Olds, correct?
24     A  Or comments made by other people that
25 were there at the time.

Page 279

1      Q  That's in that Exhibit 108?
2      A  Correct.
3      Q  You haven't read her deposition, right?
4      A  Right.
5      Q  Mr. Tondre asked if you stand by the
6  opinions in Exhibits 102, 106, and 107 which are your
7  three reports.  You've testified in your deposition
8  about some changes that you need to make in those
9  reports?
10     A  The only change --
11     Q  Yes.
12     A  -- that I would make is that anemia in
13 starved horses is probably slightly more common than
14 the way I originally presented it.
15     Q  Is your interpretation of the vet statute
16 that if a vet is not treating or attending an animal;
17 but nevertheless sees grounds to know or suspect that
18 the animal had been the victim of animal cruelty, that
19 the vet does not have a duty to report?
20         MR. TONDRE:  Objection.  Foundation.
21 That's what the statute says.
22     A  I think that a veterinarian has the duty
23 to report something whether they are there to treat an
24 animal or not.
25     Q  (BY MR. LEBSACK) So it doesn't matter

ESQUIRE
SOLUTIONS

JENA QUESTEN  VOLUME II
HATLEE vs. HARDEY

November 10, 2014
280—283

**Page 280**

1 whether they are attending or treating; if you see the
2 information that gives you that basis, you should
3 report it?
4    A  Yes.
5    Q  There are circumstances when it's okay to
6 transport a horse down in a trailer; aren't there?
7    A  There can be if you have no choice
8 sometimes.
9    Q  Right.  But in that case, what needs to
10 be done is to provide something on the floor so that
11 the horse --
12    A  Yeah.
13    Q  -- has something to lie on?
14    A  Deep bedding.
15    Q  Right.
16    A  Slinging, something.
17    Q  But if you've -- if you've got no choice
18 and the horse won't stand up, under those
19 circumstances, it's appropriate to transport the horse
20 down in the trailer?
21    A  As long as they are appropriately
22 protected, yes.
23    Q  Okay.
24       MR. LEBSACK:  Let me just take five
25 minutes and I think I'm done but let me just talk to my

**Page 281**

1 client and I'll double-check.
2       (Recess was taken from 3:02 p.m. to
3 3:04 p.m.)
4    Q  (BY MR. LEBSACK) Just a couple of
5 questions.  You've talked about the two different kinds
6 of anemia, right, where there's --
7    A  Regenerative and nonregenerative.
8    Q  -- regenerative and nonregenerative.  As
9 far as signs of those two different kinds, what are the
10 signs of one versus the other?
11    A  My understanding from -- because that's
12 been a big sticky thing from the beginning and from
13 what I have read, I've determined that it can be
14 difficult to tell from peripheral blood smear which is
15 generally what a veterinarian is going to need to look
16 at.  It's difficult to even tell from that and the best
17 test to determine that would be a bone marrow.
18    Q  So from the lab tests, you don't
19 necessarily know which one it is?
20    A  Right, it can be hard to tell.
21    Q  And there are signs as far as from a
22 physical exam or looking at horse or anything like
23 that?
24    A  There is nothing on a physical exam that
25 would tell you that.

**Page 282**

1    Q  Okay.  Is there -- are you familiar with
2 the term microcytic hypochromic anemia?
3    A  Uh-huh.
4    Q  What is that, as you -- as far as you
5 know?
6    A  It's just a classification of a type of a
7 description of an anemia, how the cells look.
8    Q  Is that regenerative or nonregenerative?
9    A  I couldn't tell you off the top of my
10 head.
11    Q  And would a toxin cause regenerative or
12 nonregenerative?
13    A  It would depend on the toxin.
14    Q  It could cause one or the other?
15    A  As far as I know.
16       MR. LEBSACK:  Okay.  All right.  That's
17 all I've got, thank you.
18       FURTHER EXAMINATION
19 BY MR. TONDRE:
20    Q  What kind of bedding should be in a
21 trailer for a horse that's having trouble standing?
22    A  Thick bedding, something very thick to
23 cushion them from the floor of the trailer.  So
24 something ideal would be several bales of straw would
25 be one example.

**Page 283**

1    Q  How deep should it be?
2    A  The deeper the better to protect that
3 animal.  I mean, it's an 800-pound animal that is being
4 thrown around on a hard metal surface, so at least --
5 if it's shavings, I would say at least as a minimum, 6
6 to 8 inches of shavings; if it's straw, at least a
7 foot, foot and a half of straw, if not more.
8       MR. TONDRE:  Thank you.
9       (Whereupon, at 3:06 p.m. the
10 deposition was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Swift Case 9/11/2012

This case is regarding Ron Swift and Randee Hallee, who own horses housed on a ranch in Bailey, Colorado, called Echo Valley Ranch. In December of 2011, 6 of the approximately 40 horses on the ranch began to lose weight and show signs of severe weakness. Of note is that only those 6 animals of the 40 on the property were affected, and 5 of those were all young horses under 2 years of age, and the sixth being an older mare historically known for being thin in the winter.

Those 6 horses were brought out of the pastures and brought into individual pens near the barn for closer evaluation and increased feeding, throughout the time period from December 1, 2011 through February 12, 2011. Records indicate the condition of the horses was being monitored by Timberline Equine veterinarians Dr. Horton and Burton, who suspected the 6 most severely affected animals were suffering from some sort of toxic ingestion, possibly botulism. Clinical signs of all animals included: thin body condition scores (2 or 3 out of 9), elevated heart rates, abnormal heart rhythms, diastolic heart murmurs, anemia (low red blood cell count) as noted on blood work, and varying abnormal neurological symptoms including being down and unable to rise, and crossing over of their feet when they walked (conscious proprioceptive deficits). Apparently, other animals in the area were reported to have similar symptoms, including being down and unable to rise, and even death. Botulism is difficult to accurately diagnose in horses, and there is no effective treatment. One of the horses later tested negative for botulism. The condition of Mr. Swift and Mr. Hallee's horses on the ranch was brought to the attention of Animal Control Officers for Park County, as possibly a case of starvation and/or neglect.

Dr. Horton indicated in an email dated February 28, 2012, that she suggested the animals be transferred for advanced diagnostics tests at Colorado State University. When she consulted with the cardiologist Dr. Adams at Colorado State University regarding the clinic signs the horses were displaying, Dr. Adams revealed that there is no known association between low body condition scores and diastolic murmurs in horses. Apparently Mr. Swift had an appointment at Colorado State University Teaching Hospital for these advanced diagnostic tests, when the horses were seized by Park County, making the afflicted animals unavailable for advanced testing during the height of clinical signs.

While under the custody of Park County, the horses were under the care of both Littleton Equine Hospital and Ashley Oldes DVM. Records indicate some advanced testing was performed, multiple doses of antibiotics and probiotics were given, as well as generalized supportive care including IV fluids were administered to the horses, but there is no record of a diagnosis the cause for the high heart rates, murmurs and abnormal rhythms noted on all the animals. All the animals repeatedly showed some signs of anemia on their blood work, as well as high white blood cell counts. Only the older mare received a definitive diagnosis of advanced kidney disease and intestinal parasites, which could certainly contribute to having a thin body score.

Anemia in animals occurs for one of three reasons: blood loss, blood cell destruction, or lack of regeneration of new blood cells by the bone marrow. It does not appear from the records that the horses suffered any sort of bleeding disorder, therefore we can assume the animals were not anemic from blood loss. Nutritional anemias in animals are rare and not normally associated with an otherwise healthy animal simply having a lack of forage. Disorders that cause red blood cell destruction are termed hemolytic anemias and are usually associated with immunologically mediated mechanisms (such as equine infectious anemia, autoimmune hemolytic anemia, or transfusion reactions), certain bacterial infections (Clostridium perfringens), plant or chemical toxicity (red maple leaves, phenothiazine, onions, Hoary Alyssum), or blood parasites (Babesia, Ehrlichia equi).* Although the records are lacking in the specifics of the classification of the type of anemia the horses suffered from, they were treated with antibiotics, indicating that an infection of some kind was suspected (perhaps Clostridium perfringens?), and supportive care including IV fluids, such as would be the only treatment option in many cases of toxic ingestion. It is interesting to note that even under the care of animal control, the red blood cell counts were still decreased, and the white blood cell counts increased, indicating clearly that despite additional forage and calories, the animals were still affected by something else causing the anemia, which then led to the continued cardiac abnormalities (high-high rates, abnormal rhythms and murmurs). All of which are not normal or customary clinical symptoms associated with starvation.

The animals were later returned to the care of Ron Swift and Randy Hallee, who throughout this time had been working with equine specialists, other veterinarians, and their local county extension agent to determine if botulism or some other toxin could have been the initial cause for the horses condition.

Eventually it was discovered that the toxic weed Hoary Alyssum was pervasive on the property, and more prolific throughout the area due to recent drought conditions. Hoary alyssum is known to be highly toxic to horses (but not to cattle or other ruminants), with a characteristic set of symptoms (not all present in every affected horse and not all horses are equally susceptible). Symptoms include depression, fever, increased heart rate, laminitis, limb edema, diarrhea, dehydration, intravascular haemolysis (red blood cell destruction), hypovolemic shock, anemia, and abortion in pregnant mares (Becker et al, Hovda and Rose 1993, Knight and Walker 2004, Knight and Gaskill 2011, Martinson et al 2007).

In conclusion, 1) it would be uncommon in a case of severe neglect and starvation to only have 6 out of 40 animals affected 2) it is common for toxic ingestion to more strongly affect the younger animals who might be less discriminating in their forage choices and have fewer reserves for recovery 3) Starved horses will be weak, but not necessarily show signs of neurological abnormalities and conscious proprioception changes, and most importantly 4) Cardiac abnormalities and anemia are not generally associated with starvation, and in fact in this case, persisted despite having increased calories and forage, therefore, the likelihood of some third other unknown cause, such as a persistent toxin in the animals tissues, or some other undiagnosed disease process, is highly suspect in this case. It is unlikely this was a case of selective neglect and starvation, but much more likely some other reason for the thin body scores; cardiac abnormalities, and anemia, such as ingestion of some sort of toxin or toxins, such as either in the ground, through the hay or feed source, or in the pasture plants. *(Equine Medicine and Surgery, Mosby, 1999).

Addendum 2/1/2013

Additional records were supplied with regards to another animal on the property, known as Bear or Spencer, another 2 year old horse with a similar condition to the 6 horses mentioned above. It would be sensible to say that it is likely this young horse might also have been suffering from a similar toxic ingestion as the other animals, especially in light of the fact (according to Dr. Oldes) he was treated, and responded, in a similar manner as the other animals in question. In the records supplied there was not a description of Bear's cardiac condition, but it does mention treatment with antibiotics, and his blood work was similar to the other horses.

There is often no further treatment for toxic ingestion in horses other than to remove the source of the toxin, provide supportive care, including food and water, and providing protection from (and treatment for) abrasions caused as a result of any neurological conditions, until the body can clear the toxin from the system allowing the animal to recover and assimilate nutrients normally again.

In conclusion, it is likely that Bear, or Spencer, was suffering from the same malady as the other 6 horses, for all the same reasons listed previously.

218

Rebuttal Report (Case of Swift/Hatlee) to Defendant Olds Expert Witness Disclosures
by Jena Questen DVM 6/29/2014

A) I personally examined all the horses on 4/11/2012, the day they were returned to Mr. Swift and Mr. Hatlee.
1) The horse Lena still had a cardiac arrhythmia, mild tachycardia, and neurological signs which were all reported to have resolved after one week of nutritional support.
2) The horse Echo still had tachycardia and mild neurological symptoms, after being reported to have resolved after one week of normal nutrition.
3) The horse Chance showed moderate neurological symptoms and severe cardiac abnormalities.
4) All horses were still very thin and many had green diarrhea from free feeding on alfalfa hay. They did *not* appear to be rapidly recovering, quickly gaining weight, and overcoming their other symptoms with just an adequate refeeding program, as asserted by the experts.

I am confident that three veterinarians (Horton, Burton, and myself) are able to discern weakness from true neurological symptoms. In summary, it is highly unlikely these horses would have recovered from these symptoms completely, as reported, and then relapsed in the time period from February 19, 2012 to April 11, 2012. Therefore these horses were not rapidly recovering with just refeeding, as described.

B) Dr. Henneke himself, who pioneered the Henneke Body Condition Score (BCS) system, prepared a statement for consideration when using his system in cases of animal neglect. In this statement Dr. Henneke makes statements which are of particular interest in this case:
- Do not overreact or act too hastily
- Work with the owner to the extent possible leaving seizure an an absolute last resort
- As an equine neglect investigator, learn as much about nutrition and equine management as you possibly can.
content/uploads/2012/02/HENNEKE-REPORT.pdf

In this case, not only did the experts making statements not utilize the system properly, as in by not physically laying hands on the animals but basing their scoring on photos, but also the intent of the system was not adhered to as Dr. Henneke intended, since a clear picture of the history and ongoing care of the horses was not adequately taken into consideration.

C) Regarding the bloodwork:
- The type of anemia the horses exhibited was not classified according to the records provided. Perhaps if it had been it would have been more clear to determine if the cause of the anemia was related to red blood cell destruction (perhaps from a toxin), versus reduced red blood cell production (lack of nutrition).
- It was agreed all horses suffered from anemia (low red blood cell count) and elevated white blood cell count (indicating infection). However, red blood cell counts in horses suffering from malnutrition can be *either* elevated or decreased. It is *not* usual to expect the horses to show an

*EX 106*
*219*

increased in white blood cell counts without an obvious infection (runny nose, cough, high body temperature, etc.) , which none of the horses had.

-**None of the experts commented on the high potassium levels** which affected *all* the horses. Generally potassium is not affected in cases of starvation, yet this abnormality was consistent in all the bloodwork from the horses in question. Causes of high potassium include: decreased excretion from the kidneys, urinary tract obstruction, or hypoaldosteronism. None of the horses exhibited symptoms related to those diseases. Perhaps the abnormality was related to an increased intake of potassium, possibly from a toxin.

http://ahdc.vet.cornell.edu/clinpath/modules/chem/hyperk.htm

-Bear was found to have high phosphorous on his bloodwork, however, experts opine that laboratory findings in starved horses tends to show low phosphorous levels.

-Experts state that every animal does not always have all of the laboratory abnormalities listed in many of the of the disease processes. Defendant's experts say the horses did not present with a perfect case of toxic ingestion, but, disingenuously fail to point out that they did not present a perfect case of malnutrition, either.

D) The horses were treated with vitamin B, although experts assert they were treated with, and responding to, nothing but adequate nutrition.

E)The statement that young and old animals are subordinate to more dominant animals, which accounts for why some horses received nutrition when others did not, is invalid when considering that the 7 horses in question were in separate pens and being fed individually.

F) It is clearly stated on page 4 of attachment 1 by Dr. Leone, that veterinarians were unable to determine the cause or the solution for the decline of the animal's health. This indicates that it was *not* clearly a case of starvation.

G) This is a complex case with respect to which defendants and their experts jumped to conclusions without using a scientifically valid methodology. The experts attempted to pigeonhole the symptoms of the horses as clearing being starvation, when it was not. As well the horses did not recover as they asserted, with only nutritional support, again supporting some other unidentified cause or factors was at play. What is of importance is that in either case (starvation or toxin) the treatment would be the same, adequate nutrition and supportive care until the animals clear the toxins from their system or they gained weight, which is exactly what was being done by the owners at the time of when the animals were confiscated.

6/29/2014

Swift-Hatlee Case 5/28/2014

I was retained as an expert in People v. Hatlee and Swift in September of 2012, and in this case. My opinions are set forth below. A copy of my report in the criminal case is attached. This statement is regarding Ron Swift and Randy Hatlee, who own horses housed on a ranch in Bailey, Colorado, called Echo Valley Ranch, and veterinarian Dr. Ashley Olds who was on this ranch and visited the animals owned by the before mentioned on February 16, 2012.

In December of 2011, 6 of the approximately 40 horses on the ranch began to lose weight and show signs of severe weakness. Of note is that only those 6 animals of the 40 on the property were affected, and 5 of those were all young horses under 2 years of age, and the sixth being an older mare historically known for being thin in the winter.

Those 6 horses were brought out of the pastures and brought into individual pens near the barn for closer evaluation and increased feeding, throughout the time period from December 1, 2011 through February 12, 2011. Records indicate the condition of the horses was being monitored by and a working diagnosis and treatment plan was in place with Timberline Equine veterinarians Dr. Horton and Burton, who suspected the 6 most severely affected animals were suffering from some sort of toxic ingestion, possibly botulism. Clinical signs of all animals included: thin body condition scores (2 or 3 out of 9), elevated heart rates, abnormal heart rhythms, diastolic heart murmurs, anemia (low red blood cell count) as noted on blood work, and varying abnormal neurological symptoms including being down and unable to rise, and crossing over of their feet when they walked (conscious proprioceptive deficits). Apparently, other animals in the area were reported to have similar symptoms, including being down and unable to rise, and even death. Botulism is difficult to accurately diagnose in horses, and there is no effective treatment. One of the horses later tested negative for botulism.

Routt County Animal Control officer Dawn Smith requested the assistance of Harmony Horse Works, which in turn enlisted the aid of Dr. Olds on February 16th to take into custody one horse on the property which was being monitored by Routt County. While on the property, Dr. Olds observed 7 other horses on the property which she asserted were cases of starvation and animal cruelty. The condition of Mr. Swift and Mr. Hatlee's horses on the ranch was brought to the attention of Animal Control Officers for Park County, as possibly a case of starvation and/or neglect. Dr. Olds demanded the thin horses be immediately seized by Park County. That same day, Dr. Olds also sent emails to various individuals regarding what she had seen on site, in what can perhaps be deduced as an attempt to create a public outcry against the horse owners and the Sherriff's Department for how they were handling the situation.

C.R.S. §12-64-121 states:

(1) A licensed veterinarian who, during the course of attending or treating an animal, has reasonable cause to

know or suspect that the animal has been subjected to cruelty in violation of section 18-9-202 C.R.S....shall

report or cause a report to be made of the animal cruelty...to a local law enforcement agency or the bureau of

animal protection.

For a veterinarian to have reasonable cause to know or suspect that animals have been the victim of cruelty, specifically by way of starvation, he or she must reach a conclusion as to what might have caused the condition of the animals. This requires the standard process of developing a differential diagnosis list, which is derived from performing a complete physical exam and obtaining as thorough a history as possible of the animals and their current care. This information is then used to reach a scientific conclusion as to what is the most likely cause or causes for the condition, and therefore subsequently produce either a diagnosis, or list of working differential diagnosis'. After review of all statements and records, it would appear Dr. Olds violated this fundamental principle of veterinary medicine by failing to 1) perform thorough physical exams on the animals in question 2) obtain a thorough history on the animals from both the owners and the current attending veterinarians at Timberline Equine and 3) not developing a differential diagnosis list with some of the possible medical reasons other than neglect and starvation as possible causes for the condition of the animals, before jumping to the unsubstantiated conclusion that the horses had been starved and demanding the situation be handled as such .

Of the horses in question, one was taken by Dr. Olds for treatment in her clinic, 1 died and the others were left in the custody of Hatlee and Swift. The horse which was taken to Dr. Olds clinic was treated in such a manner as a horse which has been starved, suffering from malnutrition, or another condition known as Equine Winter Starvation Syndrome. The latter is a condition where horses do not have enough additional calories needed to produce the body heat need in plummeting outside temperatures. These horses will lose weight despite having feed, if the feed is not enough in quality or quantity to account for the increased energy demand. What is inconsistent with this working diagnosis is that anemia is not what one would typically consider associated with this condition, nor is an elevated white blood cell count, and in fact, these animals will characteristically have a *decreased* appetite, which are all inconsistencies with what is reported in the medical record for the horse taken to Dr. Olds clinic. This leads one to surmise some other factor or factors were contributing to the condition of the animals, which were not being adequately taken into consideration, and that in fact the animal was likely misdiagnosed. Of concern are the allegations that Dr. Olds office manager declined information from Drs. Burton and Horton regarding the differential diagnosis which might have assisted in determining a more accurate diagnosis.

The concern with this situation is certainly not that a veterinarian was concerned for the welfare of some animals in apparent need of care, but that Dr. Olds was not asked onto the property to evaluate those animals, and in fact, the animals were under the care of Timberline Equine. Without thorough physical exams on each of the afflicted animals, as well as a complete history obtained from the horse owners, and a consultation with the veterinarians who had been in contact with the owners about the horses care, it is against the standard of care to make any assumption about the cause of the condition of the animals, and certainly inappropriate to act in such a manner as to actively demand to have the animals seized for cruelty. At first glimpse of skinny horses it could certainly seem that the animals were not being fed properly, but the flat bed trailer full of hay reported to be parked near the animals, as well as all the unusual clinical signs (specifically the neurological signs) the animals showed, does not support a reasoned scientific conclusion that they were starved. In fact Cindy Hardy reported the horses in question had heated water and hay available in their respective pens. A more thorough history would have revealed that the horse had been getting increased care and attention, hay, and were being fed grain twice daily since December when their condition was initially observed. Also of note is that Dr. Olds claims the animals were not showing any signs of neurological problems, however, on the video footage taken of the animals to demonstrate their poor condition, neurological abnormalities are present.

Furthermore, Dr. Horton (one of the vets from Timberline Equine) indicated in an email dated February 28, 2012 that she suggested the animals be transferred for advanced diagnostics tests at Colorado State University. When she consulted with the cardiologist Dr. Adams at Colorado State University regarding the clinic signs the horses were displaying, Dr. Adams revealed that there is no known association between low body condition scores and diastolic murmurs in horses. Apparently Mr. Swift had an appointment at Colorado State Teaching Hospital for these advanced diagnostic tests, when the horses were seized by Park County, making the afflicted animals unavailable for advanced testing during the height of clinical signs.

While under the custody of Park County, the horses were under the care of both Littleton Equine Hospital and Ashley Olds DVM. Records indicate some advanced testing was performed, multiple doses of antibiotics and probiotics were given, as well as generalized supportive care including IV fluids was administered to the horses, but there is no record of a diagnosis the cause for the high heart rates, murmurs and abnormal rhythms noted on all the animals. All the animals repeatedly showed some signs of anemia on their blood work, as well as high white blood cell counts. Only the older mare received a definitive diagnosis of advanced kidney disease and intestinal parasites, which could certainly contribute to having a thin body score.

Anemia in animals occurs for one of three reasons: blood loss, blood cell destruction, or lack of regeneration of new blood cells by the bone marrow. It does not appear from the records that the horses suffered any sort of bleeding disorder, therefore we can assume the animals were not anemic from blood loss. Nutritional anemias in animals are rare and not normally associated with an otherwise healthy animal simply having a lack of forage. Disorders that cause red blood cell destruction are termed hemolytic anemia's and are usually associated with immunologically mediated mechanisms (such as equine infectious anemia, autoimmune hemolytic anemia, or transfusion reactions), certain bacterial infections (Clostridium perfringens), plant or chemical toxicity (red maple leaves, phenothiazine, onions, Hoary Alyssum), or blood parasites (Babesia, Ehrlichia equi)." Although the records are lacking in the specifics of the classification of the type of anemia the horses suffered from, they were treated with antibiotics, indicating that an infection of some kind was suspected (perhaps Clostridium perfringens?), and supportive care including IV fluids, such as would be the only treatment option in many cases of toxic ingestion. It is interesting to note that even under the care of animal control, the red blood cell counts were still decreased, and the white blood cell counts increased, indicating clearly that despite additional forage and calories, the animals were still affected by something else causing the anemia, which then led to the continued cardiac abnormalities (high high rates, abnormal rhythms and murmurs). All of which are not normal or customary clinical symptoms associated with starvation.

Records were supplied with regards to another animal on the property, known as Bear or Spencer, another 2 year old horse with a similar condition to the 6 horses mentioned above. It would be sensible to say that it is likely this young horse might also have been suffering from a similar toxic ingestion as the other animals, especially in light of the fact (according to Dr. Olds) he was treated, and responded, in a similar manner as the other animals in question. In the records supplied there was not a description of Bear's cardiac condition, but it does mention treatment with antibiotics and his blood work was similar to the other horses. It is likely that Bear, or Spencer, was suffering from the same malady as the other 6 horses, for all the same reasons listed previously.

The animals were later returned to the care of Ron Swift and Randy Hatlee, who throughout this time had been working with equine specialists, other veterinarians, and their local county extension agent to determine if botulism or some other toxin could have been the initial cause for the horse's condition.

I was asked by Mr. Swift to be present on the day the horses were returned to Swift and Hatlee, 4/11/2012 and can personally attest to that, despite receiving treatment for supposed starvation while under the care of animal control, some of the horses were still showing obvious neurological deficits as well as abnormal heart sounds, which are highly inconsistent signs to be associated with starvation.

One of the returned horses, Echo, a 1 year old stud colt, was also apparently suffering from lameness, and bright green loose stool indicating he had recently been eating a diet high in alfalfa hay. The clients reported to me he had not been in suffering from lameness before seizure. It seems that while under the care of Animal Control the horses were fed a large amount of alfalfa hay. It is well known that large amounts of alfalfa hay are too high in protein for the young growing horse. Researcher T. J Hulland at the University of Guelph-Ontario feels that most "contracted tendons" in young horses are the result of contracted muscles in the forearms. The tendons and ligaments themselves are not capable of shortening.

but it is possible for a young horse that is getting too much calcium and protein in the form of straight alfalfa hay to have this tight muscle condition. If the problem is caught early on, dietary changes can often prevent permanent damage. This is done by reducing the protein content of the ration (diluting alfalfa hay with mostly grass hay) and bringing the calcium/phosphorous ratio closer to the ideal 1: 1. It is a reasonable conclusion that this young horse suffered musculoskeletal injury as a result of the refeeding program he was on while under the care of Animal Control.

It was later discovered that the toxic weed Hoary Alyssum was pervasive on the property, and more prolific throughout the area due to recent drought conditions. Hoary alyssum is known to be highly toxic to horses (but not to cattle or other ruminants), with a characteristic set of symptoms (not all present in every affected horse and not all horses are equally susceptible). Symptoms include depression, fever, increased heart rate, laminitis, limb edema, diarrhea, dehydration, intravascular haemolysis (red blood cell destruction), hypovolemic shock, anemia, and abortion in pregnant mares (Becker et al. 2004, Hovda and Rose 1993, Knight and Walker 2004, Knight and Gaskill 2011, Martinson et al. 2007).

Interestingly, many of the symptoms the horses displayed were consistent with the ingestion of the toxic plant, bracken fern. Horses which have ingested bracken fern tend to lose weight, have depression, uncoordinated gait, anemia, and rapid heart rates. The blood tests to determine bracken fern toxicity, low thiamin levels and an elevated serum pyruvic acid level, were not performed on any of the horses involved in this case to my knowledge. (Knight, A Guide to Plant Poisoning. pg 224).

There is often no further treatment for toxic ingestion in horses, especially without a definitive diagnosis, other than to remove the source of the toxin, provide supportive care, including food and water, and providing protection from (and treatment for) abrasions caused as a result of any neurological conditions, until the body can clear the toxin from the system allowing the animal to recover and assimilate nutrients normally again.

In conclusion, 1) it would be uncommon in a case of severe neglect and starvation to only have 6 out of 40 animals affected 2) it is common for toxic ingestion to more strongly affect the younger animals who might be less discriminating in their forage choices and have fewer reserves for recovery 3) Starved horses will be weak, but not necessarily show signs of neurological abnormalities and conscious proprioception changes, and most importantly 4) cardiac abnormalities and anemia are not generally associated with starvation, and in fact in this case, persisted despite having increased calories and forage, therefore, the likelihood of some third other unknown cause, such as a persistent toxin in the animals tissues, or some other undiagnosed disease process, is highly suspect in this case. It is unlikely this was a case of selective neglect and starvation, but much more likely some other reason for the thin body scores, cardiac abnormalities, and anemia, such as ingestion of some sort of toxin or toxins, such as either in the ground, through the hay or feed source, or in the pasture plants. "(Equine Medicine and Surgery, Mosby, 1999), 5) it is unlikely equine winter starvation syndrome might have been a cause for the condition of the horses in light of all the other clinical signs and that animals maintained excellent appetites, 6) it was premature of Dr. Olds and could be considered malpractice to make a conclusion of animal cruelty without further investigation, it was inappropriate conduct to openly discuss the details of the case while the investigation was ongoing, and from review of all the presented information it appears that her methodology was below the standard of care.

*[signature]* DVM

FACTS AND DATA CONSIDERED: Review of medical records, depositions, other records pertaining to the case, and literature on the topics at hand.

CV: attached

PUBLICATIONS: Volume 7, Number 4 of The Aquatic Veterinarian fourth quarter 2013 Orando Goldfish with Buoyancy Disorder

LISTING OF TESTIMONY for Jena Questen, DVM:

2/27/13 Attorney Darrel Campbell
State of CO v. Ronald Swift and
Randall Hatlee

Case numbers 12M43 and
12M44

Venue - Park County Court, Colorado

COMPENSATION: My regular hourly rate is $200 per hour, to date on this case have done 7 hours of work.

Compensation for previous case: $

223

# EXHIBIT 27

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER
and ASHLEIGH OLDS,

Defendants.

-------------------------------------------------------
DEPOSITION OF SVEN BONNELYCKE
October 8, 2014
-------------------------------------------------------

Deposition location:
825 Clark Street
Fairplay, Colorado

APPEARANCES:

Brice A. Tondre, Esq.
BRICE A. TONDRE, P.C.
215 South Wadsworth Boulevard, #500
Lakewood, Colorado  80226

For the Plaintiffs.

John Lebsack, Esq.
WHITE and STEELE, P.C.
Dominion Towers
600 17th Street, Suite 600N
Denver, Colorado  80202

For the Defendant, Olds.



**AVERY WOODS REPORTING**
455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

225

**Page 2**

1  APPEARANCES (CONTINUED):
2  Timothy P. Schimberg, Esq.
   FOWLER, SCHIMBERG & FLANAGAN, P.C.
3  1640 Grant Street, Suite 300
   Denver, Colorado  80203
4              For Park County.
5
6  Also present:  Ronald Swift.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1         The deposition of SVEN BONNELYCKE,
2  called for examination by the Plaintiffs, was
3  taken in the offices of Park County Human Services
4  Building, 825 Clark Street, Fairplay, Colorado,
5  commencing at 1:02 p.m., on the 8th day of
6  October, 2014, before Linda L. Frizzell of
7  Avery/Woods Reporting Service, Inc., 455 Sherman
8  Street, Suite 460, Denver, Colorado 80203,
9  Registered Professional Reporter, Certified
10  Shorthand Reporter, and Notary Public in and for
11  the State of Colorado, pursuant to the Colorado
12  Rules of Civil Procedure.
13         I N D E X
14  EXAMINATION OF SVEN BONNELYCKE          PAGE
15  BY MR. TONDRE            4, 54
    BY MR. SCHIMBERG            51
16
17        (No Exhibits Marked.)
18
19
20
21
22
23
24
25

**Page 4**

1              SVEN BONNELYCKE,
2  being first duly sworn to state the truth, the whole
3  truth, and nothing but the truth, testified under oath as
4  follows:
5              EXAMINATION
6  BY MR. TONDRE:
7       Q  State your name.
8       A  Sven Bonnelycke.
9       Q  Spell it.
10      A  S-v-e-n, is my first name; Bonnelycke,
11  spelled B-o-n-n-e-l-y-c-k-e.
12      Q  Mr. Bonnelycke, what is your present
13  occupation?
14      A  I am employed by the Park County
15  Sheriff's Office as a captain.
16      Q  And how long have you been employed by
17  the Park County Sheriff's office?
18      A  Park County Sheriff's, I will be employed
19  17 -- it will be 18 years in May of 2015.
20      Q  And what different positions have you
21  held with the Park County Sheriff's Office?
22      A  I started out as a patrol deputy, and
23  then was promoted to a detective corporal. Eventually
24  promoted to a sergeant with detectives and then
25  advanced the rank to staff sergeant or senior sergeant

**Page 5**

1  and then moved to lieutenant and now captain.
2       Q  Any other law enforcement experience?
3       A  Yes, I have a total of 21 years, and I
4  was a deputy sheriff in Delta County. Previous to
5  that, I was an officer with Cedar Ridge Police
6  Department. Prior to that, I was an officer with the
7  Pikes Peak Community College Campus Police, and I
8  started my career as a reserve officer with Florence
9  Police Department.
10      Q  What's your educational background?
11      A  I hold an associate's degree in applied
12  sciences for criminal justice.
13      Q  Post certified?
14      A  I am.
15      Q  When did you become post certified?
16      A  That was in 2002, November. My
17  certification number is B0906.
18      Q  As a captain, what are your duties?
19      A  As a captain, I am primarily an
20  administrative personnel. I oversee two divisions, the
21  animal control division and that of detectives. Also
22  one of my responsibilities as a captain is I am the
23  lead firearms instructor for the agency. I also
24  receive professional standards and oversee evidence
25  control.

2  (Pages 2 to 5)

226

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 6

1    Q  Was that true in 2012, 2013?
2    A  I'm sorry, for what?
3    Q  Let me -- were you overseeing animal
4  control professional standards and evidence control in
5  2012 and 2013?
6    A  Yes.
7    Q  To whom do you report?
8    A  I report to Undersheriff Monte Gore.
9    Q  What was your first knowledge regarding
10 the case that involved Mr. Swift and Mr. Hatlee?
11   A  The first time I was advised of it was
12 the first day that Cindy Hardey had responded out to
13 the address to help Routt County.
14   Q  And is that something that would normally
15 usually be reported to you?
16   A  Not typically, no.
17   Q  What were the -- what is your
18 understanding of why it was reported to you that first
19 day?
20   A  It was reported to me through Sergeant
21 Priestly, who advised me there was some concerns about
22 the welfare of some horses that were out there. And
23 there was a concern as to whether or not they wanted to
24 consider the removal of those animals due to their
25 condition. And based on that, I wasn't comfortable

Page 7

1  until we had an independent veterinarian take a look at
2  them before we made that decision.
3    Q  And who did you have look at them?
4    A  As far as I remember, I don't think we
5  had a third person independent of what was already
6  there out there, and I don't recall as to -- as to why
7  that was.
8    Q  Kate Anderson was involved --
9    A  Okay.
10   Q  -- isn't she a veterinarian?
11   A  I believe so.  I recognize the name.  I
12 think she is, but I don't know for certain.
13   Q  Well, what -- what did you -- what, if
14 anything, did you recommend regarding the animals on
15 that first day?
16   A  The only recommendation I made on that
17 first day is I wanted an independent veterinarian to
18 look at those animals and have an independent opinion
19 made prior to making a decision for removal.
20   Q  Why did you want an independent
21 veterinarian involved?
22   A  From what I remember, the way it was
23 originally reported to me, I believe there was another
24 veterinarian that was involved in that, there seemed to
25 be some concerns, I don't remember what those were, but

Page 8

1  it was enough for me to sit there and say I wanted
2  somebody else coming in and I wanted a different
3  opinion.  It almost seemed as a personal opinion versus
4  more of a veterinarian opinion, a professional opinion.
5    Q  "A personal opinion," was that coming
6  from Ashleigh Olds?
7    A  I couldn't tell you that.  I don't know.
8    Q  Well, what was -- what was the source of
9  your information that led you to believe that the
10 veterinarian involved was a -- that it was a personal
11 opinion?
12   A  All of this information that I got was
13 relayed to me by Sergeant Priestly, and then I presume
14 that was given to her by Cindy Hardey.
15   Q  Well, do you recall what it was about
16 this veterinarian that led you to believe it was a
17 personal matter with her or him?
18   A  I -- I don't know.  I think it was more
19 about the reaction to what was out there, which was
20 enough of a concern for me, I wanted a professional
21 opinion and not something guided by personal belief.
22   Q  Did you make any reports whatsoever
23 regarding your involvement with the case?
24   A  I did not.
25   Q  Now, was it Sergeant Priestly that you

Page 9

1  expressed your desire that -- that the horses be
2  examined by an independent veterinarian?
3    A  It was.
4    Q  What was her response?
5    A  She said okay.
6    Q  Did you follow up on that and see if it
7  was done?
8    A  I believe at one point she came back up
9  and told me what was going on, which caused the removal
10 of the horses not to be done; and I don't recall the
11 basis for that.  But it -- at that time for me to allow
12 it to continue that way, it would have had to have been
13 acceptable.
14   Q  So you don't remember what you were told?
15   A  Not exactly, no.
16   Q  How about what do you remember?
17   A  Pretty much what I just described to you.
18   Q  Well, what -- I mean, on day one, you
19 wanted an independent veterinarian?
20   A  Correct.
21   Q  The next -- on -- on the next day, you
22 were involved, whatever that may have been, you still
23 didn't have an independent veterinarian, right?
24   A  No.  It was the same day, she had come
25 back and explained to me -- on that very first day, it

3  (Pages 6 to 9)

227

Page 14

1      MR. SCHIMBERG: Object to form.
2      Q (BY MR. TONDRE) -- killed, hurt?
3      MR. SCHIMBERG: Form and foundation. Go
4  ahead.
5      A  I don't recall that in any other case.
6      Q (BY MR. TONDRE) Do you recall whether any
7  effort was made to learn who was making the threats and
8  to make a criminal case against them?
9      A  I was not aware of it, no.
10      Q  You think it should have been done?
11      A  I'm sorry?
12      Q  Do you think -- do you think an
13  investigation should have been launched to determine
14  who was making the threats?
15      MR. SCHIMBERG: Object to form. Go
16  ahead.
17      A  I don't know if I can answer that because
18  I don't really know what was done. That was an aspect
19  of this case that I had no involvement in and that was
20  something that was handled by Undersheriff Monte Gore,
21  not I.
22      Q (BY MR. TONDRE) Okay. Did you ever
23  discuss the fear for the safety of the horses that
24  Mr. Hatlee and Mr. Swift with any member of the animal
25  control portion of the sheriff's office?

Page 15

1      A  I did not, no.
2      Q  Okay. Were you advised that on this
3  first day of your involvement with the case that there
4  was a veterinarian on the Echo Valley Ranch premises
5  that was demanding of Cindy Hardey that she -- that all
6  of the horses be removed?
7      A  I think there was something said about
8  that. And I think that was the reason for Sergeant
9  Priestly coming to me and advising me what was going
10  on.
11      Q  And was that the reason or was that the
12  reason why you believed it was kind of a personal
13  matter with that veterinarian?
14      A  I believe, yes.
15      Q  At any time during the case, during
16  the -- the investigation of the case, did you have any
17  contact with -- well, first of all, do you know
18  Ashleigh Olds?
19      A  I do not.
20      Q  Have you ever had any contact with her?
21      A  I have not.
22      Q  Have you ever had any contact with Eugene
23  or Shelly Ferraro?
24      A  The only contact I've had with either one
25  of those I believe was Eugene.

Page 16

1      Q  And what contact did you have with Eugene
2  Ferraro?
3      A  That was when he came and spoke with
4  Undersheriff Monte Gore.
5      Q  You were present during that discussion?
6      A  I was.
7      Q  How long did that discussion last?
8      A  Roughly 40, 45 minutes.
9      Q  And what do you recall of that
10  discussion?
11      A  The only thing I recall is he was
12  discussing about some information he had apparently
13  uncovered during his investigation of whatever that may
14  have entailed. And I think that he may have provided
15  some information or names that could have been
16  potential witnesses.
17      Q  Do you think it was unusual that he was
18  involved in the investigation?
19      MR. SCHIMBERG: Object to form.
20      A  I think so, to the point where I didn't
21  know what his involvement in the case initially would
22  have been to begin with.
23      Q (BY MR. TONDRE) Did you ever learn what
24  his involvement was?
25      A  The best presumption I was able to make

Page 17

1  is because they had a desire to know what was going on
2  in the case, and they had certain feelings about the
3  case in and of itself because it involved animals.
4      Q  Did he ever express in your presence a
5  dissatisfaction for the way in which the case was being
6  prosecuted?
7      A  I don't recall that.
8      Q  Did he express a concern regarding the
9  way in which the case was being investigated?
10      A  I don't recall that either.
11      Q  Do you recall him expressing any sort of
12  dissatisfaction?
13      A  Not dissatisfaction. I think he -- the
14  way he presented himself that I recall that day is he
15  was trying to help with providing information that
16  could be followed up on.
17      Q  Any contact -- have you had any contact
18  with Barbara Wright?
19      A  No.
20      Q  Does that name mean anything to you?
21      A  It does not.
22      Q  Did -- have you had any contact with
23  Monika Courtney?
24      A  No.
25      Q  Does that name mean anything to you?

Page 18

1    A  The name sounds familiar but I don't know
2  from where.
3    Q  Now, were you aware that during the
4  course of the investigation, investigative materials
5  were made to third parties outside the sheriff's
6  department?
7    A  When you say "investigative materials," I
8  don't know exactly what you mean.
9    Q  Evidence that was being gathered during
10  the course of the investigation such as photographs,
11  lab studies, and things of that nature?
12    A  I was aware of some photographs being
13  released.
14    Q  And how did you happen to have that
15  awareness?
16    A  I believe that was something Undersheriff
17  Gore had mentioned and something he had cleared with
18  the district attorney's office.
19    Q  Now, did that fall within your
20  responsibility with respect to evidence control?
21    A  If it had been booked into evidence and
22  there was a procedural issue with regards to chain of
23  custody and that; yes, it would have.
24    Q  Would photographs fall within a chain of
25  custody issue?

Page 19

1    A  If they were booked into our evidence
2  control, yes.
3    Q  Do you know whether they were?
4    A  I do not.
5    Q  How would we find that out?
6    A  We would have to refer to records to see
7  if they were booked into evidence and compare the date
8  of the -- when they were booked in until the date of
9  the release of the photographs.
10    Q  Who makes the decision whether to book
11  them in to evidence?
12    A  That would be up to the individual
13  officer or deputy.
14    Q  Now, did you attend a fundraiser in
15  Evergreen on April the 7th, 2012?
16    A  I did.
17    Q  Why did you go to that?
18    A  The undersheriff had requested that I
19  attend because I was the commander of the division and
20  that it was a fundraiser to help with veterinary bills
21  and things along those lines; and based on that, I did.
22    Q  Did you understand it was related
23  directly to the case that was under investigation by
24  the Park County Sheriff's Department?
25    A  Well, I don't know if it was directly

Page 20

1  related to the investigation, but I'm assuming that
2  based that it was a fundraiser, that the money would go
3  toward the vet bills; then yes, it would have some sort
4  of tie into the investigation.
5    Q  Who did you talk to at that fundraiser?
6    A  Very minimal people.  And then the people
7  that I did talk to was more along the lines of
8  niceties, things such as hey, how are you doing, nice
9  to meet you, that kind of a thing.
10    Q  Do you remember seeing some of the
11  photographs that were furnished by or under the
12  direction of Monte Gore?
13    A  Well, I don't know what photographs
14  Undersheriff Monte Gore released.  I do remember seeing
15  photographs, but I don't think those were photographs
16  directly related to the animals in question.
17    There was a lot of photographs of horses
18  and things of that nature; where those came from, I
19  don't know.  Assuming from either books or internet or
20  something along those lines.
21    Q  Did you see a slide show while you were
22  there?
23    A  I don't recall a slide show.
24    Q  Did you talk to anybody whose name you
25  would remember?

Page 21

1    A  No.
2    Q  Did you contribute any money to the
3  cause?
4    A  I did not.
5    MR. SCHIMBERG:  Geez.  I'm teasing you.
6    Q  (BY MR. TONDRE)  How long were you there
7  did you say?
8    A  Maybe right around an hour or so.  Maybe
9  a little over that, but not much more than that.
10    Q  Were any speeches or presentations made
11  when -- while you were there?
12    A  Not that I recall.
13    Q  What was going on?
14    A  It was just a bunch of people eating
15  dinner, drinking, some drinking alcoholic beverages,
16  others not.  Communication, talking, understanding this
17  was a fundraiser, a lot of things that I did see were
18  in the back, that were -- I don't remember if they were
19  pottery, some sort of horse memorabilia, that were
20  up for -- I don't know if it was up for auction or up
21  for sale, that was pretty much it.
22    Q  Is that a usual and customary thing for
23  the sheriff's department to do is to stand -- attend
24  parties that are being thrown by proponents of the
25  arrest and conviction of people of whom the sheriff's

SVEN BONNELYCKE - OCTOBER 8, 2014

**Page 22**

1 department is investigating?
2 MR. SCHIMBERG: Object to form and
3 foundation.
4 MR. LEBSACK: Form.
5 A It's not a custom for a sheriff's office
6 to attend parties and functions. Now, whether they are
7 directly related to an investigation, I personally
8 never attended a party, so to speak, for an
9 investigation. I have attended other functions that
10 related around things that involved one of my victims
11 such as wakes, funerals, things of that nature, or just
12 general family get-togethers.
13 Q (BY MR. TONDRE) Did Undersheriff Gore tell
14 you why he wanted you to go to the fundraiser?
15 A As a representative of the commander of
16 that division,
17 Q Did he express why it was in his
18 judgment, appropriate to attend a fundraiser?
19 A No.
20 Q Did you think that was an appropriate
21 thing to do?
22 A I saw no harm in it, nor did I see that
23 being in any way, shape, or form subjective to the
24 investigation.
25 Q Do you think it would be inappropriate to

**Page 23**

1 do that in order to appease the people who were crying
2 for the conviction of Mr. Hatlee and Mr. Swift?
3 MR. SCHIMBERG: Object to form and
4 foundation.
5 A I don't believe our attendance there was
6 simply to appease people who had a certain interest or
7 disagreement with Mr. Hatlee or Mr. Swift or the
8 investigation itself.
9 Q (BY MR. TONDRE) Well, if that was the
10 case, that he wanted you all there for appeasement, do
11 you think that is appropriate?
12 MR. SCHIMBERG: Object to form.
13 MR. LEBSACK: Same.
14 A If it was stated in such a manner, then I
15 would have disagreed with it. But this was not a
16 forced issue. We had the opportunity to go or not go,
17 it was our decision. I opted to go.
18 Q (BY MR. TONDRE) If you had been told that
19 you were being asked to go in order to appease these
20 people that were throwing the fundraiser and that they
21 were the people who were pushing the sheriff's
22 department to convict or arrest and -- and pursue the
23 conviction of Mr. Hatlee and Mr. Swift, would you have
24 gone under those circumstances?
25 MR. SCHIMBERG: Object. Object to form.

**Page 24**

1 A Under those circumstances, I probably
2 would not likely have attended, and I don't believe
3 that this would have been an issue of them trying to
4 push us to try to pursue Mr. Hatlee or Mr. Swift and if
5 it had been the case, I would have objected and not
6 gone.
7 Q (BY MR. TONDRE) So you didn't have any
8 information that a group of people were advocating in a
9 rather strenuous manner the charging and prosecution of
10 Mr. Hatlee and Mr. Swift?
11 A My knowledge of this case is extremely
12 limited.
13 Q I'm going --
14 A Even more so -- even more so to the point
15 where whatever pressures there may have been or may not
16 have been with regards to this particular group and
17 with respect to this case is beyond my knowledge.
18 Q Okay. Was there some disagreements
19 ongoing between the sheriff's department and the
20 district attorney's office regarding the district
21 attorney's failure to prosecute cases that the
22 sheriff's department thought should be prosecuted?
23 A We have had some professional
24 disagreements along those lines, yes.
25 Q Were those professional disagreements

**Page 25**

1 ongoing in 2012?
2 A I believe they were.
3 Q And do you recall that the sheriff's
4 department adv- -- adv- -- actively supported the
5 opponent of Mr. LeDoux in the November 2012 election?
6 A I was.
7 MR. SCHIMBERG: Object to form.
8 THE DEPONENT: Oh.
9 MR. SCHIMBERG: That's okay.
10 Q (BY MR. TONDRE) Were you one of the people
11 who was joining in that adversary -- that advocacy
12 program?
13 MR. SCHIMBERG: Object to form.
14 A I did not nor do I not. It was a
15 political matter and I don't involve myself in that.
16 Q (BY MR. TONDRE) Did you harbor a belief
17 that the district attorney's office was not prosecuting
18 some cases that should be prosecuted?
19 A I believe that there were some cases that
20 they should have prosecuted and for whatever reason,
21 refused not -- refused to do so.
22 Q Did you ever have any discussions with
23 Mr. LeDoux regarding any aspect of the Hatlee and Swift
24 case?
25 A I did not.

7 (Pages 22 to 25)

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

230

SVEN BONNELYCKE - OCTOBER 8, 2014

| Page 26 | Page 28 |
|---|---|

**Page 26**

1   Q  Did you have any discussions with him
2   regarding the Hat- -- between him and the sheriff's
3   department being reported to you by anyone in the
4   sheriff's department?
5       A  I'm sorry, could you repeat that -- I
6   don't quite understand.
7       Q  Well, let me -- let me make it even
8   narrower. Had you ever heard that anyone from the
9   sheriff's department was pressuring Mr. LeDoux to
10  prosecute the Hatlee and Swift case?
11      A  No. I've never heard that.
12      Q  Were you aware of the extent of the
13  emails that were flowing into the sheriff's office
14  advocating the investigation and prosecution of
15  Mr. Hatlee and Mr. Swift?
16      A  I recall seeing some, some emails. But I
17  don't remember there -- there being a huge amount or
18  overabundant amount or anything like that. But I
19  couldn't tell you what the number to those are.
20      Q  Under what circumstances did you see
21  them?
22      A  I think those were things that the
23  undersheriff may have forwarded to me or responses he's
24  made and just carbon copied me on those.
25      Q  Do you have any responsibility as a

**Page 27**

1   captain or did you have any responsibility as a captain
2   during 2012 -- '11 and '12 for the training of animal
3   control officers?
4       A  No. That responsibility fell on other --
5   other areas, not I.
6       Q  Whose area did that fall in?
7       A  That would have been either the
8   Department of Agricultural for the Bureau of Animal
9   Protection or the district attorney's office.
10      Q  Did you have any responsibility for
11  reviewing the competence of animal control officers
12  with respect to constitutional issues?
13      A  The only time I would actually review, as
14  you put it, the competence, would be if there was a
15  complaint that was filed in that regard.
16      Q  Did you ever have a complaint regarding
17  Cindy Hardey particularly with respect to the Hatlee
18  and Swift case?
19      A  I did not.
20      Q  Did you become aware that the -- the
21  Judge Green found that she had acted in bad faith in
22  securing a seizure warrant?
23      MR. SCHIMBERG:  Object to form. Go
24  ahead.
25      MR. LEBSACK:  Same.

**Page 28**

1       A  I was made aware of that judgment by
2   Judge Green only when this litigation came about.
3       Q  (BY MR. TONDRE) When you say "this
4   litigation," you're talking about the suit in which the
5   sheriff has been sued?
6       A  That is correct.
7       Q  And what were the circumstances that
8   brought it to your attention at that point in time?
9       A  There was a -- there was a brief
10  discussion that Judge Green had made or rendered the
11  judgment. That the affidavit that was filed by Cindy
12  Hardey, deputy at the time, was done in bad faith
13  because there was some information that was left out of
14  the affidavit itself. And that he felt that based on
15  that, he's not sure if the judge that reviewed the
16  affidavit originally could have made a full judgment as
17  to whether or not to authorize that affidavit or turn
18  it down.
19      MR. SCHIMBERG:  Let me caution you,
20  Captain, that if -- if there's -- when he asks you a
21  question, if it involves a -- a conversation in my
22  presence, that's subject to attorney/client privilege.
23  I just wanted to --
24      THE DEPONENT:  Oh.
25      MR. SCHIMBERG:  -- make sure you knew you

**Page 29**

1   didn't have to go there.
2       Excuse me, Counsel.
3       MR. TONDRE:  That's fine.
4       Q  (BY MR. TONDRE) So the matter of -- of the
5   affidavit and the circumstances of it's being dealt
6   with by the judge were not something that you were
7   aware of during the course of the underlying case; is
8   that correct?
9       A  That is correct.
10      Q  Never heard a word about the -- the order
11  seizing the horses being overturned?
12      A  I do recall that. And that's the reason
13  why we had to give the horses back.
14      Q  But you knew nothing more than it had
15  been overturned?
16      A  That's it, that's it.
17      Q  You weren't told the circumstances of it
18  being overturned?
19      A  No.
20      Q  Fred Wegener testified that you had a
21  conference with Cindy Hardey to discuss with her
22  conduct relating to the affidavit; is that true or
23  false?
24      MR. SCHIMBERG:  Object to form.
25      A  That is false.

8  (Pages 26 to 29)

231

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 30

1    Q (BY MR. TONDRE) As a captain in charge of
2  professional standards, if it had been brought to your
3  attention that a deputy under your supervision had
4  authored and submitted an affidavit in bad faith, would
5  you have convened an invest-- a professional
6  standards investigation?
7       MR. SCHIMBERG: Object to form.
8       A That would depend on what is meant by
9  "bad faith." There's a difference between bad faith by
10 leaving out information accidently or with intent.
11     Q (BY MR. TONDRE) Would you expect an animal
12 control officer to know that it's a violation of the
13 fourth amendment to omit material information from the
14 affidavit?
15     A I expect my animal control officers, as
16 much as my other deputies that fall under my purview
17 and charge of command, that they are not allowed to
18 omit information with the intent of some sort of
19 harmful or benefit to their side of the case. There
20 are times when people forget because of the amount of
21 abundant information that is in the investigation that
22 they can't get all the information in there and forget
23 certain aspects of it. There's a difference between
24 forgetfulness and intent.
25     Q Would you expect an animal control

Page 31

1  officer to know the definition of -- the legal
2  definition of probable cause?
3       A I do.
4       Q And if the animal control officer doesn't
5  know the definition of legal -- the legal definition of
6  probable cause -- let me start over.
7       If a Park County Sheriff's Department
8  animal control officer does not know the legal
9  definition of probable cause, whose fault is that?
10      MR. SCHIMBERG: Object to form. Go
11 ahead.
12      A There -- the best way I could answer that
13 is there's a difference between knowing exactly what
14 the legal definition is verbatim and understanding the
15 intent behind that, what it means. I don't think that
16 there's anybody that you can go up to and say give me
17 the legal definition of probable cause but they
18 understand what it is.
19      Q (BY MR. TONDRE) Can you give me the legal
20 definition of probable cause?
21      A I personally verbatim cannot.
22      Q What's your understanding of the
23 definition of probable cause?
24      A Probable cause is more than a reasonable
25 suspicion.

Page 32

1    Q That's your -- the total extent of your
2  understanding?
3       A No. I can give a long rendition of what
4  probable cause is, but I couldn't give you a legal
5  definition of it.
6       Q Is a feeling enough?
7       A A feeling is not enough, but it can be a
8  basis to move into something more than that, and a
9  feeling in and of itself is not probable cause nor is
10 it really the guideline for a reasonable suspicion
11 either.
12      Q Would you expect an animal control
13 officer to know that a thorough investigation must be
14 made before a decision as to probable cause is reached?
15      A I'm sorry, are you asking that they have
16 to conduct a thorough investigation before probable
17 cause can be reached?
18      Q Right.
19      A A thorough investigation isn't
20 necessarily the ultimate thing to have to be done
21 before probable cause can be determined. Probable
22 cause can be determined long before a thorough
23 investigation is done.
24      Q Have you read Cortez versus McCauley?
25      A Which is a recent case, but I don't know

Page 33

1  the name in and of itself but I do understand that that
2  is a part of it, yes.
3       Q Yeah. Do you think that any reasonable
4  police officer, law enforcement officer, should know
5  the teaching of Cortez versus McCauley?
6       A Well, it certainly makes a determination
7  how investigations are conducted, absolutely.
8       Q Have you heard of the concept of -- of
9  approaching seizure warrants in the fashion -- in the
10 Reader's Digest fashion?
11      A I'm sorry, I don't understand what your
12 question is. I'm --
13      MR. SCHIMBERG: I'll object to form.
14      Q (BY MR. TONDRE) What I'm asking, Captain,
15 is whether you've heard of the Reader's Digest approach
16 to search warrant -- affidavit seizure warrant
17 affidavits?
18      A My understand-- -- what I'm understanding
19 is you're asking is it an actual creating an affidavit
20 for a search warrant that you reduce the information in
21 a Reader's Digest within so many pages; if that's what
22 you're asking yes, I've heard of that before.
23      Q Okay. And what have you heard about it?
24      A And this is -- that is something
25 typically that is very common that when you actually --

AVERY WOODS REPORTING SERVICE, INC.    (303) 825-6119

232

Page 38

MR. SCHIMBERG: Form.

A I don't disagree with that. But I also think that's a matter of thoroughly investigating, putting the information in the affidavit, try to get all the information, relevant facts in the affidavit, when you have a tendency to not put the information in there, there's a difference between forgetting a piece of information or intent -- or with intent of not putting the information in there.

Q (BY MR. TONDRE) Would you agree that if you know -- if you know about information, failure to put it in is intentional?

MR. SCHIMBERG: Object to form.

A If it was such information that you wouldn't normally forget and then not put it in, yes.

Q (BY MR. TONDRE) Would you expect an officer who has only been involved with a case for less than a week have a better memory than someone who has been involved with the case for a month?

A Well, I wouldn't necessarily agree with that, and I wouldn't necessarily agree with that for the fact that for me having -- and I presume you are speaking of me, having the knowledge that I have, is based off of my understanding of the case, and so much time after the case has transpired versus actually

Page 39

physically being there in the midst of the case as it's evolving. So I don't necessarily agree with that.

Q You think your memory would be just as good at a later time as it would be at the time of the -- the information coming to your attention?

A No. I know my memory wouldn't be, depending on if there has been a certain amount of time that has passed, I would have to do a lot of review to get myself back up to remember certain events, yes.

Q That's an obligation to remember what you may have forgotten; isn't it?

A Yes.

MR. SCHIMBERG: Object to form.

Q (BY MR. TONDRE) When Mr. Hatlee and Mr. Swift were acquitted of the charges against them, what was the reaction of the people within the sheriff's department?

A I'm not sure what their reaction is. I'm sure they were not pleased with the decision.

Q The system reached its conclusion, correct?

A Correct.

Q You're familiar with the term or the statement that -- the one of Shakespeare makes, first let us kill all the lawyers, correct?

Page 40

A I'm not -- I'm not a Shakespeare aficionado, no.

Q You haven't heard the statement?

A Well, I have heard statements along those lines, but not by Shakespeare.

Q Do you believe it will be a better system if you didn't have lawyers and judges to disagree with the decision of the police department?

A I believe that the system that we have is the best system in the world. So I don't argue with the system. I may not -- I may not agree with some of the way things go, but that's not my job. My job is to be an officer and to investigate and to report that to the attorneys that have to prosecute.

Q And if the prosecutor prosecutes and the accused defends and the jury says not guilty, then justice has been done; hasn't it?

A I have no arguments with that process whatsoever. I respect that decision. I may not agree with it totally. But I respect it.

Q Was -- based on your perception of Monte Gore's involvement in this investigation, was he inv- -- involved in it more than he would normally be?

A Yeah, he was.

Page 41

Q And do you have any understanding as to why he was involved more than normally?

A I think Undersheriff Gore was involved when it did come to the amount of unhappiness by the public. And I think at that point, and also being the public information officer, he stepped in and then worked a little bit more directly with the animal control division and allowed them to do what they were supposed to do; and he would handle things on his level with dealing with the public.

So he is normally -- not normally this heavily involved in a criminal investigation, but yet again he is still a law enforcement officer and he is the undersheriff and he can make the decision if he wants to go in and work the case.

Q What is your understanding -- well, was it usual for him to go out and supervise the seizure of the horses?

A It's not a norm, but he's done -- he's done something along those lines before.

Q What's your understanding of why he did it here?

MR. SCHIMBERG: Object to form, foundation. Go ahead.

A I'm not sure if I have an understanding

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 42

1  other than the fact that he received a lot of
2  complaints and then, based on that, was involved and
3  then directly started working hand in hand with animal
4  control.
5      Q (BY MR. TONDRE) Isn't that your job?
6      A But he's also my boss.
7      Q Did he tell you he was taking control
8  from you?
9      A No. He didn't have to tell me, I saw it
10 firsthand so I stood aside.
11     Q Were you in any way involved in the
12 decision to take Cindy Hardey off the case?
13     A I was not.
14     Q Did you know what happened?
15     A My understanding is that there was some
16 concerns that were given to the undersheriff that they
17 thought that she may have had some personal friendship,
18 I don't know if that was with Mr. Hatlee or Mr. Swift;
19 but in the light of that, they didn't want there to be
20 a view that we would allow her to continue and not be
21 objective in the investigation.
22     Q Now, when did you learn that that was the
23 case?
24     A I think it was right about the same time
25 they actually made that decision or shortly thereafter.

Page 43

1      Q Who made that decision?
2      A I believe that was a decision that came
3  from Undersheriff Gore.
4      Q Did you have any information that led you
5  to believe that she was friendly to Swift or Hatlee?
6      A I personally did not, no. No.
7      Q All right. Now, by the time that
8  happened, she had -- it had already been adjudged that
9  she had filed a bad faith affidavit, right?
10     MR. SCHIMBERG: Object to form.
11     A Honestly, I do not know. I don't know
12 where that falls in the time line.
13     MR. TONDRE: Let's take a few minutes.
14     (Recess taken from 1:59 p.m. to
15 2:08 p.m.)
16     Q (BY MR. TONDRE) Okay. I'm going to
17 hypothecate some facts to you, Captain, which I want
18 you to accept as true. The beginning of the
19 investigation by Cindy Hardey was on February the 16th,
20 2012. The protective agreement that was entered into
21 between the sheriff's office and Mr. Hatlee and
22 Mr. Swift was entered into on February 19th, three days
23 later. And the seizure warrant affidavit was signed on
24 February the 22nd, 2012. We have three days between
25 each event.

Page 44

1      Would you expect on February 22nd
2  that Cindy Hardey would, without a doubt, remember
3  entering into -- or giving a notice of warning on
4  February 19th?
5      MR. SCHIMBERG: Object to form. Go
6  ahead.
7      A I would like to think she would have
8  remembered, yes.
9      Q (BY MR. TONDRE) And would you think on
10 February 22nd, she would remember a protective
11 agreement she entered into on February 19, 2012?
12     A Again, I would like to think that she
13 would have remembered, yes.
14     Q And would you think that during that
15 short time span she would know the contents of those
16 two documents?
17     A I would hope so, yes.
18     Q And would you think she would remember a
19 conversation that she had the morning of the day she
20 signed the affidavit for search -- for seizure warrant?
21     A I would like to think so, yes.
22     Q Now, as the professional standards person
23 as it relates to animal control officers, would you
24 expect to be told that one of your officers had been
25 found in bad faith by a judge?

Page 45

1      MR. SCHIMBERG: Object to form.
2  Foundation. Characterization, go ahead.
3      A I would like to be informed of any --
4  anything that my officers are doing or, in this
5  particular case, if there was something of fact like
6  that that happened.
7      Q (BY MR. TONDRE) But you weren't, were you?
8      A No. I was not.
9      Q Someone made the decision to keep you out
10 of that equation, right?
11     MR. SCHIMBERG: Object to form.
12 Foundation.
13     A I don't think it was a matter of them
14 intently keeping me out of the loop so to speak; I
15 think it might have been something that they felt,
16 well, there's nothing we can do about it now and then
17 felt that there was no wrongdoing.
18     Q (BY MR. TONDRE) Isn't it true, that a law
19 enforcement agency has a duty and an obligation to
20 supervise and discipline its officers?
21     A Yes, I do.
22     Q Was there any investigation made to
23 determine whether Cindy Hardey had committed an act
24 which -- which justified discipline?
25     A Not by I.

12  (Pages 42 to 45)

234

SVEN BONNELYCKE - OCTOBER 8, 2014

Page 46

1   Q  Well, do you know of anybody who did make
2   such an investigation?
3   A  Not that I'm aware of.
4   Q  And who had the authority to make that
5   investigation other than you?
6   A  That typically will be ordered by the
7   sheriff for, let's say, an internal investigation under
8   professional standards, but I would not be the only
9   person who would probably conduct an investigation.  It
10  could be the undersheriff himself that could have done
11  it.  But it will be a higher-ranking member.
12  Q  Have you ever heard that an investigation
13  was made by anyone?
14  A  No.
15  Q  Would you expect as the person in charge
16  of that officer to be told if the officer was
17  investigated?
18  A  I would.
19  Q  Did you ever discuss the issue regarding
20  the insufficiency of the affidavit because of omissions
21  with Detective Priestly?
22  A  With Sergeant Priestly?
23  Q  Sergeant Priestly.
24  A  Okay.  Now I just side-tracked myself by
25  asking you that question.  Ask me again, please.

Page 47

1   Q  Did you ever discuss with Sergeant
2   Priestly the question of the sufficiency or
3   insufficiency of the seizure warrant affidavit?
4   A  I think after we found out about the
5   judgment by the Court, we did talk about it and then
6   the fact that the information that wasn't in there
7   wasn't something that was typically put into an
8   affidavit to begin with.
9   Q  So it was the conclusion of you as a
10  professional standards person and Sergeant Priestly, as
11  a supervisor of Officer Hardey, and you as supervisor
12  of Sergeant Priestly, that it was a typical, usual, and
13  customary practice of the sheriff's office to not
14  include things of the nature that were omitted from the
15  affidavit in this case --
16  MR. SCHIMBERG:  Object to form.
17  Q  (BY MR. TONDRE)  -- is that correct?
18  MR. SCHIMBERG:  And foundation.
19  A  That is not correct.  That decision does
20  not stop with me.  That is a decision made by the
21  sheriff.  And if there's an investigation to be
22  conducted, it is he who orders it.
23  Q  (BY MR. TONDRE)  It was your judgment from
24  talking to -- you -- you and Sergeant Priestly came to
25  the decision that it was the practice of the office not

Page 48

1   to include things such as those omitted by Officer
2   Hatlee -- Hardey.
3   A  It --
4   MR. SCHIMBERG:  Hold on.  Object to form
5   and foundation.  Do you want me to ask him to leave so
6   I can tell you what the nature of my objection is?  So
7   you don't, rightfully, accuse me of trying to educate
8   him.
9   MR. TONDRE:  Okay.  I'm interested.  I'm
10  curious.
11  MR. SCHIMBERG:  Do you want me to say it
12  now or have him leave?
13  MR. TONDRE:  Or we can leave.
14  MR. SCHIMBERG:  No, no, no.  I want -- I
15  want to share with you the nature of my objection
16  because I'm close to telling him he doesn't have to
17  answer based upon his prior testimony.  I'm trying to
18  be real fair about it.
19  MR. TONDRE:  All right.  Have him leave.
20  I'm puzzled.
21  MR. SCHIMBERG:  Yeah.  Maybe we can clear
22  it up.
23  MR. TONDRE:  Don't go away.
24  THE DEPONENT:  I will be right out the
25  door but not in earshot.

Page 49

1   MR. SCHIMBERG:  See you tomorrow.
2   (Captain Bonnelycke has left the
3   room.)
4   MR. SCHIMBERG:  My foundation objection,
5   Brice, is that he's told you he didn't see the
6   affidavit.  So you're asking him basically to -- when
7   you say for the things that were left out, he doesn't
8   have that knowledge of what elements you're talking
9   about.
10  MR. TONDRE:  But he just testified to the
11  contrary of that, Tim.
12  MR. LEBSACK:  I don't think he did.
13  MR. SCHIMBERG:  I don't think so.
14  MR. TONDRE:  Well --
15  MR. SCHIMBERG:  That's my -- that's my
16  only thing.  If you want to walk him through the
17  litany, that -- that at least educates him.  But to ask
18  it as broadly as you did, he doesn't have that
19  foundation.
20  MR. TONDRE:  Well, I can solve that
21  simply by asking him whether he discussed the specific
22  omissions with Sergeant Priestly, that should satisfy
23  your objection.
24  MR. SCHIMBERG:  Yeah, I think that would
25  be fine.

13  (Pages 46 to 49)

Page 50

1        MR. TONDRE: Yeah.
2        MR. LEBSACK: Bring him back?
3        MR. TONDRE: Yeah.
4        MR. SCHIMBERG: That's the way to deal
5  with it, because --
6        THE COURT REPORTER: That was all on the
7  record, right?
8        MR. SCHIMBERG: That's fine. Brice, will
9  pay for that.
10       MR. TONDRE: Yeah.
11       MR. SCHIMBERG: Those two or three pages
12  on him.
13       (Captain Bonnelycke returns.)
14       Q (BY MR. TONDRE) All right. We've -- I
15  think we've clarified the question.
16       A  Okay.
17       MR. SCHIMBERG: Is that sun bothering
18  you?
19       THE DEPONENT: No.
20       Q (BY MR. TONDRE) The question is:  Did you
21  discuss with Sergeant Priestly the specific omissions
22  or the omissions that were specifically discussed by
23  the judge?
24       A  I think we did have a discussion that the
25  information pertaining to the actual state notice of a

Page 51

1  warning and the agreement was not in the affidavit.
2        Q  Anything else?
3        A  I don't believe there was anything else
4  other than those two items.
5        Q  And did you believe that those were not
6  material omissions?
7        A  I -- I don't think I believe they were
8  material omissions based on what I was advised, that
9  that was not a standard that was entered in affidavits.
10  And based on this case, after this, we reversed that
11  and decided from here on out that has to be added
12  obviously for the court judgment.
13       MR. TONDRE: No further questions.
14       MR. LEBSACK: I don't have any questions.
15       MR. SCHIMBERG: I do.
16  Got to prove that I was here today
17       MR. TONDRE: I object.
18       MR. SWIFT: Me too.
19       MR. SCHIMBERG: What's yours?  Form, and
20  yours is foundation, I bet.
21       EXAMINATION
22  BY MR. SCHIMBERG:
23       Q  All right. Here we go.  I want to go
24  back to the conversation you had with Mr. Tondre
25  regarding Mr. Ferraro.

Page 52

1        A  Okay.
2        Q  That's the context.
3        MR. TONDRE: I withdraw my objection.
4        Q (BY MR. SCHIMBERG) Okay.  I want to make
5  sure I understand. Did Mr. Ferraro have any role in
6  the investigation performed by the Park County
7  Sheriff's Office in regards to Swift and Hatlee?
8        MR. TONDRE: Objection. Foundation.
9        A  No.
10       Q (BY MR. SCHIMBERG) Okay.  Did he share
11  with you in that meeting over at the sheriff's office
12  that he had on his own, done some investigation?
13       A  Yeah.
14       Q  Okay.  Was he ever asked to perform any
15  investigation on behalf of your office?
16       A  No.
17       Q  Okay.  I think Mr. Tondre's question
18  could have been interpreted a couple different ways,
19  and that is why I home in on this.  He asked you:
20  Well, was it unusual that he was part of the
21  investigation?  Did you take that to mean that he was a
22  part of the Park County's office investigation?
23       A  No.
24       Q  Okay.  Did Mr. Ferraro clothe himself
25  with some sort of experience or skill in the field of

Page 53

1  investigation?
2        A  I think -- if I remember correctly, I
3  think that he may have discussed in some of his past
4  experiences or his ability to conduct investigations.
5  But I don't remember what those are.
6        Q  Was he ever allowed to interject himself
7  into the investigation?
8        A  No.
9        Q  Okay.  Now, my next question goes to this
10  fundraiser. Mr. Tondre is very artful in how he
11  characterizes the folks that held the fundraiser.  Did
12  you have any awareness of any particular motive or
13  political purpose of the group that you -- that held
14  the fundraiser that you attended?
15       A  Well, I'm not aware of any political
16  motivation.  I took it as people who were trying to
17  raise funds that went towards veterinary help and
18  assistance from what we put into the animals at that
19  point.
20       Q  Okay.  The way the questions were asked
21  of you, these people were characterized as desirous of
22  prosecution of Mr. Swift and Mr. Hatlee.  Were you
23  aware of any such characterization when you attended?
24       A  No.  I don't think I've ever seen
25  anything like that.

14  (Pages 50 to 53)

236

# EXHIBIT 28

BOBBI PRIESTLY - JUNE 24, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.

 **COPY**

-----------------------------------------------------------

DEPOSITION OF BOBBI PRIESTLY
June 24, 2014

-----------------------------------------------------------

Deposition location:
825 Clark Street Road
Fairplay, Colorado

APPEARANCES:

Brice A. Tondre, Esq.
BRICE A. TONDRE, P.C.
215 South Wadsworth Boulevard, #500
Lakewood, Colorado   80226

For the Plaintiffs.

John Lebsack, Esq.
WHITE and STEELE, P.C.
Dominion Towers
600 17th Street, Suite 600N
Denver, Colorado   80202

For the Defendant, Olds.

**AVERY WOODS REPORTING** 
455 Sherman Street, Suite 250 · Denver, Colorado 80203
303-825-6119 · 1-800-962-3345 · FAX 303-893-8305
www.averywoods.net

238

BOBBI PRIESTLY - JUNE 24, 2014

| Page 22 |
| --- |

1  form of the question.
2      Q  (BY MR. TONDRE)  Yes.
3          MR. SCHIMBERG:  Legal conclusion.  You
4  can answer as an animal control.
5      A  Sufficient evidence and facts based on --
6  well, it would be sufficients -- sufficient facts
7  based -- that there's a crime that has been committed,
8  it would be sufficient fact that there has been a crime
9  or -- that's what probable cause is.
10     Q  (BY MR. TONDRE)  Is it --
11     A  Sufficient facts.
12     Q  I'm sorry, I interrupted you.
13     A  Go ahead.
14     Q  Is it enough to have a feeling that a
15 crime was committed?
16         MR. SCHIMBERG:  Object to form.
17     A  No.  Go ahead.
18     Q  (BY MR. TONDRE)  Are you familiar with the
19 holdings in the 10th Circuit Court of Appeals requiring
20 the requirement that a thorough investigation be made
21 before seeking a search and seizure warrant?
22         MR. SCHIMBERG:  Object to form.  Go
23 ahead.
24     A  Yes.
25     Q  (BY MR. TONDRE)  Did you provide any

| Page 23 |
| --- |

1  training to Cindy Hardey regarding search and seizure?
2      A  Did I provide any training?
3      Q  Yes, ma'am.
4      A  No.
5      Q  She prepared two affidavits, one to
6  search for hay and one to seize horses in the Swift and
7  Hatlee case.  Did you review those before she submitted
8  them to the Court?
9      A  I did not review those -- those
10 particular affidavits.  I did not.
11     Q  So if she said she did, you're ly- --
12 she's lying, right?
13         MR. SCHIMBERG:  Object to form.  Go
14 ahead.
15     A  I wouldn't say she's lying.  I
16 normally -- I think I -- I was in Lake George when she
17 prepared those, investigating another case.
18     Q  (BY MR. TONDRE)  Let me see.  You're in
19 the -- you're in the business of deciding credibility
20 of informants, aren't you?
21     A  Am I in the business?
22     Q  Well, it's involved in your commission,
23 isn't it, determining the credibility of informants?
24         MR. LEBSACK:  Object to the form.
25         MR. SCHIMBERG:  I'll join.

| Page 24 |
| --- |

1      A  Informants, I -- I don't understand the
2  question.
3      Q  (BY MR. TONDRE)  People who give you
4  information that you use to -- to obtain a search or
5  seizure warrant, you're -- you're responsible for
6  determining their credibility before you use their
7  statement, aren't you?
8          MR. SCHIMBERG:  Same objection.  Go
9  ahead.
10     A  We investigate facts, yes.
11     Q  (BY MR. TONDRE)  And you have to make a
12 determination whether the person that's furnishing you
13 with information is telling you the truth or not, don't
14 you?
15     A  Yes.
16     Q  Now can you give me any explanation for
17 why Cindy Hardey would say that you reviewed the search
18 and seizure warrants when you didn't?
19         MR. LEBSACK:  Object to the form.
20         MR. SCHIMBERG:  Well, hold on, Brice.
21 You know, I have an objection; but you're going to
22 accuse me, rightly so, of trying to steer the witness.
23 So do you want Bobbi to leave the room while I make my
24 objection or does it matter that much?
25         MR. TONDRE:  It doesn't matter to me.  I

| Page 25 |
| --- |

1  mean --
2          MR. SCHIMBERG:  I think it misstates
3  Ms. Hardey's testimony; therefore, I object.
4          MR. TONDRE:  Oh.
5          MR. LEBSACK:  Same objection.
6      Q  (BY MR. TONDRE)  Ms. Hardey testified in a
7  deposition last Friday, and she also testified three
8  times in court.  You're aware of that, right?
9      A  Yes.
10         MR. SCHIMBERG:  That's probably a good
11 point.  I was saying misstated her depo testimony of
12 last Friday.
13     Q  (BY MR. TONDRE)  In court she testified she
14 was asked this question:
15         And apparently you reviewed that search
16 warrant with your supervisor Officer Priestly; is that
17 correct?
18         Yes.
19         Is that a lie?
20         MR. SCHIMBERG:  Object to form.
21     A  I don't think that's a lie.  I don't
22 think she remembered -- I mean we always have
23 supervisors and let -- if I may?  If I may clarify?
24         MR. SCHIMBERG:  Yes, go ahead.
25         MR. LEBSACK:  Well --

7  (Pages 22 to 25)

**Page 42**

1    Q  And what decision did she make?
2    A  We -- we spoke about the conditions of
3  the horses. I -- I mean, she -- she told me that she
4  had -- and I talked with Mr. Swift like I said, and she
5  decided that based on the fact, that she was going to
6  go ahead and issue a warning at this point.
7    Q  Did she tell you she was of the opinion
8  the horses were not endangered by leaving them in
9  place?
10    A  I don't remember that she specifically
11  said that.
12    Q  Well, if she thought they were in danger
13  being at Echo Valley Ranch, wasn't she obligated to
14  have them moved?
15    MR. SCHIMBERG:  Object to form.
16    A  I know she --
17    MR. SCHIMBERG:  Go ahead.
18    A  I know she was very concerned about
19  Maggie and thought she should be euthanized.  I
20  remember that.  So I don't know, I -- I guess if you
21  could restate the question.
22    Q  (BY MR. TONDRE)  Did she say the horses
23  were in danger, yes or no?
24    MR. SCHIMBERG:  Asked and answered.
25    A  Some of them.

**Page 43**

1    Q  (BY MR. TONDRE)  Which ones?
2    A  Well, obviously, Spencer or Bear was
3  leaving because he was in danger.
4    Q  By whose account?
5    A  Well, they had a warrant and -- Dawn
6  Smith, Ashleigh Olds.  Maggie -- she thought Maggie
7  needed to be euthanized, she was concerned about -- she
8  said the babies looked really, really bad.  So I mean,
9  I don't know, I can't -- I can't speak for what Cindy
10  specifically thought.
11    Q  Let me see if I understand.  Cindy
12  thought Maggie should be euthanized?
13    A  Yes.
14    Q  And what veterinary school did she go?
15    MR. LEBSACK:  Objection to form.
16    MR. SCHIMBERG:  Join.
17    A  She didn't go to any veterinarian school
18  that I'm aware of.
19    Q  (BY MR. TONDRE)  Well, she was aware and
20  you were aware, aren't you, that it was Dr. Horton's
21  judgment that she shouldn't be euthanized, that she was
22  getting better?
23    MR. LEBSACK:  Objection to the form.
24    MR. SCHIMBERG:  Join.
25    Q  (BY MR. TONDRE)  Isn't that right?

**Page 44**

1    A  I don't know what her opinion was, sir.
2    Q  Isn't that a relevant bit of information?
3    MR. SCHIMBERG:  Object to form.
4  Argumentative.
5    A  I don't --
6    Q  (BY MR. TONDRE)  Don't you make decisions
7  regarding what is relevant bits of information with
8  respect to an investigation?
9    A  I -- I go by facts, sir.
10    Q  And you decide which facts are relevant,
11  don't you?
12    A  I do.
13    MR. SCHIMBERG:  It doesn't have to be
14  now, Brice, whenever there is a good break point.
15    MR. TONDRE:  Well, I'm about to launch
16  into an areas that's going to take some time.  So why
17  don't we take a break now.
18    MR. SCHIMBERG:  Thanks.  Appreciate it.
19    (Recess was taken from 11:07 a.m. to
20  11:20 a.m.)
21    Q  (BY MR. TONDRE)  All right.  Let's go.
22    During the course of telephonic
23  contacts with Cindy Hardey on February 16th, 2012,
24  did you have occasion to contact Dr. Kate
25  Anderson?

**Page 45**

1    A  Yes, I made a call to Dr. Anderson.
2    Q  Who is Dr. Anderson?
3    A  She is the veterin- -- she's one of the
4  veterinarians for the State of Colorado and she is the
5  head of PACFA.
6    Q  Head of what?
7    A  PACFA.
8    Q  What is that?
9    A  Pet Animal Care Facilities Act.
10    Q  Why did you call Dr. Anderson -- well,
11  wait a minute, did you call Dr. Anderson?
12    A  I did.
13    Q  Why did you call her?
14    A  I called to get -- to get her advice and
15  see what she thought as a veterinarian we should do.
16    Q  And you explained to her the facts as you
17  understood them, right?
18    A  I explained that we were told that the
19  horses on the Echo Valley Ranch were under veterinary
20  care, that I was told by Mr. Swift when I spoke
21  with him, and asked her what she thought we should do
22  involving the six horses on the property and on Maggie.
23    MR. SCHIMBERG:  Listen to his question.
24    A  Okay.
25    Q  (BY MR. TONDRE)  My question is:  You

12  (Pages 42 to 45)

240

Page 46

1  explained the facts as you understood them to
2  Dr. Anderson, correct?
3      A  Yes.
4      Q  And she told you that if a veterinarian
5  was caring for the horse that was down, and testings --
6  tests was -- tests were being run, she was comfortable
7  with just monitoring the situation for now?
8      A  Yes.
9      Q  And what did you tell her about the
10  situation as you understood it?
11     A  I told her that Mr. Swift told me that
12  the horses on the ranch were under veterinary care.
13     Q  Well, you wrote that the -- that she
14  stated: If the owner had its veterinarian caring for
15  the horse that was down --
16     A  Yes. That was the -- that was Maggie.
17     Q  Yeah. Did you talk to the veterinarian
18  that was caring for Maggie?
19     A  No.
20     Q  Why not?
21     A  She was out doing -- I don't know, she
22  wasn't where the cell phone was. You had to go up a
23  way from the horses to talk on the cell phone.
24     Q  Well, is it your understanding that the
25  veterinarian was at the ranch?

Page 47

1      MR. LEBSACK: Can I ask which
2  veterinarian are you talking about? "The
3  veterinarian." It's not clear to me, could you clarify
4  that question.
5      Q  (BY MR. TONDRE) What -- what veterinarian
6  are you talking about?
7      A  I'm talking about -- are you talking
8  about Dr. Anderson? I was talking to her on the
9  telephone, and you were talking about the veterinarian
10  who was at the ranch, I don't know which veterinarian
11  you're talking about --
12     Q  Well --
13     A  -- either.
14     Q  -- you said she stated that: If the
15  owner had his veterinarian caring for the horse that
16  was down.
17         Who is his -- who do you have reference
18  to when you say "his veterinarian"?
19     A  The only veterinarian that I knew of was
20  Dr. Horton.
21     Q  Do you know Dr. Horton?
22     A  Do I know her?
23     Q  Yeah.
24     A  I spoke with her on the telephone once,
25  yes.

Page 48

1      Q  Once in your lifetime?
2      A  Yes.
3      Q  Did you try and call her on February the
4  16th?
5      A  No.
6      MR. SCHIMBERG: Mr. Tondre, would it be
7  appropriate if we allowed Ms. Priestly to have the
8  exhibit that you're reading from so she can refresh if
9  she needs to.
10     MR. TONDRE: Yeah, sure.
11     MR. SCHIMBERG: Okay. And you're
12  entitled to ask your questions the way you want but --
13     MR. TONDRE: I think it's Exhibit 65.
14     MR. LEBSACK: 66.
15     MR. TONDRE: 66. Yeah, it may be
16  helpful.
17     A  Thank you.
18     Q  (BY MR. TONDRE) What did you understand
19  your role to be in this whole scenario that was
20  enveloping or -- or developing in -- on February 16th?
21     A  What was my role?
22     Q  Yes.
23     A  I'm an animal control officer for the
24  Park County Sheriff's Office and Cindy's supervisor.
25     Q  Okay. And she was looking to you for

Page 49

1  advice as to what to do with the situation, correct?
2      MR. SCHIMBERG: Object to form.
3      A  She was telling me what the situation
4  was.
5      Q  (BY MR. TONDRE) Was she asking your
6  advice?
7      A  In some situations.
8      Q  All right. Now, did you ask for any
9  advice from Ashleigh Olds?
10     A  I did not speak with Ashleigh Olds.
11     Q  Do you know -- did you know Ashleigh Olds
12  at that point in time?
13     A  No.
14     Q  Had you ever called Dr. Anderson before
15  during a wellness check?
16     A  In which case?
17     Q  Any case.
18     A  Oh, yes, absolutely.
19     Q  Is this a common thing you do, call
20  Dr. Anderson and say what do you think, Doc?
21     A  Absolutely.
22     Q  And why do you do that?
23     A  Because we always have a veterinarian's
24  opinion on cases before we do anything.
25     Q  What -- who made the decision to issue a

13  (Pages 46 to 49)

241

Page 70

```
 1          MR. TONDRE: Foundation.
 2          A  It's a small community. I have no idea.
 3    Dawn Smith knew. I don't know.
 4          Q  (BY MR. TONDRE) Ashleigh Olds knew?
 5          MR. LEBSACK: Object to form.
 6          A  Yeah.
 7          Q  (BY MR. TONDRE) Ann Murdock appeared on
 8    Channel 7 news. Are you aware of that?
 9          MR. LEBSACK: Object to the form.
10          A  I don't know who Ann Murdock is.
11          Q  (BY MR. TONDRE) Veterinarian in the
12    Ashleigh Olds' clinic.
13          A  No.
14          Q  You didn't see -- you didn't see the
15    Channel 7 news report?
16          A  No, sir. I did not.
17          Q  Did you hear about it?
18          A  I'm sure I did. I mean, there was a lot
19    of press. I -- I -- I don't know which one
20    specifically you're talking -- I don't watch the news,
21    so...
22          Q  Well, in any event, to your knowledge,
23    nobody in the sheriff's department publicized the
24    decision; is that correct?
25          MR. SCHIMBERG: Object to form.
```

Page 71

```
 1          Q  (BY MR. TONDRE) And I'm talking about --
 2    let's -- let's concentrate on February 16th, 17th, and
 3    18th. Did anybody to your knowledge in the sheriff's
 4    department publicize the decision to leave the horses
 5    at Echo Valley Ranch?
 6          A  I believe we did a press release. I
 7    don't know which day that was.
 8          MR. SCHIMBERG: Then don't guess. Answer
 9    his question based upon what you know.
10          A  Not that I'm aware of.
11          Q  (BY MR. TONDRE) According to your report,
12    page 89, on February 19th, you received a call from
13    Undersheriff Gore at your residence; undersheriff
14    advised you that he had received several telephone
15    calls from the public information officer for the State
16    of Colorado's Department of Agriculture office. He was
17    concerned for the safety of the owners and horses, the
18    owners of the horses and the horses themselves.
19          Do you remember any more particularly
20    what sort of communications he had received that caused
21    him to be concerned about the -- the safety of the
22    owners and their horses?
23          A  No.
24          Q  Were there death threats?
25          A  No. Not that I -- I don't -- I don't
```

Page 72

```
 1    remember specifically.
 2          Q  Did Dr. Horton ask you about death
 3    threats?
 4          A  I know she -- if I can look at my report?
 5          Q  Yeah, you can find it on page 91.
 6          A  Yes.
 7          Q  That was a conversation you had with her
 8    on February 21st, correct?
 9          A  That's correct.
10          Q  And on February 21st, she told you she
11    was in no hurry to jump to a conclusion in the case as
12    it is not a clear-cut case at all, right?
13          A  Yes, those were her words.
14          Q  Now what did you learn from Dr. Horton
15    about death threats she had received?
16          A  I wasn't really paying that much
17    attention, I was taking notes feverishly about what she
18    said. She was talking to the sheriff particularly
19    about that. And he was speaking to her about that.
20          Q  Are death threats a crime in Park County?
21          A  Yes, sir.
22          Q  Was anybody prosecuted for any of those
23    death threats?
24          A  She doesn't live in Park County, that is
25    why he told her to contact law -- to contact law
```

Page 73

```
 1    enforcement officers in her county, which I believe are
 2    Jefferson County.
 3          Q  Now were there any death threats made --
 4    well, let me make it more generic than that. Were
 5    there any threats made to persons involved with the
 6    Bailey feed store?
 7          MR. SCHIMBERG: Object to form.
 8    Foundation. Go ahead.
 9          A  Not to me, sir.
10          Q  (BY MR. TONDRE) What did Undersheriff Gore
11    suggest be done about the matters that were causing him
12    to be concerned about the safety of the owners and
13    their horses?
14          A  His suggestion was to remove the horses
15    from the situation so that people did not go and take
16    matters into their own hands, which he expressed some
17    concern that that might be a possibility.
18          Q  Did he say why he was concerned that
19    vigilante justice may take hold?
20          MR. LEBSACK: Object to the form.
21          MR. SCHIMBERG: Object to the form.
22    Characterization. Go ahead and answer the question.
23          A  He -- he just said with all of the calls
24    and emails that we were getting he was concerned about
25    the safety of the horses and the owners; and he did not
```

19 (Pages 70 to 73)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

242

| Page 74 | Page 76 |
|---|---|

**Page 74**

1  want people to take matters into their own hands; so he
2  thought for the safety of everybody, that it would be
3  in the best interests to remove them from the situation
4  and put them in -- in protective custody, per se.
5      Q  (BY MR. TONDRE)  Would you agree taking
6  matters into their own hands would constitute vigilante
7  justice?
8          MR. LEBSACK:  Object to the form.
9          MR. SCHIMBERG:  Object to form.  Go
10  ahead.
11      A  I would not agree that that was a
12  statement that was used.
13      Q  (BY MR. TONDRE)  What does the term
14  vigilante justice mean to you?
15      A  People with axes and guns showing up on
16  somebody's property and taking things by force.
17  A lynch mob, per se, I guess, would be what I --
18  screaming, you know, like, kind of like in the movies
19  thing.
20      Q  In this day of the internet, it can take
21  on a different scope, can't it?
22          MR. SCHIMBERG:  Object to form.  Go
23  ahead.
24          MR. LEBSACK:  Same.
25      A  Sure.  Sure.

**Page 75**

1      Q  (BY MR. TONDRE)  Now, what was it about the
2  situation that prevented the sheriff's office from
3  being able to protect the owners and their horses?
4          MR. SCHIMBERG:  Object to form.
5  Foundation.
6      A  I -- I guess I don't understand the
7  question.
8      Q  (BY MR. TONDRE)  Well, is this a county
9  where you can rely on your law enforcement people to
10  protect you from -- obviously concerns for your safety?
11          MR. SCHIMBERG:  Object to form.
12  Foundation.
13      A  Sure.
14          MR. SCHIMBERG:  Argumentative.
15      A  Sure, if you call.  I mean, that's what
16  we do.  I don't do that, the deputies do that, but
17  sure.
18      Q  (BY MR. TONDRE)  Well, what did they do to
19  protect Hatlee and Swift other than say get out of
20  town, folks?
21      A  It was a preventative measure.
22      Q  Well, is this a place where threats are
23  okay?
24          MR. SCHIMBERG:  Object to form,
25  foundation.

**Page 76**

1      A  Oh, absolutely not.
2      Q  (BY MR. TONDRE)  Is it a crime to make
3  threats?
4          MR. SCHIMBERG:  Object to form.  Go
5  ahead.  Asked and answered.
6      A  If -- if they're substantiated, yes, it's
7  against the law to do that.
8      Q  (BY MR. TONDRE)  And how do you
9  substantiate them, isn't there a little matter called
10  investigation?
11      A  I'm not a deputy, sir; but yeah, I would
12  say it has to live up to the threshold, so I don't know
13  how to answer that question.
14      Q  Are you aware of any investigation of any
15  of these threats of bodily harm that were being made?
16          MR. SCHIMBERG:  Object to form.
17  Foundation.  Go ahead.
18          MR. LEBSACK:  Same.
19      A  Am I aware of any investigation?
20      Q  (BY MR. TONDRE)  Yeah.
21      A  I don't know what Jefferson County did,
22  so -- no.  I'm not aware of any.
23      Q  How about the ones that were made in Park
24  County?
25          MR. SCHIMBERG:  Same objection.  Go

**Page 77**

1  ahead.
2      A  Not aware of any in Park County.  So...
3      Q  (BY MR. TONDRE)  Did you ever become aware
4  of the names of any of the people who were making these
5  threats?
6      A  No.
7      Q  You know Shelley Ferraro?
8      A  Yes.
9      Q  How do you know her?
10      A  She adopted the horse called Bear.
11      Q  You know anything else about her?
12      A  She is married to Gene Ferraro.  She was
13  in court and she -- I believe she testified at one of
14  the hearings.
15      Q  Are you aware of the postings she was
16  making on Pinecam?
17      A  I'm not because I'm not a member of that.
18  I don't even --
19      Q  Are you aware of any threats she made
20  with respect to the -- directed at Dr. Horton?
21      A  No.
22      Q  Turn to page 91.
23      A  I'm there.
24      Q  "Dr. Horton then asked about death
25  threats and harassing phone calls.  She stated that she

20  (Pages 74 to 77)

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

Page 82

1    A  Yes, sir.
2    Q  When?
3    A  It appears it was on the 17th or 16th.
4    Q  4 p.m. in the afternoon, right?
5    A  Yes.
6        MR. SCHIMBERG: Excuse me.  Bathroom
7  break when we're done with this category?
8        MR. TONDRE: It's lunchtime.
9        MR. SCHIMBERG: I could do two things at
10  once.
11        MR. TONDRE: Let me --
12        MR. SCHIMBERG: I don't care.
13        MR. TONDRE: Let me -- let me finish this
14  and then we'll go.  If I can find my -- there's too
15  many boxes.  No.  Let's break for lunch.
16        (Luncheon recess was taken from
17  12:24 p.m. to 1:36 p.m.)
18        Q  (BY MR. TONDRE) All right.  Let's go.
19  When we broke, we were talking about
20  moving the horses.  What I understand your
21  testimony to be is that the decision to move the
22  horses for the safety of their owners and the
23  horses was a decision of Mr. Gore.
24    A  Yes.
25    Q  And tell me, did you have any involvement

Page 83

1  in the discussions relating to the movement of the
2  horses?  I realize you had conversation with Mr. Gore
3  but what -- what did you do after that?
4        MR. SCHIMBERG: Can -- can I ask you a
5  question, Brice?
6        MR. TONDRE: Yeah.
7        MR. SCHIMBERG: Maybe it's just me.  Are
8  we talking about from Echo Valley Ranch?
9        MR. TONDRE: To LeBeau.
10        MR. SCHIMBERG: Okay.
11        MR. TONDRE: Yeah.
12        MR. SCHIMBERG: All right.  That's what I
13  wanted to make sure, thanks.
14    A  All right.  Did I --
15    Q  (BY MR. TONDRE) Yeah, what -- after you
16  spoke with Mr. Gore and he expressed a concern for the
17  safety of the owners and the horses --
18    A  Uh-huh.
19    Q  -- and suggested that they be moved, did
20  you -- did you become involved in the efforts to get
21  them moved?
22    A  I contacted Cindy --
23    Q  Okay.
24    A  -- and talked to her and told her that --
25  that that was a recommendation made by the

Page 84

1  undersheriff, and -- and -- and then she contacted, I
2  believe Ron Swift.
3    Q  Did you -- did you prepare the agreement?
4    A  I did.
5    Q  Okay.  And how did you get that to her?
6    A  I met -- I met them at Kirstin LeBeau's
7  place that evening.
8    Q  All right.  And what was occurring when
9  you arrived at Kirstin LeBeau's place?
10    A  I arrived there prior to them.
11    Q  And you awaited their arrival?
12    A  Yes.
13    Q  And what did you observe when they
14  arrived?  Did you observe the unloading of the horses?
15    A  A couple of them, yes.
16    Q  Do you recall which ones?
17    A  No.
18    Q  Did you have anybody with you when you
19  went to the ranch, I mean, to the LeBeau place?
20    A  Yes.
21    Q  Who did you have with you?
22    A  My youngest daughter was with me.
23    Q  Why would you have your daughter with
24  you?
25    A  She came with me to help.

Page 85

1    Q  To help with what?
2    A  To help with the -- we, Kirstin was
3  moving horses from her ranch, so she came with me just
4  to assist.  She's going to veterinarian school.
5    Q  Not employed by the sheriff's department?
6    A  She is not.
7    Q  And she was going to veterinary school at
8  the time?
9    A  No.  She is going -- she just graduated
10  this year.
11    Q  Graduated from what?
12    A  From high school.  From Cripple Creek
13  High School.
14    Q  So she was a sophomore in high school
15  when you took her out to LeBeau's place?
16    A  Yes.
17    Q  Didn't have anybody from the sheriff's
18  office that could help?
19    A  No.
20    Q  What sort of help were you proposing to
21  give?
22    A  Well, I wasn't sure what we were going to
23  need.
24    Q  Well, what did it turn out that you
25  needed?

                    22  (Pages 82 to 85)

244

Page 86

1      A  We helped Kirstin and them move all of
2  their horses.  They had a bunch of horses out in the
3  pasture, and we had to move -- it was dark, so we all
4  got out and moved her large herd of horses from the
5  pasture -- from the arena out to the pasture.  So we
6  were all walking out there, moving horses.
7      Q  Was -- was Cindy Hardey there?
8      A  Not at that time, no.
9      Q  Did she get there later?
10     A  Yes.
11     Q  What time did she get there?
12     A  I don't recall.
13     Q  What did she do when she got there?
14        MR. SCHIMBERG:  I'm going to object for
15  the record, go ahead.
16     A  She was with Mr. Swift and Mr. Hatlee.
17     Q  (BY MR. TONDRE)  Oh, she arrived with them?
18     A  Yes.
19     Q  So as far as the sheriff's office was
20  concerned, it was you and Cindy Hardey?
21     A  Yes.
22     Q  All right.  Did you make any assessment
23  of the conditions of the horses at that time?
24     A  No.
25     Q  Did you notice anything about the horses

Page 87

1  that indicated to you that they might be having
2  neurological problems?
3      A  No.
4      Q  Did you notice the younger horses' back
5  legs were moving strangely?
6      A  They were quivering when they came off of
7  the trailer, one of them particularly.
8      Q  How many -- how many -- how many of them
9  had quivering legs?
10     A  I noticed one.
11     Q  Well, you wrote on the notice that the
12  younger horses', that's with an "s," back legs were
13  quivering when they walked, that's the one in your
14  report?
15     A  It might have been a typo.  I only recall
16  one at this time.
17     Q  Did it cross your mind that's a
18  neurological problem?
19     A  No.
20     Q  What did -- what did you do then to find
21  out what might be causing that quivering?
22     A  I -- I didn't do anything.  I don't know.
23  Can you clarify?
24     Q  I don't know how I can be any clearer.
25  My question is:  What did you do to determine what

Page 88

1  might be causing the quivering of the back legs?
2      A  Nothing.
3      Q  Did you think that was a concern?
4      A  No.
5      Q  You think they're just normal?  Do legs
6  quiver normally?
7      A  Sometimes when they get off trailers,
8  yes.
9      Q  Oh, okay.  Did Mr. Hatlee discuss with
10  you the quivering of the back legs?
11     A  He may have said something.
12     Q  What do you think he may have said?
13     A  I remember him saying -- I remember him
14  saying watch Echo walk.
15     Q  Did you ask him what's causing that?
16        MR. SCHIMBERG:  Object to form.
17     A  Not that I remember.
18        MR. SCHIMBERG:  Go ahead.
19     A  Not that I remember.
20     Q  (BY MR. TONDRE)  Do you -- do you remember
21  him telling you that there's a suspicion that it's a
22  neurological problem caused by some kind of toxic
23  condition?
24     A  No.
25     Q  You say, this is on page 89:  "The horses

Page 89

1  were moved to a private ranch in Park County and housed
2  in an enclosed barn.  The horses were provided with
3  veterinarian care by Timberline Equine Veterinary
4  Services while at this location."  What's -- what's the
5  basis for your statement?  How did you know that?
6      A  Because that's what I was told.
7      Q  Other than this visit to LeBeau's on the
8  19th, did you at any other time prior to the seizure of
9  the horses go to the LeBeau place?
10     A  Reference this case?
11     Q  Yes.
12     A  No.
13     Q  You say:  "Hatlee was concerned about one
14  of the young colts named 'Chance.'"  Did you look at
15  that colt?
16     A  Yes.
17     Q  And what did he tell you caused him
18  concern?
19     A  I don't recall.
20     Q  You say:  He told you that the colt had
21  been collapsing frequently and that he was unable to
22  rise on his own.
23        Do you remember that?
24     A  I do.
25     Q  Do you remember being concerned that the

23  (Pages 86 to 89)

# EXHIBIT 29

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

 COPY

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.

-------------------------------------------------------------

DEPOSITION OF CINDY HARDEY
June 20, 2014

-------------------------------------------------------------

Deposition location:
9998 Havekost Road
Conifer, Colorado  80433

APPEARANCES:

Brice A. Tondre, Esq.
BRICE A. TONDRE, P.C.
215 South Wadsworth Boulevard, #500
Lakewood, Colorado  80226

                                        For the Plaintiffs.

John Lebsack, Esq.
WHITE and STEELE, P.C.
Dominion Towers
600 17th Street, Suite 600N
Denver, Colorado  80202

                                        For the Defendant, Olds.

# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

247

**Page 10**

1      A   Major ones, three.
2      Q   What were they?
3      A   The Walker case. There was one before
4   that, but I can't remember its name. And then the
5   Swift and Hatlee.
6      Q   Did the Walker case involve horses?
7      A   No.
8      Q   Did the other case that you can't
9   remember the name involve horses?
10     A   No.
11     Q   Did you ever investigate a case involving
12  horses?
13     A   Yes.
14     Q   How many?
15     A   I don't know.
16     Q   Did any investigation you conducted with
17  respect to horses result in prosecution other than the
18  Hatlee and Swift matter?
19     A   Yes.
20     Q   How many?
21     A   "Prosecution" meaning like we went to
22  court and jury trial?
23     Q   Yeah.
24     A   No. It did not.
25     Q   How about pleas?

**Page 11**

1      A   No.
2      Q   Did you receive any sort of commission or
3   certification from the Department of Agriculture?
4      A   Yes.
5      Q   What did you receive?
6      A   My horse-handling certificate --
7      Q   All right.
8      A   -- that I obtained at the fairgrounds in
9   Jefferson County.
10     Q   That was it, eight hours?
11     A   Uh-huh.
12     Q   Does the term "code enforcement officer,"
13  mean anything to you?
14     A   Yes.
15     Q   What is that?
16     A   For Park County at the time that I worked
17  there, code enforcement meant that we went around and
18  checked MMJ houses.
19     Q   What's an MMJ?
20     A   Marijuana house to make sure that they
21  were legal and paying their taxes.
22     Q   Did that have anything to do with
23  animals?
24     A   No.
25     Q   What training did you receive with

**Page 12**

1   respect to obtaining search and seizure warrants?
2      A   My sergeant trained me throughout the
3   nine and a half years on how to --
4      Q   Your sergeant being whom?
5      A   Bobbi Priestly.
6      Q   And what -- do you remember any --
7   attending any formal courses of -- any formal courses
8   of instruction with respect to the requirements under
9   the fourth amendment to the United States Constitution?
10     A   No.
11     Q   Are you familiar with the case of Franks
12  versus Delaware?
13     A   No.
14     Q   You -- you familiar with any search and
15  seizure cases?
16     A   No.
17     Q   How many search warrants or seizure
18  warrants have you sought and obtained during your nine
19  years?
20     A   I don't know.
21     Q   More than two?
22     A   Yes.
23     Q   By what authority did you have -- were
24  you -- were you a commissioned peace officer?
25     A   No.

**Page 13**

1      Q   Were you familiar with the provision of
2   the criminal procedures guidelines?
3      A   No.
4      Q   Were you provided a Colorado peace
5   officer's handbook for use in connection with your
6   duties?
7      A   I had one available, yes.
8      Q   Did you review it carefully?
9      A   No.
10     Q   Were you aware that it's a violation of
11  law to omit material information from a search warrant
12  affidavit?
13         MR. SCHIMBERG: Object to form. Go
14  ahead.
15     A   I don't understand what you are asking.
16     Q   (BY MR. TONDRE) Let me see if I can make
17  it clear.
18         (Mr. Hatlee arrives.)
19     Q   (BY MR. TONDRE) Were you ever told as to
20  what the requirements were for an affidavit in support
21  of issuance of a seizure warrant?
22     A   Yes.
23     Q   And who told you that?
24     A   Sergeant Bobbi Priestly.
25     Q   Did Sergeant Bobbi Priestly instruct you

4  (Pages 10 to 13)

248

Page 14

1  that it is a violation of constitutional law to omit
2  material facts from an affidavit in support of the
3  search warrant?
4       A  No.
5       Q  Did Bobbi Priestly inform you that it was
6  a violation of constitutional law to make a false
7  statement in an affidavit in support of a seizure
8  warrant?
9       A  No.
10      MR. SCHIMBERG:  Object to form.
11      Q  (BY MR. TONDRE)  What did Bobbi Priestly
12  tell you about -- excuse me.
13      MR. HATLEE:  Gentlemen, excuse me, I have
14  to go to the morgue to take care of it.
15      MR. SCHIMBERG:  Blessings to your family.
16      MR. LEBSACK:  Yeah.
17      (Mr. Hatlee leaves.)
18      Q  (BY MR. TONDRE)  What instructions did
19  Bobbi Priestly give you with respect to the
20  requirements for an affidavit in support of a seizure
21  warrant?
22      MR. SCHIMBERG:  Object to form.
23      A  To be honest, it's been a couple years.
24  I don't remember exactly because she taught me seven
25  years ago how to do it.

Page 15

1       Q  (BY MR. TONDRE)  Did she use any written
2  materials in connection with her teaching of you?
3       A  She used her search and seizure warrant
4  as my guideline.  And I apologize again, that was
5  several years ago.
6       Q  I'm -- you say "she used her search and
7  seizure"?
8       A  Yeah.
9       Q  What do you mean?
10      A  As an example, she -- for when I had to
11  do mine a long time ago, she would pull up one of her
12  old ones and show me -- it showed me exactly how to do
13  it minus the narrative within the search and seizure
14  warrant.
15      Q  What do you mean "minus the narrative"?
16      A  Well, because the narrative changes with
17  every search and seizure warrant.
18      Q  But did she give you any guidance as to
19  what the requirements were under the law with respect
20  to an affidavit in support of a seizure warrant?
21      A  I'm sure she did.  But I can't quote or
22  remember what it was.
23      Q  Did Bobbi Priestly review the affidavit
24  that you submitted in support of a search and -- search
25  warrant and a seizure warrant in the Hatlee and Swift

Page 16

1  matter?
2       A  No.
3       Q  Did she know you were doing it?
4       A  Yes.
5       Q  In connection with the Hatlee and Swift
6  matter, how many times have you testified?
7       A  Three.
8       Q  Have you reviewed anything in preparation
9  for your deposition?
10      A  Yes.
11      Q  What have you reviewed?
12      A  My report.
13      Q  Have you reviewed your prior testimony?
14      A  I attempted to.  But it was a lot.
15      Q  It is a lot.
16      A  I just reviewed my report mostly, yes.
17      Q  Okay.
18      MR. SCHIMBERG:  I'm really glad I told
19  you to review it and you don't listen to your attorney.
20  That's okay.  No one does.
21      A  I'm sorry.
22      Q  (BY MR. TONDRE)  Let me ask you:  Since you
23  did review your report, did you find anything in that
24  report that you felt was incorrect?
25      A  No.

Page 17

1       MR. SCHIMBERG:  I'm teasing you.
2       Q  (BY MR. TONDRE)  How long have you known
3  Ron Swift?
4       A  Since grade school.  15, 20 -- 20 years
5  maybe.
6       Q  And how long have you known Randy Hatlee?
7       A  I met him the first time in 2012.
8       Q  When you went to --
9       A  Yeah.
10      Q  -- Echo Valley Ranch?
11      A  Yeah.
12      Q  In your experience as an animal -- well,
13  first of all, what were your -- let me make sure I
14  understand your duties.  What were your duties as an
15  animal control officer?
16      A  Catching lost animals, loose animals,
17  animals like dogs, cats.  Sometimes cattle would get
18  out on the highway, and we'd have to go to that
19  location and put them back into their fence.  Welfare
20  of the animals.  Cruelty cases, fires, we'd have to
21  evacuate subdivisions.  Report writing.
22      Q  Did anybody supervise you other than
23  Bobbi Priestly?
24      A  There's -- we had a supervisor above her.
25      Q  And who was that?

5 (Pages 14 to 17)

249

Page 38

1  regarding what to do with the horses?
2      A  Can you rephrase that question, please?
3      Q  Sure.  On February the 16th, 2012, did
4  you have input from Dr. Anderson, Dr. Britt, and
5  Mr. Dutcher regarding what should be done with the six
6  horses?
7      A  I did not.
8      Q  Who did?
9      A  Sergeant Priestly.
10      Q  And what was your understanding of the
11  input that came from Dr. Anderson?
12      A  My understanding was that if there was a
13  vet involved that I needed to leave the horses at that
14  time, sorry; and speak to the vet, get all my ducks in
15  a row, and go from there.
16      Q  What was your understanding of
17  Dr. Britt's input?
18      A  I don't recall getting input -- I don't
19  remember getting input from Dr. Britt on the 16th.
20      Q  Were you ever advised that Dr. Britt
21  offered to come to evaluate the horses if you asked him
22  to?
23      A  Yes.
24      Q  Did you ask him to come evaluate the
25  horses?

Page 39

1      A  No.
2      Q  Who is Dr. Britt?
3      A  In -- I've never met the gentleman, but I
4  believe he's a vet located south of Fairplay.
5      Q  How did you learn that he offered to come
6  evaluate the horses?
7      A  Sergeant Bobbi Priestly.
8      Q  And what was your understanding of the
9  input that came from Mr. Dutcher?
10      A  Dutcher.
11      Q  Dutcher?
12      A  He had the same input as Anderson.
13      Q  Now, do you know what information was
14  supplied to Dr. -- to Anderson, Dr. Britt, and
15  Mr. Dutcher?
16      A  I do not.
17      Q  Who is Mr. Dutcher?
18      A  He is the chief cruelty investigator.
19      Q  For the Department of Agriculture?
20      A  Yes, Bureau of Animal Protection League.
21      Q  Did you have any veterinarian go evaluate
22  the six horses?
23      A  At any time?
24      Q  At any time between February 16th and
25  February 22nd?

Page 40

1      A  No.
2      MR. TONDRE:  Mark that as the next
3  number.
4      (Whereupon, Deposition Exhibit
5  No. 67 was marked for identification by the
6  reporter.)
7      MR. TONDRE:  What is it?
8      THE COURT REPORTER:  67.
9      Q  (BY MR. TONDRE)  I've handed you what has
10  been marked as Exhibit 67.  What is that?
11      A  A state notice of warning.
12      Q  And did you prepare that?
13      A  I did.
14      Q  And was this prepared pursuant to a
15  consensus decision among you, Bobbi Priestly,
16  Dr. Anderson, Dr. Britt, and Mr. Dutcher?
17      A  No.
18      Q  They had nothing to do with it?
19      A  No.
20      Q  They didn't know you were doing it?
21      A  Sergeant Priestly knew I was doing it.
22      Q  Did Mr. Dutcher, Dr. Britt, and
23  Dr. Anderson concur that the horses should be left
24  where they were?
25      MR. SCHIMBERG:  Object to form.  Go

Page 41

1  ahead.
2      A  Dr. -- or Anderson and Dutcher are very
3  confident in our abilities to handle cruelty cases.  So
4  they stand by our decisions and did not concur or agree
5  or say anything towards my decision to write the state
6  notice of warning.
7      Q  (BY MR. TONDRE)  Okay.  Why did you
8  decide -- well, first of all, let me ask you another
9  question.  If -- if the horses were in danger in that
10  location, you had an obligation to impound them, didn't
11  you?
12      A  Yes.
13      Q  So it follows, does it not, that you did
14  not consider them to be endangered?
15      A  No.
16      MR. SCHIMBERG:  Object to form.
17      Q  (BY MR. TONDRE)  It doesn't follow?
18      A  I guess reword the question, please.
19      Q  I'm sorry?
20      A  Can you reword --
21      Q  Did you believe the horses were
22  endangered if left on the premises of Echo Valley?
23      A  No.
24      Q  Had you ever issued a notice of warning
25  before?

11 (Pages 38 to 41)

Page 46

1  should say no comment?
2      A  I do not remember.
3      Q  Do you remember going out to Echo Valley
4  Ranch at any time after February 16th?
5      A  Any time after February 16th?
6      Q  Yes.
7      A  Yes.
8      Q  When was the first time?
9      A  I don't know.
10     Q  Do you recall becoming aware that
11 Channel 7 News was nosing about?
12     A  Yes.
13     Q  How did you learn that?
14     A  I believe Sergeant Priestly or Ron Swift,
15 one of the two.
16     Q  What was your understanding of what kind
17 of threats were being received at the Bailey Food --
18 Feed Store?
19     A  Don't quote me on this.
20     MR. SCHIMBERG:  He's going to.
21     A  He's going to.  I know you're going to
22 write it down.
23     Q  (BY MR. TONDRE)  No.  The court reporter is
24 going to write it down.
25     A  I don't remember verbatim.  But my

Page 47

1  perception on that was they, you know, they were
2  accusing Ron of his hay being bad.  You know, I
3  actually, honestly don't remember what Ron Swift told
4  me about the threats being made at his house or at his
5  workplace.  It's been two years.  I don't remember.
6      Q  Well, I guess what I'm searching for is
7  it seems to me to be a major concern to cause you to
8  transport six horses to a hidden location.  What was
9  the nature of the threats that you were told about?
10     A  I am -- well, to be honest, I would not
11 have removed the horses if they weren't bad.  But I
12 don't remember the nature of the threats.
13     Q  When you say "if they weren't bad," you
14 are talking about the threats --
15     A  Yeah.
16     Q  -- being bad?
17     During the course of this case, did the
18 names of Gene and Shelley Ferraro come to your
19 attention?
20     A  Yes.
21     Q  And where did you learn about them?
22     A  They were concerned citizens.  I believe
23 Ferraro is the one that now owns Bear, Spencer.  She
24 was present, I believe, at the time that Bear was taken
25 to Dr. Olds' facility.

Page 48

1      Q  Now, were you informed by Dr. Horton or
2  Dr. Burton --
3      A  Horton.
4      Q  -- that Shelley Ferraro had threatened
5  her?
6      A  I don't remember.
7      Q  Well, do you remember Dr. Horton or
8  Dr. Burton telling you they had been threatened?
9      A  They had received phone calls, yes.
10     Q  Did they tell you what the nature of the
11 phone calls were?
12     A  I don't remember.
13     Q  In Park County, can you get away with
14 just going around and threatening people?
15     A  No.  Well, actually, I mean, I don't
16 know.
17     Q  Was -- was a single one of these people
18 prosecuted for threatening?
19     A  No.
20     Q  Is that a crime?
21     MR. SCHIMBERG:  Object to form.
22 Foundation.  Go ahead.
23     Q  (BY MR. TONDRE)  Is threatening a crime?
24     A  I don't know.
25     Q  Did you perceive it might be a crime?

Page 49

1      A  Yes.
2      Q  Did you hear any discussion -- how often
3  did you go to the sheriff's office?
4      A  Every day.
5      Q  Did you hear any discussion about
6  prosecuting these threatening vigilantes?
7      MR. LEBSACK:  Object to form.
8      MR. SCHIMBERG:  Object to form.  Go
9  ahead.
10     A  No.
11     Q  (BY MR. TONDRE)  Does Park County kind of
12 like those westerns your husband watches?
13     MR. SCHIMBERG:  Object to form, Brice.
14     MR. LEBSACK:  Object to form.
15     A  I don't have a comment on that.
16     Q  (BY MR. TONDRE)  All right.  Did you make
17 any visits to Echo Valley Ranch to check the horses
18 between February 16th and February 19th when they were
19 removed to the LeBeau place?
20     A  No.
21     Q  Did the condition of the horses change
22 between February 16th and February 19th?
23     A  No.
24     Q  Was it safe to transport them?
25     A  Safe to transport them?  Yeah.  Yes.  It

**Page 50**

1 was safe to transport them, although Chance was not
2 doing well at that time.
3 Q And what steps were taken to protect
4 Chance during the transfer?
5 A I did not transport them. Mr. Hatlee
6 transported them. I followed behind them. Mr. Swift
7 and Mr. Hatlee loaded them into their trailer. They
8 had full control of the transportation of their animals
9 and the loading of their animals. I just observed and
10 followed them to the secure location.
11 Q Did Mr. Hatlee ride in the trailer with
12 Chance?
13 A I don't remember.
14 Q On the issue of transport, was -- was
15 Bear fit for transport when Ashleigh Olds transported
16 him?
17 MR. LEBSACK: Object to form.
18 MR. SCHIMBERG: Join. Go ahead.
19 A My perception, no.
20 Q (BY MR. TONDRE) You did become aware,
21 didn't you, that the horse fell while being
22 transported?
23 A Yes.
24 Q And that Ashleigh Olds took no steps to
25 prevent him from falling?

**Page 51**

1 MR. LEBSACK: Object to the form.
2 A I have no idea.
3 Q (BY MR. TONDRE) Well, how would he fall if
4 she took steps to prevent it?
5 MR. LEBSACK: Object to form.
6 A I don't know. I was not present when she
7 transported.
8 Q (BY MR. TONDRE) Why did you believe that
9 he wasn't fit for transport?
10 MR. SCHIMBERG: Object to form.
11 MR. LEBSACK: Same.
12 A Can you reword that, please?
13 Q (BY MR. TONDRE) Sorry?
14 A Can you reword that?
15 Q Yeah. Why do you believe he wasn't fit
16 for transport?
17 MR. SCHIMBERG: Object to form.
18 MR. LEBSACK: Same.
19 MR. SCHIMBERG: Go ahead.
20 A I was not present when they were
21 attempting to get him to stand. I did hear from
22 Corporal Plutt that they had to take some steps to get
23 him to stand. He did not -- he looked malnourished to
24 me. He looked like he had been lying in a stall of
25 muck. When I saw him and took pictures of him, he was

**Page 52**

1 tied to -- or tethered to one of the fence posts.
2 I watched Dr. Olds and her assistant walk
3 him to the trailer. I did not see them load him into
4 the trailer. And when Dr. Olds got to her facility and
5 told me that it took an I.V. and several forms of
6 medication in that I.V. to get him to stand, that's why
7 I made my decision on I don't think he was fit for
8 travel.
9 Q (BY MR. TONDRE) Well, that's kind of
10 interesting. She wasn't -- here's a trained
11 veterinarian wasn't able to get a horse to stand up.
12 How did -- how did the folks at Echo Valley Ranch get
13 the horse to stand up?
14 A I don't know.
15 MR. LEBSACK: Objection.
16 A I wasn't present for that.
17 Q (BY MR. TONDRE) We did see photographs
18 yesterday during Mr. Hatlee's deposition of Bear
19 standing behind the truck eating. Do you have any
20 indication that that photograph isn't a true depiction
21 of what was occurring?
22 MR. LEBSACK: Object to form.
23 MR. SCHIMBERG: Object to form.
24 Characterization. Go ahead.
25 A Do I -- do I believe that picture does --

**Page 53**

1 is not real, is that what you are asking me?
2 Q (BY MR. TONDRE) Yep. That's a good
3 question.
4 A Well, if that's what you are asking me, I
5 believe that picture is real.
6 Q All right. Let's look at it rather than
7 argue about it. If I can figure out where it is. Got
8 it. Exhibit No. 56.
9 You say he was tied to a fencepost.
10 First of all, let me ask you if the first photograph in
11 Exhibit No. 56 is a picture of Bear?
12 A Yes.
13 Q And is he tied to a truck?
14 A Yes.
15 Q What is he doing?
16 A Looking at the camera.
17 Q Is there any feed available to him?
18 A If that's feed (motioning) then, yes.
19 Q The third picture in Exhibit No. --
20 MR. SCHIMBERG: 56.
21 Q (BY MR. TONDRE) 56, what is he doing? Is
22 that Bear again?
23 A Yes.
24 Q What is he doing?
25 A Eating.

**Page 66**

1 operation?

2     A  No.

3     Q  The horses you were raised with, the

4 three, what were they used for?

5     A  Roping, 4H, family use.

6     Q  Sort of pets?

7     A  Yep.

8     MR. SCHIMBERG:  I thought you were a

9 barrel racer all this time.

10     THE DEPONENT:  I tried.

11     MR. SCHIMBERG:  Did you?

12     THE DEPONENT:  I did.

13     Q  (BY MR. TONDRE) How was it?

14     A  It didn't pan out very well.

15     Q  Wasn't your cup of tea?

16     A  Nope.

17     Q  You prepared the seizure application,

18 correct?

19     A  Yes.

20     Q  And it was approved by Priestly, correct?

21     A  No.

22     Q  You also reviewed -- well, did you review

23 the application for the two warrants with anybody?

24     A  Yes.

25     Q  Who?

**Page 67**

1     A  Steve Sullivan.

2     Q  Did you testify in the motions hearing

3 held on December 3, 2012, that you reviewed the search

4 warrant with your supervisor, Officer Priestly?

5     A  Yes.

6     Q  Was that false?

7     A  I think the term review is false.

8     Q  It's your word.

9     A  Huh?

10     Q  It's your word.

11     A  Yeah. She was advised that I was doing

12 the search warrants. But the actual review of the

13 search warrants before I could give it to a judge was

14 reviewed by Steve Sullivan. And I can't exactly

15 remember if she looked them over or not. But I do know

16 Steve Sullivan approved them to go to the judge.

17     So if my testimony says yes, then yes,

18 she did. But I cannot remember. Because she pretty

19 much oversees everything I do.

20     Q  Did Steve Sullivan make any suggestions

21 to you?

22     A  If he did, it was probably grammar.

23 Usually, I am sent back to the sheriff's office to fix

24 something and I don't remember what, if any.

25     Q  Now, at the time that you reviewed the

**Page 68**

1 search warrant with Mr. Sullivan, did he have a file on

2 the matter?

3     A  Did he have a what?

4     Q  A file, an investigatory file?

5     A  Yes.

6     Q  How much time would you estimate he spent

7 reviewing the matter before talking with you about the

8 search warrant?

9     A  I have no idea.

10     Q  How far in advance did you schedule a

11 meeting with him?

12     A  I called him and asked him if he was

13 available.

14     Q  And when was that?

15     A  After I was done writing the search

16 warrant.

17     Q  And how much time did he spend with you?

18     A  He -- enough time to read both search

19 warrants. And he's an attorney, so I guess it depends

20 on how fast he can read.

21     Q  You're assuming an attorney can read?

22     A  I hope so.

23     Q  Do you have an estimate of how much time

24 he spent with you?

25     A  No.

**Page 69**

1     Q  Did he ask you any questions?

2     A  No.

3     Q  Did he have a file that he was reviewing

4 in connection with the materials you presented him?

5     A  No.

6     Q  What did you present him, the affidavit?

7     A  Both. The search warrant and the

8 affidavit.

9     Q  Anything else?

10     A  No.

11     Q  Did the -- were the concerned -- did it

12 come to your attention the concerned citizens were

13 critical of Mr. Sullivan's handling of the case?

14     A  I don't think so, no.

15     Q  Did there come a time when Mr. Sullivan

16 was taken off the case and replaced by Mr. LeDoux?

17     A  I don't know.

18     MR. SCHIMBERG:  Object to form,

19 foundation.

20     Q  (BY MR. TONDRE) What involvement did you

21 have with the case after obtaining the search and

22 seizure warrants?

23     A  What involvement?

24     Q  Yes, ma'am.

25     A  I responded with Sergeant Priestly and

18 (Pages 66 to 69)

Page 74

1  asked to stand up?
2          MR. SCHIMBERG: Object to form.
3      Q (BY MR. TONDRE) What purpose was that
4  supposed to serve?
5          MR. SCHIMBERG: Object to form.
6      A  I don't know.
7      Q (BY MR. TONDRE) You knew at the time you
8  attended that fundraiser on April the 7th, 2012, that
9  there was a hearing scheduled to question the validity
10 of your obtaining seizure warrants; didn't you?
11     A  No.
12     Q  You were scheduled to testify on April
13 the 10th, 2012, weren't you?
14     A  If that's what it says, yes.  I don't
15 remember the dates of all the things I was asked to go
16 to.
17     Q  What do you think -- do you think you
18 wouldn't --
19         MR. LEBSACK: It's passed.
20         MR. TONDRE: It's gone.
21         MR. GORE: Okay.
22         MR. TONDRE: We can tolerate a little
23 noise.
24     Q (BY MR. TONDRE) You think you would have
25 known that that hearing was going to take place three

Page 75

1  days later when you stood up in front of the crowd?
2      A  Well, if I was asked to go to a hearing,
3  yes.
4      Q  Well, do you remember testifying at the
5  hearing where the judge ordered return of the horses?
6      A  That I do remember.
7      Q  Do you remember the judge finding that
8  your affidavit was not made in good faith?
9      A  Yes.
10     Q  Were you disciplined --
11         MR. SCHIMBERG: I'm going to object to
12 form -- to that, I'm sorry, thank you. Go ahead.
13     Q (BY MR. TONDRE) Were you disciplined by
14 the sheriff's office for preparing an affidavit that
15 was deemed to be not in good faith?
16         MR. SCHIMBERG: Object to form.
17     A  No.
18         MR. SCHIMBERG: Go ahead.
19     Q (BY MR. TONDRE) Were you criticized by
20 anyone?
21     A  Not that I'm aware of, no.
22     Q  What's your understanding of the term
23 probable cause?
24         MR. SCHIMBERG: I'll object to form. Go
25 ahead.

Page 76

1      A  My understanding of probable cause?
2      Q (BY MR. TONDRE) Right.
3      A  I have to have probable cause to go onto
4  Mr. Swift's property and look at his animals.
5      Q  What's the legal definition of probable
6  cause?
7      A  I do not know.
8      Q  Didn't you disclose in the warrant
9  affidavit that you had entered into a 30-day warning
10 agreement with Swift and Hatlee?
11     A  I don't know.
12     Q  Why didn't you state in the warrant
13 affidavit that the horses were in protective custody?
14     A  I don't know.  I think it's because I was
15 just putting a Reader's Digest version of when, where,
16 and why instead of a whole narrative.
17     Q  Why didn't you put in the warrant
18 affidavit the fact that the move of the horses to
19 protective custody was driven by threats?
20         MR. SCHIMBERG: Object to form.
21     A  Because it wasn't my report, it was just
22 a brief synopsis.
23     Q (BY MR. TONDRE) Why didn't you put in your
24 warrant affidavit that Dr. Britt wanted testing done
25 before any action was taken?

Page 77

1      A  Again, it was a brief synopsis, not my
2  report.
3      Q  Why didn't you put in your affidavit that
4  the horses were under the care of a veterinarian?
5      A  Same as stated before.
6      Q  Why didn't you put in your affidavit that
7  the condition of the horses didn't change from
8  February 16th to February 23rd?
9      A  Because it was a brief synopsis not my
10 report.
11     Q  Why didn't you -- it is correct, is it
12 not, that you did not put in your report that the
13 horses were in danger, I'm sorry, in your affidavit?
14     A  Endangered?
15     Q  Yes.
16     A  Or in danger?
17     Q  Did you put in your report that they were
18 in danger?
19     A  In danger.  I did not use those words.
20     Q  Why didn't you put in your report that
21 the blood tests were not indicative of malnutrition?
22         MR. LEBSACK: Object to form.
23         MR. SCHIMBERG: Join.
24     A  Why did -- in my report?
25     Q (BY MR. TONDRE) On your affidavit?

254

# EXHIBIT 30

Thank you,
Thom LeDoux
District Attorney 11th JD

---

**From:** Gene Ferraro [mailto:eferraro@businesscontrols.com]
**Sent:** Tuesday, April 24, 2012 5:13 PM
**To:** Steve Sullivan; tcourt5096@aol.com; Barbara Wright
**Subject:** Bailey Horses
**Importance:** High

Mr. Sullivan,

We were the people that stopped by your office today and delivered a letter to you. I ask that you look at this slide show of these poor horses under the care of Ron Swift. The community wants you to do the right thing and set aside your differences with the Sheriff's department and defend these poor defenseless horses. If you can look at these pictures and think this is ok, then there is something seriously wrong with you. We intend to go public with all this information and more. We intend to contact the media and officials much higher up on the food chain. We have only just begun. My husband, Eugene Ferraro will be in contact with you as soon as he returns from business travel and will set an appointment for a meeting with you. Hopefully you'll be available the next time we stop by. Please watch the slide show below!!

Respectfully

Shelley Ferraro

http://pix.kg/p/767597054214%3A1023164567/scl
Eugene F. Ferraro, CPP, CFE, PCI, SPHR
Chairman/Founder

Business Controls, Inc.
5995 Greenwood Plaza Boulevard, Suite 110
Greenwood Village, Colorado 80111
Office: 303.526.7600 | Toll-free: 800.650.7005
Check out our new website: www.BusinessControls.com
Follow us: Facebook | Twitter | LinkedIn | YouTube

*"Insight in an Instant"*

CONFIDENTIALITY WARNING: This e-mail is for the confidential use of the intended recipients only, and may be protected by the attorney work-product privilege. Any unauthorized review, access, copying, dissemination, distribution, or use of the content of this message/information is strictly prohibited by Federal Law. Attempts to intercept this message or distribute it without authorization are in violation of 18 U.S.C. 2511(1) of the Electronic Communications Privacy Act (ECPA). Fines, imprisonment, and/or civil damages may be imposed for violations. Licensed in California, Florida and Illinois. Insured where necessary. PI 21470

1126

4

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1126



## Bobbi Jo Priestly

| | |
|---|---|
| **From:** | Shelley Ferraro [shelley@shelleysdesigns.com] |
| **Sent:** | Monday, June 04, 2012 11:25 PM |
| **To:** | 'Gia McNerney'; Monte Gore; aolds@aspencreeklac.com; 'Ashleigh Olds, DVM'; Harmonyhorsewrks@aol.com; 'joan mcneill'; 'Joe and Ingrid'; 'Landrock, Takeshi'; 'Thom LeDoux'; TCourt5096@aol.com; 'MARY HELEN IRVINE'; 'Mary J. Sosnowski'; 'Dagna Van Der Jagt, Esq.'; Bobbi Jo Priestly; Cindy Hardey |
| **Cc:** | Bobbi Gore; 'mclimans, debra' |

**Subject:** RE: Ron Swift Trial and Bailey Horse Update

Gia, I think you should post your concerns that Mr. LeDoux won't answer your numerous e-mails on pinecam, Facebook, 285bound and Evergreen bound. Do you think that could possibly get his attention or someone in his office to reply.

It is more than obvious that the DA and his office don't return calls or e-mails, even though Mr. LeDoux won't admit to that. Mr. LeDoux is handing the case over on a silver platter to the defense attorney. The fact that LeDoux coached Cindy Hardey in what to say on the stand was more than despicable.

I also believe that Officer Hardy is in the bag for Swift and has been for years and she is an absolute conflict of interest. I also believe that Mr. LeDoux is sadly mistaken when he states at different debates tin Park County that the horse community thinks he's doing a good job. Mr. LeDoux is obviously very confused with reality.

**From:** Gia McNerney [mailto:spamrestricted@yahoo.com]
**Sent:** Monday, June 04, 2012 8:26 PM
**To:** Monte Gore; Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; Landrock, Takeshi; Thom LeDoux; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Dagna Van Der Jagt, Esq.; Bobbi Jo Priestly
**Cc:** Bobbi Gore; mclimans, debra
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Dear Mr. LeDoux,

Is there someone else that can answer the questions and concerns I have below? I'm still very confused as to why you handled the case the way you did and concerned about this going forward.

This is the second email I've sent and would appreciate a response specific to my questions and concerns below.

Gia McNerney

**From:** Gia McNerney <spamrestricted@yahoo.com>
**To:** Monte Gore <MGore@parkco.us>; Shelley Ferraro <shelley@shelleysdesigns.com>; "aolds@aspencreeklac.com" <aolds@aspencreeklac.com>; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; "Harmonyhorsewrks@aol.com" <Harmonyhorsewrks@aol.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; "TCourt5096@aol.com" <TCourt5096@aol.com>; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly

1103

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1103

257

<BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Thursday, May 17, 2012 1:11 PM
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

I wanted to comment on Monte's #2 as I completely agree on this matter.

Dear Mr. LeDoux,

I'm also not certain why you did this, I actually had to walk out of the court room toward the end of her testimony. This really appeared to have hurt the prosecution as her testimony was not questioned or made evident.

Mr. LeDoux, why did you not question Officer Hardey on two matters?

1) Why did she do scheduled visits for a criminal case, why weren't they random/unannounced visits?
2) How was she was able to give explicit details on each day she monitored without a notepad in front of her, I find it hard to believe that she could remember such detail within the nature of her job, especially almost a month ago - that is very questionable. She also mentioned she used a weight tape, but stated no numbers and again no notes, does this mean she did not record these weights.

For this critical case, could we please have pictures taken of each of the 6 horses and the place they are being kept (especially the ground they are standing on & hooves) during each visit by the Officer? I think weights should still be taken, but these numbers should be recorded going forward and brought out in court along with the pictures. I think this would be acceptable evidence as to status of the horses.

Thanks,
Gia McNerney

**From:** Monte Gore <MGore@parkco.us>
**To:** Shelley Ferraro <shelley@shelleysdesigns.com>; aolds@aspencreeklac.com; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; Harmonyhorsewrks@aol.com; Gia McNerney <spamrestricted@yahoo.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; TCourt5096@aol.com; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Wednesday, May 16, 2012 10:30 AM
**Subject:** RE: Ron Swift Trial and Bailey Horse Update

A couple of things that need to be addressed in your summation:

1. Judge Green had an excellent explanation as to why the horses were returned to the owners at the previous bond hearing, there was no compelling evidence presented on behalf of the people.

2. Officer Hardey answered specific questions she was asked by the DA. My question would be if he knew what her testimony was going to be, and it would be detrimental to the case, why would you present it?

Monte

1104

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1104

258

## Bobbi Jo Priestly

**From:** Gia McNerney [spamrestricted@yahoo.com]

**Sent:** Monday, June 04, 2012 8:26 PM

**To:** Monte Gore; Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; Landrock, Takeshi; Thom LeDoux; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Dagna Van Der Jagt, Esq.; Bobbi Jo Priestly

**Cc:** Bobbi Gore; mclimans, debra

**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Dear Mr. LeDoux,

Is there someone else that can answer the questions and concerns I have below? I'm still very confused as to why you handled the case the way you did and concerned about this going forward.

This is the second email I've sent and would appreciate a response specific to my questions and concerns below.

Gia McNerney

**From:** Gia McNerney <spamrestricted@yahoo.com>
**To:** Monte Gore <MGore@parkco.us>; Shelley Ferraro <shelley@shelleysdesigns.com>; "aolds@aspencreeklac.com" <aolds@aspencreeklac.com>; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; "Harmonyhorsewrks@aol.com" <Harmonyhorsewrks@aol.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; "TCourt5096@aol.com" <TCourt5096@aol.com>; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Thursday, May 17, 2012 1:11 PM
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

I wanted to comment on Monte's #2 as I completely agree on this matter.

Dear Mr. LeDoux,

I'm also not certain why you did this, I actually had to walk out of the court room toward the end of her testimony. This really appeared to have hurt the prosecution as her testimony was not questioned or made evident.

Mr. LeDoux, why did you not question Officer Hardey on two matters?

1) Why did she do scheduled visits for a criminal case, why weren't they random/unannounced visits?
2) How was she was able to give explicit details on each day she monitored without a notepad in front of her, I find it hard to believe that she could remember such detail within the nature of her job, especially almost a month ago - that is very questionable. She also mentioned she used a weight tape, but stated no numbers and again no notes, does this mean she did not record these weights.

1090

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1090

259

## Bobbi Jo Priestly

| | |
|---|---|
| **From:** | Thom LeDoux [tledoux@da11thjd.org] |
| **Sent:** | Monday, June 11, 2012 3:51 PM |
| **To:** | Gia McNerney |
| **Cc:** | Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Bobbi Jo Priestly |

**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Ms. McNerney,

I put Ofc. Hardy on the stand to explain to the public what the status of the horses was. Again, it wasn't to hurt or help our case in any way. Given the public's interest in the case I felt it was important to get the information out to the public regardless of what that information was. I would think that it would put the public at ease knowing that the horses are doing better now. It certainly makes me feel better. And as I explained below, if anything that arguably helps the case.

I warned you about the motion to dismiss because I didn't want it to upset anyone when it came out without any forewarning. I am not saying that the case will be dismissed or that I think that it should be. I was just trying to warn you about how things would progress. We will fight the motion to dismiss the case and I THINK that we will prevail, but I am not in a position to offer any guarantees.

The criminal justice system is what it is. I didn't invent it and I am not in charge of it. You may not like it, there are parts that I don't like, but that is the system that we are dealing with. If you have complaints about the system please keep those separate from your opinion of the district attorney's office or the way we are working within that system.

Thom LeDoux


Sent from my iPad

On Jun 6, 2012, at 12:05 PM, "Gia McNerney" <spamrestricted@yahoo.com> wrote:

Mr DeLoux,

Thanks for finally responding, but I still have no idea why you put Officer Hardy on the stand. In your response to Undersherriff Gore - copy/pasted below...

\*\*\*

2. The testimony that Officer Hardey gave at the last hearing was the truth. It doesn't matter whether or not that testimony is "detrimental to the case" or good for the case. We have an obligation to present the truth to the Court. So it is what it is. The hearing was simply a pre-trial conference. As you heard the Judge say, it was highly irregular to hear any testimony at all at that stage of case. We are not trying to "win" the case at this point. That comes much later when we are in front of a jury. And even then it isn't about "winning" or "losing" the case, it is about presenting the facts to the jury and then arguing to them that those facts constitute the commission of a crime.

1078

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1078

260

\*\*\*

So, again, why did you put Hardy on the stand? As you quoted above it was highly irrefular to hear any testimony, so why?

You only hurt the case as it never discussed the cruelty the animals endured for so long prior to the seizure. In the transcript of the April 10, 2012 case, Officer Hardy's testimony was completely opposite to the testimony that you had her give at this last court date. Was this only to get it on public record --- that Hardy has now changed her tune? There is something very much not right about this and therefore, since I still have not received justification as to why you allowed her testimony for the defense, I need to reach out elsewhere for help.

Another reason why I will be looking elsewhere for support in this case, is because you are stating they may actually get to dismiss this case, based again on unjustifiable reasons. This is America which has freedom of speech and freedom to make public injustice being done to animals without a voice. If this court is stating that factual pictures and documentary on the deployable conditions of the horses should have been hidden from the public, I think this will become a much bigger issue.

Gia

**From:** Thom LeDoux <tledoux@da11thjd.org>
**To:** Gia McNerney <spamrestricted@yahoo.com>; Shelley Ferraro <shelley@shelleysdesigns.com>; aolds@aspencreeklac.com; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; Harmonyhorsewrks@aol.com; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; TCourt5096@aol.com; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Sent:** Monday, June 4, 2012 9:59 PM
**Subject:** RE: Ron Swift Trial and Bailey Horse Update

Ms. McNerney, et al.,

I will do my best to answer the various questions from the e-mails and to provide some additional follow up information:

1. I don't know why Officer Hardey did scheduled visits as opposed to random/unannounced visits. I didn't ask about this because it was obvious that she had not done random/unannounced visits and I didn't think that the reason(s) behind that approach were relevant. I don't know how her answer to the "why" question would have had any meaningful impact on the case or the issues before the court, so I didn't ask it.

2. Officer Hardey and I had reviewed her testimony immediately before the hearing. Therefore, she was aware of the questions that I was going to ask and she had given me the answers just prior to the hearing. I assume that this is how she was able to give the details without referring to her notes. I would also guess that under the circumstances she was acutely focused on this case and her testimony. I would point out that witnesses are generally not allowed by evidentiary rule to read their testimony from notes in any event.

3. It is up to the Park County Sheriff's Office to determine how to appropriately monitor the horses in question. Given the nature of the testimony (at a court hearing, on a non-trial issue, etc.) photographic evidence and/or measurements is not required. I have no reason to think that the Court has anything but the utmost respect for the credibility of the

1079

Park County Sheriff's Animal Control Officers. Therefore, the testimony of the Park County Sheriff's Office Animal Control Officers is sufficient under these circumstances.

As to the Undersheriff's concerns:

1. As you have seen from the transcript, DDA Sullivan did present the testimony of the lead PCSO Animal Control officer about the state of the horses and the conditions at the ranch. Judge Green explained that he did not find that evidence to be compelling as to the issue of whether or not the horses would continue to be abused if returned to the care of the defendants. Judge Green further explained that the evidence presented regarding the measures taken by the defendants to bring the horses in from the pasture and the effort to obtain veterinary care for the horses outweighed in his mind the inference that could have been drawn from the prior treatment of the horses, i.e. that they would continue to be abused in the future by the defendants. Whether you agree with that decision or not (as you know I do not, and I asked the judge to reconsider that decision), that was the explanation the Judge gave for his decision. DDA Sullivan presented the evidence, that the Judge did not find it "compelling" is within the prerogative of the judge.

2. The testimony that Officer Hardey gave at the last hearing was the truth. It doesn't matter whether or not that testimony is "detrimental to the case" or good for the case. We have an obligation to present the truth to the Court. So it is what it is. The hearing was simply a pre-trial conference. As you heard the Judge say, it was highly irregular to hear any testimony at all at that stage of case. We are not trying to "win" the case at this point. That comes much later when we are in front of a jury. And even then it isn't about "winning" or "losing" the case, it is about presenting the facts to the jury and then arguing to them that those facts constitute the commission of a crime.

Also, the fact that the horses are now doing really well in the care of the defendants is certainly NOT "detrimental" to the case. In fact, it is very much the opposite. If the defendants are capable of keeping the horses in good condition, then the fact that they were not doing so just a few weeks before means that they were negligent in their behaviors at that time, which we have to prove to convict them of the animal cruelty crimes we have charged them with.

Now to update you on the current status of the horses. The last time I spoke with the new lead investigator in the case, Bobbi Priestly she had just been out to the ranch with a veterinarian to monitor the horses. I believe that was also part of an "unscheduled" or somewhat "random" checkup on the horses, i.e. not on a previously scheduled Wednesday. I am happy to report that the body scores reported by Officer Priestly and the Vet were actually higher/better than those provided by Officer Hardey at the hearing, i.e. in the 4 ish range. Although I am told that there may be some lingering effects of the abuse, it appears that the horses are recovering to the extent possible and are being well cared for at this time.

To bring you up to date on the process of the case, as I mentioned in Court the other day we have apparently hit a "line in the sand" in the plea negotiations regarding allowing the defendants to keep the horses as part of a plea agreement, i.e. they apparently won't agree to a plea agreement that calls for the surrender of the horses and we are not willing to offer a plea agreement that doesn't call for the surrender of the horses.

The defendant has filed a motion for sanctions for violation of the discovery rules in connection with the posting of the investigative photographs on the internet. The defendant is asking the court to consider dismissing the case altogether, or other sanctions as the court feels are appropriate. We will argue against a dismissal of the case and any other unnecessary sanctions. Following the motions hearing on the 18th, it is my hope that the Court will set the matter for a jury trial. Given the court's docket that will probably be

1080

about 5 months from now.

I know that this process is frustrating. I work with victims in the system on a daily basis so I have some idea what you are going through. Please understand that we are doing our best under the rules and the system to protect the horses and to bring to justice those that would neglect animals. As I told you, I am not a "horse person," in that I don't know much about horses or their care. But I am a "dog person," in that I have two dogs that think they are humans and are treated as such or better in my house, so hopefully that counts for something. Also, I have been through this process before in murders, sex assaults, drug cases, etc., so please have some confidence that we can get this thing through the system and before a jury with the strongest case possible.

If you have any other questions or comments, please let me know.

Thank you,

Thom LeDoux
District Attorney 11th JD
719-371-3032
tledoux@da11thjd.org

---

**From:** Gia McNerney [mailto:spamrestricted@yahoo.com]
**Sent:** Monday, June 04, 2012 8:26 PM
**To:** Monte Gore; Shelley Ferraro; aolds@aspencreeklac.com; Ashleigh Olds, DVM; Harmonyhorsewrks@aol.com; joan mcneill; Joe and Ingrid; Landrock, Takeshi; Thom LeDoux; TCourt5096@aol.com; MARY HELEN IRVINE; Mary J. Sosnowski; Dagna Van Der Jagt, Esq.; Bobbi Jo Priestly
**Cc:** Bobbi Gore; mclimans, debra
**Subject:** Re: Ron Swift Trial and Bailey Horse Update

Dear Mr. LeDoux,

Is there someone else that can answer the questions and concerns I have below? I'm still very confused as to why you handled the case the way you did and concerned about this going forward.

This is the second email I've sent and would appreciate a response specific to my questions and concerns below.

Gia McNerney

**From:** Gia McNerney <spamrestricted@yahoo.com>
**To:** Monte Gore <MGore@parkco.us>; Shelley Ferraro <shelley@shelleysdesigns.com>; "aolds@aspencreeklac.com" <aolds@aspencreeklac.com>; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; "Harmonyhorsewrks@aol.com" <Harmonyhorsewrks@aol.com> <Harmonyhorsewrks@aol.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; "TCourt5096@aol.com" <TCourt5096@aol.com>; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Thursday, May 17, 2012 1:11 PM

|08|

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1081

263

**Subject:** Re: Ron Swift Trial and Bailey Horse Update

I wanted to comment on Monte's #2 as I completely agree on this matter.

Dear Mr. LeDoux,
I'm also not certain why you did this, I actually had to walk out of the court room toward the end of her testimony. This really appeared to have hurt the prosecution as her testimony was not questioned or made evident.

Mr. LeDoux, why did you not question Officer Hardey on two matters?

1) Why did she do scheduled visits for a criminal case, why weren't they random/unannounced visits?
2) How was she was able to give explicit details on each day she monitored without a notepad in front of her, I find it hard to believe that she could remember such detail within the nature of her job, especially almost a month ago - that is very questionable. She also mentioned she used a weight tape, but stated no numbers and again no notes, does this mean she did not record these weights.

For this critical case, could we please have pictures taken of each of the 6 horses and the place they are being kept (especially the ground they are standing on & hooves) during each visit by the Officer? I think weights should still be taken, but these numbers should be recorded going forward and brought out in court along with the pictures. I think this would be acceptable evidence as to status of the horses.

Thanks,
Gia McNerney

**From:** Monte Gore <MGore@parkco.us>
**To:** Shelley Ferraro <shelley@shelleysdesigns.com>; aolds@aspencreeklac.com; "Ashleigh Olds, DVM" <brdiedrich@aspencreeklac.com>; Harmonyhorsewrks@aol.com; Gia McNerney <spamrestricted@yahoo.com>; joan mcneill <joanmcneill@msn.com>; Joe and Ingrid <joeingrid@live.com>; "Landrock, Takeshi" <Tak.Landrock@KMGH.com>; Thom LeDoux <tledoux@da11thjd.org>; TCourt5096@aol.com; MARY HELEN IRVINE <mhi99@msn.com>; Mary J. Sosnowski <mjs@sosnowskibooks.com>; "Dagna Van Der Jagt, Esq." <dagna@vdjlaw.com>; Bobbi Jo Priestly <BPriestly@parkco.us>
**Cc:** Bobbi Gore <BGore@parkco.us>; "mclimans, debra" <debra.mclimans@judicial.state.co.us>
**Sent:** Wednesday, May 16, 2012 10:30 AM
**Subject:** RE: Ron Swift Trial and Bailey Horse Update

A couple of things that need to be addressed in your summation:

1. Judge Green had an excellent explanation as to why the horses were returned to the owners at the previous bond hearing, there was no compelling evidence presented on behalf of the people.

2. Officer Hardey answered specific questions she was asked by the DA. My question would be if he knew what her testimony was going to be, and it would be detrimental to the case, why would you present it?

1082

Monte

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1082

264

**From:** Shelley Ferraro [mailto:shelley@shelleysdesigns.com]
**Sent:** Tuesday, May 15, 2012 8:24 PM
**To:** aolds@aspencreeklac.com ; 'Ashleigh Olds, DVM'; Harmonyhorsewrks@aol.com; ' Gia
McNerney '; 'joan mcneill'; 'Joe and Ingrid'; Monte Gore; 'Landrock, Takeshi'; 'Thom LeDoux';
TCourt5096@aol.com; 'MARY HELEN IRVINE'; 'Mary J. Sosnowski'; ' Dagna Van Der Jagt, Esq. ';
Bobbi Jo Priestly
**Subject:** Ron Swift Trial and Bailey Horse Update

Today at 1 p.m. at the Park County Court House in Fairplay , Colorado a pre-trial
conference/hearing involving defendants Mr. Ron Swift and Mr. Randall Hatlee was
held. Each of the Defendants is facing several counts of animal cruelty stemming
from an inspection of the Echo Valley Ranch in Park County on which both men
board horses.

After almost one hour of the Court handling a number of other cases, the hearing
got off to a brisk start with Park County District Attorney, Thom LeDoux taking
charge replacing Assistant D.A. Steve Sullivan who had previously been handling
the case. Though he was present, Mr. Sullivan said nothing during the entire event.
Prior to Mr. LeDoux presenting the County's case, Judge Brian Green summarized
the prior bond hearing which occurred on April 10, 2012 and his decision to return
the six horses which were seized from the Echo Valley Ranch on February 23,
2012. During that hearing Judge Green found that the horses had been seized
improperly, for the County had failed to show adequate probable cause justifying
the seizure. The horses were indeed returned (at County expense) to Mr. Swift and
Mr. Hatlee the following day.

Judge Green's review of the prior ruling concluded with him ordering $191.52 be
returned to each Defendant and the balance of their $720 bond be retained by the
County as payment for the horses board while under its care. The Judge also
admonished those in attendance that he'd tolerate no out-bursts or disorder during
the present hearing.

Upon the Judge's request Mr. LeDoux revealed that Timberline Equine Veterinary
Services' (Timberline Vets) records had been subpoenaed and were to be provided
by Friday, May 18, 2012. Seizing the opportunity, Mr. LeDoux requested the Judge
reconsider his decision to return the horses to Echo Valley Ranch. The Judge
declined and instructed Mr. LeDoux to put his request in writing and submit it as a
"Motion to Reconsider." Mr. LeDoux indicated that he would do so immediately.

Mr. LeDoux then requested he be allowed to present a witness (Animal Control
Officer, Cindy Hardy). The Judge noted that the request was highly unusual and
with the consent of the Defendant's counsel (Mr. Darrel Campbell), Mr. LeDoux
called Officer Hardy to the witness stand. The examination of Ms. Hardy did not go
well for the prosecution. Officer Hardy testified that since the return of the horses
she has conducted scheduled animal welfare visits at Echo Valley Ranch every
Wednesday at 10:00 a.m. To no one's surprise, she revealed that on every visit,
like clockwork, when she arrived at the ranch, each of the six returned horses had
ample food and fresh water. In fact on two occasions, she found the Defendants
grooming the horses upon her arrival. The only person in the courtroom to fail to
see her naïveté, was Officer Hardy. Even the Judge appeared to have some

1083

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1083

265

difficulty not commenting on her unvarnished gullibility. She also testified that the horses appeared to be doing very well and were gaining weight steadily. To complete the absurdity, Mr. LeDoux concluded by asking if Officer Hardy thought the horses should be re-seized. Happily, Officer Hardy said the horses should remain in the Defendant's custody. Her testimony was so helpful to the Defense that when offered to cross-examine her, Mr. Campbell declined and asked no further questions. The Defendant's luck then turned.

Mr. LeDoux revealed that the County intended to amend its criminal complaint and add an additional charge of animal cruelty to the charges of each Defendant. The additional charge was for the alleged abuse of Little Big Man (Spencer). Given a technical defect in the amended complaint containing the additional charges, the Defendants declined to enter a plea and were given until June 18, 2012 to enter it. After more legal wrangling and back and forth between the parties and the Judge, the hearing concluded.

While we were disappointed with Officer Hardy's testimony and some of her opinions, we do however appreciate Mr. LeDoux's effort and representation of the horses, for they have no voice. Thank you Mr. LeDoux.

Gene and Shelley Ferraro

1084

6/12/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1084

266

**Bobbi Jo Priestly**

| | |
|---|---|
| **From:** | Thom LeDoux [tledoux@da11thjd.org] |
| **Sent:** | Tuesday, June 12, 2012 5:26 PM |
| **To:** | Harmonyhorsewrks@aol.com; Bobbi Jo Priestly; Betty L. Royse |
| **Cc:** | eferraro@businesscontrols.com; spamrestricted@yahoo.com; tcourt5096@aol.com; aolds@aspencreeklac.com |

**Subject:** RE: Check out Animal Legal Defense Fund : Contact Us

Ms. Wright,

Obviously I want to be able to address all of your concerns. However, you have raised a lot of issues and I want to be able to spend enough time on the case itself as well as on my other current responsibilities. Therefore, some of these responses may seem brief.

1. Thank you for the ALDF information. If I feel like we run into a legal issue that we need some help with we will be sure to use that resource. The current issue relates to the specific Colorado Rules of Criminal Procedure. So given that it is a procedural legal issue and specific to Colorado I am not sure how much the ALDF would be able to help.

2. As to the list of questions. Most of these I do not know the answer to and they are better addressed to the Park County Sheriff's Office, probably Animal Control Officer Priestly. Officer Priestly and I have a meeting scheduled for tomorrow afternoon to prepare for the hearing on the next Monday. So we might have some time to look over your questions and answer some of them.

On question #5 – which is best directed to the DA's office, I think that I have already tried to address this question at length. But again, it wasn't a "defendant-friendly" witness, it was the lead investigator from the PCSO assigned to the case at the time. I don't know anything about the relationship between Ofc. Hardy and the defendants. That is an issue for the Sheriff. As far as I am concerned, if the PCSO has assigned her to the case as the lead investigator she is a "suitable prosecution witness" in that capacity, absent specific compelling evidence to the contrary.

#8c = At this point I don't know how the Routt County information is relevant to our case. If it becomes apparent that it is necessary to present our case, then yes, we will call those witnesses and present those records.

#9 = Because a vet has opined that Maggie's death was the result of a heart condition. We do not have a vet opinion that the heart condition was the direct result of any neglect. If we had such an expert opinion we could revisit the issue. There has to be a direct causation link between the harm and the neglect. If we try to expand that causation link too far it will make the overall case much weaker. I would guess that many if not most horses that die, die of something that COULD have been prevented under different care. On a lesser scale and merely as an example, I doubt there will be a prosecution of the owners of "I'll have another" for neglect even though the injury to that horse could have been prevented had the horse not been raced under such severe conditions. To go back to Maggie, if an investigation can prove that the defendants specifically withheld vet care that they knew was necessary and a vet concludes that the lack of vet care directly caused the death then we will consider charging the death. As of now that is not the state of the evidence or the expert opinion. Again, we can make the case as a whole weaker by being too aggressive with our theories of the case.

#10. We will call the necessary witnesses to present the case. A final determination will be made closer to the jury trial. I would think that it would most likely be: Hardey, Priestly, Horton, Burton, Toll and

1074

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1074

267

Olds.

And now some questions for you:

1. It would be helpful if I could compare the photos that were provided by PCSO with the photos that were obtained from other sources. Can you provide this information to me?

2. It appears to my investigator that the slide show and some of the blogs have been taken down. Is this the case? If so, when were they put up and when were they taken down?

Thank you again for your concern and dedication to the well being of these horses.

Thom LeDoux

**From:** Harmonyhorsewrks@aol.com [mailto:Harmonyhorsewrks@aol.com]
**Sent:** Monday, June 11, 2012 2:02 PM
**To:** Thom LeDoux; bpriestly@parkco.us
**Cc:** eferraro@businesscontrols.com; mgore@parkco.us; spamrestricted@yahoo.com; tcourt5096@aol.com; aolds@aspencreeklac.com
**Subject:** Check out Animal Legal Defense Fund : Contact Us

Mr. LeDoux and Ms. Priestly,

First, thank you both for taking this equine neglect case to heart and attempting to push it through to trial, despite increasing obstacles. Below is the contact link for the ALDF.

Click here: Animal Legal Defense Fund : Contact Us

From the ALDF Legal Advocates' Manual:

"In addition to its staff attorneys, ALDF has developed a network of nearly 400 volunteer lawyers all around the country, anxious to be called upon to do research work for briefs, motions and memos, litigate cases as special prosecutors, or provide any other legal help needed. Just contact us with the specifics of what you are looking for, and we'll see if we can find a match of skills in your region an dput you in touch with a volunteer or staffer.

Telephone Advice and Ideas from Prosecutors

Animal cases do involve new and sometimes difficult issues from other cases, and sometimes just being able to talk about it with someone who has done it before can provide the insight and confidence needed to go forward. Over the years, ALDF has been fortunate to be able to provide assistance to prosecutors willing to reach out later and help others like them through our Prosecutors Network. Just contact us and we will ensure we put you in touch with one who is currently available to talk and share ideas. *We also have a former prosecutor on our Anti-Cruelty Division staff for those last-minute, short-deadline inquiries.*"

Second, we respectfully submit the attached list of questions concerning this case in hopes that some or all of them will be answered prior to trial (assuming this case reaches trial), and hope they can be useful to you in some way. (See attached "List of Questions for Park County DA").

Finally, in view of the possbility (or already a fact?) of Mr. Campbell filing a motion to dismiss the case for reasons of improper dissemination on the internet of "investigative material," it might be prudent to consult with free expert advice on how to counter this. My fear is being blindsided by the judge once more, as in the case of the remand of the horses to Swift and Hatlee. From my personal viewpoint, *not legally researched by any means*, I have the following comments:

1. All photos of the Routt County Colt, referred to as Little Big Man, were posted on the internet before he was added to the charges against Swift and Hatlee and so they could not be considered investigative to this

6/13/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1075

1075

268

case. They were not provided by Park County Animal Control, but by others such as myself, Mrs. Ferraro, Dr. Olds and Routt County Animal Control. Surely there is an argument against those photos being considered investigative.

2. The photos provided to us were (1) intake photos of the horses being admitted to Harmony Equine Center, and (2) April update photos of their 30 day progress at the same place. These photos, to my knowledge, were not taken by Park County Animal Control but by Harmony Equine Center staff, and are not considered investigative since they were taken at the request of concerned citizens raising money for what then appeared to be "adoptable" horses, once rehabilitated. This was before Judge Greene's remand of the horses to Swift. I am sure PCSO AC has taken its own evidentiary photos to be used in prosecuting the case not released to anyone. (If not, we are in serious trouble here). The rehabilitation center would, as a matter of course, take photos of horses being admitted to their care in any event, whether or not a criminal case was involved.

3. The internet is immediate, world-wide, unstoppable and uncontrollable. Social media has made this even more so. I cannot recall any animal neglect and abuse cases where pretrial publicity was not made by newspapers, radio, television, and the internet plus social media. In the Flying AH equine neglect case in Fairplay a few years back, I received photos of the dead animals on the property, the badly disfigured foal ravaged by a dog and images of the other starving horses long before a case was brought against the woman who ran the "rescue." We often receive photos of starving horses here involved in neglect cases long before the matter goes to trial. This is out relief organizations appeal for help - by using the available photos from whatever source to help the jeopardized animals by dissemination of images.

The Bailey horses have no voice. They have no day in court. Now they have no pictures?

Mr. LeDoux, I am not a legal person just like you are not a horse person, so we can at least console ourselves with our mutual ignorance on certain subjects. Maybe two or more heads are better than either of ours in this case, so let me know if I we help in any way to get a dialog going with the ALDF. I feel this case has the potential to be a landmark case and its failure to reach a jury trial is preventable by everyone doing their utmost to help the prosecution. What a discredited message this failed case would send to the mountain horse-owning public and animal lovers and advocates, indicating that starvation and neglect of horses are impervious to the "long arm of the law" because it has been amputated.

Respectfully submitted,

Barbara Wright
Harmony HorseWorks
*Horse Sanctuary & Therapy Center*
*501(c)(3) Nonprofit Corp.*
13639 Elsie Road
Conifer CO 80433
(303) 816-0766
harmonyhorsewrks@aol.com
www.harmonyhorseworks.com
www.barbarawrightart.com
**MAKE ROOM FOR A HORSE IN YOUR HEART!**

Harmony HorseWorks is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY used to heal spooky, anxious and nervous horses and Equestrian Performance Coaching (EPC) using PEAT energy psychology for the fearful rider. We are a Colorado non-profit corporation in good standing and a tax exempt 501[c][3] corporation (DLN 17053233026024) since February 23, 2004. FEIN 20-0763702.

1076

6/13/2012

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1076

269

# EXHIBIT 31

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

     Plaintiffs,

          vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

     Defendants.



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ASHLEIGH OLDS, DVM, DABVP-Equine
March 25, 2014

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition location:
600 17th Street,
Suite 600N
Denver, Colorado 80202

ALSO PRESENT:  Randall Hatlee
Ronald Swift

## AVERY WOODS REPORTING

455 Sherman Street, Suite 250 · Denver, Colorado 80203
303-825-6119 · 1-800-962-3345 · FAX 303-893-8305
www.averywoods.net

271

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 30

1       MS. BRONSON: Objection.
2       MR. LEBSACK: Same area?
3       MR. TONDRE: Same area.
4       A. I don't know that I could make a direct
5   comparison.
6       Q. (BY MR. TONDRE) Well, do you recall
7   calling the Bailey Feed Store and asking why
8   Mr. Swift is not recommending you?
9       A. I remember a phone call to the feed
10  store. And the context of the phone call was because
11  Mr. Swift had an unpaid bill to me at my office, and
12  we had sent multiple collection notices to him
13  without receiving payment. And I thought it would be
14  more effective to call him personally and ask if
15  there was any particular reason why he hadn't paid
16  the bill. I asked if he had been satisfied with the
17  services that were provided because I had noticed
18  that he was promoting a different veterinarian on
19  Pinecam, and he answered that everything was fine; he
20  was perfectly happy with my services, and that he
21  would send me a check, which he did not do.
22      Q. Do you remember my question?
23      A. You can rephrase it.
24      MR. LEBSACK: Could you restate it.
25      Q. (BY MR. TONDRE) Did you, during that

Page 31

1   conversation, ask why he was not recommending you?
2       A. No, I did not specifically ask that.
3       Q. What was your involvement with Shelly
4   and Eugene Ferraro prior to you coming into contact
5   with Spencer?
6       A. I have been the veterinarian for the
7   Ferraros for several years.
8       Q. How many horses do they have?
9       A. Currently, they have four horses, one
10  of which is Spencer.
11      Q. What is your impression of their
12  ability to make decisions regarding the care and
13  treatment of horses?
14      MR. LEBSACK: Same objection.
15      A. I think that Shelly takes very good
16  care of her horses. I think that she calls in a
17  timely fashion when she has concerns about her
18  animals.
19      Q. (BY MR. TONDRE) Tell me the regimen you
20  perform in making a diagnosis with respect to a horse
21  you are evaluating.
22      MR. LEBSACK: Object to the form.
23      A. In general, you would obtain as much
24  history as possible on the animal, perform a physical
25  exam of the animal, decide if additional diagnostic

Page 32

1   testing is indicated, and in most cases, you can
2   achieve a diagnosis. In some cases you may have
3   several different possibilities that you might
4   consider, in which case you would pursue additional
5   diagnostic testing or procedures to try to determine
6   the cause. And in some cases, you can't do that, and
7   you instigate treatment and monitor response to
8   treatment.
9       Q. That's basically a SOAP-note approach,
10  isn't it?
11      A. Yeah. In most -- I mean, you can say
12  that in most cases.
13      Q. Is the SOAP-note approach taught in
14  veterinary school?
15      A. Yes.
16      Q. And integral to the SOAP-note approach
17  is the differential diagnosis, correct?
18      A. Well, SOAP is subjective, objective,
19  assessment, plan. So you take all of your subjective
20  and objective information, put it together, and come
21  up with an assessment. So if you want to say
22  differentials could be under the assessment, in some
23  cases assessment could be patient is doing better
24  today; patient is doing worse today; patient is
25  responding well to treatment. And the P part of the

Page 33

1   SOAP is plan, so what is your plan moving forward.
2       Q. Assessment is the diagnosis, correct?
3       A. Assessment is your assessment of the
4   patient.
5       Q. Yeah.
6       A. It's not always a diagnosis. It could
7   be an ongoing -- your interpretation of the
8   subjective and objective findings.
9       Q. But if there are a number of potential
10  causes, that falls under assessment differential
11  diagnosis, correct?
12      A. Yes.
13      Q. And in order to reach an assessment,
14  you first have to go through the subjective or
15  fact-finding from a third-party source since the
16  horse can't talk to you, then you make an objective
17  finding, and from that, you attempt to make a
18  diagnosis, correct?
19      A. I feel like you are trying to put words
20  into my mouth, and that's not really a question. If
21  you want to ask me how I go about it, I would be
22  happy to answer that.
23      Q. Well, what I'm searching for is the
24  standard of care.
25      A. Standard of care is you take all of the

9 (Pages 30 to 33)

272

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that the foregoing Appellants' Appendix-Volume I as submitted in Digital Form is an exact copy of the written document filed with the Clerk, that all required privacy redactions have been made and that it has been scanned for viruses by McAfee's most recent virus screening program updated May 16, 2016.

/s/ Brice A. Tondre_____

## CERTIFICATE OF SERVICE

I hereby certify that on this the 16th day of May, 2016, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

John Lebsack

jlebsack@wsteele.com

/s/ Brice A. Tondre_____