UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

Case No. 16-1065

RANDALL J. HATLEE and RONALD L. SWIFT

Plaintiffs-Appellants,

vs.

ASHLEIGH OLDS,

Defendant-Appellee.

On Appeal From the United States District Court

For the District of Colorado

The Honorable Raymond P. Moore, United States District Judge

D.C. No. 13-cv-02469-RM-MJW

APPELLANTS' APPENDIX

VOLUME II-PAGES 273-503

Brice A. Tondre

215 S. Wadsworth #500
Lakewood, CO 80226

303-296-3300

TABLE OF CONTENTS

Civil Docker for Case No. 1:13-CV-02469-RM-MJW.............................1-23

Plaintiffs' First Amended Complaint and Jury Demand.......................24-36

Final Pretrial Order................................................................37-70

Defendant Olds' Motion for Summary Judgment...............................71-90

Exhibit N.............................................................................91-94

Plaintiffs' Memorandum in Opposition to Defendant Olds' Motion for

   Summary Judgment...........................................................95-272

     Exhibit 1.......................................................................106-110

     Exhibit 2.......................................................................111-117

     Exhibit 3.......................................................................118-119

     Exhibit 4.......................................................................120-123

     Exhibit 5.......................................................................124-126

     Exhibit 6.......................................................................127-128

     Exhibit 7.......................................................................129-130

     Exhibit 8.......................................................................131-132

     Exhibit 9.......................................................................133-134

     Exhibit 10......................................................................135-138

     Exhibit 11......................................................................139-140

     Exhibit 12......................................................................141-142

     Exhibit 13......................................................................143-150

     Exhibit 14......................................................................151-155

Exhibit 15.................................................................156-158

Exhibit 16.................................................................159-160

Exhibit 17.................................................................161-162

Exhibit 18.................................................................163-166

Exhibit 19.................................................................167-169

Exhibit 20.................................................................170-174

Exhibit 21.................................................................175-176

Exhibit 22.................................................................177-182

Exhibit 23.................................................................183-188

Exhibit 24.................................................................189-201

Exhibit 25.................................................................202-210

Exhibit 26.................................................................211-223

Exhibit 27.................................................................224-236

Exhibit 28.................................................................237-245

Exhibit 29.................................................................246-254

Exhibit 30.................................................................255-269

Exhibit 31.................................................................270-272

Plaintiffs' Memorandum in Opposition to Motion for Partial Summary

Judgment Regarding Damages.................................................273-288

Exhibit 32.................................................................289-290

Exhibit 33.................................................................291-312

Exhibit 34.................................................................313-315

Exhibit 35.................................................................316-324

Exhibit 36...................................................................................325-326

Supplemental Memorandum in Opposition to Documents 63,64,65and 66..327-328

Exhibit 37...................................................................................329-333

Exhibit 38...................................................................................334-337

Exhibit 39...................................................................................338-344

Exhibit 40...................................................................................345-353

Exhibit 36 (signed)......................................................................354-357

Defendant Olds' Reply Brief in Support of Motion for Summary

Judgment.....................................................................................358-373

Defendant Olds' Separate Statement of Undisputed Material Facts in

Support of Motion for Summary Judgment.............................374-417

Motion to Supplement the Record With Respect to Summary Judgment

Motions Number 61,64,65and 66..........................................418-421

Exhibit 42...................................................................................422-423

Exhibit 43...................................................................................424-432

Exhibit 44...................................................................................433-447

Order..........................................................................................448-495

Stipulation of Dismissal of All Claims Against Park County Defendants....496-497

Order..........................................................................................498-499

Final Judgment...........................................................................500-501

Notice of Appeal.........................................................................502-503

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO

## MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DAMAGES [#66[

This case seeks redress for a deliberate attack mounted against Plaintiffs designed to cause seizure of their horses and prosecution of them. It was orchestrated by Ashley Olds, a veterinarian, whose unfounded and unprofessional drive by diagnosis caused an email blast which resulted in the hereinafter described seizure and prosecution. The prosecution resulted in an acquittal. The Park County Sheriff's Office succumbed to the pressure and joined with Dr. Olds' outcryers and e-mailers. The result was a violation of the United States Constitution.

As of 2012 Randy Hatlee at age 52 and Ron Swift at age 70 had established an idyllic existence and an excellent reputation as horsemen. They were caretakers of Echo Valley Ranch near Bailey, Colorado. The ranch is owned by a family in South Carolina.

The ranch is 1600 acres, has two houses, a barn and a group of pens adjacent to the barn.

1

273

Swift lives in one of the houses. The owners use the other house when they visit.

Hatlee and Swift pursued a commercial horse operation on the ranch. They housed, trained and cared for their own horses, boarded horses for others, taught people to ride, trained horses for others, gave advice about horses to many who inquired.

In early 2012, Mr. Hatlee was also engaged in the chaff hay business. Though it was in its infancy, early results were promising. At that time Mr. Swift was part owner of a feed store.

All of the foregoing was severely affected by the events which began on February 16, 2012. Demand for their services and products disappeared.

Defendants argue that Plaintiffs' economic losses are minimal. In the words of Shakespeare, spoken through Iago, "Good name in man and woman, dear my lord, is the immediate jewel of their souls. Who steals my purse steals trash; 'tis something, nothing; 'Twas mine, 'tis his, and has been slave to thousands; But he who filches from my good name robs me of that which not enriches him, and makes me poor in deed."

In February 2012, Mr. Hatlee was boarding a horse named Bear for his ex-wife at Echo Valley Ranch. This was done in order to accommodate a Routt County court order. In order to check on the horse, Dawn Smith, a Routt County Deputy, visited the ranch on February 13, 2012.

Upon her visit on February 13, 2012, Deputy Smith noted that Bear and seven other horses were thin and that Bear and Maggie were down. Deputy Smith decided to seize Bear and notified Park County animal control of the other 7 skinny horses. Those seven horses were Maggie, Lena, Midnight, Chance, Fiona, River and Echo.

Bear and Maggie were housed in the barn. The other six were housed in pens

2

274

immediately adjacent to the barn. While in the pens the six horses were being re-fed in accordance with AAEP guidelines. The re-feeding began for Midnight in November, 2011, for Echo,Fiona and Bear in late December, 2011, and for Chance, Lena and River in early January, 2012

Bear was supposed to be periodically evaluated by a veterinarian. However, due to Routt County's failure to pay the veterinarian, the evaluations ceased in late 2011.

Deputy Smith and Deputy Cindy Hardey of Park County Animal Control notified Messrs. Hatlee and Swift that they were coming to the ranch on February 16, 2012, for Deputy Smith to pick up Bear pursuant to a court order and for Deputy Hardey to conduct a wellness check on the seven skinny horses. Deputy Hardey did not have a warrant.

Deputy Smith contacted Barbara Wright of Harmony Horse Works in Conifer, CO, for assistance in picking up Bear. Ms. Wright arranged for her veterinarian, Ashleigh Olds, to accompany Deputy Smith and transport Bear to Olds' clinic, Aspen Creek Veterinary Hospital.

When they arrived at the ranch Dr. Olds and Deputy Smith were shown Bear who was recumbent in the barn. Without being requested to do so, Dr. Olds accompanied Deputy Hardey on her wellness check of the other seven horses. This was without the consent of Hatlee and Swift and without the request of Deputy Hardey.

Without obtaining a history with respect to the weight loss of the horses and without examination and laboratory testing, Dr. Olds demanded that Maggie be euthanized and that the other six horses be seized by Deputy Hardey. Dr. Olds stated without scientific analysis or basis that the cause of the horses condition was starvation. [There is testimony that she demanded that the entire herd be seized.] Deputy Hardey communicated this demand to her supervisor, Sgt.

3

275

Bobbi Priestly. Sgt. Priestly instructed Deputy Hardey to tell Dr. Olds to take Bear and leave, which she did. Captain Bonnelycke told them to get an independent veterinarian to evaluate the seven horses. He did not consider Dr. Olds to be independent, and with good cause since she seemed to have a personal stake.

Three veterinarians, Drs. Horton, Burton and Questen have testified that it is unreasonable for a veterinarian to reach a diagnosis without a history, a differential diagnosis and testing to determine the cause by reasoning to the best inference. Support for this approach is found in *Bitler v. A.O. Smith Corp.*, 391 F. 3d 1114 (10th Cir. 2004)

Drs. Horton and Burton stated in a Pinecam posting;

> …Contrary to several posts, these horses were not diagnosed with any disease, neurologic or otherwise, to the exclusion of malnutrition. There were simply peculiarities that remained unexplained by starvation alone, and if there was another condition contributing to their weight loss, it certainly should be addressed and not dismissed or overlooked. In fact, it would constitute malpractice not to investigate potential factors, It should be noted that these possibilities were being explored while the horses were already being re-fed according to AAEP guidelines.

Among the possibilities was toxic plant ingestion. The treatment by Hatlee and Swift was exactly correct for toxemia. The treatment is food, water and time. By this time Mr. Hatlee had gotten Bear to rise from his recumbent position and tied him to a truck where he was eating grain. Dr. Olds and Deputy Smith led Bear to Dr. Olds trailer which was 100 yards away. The trailer did not have adequate padding to protect Bear if he fell or a sling to prevent him from falling. There is testimony that it was cruel to transport Bear in that method. Shortly after leaving the ranch Bear fell. When he arrived at Dr. Olds clinic he could not get up and had to be lifted from the trailer. Barbara Wright photographed and videoed the unloading and used them to advocate seizure of the other horses and prosecution of Messrs. Hatlee and Swift.

4

276

After Dr. Olds left, Sgt. Priestly conferred with Kate Anderson, D.V.M., a Colorado Department of Agriculture Veterinarian, Scott Dutcher, chief investigator with the bureau of Animal Protection, Dr. Britt of Rocky Top Veterinary Services and Deputy Hardey, who described the condition of the horses and the care which was being provided to them. They all agreed that the appropriate thing to do was issue a notice of warning and leave the seven horses in the care of Messrs. Hatlee and Swift, giving them thirty days to demonstrate that the horses were not being mistreated. Deputy Hardey did not believe that leaving the horses with Messrs. Hatlee and Swift would endanger them and, based upon unanimous agreement, issued the warning. Deputy Hardey noted in her report that the horses all had food and water. This caused a doubt with respect to Dr. Olds hasty conclusion that they had been starved.

Failure to seize the horses and charge Messrs. Hatlee and Swift with animal cruelty infuriated Dr. Olds. Shortly after she arrived at her clinic and unloaded Bear, Dr. Olds e-mailed Deputy Hardey and complained to Barbara Wright and Shelly Ferraro that Park County had refused to seize horses that had been starved by Messrs. Hatlee and Swift. Thus began the pressure on Park County to seize the horses and bring criminal charges against Messrs. Hatlee and Swift. Significantly, in her email Dr. Olds stated that the horses had no food and water which is a bald false lie and contrary to the report of Deputy Hardey.

In a February 18, 2012, e-mail to Monika, Barbara Wright states: "We will wait and see what happens after the e-mail blast goes out." On February 19, 2012, Barbara Wright acknowledges receipt of a report on Little Man (Bear) from Dr. Olds Clinic and reports that the Ferraros "are helping with lobbying Officialdom to move on this travesty." The e-mail states that the problems of the horses were caused by starvation and not anything else.

5

277

On February 19, 2012, Undersheriff Gore called Deputy Priestly at home and expressed concern regarding calls and e-mails threatening harm to Messrs. Hatlee and Swift and their horses. Gore suggested that the horses be moved to an undisclosed location for their safety. Hatlee and Swift agreed and moved them to Kirsten LeBeau's ranch where they were placed indoors.

An agreement to the mutual benefit of both Hatlee and Swift and the Sheriff's office was signed. The benefit to Hatlee and Swift was continued possession which would allow them to show that the horses were sick, not starved. The benefit to the Sheriff's Office was that it would discharge its responsibility to protect Hatlee, Swift and their horses.

Significantly, while the horses were at the LeBeau ranch, they did not have much of an appetite which indicates that they were sick, not malnourished. Drs. Horton and Burton, the Plaintiff's veterinarians, had toxicity in their differential diagnosis. They expressed to Hardey, Priestly, Gore and Olds that this was a complex case and that they should not jump to conclusions. This is the very advice given in a publication by Dr. Olds clinic.

At no time during the period February 16 through 23, did Hardey consider the horses to be endangered by remaining with the owners.

Hardey claims she decided to seek a warrant to seize the horses because she was told by Horton that "she believes that Swift waited too long to rectify the problem and could have avoided the situation." Discovery has shown that Hardey did not investigate how soon after the problem was noticed that the horses were brought out of the pasture and placed in pens where they could be closely watched and fed.

The facts show that what Hatlee and Swift were doing was the appropriate therapy.

6

278

In truth, the seizure was sought to appease the protesters. This came after Hardey, Priestly and

Wegener had a conference during which they had a telephone conference with Dr. Horton.

The move did not eliminate the threats. The outrage continued. The complainers would

accept nothing short of seizure and prosecution. This is exemplified by Shelly Ferraro's e-mail of

February 21, 2012, to Priestly which states:

> Why don't you people do yourself a favor instead of continuing to shoot yourself in the
> foot. The community wants to know that the precious horses are getting intense medical
> care in a medical hospital. They want to know the horses are getting iv's and are being
> rehydrated and given electrolytes, water and food. Why do you continue to refuse to help
> the community in knowing that these little horses are safe and are truly in competent care.
> It's pretty simple, get over your power trip and settle this horrific situation down, or your
> just going to continue to get jammed by the public, this isn't going away anytime
> soon..........if you don't know already this is all over the country and people are
> watching and ready to take more action.

Priestly forwarded this e-mail to Gore marked "Importance: Hi". Gore immediately contacted

Dr. Olds to inquire if she would temporarily take over care of the horses. She responded that she

would. After receiving confirmation that Dr. Olds had space available to provide temporary care

Hardey commenced preparing her affidavit for a warrant.

In order to obtain a seizure warrant Deputy Hardey prepared an affidavit which omitted

the following:

> (1) that there was an agreement to leave the horses in the care and custody of the
> Plaintiffs for 30 days in order to allow them to demonstrate that the hoses were not
> neglected but were suffering from an illness;
>
> (2) that the Sheriff's Office had the consent of Hatlee and Swift to inspect the horses and
> premises every two days;
>
> (3) that two veterinarians and a Department of Agriculture Official agreed that the
> agreement was reasonable;
>
> (4) that the horses were well treated at the facility where they were housed;

7

279

(5) that he horses were not in danger where they were housed;

(6) that the horses were under the care of Dr. Horton, a veterinarian;

(7) that Dr. Horton told Deputy Hardey that the case was not clear cut and much diagnostic work needed to be done to reach a scientific conclusion. Dr. Horton's differential diagnosis included 10 potential causes.

(8) that animal control personnel were checking the horses every two days;

(9) that C.R.S. 18-9-202(b)1.8 provides that an animal can be impounded if it will be endangered if it remains with the owner; and

(10) that the true intent of the requested warrant was to silence the demands of Dr. Olds and others.

(11) That she had not investigated when the problems with the horses was noticed and when they were brought in and placed in pens.

Hardey denies knowing that false statements and material omissions were unconstitutional. She was either plainly incompetent or a knowing violator of the law. Therefore, she is clearly not entitled to qualified immunity. *Malley v Briggs*, 475 U.S. 335, 345 (1986). She was either untrained or a knowing prevaricator. The fact that she was not disciplined or criticized supports the inference that she was not violating her training but was in fact untrained. Wagener says it was Priestly' duty to train her and Hardey denies being trained by Priestly. Failure to train regarding these two fundamental principles would be expected to result in Fourth Amendment violations.

Deputy Hardey also knew that C.R.S. §18-9-202(b)1.8 authorized seizure of an animal only if it is endangered if it remains with the owner and knew that the horses were not endangered if left with Messrs. Hatlee and Swift. Deputy Hardey failed to include these facts in her affidavit in support of issuance of a warrant to seize the horses.

8

280

Hence, Deputy Hardey violated both the Fourth Amendment to the United States

Constitution and the Colorado statute.

As noted by the trial judge, had the omitted matters been disclosed, the warrant would not

have been issued.

The warrant was issued and the horses were seized on February 23, 2012 and Hatlee and

Swift were charged with animal cruelty.

In her victory lap on February 24, 2012, the day after Park County seized the horses, Dr.

Olds, in an e-mail to Monika proudly crows:

> Thank you for all your help. Barb at Harmony really got the publicity going and everyone
> else helped keep the fire on. I don't know if this would have been taken seriously without
> all the public pressure. Hopefully the end result will be that justice is served and the
> horses are homed where they will be FED!

The new age vigilanteism by e-mail worked. It was sparked by Dr. Olds report that there was no

doubt that the horses had been starved. The publicity caused Gore to take over supervision of the

case from Bonnelycke, thus silencing his insistence on an independent opinion.

On April 7, 2012, a fundraiser was held for the seized horses. Deputy Hardey, Sgt.

Priestly, Captain Bonnelycke and Undersheriff Gore attended the fundraiser, with Sheriff

Wagener's approval. Sheriff Wegener admits that they were trying to appease the group that was

complaining about the way the Sheriff's office was handling the case. They went so far as to give

investigative materials to Wright who disseminated them nationwide.

On April 10, 2012, the trial judge, after an evidentiary hearing, ordered the horses

returned to their owners because he concluded that the animal control officers did not have

probable cause to believe that the horses were endangered by remaining with Hatlee and Swift.

This sparked another public outcry.

9

281

To this point the case had been handled by DDA Steve Sullivan. Because of complaints about Sullivan, the prosecution was taken over by the DA, LeDoux. The DA was up for re-election in 2012 and was openly opposed by the Sheriff's office which complained that the DA was not prosecuting cases which the Sheriff's office worked up. Sheriff Wegener wanted to get rid of LeDoux because he was making decisions that some cases brought to him were not prosecuted because he believed non-prosecution was in the interests of justice. Wegener was crying for LeDoux's political head because, in the interests of justice, he chose not to prosecute certain cases. Wegener wanted to make the decision.

At about the same time Deputy Hardey was replaced as lead investigator by Sgt. Priestly because there was a public outcry that Deputy Hardey was friendly to Mr. Swift.

Early on Captain Bonnelycke was replaced as supervisor of the investigation by Undersheriff Gore when he insisted that before the case went forward it be evaluated by an independent veterinarian. He did not consider Dr. Olds to be independent. A veterinarian was never retained.

On April 11, 2012, the day after the judge ordered the horses returned, Dr. Olds sent Undersheriff Gore an e-mail in which she expressed her dissatisfaction with the way the case was being handled by the district attorney. She states, "I am as appalled as everyone else as to how this can happen. I am very concerned that the case is not being presented to its maximum effectiveness based on the results some of the comments in this last email from Bobbi Priestly...." Gore responds: "I will get with Sgt. Priestly and Lt. Bonnelycke and our county attorney to analyze a strategy for going forward. We are here with you."

Thus the pressure to continue the prosecution began . It was an election year, the

10

282

Sheriff's Office was opposing re-election of the DA for not prosecuting cases, the public was questioning the DA's competence, so the DA had no alternative but to continue the prosecution. He could not politically afford to dismiss this high profile case and agreed to continue the prosecution though he knew he could not win it.

On December 3, 2012, after an evidentiary hearing, the trial judge held that the seizure warrant was obtained by Hardey's omissions which were made in bad faith. As a result, all evidence gathered during the seizure period was suppressed.

Captain Bonnelycke was overseer of animal control and professional standards. Sheriff Wegener testified that Captain Bonnelyck, as overseer of professional standards, had a conference with Deputy Hardey to discuss her conduct regarding the omissions of material facts from her affidavit. Captain Bonnelycke testified that Sheriff Wegener's testimony is false.

Deputy Hardey's unconstitutional conduct not only went unpunished but also went uninvestigated. Discovery has demonstrated that Deputy Hardey did not know the definition of probable cause, did not know that false statements in and material omissions from an affidavit in application for a warrant were a violation of the Fourth Amendment and that her method in preparing affidavits was the Reader's Digest approach.

Deputy Hardey was supposed to be trained by Sgt. Priestly but was not.

After a 5 day trial Hatlee and Swift were acquitted. Immediately following the acquittal LeDoux stated to Mr. Hatlee and his attorney, "This is the last time I will be pressured into prosecuting a case I knew I could not win."

## STANDARD FOR DAMAGES

Compensatory damages are mandatory where plaintiff succeeds in establishing liability

11

283

and shows compensable injury. *Smith v. Wade*, 461 U.S. 30, 52 (1983).

The availability of damages for constitutional rights violations is considered a question of federal law and is governed by federal standards, informed by common law. *Carey v. Piphus*, 435 U.S. 247, 262 (1978). *Piphus* admonishes courts to examine the common law and apply the most analogous common law rule of damages.

Compensatory damages may take the form of actual damages, presumed damages and punitive damages.

In a case where a constitutional law has been violated but it is impossible to show any actual damages and where the court determines, based on common law-principles, that presumed damages are unavailable, plaintiffs may still seek punitive damages, where a need to punish and deter can be shown, as well as nominal damages for violation of the right itself. *Carlson v. Green*, 446 U.S. 14, 22 n.9 (1980). The standard for the award of punitive damages is conduct which exhibits "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade, supra*, at 56. Prosecuting someone for political purposes certainly qualifies.

Here the most analogous torts are wrongful arrest and malicious prosecution. The jury instructions for these two common law torts are substantially identical. See, CJI-Civ. 17.9 and 21.5 (2014). The damages included are physical and mental pain and suffering, fear, anxiety, humiliation, embarrassment, indignity, public disgrace, loss of reputation, costs of defense and losses to his business.

Punitive damages in a §1983 case may be awarded even if actual injury is not shown and presumed damages are unavailable. Punitive damages may be awarded where defendant's conduct exhibits "reckless or callous indifference to the federally protected rights of others."

284

*Carlson v. Green*, 446 U.S. 14, 22 n.9 (1980); *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Defendants argue that Plaintiffs' claimed damages are not recoverable because the amount is uncertain and speculative. As stated in *Cooper v. Hollis*, 600 P.2d 109 (Colo. App. 1984) "The rule which precludes recovery of uncertain and speculative damages applies only to situations where the fact of damage is uncertain, not where the amount of damage is uncertain.

Lost future profits may be based on estimates by the plaintiff. The estimate may be based upon the judgment of the plaintiff and formulated on a reasonable basis. *Malloy v. Monahan*, 73 F.3d 1012, 1016-17 (10th Cir. 1996).

There can be no doubt that the Plaintiffs did, in fact, sustain damages. From the sampling of e-mails (Exhibit 33) one would certainly expect that Plaintiffs would suffer financial losses, emotional suffering, damage to their reputations and embarrassment. Exhibit 33 is but a small sampling of the product of the e-mail blast.

## PROBABLE CAUSE TO PROSECUTE

The Park County Defendants assert a statement made by the trial judge as preclusive on the issue of probable cause to prosecute. During his ruling holding that the seizure warrant was without probable cause, the judge stated that there was probable cause to take the animal cruelty charges to trial. The statement is not preclusive.

In order for a judicial determination in one case to be preclusive in another case, (1) the issues must be identical; (2) the merits of the prior action have been fully adjudicated; (3) the party against whom the doctrine is invoked was a party or in privity with a party in the prior action; and, (4) in the prior action, the party against whom the doctrine is invoked has had a full and fair opportunity to litigate the issue. *Murdock v. Life Indian Tribe*, 975 F.2d 683, 687 (10th

13

285

Cir. 1992. The issue was not tried in the prior action. The issue in the prior case, probable cause to seize the horses, was the only probable cause issue litigated.

In this case the issue is whether, if the horses had been had been left in their custody, Hatlee and Swift could have demonstrated that there was no probable cause to charge them with animal cruelty. However, without this evidence, Hatlee and Swift had no basis on which to convince the District Attorney that he should exercise his discretion to refuse to prosecute.

Plaintiffs were denied this evidence by the breach of their contract with the Sheriff's Office. This breach is fully discussed in Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment Regarding Plaintiffs' Third Claim for Relief. Defendants are liable for all of Plaintiffs' fees incurred in defense of the criminal charges whether it be for violation of the Fourth or the Fourteenth Amendments.

Sheriff Wegener pin pointed the animal cruelty issue when he asked during the telephone conference with Dr. Horton if she thought Swift did not call a vet sooner because he was an older rancher and he thought he could take care of things himself. Dr. Horton told the Sheriff she felt that would fit Swift. Dr. Horton stated that Swift had a lot of confidence in his experience as a horseman, he has some strongly held values as to how they should be doctored and what is appropriate. Wegener testified that this should have been investigated before the horses were seized. It was not. Acting in accordance with ones confidence in his ability is not criminal negligence as required by C.R.S. §18-9-202.

Hatlee and Swift were in the process of arranging to have the horses evaluated at the CSU vet school when they were seized.

The fact that the DA continued the prosecution after the horses were returned does not

14

286

excuse Defendants Wegener, Gore, Priestly and Hardey from liability. As stated in *Malley v. Briggs, supra* at 345, a reasonably trained police officer cannot escape liability for an act he knows or should know is unconstitutional because someone else in his chain of authority approved of what he was doing. Furthermore, LeDoux continued the prosecution reasons, not because he believed there was probable cause.

As it turned out, Swift was correct. There was a suspicion that the six horses were suffering from toxemia. As noted by Dr. Questen, (1) the cure for toxemia is food, water and time; (2) the time and feeding of the affected horses done prior to the seizure contributed to their recovery; (3) which continued to progress under the care of Littleton and Olds, aand (4) completed their recovery after they were returned to Echo Valley ranch.

LeDoux told Hatlee and Swift that he would not prosecute if he were convinced that the condition of the horses was due to toxicity. Seizure of the horses wrongfully took this opportunity away from Hatlee and Swift. As they were packing up to leave the courtroom following the acquittal, LeDoux remarked to Hatlee and his lawyer that thiss is the last time he would be pressured into prosecuting a case he knew he could not win.

It is respectfully submitted that the motion regarding damages must be denied.

/s/ Brice A. Tondre

<div style="margin-left:40%">

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado 80226
Telephone: 303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com

ATTORNEY FOR PLAINTIFF

</div>

15

287

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on counsel for Defendants this 3rd day of January, 2015, addressed as follows:

Timothy P. Schimberg
t_schimberg@fsf-law.com

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre

_____

16

288

# EXHIBIT 32

## DECLARATION OF RANDALL J. HATLEE

I am one of the Plaintiffs in this case.

At the conclusion of the criminal trial in which Mr. Swift and I were found not guilty, I was helping my attorney pack up our trial materials. Mr. LeDoux, the district attorney, was doing the same. He remarked that this is the last time he would allow himself to be pressured into trying a case he knew he could not win.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 1/3/15

RANDALL L. HATLEE

# EXHIBIT 33



**To:** Shelley Ferraro; Harmonyhorsewrks@aol.com
**Subject:** Sorry forgot to cc you guys.

**From:** Gene Ferraro
**Sent:** Monday, May 07, 2012 12:56 PM
**To:** 'Thom LeDoux'
**Subject:** RE: Bailey Horses

Your request is acknowledged. I am confirming the following: the slide show was compiled and the copy written by Barbara Wright of Harmony HorseWorks (http://www.harmonyhorseworks.com/contact.htm) with myself as a contributor. The images contained in it were taken by Ms. Wright, myself or my wife, Shelley. The document was posted on Facebook and Pinecam.com and distributed to many people in the U.S. horse community as well as numerous members of the press and Colorado's media outlets. Printed copies are being sent to Dr. Eric Jensen, MD, and his sister, both currently residing in Chapel Hill, SC for they are the owners of Echo Valley Ranch. Copies are also on their way to local media outlets in SC and elsewhere. Copies have also be distributed to several global animal rights organizations including PETA.

I will get back to you as soon I confirm the above.

Eugene F. Ferraro, CPP, CFE, PCI, SPHR

Business Controls, Inc.
5995 Greenwood Plaza Boulevard, Suite 110
Greenwood Village, Colorado 80111
Office: 303.526.7600 | Toll-free: 800.650.7005
Check out our new website: www.BusinessControls.com
Follow us: Facebook | Twitter | LinkedIn | YouTube

*"Insight in an Instant"*

CONFIDENTIALITY WARNING: This e-mail is for the confidential use of the intended recipients only, and may be protected by the attorney work-product privilege. Any unauthorized review, access, copying, dissemination, distribution, or use of the content of this message/information is strictly prohibited by Federal Law. Attempts to intercept this message or distribute it without authorization are in violation of 18 U.S.C. 2611(1) of the Electronic Communications Privacy Act (ECPA). Fines, imprisonment, and/or civil damages may be imposed for violations. Licensed in California, Florida and Illinois. Insured where necessary. PI 21470

**From:** Thom LeDoux [mailto:tledoux@da11thjd.org]
**Sent:** Monday, May 07, 2012 10:20 AM
**To:** Gene Ferraro
**Subject:** RE: Bailey Horses

Mr. and/or Mrs. Ferraro,

I have had a chance to review the slide show that you provided a link to in the e-mail below. I have also been informed that the slide show has been posted at pinecam.com.

The defense attorney has raised some concerns regarding the pre-trial publicity rules. In order to protect our animal cruelty charges I would like to know the following:

1. Who created the slide show?

1128

2
Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 1128

292

Posts: 2726
Location: Where ever the dogs take me.

Mahatma Gandhi

"If you are kind, people may accuse you of selfish, ulterior motives; Be kind anyway." -Mother Teresa Of Calcutta

www.friendsforlifeco.com
www.doggiedoorbells.com

Report Post To Pinecam Moderators

**Back to top**

( ✗ ignore )( 👤 profile )( ✉ pm )( ✉ email )( 🌐 www )

---

**walktrot**
Oh my, Big Time poster!



Joined: 13 Oct 2004
Posts: 3343
Location: Comfortable, honey?

Posted: Wed May 09, 2012 4:21 pm    Post subject: Re: s      ( quote )

> **In a whisper wrote:**
>
> s3nido,
>
> Oh yes you can get this information publicly, you just have to know how. It helps when you own a Corporate Investigation company. So put that in your pipe and smoke it.



Always kiss as if it's the first and last time.

It's never to late to live Happily Ever After.

Report Post To Pinecam Moderators

**Back to top**

( ✗ ignore )( 👤 profile )( ✉ pm )

---

**In a whisper**
Posts pretty often



Joined: 23 Apr 2008
Posts: 76
Location: Pine

Posted: Wed May 09, 2012 5:51 pm   Post subject: Starved Bailey Horses    ( quote )

It is a sad day in America when people do not take responsibility for their actions. We as people have been taught in the last decade or so to not get involved or to speak up against evil or cruelty. I find it so very pathetic that the brother and sister that own the family ranch called Echo Valley can so casually sit by and watch the horrific things that have taken place on their family ranch and continue to remain silent and I would speculate that they are hoping to not be exposed.

I guess since Echo Valley Ranch is leased out to someone, the owners of the property apparently must feel no responsibility for the horrible things that have taken place on their property. Yet they watch pinecam and follow the thread, it's almost as if they're voyeurs.

If I owned such a ranch I would certainly be concerned about my ranch's reputation for my past family members and future family members as well. Echo Valley Ranch is indeed a lovely property, but the reputation that it has today is less than what it had yesterday and unfortunately it could diminish over time because of this awful animal abuse case.

Reputated

Pinecam.com - An Electronic Community In The Colorado Rockies



I'm curious ridge, would your reaction be different if this was a case with GSD's? Some people have a very different attitude toward horses.

My reaction would be exactly the same. I refuse to be judge and jury ... period.

Help the animals (horses or GSDs)? Absolutely.

Ruin someone's reputation and business without all the facts? Absolutely not.

Hamahaidd Ratsastaja



Joined: 19 Mar 2004
Posts: 10967
Location: Bailey

Reply with Quote To Pinecam Moderators

walkirot
Oh my, Big Time poster!

Posted: Tue Feb 21, 2012 11:55 am   Post subject:

The horses have been relocated. They are receiving water and hay and any other feed they require. They have vet care and test results will be coming in on blood draws.
The sheriff's dept. is continuing it's investigation concerning neglect/abuse.
May I suggest it is time to let this thread die and a new thread started when there is further information from the sheriff's dept. concerning the horses and/or the humans.
Each in this thread has their own mindset and has dug their heels in. Continuing this thread serves no purpose.

"The most beautiful people we have known are those who have known defeat, known suffering, known struggle, known loss, and have found their way out of the depths. These persons have an appreciation, a sensitivity, and an understanding of life that fills them with compassion, gentleness, and a deep loving concern. Beautiful people do not just happen." ~ Elizabeth Kubler
Man has turned earth into a hell for animals. Arthur Schopenhauer

Joined: 13 Oct 2004
Posts: 3139
Location: Oh, Walkur.

Last edited by walkirot on Tue Feb 21, 2012 11:56 am; edited 1 time in total

Report Post To Pinecam Moderators

homeopath
Stratospheric Poster!

Posted: Tue Feb 21, 2012 11:55 am   Post subject:

It is MY understanding they were removed, BECAUSE of threats/perceived innuendos that were negative in their content......being proactive and cautious is WHY they were removed,........once AGAIN, just my understanding.

Be who u are and say what u feel,
Because those who mind, don't matter
and those who matter, don't mind.....Dr. Seuss

Joined: 23 Feb 2006
Posts: 5654

Report Post To Pinecam Moderators

CHewUR
Whoa mamma! A top Pinecam poster!

Posted: Tue Feb 21, 2012 11:58 am   Post subject:

CHSD wrote:
Investigating past cruelty to animal investigations by this particular "horse owner' really needs to be looked into, its an interesting series of events

Is this a matter of public record? How would one go about finding out more?

"Your horse is a mirror to your soul. Sometimes you might not like what you see... sometimes you will." ~ Buck Brannaman

Joined: 02 Nov 2006
Posts: 2012
Location: Wishing I was somewhere else

Report Post To Pinecam Moderators

JMiller
Pinecam Hall of Fame poster!



Posted: Tue Feb 21, 2012 12:17 pm   Post subject:

In my humble opinion this thread should continue as THE only thread regarding the situation with the horses. Continuing THIS thread may bring a reality check to those that wish to continue to make assumptions and judgements with lack of facts.

It would be good to see this mess through in one place. too many times these stupid threads are started and we don't see the resolution.

Great now more rumor and innuendo.

Joined: 08 Oct 2005
Posts: 21467
Location: Bailey

Boycott

Top  profile

**Mountaingirl**

offline

**Joined:** Mon Oct 18, 2010 10:06 am
**Posts:** 177

**Post subject:** Starving Horses  Posted: Sun Mar 11, 2012 10:51 am

We *vote* on who we support and don't;

BOYCOTT!!!

Ron Swift and Randall Hatlee, from Bailey
Bailey Depot Feed & Supply Co   Dislike
33 Road P68, Bailey, CO 80421, Park County

I will forward this to Serenity, & Mountain Connection.

Mountain Connection

Live without pretending, Love without depending, Listen without defending, Speak without offending.

*Log in or register to leave comments.*

Top  profile

**Becky**

offline

**Joined:** Tue May 11, 2010 12:03 pm
**Posts:** 6158
**Location:** Looking towards home

**Post subject:** Re: Starving Horses  Posted: Sun Mar 11, 2012 11:19 am

hmmmm. No one has gone to trial so I think it may be a little presumptive to convict them here on 285bound.

I will personally not support any boycott of any local business without a trial and verdict.

The harder you work, the luckier you get.
Mile Marker List

*Log in or register to leave comments.*

Top  profile

**Mountaingirl**

offline

**Post subject:** Starving Horses  Posted: Sun Mar 11, 2012 11:25 am

It is not a "conviction" it is an education process, just as you have yours,

Live without pretending, Love without depending, Listen without defending, Speak without offending.

*Log in or register to leave comments.*

step up and intervene when the need is more than clear, and the animals depend on this very intervention when those who cause this mess simply dismiss people who care, a vet's opinion and the very animals themselves, because they got caught. Prolonged investigations, slow bureaucratic wheels turning and lack of ethics by those in charge to take action do not serve our community nor the animals affected by such serious neglect. It only fosters repeat violations and it is high times the suffering of animals is taken more serious. Help is available, people pull together to assist, and I ask Mr. Roehr and Mr. Wegener join ship.

"To the world you are just one person; to a rescued pet you are the WORLD"

Back to top    profile   pm   www

**thunderbucks**
Prolific Pinecam Poster



Joined: 12 Mar 2007
Posts: 901
Location: South of the Bailey Mall

□ Posted: Sat Feb 18, 2012 2:20 am   Post subject:

Please write to Keith Roehr, state vet and demand intervention and immediate admission to vet clinic and local horse rescue for those horses. Their survival depends on prompt proper care which cannot be administered on said premises where neglect took place.
Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Thank you. Monika Courtney

"To the world you are just one person; to a rescued pet you are the WORLD"

Report Post To Pinecam Moderators

Back to top    profile   pm   www

**thunderbucks**
Prolific Pinecam Poster



Joined: 12 Mar 2007
Posts: 901
Location: South of the Bailey Mall

□ Posted: Sat Feb 18, 2012 2:32 am   Post subject:

Boycott Bailey Feed store. A guy who sells feed but refuses to feed his own ?

"To the world you are just one person; to a rescued pet you are the WORLD"

Report Post To Pinecam Moderators

Back to top    profile   pm   www

**homeagain**
Stratospheric Poster!

Joined: 23 Feb 2006
Posts: 5654

□ Posted: Sat Feb 18, 2012 6:31 am   Post subject:

thunderbucks wrote:

Please write to Keith Roehr, state vet and demand intervention and immediate intervention to vet clinic and local horse rescue for those horses. Their survival depends on prompt proper care which cannot be administered on said premises where neglect took place
Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

**Back to top**

**Rak**
Scanner Monitor

Joined: 24 Mar 2005
Posts: 11075

[profile] [pm]

[quote]

Posted: Sun Feb 26, 2012 11:17 am    Post subject:

**CHewUR wrote:**

Rak, wasn't it you that started a thread about your friends dog getting shot? As I recall, you felt the guys that shot had were guilty. Many people here stood behind you and wanted a full recovery for the dog. I really don't see how this case is any different

I'm finding Pinecam and it's posters to be completely contradictory. On one hand a person is guilty for their stupidity, on another they are innocent until proven guilty. On one hand it is okay to post a business name and completely bash it, on another it gets completely deleted. I'm not understanding the logic. What gives?

Yes I did start that thread. I felt the guy who shot the dog was guilty because the "alleged shooter" said he shot the dog because he thought it was a coyote. It was not a contested event. In the case of the horses here it is unclear how much damage was caused by intentional neglect versus disease that could have been mitigated or how much debilitation occourred before the present property owner took the horses. That's why there will be a more complete investigation and possibly a trial to determine guilt or innocence. In the story about the dog shot by coyote hunters, the hunter who shot the dog clearly and immediately stated that he shot the dog because of mistaken identity. It's not like he said he did nothing wrong and tried to bring in experts to say he did nothing wrong. Some of the extracts taken from my posts in that topic show that my irritation is at the error of a shooter not having a clear identified shot.

Only registered users can see links on this board!
Get registered or enter the forums!

The drift I had was not of trying to presume guilt of shooting a dog, he already admitted he did so. I am concerned about the need to ensure that hunters clearly identify the target.

SNIP
In my opinion there should be stronger enforcement of the existing hunting requirement to identify clearly before pulling the trigger.
SNIP
Clear identification of a target is the point here and is the obligation of anyone hunting or targetshooting. Hunters or others should not be shooting unless there is clear identification of the target.
SNIP
All hunters and all target shooters need to exercise caution in picking when and where they will shoot. There has to be thought and concern about what is downrange for the original shots or richochets.
SNIP
I would hope that nobody thinks responsible sport or meat hunters are crazed unbalanced killers and a danger to the public. The danger comes from the irresponsible shooters whether hunters or target shooters who don't know, or don't care what they're shooting at.

Report Post To PineCam Moderators

**Back to top**

**Rak**
Scanner Monitor

Joined: 24 Mar 2005
Posts: 11075

[profile] [pm]

[quote]

Posted: Sun Feb 26, 2012 11:21 am    Post subject:

**homesagain wrote:**

The horses in this thread are NOW being provided for and hopefully will be able to thrive. Perhaps there is ANOTHER oppurtunity to balance the scales.......there are presently TWO older horses (see FOR THE BOYS) who are being cared for (at present) BUT the person NEEDS help . . . consider sponsoring one of these horses, so that they may remain in place and thrive...... it is one way to put your passion/words to WORK in a more productive way......JMO......

Yes Homesagain I heartily endorse your push on this.
The topic referenced is:

Only registered users can see links on this board!
Get registered or enter the forums!

Report Post To PineCam Moderators

**Back to top**

**sterekbk**
Posts pretty often

Joined: 20 Sep 2005
Posts: 88
Location: Bailey

[profile] [pm]

[quote]

Posted: Sun Feb 26, 2012 12:28 pm    Post subject: truth!

"BURP"

Report Post To PineCam Moderators

**Back to top**

**gla58**

[profile] [pm] [email]

Posted: Sun Feb 26, 2012 3:42 pm    Post subject:

297

Pinecam.com - An Electronic Community In The Colorado Rockies



Home    Weather    Fire Info    News    Agencies    Government    HOAs    Classifieds    Forums    Recipes    Misc.

Find a Sweetheart of a Deal at
Kenosha Auctions

🏢 Terms of Service    🗒 Community Calendar    ❓ FAQ    🔍 Search    👥 Memberlist    🗐 Usergroups    ☑ Register
📷 Upload Image    🖼 Image FAQ    🗒 Profile    🖾 Log in to check your private messages    🔓 Log in

## Feed Store starving Horses- Help Harmony Horse Works
Goto page Previous 1, 2, 3 ... 11, 12, 13 ... 15, 16, 17  Next

newtopic    postreply    Pinecam.com Forum Index -> The Corral

View previous topic :: View next topic

| Author | Message |
|---|---|
| **JMiller**<br>Pinecam Hall of Fame poster!<br><br>Joined: 08 Oct 2005<br>Posts: 21467<br>Location: Bailey | □ Posted: Tue Feb 21, 2012 1:28 pm    Post subject:    quote<br><br>**walktrot wrote:**<br>If there were not facts regarding this case then the TV channel would not have reported it. I did not see the news cast as I am not in the area. The sheriff's reports have facts, the other county having a court order to remove the 2 (in the end only one because the other was deceased) horse is a fact. The severe condition of the horse remove is a fact. The photos of the remaining horses condition is also a fact. The horses need and received help, a fact<br>This is what I mean by digging in one's heels. None of these facts register with those that are defending the owner/person responsible for the care of the horses, AND none of us that have as a priority the horses are willing to ignore the facts thus for and are not willing to believe the humans are not responsible or have a good "excuse."<br>Let the law do it's work, let the vet do his work, let the horses heal and let's wait for the decisions.<br><br>I am not defending or condemning. Others opinions are based on photos and misleading thread titles and headlines. We don't know how the horses belonging the feed sstore owner came to be that way. That is what is being investigated. Folks are jumping the horse at Aspen Creek and the deceased one into the same circumstances and we don't know that to be the case. The news is notorious for escalating information to make a better read. Saying that Routt County 'refused' to comment instead of saying actually they can not discuss an ongoing investigation or declining to comment fuels the negative aspects of any story. No one is discussing that there were horses in his care that were fine. No story there.<br><br>"Gore also said the owner of the horses has many horses on the ranch who were in perfect health."<br><br>You don't know why the horses were there, where they came from, in what condition or how long they were at Echo Valley. But people have to shoot off their mouths and make judgements and post misinformation and then act like moving the horses to keep folks from doing further harm by threatening to steal them has actually helped them. So much BS here, now the back peddling and butt covering.<br><br>Not being willing to go along with calls for destroying the mans business and trying to be reasonable without saying blame without enough information does not mean we don't have the horses as a concern. This isn't an either or situation.<br><br>Report Post To Pinecam Moderator<br><br><br>**Back to top**    profile    pm |
| **LoriKrp**<br>Active Pinecam Poster<br><br>Joined: 02 May 2003<br>Posts: 458<br>Location: Pine | □ Posted: Tue Feb 21, 2012 1:41 pm    Post subject:    quote<br><br>Good News, the little guy at Aspen Creek Vet is doing a bit better! He is standing on his own and for longer periods of time, he is eating and drinking than taking a nap. He is getting a bit bored and has enough strength to pick up his front leg and paw a bit at his bucket.<br><br>Just a glimmer of light on this!<br><br>Report Post To Pinecam Moderator<br><br>**Back to top**    profile    pm    email |
| **JMiller**<br>Pinecam Hall of Fame poster!<br><br>Joined: 08 Oct 2005<br>Posts: 21467<br>Location: Bailey | □ Posted: Tue Feb 21, 2012 1:45 pm    Post subject:    quote<br><br>**CHowUR wrote:**<br>And, it scares me that people in the community think it is okay for animals to suffer like that.<br><br>Show me where anyone said it is okay for the animals to suffer.<br><br>**CHowUR wrote:** |

http://www.pinecam.com/phpBB2/viewtopic.php?t=146149&postdays=0&postorder=asc&...    2/28/2012

298

Pinecam.com - An Electronic Community In The Colorado Rockies                    Page 2 of 4



**Joined:** 08 Oct 2005
**Posts:** 21467
**Location:** Bailey

No I am not 'trying' to give him the benefit of the doubt I AM giving him the benefit of the doubt. Just like I would do unto you...just like I would desire to be done unto me. Innocent until proven otherwise....

Report Post To Pinecam Moderators

Back to top    [profile] [pm]

**Marcel**
**Active Pinecam Poster**

[quote]

☐ Posted: Tue Feb 21, 2012 7:30 pm   Post subject:

Dear Jmiller, I think I would like to be your friend.

" When you stumble, make it part of the dance."

Report Post To Pinecam Moderators

**Joined:** 20 Feb 2007
**Posts:** 566
**Location:** Bailey Co.

Back to top    [profile] [pm]

**snow**
**Whoa mammal A top Pinecam poster!**

[quote]

☐ Posted: Tue Feb 21, 2012 8:08 pm   Post subject:

My guess is that in the next couple of weeks we will all have a better understanding as to what is going on.

I am glad that the remaining horses are now in a situation where they can be watched.

You might think this is a stretch here, but those that write bad restaurant reviews after one visit affects the business owner, yet I see many going it without just cause only because the food was not to their liking but many others like the food just fine.

**Joined:** 24 Oct 2002
**Posts:** 1649

I just want animals to be taken care of, be it a horse, cat, dog or guinea pig; in a case like this there are going to be opinions same as with a restaurant review.

All are allowed to have opinions and I would hope that people actually wait for more facts before boycotting or not visiting a business.

We are adults here and this is a public website so like it or not opinions are going to happen.

Report Post To Pinecam Moderators

Back to top    [profile] [pm]

**CHSD**
**Infrequent Pinecam poster**

[quote]

☐ Posted: Wed Feb 22, 2012 9:55 am   Post subject:

So where in the world did these horses go? I wonder in whose care they are now?

Report Post To Pinecam Moderators

**Joined:** 23 Jan 2011
**Posts:** 12
**Location:** Park, Summit, Clear Creek, Gilpin Counties

Back to top    [profile] [pm] [email]

**Rak**
**Scanner Monitor**

[quote]

☐ Posted: Wed Feb 22, 2012 10:30 am   Post subject:

    CHSD wrote:
    So where in the world did these horses go? I wonder in whose care they are now?

**Joined:** 24 Mar 2005
**Posts:** 11075

I posted a link earlier in this topic giving a link from the story in the Flume giving information from the Sheriff's department. In part it said:

**"The horses in question were moved to an undisclosed location in Park County Sunday afternoon," said a Sunday press release from the Sheriff's Office. "The Sheriff's Office felt this was necessary to avoid any complications that could arise and [ensure] the safety of everyone involved."**

They moved the horses to an undisclosed location because of perceived threats by various individuals, to take the horses.

Report Post To Pinecam Moderators

Back to top    [profile] [pm]

**gla58**
**Posts pretty often**

[quote]

☐ Posted: Wed Feb 22, 2012 11:21 am   Post subject:

This is just OJ Simpson Bailey style. Because there is much too much mystery and handling around this animal abuse case.

299

Demonstration
Feed Store

Please do.

Always kiss as if it's the first and last time.

It's never to late to live Happily Ever After.

Report Post To Pinecam Moderators

**Back to top**

( X ignore )( & profile )( && pm )

**In a whisper**
Posts pretty often

Joined: 23 Apr 2008
Posts: 86

□ Posted: Wed May 16, 2012 8:00 am    Post subject: Results of Echo Valley        ( quote )
Ranch Hearing - May 15th @ 1:00.

It was a bit disappointing that there wasn't more of a turnout. There was no demonstration which I think was a good thing. The people were all respectful in the court room, no one made any out burts at all.

The charges are 4 counts of "animal cruelty" on both Ron Swift and Randy Hatlee.

Our concern is that the trial date will be this winter. Most people that have horses "feed up" so that their horses have extra weight to keep them warm in throughout winter, but if the Bailey 6 horses are kept in pens they will not get the opportunity to "feed up" or have the enjoyment of grazing along with the boarded horse.

 If people want to demonstrate I believe it should be in front of Bailey Feed Store not the court house in Park County. 😊

We call them dumb animals and so they are for they cannot tell us how they feel, but they do not suffer less because they have no words.
By Anna Sewell,
Author of Black Beauty

Last edited by In a whisper on Wed May 16, 2012 8:05 am; edited 1 time in total

Report Post To Pinecam Moderators

**Back to top**

( X ignore )( & profile )( && pm )



**Pinecam Moderators**
Whoa momma! A top
Pinecam poster!

Joined: 09 Jun 2004
Posts: 1631

□ Posted: Wed May 16, 2012 8:01 am    Post subject:        ( quote )

This is a WARNING.................if this continues down the path that the previous three locked threads did......................this will also be locked. Keep it civil and factual.

The Pinecam Moderator Team

Report Post To Pinecam Moderators



**offline**

Joined: Sun Jun 06, 2010
12:34 pm
Posts: 686

> **jf1acai wrote:**
> Sentencing before trial doesn't fit with presumption of innocence.

I am not sentencing anyone, and the evidence does not presume innocence. Look again.



It is the American way, leave it up to the courts. That is fine. Some judge that doesnt know the difference between a cow and a horse is going to make a decision on starvation and abuse, will render a judgement that punishes the human? The human is fine.

Just save the horses. Another horse goes hungry tonight.

*Log in or register to leave comments.*

**Top**     **profile**

| **Mountaingirl** | Post subject: Starving Horses | Posted: Sun Mar 11, 2012 4:01 pm |

**offline**

Joined: Mon Oct 18, 2010
10:06 am
Posts: 177

The horses ultimately have been "sentenced".

We are witnessing the after effects, which are disgraceful, despicable and inhumane.



Live without pretending, Love without depending, Listen without defending, Speak without offending.

*Log in or register to leave comments.*

**Top**     **profile**

| **CinnamonGirl** | Post subject: Re: Starving Horses | Posted: Sun Mar 11, 2012 4:04 pm |

**offline**

Anyone that owns a feed store and has starving animals. Give me a break. This is not about the owners anymore. The courts will take



care of it, I just wanted to see the county get them out of there. When a horse gets better after being confiscated then you have your answer. As long as the animals are safe and they don't own again. I really don't care. viewtopic.php?f=128&t=18510

_____

*My evil twin is Robynabc*
*Learning to ignore things is one of the great paths to inner peace.*
Bound to make a difference in your Community.
CommunitiesBound.com


**Joined:** Thu Apr 08, 2010 8:23 pm
**Posts:** 12206
**Location:** Colorado

*Log in or register to leave comments.*

**Top**     👤 **profile**

---

Display posts from previous: All posts | Sort by Post time | Ascending | Go

---

🗋 **new topic**    🗋 **postreply**    **Page 2 of 7** [ 62 posts ]    Go to page **Previous** 1, 2, **3**, **4**, **5** ... **7** **Next**

---

**Board index » The Highway » The Campfire**     All times are UTC - 7 hours [ DST ]

---

**Who is online**

Users browsing this forum: **magicwrenchmedia**, **ZHawke** and 7 guests

You **cannot** post new topics in this forum
You **cannot** reply to topics in this forum
You **cannot** edit your posts in this forum
You **cannot** delete your posts in this forum

Jump to:   The Campfire    Go

Powered by phpBB © 2000, 2002, 2005, 2007 phpBB Group

*Feed Store*



offline

**Joined:** Mon Oct 18, 2010
10:06 am
**Posts:** 177

I am basing my *decision* on looking at the starving horses, *seeing* them live and *talking* with the professionals who treated them.

Private businesses which sell to the public, are private citizens that got busted.

I am publicly disappointed that animals in the control of people who mistreat them continues. No, that is not OK with me!

_____

Live without pretending, Love without depending, Listen without defending, Speak without offending.

*Log in* or ***register*** *to leave comments.*

**Top**      profile

---

**Becky**

offline



**Joined:** Tue May 11, 2010
12:03 pm
**Posts:** 6105
**Location:** Looking towards home

Post subject: Re: Starving Horses     Posted: Sun Mar 11, 2012 1:11 pm

m'kay

_____

The harder you work, the luckier you get.
Mile Marker List

*Log in* or ***register*** *to leave comments.*

**Top**      profile

---

**Hoot Owl**

offline



**Joined:** Sun Jun 06, 2010
12:34 pm
**Posts:** 686

Post subject: Re: Starving Horses     Posted: Sun Mar 11, 2012 1:49 pm

Becky,
the owner/care-giver of this horse owns a feed store, and I would assume has some animal husbandry knowledge. This is a situation that went terribly wrong. But it was not an accident, it was neglect. This does not need to go through a lengthy court hearing. The horse was starving and very sick. What part of this picture dont you understand?

285Bound.com Community Forums, Calendar, Events, Local Weather and Road Condition | Page 36 of 238





**offline**

**Joined:** Tue May 11, 2010 12:03 pm
**Posts:** 6105
**Location:** Looking towards home

So...Let me see if I understand your positions.....
You are basing your educated opinion or guess based on a newspaper article. No trial or investigation completed yet.
You are relying on one article from a newspaper that has more often than I would like to see, portrayed a situation that was somewhat different than the ultimate outcome. (JMO)
A great example of slant are the two articles from the HTT and Flume in regards to the IMHS situation. Who do we believe?

I wonder how you would feel if you were accused of a crime that you felt you were not guilty of and a group of folks went on a public discussion forum and anonymously threatened your livelihood by announcing a boycott without you having the ability to have your day in court. Would that be ok with you?

These are private businesses and private citizens.

I am personally disappointed that any of us would go down this road.

_____

The harder you work, the luckier you get.
Mile Marker List

***Log in* or *register* to leave comments.**

**Top** | **profile**

---

**HappyCamper** | **Post subject:** Starving Horses | **Posted:** Sun Mar 11, 2012 1:08 pm

**online**

**Joined:** Sun Nov 28, 2010 11:08 am
**Posts:** 427

This is why we are all allowed to have our own opinion.

If this involved a child and not just an animal you know that it would not be tolerated.

This is not the first time that horses have been investigated at Echo it is just the first time that they have been seized.

I am perfectly comfortable with my comments and do not feel bad in anyway about voicing my opinion.

 One other thing O.J. was found innocent and if he had a business up here I would not patronize it.

***Log in* or *register* to leave comments.**

**Top** | **profile**

---

**Mountaingirl** | **Post subject:** Starving Horses | **Posted:** Sun Mar 11, 2012 1:09 pm



Feed Store

Joined: 23 Apr 2008
Posts: 79
Location: Pine

sickened by how the remaining 6 horses are being cared for. The horses need food and clean water 24 hours a day. They are trying to recover from being starved and must have food. Tell me why these little horses aren't out on pasture with the rest of the herd...............1600 acres of grass. I think there would be plenty for them to eat.

Ron also said he couldn't afford to feed the horses.................he owns a feed store for heaven sake.

We call them dumb animals and so they are for they cannot tell us how they feel, but they do not suffer less because they have no words.
By Anna Sewell,
Author of Black Beauty

Report Post To Pinecam Moderators

Back to top | X ignore | profile | pm |

**kirt8572**
Posts pretty often

Posted: Tue May 15, 2012 9:02 am    Post subject: | quote |

You can't sway me. I know what I stand for.

Joined: 19 Jan 2008
Posts: 113

Report Post To Pinecam Moderators

Back to top | X ignore | profile | pm |

**TwoHawks**
Posts pretty often

Posted: Tue May 15, 2012 9:03 am    Post subject: | quote |

Gee you keep adding so much to the story each time. The horses have been on special feeding program set by the vets( as stated in timberlines post). You cant keep your facts right.

Joined: 06 Jan 2009
Posts: 80
Location: Co.

Report Post To Pinecam Moderators

Back to top | X ignore | profile | pm |

Display posts from previous: All Posts    Oldest First    Go

newtopic    postreply    **Pinecam.com Forum Index ->**
**The Corral**

All times are GMT - 7 Hours
Goto page Previous  1, 2, 3 ... 9, 10, 11

Page 11 of 11
Quick Reply:

305



Agreed. Seems like there might be a lot of information missing or, perhaps, the article is just very poorly written. I'm confused as well.

Hamahakki Ratsastaja

Report Post To Pinecam Moderators

Joined: 19-Mar 2004
Posts: 11020
Location: Bailey

**Back to top**    profile    pm

**Sugar Lady**
Infrequent Pinecam poster

Joined: 13 Jun 2011
Posts: 48
Location: ON THE MOINTAIN

Posted: Fri Feb 17, 2012 4:27 pm    Post subject: Re: Feed Store starving Horses- Help Harmony Horse Works    quote

**Anais101 wrote:**

I am posting this with the permission of Barbara @ Harmony . Please help with you donations so they can continue there work. This is very distressing knowing that a feed store has starving horses.

Hello Everyone who loves animals,

We received a call for help in an impound case from Routt County regarding a horse that was transferred out of their jurisdiction to Bailey, CO, near us, and they needed help saving the little colt from death. He is so weak that transporting him back up to Steamboat Springs would have surely killed him. Here is the slideshow of its arrival at our vet in Conifer, CO. We need your help for his aftercare and rehabilitation here. There are six more horses in worse condition then this one, but Routt has no jurisdiction in Park County, so Perk is working on a court order to impound. The owner is [removed by moderator] -- yes, that's right -- a feed store with starving horses. Barb Verrone came with me to help settle him in when he arrived. It was a replay of other unimaginable scenarios, but we think he may make it! Send prayers and love to this 2 year-old we named Little Big Man. We are working with other rescues to prepare them for taking the other six when they are impounded. Cut and paste this link into your browser to see his arrival at our vet's clinic.

Only registered users can see links on this board!
Get registered or enter the forums!

Barbara Wright
Harmony HorseWorks
Horse Sanctuary & Therapy Center
501(c)(3) Nonprofit Corp.
13639 Elsie Road
Conifer CO 80433
(303) 816-0766.

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

Only registered users can see links on this board!
Get registered or enter the forums!

MAKE ROOM FOR A HORSE IN YOUR HEART!
MAKE ROOM FOR A HORSE IN YOUR ART!
Only registered users can see links on this board!
Get registered or enter the forums!

When you register with iGive and shop online through the iGive portal, a percentage of the sale is donated to Harmony HorseWorks when you indicate us as the charity of your choice.

Harmony HorseWorks is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY used to heal spooky,

Since the owners and caretakers have vets treating the sick horses and the animal control officers have been out several times.

The horses are sick not starving.



IMO It is slanderous to vilify the owners of a business without more info.

I think it is dangerous to assume that this is anything more then what you see sick horses.

Code Enforcement deputies responded to the Ranch. Upon investigation and after conferring with the State Veterinarian's Office and three other Vets it was decided it is in the best interest of the horses to leave them at Echo Valley Ranch and continue their **treatment regiment** at that location. We concur with the recommendation of those veterinarians

Last edited by Sugar Lady on Fri Feb 17, 2012 5:35 pm; edited 1 time in total

Report Post To Pinecam Moderators

**Back to top**    profile    pm

**CHowUR**    Posted: Fri Feb 17, 2012 4:31 pm    Post subject:    quote

*Feed Store*



Goto page 1, 2, 3 ... 17, 18, 19  Next

# Feed Store starving Horses- Help Harmony Horse Works

| Author | Message |
|---|---|
| **Anais101**<br>Infrequent Pinecam poster<br><br>Joined: 09 Feb 2007<br>Posts: 27 | Posted: Fri Feb 17, 2012 2:15 pm   Post subject: Feed Store starving Horses- Help Harmony Horse Works   quote<br><br>I am posting this with the permission of Barbara @ Harmony . Please help with you donations so they can continue there work. This is very distressing knowing that a feed store has starving horses.<br><br>Hello Everyone who loves animals,<br><br>We received a call for help in an impound case from Routt County regarding a horse that was transferred out of their jurisdiction to Bailey, CO, near us, and they needed help saving the little colt from death. He is so weak that transporting him back up to Steamboat Springs would have surely killed him. Here is the slideshow of its arrival at our vet in Conifer, CO. We need your help for his aftercare and rehabilitation here. There are six more horses in worse condition than this one, but Routt has no jurisdiction in Park County, so Park is working on a court order to impound. The owner is [removed by moderator] -- yes, that's right -- a feed store with starving horses. Barb Verrone came with me to help settle him in when he arrived. It was a replay of other unimaginable scenarios, but we think he may make it! Send prayers and love to this 2 year-old we named Little Big Man. We are working with other rescues to prepare them for taking the other six when they are impounded. Cut and paste this link into your browser to see his arrival at our vet's clinic.<br>Only registered users can see links on this board!<br>Get registered or enter the forums!<br><br><br>Barbara Wright<br>Harmony HorseWorks<br>Horse Sanctuary & Therapy Center<br>501(c)(3) Nonprofit Corp.<br>13639 Elsie Road<br>Conifer CO 80433<br>(303) 816-0766<br>Only registered users can see links on this board!<br>Get registered or enter the forums!<br>Only registered users can see links on this board!<br>Get registered or enter the forums!<br>Only registered users can see links on this board!<br>Get registered or enter the forums!<br><br>MAKE ROOM FOR A HORSE IN YOUR HEART!<br>MAKE ROOM FOR A HORSE IN YOUR ART!<br>Only registered users can see links on this board!<br>Get registered or enter the forums!<br><br>When you register with iGive and shop online through the iGive portal, a percentage of the sale is donated to Harmony HorseWorks when you indicate us as the charity of your choice.<br><br>Harmony HorseWorks is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY used to heal spooky,<br><br>Report Post To Pinecam Moderators |
| Back to top | profile    pm |
| **thunderbucks**<br>Prolific Pinecam Poster | Posted: Fri Feb 17, 2012 3:57 pm   Post subject:   quote<br><br>Press Release from Park County Sheriff's Office<br><br>Sheriff Fred Wegener |

Pinecam.com - An Electronic Community In The Colorado Rockies                    Page 3 of 4



On a serious note, I just have three questions after reading all of this, if anyone does know, I would appreciate -

What does Routt County have in all this, because as far as I can see I'm pretty thankful since this is what brought this to visibility? Why was Routt County involved? This seems very fishy and I'm wondering if any money is being passed through all this.

Yesterday's channel 7 news interview stated owner said it was botulism (which I doubt after reading symptoms), should we be concerned - since it is caused by bad feed?

The horses, my biggest concern, if these horses were taken away by Sheriff Office. Well, how can people who love horses be assured that they are being taken care of and not just hidden? Is there someone I can call/email to ease my concerns where they can go out to see the horses?

Thanks.

Report Post To Pinecam Moderators

**Joined:** 24 Apr 2006
**Posts:** 108

Back to top · (profile) (pm)

**ridgewalker**
Pinecam Hall of Fame poster
▲▲▲▲

☐ Posted: Wed Feb 22, 2012 12:11 pm   Post subject:                              quote

I suppose you can call the Sheriff's office but I'm pretty sure they will tell you exactly what was in the press release quoted in the post above yours, that the horses were moved to an undisclosed location due to perceived threats.

Do you really think the Sheriff's office is hiding the horses for some nefarious purpose? Really?

Hamahakki Ratsastaja

Report Post To Pinecam Moderators

**Joined:** 19 Mar 2004
**Posts:** 10962
**Location:** Bailey

Back to top · (profile) (pm)

**CH8D**
Infrequent Pinecam poster
▲

☐ Posted: Wed Feb 22, 2012 12:32 pm   Post subject:                              quote

A system that works should proudly tell the taxpayers and voters where these horses are, and what an update of their condition is.

Perhaps a few of us, would like to donate to the care of these horses, its really that simple.

Seriously the horses are 'undisclosed' due to safety issues , there is no threat against the horses. Really!!

Gla58 you are correct, the mystery around this entire event is out of control.

**Joined:** 29 Jan 2011
**Posts:** 12
**Location:** Park, Summne,
Clear Creek, Gilpin Counties

Report Post To Pinecam Moderators

Back to top · (profile) (pm) (email)

**wildGoose2**
Oh my, Big Time poster



☐ Posted: Wed Feb 22, 2012 12:40 pm   Post subject:                              quote

there was a threat - by e-mail - some threatened to go to EVR and remove the horses themselves - while they may have only been threatening, the SO takes threats like that seriously - hence the need for further protection
If a man was threatening a woman, and tax paid SO transported her to a woman's shelter, should the men be notified of her where-abouts because the man's taxes were involved in the transportation?

Report Post To Pinecam Moderators

**Joined:** 05 Oct 2005
**Posts:** 3973

Back to top · (profile) (pm)

Display posts from previous:  All Posts   Oldest First   [Go]

All times are GMT - 7 Hours

(newtopic) (postreply)    Pinecam.com Forum Index -> The Corral         Goto page Previous  1, 2, 3 ... 12, 13, 14, 15, 16, 17  Next

Page 13 of 17

Jump to:  The Corral                                                                    [Go]

You cannot post new topics in this forum
You cannot reply to topics in this forum
You cannot edit your posts in this forum
You cannot delete your posts in this forum
You cannot vote in polls in this forum

Pinecam's Community Forum uses phpBB © 2010
Pinecam.com is a member of the Platte Canyon Chamber of Commerce

| Advertise on Pinecam | Donate to Pinecam | Community Calendar | Contact Us | Donate to TSAC |

308

PARK COUNTY SHERIFF'S
CONTINUATION SHEET

| | | Report Number |
|---|---|---|
| | | 2012000142 |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Dr. Britt stated he would be glad to go and examine the horse. The only thing he would suggest he would give the owner would be if the mare was not standing on her own within twenty-four to forty –eight hours he would recommend euthanasia.

I asked Dr. Britt about the possibility of Tic Paralysis and he was reserved about this even being a possibility. He stated he has never seen a case in Colorado, but that does not mean anything. He felt the time of the year was a factor and ticks are usually out in the spring season not the winter. I asked what the symptoms of Tic Paralysis are and he stated coordination loss, which would lead to paralysis of the legs and chest muscles.

On February 17, 2012 I was contacted by Deputy Hardey and advised that "Maggie" was deceased and that Timberline Equine Veterinary Services had arranged a necropsy with Colorado State University. The necropsy was to determine the horse's cause of death.

On February 19, 2012 I received a telephone call from Under sheriff Gore at my residence. The Under sheriff advised me that he had received several telephone calls from the Public Information Officer for State of Colorado's Department of Agricultures Office. He was very concerned for the safety of the owners of the horses and the horses themselves. The Under sheriff stated that he had been on the telephone all morning and the emails and telephones calls were very concerning to him. He asked if I could make arrangements to move the horses. I advised the Under sheriff that I would see if the owners would agree to move the horses into protective custody on a temporary basis.

Deputy Hardey contacted Swift and Hatlee and they did agree to move the horses. I completed a written agreement that was signed by Hatlee, Swift and Deputy Hardey. This agreement was turned over to Deputy Hardey and has been placed in the case file.

The horses were moved from the Echo Valley Ranch and transported by Swift and Hatlee. The horses were moved to a private ranch in Park County and housed in an enclosed barn. The horses were provided with veterinarian care by Timberline Equine Veterinary Services while at this location. I assisted with unloaded the horses and accessing them once they were taken off of the trailers. I noticed that the younger horses back legs were quivering when they walked. The horses were given hay and water before we left the area. Hatlee was concerned about one of the young colts named "Chance". Hatlee advised us that the colt had been collapsing frequently and that he was unable to rise on his own.

On February 21, 2012 at approximately 10:30 AM, I received a call from Dr. Horton, DVM. Dr. Horton called and stated that she had some preliminary results on the necropsy that was done on "Maggie". I recorded a portion of this conversation (see attached audio disk). Under sheriff Monte Gore and Sheriff Fred Wegener were both in the office for the conversation with Dr. Horton.

Dr. Horton stated:

| Officer's Signature & Number | Supervisor's Initials & Date | Page ____ of ____ |
|---|---|---|
| Sgt. B. Priestly #9522 | | |
| | | Form: PCSO- |

Rev. 6/98
N

89

309

Threats

**PARK COUNTY SHERIFF'S OFFICE**
CONTINUATION SHEET   Copy

| | Case Report Number |
|---|---|
| | 2012000142 |
| | Date of Report |
| | 2/16/2012 |

| Initial Offense Classification | Subject |
|---|---|
| Cruelty to Animals | Swift, Ron and Hatlee, Randal |

During the course of the day, I had received over ten telephone calls from concerned citizens and due to the amount of public attention, I had to get Under Sheriff M. Gore involved. Swift advised me that he was getting threats on his feed store. I had also spoken the Dr. Horton that day and she advised me that she was receiving threats from concerned citizens at her clinic.

On February 19, 2012, at approximately 12:30PM, the decision was made to remove the horses from the Echo Valley Ranch and place the horses into protective custody. I had spoken to Sergeant B. Priestly and we made arrangements to take the horses to an undisclosed location. The female party that resided at that residence identified herself as:

### IP- Kirstin LeBeau (DOB 08/05/1972)

I asked both Swift and Hatlee if they were ok with moving the horse. I felt at that time, the decision to move the horses was in the best interest of both the owners and the horses. After a long discussion Swift and Hatlee agreed to move the horses. Hatlee advised me that "Chance" was not doing well. Hatlee stated that Chance was unable to stand on his own. Hatlee said he was uncomfortable moving "Chance" but he would do what I asked.

At approximately 3:00PM, I responded to the Echo Valley Ranch with Swift and Hatlee. "Midnight," "Lena," "Fiona," "Echo," "River" and "Chance" were loaded into two trailers (Swift and Hatlee personally transported) nd brought the horses to 1401 Park County Road 77, Jefferson, Colorado. At the time of arrival, approximately 5:00PM, Sgt. Priestly was already on scene ready to help. LeBeau moved her personal horses to a pasture and we put the horses in an enclosed arena. Once the horses were settled, Sgt. Priestly and I cleared the residence and went home.

On February 20, 2012, I called Dr. Horton to see if she had any information with the results on "Maggie." Dr. Horton said "Maggie" died from an abscess in her Aorta, which caused blood to go else where in her body other than her heart. I also spoke with Sgt. Priestly and she said that the disease sounded like a genetic defect in her heart.

On February 22, 2012, at approximately 10:00AM, I called Dr. Horton on the telephone. I asked Dr. Horton if she had received any further information on the horses. Dr. Horton said she had gone to 1401 Park County Road 77, and took blood work on the six horses. Dr. Horton said some of the blood results showed that all the horses were anemic and some had a high white blood count. A few of the horses also had fast heart rates. I asked Dr. Horton if all the results she gave me would result in being emaciated. Dr. Horton said, "No." Dr. Horton felt the horses were left out to pasture for too long without being supplemented with other food and that is how they got skinny. At that point I made the decision to write a warrant to seize the six horses and hay samples from Echo Valley Ranch. I will be charging Swift and Hatlee with Cruelty to Animals. Each party will be charged with three counts based on the three horses that each owned.

| Officer's Signature & Number | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|
| C. Hardey 9523 | | |

74

310

Fire
Swift



Joined: 08 Oct 2005
Posts: 22160
Location: Out of my Mind

Especially when he has "experience" and all it required was food???
Why is it okay to let a horse sit in it's own fecal matter,is that a normal
human reaction? I would've sent my horse to the vet asap (I am a prior
horse owner)
What story do we not know exactly?
You have a horse that is starving....Someone else rescues them feeds them
and they recover,obviously it's the prior owners fault. No medical problems
and such...Just food
Like I said this person has been known (not only in my eyes,to be mean in
spirit)
**Don't reply Mr.Garcia I refuse to argue as we live on different
planets**
**But if you need to King Soopers sells Kleenex**

Was this for me? We have nothing to argue about. You don't know me and you
don't know my heart in all of this. What a mindless thing to say.
Didn't know anyone's 'spirit' was a matter of law in this.

There are some that have actually had reasonable discussions privately with
me. Thank you. There are some that actually understand where I stand on
this.
But this isn't about me. It's about the day in court which can't come too soon
and hopefully where justice will be served, or served as well as is possible in
light of everything.

Report Post To Pinecam Moderators

**Back to top**

( X ignore ) ( profile ) ( pm )

**In a whisper**
Posts pretty often



Joined: 23 Apr 2008
Posts: 68
Location: Pine

Posted: Mon May 07, 2012 8:11 am   Post subject: Starved Bailey Horses      ( quote )

What you wrote CC Rider is so very well put.

I want to make sure that everyone knows that Ron Swift is only the caretaker
at Echo Valley Ranch he is not the owner of the property, and I know this for a
fact. Ron Swift needs to be fired and have all horses taken away from him
forever.

And Steve baby it appears that you seem to hate anyone that believes in God.
I feel so sorry for you.

"We call them dumb animals for they cannot tell us how they feel, but they do
not suffer less because they have no words" Anna Sewell Author, Black
Beauty.

Report Post To Pinecam Moderators

**Back to top**

( X ignore ) ( profile ) ( pm )

Posts pretty often

Here is the latest update on Echo Valley Horse – 6 Bailey Horses

Dear Mr. LeDoux:

Thank you for meeting with us today. Following our meeting this morning we took the opportunity to drive to Echo Valley Ranch. Visible from County Road 70 (which transects the ranch) were the 6 Bailey horses along with a few others on a dry lot (or small paddock) with no apparent food or water. A number of other horses were observed on large green pasture eating lush grass. It is our collective opinion that the 6 Bailey horses that were returned to Mr. Swift after being seized for alleged mistreatment need 24 hour a day access to water and hay to continue their recovery. It appears that Mr. Ron Swift has decided to punish them. One has to wonder why all of the horses aren't receiving the same treatment and nourishment? There are hundreds of acres of grass pasture on the property. Why have horses kept segregated on a dry lot? It's heartbreaking to see and seems so unnecessary.

We look forward to attending Mr. Swift's hearing tomorrow at 1 p.m. See you there.

————————————

We call them dumb animals and so they are for they cannot tell us how they feel, but they do not suffer less because they have no words.
By Anna Sewell,
Author of Black Beauty

Report Post To Pinecam Moderators

Joined: 23 Apr 2008
Posts: 76
Location: Pine

Back to top

Display posts from previous:  All Posts    Oldest First    Go

Pinecam.com Forum Index -> The Corral

All times are GMT - 7 Hours

Goto page Previous  1, 2, 3, 4, 5, 6, 7, 8, 9, 10

Page 10 of 10

Quick Reply:

Preview    Submit

Stop watching this topic

Jump to:  The Corral    Go

# EXHIBIT 34

The horse named Lana put on 38 pounds during that week. On Feb. 23, it weighed 690 pounds, and on March 1, it weighed 728 pounds.

The horse named Fiona put on 35 pounds during that week. On Feb. 23 it weighed 505 pounds, and on March 1 it weighed 540 pounds.

The horse named Echo put on 22 pounds that week. On Feb. 23, it weighed 405 pounds, and on March 1 it weighed 427 pounds.

The horse named Chance put on 21 pounds during that week. It weighed 465 pounds on Feb. 23 and 486 on March 1.

---

**You**

**Aqueria**

Posts Semi-Regularly

Joined: Apr 13, 2011 5:52 pm
Posts: 299

**Post subject:**

gle88 wrote:
Yes, the court date, does anyone know when the court date/time is for this case?

This article states May 15th:

http://www.thedenverchannel.com/news/30 ... etail.html

Quote:
He will be back in court on May 15 on the misdemeanor animal cruelty charge

Everybody is a genius. But if you judge a fish by its ability to climb a tree, it will live its whole life believing that it is stupid.

D Posted: Apr 20, 2012 3:41 am

---

**Top**

**TimberlineEquine**

New Poster
Joined: Feb 18, 2012 10:15 am
Posts: 1

**Post subject:**

D Posted: Apr 26, 2012 3:31 am

In response to the barrage of misinformation regarding the horses at Echo Valley Ranch and Timberline Equine's role in same, we would like to set the record straight for all who are interested in the facts.

We have a considerable amount of experience with Animal Control agencies in multiple counties and states, and our focus in this case and in all Animal Control cases has been since the start of our involvement and will continue to be providing appropriate veterinary care to the horses. We endeavor to educate and gain compliance from owners for the sake of the horses, we do not punish or libel them. Our concern is the horses. Legal matters are for prosecutors, judges and juries.

Firstly, there are at least 3 distinct cases which have been conflated by many posters. 1. Horses seized by order of Routt County Animal Control. 2. One horse that treated for an unrelated illness. 3. Horses seized by Park County Animal Control.

Case 1: 2 Routt County Animal Control horses. Timberline has no current knowledge of these horses. We have neither examined those horses, nor even seen them "in passing" since mid 2011, at which time they were in normal body condition.

Case 2: An underweight horse that exhibited sudden onset of paralysis.
Contrary to a grossly exaggerated description of a horse that was near death and covered with body sores, this horse actually regained the ability to stand on her own. Sadly, she later suffered a sudden and unpreventable cardiovascular death. Post mortem examination was conducted by Colorado State University and the some of the report was released by the Park County Sheriff's Department. The pathologists at CSU examined and commented upon the sores as hair loss and small areas of abrasion and inflammation. To have assumed a diagnosis of simple malnutrition in this horse would not only have constituted malpractice, as neurologic signs such as paralysis are not explained by malnutrition alone, but would have entirely missed the catastrophic lesion that caused her death. This horse's paralysis and cause of death were unrelated to the horses that comprise case 3.

Case 3: Six underweight horses seized by Park County Animal Control
Early on, there were several posts here on Pinecam claiming that Timberline had examined these horses and said that they were "fine" and that their condition was okay for their breed in the winter months. This is patently false. The horses were not examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody. They were at that point examined and given appropriate body condition scores according to the customary Henneke scale. At the time we examined them, they were already in the process of being appropriately re-fed. Peculiarities in the physical findings in addition to body condition scores necessitated further and more thorough investigation.

Botulism was considered initially as a potential cause in cases 2 and 3, but it was quickly ruled out clinically, and later by laboratory testing.
Contrary to several posts, these horses were not diagnosed with any disease, neurologic or otherwise, to the exclusion of malnutrition. There were simply peculiarities that remained unexplained by starvation alone, and if there was another condition contributing to their weight loss, it certainly should be addressed and not dismissed or overlooked. In fact, it would constitute malpractice not to investigate potential contributing factors. It should be noted that these possibilities were being explored while the horses were already being re-fed in accordance with AAEP guidelines.

An internal medicine specialist, cardiologist, toxicologist, the State Veterinarian's office, among other experts, were contacted by Timberline Equine in an attempt to shed light on these peculiarities, which are not typically associated with malnutrition, even extreme malnutrition.

One post claimed that a treating vet would be "defending" the owners. If this post indeed was intended to mean Timberline, we would like to make it clear that we are on the side only of the horses and the facts. We are not attorneys and do not defend anyone.

Some have claimed there were dead and or dying horses lying about the ranch. We did not observe any dead horses on our visits to the ranch. The only horse to our knowledge that was down was case 2.

It must also be understood that it is a violation of the ethics of our profession to improperly disclose client or patient information (read our professional ethics here http://www.aaep.org/ethics_prof_guide.htm and here http://www.avma.org/issues/policy/ethics.asp). Therefore, no specific patient information has been or will be made public without permission from an owner or as required by law. We are simply not permitted to ignore our professional ethics because of

Ex 8
314

public interest. The proper authorities have had and will continue to have our full cooperation. Although we understand the community's concern and interest, we can no more make public these records than your doctor can post your medical records without your permission.

Lastly, to those of you who have let cooler heads and reason prevail, we thank you. This case has been the subject of gross exaggeration, misinformation and rumor. If this case goes to trial, all of the facts of the case will come out. We can assure you with absolute certainty that if and when these details are made public that they will corroborate and confirm everything that we have stated here.

---

Top                 (profile)                                                          □ Posted: Apr 26, 2012 8:42 am
○ JHiller             Post subject:

Pinecam Hall of Fame poster!    I am grateful and appreciative of the information you have chosen to professionally disclose here.

                      I hate to tell you it won't matter a hill of beans as some of these people don't read, don't comprehend and already have appointed
                      themselves judge jury and hangman.

                      As far as they are concerned the horses were starved, intentionally, one died and that's all they need to know and the rest of this
                      thread is a waste of anyone's time.

Joined: Oct 5, 2005 1:27 pm    If anything but a guilty verdict is handed down and the sentence isn't to their liking, and it won't be, they will cry corruption. It is truly
Posts: 34253           bizarre.

---

Top                 (profile)                                                          □ Posted: Apr 26, 2012 9:08 am
○ Lazierfon           Post subject:

Pinecam Hall of Fame poster!

                                        Hall Timberline.

Joined: Nov 26, 2002 3:51 pm
Posts: 12410
Location: Geology is not a real science!!!

---

Top                 (profile)                                                          □ Posted: Apr 26, 2012 9:14 am
○ wildGoose2          Post subject:

Pinecam Hall of Fame poster!    Thank you, Timberline!

Joined: Oct 5, 2005 6:47 pm
Posts: 11348

---

Top                 (profile)                                                          □ Posted: Apr 26, 2012 9:24 am
□ nomaagain          Post subject:



                      TimberlineEquine wrote:
                      In response to the barrage of misinformation regarding the horses at Echo Valley Ranch and Timberline Equine's role in same, we
                      would like to set the record straight for all who are interested in the facts.

                      We have a considerable amount of experience with Animal Control agencies in multiple counties and states, and our focus in this
                      case and in all Animal Control cases has been since the start of our involvement and will continue to be providing appropriate
Joined: Feb 23, 2006 10:47 am    veterinary care to the horses. We endeavor to educate and gain compliance from owners for the sake of the horses, we do not
Posts: 6285            punish or libel them. Our concern is the horses. Legal matters are for prosecutors, judges and juries.

                      Firstly, there are at least 3 distinct cases which have been conflated by many posters. 1. Horses seized by order of Routt County
                      Animal Control. 2. One horse that treated for an unrelated illness. 3. Horses seized by Park County Animal Control.

                      Case 1: 2 Routt County Animal Control horses. Timberline has no current knowledge of these horses. We have neither examined
                      these horses, nor even seen them "in passing" since mid 2011, at which time they were in normal body condition.

                      Case 2: An underweight horse that exhibited sudden onset of paralysis.
                      Contrary to a grossly exaggerated description of a horse that was near death and covered with body sores, this horse actually
                      regained the ability to stand on her own. Sadly, she later suffered a sudden and unpreventable cardiovascular death. Post mortem
                      examination was conducted by Colorado State University and the some of the report was released by the Park County Sheriff's
                      Department. The pathologists at CSU examined and commented upon the sores as hair loss and small areas of abrasion and
                      inflammation. To have assumed a diagnosis of simple malnutrition in this horse would not only have constituted malpractice, as
                      neurologic signs such as paralysis are not explained by malnutrition alone, but would have entirely missed the catastrophic lesion
                      that caused her death. This horse's paralysis and cause of death were unrelated to the horses that comprise case 3.

                      Case 3: Six underweight horses seized by Park County Animal Control
                      Early on, there were several posts here on Pinecam claiming that Timberline had examined these horses and said that they
                      were "fine" and that their condition was okay for their breed in the winter months This is patently false. The horses were not
                      examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody. They were at that
                      point examined and given appropriate body condition scores according to the customary Henneke scale. At the time we examined
                      them, they were already in the process of being appropriately re-fed. Peculiarities in the physical findings in addition to body
                      condition scores necessitated further and more thorough investigation.

                      Botulism was considered initially as a potential cause in cases 2 and 3, but it was quickly ruled out clinically, and later by laboratory

315

# EXHIBIT 35

AGREN BLANDO COURT REPORTING & VIDEO INC

# ORIGINAL

1

DISTRICT & COUNTY COURT, COUNTY OF PARK,
STATE OF COLORADO

CASE NO. 2012 M 000043, DIV. A
CASE NO. 2012 M 000044, DIV. A

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

RANDALL J. HATLEE, and RONALD L. SWIFT,

    Defendants.

---

    The above-entitled matter came on for hearing

on Monday, December 3, 2012 at 9:56 a.m. before the

HONORABLE BRIAN LOUIS GREEN, County Judge.

APPEARANCES:

FOR THE PLAINTIFF:        THOMAS K. LEDOUX

FOR THE DEFENDANT:      DARRELL LEE CAMPBELL

ALSO PRESENT:          RANDALL J. HATLEE
                           RONALD L. SWIFT
                           CINDY HARDY

317

AGREN BLANDO COURT REPORTING & VIDEO INC

81

1    were not evident to her?

2        A.    I'm not aware of that, no.

3        Q.    And she made -- and then it also went on in

4    her report, she said she -- "she" meaning Dr. Horton --

5    never saw them at all when she was out there on the

6    11th of February.  Well, let me just ask you:  When she

7    gave you that opinion, did she give you any facts to

8    indicate that she knew when the horses were brought in?

9        A.    No.

10       Q.    Did you ask her when she knew -- what

11   information she had about the horses being brought in?

12       A.    No.

13       Q.    Did you -- at the time you listened to her

14   opinion and made the decision to seize these horses,

15   were you aware of when she was -- what information she

16   had to indicate that the defendants were aware of the

17   horses losing weight and they didn't bring them in in

18   time?

19       A.    No.

20       Q.    So at this point, when you signed the

21   affidavit, you had no idea when the defendants had

22   recognized that the horses were losing weight.

23       A.    No.

24       Q.    And so when Dr. Horton said they should have

25   recognized it and they didn't, you had no time frame

318

1    there. You didn't know how many weeks they'd been

2    brought in or if it was just a few days before the

3    notice of warning, do you?

     A.   No.

     Q.   And, in fact, isn't it true that in your

     conversations with the defendants, Mr. Swift had told

     you that as soon as he noticed they were losing weight,

8    he brought them in?

9         A.   Yes.

10        MR. LEDOUX:  Objection, Your Honor.

11   Again, I don't understand the relevance of this line

12   of questioning.  I don't think it goes to any of the

13   issues -- it's not relevant.  I think we're talking

14   about the affidavit at this point.  It's not relevant

15   to an omission that I'm aware of yet from the

16   affidavit.

17        THE COURT:  I'm going to overrule.  The

18   knowledge possessed by the officer at the time the

19   affidavit was submitted is relevant to whether that

20   information should have been presented to the reviewing

21   judge.  Go ahead, Mr. Campbell.

22        Q.   (By Mr. Campbell)  So and he -- the defendant

23   told you he brought them in immediately when he saw

24   they were losing weight.

25        A.   Yes.

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

319

AGREN BLANDO COURT REPORTING & VIDEO INC

85

1    correct that when you advised the Court about what

2    Dr. Horton had told you, you said that she said she

3    believes --

4        A.   Yes.

5        Q.   Did you take that as a diagnosis?

6        A.   No, I took it as her opinion.

7        Q.   Okay.  And then you also said that -- when

8    you say "I believe if Swift had noticed the horses

9    condition sooner, he would have been -- they wouldn't

10   be in the condition today."  That's how you concluded

11   your affidavit, isn't it?

12       A.   Yes.

13       Q.   So you have a belief, but you have no idea

14   how long -- when the horses were brought in and whether

15   they were brought in -- what time span occurred between

16   when they were noticed to be losing weight and when

17   they were brought in, do you?

18       A.   Correct.

19       Q.   And you didn't mention that in your

20   affidavit, did you?

21       A.   No.

22       Q.   Nor did you mention the fact that the blood

23   test showing anemia could be a result of any other

24   factors that would cause malnutrition other than the

25   owners not feeding the horses; is that right?

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

320

135

1  seizure of the horses and -- is that correct?

2      A.   Yes.

3      Q.   And apparently you reviewed that search

4  warrant with your supervisor, Officer Priestly; is that

5  correct?

6      A.   Yes.

7      Q.   And you also reviewed it with Deputy District

8  Attorney Steve Sullivan?

9      A.   Yes.

10     Q.   And then you presented it to a judge.

11     A.   Yes.

12     Q.   Which judge was that?

13     A.   One out of Canon City.

14     Q.   Okay.  Do you remember the judge's name?

15     A.   I do not.

16          THE COURT:  We've incorporated the prior

17  hearings.  It was Judge Alderton out of Chaffee County.

18          MR. LEDOUX:  His handwriting is even worse

19  than the defendants and yours.

20     Q.   (By Mr. Ledoux)  Okay.  So Judge Alderton

21  signs the search warrant; is that correct?

22     A.   Yes.

23     Q.   Now, did you, at any time, or while you were

24  authoring the affidavit, did you intentionally leave

25  details out of the affidavit in an effort to mislead

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

321

AGREN BLANDO COURT REPORTING & VIDEO INC

169

1   MR. LEDOUX:  I'll assume from that that the

2   Court's going to deny the motion to suppress.  If it's

3   granting a portion of it, obviously, I'll need an

4   opportunity to offer evidence and make further record.

5        THE COURT:  Well, you can listen to my ruling

6   and then decide if you can convince me to put on

7   additional evidence and reconsider.  But at this point

8   it's fairly simple in my eyes, and it all boils down to

9   fairness.  And, obviously, a person's perception of

10  what is fair depends on where they're sitting.

11  Obviously, Mr. Swift and Mr. Hatlee want to be treated

12  fairly by law enforcement and by the Court.  Law

13  enforcement wants to be treated fairly and not have the

14  fruits of their investigations thrown out on a

15  technicality.

16          This case has a serious problem, and that

17  problem is that the affidavit for a search warrant

18  asking the Court to authorize the seizure of the horses

19  never once mentions that the horses are endangered if

20  they're left with the defendants or with their current

21  custodian.  And it goes back to my prior ruling in the

22  case regarding the return of the horses.  The Statute

23  regarding seizure of animals I think is treated too

24  casually by animal control and by the courts up till

25  now.  And I'm glad I wasn't the judge presented with

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

322

1  ability to analyze whether or not the request to seize

2  the horses was something that should be granted.

3       MR. LEDOUX:  And so the Court's finding that

4  even though they don't constitute immunity, they

5  somehow are material and adverse.

6       THE COURT:  They are a material omission from

7  the information presented to the Court that would

8  essentially blindfold the Court on determining whether

9  to grant the request.

10      MR. LEDOUX:  And if the Court would be

11  willing to expand upon that, the defendant in the

12  motion to suppress did not explain how those admissions

13  would be material and adverse and hasn't argued to the

14  Court in any way.  So I'm requesting, if the Court

15  would be willing in our analysis of whether or not to

16  appeal the Court's decision, we can be clear about how

17  the Court is finding that those items are material and

18  adverse.

19      THE COURT:  All right.  The ruling,

20  specifically, is that the failure to notify the Court

21  of the 30-day warning notice provided to the defendants

22  was a material omission from the document, which

23  prevents the officer from benefitting from the good

24  faith mistake exception in relying on the Court

25  authored seizure of the horses.

Court Reporting Videography Digital Reporting Transcription Scanning Copying
Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306

323

AGREN BLANDO COURT REPORTING & VIDEO INC

177

1           MR. LEDOUX:  I guess my --

2           THE COURT:  The officer did not include any

3    information in her request for seizure to show that the

4    animals were endangered.  The seizure should not have

5    been granted in the first place.  I'm not allowing good

6    faith exception, because the officer did not include

7    material evidence for the Court to review.

8           MR. LEDOUX:  I guess my question is, if an

9    investigative officer, in any other investigation, at

10   some point thinks to themselves, "I don't think this

11   person I'm investigating committed this crime," an

12   extension of the Court's ruling would be that that

13   conclusion by the officer would have to be included in

14   any subsequent affidavits filed in that investigation

15   even if the investigating officer subsequently came to

16   a different conclusion based on evidence obtained in

17   the investigation.  And I don't think that's the state

18   of the law, so I just --

19          THE COURT:  I don't agree that that's an

20   accurate extension of my ruling.

21          MR. LEDOUX:  Okay.  And my other question is,

22   the Court is referencing the seizure Statute.  The

23   search warrant granted in this case was a search

24   warrant, to the extend they're different, and I believe

25   that they are, was a search warrant based on the fourth

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

324

# EXHIBIT 36

325

## DECLARATION OF JENA QUESTEN, D.V.M.

I am a doctor of veterinary medicine who has been retained to provide expert opinions in this case. My opinions are set forth in Exhibits 102, 106 and 107 of my deposition.

As noted, it is my opinion that the horses which are the subject of this case were suffering from toxemia. The cure for toxemia is food water and time. The time and feeding of the subject horses prior to their seizure contributed to their recovery which continued to progress under the care of Littleton Equine and Olds. Their recovery was completed after they were returned to Echo Valley ranch.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____

_____

JENA QUESTEN, D.V.M.

326

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

---

SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DOCUMENTS 63, 64, 65 and 66

---

Attached hereto are:

\     Exhibit 37-Index of Exhibits

Exhibit 38-Separate Statement of Facts re Third Claim [#64]

Exhibit 39-Separate Statement of Facts re Individual Capacity [#65]

Exhibit 40-Separate Statement of Facts re Damages [#66]

1

327

/s/ Brice A. Tondre

_____

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado 80226
Telephone: 303-296-3300
Facsimile: 303-238-5310

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of January, 2015, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which willsend notification of filing to the following.

Timothy P. Schimberg

John Lebsack

/s/ Brice A. Tondre

_____

2

328

# EXHIBIT 37

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

**INDEX OF EXHIBITS TO PLAINTIFFS' MEMORANDA IN OPPOSITION TO
MOTIONS FOR SUMMARY JUDGMENT [Doc. Nos. 67, 68, 69, 70 and 71]**

There are 36 Exhibits which have been filed with [#68] the first 31 of which are also

attached to [#67]. A description of each exhibit follows.

| **EXHIBIT** | **DESCRIPTION** |
|---|---|
| 1 | Cindy Hardey's report of the wellness check conducted at Echo Valley ranch on February 16, 2012, and her contacts with Dr. /Olds on that date. |
| 2 | Bobbi Priestly's report of the wellness check conducted at Echo Valley ranch on February 16, 2012. |
| 3 | February 16, 2012, Notice of Warning. |
| 4 | February 16-17, 2012, e-mails between Dr. Olds and Deputy Hardey. |
| 5 | February 16, 2012, e-mail setting forth Dr. Horton's differential diagnosis of Maggie |
| 6 | February 16, 2012, e-mail from Barbara Wright urging the Sheriff's Office to |

1

330

seize the horses and noting that she was present for and photographed the arrival of Bear and Dr. Olds at her clinic

7       February 18, 2012, e-mail from Barbara Wright to Drs. Horton and Burton urging them to convince Mr. Swift to give up the horses to her.

8       February 18, 2012 e-mail from Barbara Wright to Monika expressing frustration with  Park County animal control and her intent to launch an "email blast."

9       February 19, 2012, posting in BEARCAT by Barbara Wright noting that she just received a report from the clinic that Bear's problem was not neurological and is starvation. It noted that the Ferraros were helping with "lobbying Officialdom to move on this travesty."

10      Report of Sgt. Priestly regarding the events leading up to placing the horses in protective custody and to seizure. Concern about threats was the motivating factor. Dr. Horton expressed the need to go slowly in analyzing the case and expressed concern about harassing calls she was receiving from Shelly Ferraro and about death threats which she received. It reports a meeting of Wegener, Gore and Priestly on February 21, 2012, during which they have a telephone conference with Dr. Horton.

11      The Protective Custody Agreement.

12      Paper published by Dr. Olds clinic regarding the need to go slowly in diagnosing the cause of equine anemia.  It is noted that there are many potential causes one of which is ingestion of toxins. All subject horses were anemic.

13      A number of e-mails dated February 21 and 22, 2012 showing dissatisfaction with the protective custody agreement, a threat by Shelley Ferraro sent to Sgt. Priestly which she forwards to Undersheriff Gore who immediately enlisted Dr. Olds to aid him in planning to relocate the horses from protective custody. Dr. Olds agrees to temporarily house the horses and provide various services for their care. This follows on the heels of the February 21, 2012, meeting of Wegener, Gore and Priestly described in Exhibit 10. It is fair to infer that they were planning to attempt to seize  the horses.

14      On February 24, 2012, the day after the horses were seized, Dr. Olds sent an e-mail thanking everyone who put pressure on the Sheriff's Office and acknowledging that the public pressure caused their demands to be taken seriously.

15      Affidavit for the search warrant.

2

331

16 February 25, 2012, e-mail from Monika to Dr. Olds stating that after a conversation with Gore she believes he is alright. Compare with this the Ferraro threat to create more publicity (Exhibit 13). Before the seizure Gore is a villain.

17 February 28, 2012, memo from Dr. Burton listing the diagnostic testing and analysis which was being arranged by Plaintiffs when the horses were seized. The seizure prevented testing and analysis which would have prevented their seizure and prosecution.

18 April 10, 2012, Order directing return of the seized horses to Plaintiffs.

19 April 12, 2012, e-mail from Dr. Olds to Gore asserting that the incompetence of the assistant district attorney in handling the hearing at which the horses were ordered returned was the cause. Dr.. Olds is urging Gore to press the prosecution. Gore responded that, "I will get with Sgt. Priestly and Lt. Bonnelycke and our county attorney to analyze a strategy for going forward. We are there with you." Dr. Olds threatens Gore that "this is about to erupt into another media storm."

20 In an April 11, 2012 e-mail Sgt. Priestly bemoans the loss, criticizes the District Attorney, and says "We have NEVER lost a case and I am not about to start now." [So it is all about winning, justice be damned.]

21 Barbara Wright's memo regarding her attempt to buy the horses through Drs. Burton and Horton and that Plaintiffs could avoid legal proceeding if they sold the horses to her.

22 Excerpts from the deposition of Dr. Burton.

23 Excerpts from the deposition of Dr. Horton.

24 Excerpts from the deposition of Sheriff Wegener.

25 Excerpts from the deposition of Undersheriff Gore.

26 Excerpts from the deposition of Dr. Questen and her expert reports.

27 Excerpts from the deposition of Captain Bonnelycke.

28 Excerpts from the deposition of Sgt. Priestly.

29 Excerpts from the deposition of Deputy Hardey.

30 E-mails illustrating pressure on the District Attorney.

3

332

31     Excerpts from the deposition of Dr. Olds.

32     Declaration of Randall J. Hatlee.

33     A sampling of publications which were damaging to Plaintiffs' reputations, embarrassing and emotionally injurious to Plaintiffs.

34     A Pinecam posting by Drs. Horton and Burton in response to the barrage of misinformation regarding Plaintiffs' horses.

35     December 3, 2012, ruling suppressing evidence of what transpired during the seizure period.

36     Declaration of Jena Questen, D.V.M.

/s/ Brice A. Tondre

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado 80226
Telephone: 303-296-3300
Facsimile: 303-238-5310

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of January, 2015, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system which will send notification of the filing to the following:

Timothy P. Schimberg

John Lebsack

/s/ Brice A. Tondre

4

333

# EXHIBIT 38

334

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.      13-cv-02469-RPM-MJW

RANDALL J. HATLEE,
RONALD L. SWIFT,

Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
ASHLEIGH OLDS,

Defendants.

**SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE: MOTION FOR
SUMMARY JUDGMENT REGARDING PLAINTIFFS' THIRD CLAIM FOR RELIEF**

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 1.  A copy of the "Agreement" is attached hereto as Exhibit A. | The agreement includes the Notice of Warning which is Plaintiffs' Exhibit 3. | |
| 2.  It was signed by Animal Control Officer Cindy Hardey on February 19, 2012. *Id.* at ¶ 3.  It was signed by the Plaintiffs on that same date. | | |

Respectfully submitted this 15th day of January, 2015.

> *(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*
>
> */s/ Timothy P. Schimberg*
>
> _____
>
> Timothy P. Schimberg
>
> FOWLER, SCHIMBERG & FLANAGAN, P.C.
> 1640 Grant Street, Suite 150
> Denver, Colorado 80203
> (303) 298-8603
>
> ATTORNEY FOR DEFENDANTS CINDY
> HARDEY, BOBBI PRIESTLY, MONTE GORE,
> AND FRED WEGENER

2

336

## CERTIFICATE OF SERVICE

  I hereby certify that on this 15th day of January, 2015, I caused a true and correct copy of the foregoing **SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE: MOTION FOR SUMMARY JUDGMENT REGARDING PLAINTIFFS' THIRD CLAIM FOR RELIEF** to be filed via the ECF system, with notice of same being electronically served to the following:

Brice A. Tondre, Esq.  
Brice A. Tondre, P.C.  
215 S. Wadsworth Blvd., Ste. 500  
Lakewood, CO 80226-1566  
*Attorney for Plaintiffs*

John M. Lebsack, Esq.  
White and Steele, P.C.  
600 17th Street, Ste. 600N  
Denver, CO 80202  
*Attorney for Defendant Ashleigh Olds*

*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*

*/s/ Kala Cyganiewicz*

_____

337

# EXHIBIT 39

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.    13-cv-02469-RPM-MJW

RANDALL J. HATLEE,
RONALD L. SWIFT,

Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
ASHLEIGH OLDS,

Defendants.

---

## SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE: DEFENDANTS WEGENER, GORE, PRIESTLY AND HARDEY'S MOTION FOR SUMMARY JUDGMENT RE: INDIVIDUAL CAPACITY CLAIMS

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 1. On February 23, 2012, a warrant issued for the seizure of six of Plaintiffs' horses. *See* Exhibit A, Warrant and Affidavit. | | |
| 2. The warrant was supported by an affidavit from Animal Control Officer Cindy Hardey. *Id.* | | |
| 3. Undersheriff Gore has been the Undersheriff of Park County since 2005. *See* Exhibit B, Gore's Deposition at 7. | | |
| 4. Undersheriff Gore was not | Denied. See Plaintiffs' | |

339

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| involved in the decision to file animal cruelty charges against Mr. Hatlee or Mr. Swift. *Id.* | Exhibit 13. It indicates that in response to an e-mail from Shelley Ferraro to Sgt. Priestly which was forwarded to Undersheriff Gore with noted Hi Importance that he contacted Dr. Olds to arrange for temporary housing of the horses at her clinic while arranging for more permanent arrangements and short notice transfer of the horses. This is clearly preparatory to immediate seizure. | |
| 5. Undersheriff Gore was not involved in the drafting of the Affidavit that Cindy Hardey executed in order to obtain a search and seizure warrant. *Id.* at 8. | | |
| 6. Undersheriff Gore is not Cindy Hardey's immediate supervisor. *See id.* at 23. | | |
| 7. Undersheriff Gore is not responsible for disciplining Cindy Hardey. *Id.* | | |
| 8. Sheriff Wegener is the duly elected Sheriff of Park County and has been for 16 years. *See* <u>Exhibit C,</u> Deposition of Wegener at 4. | | |
| 9. Sheriff Wegener's role regarding the investigation of Plaintiffs was minimal and involved communicating with Sheriff Wiggins from Routt County and directing Sergeant Bobbi Jo Priestly to look into claims of animal cruelty regarding Plaintiffs. *See id.* at 8. | | |

2

340

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 10. The Sheriff was not involved in the decision to seize the horses. *See id.* at 13. | Denied. See Exhibit 10 which reports that Wegener, Gore and Priestly had a telephone conference with Dr. Horton on February 21, 2012. Following this conference Gore contacted Dr. Olds regarding moving the horses to. her clinic. See Exhibit 13. The clear inference is that seizure was discussed during the meeting of the three on February 21. | |
| 11. Sgt. Priestly has worked as Animal Control Officer at the Park County Sheriff's Department for 12 years and is currently the senior Animal Control Officer. *See* Exhibit D, Deposition of Priestly at 4. | | |
| 12. Priestly did not review Hardey's affidavits in support of the search and seizure. *Id.* at 22. | This is disputed. Dur | |
| 13. Priestly testified that Hardey made the decision to seize the horses. *Id* at 89. | | |
| 14. On April 10, 2012, at an "animal bond hearing" a County Court judge found that there was no probable cause to detain the horses because the horses were not imminent danger, but there was probable cause to believe the horses suffered from animal cruelty. *See* Exhibit E, Animal Bond Hearing at p. 65 lines 22 to page 66 line 4. | | |
| 15. At that same hearing, the County Court judge | | |

3

341

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| suggested that there may have been material omissions from Officer Hardy's affidavit regarding whether the horses were in danger, but made clear that there was nevertheless probable cause to believe Plaintiffs' committed animal cruelty. *Id.* | | |
| 16.  At a later hearing on December 3, 2012, the County Court judge found that the affidavit contained material omissions regarding whether the horses were in imminent danger and therefore suppressed evidence obtained that were the fruits of that seizure. *See* Exhibit F, December 3, 2012 Hearing Transcript at 173 lines 23 – p. 174 line 7. | | |
| 17.  Again, however, at the December 3, 2012, the County Court Judge stated that there was still probable cause to believe Plaintiffs committed animal cruelty. *Id.* | | |
| 18.  Plaintiffs' horses were returned to them on April 11, 2012. | | |
| 19.  Undisputed Facts Nos. 10-21 from the Motion for Partial Summary Judgment Regarding Damages are specifically incorporated herein. | | |

4

342

Respectfully submitted this 15th day of January, 2015.

*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*

*/s/ Timothy P. Schimberg*

Timothy P. Schimberg

FOWLER, SCHIMBERG & FLANAGAN, P.C.
1640 Grant Street, Suite 150
Denver, Colorado 80203
(303) 298-8603

ATTORNEY FOR DEFENDANTS CINDY
HARDEY, BOBBI PRIESTLY, MONTE GORE,
AND FRED WEGENER

343

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of January, 2015, I caused a true and correct copy of the foregoing **SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE: DEFENDANTS WEGENER, GORE, PRIESTLY AND HARDEY'S MOTION FOR SUMMARY JUDGMENT RE: INDIVIDUAL CAPACITY CLAIMS** to be filed via the ECF system, with notice of same being electronically served to the following:

Brice A. Tondre, Esq.                        John M. Lebsack, Esq.
Brice A. Tondre, P.C.                        White and Steele, P.C.
215 S. Wadsworth Blvd., Ste. 500             600 17th Street, Ste. 600N
Lakewood, CO 80226-1566                      Denver, CO 80202
*Attorney for Plaintiffs*                    *Attorney for Defendant Ashleigh Olds*


*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*

*/s/ Kala Cyganiewicz*
_____

6

344

# EXHIBIT 40

345

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.     13-cv-02469-RPM-MJW

RANDALL J. HATLEE,
RONALD L. SWIFT,

Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
ASHLEIGH OLDS,

Defendants.

## SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE: MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DAMAGES

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 1. The horses were seized pursuant to a warrant on February 23, 2012. *See* First Amended Complaint at ¶ 26. | Admitted. | |
| 2. The horses were seized based on a finding of probable cause that Plaintiffs were neglecting the horses. *See* Exhibit A, Warrant and Affidavit for a search warrant. | Denied. The seizure was on the basis of an affidavit which omitted material facts and was therefore illegal. The material omissions were in bad faith. Exhibit 35 p. 175 | |
| 3. The horses were returned to Plaintiffs on April 11, 2012, following an "animal bond hearing" on April 10, 2012. *See* Exhibit B, | | |

346

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| Transcript of Animal Bond Hearing at p. 65 line 2 – p. 66 line 16. | - | |
| 4. The Court specifically held that there was probable cause to believe Plaintiffs committed animal cruelty. *Id.* At 65. The County Court concluded that there was not probable cause to believe horses were in imminent danger and ordered the horses returned to the Plaintiffs. At a later hearing on December 3, 2012, the Court held that there were material omissions from the affidavit in support of the warrant regarding whether the horses were in imminent danger. *See* Exhibit C, December 3, 2012 hearing transcript at p. 173 line 23 – p. 174 lines 1-7. Again, the Court specifically held that there was still probable cause to believe Plaintiffs committed animal cruelty.  *Id.* | The issue of whether there was probable cause to believe that Plaintiffs committed animal cruelty was not litigated. | |
| 5. Following, the "animal bond hearing" and December 3, 2012 motions hearing, the District Attorney made the decision to prosecute the animal cruelty case against Plaintiffs to verdict based on his conclusion that there was still probable cause to believe that the Plaintiffs committed misdemeanor animal cruelty, a conclusion shared by the County Court judge, and | The evidence indicates that the District Attorney took the case to trial for political reasons and because he was pressured to do so. Exhibits 19, 20 and 32. | |

347

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| based upon his belief that he had enough evidence to convict Plaintiffs beyond a reasonable doubt. *See* Exhibit D, Affidavit of 11th Judicial District – District Attorney Thom K. LeDoux. | | |
| 6. Following the "animal bond hearing" the alleged omissions from the affidavit in support of the warrant were known to all parties, to include the District Attorney. *Id.; see also* Exhibit B, Transcript of Animal Bond Hearing of April, 2012 at p. 65 lines 2 to p. 66 lines 16. | | |
| 7. Notwithstanding the alleged omissions, the District Attorney believed there was probable cause and sufficient evidence to convict beyond a reasonable doubt. *Id.* At ¶ 9. The County Court Judge agreed. *See* Exhibit B, April 10, 2012 Hearing Transcript at p. 65 lines 22-24; Exhibit C, December 3, 2012 Hearing Transcript at p. 173 lines 23- p. 174 lines 1-7. | Disputed. Exhibit 32 | |
| 8. On March 1, 2013, the Plaintiffs were acquitted following a jury trial. *See* First Amended Complaint ¶ 31. | | |
| 9. Notwithstanding the acquittal, the District Attorney still believes there was probable cause and enough evidence to convict Plaintiffs. *See generally* | Disputed. Exhibit 32. | |

3

348

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| Exhibit D. The County Court judge agreed. *See* Undisputed Fact No. 8, *supra*. | | |
| 10. The District Attorney made the decision to prosecute based on his own independent professional judgment and was not influenced by these Defendants or anyone else. *Id*. At ¶ 9 and 12. | Disputed. Exhibits 19, 20 and 32. | |
| 11. The horses were returned to Plaintiffs, with the weight of each horse increasing an average of 125 pounds in 7 weeks. *See* Exhibit E, Park County Sheriff's Office Investigation File – Continuation Sheet (Park County Defendants' Disclosures 000108-109). | | |
| 12. Pictures taken before the horses were seized are attached as Exhibit F. | | |
| 13. During the period when Plaintiffs did not have their horses, there is no evidnce that Plaintiffs incurred any costs to feed and care for the horses. | | |
| 14. In Plaintiffs' Initial Disclosures, Plaintiffs claimed the following damages: $85,000 to defend the underlying criminal case; $500,000 in lost "income and value"; $2 million in non-economic damages; and $2,000,000 in exemplary damages. *See* Exhibit H, | | |

349

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| Plaintiffs' Initial Disclosures, p. 5. | | |
| 15. Plaintiffs' Initial Disclosures did not contain a computation of Plaintiffs' economic damages consistent with Fed.R.Civ.P. 26(a)(1)(C). *Id.* | Disputed. Those were good faith estimates based upon Plaintiffs' judgment. *Malloy v. Monahan*, 73 F.3d 1012, 1016-17 (10th Cir. 1996). | |
| 16. Without explanation, when written discovery responses served, the amount of economic damages increased to over $1 Million. *See* Exhibit I, Plaintiffs' Discovery Responses, p. 4-5. | Same as 15. | |
| 17. On July 24, 2014, Park County Defendants served their second set of interrogatories and requests for production of documents to the Plaintiffs. *See* Exhibit J. Plaintiffs could not/did not produce any copies of state and federal income tax returns (neither have filed any during the relevant time period involved), quarterly estimated tax filings or any other document to support any claim of financial loss as to them. Plaintiffs could not produce state and federal income tax returns for Bailey Depot Feed. Plaintiffs could not/did not provide any documents to support claims regarding horse boarding contracts/agreements. There were no documents either in disclosures or responses to requests for production of | Each Plaintiff was deposed for two days. The damages were fully explained during those depositions. | |

5

350

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| documents to support any claim regarding farrier work, training of horses, the brokering of hay (*see* ¶ 19 below). | | |
| 18. *Chart will not fit into this box. Please refer to Motion for Partial Summary Judgment Regarding Damages* | | |
| 19. Of the $85,000 in attorney fees sought, $4,852.94 were incurred before April 12, 2012 (figure derived by adding the March 2012 and April 2012 invoices then subtracting all entries after April 12, 2012). *See* Exhibit S, criminal defense attorney Campbell's Bills. | As a result of the breach of the agreement (Exhibits 3 and 11) Plaintiffs were denied the opportunity to have diagnostic testing and analysis done which would have exonerated them thereby eliminating a trial on criminal charges. | |
| 20. There is no evidence in the record that Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to federally protected rights of others. | Disputed. Prosecution for political reasons is clearly reckless and callous. Particularly egregious is the seizure of the horses prior to the expiration of the 30 days which the Sheriff's Office agreed to give Plaintiffs to prove their innocence.. Equally egregious was Hardey's seizure of the horses when she did not believe they were endangered. Exhibits 18 and 29, p.41 . | |

351

Respectfully submitted this 15th day of January, 2015.

>*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*
>
>*/s/ Timothy P. Schimberg*
>
>_____
>
>Timothy P. Schimberg
>
>FOWLER, SCHIMBERG & FLANAGAN, P.C.
>1640 Grant Street, Suite 150
>Denver, Colorado 80203
>(303) 298-8603
>
>ATTORNEY FOR DEFENDANTS CINDY
>HARDEY, BOBBI PRIESTLY, MONTE GORE,
>AND FRED WEGENER

352

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of January, 2015, I caused a true and correct copy of the foregoing **SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE: MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DAMAGES** to be filed via the ECF system, with notice of same being electronically served to the following:

Brice A. Tondre, Esq.
Brice A. Tondre, P.C.
215 S. Wadsworth Blvd., Ste. 500
Lakewood, CO 80226-1566
*Attorney for Plaintiffs*

John M. Lebsack, Esq.
White and Steele, P.C.
600 17th Street, Ste. 600N
Denver, CO 80202
*Attorney for Defendant Ashleigh Olds*

*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*

*/s/ Kala Cyganiewicz*
_____

8

353

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

_____

SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DOCUMENT NOS. 61 AND 66

_____


Attached hereto is Exhibit 36 which was filed unsigned. Attached is the signed copy.


/s/ Brice A. Tondre

_____
Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado  80226
Telephone:  303-296-3300
Facsimile: 303-238-5310
briceatondrepe@msn.com

ATTORNEY FOR PLAINTIFF

1

354

## CERTIFICATE OF SERVICE

I hereby certify that on this the 12th day of January, 2015, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which willsend notification of filing to the following.

Timothy P. Schimberg
t_schimberg@fsf-law.com

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre
_____

2

355

# EXHIBIT 36

356

## DECLARATION OF JENA QUESTEN, DVM, CertAqV

I am a doctor of veterinary medicine who has been retained to provide expert opinions in this case. My opinions are set forth in Exhibits 102, 106 and 107 of my deposition.

As noted, it is my opinion that the horses which are the subject of this case were suffering from toxemia. The cure for toxemia is food water and time. The time and feeding of the subject horses prior to their seizure contributed to their recovery which continued to progress under the care of Littleton Equine and Olds. Their recovery was completed after they were returned to Echo Valley ranch.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 1/7/15

Jena Questen DVM CertAqV

357

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants

---

## DEFENDANT OLDS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT [#61]

---

Defendant Ashleigh Olds ("Dr. Olds"), through her counsel John Lebsack and Adam
Goldstein, files this Reply Brief in support of her Motion for Summary Judgment [#61].

### INTRODUCTION

Plaintiff concedes the bulk of Dr. Olds' Statement of Undisputed Material Facts. These
undisputed facts entitle Dr. Olds to judgment as a matter of law. Dr. Olds was not a state actor,
and Plaintiff's suggestion that Colorado's mandatory reporting statute converts Dr. Olds into a
state actor has been roundly rejected. Next, the undisputed facts establish that Dr. Olds had
sufficient information to know or suspect animal cruelty. Plaintiff's argument that Dr. Olds
needed to meet a professional standard of care and reach a formal differential diagnosis before
reporting her suspicions is contrary to the plain language of the statute.

1

358

# UNDISPUTED MATERIAL FACTS

Dr. Olds' Reply Statement of Undisputed Material Facts In Support of Motion for Summary Judgment, filed herewith, constitutes Dr. Olds' formal reply to each of Plaintiffs' responses to Dr. Olds' original Statement of Undisputed Facts.

It is notable that Plaintiffs did not respond to, and thereby conceded, the vast majority of the facts presented in Dr. Olds' Statement of Undisputed Material Facts. [*See* #73-2.] Where Plaintiffs did respond to Dr. Olds' Statement of Undisputed Material Facts, the response often lacks any citation to authority. *Id.*, at ¶¶ 4, 7, 46-49, 54, 60, 68 [sic], 83 [sic], 100 [sic]. Finally, in the rare instances when Plaintiff's response included a citation to authority, the citations are contrary to the Court's requirement of pinpoint citations and/or they fail to support the asserted response. *See id.*, at ¶¶ 11, 36, 42, 44-45, 50, 62 [sic], 74 [sic], 77 [sic], 84 [sic], 85 [sic], 96 [sic].[1] The Court should reject Plaintiffs' arguments and purported facts that are unaccompanied by a proper reference to supporting exhibits in the record.

Important to Dr. Olds' Motion, it is now conclusively established that the following facts are undisputed:

- Dr. Olds is a licensed veterinarian (Statement of Fact 1).

- Dr. Olds was not an agent of Park County (SOF 6).

---

[1] Plaintiffs submitted 36 exhibits with their responses to the defendants' motions for summary judgment [see index at #72-1], but nine of these exhibits are not referenced anywhere in Plaintiffs' response briefs or Plaintiffs' responsive statement of facts to Dr. Olds' motion or the motions by the other defendants. The unreferenced exhibits are 14, 16, 21, 24, 25, 27, 28, 30, and 36. The Court should not consider these unreferenced exhibits.

- Dr. Olds played no part in the drafting, reviewing or approval of the Park County Sheriff's seizure application and affidavit, or the summonses and complaints issued to the Plaintiffs (SOF 92-93).

- Dr. Olds played no role in the seizure of the Six Horses on February 23, 2012 (SOF 94).

*Disputed*

- Maggie, Bear and The Six Horses were too thin on February 16, 2012 (SOF 13, 41).

- The photos of Maggie, Bear and the Six Horses taken on February 16, 2012 and attached as exhibits to Dr. Olds' Motion are authentic (SOF 14-16).

- Dr. Olds knew that one horse under Plaintiffs' care (Bear) was already the subject of a pending animal abuse case (SOF 17-18, 24-26).

- On February 16, 2012, Dr. Olds found Bear down, extremely thin, covered in urine/manure and unable to stand on its own (SOF 30, 32).

- On February 16, 2012, Dr. Olds saw an emaciated, down and sore-covered mare named "Maggie" (SOF 33). Maggie died the next day (SOF 35).

- On February 16, 2012, Dr. Olds saw The Six Horses, all of which were too thin (SOF 13, 36, 41).[2]

- On February 16, 2012, Dr. Olds was told by Plaintiff Swift that several horses at Echo Valley Ranch had already died (SOF 43).

---

[2] Plaintiffs contend there is an issue of fact as to whether The Six Horses' feed bins were empty and water troughs frozen upon Dr. Olds' February 16, 2012 visit. *See* Reply Statement of Facts, 36, 42. Dr. Olds disputes that Plaintiffs have raised a true disputed question of fact on the issue. Regardless, Dr. Olds had reasonable cause to suspect abuse even without the fact of empty food and water bins.

3

360

- The last time The Six Horses had been seen by a veterinarian and received treatment was: Fiona – never; Lena – never; Echo - August 2010; Midnight – September 2010; River – October 2010; Chance - October 2010 (SOF 74).

- During a February 20, 2012 examination, another veterinarian (Dr. Horton) found the Six Horses to be extremely thin and grossly anemic (SOF 76-78).

- Dr. Horton agrees that "the horses had deteriorated past a point where assistance should have been sought," and "regardless of why the horses were thin, . . . those horses were let go far too long" (SOF 80-82).

- On April 10, 2012, and again on December 3, 2012, Park County Judge Brian L. Green found that probable cause existed to charge Plaintiffs with animal cruelty (Reply Statement of Facts 44, 49, 97).

## ARGUMENT

## I.   Dr. Olds Did Not Act Under Color of State Law.

Plaintiffs' response brief fails to create a triable issue that Dr. Olds acted under color of state law. Plaintiff's response brief raises several arguments, but none are availing.

### A.   C.R.S. § 13-64-121 does not make Dr. Olds a state actor.

Plaintiffs' primary argument is that Dr. Olds qualifies as a state actor because C.R.S. § 13-64-121 requires licensed veterinarians to report *reasonably suspected* animal cruelty to law enforcement. Without any case law or other legal support, Plaintiffs claim this statute turns veterinarians into "co-actors with animal control officers" and "an investigative arm of the state."

In truth, multiple federal courts have determined that state mandatory reporting statutes <u>do not</u> turn the mandatory reporter into a state actor for purposes of § 1983. *See generally,*

4

361

*Brown v. Newberger*, 291 F.3d 89, 93 (1st Cir. 2002)(statutory reporting requirement does not create the kind of regulatory nexus that justifies treating reporter as a state actor); *Preston v. New York*, 223 F.Supp.2d 452, 465 (S.D.N.Y. 2002)(statutory obligation to preserve evidence and report suspected abuse insufficient to impose § 1983 liability on a private entity); *Thomas v. Beth Israel Hospital, Inc.*, 710 F.Supp. 935, 940-41 (S.D. N.Y. 1989)(compliance with state law by reporting suspected abuse does not mean reporter acted under color of state law); *Schneider v. Sutter Amador Hospital*, 2014 U.S. Dist. LEXIS 152869, at *18 (E.D. Cal. 2014)("the doctors' compliance with state reporting requirements does not make them state actors"); *Amor v. Arizona*, 2009 U.S. Dist. LEXIS 19606, at *7-11 (D. Ariz. 2009)(private doctor failed to come within color of state law despite mandatory reporter statute); *Haag v. Cuyahoga County*, 619 F.Supp. 262, 283 (N.D.Ohio, 1985)(individual not state actor despite mandatory reporting law); *Arline v. City of Jacksonville*, 359 F.Supp.2d 1300, 1312 (M.D. Fla. 2005)(private doctor's alerting authorities of suspected child abuse per state statute and providing information that may lead to an arrest is not sufficient to convert a private person's actions into public action); *Murphy v. Parker*, 2006 U.S. Dist. LEXIS 50141, at * 7 (D. Ariz. 2006)(a private person who makes representations to an official, even in a report required by law, is not acting under color of state law within the meaning of the civil rights statutes); *Boyko v. Parkview Hospital, Inc.*, 2012 U.S. Dist. LEXIS 114384, at * 10 (N.D.Ind. 2012)(fact that private actor is required to follow the laws of a state does not mean the actor functions as the state by complying); *see also Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983)("the mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985.").

362

The *Brown* decision is directly on point. In *Brown*, the plaintiff sued a social worker for reporting suspected abuse under the state's mandatory reporting law. *Brown*, 291 F.3d at 93. The 1st Circuit ruled that the social worker was <u>not</u> acting under color of state law despite the state's mandatory reporting statute:

> Defendant Kern's liability as a state actor is pressed on the basis that she filed a report of suspected sexual abuse with DSS. Mass. Gen. Laws ch 119, § 51A requires a wide variety of social and health workers to file such reports if they have reasonable cause to believe that a child is suffering from sexual abuse. . . . While this kind of "mandatory reporting" goes somewhat beyond the cases dealing with the voluntary furnishing of information to the police, . . . we conclude that the reporting requirement under section 51A does not create the kind of regulatory nexus that could justify treating Kern as a state actor.

*Id.* (internal citations omitted). As the 1st Circuit in *Brown* summed up:

> Nothing seems more counterintuitive to us than to reason that a statute which protects one who complies from civil or criminal actions under state law should be the vehicle for subjecting the actor to liability under federal law.

*Id.* Because so-called "mandatory reporting" statutes do not turn the mandatory reporter into a state actor for purposes of § 1983, Dr. Olds does not qualify as a state actor and Plaintiff's § 1983 claims against her must be dismissed.

**B.  Dr. Olds does not qualify as a state actor under the "joint action" or "conspiracy" tests.**

Plaintiffs' cited case law does not support finding Dr. Olds a state actor under the so-called "joint action" or "conspiracy" tests. Cases concerning these doctrines involve situations where the defendant pursued a constitutional violation with the assistance of or in conspiracy with state officials. *See e.g., Lugar v. Edmondson*, 457 U.S. 922. (1982). *Lugar* involved a creditor seizing for himself a debtor's property with the assistance of a sheriff. *Id.*, at 924-25. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (197) involved a lunch counter manager

6

363

refusing service on racial grounds at the direction of local police. *Dennis v Sparks*, 499 U.S. 24 (1980) and *Tower v. Glover*, 467 U.S. 914 (1984) involved the alleged bribing of a judge and a public defender, respectively. By contrast, Dr. Olds did not seize anything, she did not garnish or attach any property for herself, she received no compensation from Park County for her actions, and she was not pursuing any sort of private cause of action against Plaintiffs.

The case of *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1142 (10th Cir. 1995) rejected the application of the "joint action" and "conspiracy" doctrines. Under either test, "the conduct allegedly causing the 'deprivation of a federal right' must be 'fairly attributable to the state.'" *Id*, at 1447. The existence of governmental regulations, standing alone, does not provide the required nexus. *Id.*, at 1448. Likewise, citizens who make complaints to police officers that result in arrests are not state actors. *Id.*, at 1454. For the joint action/conspiracy test to apply, the allegedly unconstitutional act must have resulted from a concerted action such as a conspiracy, prearranged plan, or policy that substituted the judgment of a private party for that of the police. *Id.* Such joint action or conspiracy is not present when the police make an independent decision to make the challenged arrest. *Id.*

Here, there is no evidence to suggest that the Sheriff's Office made anything other than an independent decision to charge Plaintiffs and seize the horses. Dr. Olds lacked the power or authority to compel the Sheriff's Office to do anything. There is no evidence to suggest that the employees of the Sheriff's Office substituted Dr. Olds' judgment in place of their own. To the contrary, the undisputed facts show that Officer Hardey *declined* to seize the horses on February 16, 2012 at Dr. Olds' suggestion, and did so several days later after her ongoing investigation revealed further evidence (from Plaintiffs' own veterinarian) that Plaintiffs' let matters go too

7

364

long and should have sought assistance sooner. *See* SOF 52, 70-82, 85-86. It is undisputed that Dr. Olds was not involved in the seizure of the horses on February 23, 2012. *See* SOF 87-88, 91-96.

Because the so-called "joint action" and "conspiracy" tests do not apply, Dr. Olds does not qualify as a state actor and she is entitled to summary judgment on Plaintiff's § 1983 claims.

## C.    Plaintiffs' unsupported factual claims should be disregarded.

Plaintiffs' response brief makes a series of factual assertions without citation to any record support. For example, Plaintiffs claim it was Dr. Olds who incited the so-called public outcry, but Plaintiffs offer no evidence linking her thereto. *See* [#67, at p. 4, 7-8].[3] Next, Plaintiffs allege that Dr. Olds asserted that "the horses were *intentionally* starved by the Plaintiffs," but Plaintiffs point to no evidence of any such assertion. *See* [#67, at p. 4] (emphasis added). Plaintiffs claim "Dr. Olds allowed her unfounded claims to be broadcast over Channel 7 News" without any evidence that her permission was sought or granted. *See* [#67, at p. 5]. Plaintiffs offer no support for the claim that Dr. Olds "encouraged Harmony HorseWorks to embark upon a public outcry," or that the publicity campaign was "based upon Dr. Olds' request." *See* [#67, at p. 6]. Finally, Plaintiffs claim that anonymous threats "were a direct outgrowth of the unfounded claims of Dr. Olds," but Plaintiffs offer no evidentiary support for the assertion. *See* [#67, at p. 6].

Plaintiffs unsupported factual claims do not constitute evidence. Unsupported allegations lacking record support do not create triable issues of fact. *See* Fed.R.Civ.P. 56(c)(1); *Celotex*

---

[3] On Page 7, Plaintiffs cite to an email drafted by Barbara Wright of Harmony HorseWorks (Exhibit 8), but Dr. Olds is not even copied on the email and there is no evidence linking Dr. Olds to it.

*Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Further, even if these alleged facts were supported by evidence and assumed true, they do not make Dr. Olds a state actor. Even assuming for argument that Dr. Olds spoke out as part of the public outcry, there is no evidence she did so on behalf of the state or under color of state law. The First Amendment would be seriously eroded if a citizen's call for government action subjects the speaker to § 1983 liability.

Because Dr. Olds did not act under color of state law, the 1983 claims against her fail as a matter of law.

## II. Plaintiffs' State Law Malicious Prosecution Claim Against Dr. Olds Fails Because Dr. Olds Enjoys Statutory Immunity.

Plaintiffs' state law malicious prosecution claim fails as a matter of law because Dr. Olds has immunity under C.R.S. § 12-64-121 (2013). As discussed in Dr. Olds' Motion, this statute (i) requires veterinarians to report suspected animal cruelty, (ii) provides immunity for the making of such good faith reports, and (iii) presumes the good faith of veterinarians making such reports. C.R.S. § 12-64-121.

Plaintiffs' argument against Dr. Olds' statutory immunity is based on an unsupportable interpretation of the statute. Specifically, Plaintiffs argue that (i) the "reasonable cause" requirement of the statute requires a veterinarian to have probable cause prior to making a report [#67, at p. 3]; and (ii) a veterinarian must meet a professional standard of care and reach a formal differential diagnosis before reporting suspected animal cruelty. [#67, at p. 5]. These arguments misinterpret the plain language of the statute.

9

366

**A. C.R.S. § 12-64-121 does not require probable cause prior to the making of a report and the attachment of statutory immunity.**

The interpretation of a statute is a question of law for the Court, and not a disputed issue

of fact. *See generally, Stewart v. Beach*, 701 F.3d 1322, 1334 (10th Cir. 2012); *Cain v. People*,

327 P.3d 249 (Colo. 2014). Contrary to Plaintiffs' suggestion, C.R.S. § 12-64-121 does not

require probable cause before its statutory reporting obligation is triggered and its immunity

protection attaches. The statute, on its face, states otherwise:

> A licensed veterinarian who . . . **has reasonable cause to know or suspect** that the animal has been subjected to cruelty in violation of section 18-9-202, C.R.S., . . . shall report or cause a report to be made of the animal cruelty or animal fighting to a local law enforcement agency or the bureau of animal protection. . . .

> A licensed veterinarian who in good faith reports **a suspected incident** of animal cruelty . . . in accordance with subsection (1) of this section shall be immune from liability in any civil or criminal action brought against the veterinarian for reporting the incident.

C.R.S. § 12-64-121 (1), (4) (emphasis added). As opposed to requiring "probable cause" of

animal cruelty, the statute merely requires "reasonable cause to know or suspect" cruelty.

"Reasonable cause to know or suspect" is not the same thing as probable cause. Probable

cause is defined to exist when the objective facts and circumstances presented are sufficient to

induce a person of ordinary prudence and caution to entertain a reasonable belief that the

defendant committed a crime. *See generally, People v. Castaneda*, 249 P.3d 1119, 1122 (Colo.

2011); *People in re M.V.*, 742 P.2d 326, 329 (Colo 1987). Stated differently, probable cause

exists "when there is a fair probability that the defendant has committed, is committing, or is

about to commit a crime." *People v. Brown*, 217 P.3d 1252, 1256 (Colo. 2009). Critically,

10

probable cause requires more than mere suspicion. *People v. Gutierrez*, 222 P.3d 925, 937 (Colo. 2009); *citing Brinegar v. United States*, 338 U.S. 160, 175 (1949).

C.R.S. § 12-64-121 requires reporting and provides immunity when a veterinarian "has reasonable cause to know or suspect" animal cruelty. This threshold, by its terms, is something less than probable cause because probable cause requires more than mere suspicion.

The reporting statute's threshold of "reasonable cause to know or suspect" is more akin to the concept of "reasonable suspicion," which exists when the facts known, taken together with rational inferences from those facts, create a reasonable and articulable suspicion of criminal activity. *See People v. Funez-Paiague*, 276 P.3d 576, 578-79 (Colo. 2012). "Reasonable suspicion" has been explicitly defined as something less than probable cause. *See e.g., People v. Archuleta*, 980 P.2d 509, 512 (Colo. 1999) Plaintiff is simply wrong to suggest that C.R.S. § 12-64-121 requires a veterinarian to have probable cause before the reporting requirement and immunity protection attach.

**B.     C.R.S. § 12-64-121 does not require a conclusive diagnosis prior to the making of a report and the attachment of statutory immunity.**

Plaintiffs next argue that a veterinarian must meet a professional standard of care, follow a differential diagnosis protocol, and reach a formal diagnosis of abuse before making a report under the statute. [#67, p. 5, 10]. The statute, however, contains no such language. The statute does not require a formal diagnosis or a final conclusion. To the contrary, the statute only requires that the veterinarian have reasonable cause to know or suspect animal cruelty.

Plaintiffs incorrectly attempt to inject professional standards of care and formal diagnosis requirements even though no such requirements appear in the statute. This is not a malpractice case, and Dr. Olds need not prove that her suspicions were correct in order to enjoy statutory

11

368

immunity. The information required to reach a formal patient diagnosis is not the same thing as the information required to reach a reasonable suspicion. Plaintiffs cite no legal authority for the proposition that the two issues are one in the same.[4]

The case of *Thomas v. Beth Israel Hospital, Inc.* provides good analysis of the difference between suspected abuse and a formal diagnosis. In *Thomas*, the plaintiff sued a hospital after the hospital reported suspected child abuse under the state's mandatory reporting law. *Thomas*, 710 F.Supp. at 937-38. The hospital reported the suspected abuse after a hospital doctor examined the child and found multiple abrasions and black and blue marks. *Id.*, at 937, 941. While these marks led the hospital to suspect abuse, common sense dictates that such marks could have resulted from a fall, accident, or any number of other potential causes.

The Court in *Thomas* granted the hospital immunity under the state reporting statute despite the hospital's failure to exclude other potential causes for the marks. Specifically, the Court held:

> Dr. Ilano's medical examination of [the child], which revealed multiple abrasions and black and blue marks, both old and new, clearly indicated the possibility of physical abuse or mistreatment and required [the hospital] to file a report of suspected child abuse. [Plaintiff's] allegations of "fraudulent" reporting of child abuse are factually incorrect and insufficient to rebut the statutory presumption that [the hospital] acted in good faith in reporting [the child] as a suspected victim of child abuse. **The reporting requirements that trigger the qualified immunity provision of [the state law] are premised not on actual or conclusive proof of abuse, but on reasonable cause to suspect such abuse.**

*Id.*, at 941-42 (emphasis added).

---

[4] An expert witness such as Dr. Questen, may opine about a veterinarian's professional duty of care in a malpractice setting, but the quantum of evidence required to trigger C.R.S. § 12-64-121 is a matter of statutory interpretation and a question of law for the Court. *See Stewart*, 701 F.3d at 1334; *Cain*, 327 P.3d 249.

369

Much like the reporting statute in *Thomas*, C.R.S. § 12-64-121 merely requires reasonable cause to suspect animal cruelty, and not actual or conclusive proof. Nothing in the statute suggests that other potential causes must be excluded before reporting the suspected cruelty. Nothing in the statute suggests that a formal differential diagnosis is required before reporting the suspected cruelty. Instead, the plain language of the statute merely requires "reasonable cause to know or suspect that the animal has been subjected to cruelty."

### C. The undisputed facts establish that Dr. Olds had sufficient evidence to suspect animal cruelty.

The undisputed materials facts that have been conceded in this matter establish that Dr. Olds had sufficient evidence to report suspected animal cruelty and obtain statutory immunity. To start, Dr. Olds' good faith is statutorily presumed. C.R.S. § 12-64-121(4). On top of the presumption, the undisputed evidence reveals that, *inter alia*, (i) Maggie, Bear, and The Six Horses were all too thin, (ii) Bear was down, covered in urine/manure, and unable to stand on his own, (iii) Maggie was emaciated, down, and covered in sores, (iv) The Six Horses were not under veterinarian care, (v) the horses had deteriorated past the point where veterinary assistance should have been sought, and (vi) Dr. Olds was informed that several horses at Echo Valley Ranch had already died. While Plaintiffs argue these facts were insufficient to reach a formal, final, and conclusive differential diagnosis, these facts were certainly sufficient to raise a reasonable suspicion of animal cruelty. This is all that is required to trigger the statutory reporting obligation and the grant of immunity.

13

370

III.    **Plaintiffs' State Law Malicious Prosecution Claim Against Dr. Olds Fails**
        **Even Without Statutory Immunity.**

Even without considering Dr. Olds' statutory immunity, Plaintiffs' malicious prosecution

claim fails because Plaintiffs cannot prove the essential element of lack of probable cause.

Lack of probable cause is a necessary element of a malicious prosecution claim. *Hewitt*

*v. Rice*, 154 P.3d 408, 411 (Colo. 2007); *Thompson v. Hiwan Ridge Dev. Co., Inc.*, 84 P.3d 496,

503 (Colo. 2004); *Lounder v. Jacobs*, 205 P.2d 236, 238-239 (Colo. 1949). "The existence of

probable cause is alone sufficient to relieve a defendant of a charge of malicious prosecution."

*Montgomery Ward and Co. v. Pherson*, 272 P.2d 643, 645 (Colo. 1954).

Whether a given state of facts or circumstances amounts to probable cause is a question

of law for the Court. *Montgomery Ward*, 272 P.2d at 646; *Gurley v. Tomkins*, 30 P. 344, 439

(Colo. 1892). Where the conceded or substantially undisputed facts do not show a want of

probable cause, the Court should take the responsibility of directing a verdict in favor of the

defendant. *Montgomery Ward*, 272 P.2d at 646; *citing Gurley*, 30 P. 349. It is only where there

is a dispute as to the existence of those facts which are relied upon as constituting probable cause

that the matter is to be determined by the jury. *Konas v. Red Owl Stores, Inc.*, 404 P.2d 546, 548

(Colo. 1965); *Montgomery Ward*, 272 P.2d at 646. To constitute probable cause it is only

necessary that there be a belief held in good faith in the guilt of the accused, and that such belief

be reasonable and prudent. *Konas*, 404 P.2d at 548.

Additionally, "if a magistrate binds over a person charged with a criminal offense, this

establishes a rebuttable presumption of probable cause for purposes of a subsequent malicious

prosecution claim." *Schenck v. Minolta Office Systems, Inc.*, 802 P.2d 1131, 1133 (Colo. App.

1990).

371

Here, Dr. Olds is entitled to a rebuttable presumption of probable cause because the Park County Judge found probable cause to believe the animals suffered from cruelty. *See* Reply Statement of Facts 44, 49, 97. Furthermore, the undisputed material facts outlined above were sufficient to provide Dr. Olds with probable cause to believe that animal cruelty had occurred. Because the material facts are not in dispute, the presence or absence of probable cause is a matter of law for the Court. Because the undisputed facts form a sufficient basis for probable cause, Plaintiffs' malicious prosecution claim fails as a matter of law.

As discussed, Plaintiffs' argument that Dr. Olds failed to reach a final differential diagnosis is irrelevant. The relevant inquiry is not whether Dr. Olds "got it right" or whether there were other possible explanations for her observations. Instead, the question is merely whether the undisputed materials facts provided Dr. Olds with a reasonable good faith basis to believe that a crime had likely been committed. Plaintiffs can offer no evidence to the contrary, in light of the undisputed fact that horses were emaciated, down, and filthy when Dr. Olds was at Echo Valley Ranch on February 16, 2012.

## CONCLUSION

Plaintiffs contend that Dr. Olds was wrong in her suspicions of animal cruelty, and Plaintiffs are mad that Dr. Olds reported her suspicions and then testified against them. But Plaintiffs cannot maintain triable § 1983 claims or a triable state law malicious prosecution claim against Dr. Olds. Dr. Olds was not a state actor, and she reported her reasonable suspicions in good faith. For these reasons, the Court should grant Dr. Olds summary judgment and dismiss the claims against her pursuant to Fed.R. Civ.P. 56.

372

DATED this 20th day of JANUARY, 2015.

s:/John Lebsack
John Lebsack
WHITE AND STEELE, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, Colorado  80202
(303) 296-2828
Fax No.:  (303) 296-3131
jlebsack@wsteele.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of January, 2015, a true and correct copy of the foregoing was e-served via CM/ECF to the following:

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado  80226
*briceatondrepc@msn.com*

Timothy P. Schimberg
Fowler Schimberg & Flanagan, P.C.
1640 Grant St., Ste. 300
Denver, CO  80203
*t_schimberg@fsf-law.com*

s/Becky Kongs
Becky Kongs
WHITE AND STEELE, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO  80202
Telephone:  (303) 296-2828
Fax:  (303) 296-3131
bkongs@wsteele.com

16

373

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MIW

RANDALL I. HATLEE and
RONALD L. SWIFT

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants

---

## DEFENDANT OLDS' SEPARATE REPLY STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Defendant Ashleigh Olds, DVM, DABVP-Equine ("Dr. Olds"), through her counsel John

Lebsack, submits this Separate Reply Statement of Undisputed Material Facts in Support of

Motion for Summary Judgment, pursuant to Practice Standards (Civil Cases), Section

IV(B)(2)(c).

Movant's Reply Supporting Statement:

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 1. Ashleigh Olds, DVM, DABVP-Equine ("Dr. Olds") is a licensed veterinarian. #22, ¶ 7 **Ex A**, Deposition of Ashleigh Olds, at 4:7-10 | | |

374

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 2. Dr. Olds is board certified by the American Board of Veterinary Practitioners in equine medicine and surgery.<br><br>**Ex A**, at 5:20-6:12 | | |
| 3. Dr. Olds is the owner of the Aspen Creek Veterinary Hospital. Approximately 95% of her practice focuses on horses.<br><br>**Ex A**, at 7:8-24 | | |
| 4. Dr. Olds has no formal involvement with any animal rights organizations.<br><br>**Ex A**, at 23:5-19 | Denied, she was the veterinarian for Barbara Wright and Harmony Horse Works who arranged for her to accompany Deputy Smith to seize Bear. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>**Ex A**, at 23:5-19 [#62-1, p. 7] states: (1) Dr. Olds has no involvement with animal rights organizations, and (2) Harmony Horse Works is a horse sanctuary, not an animal rights organization.<br><br>The request for Dr. Olds to go to Echo Valley Ranch came from Routt County and Harmony Horse Works; Dr. Olds is not sure who called first because the contact went through her front office. **Ex A** 87:7-15 [#62-1, p. 18]. Dr. Olds was accompanied to Echo Valley Ranch by people from the Park County Sheriff's Office, not by Deputy Smith of Routt County. Facts 10, 19, 26-29 below. |

2

375

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 5. Defendants Hardey, Gore, Priestly and Wegener worked for the Park County Sheriff's Office.<br><br>**Ex B**, Deposition of Cindy Hardey, at 4:20-5:5; 6:5-11<br><br>**Ex C**, Deposition of Bobbi Priestly, at 4:7-17; 7:6-8:8; 48:18-24<br><br>**Ex D**, Deposition of Monte Gore, at 4:7-20<br><br>**Ex E**, Deposition of Fred Wegener, at 4:7-13 | | |
| 6. Dr. Olds is not and never was an employee or agent of Park County.<br><br>**Ex F**, Affidavit of Ashleigh Olds, at ¶ 3 | | |
| 7. Dr. Olds' involvement in this matter began on February 15, 2012 when she was asked if her clinic would be willing to care for a horse named Bear that Routt County was impounding.<br><br>**Ex A**, at 87:7-91:7; 95:10-19<br><br>**Ex F**, at ¶ 4 | She was asked by Barbara Wright. | The response does not deny the stated fact. Plaintiffs do not give a pinpoint citation for their additional statement, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The request for Dr. Olds to go to Echo Valley Ranch came from Routt County and Harmony Horse Works; Dr. Olds is not sure who called first because the contact went through her front office. **Ex A** 87:7-15 [#62-1, p. 18] |

376

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 8. Plaintiff Swift lives on property known as Echo Valley Ranch, located in Park County.<br><br>**Ex G**, Deposition of Ronald Swift, at 6:3-15; 10:10-11:10 | | |
| 9. Plaintiff Hatlee works with Swift at Echo Valley Ranch.<br><br>**Ex H**, Deposition of Randall Hatlee, at 18:20-19:13 | | |
| 10. Dr. Olds' lone visit to Echo Valley Ranch in connection with this matter occurred on February 16, 2012.<br><br>**Ex F**, at ¶ 5 | | |

4

377

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 11. As of February 16, 2012, Plaintiffs Hatlee and Swift owned several horses that they were caring for at Echo Valley Ranch. Plaintiffs' horses included six overly-skinny horses named Lena, Chance, Echo, Fiona, River and Midnight (hereinafter referred to as "The Six Horses"). **Ex G**, at 256:5-257:3; 258:21-259:18 **Ex H**, at 279:18-280:8; 282:11-12; 443:12-13 **Ex I**, Park County Sheriff's Office file, at pp. 68-69 (document authenticated at **Ex B**, at 93:10-97:12; **Ex C**, at 119:3-120:25) | There were approximately 40 horses on the ranch. Other than The Six Horses they were in good condition. Exhibits 1 and 2. | The response does not deny stated fact.<br><br>Plaintiffs do not give a pinpoint citation for their additional statement, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>Nothing in Exhibits 1 or 2 says there were approximately 40 horses on the ranch. Nothing in the exhibits says that other than the Six Horses the rest were in good condition.<br>To the contrary, Exhibit 1 [#68-1, p. 2] states that Bear was "unable to get up off the ground"; Maggie "was skinny, had wounds all over her body from being stuck on the ground." Exhibit 2 states that Maggie "was down an unable to rise" [#68-1, p. 7]; "Maggie was suffering and needed to be euthanized" [#68-1, p. 9] |

378

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 12. Horses owned by others were also present under Plaintiffs' care at Echo Valley Ranch on February 16, 2012, including a overly-skinny and down mare named Maggie and an overly-skinny and down horse named Bear (a/k/a Little Big Man, n/k/a Spencer).[1]<br><br>**Ex H**, at 157:6-11<br><br>**Ex I**, at p. 66-68 | | |
| 13. Maggie, Bear, and The Six Horses were skinny and too thin on February 16, 2012.<br><br>**Ex A**, at 78:9-12; 82:4-5<br><br>**Ex B**, at 31:24-33:5; 119:13-20; 113:16-115:3<br><br>**Ex F**, at ¶ 6<br><br>**Ex G**, at 191:7-22; 193:2-21; 227:18-228:22; 255:18-261:3; 402:2-14<br><br>**Ex H**, at 259:7-16; 280:6-8; 282:9-12; 312:3-313:11; 353:7-354:5; 355:18-360:18; 380:9-20; 443:6-15; 571:19-572:22<br><br>**Ex I**, at pp 67-70<br><br>**Ex J**, deposition of Troy Murdock, at 14:1-19 | | |
| 14. **Ex K** , photos of Maggie taken on February 16, 2012 (photos authenticated at **Ex F**, at ¶ 7; **Ex H**, at 188:9-15; **Ex I**, at pp. 67, 84-85) | | |

---

[1] "Bear" has been known by several different names, including "Little Big Man" and "Spencer." For simplicity, the horse is referred to herein as "Bear."

379

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 15. **Ex L**, photos of Bear taken on February 16, 2012 (photos authenticated at **Ex F**, at ¶ 8) | | |
| 16. **Ex M**, photos of The Six Horses taken at Echo Valley Ranch on February 16, 2012 (photos authenticated at **Ex B**, at 32:9-17; **Ex H**, at p. 257:6-16; 277:3-6; 298:3-7; 310:10-14; 359:21-24; 382:23-25; **Ex F**, at ¶ 9; **Ex I**, at pp. 67, 84-85) | | |
| 17. Bear (and his mother, Little Feather) were the subject of an animal abuse case pending in Routt County against Plaintiff Hatlee's ex-wife. <br> **Ex H**, at 207:6-18 <br> **Ex I**, at p. 66 | | |
| 18. Bear and Little Feather were cared for by Plaintiffs at Echo Valley Ranch. <br> **Ex H**, at 208:17-209:12 | | |
| 19. On February 13, 2012, Deputies DelValle and Smith of the Routt County Sheriff's Office went to Echo Valley Ranch to do a welfare check on Bear and Little Feather. <br> **Ex H**, at 414:13-25 <br> **Ex I**, at p 66 | | |
| 20. Upon arrival, Deputies DelValle and Smith learned that Little Feather was dead, and they observed Bear in "deplorable" condition. <br> **Ex I**, at p 66 | | |

380

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 21. The horse named "Little Feather" had died in January of 2012<br><br>**Ex H**, at p. 213:5-21 | | |
| 22. Deputies DelValle and Smith also observed The Six Horses on the property in similar condition.<br><br>**Ex I**, at p 66 | | |
| 23. As a result of Deputies DelValle and Smith's February 13, 2012 visit, Routt County (i) ordered the seizure of Bear; and (ii) reported The Six Horses to the Park County Sheriff's Office.<br><br>**Ex A**, at p. 95:10-19<br><br>**Ex I**, at p 66-67 | | |
| 24. On February 15, 2012, Dr. Olds was called and asked if she would accept and care for a horse being seized by Routt County. The horse was Bear.<br><br>**Ex A**, at 87:7-91:7 | | |
| 25. Later on February 15 or February 16, 2012, Dr. Olds was asked if she would bring her trailer, accompany the Park County officers that were seizing the horse on Routt County's behalf, and then transport the horse from the scene to her hospital.<br><br>**Ex A**, at 87:7-91:7 | | |

381

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 26. Dr. Olds agreed to transport and then care for the horse, and on February 16, 2012, she met with Park County Officials at the Bailey Substation accompanied by her vet assistant Troy Murdock. It wasn't until then that Dr. Olds learned that Bear was being seized from Echo Valley Ranch. **Ex A**, at 54:6-10; 87:7-91:7 | | |
| 27. Deputies Plutt and Hanning of the Park County Sheriff's Office went to Echo Valley Ranch on February 16, 2012 to serve the Routt County seizure warrant. **Ex B**, at 28:23-29:18 **Ex I**, at p. 67 | | |
| 28. Dr. Olds and her vet assistant Troy Murdock went to Echo Valley Ranch on February 16, 2012 to take possession of Bear after his seizure. **Ex A**, at 89:24-91:22 **Ex B**, at 28:23-29:18 **Ex J**, at 8:10-9:11; 10:7-16 | | |
| 29. Park County Animal Control Officer Cindy Hardey went to Echo Valley Ranch on February 16, 2012 to perform a welfare check on The Six Horses that had been reported a few days earlier by Routt County Officer Smith. **Ex B**, at 28:6-29:8 **Ex I**, at p. 66-67 | | |

382

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 30. When Dr. Olds and the others arrived at Echo Valley Ranch, they found Bear down in his stall in the barn, extremely thin, covered in urine/manure and unable to stand on his own.<br><br>**Ex B**, at 112:20-114:6<br><br>**Ex I**, at p. 67<br><br>**Ex J**, at 10:21-11:4<br><br>**Ex N**, February 16, 2012 e-mail from Dr. Olds to Cindy Hardey, at p . 000934 (document authenticated at **Ex B**, at 106:5-20; **Ex F**, at ¶ 10) | | |
| 31. On February 16, 2012, Bear appeared emaciated to Officer Hardey, who believed that his small size was likely as a result of malnutrition.<br><br>**Ex B**, at 114:22-115:2; 115:24-116:6 | | |
| 32. Hatlee and Swift concede that Bear was too thin and had difficulty getting up on his own.<br><br>**Ex G**, at 166:2-10; 170:3-15; 171:5-7; 172:2; 174:15-18; 191:7-22; 402:2-14<br><br>**Ex H**, at 242:19-243:5; 282:11-12; 424:16-25 | | |

383

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 33. Dr. Olds and Officer Hardey next saw an emaciated, down, and sore-covered mare named "Maggie." The mare was covered in severe pressure sores on her face, shoulders and hips and could not even get into a sitting position.<br><br>**Ex A**, at 83:21-84:3<br><br>**Ex B**, at 30:10-31:17; 32:10-33:5; 116:7-118:8<br><br>**Ex I**, at p. 67-68<br><br>**Ex N**, at p. 000934-000935 | | |
| 34. As of February 16, 2012, Maggie had been unable to stand on her own (without the aid of a sling) for approximately five days.<br><br>**Ex B**, at 116:7-117:4<br><br>**Ex G**, at 241:21-245:13<br><br>**Ex H**, at 162:1-12<br><br>**Ex N**, at p. 000934<br><br>**Ex O**, deposition of Dr. Allyson Horton, at 274:22-275:11<br><br>**Ex R**, February 16, 2012 e-mail from Dr. Horton to Officer Hardey (document authenticated at **Ex O** at 248:22-249:15) | | |
| 35. Maggie died the next day – February 17, 2012.<br><br>**Ex A**, at 99:4-10<br><br>**Ex I**, at p. 73<br><br>**Ex O**, at 276:8-25 | | |

384

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 36. Officer Hardey and Dr. Olds saw The Six Horses at Echo Valley Ranch on February 16, 2012. The horses were extremely thin. All six lacked food in their pens, and their water tanks were frozen.<br><br>**Ex A**, at 110:6-10<br><br>**Ex B**, at 30:10-31:17; 32:10-33:5; 119:13-20; 121:6-122:22<br><br>**Ex I**, at p. 68-69<br><br>**Ex J**, at 14:1-19<br><br>**Ex N**, at p. 000935 | Denied. Deputy Hardey reported that they had hay and water available. Exhibits 1, 2 and 299 p.130. [sic] | The denial applies only to the third sentence of the stated facts (food and water). The first two sentences are not denied (the Six Horses were extremely thin when Olds and Hardey saw them at Echo Valley on February 16).<br><br>Plaintiffs do not give a pinpoint citation to Exhibits 1 and 2, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>There is no Exhibit "299." If that is a typo that should say "29," Exhibit 29 has no such page 130 [#68-7, pp. 1-9]. |
| 37. Mr. Swift and Mr. Hatlee had brought Bear, Maggie and The Six Horses in from the pasture during the winter of 2011-2012 because they were thin and showing signs of weight loss.<br><br>**Ex H**, at 571:19-572:22 | | |
| 38. Mr. Swift gave Officer Hardey permission to view The Six Horses during her visit to Echo Valley Ranch on February 12, 2012.<br><br>**Ex G**, at 190:10–191:22; 192:15 – 23 | | |

385

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 39. Mr. Hatlee did not limit Dr. Olds' movement at the Ranch on February 16, 2012. **Ex H**, at 476:19–477:9 | | |
| 40. Mr. Hatlee and Mr. Swift were with Dr. Olds and Officer Hardey when they went to look at The Six Horses on February 16, 2012. **Ex H**, at 603:20–604:8 | | |
| 41. Mr. Hatlee and Mr. Swift both admit that The Six Horses were too thin on February 16, 2012. **Ex G**, at 191:7-22; 192:2-21; 255:18-261:3 **Ex H**, at 282:11-12; 571:19-572:22 | | |
| 42. Mr. Hatlee and Mr. Swift admit that there was no food and frozen water tanks in The Six Horses' pens when Dr. Olds and the people from the Park County Sheriff's Office arrived on the morning of February 16, 2012. **Ex G**, at 422:22-424:7 **Ex H**, at 435:20-436:4; 581:24-583:1 | They were in the process of feeding when the animal control contingent arrived and while there Plaintiffs continued feeding. Exhibit 1 | The response does not deny the stated fact. Plaintiffs do not give a pinpoint citation to multi-page exhibit, contrary to Practice Standard IV(B)(2)((b)(ii). Nothing in Exhibit 1 [#68-1, pp. 2-5] says that Plaintiffs were in the process of feeding when Defendants arrived. |

386

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 43. On February 16, 2012, Mr. Swift told Dr. Olds that several other horses at Echo Valley Ranch had already died.<br><br>**Ex A**, at 78:9-25<br><br>**Ex N**, at p. 000935 | | |
| 44. Based on her observations at Echo Valley Ranch on February 16, 2012, Dr. Olds suspected that Bear, Maggie and The Six Horses were victims of starvation and malnutrition.<br><br>**Ex F**, at ¶ 11<br><br>**Ex N**, at p. 00934-00935 | Her suspicion was unreasonable and below the standard of care. Exhibit 26. | The response does not deny the stated fact.<br><br>Plaintiffs do not give a pinpoint citation to a location in the 12 page document [#68-6, pp. 2-13], contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The Park County Judge found there was probable cause to believe the animals suffered from animal cruelty. [#66-2, at 65:22-24; #66-3, at 173:23-174:7] |
| 45. On February 16, 2012, Dr. Olds believed that Maggie appeared to be in imminent danger of death.<br><br>**Ex A**, at 83:8-20 | Her belief was unreasonable and below the standard of care. Exhibits 5, 26 and 34. | The response does not deny the stated fact. Plaintiffs admit Maggie died the next day, February 17. *See* Fact 35 above.<br><br>Plaintiffs do not give a pinpoint citation to multi-page exhibits [#68-1, pp. 20-21, #68-6, pp. 2-13, #68-9, pp. 2-3], contrary to Practice Standard IV(B)(2)((b)(ii). |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 46. On February 16, 2012, Officer Hardey asked Dr. Olds about her general assessment of the thin horses they saw at Echo Valley Ranch.<br><br>**Ex A**, at 45:16–46:10 | Denied. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii). |
| 47. Dr. Olds reported her suspicions to Officer Hardey at the scene and discussed with her the potential seizure of the horses.<br><br>**Ex A**, at 70:12-20<br>**Ex B**, at 32:21-33:5<br>**Ex I**, at p. 69 | No reasonable basis. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not denied Fact 47. |
| 48. Dr. Olds expressed concern about the horses to Officer Hardey while at Echo Valley Ranch on February 16, 2012.<br><br>**Ex A**, at 70:12-20<br>**Ex B**, at 32:21-25; 104:5-105:1 | No reasonable basis. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not denied Fact 48. |

388

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 49. While at Echo Valley Ranch on February 16, 2012, Dr. Olds told Officer Hardey that she believed that the horses had been neglected.<br><br>**Ex B**, at 104:17–105:13 | No reasonable basis. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not denied Fact 49.<br><br>The Park County Judge found there was probable cause to believe the animals suffered from animal cruelty. [#66-2, at 65:22-24; #66-3, at 173:23-174:7] |
| 50. Officer Hardey believed that Maggie and the six other horses were in an unacceptable condition as of February 16, 2012.<br><br>**Ex B**, at 124:23–125:11 | They were not endangered. Exhibit 29, p.41. | The response does not deny the stated fact. The fact relates to the "unacceptable condition" of the horses. Plaintiffs admit the horses were skinny and too thin. Facts 13, 13, 41 above. |
| 51. Dr. Olds did not suggest to Officer Hardey that the horses (except for Bear) be moved to her clinic.<br><br>**Ex B**, at 36:3-12 | | |

389

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 52. Officer Hardey decided not to seize The Six Horses on February 16, 2012. Instead, Officer Hardey issued Plaintiffs a Notice of Warning.<br><br>**Ex B**, at p. 31:11-17; 35:19-37:1; 40:9-13; 124:2-4<br><br>**Ex C**, at 49:25-50:4<br><br>**Ex I**, at p. 69-70<br><br>**Ex P**, Notice of Warning (document authenticated at **Ex B**, at 40:4-19; **Ex H**, at 444:23-445:5) | | |
| 53. The Notice of Warning issued on February 16, 2012 states "you will have a month from today to gain HEALTHY weight on the 6 horses. . . . If you fail to rectify the Condition of the Animals in question you may be charged."<br><br>**Ex I**, at p. 70<br><br>**Ex P** | | |

390

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 54. While at Echo Valley Ranch on February 16, 2012, Officer Hardey was under the impression that all of the horses she had looked at were under the care of Dr. Horton/Timberline Vets. This understanding played a role in Officer Hardey's decision to issue the Notice of Warning rather than seize the horses.<br><br>**Ex B**, at 100:13–101:6; 103:15-24 | They could be impounded only if endangered. Deputy Hardey did not consider them to be endangered. | The response does not deny the stated fact. The fact relates to Officer Hardey's impression about vet care, not about endangerment.<br><br>Plaintiffs' Exhibit 34 confirms this fact. Timberline wrote: "The [six] horses were not examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody." Exhibit 34 [#68-9, p.2].<br><br>Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs do not deny Fact 54. |
| 55. While Officer Hardey was at the Echo Valley Ranch on February 16, 2012, Officer Priestly spoke to Mr. Swift by phone. Mr. Swift indicated to Officer Priestly that The Six Horses and Maggie were under veterinary care.<br><br>**Ex C**, at 45:10-23 | | |

391

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 56. Mr. Hatlee told Officer Hardey that "we had talked with our vets and we were taking the steps that we were advised by our vets" in regards to all of the sick horses.<br>**Ex H**, at 443:6-444:7 | | |
| 57. Dr. Olds and her assistant loaded Bear into the trailer and left Echo Valley Ranch.<br>**Ex B**, at 31:11-12<br>**Ex F**, at ¶ 12 | | |
| 58. When Dr. Olds left Echo Valley Ranch on February 16, 2012, she knew that Park County did not plan to seize The Six Horses that day.<br>**Ex A**, at 69:24-70:11 | | |
| 59. Dr. Olds was present at Echo Valley Ranch for approximately 30-45 minutes.<br>**Ex B**, at 30:1-9 | | |

392

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 60. When Bear arrived at Aspen Creek Veterinary Clinic on February 16, 2012, he could not stand and needed to be lifted out of the trailer.<br><br>**Ex Q**, deposition of Dr. Amy Murdock, at 4:7-13;  5:8-22;  15:2-16;  20:25-21:5;  22:13-24:23;  28:8-29:2 | He could stand before his fall during transport. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response does not deny the stated fact regarding Bear's condition upon arrival at the Clinic.<br><br>Further, whether Bear could stand on his own before transport is disputed.  It is undisputed that Bear was down and unable to stand on his own when Dr. Olds first observed him at Echo Valley Ranch on February 16, 2012. *See* Facts 12, 30, 32.<br><br>Hardey wrote that on February 16, 2012, she found Bear in the barn at Echo Valley Ranch "lying in the horse stall and was unable to get up off the ground.  A male party that worked at the ranch was in the horse stall with the colt trying to get the colt to stand on his feet.  The male party identified himself as … Randall Hatlee."  Ex. 1 [#68-1, at p. 2].<br><br>Mr. Hatlee testified that Bear was down when they walked into the barn. *See* Fact 32; **Ex H**, at 424:12-25. [#62-8, p. 35] |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 61. Once Aspen Creek Veterinary Clinic fed Bear and give him IV fluids he was able to stand up and never went back down again.<br><br>**Ex Q**, at 4:7-13; 5:8-22; 15:2-16; 20:25-21:5; 22:13-24:23; 28:8-29:2 | | |
| 62. Based on her observations of Bear, Dr. Murdock agreed with the determination that Bear was malnourished and starved.<br><br>**Ex Q**, at 44:7–45:9 | | *Plaintiff's Statement [#73-3] omits Fact 62 from the sequence. The omission throws off the numbering in the Plaintiffs' statement from here to the end. All of plaintiffs' responses below are moved next to the correct numbers, e.g., Plaintiffs' #62 is moved down one cell to be next to #63, and likewise for all that follow.* |

394

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 63. After being moved to Dr. Olds' hospital, Bear displayed a voracious appetite and quickly recovered, putting on weight and otherwise responding favorably to treatment that largely consisted of basic feed and water.<br><br>**Ex F**, at ¶ 19 | Malnourished is different than being starved. Determination of why they were malnourished was going to take time as advocated by Dr. Olds clinic in Exhibit 12. Dr. Olds was opposed to taking the time necessary to the making of a reasonable diagnosis. Drs. Burton and Horton were in the process of a diagnostic analysis when the horses were seized. Exhibit 17. When the horses were ordered returned Dr. Olds attacked the competence of the district attorney. Exhibit 19. Dr. Olds [sic] persistent pressure to prosecute without scientific basis was unprofessional, unreasonable and malpractice. Exhibit 26. HHer [sic] conduct was a violation of the Fourth and Fourteenth Amendments and the reporting statute. | The response does not deny the stated fact, which pertains to Bear's appetite and recovery after he was moved to Dr. Olds' hospital.<br><br>Plaintiffs do not give pinpoint citations, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs do not dispute Fact #63.<br><br>Nothing in the cited exhibits says that Dr. Olds was opposed to taking more time; nothing says that Dr. Olds exerted any pressure to prosecute without a scientific basis.<br><br>Exhibit 12 [#68-3, p. 4] discusses anemia, not malnutrition. It was not written by Dr. Olds. |
| 64. Officer Hardey did not speak to Dr. Olds on February 16, 2012 after Dr. Olds left Echo Valley Ranch.<br><br>**Ex B**, at 81:1-11 | | |

395

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 65. On the afternoon of February 16, 2012, Dr. Olds wrote a report memorializing her observations and emailed it to Officer Hardey.<br><br>**Ex A**, at 69:10-23; 81:3-6<br><br>**Ex B**, at 112:6-11<br><br>**Ex F**, at ¶ 10<br><br>**Ex N** | | |
| 66. In the several days that followed, the Park County Sheriff's Department was inundated with telephone calls about the horses from people who were upset over the situation, and as a result Undersheriff Goes became concerned over talk about an attempt to rescue the horses at Echo Valley Ranch. As a result, he suggested moving the horses to an undisclosed location to try to diffuse the situation.<br><br>**Ex D**, at 9:16-11:14 | | |
| 67. On February 19, 2012, Plaintiffs agreed to move The Six Horses to another location, and Plaintiffs signed a written agreement in this regard.<br><br>**Ex B**, at 43:10-16<br><br>**Ex G**, at 286:22-287:12; 289:8-17; 295:12-296:16<br><br>**Ex H**, at 452:4-454:13<br><br>**Ex S**, February 19, 2012 agreement (document authenticated at **Ex B**, at 43:10-16) | | |

396

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 68. When the six horses were moved on February 19, 2012, the horses were loaded and transported by Mr. Swift and Mr. Hatlee.<br>**Ex B**, at 49:24–50:10 | | |
| 69. Dr. Olds played no role in the decision to move the horses on February 19, 2012.<br>**Ex A**, at 96:14-21; 100:13-20<br>**Ex B**, at 43:10-45:22<br>**Ex G**, at 299:16-300:12 | Denied. It was her unsupported diagnosis off [sic] starvation which provoked the e-mail blitz and the public outcry. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not disputed the testimony cited in support of Fact 69. |
| 70. Officer Hardey of the Park County Sheriff's Office continued her investigation even after the horses were moved on February 19, 2012.<br>**Ex I**, at p. 74-75 | | |
| 71. On February 22, 2012, Officer Hardey spoke by telephone to Plaintiffs' veterinarian, Dr. Horton of Timberline Equine Veterinarian Services.<br>**Ex B**, at p. 106:21-107:5<br>**Ex I**, at p. 74, 94-96 | | |

397

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 72. Dr. Horton and Dr. Burton of Timberline Equine Veterinarian Services had provided veterinarian services to Hatlee and Swift at various points in time.<br>**Ex O**, at 36:2-39:25; 74:22-75:19; 192:2-10; 194:4-6<br>**Ex T**, deposition of Dr. Burton, at 12:14-13:3; 111:20-24 | | |
| 73. After Maggie was found down in the pasture, Timberline came to Echo Valley Ranch to provide veterinary services on two occasions before Maggie's death on February 17, 2012. Those were on Febuary 11 and 13, 2012.<br>**Ex O**, at 248:22-249:19; 276:20-277:3 | | |
| 74. The last time Timberline had previously seen or treated any of The Six Horses was:<br>Fiona – Never<br>Lena – Never<br>Echo – August 2010<br>Midnight – September 2010<br>River – October 2010<br>Chance – October 2010.<br>**Ex O**, at 36:2-39:25<br>**Ex T**, at 112:6-22 | | |

398

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 75. Timberline had no veterinarian-client-patient relationship with The Six Horses as of February 16, 2012.<br><br>**Ex O**, at 77:21-79:2 | Denied, there had been telephone contact. Prior to the seizure, Drs. Burtonn [sic] had instituted a diagnostic plan which was thwarted by the seizure. Exhibit 17. The six horses were under their care at the time of seizure. | Exhibit 17 [#68-4, p. 4] says nothing about telephone contact on or before February 16, 2012. Exhibit 17 does not pertain to Timberline's relationship with the horses on February 16, 2012, which is the date of Fact 75. Exhibit 17 talks about Timberline's examination of the horses *four days later*.<br><br>Plaintiffs' Exhibit 34 contradicts their denial of Fact 75. In that exhibit, Timberline denied caring for the Six Horses until after the seizure: "The [six] horses were not examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody." Exhibit 34 [#68-9, p.2]<br><br>In the cited portion of **Ex O**, p. 77:21-79:2 [#62-17, pp. 14-16], Dr. Horton testified she did not have a veterinarian-client-patient relationship with the Six Horses as of February 16, 2012, because she had not seen them for over 12 months. |

399

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 76. Dr. Horton physically examined The Six Horses on February 20, 2012, after they were moved from Echo Valley Ranch.<br><br>**Ex O**, at 40:15-44:6; 101:20-102:7; 149:7-151:23 | | |
| 77. On February 20, 2012, Dr. Horton found The Six Horses to be extremely thin.<br><br>**Ex O**, at 40:15-44:6; 101:20-102:7; 149:7-151:23 | | |
| 78. During her February 20, 2012 examination, Dr. Horton found The Six Horses to be grossly anemic. Lab tests later confirmed this.<br><br>**Ex O**, at 102:9-104:15; 106:4–107:6 | Dr. Olds did not follow the protocol of her clinic regarding analysis of anemia in horses. Exhibit 12. | Plaintiffs do not dispute the stated fact, which refers to Dr. Horton. The response refers instead to Dr. Olds.<br><br>Not only did Dr. Horton testify that she found anemia in the Six Horses, she said that prolonged malnutrition will result in anemia. **Ex O** at 107: 3-6 [#62-17, p. 25]; **Ex W**, deposition of Dr. Horton, at 116:4-6; 117:9-12<br><br>Dr. Burton of Timberline said anemia is consistent with malnutrition; that malnourishment can cause anemia. **Ex X**, deposition of Dr. Burton, at 36:17-25; 42:3-5; 94:1-4<br><br>Exhibit 12 [#68-3, p. 4] was not written by Dr. Olds and does not refer to the horses involved in this case. |

400

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 79. On February 22, 2012, Officer Hardey called Dr. Horton as part of her ongoing investigation. The call was recorded and later transcribed.<br><br>**Ex B**, at 106:21-107:4<br>**Ex I**, at p. 74, 94-96<br>**Ex O**, at 160:21-24 | | |
| 80. During the February 22, 2012 phone call, Dr. Horton told Officer Hardey that Plaintiffs should have sought assistance for The Six Horses sooner.<br><br>**Ex B**, at 106:21-107:14<br>**Ex I**, at p. 74, 94-96 | | |
| 81. As shown by the transcript of the February 22, 2012 phone call, Dr. Horton told Officer Hardey that "Regardless of why the horses were thin, someone should have noticed and at least called and started the investigating earlier. . . . Those horses were let go far too long."<br><br>**Ex I**, at p. 95-96 | | |

40 1

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 82. Dr. Horton testified that "these horses would have benefitted from intensive attempts to correct their weight loss sooner, either through medical attention or extra feed or at least investigation." Dr. Horton further testified that "I believe that the horses had deteriorated past a point where assistance should have been sought." Dr. Horton further testified that "I believe these horses would have benefitted from veterinary intervention much sooner." Dr. Horton further testified that "The bottom line truth is that these horses were let go far too long." Dr. Horton further testified that "My professional opinion is that regardless of [what caused] those horses to be thin, someone should have noticed and sought assistance for them." **Ex O**, at 85:3-20; 112:21-113:11; 162:1-13 | | |
| 83. Dr. Horton opines that the six horses were too thin, which is a sign of starvation. **Ex O**, at 86:16–87:5 | | |

402

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 84. Dr. Horton has not ruled out starvation as a cause for the skinny condition of the horses.<br><br>**Ex O**, at 109:19-23 | But, unlike Dr. Olds was following a scientific approach to diagnosis. | The response does not address the stated fact and does not cite to supporting evidence, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not disputed the testimony cited in support of Fact 84. |
| 85. After speaking with Dr. Horton on February 22, 2012, Officer Hardey decided to charge Plaintiffs with animal cruelty and seize The Six Horses.<br><br>**Ex B**, at 107:6-108:21<br>**Ex I**, at p. 74 ("At that point I made the decision. . . ") | By February 21, 2012, Wegener, Gore, Priestly and Olds were planning for a seizure. Exhibit 13. | The response does not deny the stated fact, which pertains to Officer Hardey's February 22 decision *to charge*. The stated fact does not pertain to *seizure*; it also does not pertain to anyone other than Officer Hardey. Plaintiffs admit that Dr. Olds played no role in the seizure. Facts 91, 92, 94.<br><br>Plaintiffs do not give a pinpoint citation, contrary to Practice Standard IV(B)(2)((b)(ii). |

403

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 86. Officer Hardey's decision to charge Plaintiffs and seize the horses was based on all of her investigation, including the opinion provided by Dr. Horton that the horses were let go far too long.<br><br>Ex B, at 107:6-108:21; 123:19-124:4<br><br>Ex C, at 121:5-122:5<br><br>Ex I, at p. 74 | Deputy Hardey knew that Dr. Horton was working on a diagnosis and was not in a hurry to reach a conclusion on this complex case. Exhibits 5, 10 and 17. | The response does not address the stated fact.<br><br>Plaintiffs do not give a pinpoint citation, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>Exhibit 5 [#68-1, pp 20-21] relates only to treatment of Maggie. Exhibit 5 does not mention The Six Horses.<br><br>Exhibit 10 [#67-2, pp. 10-12] is notes by Sergeant Priestly, not Officer Hardey. The exhibit does not discuss the decision to seize the horses, but it confirms that Dr. Horton believed the owners had not properly cared for the horses. Sergeant Priestly wrote that Dr. Horton "said that Swift is going through some very difficult personal circumstances and he was very overwhelmed. Dr Horton stated that with these issues it is still not an excuse to notice horses with body condition scores this low." Exhibit 10 [#68-2, p. 12].<br><br>The basis for the decision to seize the horses is explained in Officer Hardey's report. The report shows it was Dr. Horton's comment about the owners waiting too long that prompted the decision by Officer Hardey to seize the horses and file charges ("At that point [after Dr. Horton's comment] I made |

31

404

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 87. Officer Hardey obtained a warrant to seize The Six Horses on February 22, 2012.<br><br>**Ex U**, search warrant (document authenticated at **Ex B**, at 56:11-23) | | |
| 88. On or about February 23, 2012, Officer Hardey served Mr. Swift with a summons and complaint charging him with three counts each of misdemeanor animal cruelty. On February 24, 2012, she served a similar summons and complaint on Mr. Hatlee.<br><br>**Ex B**, at 108:25-109:7<br>**Ex V**, Two Summonses and Complaints | | |
| 89. The charges issued by Officer Hardey on or about February 22, 2012 only concerned The Six Horses, and not Bear.<br><br>**Ex B**, at 108:12-110:6<br>**Ex V** | | |
| 90. Several months later, the charges were amended by the Park County District Attorney's Office to include a charge of animal cruelty for Plaintiffs' alleged cruelty to Bear prior to Routt County's February 16, 2012 seizure.<br><br>**Ex B**, 109:16-110:6 | | |
| 91. The Six Horses were seized by Park County on February 23, 2012<br><br>**Ex D**, at 21:14-17 | | |

405

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 92. Dr. Olds played no part in the drafting, reviewing or approval of the Park County Sheriff's seizure application and affidavit.<br><br>**Ex B**, at 66:17-67:19<br>**Ex F**, at ¶ 13 | | |
| 93. Dr. Olds played no part in the drafting, reviewing or approval of the summonses and complaints issued to the Plaintiffs.<br><br>**Ex F**, at ¶ 14 | | |
| 94. Dr. Olds played no role in the seizure of the horses on February 23, 2012.<br><br>**Ex B**, at 69:20-70:6<br>**Ex C**, at 90:13-20<br>**Ex F**, at ¶ 15<br>**Ex I**, at p. 75-76 | | |
| 95. The Six Horses were never taken to Dr. Olds' facility at any time.<br><br>**Ex F**, at ¶ 16 | | |
| 96. Dr. Olds played no role in the assessment or care of The Six Horses following their seizure.<br><br>**Ex A**, at 98:23-99:25<br>**Ex F**, at ¶ 17 | | |

406

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 97. Dr. Olds in good faith suspected (and continues to suspect) that Bear and The Six Horses were starved and/or neglected by Plaintiffs.<br><br>Ex F, at ¶ 18 | Denied. See Exhibits 26 and 34. | Plaintiffs do not give a pinpoint citation to multi-page Exhibits 26 and 34, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The Park County Judge found there was probable cause to believe the animals suffered from animal cruelty. [#66-2, at 65:22-24; #66-3, at 173:23-174:7] |
| 98. Other than on February 16, 2012, Mr. Hatlee has never spoken to Dr. Olds or heard anything she has said.<br><br>Ex H, at 619:15-620:1 | | |
| 99. After February 16, 2013, Mr. Hatlee never had any contact with anybody at Aspen Creek Veterinarian Hospital.<br><br>Ex H, at 624:24–625:2 | | |
| 100.   Mr. Hatlee has no information about who contacted the press after February 16, 2012.<br><br>Ex H, at 625: 14-17 | | |
| 101.   After Bear was nursed back to health, he was adopted by a third party.<br><br>Ex A, at 104:20-105:6 | The third party was Shelley Ferraro who was at the clinic when Bear arrived and relied on Dr. Olds [sic] diagnosis of starvation I [sic] making threats and advocating seizure and prosecution. | The response does not address the stated fact and does not cite to supporting evidence, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). |

407

DATED this 20th day of January, 2014.

s:/John Lebsack
John Lebsack
Adam Goldstein
WHITE AND STEELE, P.C.
600 17th Street, Suite 600N
Denver, Colorado 80202
(303) 296-2828
Fax No.: (303) 296-3131
jlebsack@wsteele.com
agoldstein@wsteele.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of January, 2014, a true and correct copy of the foregoing was e-served via CM/ECF to the following:

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado 80226
*briceatondrepc@msn.com*

Timothy P. Schimberg
Fowler Schimberg & Flanagan, P.C.
1640 Grant St., Ste. 300
Denver, CO 80203
*t_schimberg@fsf-law.com*

s/Becky Kongs
Becky Kongs
WHITE AND STEELE, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO 80202
Telephone: (303) 296-2828
Fax: (303) 296-3131
bkongs@wsteele.com

408

# EXHIBIT W

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
        CASE NO. 13-cv-02469-RM-MJW
 3      _____
 4      RANDALL J. HATLEE and
        RONALD L. SWIFT,
 5
             Plaintiffs,
 6
                         vs.
 7
        CINDY HARDEY,
 8      BOBBIE PRIESTLY,
        MONTE GORE,
 9      FRED WEGENER and
        ASHLEIGH OLDS,
10
             Defendants.
11
        -------------------------------------------------
12
             DEPOSITION OF ALLYSON RENÉ HORTON, DVM
13                     March 27, 2014
14      -------------------------------------------------
15                              Deposition location:
                                9998 Havekost Road,
                                Conifer, Colorado 80433
16
17
        ALSO PRESENT:  Jennifer R. Edwards, Esq.
18                     (For Dr. Horton)
                       Randall Hatlee
19                     Ronald Swift
                       Ashleigh Olds, DVM
20
21
22
23
24
25
```

410

Case 1:13-cv-02469-RM-MJW   Document 162-16   Filed 01/20/15   USDC Colorado   Page 3 of 4

Page 116

 1          A.    But I -- that is a supposition and
 2     nothing more.
 3          Q.    So if we go back and just go through
 4     the links.  If -- starvation or malnutrition can
 5     cause anemia, right?
 6          A.    Prolonged, yes.
 7          Q.    And then anemia can result in this kind
 8     of heart murmur.
 9          A.    Again, those are usually diastolic
10     murmurs, but altered viscosity of blood can result in
11     heart murmurs.
12          Q.    The kind that you observed, the kind
13     of --
14          A.    I do not have that answer.
15          Q.    Okay.  I thought you just said that,
16     that a --
17               MR. TONDRE:  Objection, argumentative.
18          Q.    (BY MR. LEBSACK) That the change in the
19     viscosity of the blood can cause the kind of heart
20     murmur that you observed.
21          A.    It -- theoretically I can get there,
22     but I have no proof that that's what caused those
23     heart murmurs.
24          Q.    Okay.  But the kind of heart murmurs
25     that you observed, one explanation of that is a

411

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 117

```
 1    change in the viscosity of the blood?

 2              MR. TONDRE:  Objection, foundation.

 3         Q.   (BY MR. LEBSACK) Right?

 4         A.   A possible explanation.

 5         Q.   And one cause of a change in viscosity

 6    of blood is anemia?

 7         A.   Yes.

 8              MR. TONDRE:  Objection, foundation.

 9         Q.   (BY MR. LEBSACK) And one cause of

10    anemia is starvation?

11              MR. TONDRE:  Foundation.

12         A.   Potentially.

13         Q.   (BY MR. LEBSACK) Tachycardia is also

14    something you observed?

15         A.   Yes.

16         Q.   Right.  And that is in layman's terms

17    an elevated heart rate?

18         A.   Correct.

19         Q.   Did you form any opinions as to why

20    these horses had tachycardia?

21         A.   Certainly anemia can explain that.

22         Q.   Okay.  So do you know eventually what

23    happened to these horses in regard to the problems

24    that they had with heart murmurs?  Did the murmurs go

25    away?
```

412

# EXHIBIT X

FAY E. BURTON, D.V.M.                                    April 16, 2014
HATLEE vs. HARDEY                                                     1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
        CASE NO. 13-cv-02469-RM-MJW
 3
        _____
 4
        RANDALL J. HATLEE and
 5      RONALD L. SWIFT,

 6           Plaintiffs,

 7                      vs.

 8      CINDY HARDEY,
        BOBBIE PRIESTLY,
 9      MONTE GORE,
        FRED WEGENER and
10      ASHLEIGH OLDS,

11           Defendants.

12      -------------------------------------------------

13            DEPOSITION OF FAY ELIZABETH BURTON, DVM
                        April 16, 2014
14
        -------------------------------------------------
15
                            Deposition location:
16                          9998 Havekost Road,
                            Conifer, Colorado 80433
17

18      ALSO PRESENT:   Jennifer R. Edwards, Esq.
                        (For Dr. Burton)
19                      Randall Hatlee
                        Ronald Swift
20

21

22

23

24

25
```


ESQUIRE

414

1    Dr. Horton?

2         A.    Myself and Dr. Horton.

3         Q.    Now, on page 10 is the response to

4    Officer Hardey, and the signature of that email

5    appears at the top of page 11 and is just the name of

6    Dr. Horton.  Do you see that on the top of 11?

7         A.    Yes.

8         Q.    Does that indicate that Dr. Horton

9    authored this email?

10        A.    At least part of it because those were

11   her exam findings on the 20th.

12        Q.    And then in the second paragraph of

13   that email, it says, "In my phone conversation with

14   Sergeant Priestly and the undersheriff."  Is that a

15   conversation that you had or Dr. Horton had?

16        A.    Dr. Horton had that conversation.

17        Q.    The next paragraph says, at the start,

18   "As to the blood work, there is no blood test for

19   starvation.  Some results are consistent with, but

20   not exclusive to, malnutrition."  My question is:

21   What results are consistent with, but not exclusive

22   to, malnutrition, if you know?

23        A.    Hypoalbuminemia might be consistent

24   with but not exclusive to.  Anemia might be

25   consistent with but not exclusive to.



415

```
 1   noted tachycardia?
 2           A.   It certainly should be considered.
 3           Q.   Do you believe that malnourishment can
 4   cause anemia?
 5           A.   I think it can.
 6           Q.   Look at page 18.  This is another email
 7   about Midnight, correct?
 8           A.   Yes.
 9           Q.   Do you know what caused the renal
10   failure?
11           A.   No.
12           Q.   Then please look at pages 19 through
13   23, and if you could review all of them, not so much
14   for content, but just to see if they belong together,
15   if they are a conversation that is one continuous
16   conversation by email.
17           A.   Starting on which page?
18           Q.   19 through the end, through 23.
19           A.   Oh.
20                Well, there is a break of more than a
21   month, it looks like.
22           Q.   So it's not --
23           A.   Sometimes you just pick up an email,
24   the last one that you got from them, so you can have
25   the address correct.  So it's possible that they are
```


416

Case 1:13-cv-02469-RM-MJW Document 82-2 Filed 01/20/15 USDC Colorado Page 5 of 5

1   sure I do ask this.  You mentioned that some of these
2   horses have anemia.  Can anemia be caused by
3   malnourishment?
4            A.    Yes.
5            Q.    Was Reed and Bayly the book that you
6   talked about at the start of the deposition?
7            A.    It's one of them.
8            Q.    Are you aware of any horses that died
9   at Echo Valley?
10           A.    As I recall, there was a horse with a
11  broken humerus that was euthanized, and I believe
12  that's in these records.  I think there was one that
13  Dr. Horton saw perhaps, but I wasn't there, so I'm
14  not certain about that.
15           Q.    You don't know why that horse died?
16           A.    I don't recall.
17           Q.    Any others that you know about?
18           A.    Well, if we are going to talk about
19  Maggie, then she -- she died on the ranch.
20           Q.    Okay.  We'll defer all of Maggie's
21  questions until we get all the records.
22                MS. EDWARDS:  Is there a reason we are
23  deferring all of them because you had a lot of
24  questions the last time we met?
25                MR. LEBSACK:  Yeah.  I want to make



417

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

---

**MOTION TO SUPPLEMENT THE RECORD WITH RESPECT TO SUMMARY
JUDGMENT MOTIONS NUMBER  61, 64, 65 and 66**

---

Now come the Plaintiffs and request that they be granted leave pursuant to Rule 56(e)(1)

to supplement the record with respect to the pending motions for summary judgment (Docs. #

61, 64, 65 and 66). In support of the request Plaintiffs state:

**CERTIFICATE OF CONFERENCE:** The undersigned counsel for Plaintiffs presented

a copy of this motion to counsel for Defendants and asked for their respective positions. Both

defense counsel stated that they oppose this motion.

    1.  In the Defendants' reply briefs (Docs. #81, 82, 84, 85 and 86) they argue that

1

418

Plaintiffs' responses (Docs. #67, 68, 69, 70, 71, 72, 73, 77) failed to controvert some material facts and arguments and failed to comply with the Court's practice standards in certain respects. A review of the responses confirms their assertion.

2. Rule 56(e)(1) provides that, in such circumstances, "the court may: (1) give an opportunity to properly support or address the fact." The Advisory Committee Notes state "In many circumstances this opportunity will be the court's first step."

3. Counsel for the Plaintiffs has Parkinson's Disease. Though he did not know about the potential for nor had he previously experienced a mental down period with respect to a particular task, a review of the alleged deficiencies in his responses and remembering his state of mind while preparing them, leads him to believe that a mental down period caused the deficiencies. A recent medication change will hopefully prevent this from happening again.

4. The undersigned requests that he be permitted to prepare revised responses or a supplemental response which addresses all deficiencies.

5. A few of items to be added follow:

(a) Declaration of Brice A. Tondre (Exhibit 42) attesting to the existence of a promotional video of Dr. Olds in which she states that she was brought into the seizure of Bear by Barbara Wright of Harmony HorseWorks.

(b) Declaration of Brice A. Tondre (Exhibit 42) which attests to the fact that Cindy Hardey was the only witness who testified at the April 10, 2012 and December 3, 2012 hearings. No veterinarian testified. Therefore, there was not a full and fair opportunity to litigate the issue of probable cause to prosecute thus making issue preclusion inapplicable and making probable cause a jury issue. *Murdock v. Life Indian Tribe*, 975 F.2d 683, 687 (10th Cir. 1992); *Bruning v.*

2

419

*Pixler*, 949 F.2d 352, 357 (10th Cir. 1991).

(c) Excerpts from Dr. Horton's deposition (Exhibit 43)in which she testified that, the heart murmurs in the six horses were not of the type produced by malnutrition (pp. 114, l. 15-115, l. 5); reasonable cause to report suspected cruelty to animals only arises after professional guidelines are applied through the differential diagnosis procedure (pp. 179, l.2-181, l. 15); She does not know when the six horses first exhibited signs of losing weight (pp. 202, l. 23 -203, l. 24); The horses were on a proper refeeding program in accordance with AAEP guidelines (pp.206, l. 13-208, l. 22; Ex. 34, 7th para. last sentence); a veterinarian has a duty to determine if there is a medical reason for weight loss (p. 211, ll. 10-19); her experience told her that the signs she was seeing in the six horses could not be explained simply by inadequate food intake (p, 218, l. 14-219, l. 6); she characterized the care provided Maggie by Plaintiffs was heroic (p. 300, ll. 6-9).

(d) Excerpts from the testimony of Cindy Hardey during the December 3, 2012, suppression hearing (Exhibit 44) where she testified that, the Park County Sheriff's Office agreed to leave the horses with Plaintiffs for 30 days and if they gained weight Plaintiffs would not be charged (p. 31, ll. 14-24); the horses were placed in protective custody to protect Plaintiffs and their horses from threatened conduct (pp. 58, l. 20-59, l. 1); Plaintiffs told her the six horses were sick (p. 60, ll.17-24);. while at Echo Valley Ranch she saw 20 horses which nothing was wrong with (p. 61, ll. 6-24); she considered the protective custody agreement to be a legal binding agreement (p. 62, ll. 12-63, l.1); she testified that the six horses were not eating, even though they were being fed (p. 63, ll. 2-25); she testified that on February 16, 2012,she observed food and water in the pens where the six horses were being cared for (p.64, ll. 1-25); she

3

420

testified that she did not have any tests which indicated that the problem was starvation (p. 65, ll. 1-25); she testified she had no knowledge of when the horses began losing weight and when they were brought in (p. 81, l. 10-82, l. 25; 85, l. 7-86, l.13).

Most of the foregoing is contradictory of facts asserted by Defendants. There is more. It is respectfully submitted that the interests of justice will be served by allowing Plaintiffs to supplement the record.

Wherefore, Plaintiffs pray that they be permitted to supplement their replies to the motions for summary judgment.

/s/ Brice A. Tondre
_____

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado   80226
Telephone: 303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com

ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that on this the 29th day of January, 2015, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which willsend notification of filing to the following.

Timothy P. Schimberg
t_schimberg@fsf-law.com

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre
_____

4

421

# EXHIBIT 42

422

## DECLARATION OF BRICE A. TONDRE

I am the attorney for the Plaintiffs in this case.

1. In a video of Dr. Olds prepared during the pendency of the underlying case, she states she was contacted through Harmony HorseWorks, a non-profit entity founded and managed by Barbara Wright, to aid Routt County in the seizure of Bear

2. The only witness in the hearing on April 10, 2012 and the hearing on December 3, 2012 was Cindy Hardey. No veterinarian testified,

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _JANUARY 26, 2015_

_Brice A. Tondre_

**BRICE A. TONDRE**

423

# EXHIBIT 43

424

Page 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

     Plaintiffs,

         vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

     Defendants.

------------------------------------------------

## DEPOSITION OF ALLYSON RENÉ HORTON, DVM
### March 27, 2014

------------------------------------------------

                        Deposition location:
                        9998 Havekost Road,
                        Conifer, Colorado 80433

ALSO PRESENT:   Jennifer R. Edwards, Esq.
               (For Dr. Horton)
               Randall Hatlee
               Ronald Swift
               Ashleigh Olds, DVM

# AVERY WOODS REPORTING

455 Sherman Street, Suite 250 · Denver, Colorado 80203
303-825-6119 · 1-800-962-3345 · FAX 303-893-8305
www.averywoods.net

425

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 114

1    A. Yes.
2    Q. Do you know why he was not sent to CSU?
3    A. To the best of my knowledge, it
4 revolved around the seizure of the horses and their
5 transport to another facility under the care of
6 Dr. Toll.
7    Q. Okay. Let me ask you about that. The
8 heart murmur and the tachycardia. Heart murmur, is
9 that something that you observe by using a
10 stethoscope?
11    A. Yes.
12    Q. And are you familiar with the term
13 "physiologic heart murmur"?
14    A. Yes.
15    Q. Was this heart murmur that you observed
16 in these horses, was this a physiologic heart murmur?
17    A. I don't believe so.
18    Q. What's your basis for saying that?
19    A. I consulted Dr. Adams at the cardiology
20 service at Colorado State University because these
21 heart murmurs were diastolic. Normally physiologic
22 murmurs are systolic. And particularly, heart
23 murmurs associated with malnutrition are systolic.
24 So I asked if they had any known association between
25 diastolic murmurs and malnutrition. They said there

Page 115

1 were none.
2    Q. This was who?
3    A. Dr. Adams.
4    Q. At CSU?
5    A. Yes.
6    Q. And do you have any record of that
7 conversation with him or her?
8    A. Her. I believe I actually just read
9 that in that email to Mr. Hatlee.
10    Q. Okay. That's Exhibit 2.
11    A. Yes.
12    Q. And that's where you refer to Dr. Adams
13 in there?
14    A. Yes.
15    Q. Okay. So this email is dated
16 February 28th, right?
17    A. Yes.
18    Q. So if it wasn't associated with low
19 body condition, do you have any opinions on what was
20 causing the heart murmurs that you observed?
21    A. I don't have a definitive answer.
22    Q. What are the possibilities?
23    A. It could have been as a result of the
24 altered viscosity of the blood from the anemia.
25    Q. Okay.

Page 116

1    A. But I -- that is a supposition and
2 nothing more.
3    Q. So if we go back and just go through
4 the links. If -- starvation or malnutrition can
5 cause anemia, right?
6    A. Prolonged, yes.
7    Q. And then anemia can result in this kind
8 of heart murmur.
9    A. Again, those are usually diastolic
10 murmurs, but altered viscosity of blood can result in
11 heart murmurs.
12    Q. The kind that you observed, the kind
13 of --
14    A. I do not have that answer.
15    Q. Okay. I thought you just said that,
16 that a --
17    MR. TONDRE: Objection, argumentative.
18    Q. (BY MR. LEBSACK) That the change in the
19 viscosity of the blood can cause the kind of heart
20 murmur that you observed.
21    A. It -- theoretically I can get there,
22 but I have no proof that that's what caused those
23 heart murmurs.
24    Q. Okay. But the kind of heart murmurs
25 that you observed, one explanation of that is a

Page 117

1 change in the viscosity of the blood?
2    MR. TONDRE: Objection, foundation.
3    Q. (BY MR. LEBSACK) Right?
4    A. A possible explanation.
5    Q. And one cause of a change in viscosity
6 of blood is anemia?
7    A. Yes.
8    MR. TONDRE: Objection, foundation.
9    Q. (BY MR. LEBSACK) And one cause of
10 anemia is starvation?
11    MR. TONDRE: Foundation.
12    A. Potentially.
13    Q. (BY MR. LEBSACK) Tachycardia is also
14 something you observed?
15    A. Yes.
16    Q. Right. And that is in layman's terms
17 an elevated heart rate?
18    A. Correct.
19    Q. Did you form any opinions as to why
20 these horses had tachycardia?
21    A. Certainly anemia can explain that.
22    Q. Okay. So do you know eventually what
23 happened to these horses in regard to the problems
24 that they had with heart murmurs? Did the murmurs go
25 away?

30  (Pages 114 to 117)

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

426

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 178

1  Q. And I cannot remember the name of this
2  exhibit number, but it's the one with Ms. Edwards'
3  email?
4       MR. SCHIMBERG: Did you get one?
5       MR. LEBSACK: I put one on your chair.
6  You have one now.
7       MS. EDWARDS: Well, I would like to
8  have all of them. That would be 9.
9       THE DEPONENT: That's 9.
10      MS. EDWARDS: Actually, I have two
11 copies of that one. I got really lucky.
12      MR. SCHIMBERG: Can I have one?
13      MS. EDWARDS: Yeah.
14      Q. (BY MS. BRONSON) So this is an email,
15 and I'm -- you said that you don't think you received
16 this?
17      A. I have not read this before today.
18      Q. Okay. It starts that, "I spoke
19 directly with Drs. Burton and Horton this morning and
20 found the rumors that are being spread about them
21 treating horses are just that." Then skip down.
22 "They assured me they would have reported it as
23 cruelty if they had ever seen horses like those we
24 saw pictured." Do you recall that conversation?
25      A. I believe -- no. I believe that

Page 179

1  conversation was with Dr. Burton.
2       Q. Okay. Is that your opinion that you
3  would have reported it as cruelty if you had ever
4  seen horses like those that were pictured?
5       A. I have a legal obligation to report
6  abuse if I see it. If I can expound without getting
7  in too much trouble, normally when we see horses that
8  are malnourished, our first attempt is to educate and
9  get compliance from the owner. If that does not
10 succeed or if the horses continue to deteriorate, and
11 it's clear it's not a medical condition, then yes,
12 absolutely. I would report and I have reported
13 clients to animal control.
14      Q. So would you have reported these
15 animals as cruelty had you seen them --
16      MR. TONDRE: Objection, foundation.
17      Q. (BY MS. BRONSON) -- prior to them being
18 put in to protective custody?
19      A. That would not have been my first
20 action. My first action would have been to contact
21 the owners and to investigate what was going on.
22      Q. So you don't necessarily agree with
23 this statement?
24      A. I do. I do, but I -- it's a
25 generalization.

Page 180

1       Q. And I have just one -- actually one
2  more question. Do you belong to any veterinarian
3  professional associations?
4       A. To the best of my knowledge, my
5  membership in the American Veterinarian Medical
6  Association and the American Association of Equine
7  Practitioners is current.
8       Q. Do you get the benefit of legal counsel
9  from these associations or those associations?
10      A. It is available. If you know -- AVMA
11 has a personal liability insurance trust available to
12 members that will cover if you have met the standard
13 of care.
14      Q. Is that -- are you using that service
15 for this case?
16      A. No.
17      MS. BRONSON: That is all I have.
18      MR. SCHIMBERG: Thanks, Doctor.
19      THE DEPONENT: You're welcome.
20      MS. BRONSON: Thank you.
21      MR. TONDRE: Anybody want to take a
22 break?
23      MR. SCHIMBERG: Yep.
24      MR. TONDRE: Okay. Let's take a break.
25      (Whereupon, a recess was taken from

Page 181

1  3:10 p.m. to 3:16 p.m.)
2            EXAMINATION
3  BY MR. TONDRE:
4       Q. Dr. Horton, you have a legal obligation
5  to report a situation of abuse of animals if you have
6  reasonable cause to believe it occurred, correct?
7       A. Yes.
8       Q. And you as a professional can't jump to
9  a conclusion; you have to follow your professional
10 guidelines in determining whether you have reasonable
11 cause, correct?
12      A. Yes.
13      Q. And one name for that is a differential
14 diagnosis, isn't it?
15      A. Yes.
16      Q. Do veterinarians follow what I call the
17 SOAP note process?
18      A. Subject, objective, assessment, plan.
19      Q. Right.
20      A. Some.
21      Q. Do you?
22      A. Not anymore.
23      Q. When did you quit?
24      A. End of senior year.
25      Q. Well, let me see. When you go out to

46 (Pages 178 to 181)

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 202

1      MS. BRONSON: Object to form.
2      A.  A variety of explanations. It would be
3  that these horses were lower in the hierarchy and
4  were -- only got whatever hay that the others didn't
5  want, the poor quality hay that may have toxic weeds
6  in it. It could be that they just happened to get
7  the parts of the hay that had the toxic weeds in it.
8  I don't have a definitive explanation. I have
9  possibilities.
10     Q.  (BY MR. TONDRE) Did you make an
11 assessment with respect to the 30-plus unaffected
12 horses?
13     A.  I'm not sure I understand what you are
14 asking for.
15     Q.  Well, did you assess any horses other
16 than these six?
17     A.  I assessed a horse on February 11th
18 that I'm not at liberty to discuss. At that time out
19 in the pasture, I noticed the horses that were around
20 us. Most were in acceptable body condition score.
21     Q.  Just visually?
22     A.  Just visually.
23     Q.  When did Chance first exhibit any signs
24 of losing weight?
25     A.  I don't know.

Page 203

1      Q.  When did Echo first exhibit any signs
2  of losing weight?
3      A.  I don't know.
4      Q.  When did Fiona first exhibit any signs
5  of losing weight?
6      A.  I don't know.
7      Q.  When did River first exhibit any signs
8  of losing weight?
9      A.  I don't know.
10     Q.  When did Lena first exhibit any signs
11 of losing weight?
12     A.  I don't know.
13     Q.  When did Midnight first exhibit any
14 signs of losing weight?
15     A.  Midnight had exhibited a previous
16 episode of weight loss that was resolved with
17 extracting a tooth. That was approximately a year
18 before.
19     Q.  When?
20     A.  It was in the preceding year.
21     Q.  Okay. And that was being caused by
22 teeth?
23     A.  She was unwilling to eat because of
24 pain from a loose incisor.
25     Q.  Did you have to call a dentist?

Page 204

1      A.  I am the dentist.
2      MR. SCHIMBERG: You are looking at her.
3      Q.  (BY MR. TONDRE) I'm curious, what did
4  you do to her teeth? Fit her with dentures?
5      A.  No. She simply -- she had one incisor
6  that was loose and painful, and we pulled it. And I
7  don't recall if on that date we floated her teeth or
8  not. Horses' teeth are somewhat different than
9  people's teeth. They can develop sharp points that
10 are irritating to the cheek on the uppers and the
11 tongue on the lowers, and they will often interfere
12 with the horse being able to eat comfortably. I
13 don't recall if we did that procedure or not on that
14 day, but we did pull a loose and painful incisor, and
15 when she recovered from the sedation, she ate.
16     Q.  Had she lost a considerable amount of
17 weight before you performed that procedure?
18     A.  A noticeable amount.
19     Q.  What was her body score?
20     A.  I don't recall.
21     Q.  Got a guess?
22     A.  A guess?
23     Q.  I don't -- don't guess. If you --
24     MS. EDWARDS: Object to form.
25     A.  Yeah, not less than four.

Page 205

1      Q.  (BY MR. TONDRE) All right. How long
2  had she had that condition with her tooth before you
3  were called out to look at it.
4      A.  The owners reported a few days.
5      Q.  She lost considerable weight in a few
6  days?
7      A.  She did.
8      MS. BRONSON: Object to form.
9      Q.  (BY MR. TONDRE) One of the things I
10 think I heard in responses with respect to -- is that
11 tests were negative for botulism. Did I hear that
12 wrong?
13     A.  You did not.
14     Q.  How do you know whether -- what test is
15 there for botulism?
16     A.  You can -- the test for the toxin --
17 I'm not really well versed on the intricacies of what
18 tests are available. I, after speaking with
19 Dr. Heckendorf, Dr. Gehring, and Dr. Toppin, it was
20 the consensus that the test is not particularly
21 useful because horses are so exquisitely sensitive to
22 the toxin that they can be fatally effected by nearly
23 undetectable levels.
24     Q.  So the test is by no means absolute,
25 correct?

52  (Pages 202 to 205)

428

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 206

1    A.  That's correct.
2    Q.  So you can't say that it's negative;
3  you can just say that it's not positive, right?
4    A.  That would be for the lab to answer.
5    Q.  In any event, it's not 100 percent
6  sure; is that correct?
7    A.  Not in my mind.
8    Q.  If I wanted to ask somebody from a lab
9  how reliable this test is, who would you suggest I
10  talk to?
11    A.  The botulinum toxin laboratory that CSU
12  sent the samples to.
13    Q.  Okay.  One word I haven't heard
14  mentioned today is malabsorption.  What is that?
15    A.  Malabsorption is a disorder where
16  nutrients are present in the digestive tract, but due
17  to disease, damage, other problems, the gut is not
18  able to take up the nutrients in the ingesta.
19    Q.  Is malabsorption a potential result of
20  ingestion of toxins?
21    MS. BRONSON:  Object to form.
22    A.  There are — there are toxins that
23  through a variety of actions on the gut will result
24  in nutrients not being absorbed.
25    Q.  (BY MR. TONDRE) What's the difference

Page 207

1  between starvation and malnutrition?
2    MR. LEBSACK:  Objection to the form.
3    MS. BRONSON:  Asked and answered.
4    A.  Starvation has negative connotations
5  that nutrition is being denied; the animal is not
6  being given food.  Malnutrition can result from
7  improper food or an inability to utilize the food.
8    Q.  (BY MR. TONDRE) What was your
9  impression of the feeding program when you analyzed
10  the horses on February 20, 2012.
11    MR. LEBSACK:  Objection to the form.
12    MS. BRONSON:  Join.
13    A.  What I observed —
14    Q.  (BY MR. TONDRE) Yes, ma'am.
15    A.  — when I did that exam is that the
16  horses were being given unfettered access to
17  free-choice hay of good quality, and I was satisfied
18  that that was an acceptable feeding program at the
19  time.  That was a good transition program for them.
20    Q.  Do you know what the feeding program
21  was at Echo Valley Ranch on February 15, 2012?
22    A.  Roughly.  I don't know specifics.
23    Q.  What do you understand -- and what is
24  the basis of your knowledge?
25    A.  I was told by Mr. Swift that horses --

Page 208

1  these horses had been brought in separated from the
2  herd because they had been noticed to have lost
3  weight; that they had been given extra feed in the
4  manner of hay and concentrates like grain.
5    Q.  Was that appropriate?
6    A.  It wasn't inappropriate.  It was a good
7  place to start.
8    Q.  If a horse has ingested toxins, how
9  long does it take those toxins generally to clear the
10  system?
11    MS. BRONSON:  Object to form,
12  foundation.
13    A.  Depends on the toxin.
14    Q.  (BY MR. TONDRE) Is there a range of
15  expectations.
16    A.  It's extremely variable.
17    Q.  Is there any medication you can give to
18  treat toxins?
19    A.  Depends on the toxin.
20    Q.  Will they ultimately clear?
21    A.  Depends on the toxin.  Some will.  Some
22  won't.
23    Q.  You mentioned Anthony P. Knight and his
24  book on weeds.
25    A.  Yes.

Page 209

1    Q.  Did I understand you to say you talked
2  to him?
3    A.  Yes.
4    Q.  Well —
5    A.  Well, I should clarify the "we."  The
6  practice talked to him.  I believe it was actually
7  Dr. Burton personally who spoke to him.
8    Q.  Do you know -- do you have an
9  understanding as to what they discussed, or should I
10  defer that question to Dr. Burton?
11    A.  She did relate to me their
12  conversation, but perhaps it would be best if you
13  asked her directly.
14    Q.  Well, since we are not going to talk to
15  her today, tell me generally what you recall.
16    A.  We inquired as to whether he had any
17  idea what toxins might be at play.  He suggested
18  sage.  He agreed with us that hoary alyssum was not a
19  good fit.  He suggested that we go out and walk the
20  pasture and look for what's out there, but that if --
21  if whatever toxic weed was in the hay, that it was
22  long gone and we would never find it.
23    Q.  So if, for example, bracken fern was in
24  the hay, it wouldn't lose its potency because it is
25  no longer growing?

53  (Pages 206 to 209)

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

**Page 210**

1    A.  It does not lose its potency when it's
2    dried.
3    Q.  Maybe you answered this and I just
4    don't remember.  Do you have any knowledge of any
5    testing that was done on the hay at —
6    A.  I don't.
7    Q.  You said that the horses might have
8    benefitted if you had been called earlier.  How much
9    earlier?
10    A.  I don't know that I could give a time
11    frame.  But I think it would have been prudent once
12    horses started to drop below a body condition score
13    of three that that probably should have been a red
14    flag.
15    Q.  And what would you have recommended?
16    A.  I don't know.
17    Q.  And you don't know when they started
18    dropping their weight?
19    A.  No.
20    Q.  So you really can't comment on that,
21    can you?
22    MR. LEBSACK:  Objection to the form.
23    A.  No.
24    Q.  (BY MR. TONDRE) Is it professionally
25    reasonable to — or let me rephrase it.

**Page 211**

1    In your opinion, would it have been
2    professionally reasonable to, without doing any
3    testing or creating differential diagnosis, to reach
4    the conclusion that the cause of the condition was
5    starvation?
6    MR. LEBSACK:  Objection to the form.
7    MS. BRONSON:  Object to form.
8    A.  I — I would have trouble answering the
9    question in that form.
10    Q.  (BY MR. TONDRE) Okay.  Well, let me ask
11    it this way:  Confronted with six horses that had
12    diminished body weight, is it professionally
13    reasonable to reach a conclusion without considering
14    all the possibilities for the condition?
15    MR. LEBSACK:  Objection to the form.
16    MS. BRONSON:  Object to form.
17    A.  No.  You have a duty to the horses to
18    establish that there is not a medical reason for
19    their weight loss.
20    Q.  (BY MR. TONDRE) Now, I have here an
21    email which you sent to Officer Hardey.  It's Park
22    City — or Park County defendants document
23    No. 000300.
24    MR. LEBSACK:  What is the date of it?
25    MR. TONDRE:  Dated February 16, 2012.

**Page 212**

1    MR. LEBSACK:  It's Exhibit 6.
2    MR. TONDRE:  Oh, thank you.
3    Q.  (BY MR. TONDRE) This email is based
4    upon your visit to the farm on — what was it,
5    January something or other?
6    A.  February 11, 2012.
7    Q.  February 11, five days before the visit
8    by Dr. Olds and Dawn Smith?
9    A.  Yes.
10    MS. BRONSON:  Object to form.
11    Q.  (BY MR. TONDRE) And you had the
12    opportunity to evaluate the horse at that point in
13    time, correct?
14    A.  The horse we evaluated was not one of
15    the six that was later removed.
16    Q.  I understand.  But in your analysis of
17    that horse, you came to a differential diagnosis,
18    correct?
19    MS. EDWARDS:  Object.  Privileged.
20    A.  Yeah.  I'm afraid —
21    MR. TONDRE:  It's not privileged
22    anymore.
23    MS. EDWARDS:  I'll instruct you not to
24    to answer.
25    Q.  (BY MR. TONDRE) Get Exhibit 6 before

**Page 213**

1    you.
2    A.  I have it.
3    Q.  Did you write that?
4    A.  Yes.
5    Q.  And you sent it to Cindy Hardey?
6    A.  Yes.
7    Q.  And at Cindy Hardey's request?
8    A.  Yes.
9    Q.  And you sent it on the day of the visit
10    to — the date that Dr. Olds visited?
11    A.  That's the date on the exhibit.
12    Q.  All right.  You state in this email,
13    "Horses are exquisitely sensitive to botulism or —
14    MS. EDWARDS:  I wish I had a copy of
15    it.
16    MR. SCHIMBERG:  Here.
17    Q.  (BY MR. TONDRE) — "making it all but
18    impossible to definitely confirm due to low levels of
19    toxin in the blood and GI contents.  The only
20    treatment for botulism is nursing care, time, and
21    hope."
22    What did you base that statement on?
23    MR. LEBSACK:  Well, I'm going to wonder
24    why I wanted to ask about this, but I couldn't.
25    MS. EDWARDS:  No.  Absolutely.  No.  I

54  (Pages 210 to 213)

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 218

1  foundation.
2      A.  Widely accepted as a neurologic sign.
3  There are other conditions that can produce quivering
4  and trembling.  That's certainly not exclusive.
5      Q.  (BY MR. TONDRE) Did you think that
6  drawing blood from the six horses was an important
7  diagnostic thing to do?
8      A.  For botulinum testing?
9      Q.  For anything, just to diagnose the
10 condition that the horses were in.
11     A.  I think that the complete blood count
12 and the chemistry panels were useful.  I did not
13 think that the botulinum testing was useful at all.
14     Q.  You were in no hurry to jump to a
15 conclusion regarding the six horses, were you?
16     A.  I try never to rush to a conclusion,
17 but in that case, I could not even if I wanted to.
18 My experience told me that the signs that I was
19 seeing in some of those horses could not be explained
20 simply by inadequate food intake.
21     Q.  You believed that at that juncture the
22 case of those six horses was at a fork in the road,
23 correct?
24         MR. LEBSACK:  Objection to form.
25         MS. EDWARDS:  Objection.

Page 219

1      A.  I'm not sure...
2      Q.  (BY MR. TONDRE) You believed that those
3  six horses needed to have further diagnostic testing
4  before reaching a conclusion, correct?
5      A.  I believe further investigation was
6  needed.
7      Q.  Is it your practice to do visual body
8  scoring?
9      A.  That is part of how we body score a
10 horse.
11     Q.  Just part?
12     A.  It depends on whether they have a
13 winter coat or not.
14     Q.  You said you received a call from
15 Mr. Swift in which he informed you that Bear was
16 having difficulty rising?
17     A.  Yes.
18     Q.  Do you recall approximately when that
19 was?
20     A.  That was in the fall that preceded
21 February of 2012, so the fall of 2011.
22     Q.  Can you pinpoint it any better than
23 that?
24     A.  I'm afraid I can't.
25     Q.  What was the weather like?

Page 220

1      A.  It was clear, bright, sunny day.
2      Q.  What was that winter like?
3      A.  I don't recall.
4      Q.  Did you get any information from
5  Mr. Swift other than that Bear was having difficulty
6  rising?
7      A.  No.
8      Q.  Was it at that point you said you
9  wouldn't provide any services because you hadn't been
10 paid by Routt County?
11     A.  No.  No.  At first he did not identify
12 the horse as Bear.  But later in the conversation, it
13 came up, and we did not refuse treatment.  I believe
14 I said something to the effect that he needs to be
15 seen by someone, and it was not requested of us that
16 we come examine him.
17     Q.  Look at Exhibit No. 12.  You say in the
18 one, two, three -- fifth paragraph, "We have worked
19 with many animal control offices in many states, and
20 we have never experienced such lack of
21 professionalism.  It is a disappointment that your
22 office is willing to sacrifice what could be a solid
23 working relationship that could benefit not just the
24 Hatlee horses but others as well."
25         How many different jurisdictions have

Page 221

1  you worked with regarding animal control?
2      A.  I have been licensed in good standing
3  in three states:  California, Oregon, and Colorado.
4  In California, I worked with Stanislaus County Animal
5  Control and Lassen County Animal Control.  In Oregon,
6  I worked primarily with Deschutes County Animal
7  Control, and in Colorado, I have worked primarily
8  with Jefferson County Animal Control.
9      Q.  And what is it about the animal control
10 in Routt County that caused you to say it lacked
11 professionalism?
12     A.  They reneged on their commitment to us.
13     Q.  You think that placed the horses in
14 danger?
15     A.  Well --
16         MS. BRONSON:  Object to form.
17     A.  -- I think it means that we are
18 unwilling to work with them in the future.  They also
19 failed to respond to any of our communications
20 regarding that.
21     Q.  (BY MR. TONDRE) Is it any excuse that
22 Dawn Smith was on medical leave?
23     A.  No.  She should have made some other
24 officer aware of her caseload, and somebody should
25 have been picking up the slack.

ALLYSON HORTON, DVM Vol. II
HATLEE vs. HARDEY

June 04, 2014
300–303

---

**Page 300**

1 make sure that she continued to eat and drink,
2 defecate, and urinate.
3      Q   Did that appear to be done between the
4 11th and the 13th?
5      A   Absolutely.
6      Q   How would you characterize the care that
7 was provided to Maggie by these owners?
8      A   Heroic. The effort that was put into
9 caring for her was extraordinary.
10          MR. TONDRE:  That's all I have. Thank
11 you, Doctor.
12          FURTHER EXAMINATION
13 BY MR. LEBSACK:
14      Q   I just have a few questions. I think you
15 said that these decubital -- is that how you pronounce
16 it?
17      A   Yes.
18      Q   -- these decubital ulcers that you see on
19 the photos on Exhibit 18 --
20      A   Uh-huh.
21      Q   -- they are worse than when you saw
22 Maggie on the 13th; is that right?
23      A   They -- they seem a little more
24 extensive, yes.
25      Q   Extensive in --

**Page 301**

1      A   Area.
2      Q   -- in area. They're still in the same
3 places --
4      A   Still in the same places.
5      Q   -- as they were but now they're bigger,
6 correct?
7      A   Correct.
8      Q   Were there any decubital ulcers that you
9 see on these photos in areas that you did not see them
10 when you were there on the 13th?
11      A   I did not note. But they are in
12 locations that I would expect for them to occur.
13      Q   But they're -- in the course of three
14 days, they got somewhat bigger?
15      A   Correct.
16      Q   Are these the same thing as what we call
17 bed sores in humans?
18      A   Pretty much.
19      Q   Are they developed the same way as humans
20 get bed sores?
21      A   In her case, partially. They're not
22 strictly from pressure. What you see and the reason
23 that these became more extensive over those few days is
24 she began to try to move. She was rubbing on the
25 floor, the bedding, the padding; decubital ulcers in

**Page 302**

1 people are typically pressure sores because people
2 cannot move and gradually circulation decreases to
3 those areas and the wounds can be very, very deep and
4 very severe.
5          These aren't -- and these are not even
6 truly ulcers, these are what are technically known as
7 erosions, they're only -- except in very small areas,
8 only the very superficial layers of skin have been
9 affected. The epidermis rather than the dermis.
10      Q   When Ms. Bronson was asking you
11 questions, she asked you about euthanasia, and she
12 asked you about a discussion on the 11th?
13      A   Uh-huh.
14      Q   Was there any discussion of euthanasia
15 after that with Maggie?
16      A   Yes.
17      Q   When was that?
18      A   I don't recall the date, but I believe it
19 happened in person, so I would assume it was on the
20 13th. Helen approached me in private and said that,
21 you know, and asked me should she put this horse down;
22 and I told her no and that if she wanted to do that she
23 would have to call someone else because I wouldn't do
24 it.
25      Q   And what was the reason that you said

**Page 303**

1 that?
2      A   Because we did not know why this horse --
3 what condition we are dealing with. She seemed to be
4 improving. And I thought depriving -- depriving her of
5 her life at that point was simply wrong.
6      Q   Any other conversations about euthanizing
7 Maggie that you can recall?
8      A   Not offhand.
9      Q   When Ms. Bronson was asking you
10 questions, you read from part of the necropsy report;
11 and I'd like you to refer to that same paragraph and
12 you read the sections about the -- the alopecia?
13      A   Yes.
14      Q   And then you started to read the sentence
15 that says, "Throughout the gastrointestinal tract --
16      A   Yes.
17      Q   -- there is only minimal ingesta --
18      A   Yes.
19      Q   -- with the most content being present
20 within the distal cecum."
21      A   Yes.
22      Q   That means that there was only minimal
23 food in the digestive tract?
24      A   Correct. She did not have a lot of what
25 we would call gut fill.

# EXHIBIT 44

433

1

DISTRICT & COUNTY COURT, COUNTY OF PARK,
STATE OF COLORADO

CASE NO. 2012 M 000043, DIV. A
CASE NO. 2012 M 000044, DIV. A

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

RANDALL J. HATLEE, and RONALD L. SWIFT,

    Defendants.

---

    The above-entitled matter came on for hearing

on Monday, December 3, 2012 at 9:56 a.m. before the

HONORABLE BRIAN LOUIS GREEN, County Judge.


APPEARANCES:

FOR THE PLAINTIFF:        THOMAS K. LEDOUX

FOR THE DEFENDANT:      DARRELL LEE CAMPBELL

ALSO PRESENT:          RANDALL J. HATLEE
                    RONALD L. SWIFT
                    CINDY HARDY

Court Reporting Videography Digital Reporting Transcription Scanning Copying
Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306

434

31

1    of Dr. Britt's opinion about what should be done with

2    the horses at this point?

3        A.    I remember my conversation with Britt after

4    the state notice of warning.

5        Q.    Let me ask you, with Dr. Anderson, you were

6    aware that she was indicating that under the

7    circumstances, instead of seizing the horses at this

8    point, she recommended that they actually stay with the

9    owners, didn't she?

10       A.    Yes.

11       Q.    She recommended that they stay and maintain

12   supervision by their own veterinarian.

13       A.    Yes.

14       Q.    ANd she was in agreement with the idea that

15   there should be -- that 30 days was acceptable.

16       A.    Yes.

17       Q.    And she understood at that point that you

18   folks were agreeing to allow these -- the defendants to

19   care for their animals for 30 days and if they gained

20   weight, you weren't going to charge them; is that

21   correct?

22       A.    Yes.

23       Q.    And Dr. Anderson thought it was a good idea?

24       A.    Yes.

25       Q.    Because the main issue was, you were trying

453

58

1       A.    No.

2       Q.    So at that point is it fair to assume that

3  you believe the animals were in the same condition they

4  were on the 16th?

5       A.    Yes.

6       Q.    And you saw them on the 19th; is that

7  correct?

8       A.    Yes.

9       Q.    And you didn't do any type of body condition

10  scoring at that point?

11      A.    No.

12      Q.    All right.  And to your recollection, then,

13  the horses seemed to -- appeared to be in the same

14  condition?

15      A.    Yes.

16      Q.    The purpose of the protective custody was to,

17  in your view, the horses needed more specialized care

18  than they were being provided with the defendants?

19      A.    No.

20      Q.    Why did you think they had to go into

21  protective custody?

22      A.    Because the owners were getting threats.

23  There were people calling our Sheriff's Office

24  threatening to do things to them on their property, so

25  I felt it was best for the owners and the horses to

436

AGREN BLANDO COURT REPORTING & VIDEO INC

59

1    move into protective custody.

2        Q.    Did you discuss any other options available

3    to protect the owners, such as a detail or anything to

4    protect their property from the public?

5        A.    No.

6        Q.    You said this was -- this agreement included

7    Kirsten Leboux who owned this place where the horses

8    were transported.  Before selecting Leboux, did you try

9    to -- isn't it correct that there was an attempt to

10   place the horses in Pueblo?

11       A.    I don't know if it was in Pueblo, but there

12   was another facility, yes.

13       Q.    It was an out of town rescue facility --

14       A.    Correct.

15       Q.    -- though, correct?  And isn't it correct

16   that when you -- did you make the call down there to

17   find out?

18       A.    I did.

19       Q.    You did, and isn't it correct that rescue

20   facility didn't want to take the horses?

21       A.    They had something going on with all their

22   horses. They did not have room at the time, but if I

23   needed to bring the horses down there, they would find

24   somewhere to quarantine them.

25       Q.    Okay.  And that's what I wanted to say.  They

Court Reporting Videography Digital Reporting Transcription Scanning Copying
Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306

437

AGREN BLANDO COURT REPORTING & VIDEO INC

60

1   didn't want to put these horses with the general

2   population with their horses -- other horses that were

3   already in the rescue system; is that right?

4       A.   Well they had -- I don't remember what

5   disease going on with their horses.  They did not want

6   to get Swift and Hatlees horses sick, so they were not

7   willing to take in horses.

8       Q.   So the Pueblo rescue was not -- or the other

9   rescue was not concerned about the defendant's horses

10  being in need of quarantine?

11      A.   Well, what I mean by quarantine, I meant the

12  horses that -- this other facility had something going

13  on with their horses and they did not want to get Swift

14  and Hatlees horses sick, so they were just going to

15  quarantine them somewhere else if we needed them to

16  take them.

17      Q.   In your discussions with the defendants,

18  either on the 16th or the 19th, did they tell you that

19  they believed the horses were sick?

20      A.   Yes.

21      Q.   And, in fact, you didn't have any evidence to

22  the contrary that they weren't sick at this point.  You

23  didn't have any test results.

24      A.   Correct.

25      Q.   In your experience, you're an animal control

Court Reporting   Videography   Digital Reporting   Transcription   Scanning   Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

438

Case 1:13-cv-02469-RM-MJW   Document 95-3   Filed 01/20/15   USDC Colorado   Page 7 of 15
Appellate Case: 16-1065   Document: 01019620891   Date Filed: 05/16/2016   Page: 172

61

1    officer, if horses are suspected of being sick and have

2    an infectious disease, what are you supposed to do?

3          A.    Call the vet.

4          Q.    And what do vets do at that point?

5          A.    They take blood work.

6          Q.    If they're infectious, are they required to

7    be in quarantine?

8          A.    Yes.

9          Q.    And, in fact, in this case, in protective --

10   the defendants in this case had the animals away from

11   all the other horses on the ranch, didn't they?

12         A.    Yes.

13         Q.    And that was the situation you found on

14   February 16th too; is that right?  They were up in the

15   barns.

16         A.    Well, they had -- they weren't away from

17   all -- there was other horses up there with them, yes.

18         Q.    But they had all the pasture horses remain in

19   the pasture.

20         A.    Some of the pasture horses were in pasture,

21   yes.

22         Q.    And you saw some 20 horses and you didn't

23   find anything wrong with those horses.

24         A.    Correct.

25         Q.    So, in fact, the defendants were taking the

Case 1:13-cv-02469-RM-MJW   Document 98-3   Filed 01/20/15   USDC Colorado   Page 8 of 15
Appellate Case: 16-1065   Document: 01019620891   Date Filed: 05/16/2016   Page: 173

62

 1    appropriate action to keep what they believed were sick

 2    horses away from the other general population of the

 3    horses, weren't they?

 4         A.    Yes.

 5         Q.    But you felt they needed to put them even

 6    further away.

 7         A.    For protective custody.

 8         Q.    And this was to protect the defendants --

 9         A.    Yes.

10         Q.    -- from the public.

11         A.    And their horses.

12         Q.    Did you think that you could provide better

13    care if they were in protective custody?

14         A.    I don't think I was looking for care of the

15    horses.  I was just trying to remove the horses from

16    the property and to protect them and the owners.

17         Q.    Now, if you look at Exhibit G.  You indicated

18    in this agreement -- now, let me ask you first:  Did

19    you consider Exhibit G a legal binding agreement?

20         A.    Yes.

21         Q.    And one of the parties to that was the Park

22    County Sheriff; is that correct?

23         A.    Yes.

24         Q.    And you -- at least it's your understanding

25    you had the approval of the Sheriff's Office, because

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

440

63

1    your superior approved this; is that right?

2         A.    Yes.

3         Q.    In fact, Sergeant Priestly prepared Exhibit

4    G?

5         A.    Yes.

6         Q.    Let's look at the third -- the last written

7    paragraph.  Isn't it correct that you included language

8    in that protective agreement talking about test results

9    that you were expecting on the Drone mare that had

10   passed?

11        A.    Yes.

12        Q.    And this was a Drone mare that -- Maggie, I

13   think they call it -- that was down when you saw the

14   horses on the 16th.

15        A.    Yes.

16        Q.    And at that point, you saw that that Drone

17   mare was emaciated, in your opinion, too; is that

18   correct?

19        A.    Yes.

20        Q.    And you understood that she hadn't been

21   eating.

22        A.    Correct.

23        Q.    And the six horses that you were seizing,

24   also, in your opinion, weren't eating.  Or you had been

25   told that by the owners; is that right?

441

Case 1:13-cv-02469-RM-MJW   Document 98-3   Filed 01/20/15   USDC Colorado   Page 10 of 15
Appellate Case: 16-1065    Document: 01019620891    Date Filed: 05/16/2016    Page: 175

64

1   A.   Yes.

2   Q.   That they had been feeding them and they

3   couldn't get the young -- the six horses to eat to keep

4   weight on.

5   A.   Yes.

6   Q.   And when you went in there on the 16th you

7   saw hay, you saw food, and you saw water in the pens

8   where they were maintained; is that right?

9   A.   Yes.

10   Q.   So let me ask you:  Now, if we look back to

11   Exhibit G, you're talking about -- you indicate that if

12   test results from the necropsy on the Drone mare

13   indicates starvation was a factor in the mare's death

14   chart, charges may be filed against the horse owners

15   and "at risk" horses may be impounded at a later date

16   if no other contributing factors are present other than

17   neglect.  That was the agreement you had with the

18   defendants; is that right?

19   A.   Yes.

20   Q.   Is there anything in your agreement that

21   talks about that they no longer would have the 30 days

22   to put weight on their horses?

23   A.   No.

24   Q.   Did you discuss with them the fact that that

25   30-day warning was no longer applicable?

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

442

65

1    A.   No.

2    Q.   Did you think the 30-day warning was still
3  applicable?

4    A.   Yes.

5    Q.   So you thought that they would have the right
6  to put weight on the horses for the next 30 days?

7    A.   Yeah.

8    Q.   And this was just part of it.

9    A.   Yes.

10    Q.   Under your agreement, isn't it correct that
11  you agreed that you would not -- that they would be
12  charged with the "at risk" horses may be impounded if
13  there were tests that came back that showed that
14  starvation was what caused the -- neglect and
15  starvation caused the condition; is that right?

16    A.   Yes.

17    Q.   You didn't receive any tests -- you didn't
18  have any tests at that point that indicated starvation
19  is what caused it, did you?  You didn't have any blood
20  tests that said that?

21    A.   No.

22    Q.   Did you intend to follow this -- when you
23  signed on behalf of the Sheriff's Department, was your
24  intention to follow the terms of this agreement?

25    A.   Yes.

443

AGREN BLANDO COURT REPORTING & VIDEO INC

81

1    were not evident to her?

2         A.    I'm not aware of that, no.

3         Q.    And she made -- and then it also went on in

4    her report, she said she -- "she" meaning Dr. Horton --

5    never saw them at all when she was out there on the

6    11th of February.  Well, let me just ask you:  When she

7    gave you that opinion, did she give you any facts to

8    indicate that she knew when the horses were brought in?

9         A.    No.

10        Q.    Did you ask her when she knew -- what

11   information she had about the horses being brought in?

12        A.    No.

13        Q.    Did you -- at the time you listened to her

14   opinion and made the decision to seize these horses,

15   were you aware of when she was -- what information she

16   had to indicate that the defendants were aware of the

17   horses losing weight and they didn't bring them in in

18   time?

19        A.    No.

20        Q.    So at this point, when you signed the

21   affidavit, you had no idea when the defendants had

22   recognized that the horses were losing weight.

23        A.    No.

24        Q.    And so when Dr. Horton said they should have

25   recognized it and they didn't, you had no time frame

Court Reporting Videography Digital Reporting Transcription Scanning Copying
Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306

444

AGREN BLANDO COURT REPORTING & VIDEO INC

82

1    there. You didn't know how many weeks they'd been

2    brought in or if it was just a few days before the

3    notice of warning, do you?

4         A.    No.

5         Q.    And, in fact, isn't it true that in your

6    conversations with the defendants, Mr. Swift had told

7    you that as soon as he noticed they were losing weight,

8    he brought them in?

9         A.    Yes.

10             MR. LEDOUX:   Objection, Your Honor.

11   Again, I don't understand the relevance of this line

12   of questioning. I don't think it goes to any of the

13   issues -- it's not relevant.  I think we're talking

14   about the affidavit at this point.  It's not relevant

15   to an omission that I'm aware of yet from the

16   affidavit.

17             THE COURT:   I'm going to overrule.  The

18   knowledge possessed by the officer at the time the

19   affidavit was submitted is relevant to whether that

20   information should have been presented to the reviewing

21   judge. Go ahead, Mr. Campbell.

22        Q.    (By Mr. Campbell)  So and he -- the defendant

23   told you he brought them in immediately when he saw

24   they were losing weight.

25        A.    Yes.

445

AGREN BLANDO COURT REPORTING & VIDEO INC

85

1    correct that when you advised the Court about what

2    Dr. Horton had told you, you said that she said she

3    believes --

4        A.    Yes.

5        Q.    Did you take that as a diagnosis?

6        A.    No, I took it as her opinion.

7        Q.    Okay.  And then you also said that -- when

8    you say "I believe if Swift had noticed the horses

9    condition sooner, he would have been -- they wouldn't

10   be in the condition today."  That's how you concluded

11   your affidavit, isn't it?

12       A.    Yes.

13       Q.    So you have a belief, but you have no idea

14   how long -- when the horses were brought in and whether

15   they were brought in -- what time span occurred between

16   when they were noticed to be losing weight and when

17   they were brought in, do you?

18       A.    Correct.

19       Q.    And you didn't mention that in your

20   affidavit, did you?

21       A.    No.

22       Q.    Nor did you mention the fact that the blood

23   test showing anemia could be a result of any other

24   factors that would cause malnutrition other than the

25   owners not feeding the horses; is that right?

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

446

AGREN BLANDO COURT REPORTING & VIDEO INC

86

1     A.   Correct.

2     Q.   When you submitted this affidavit, you were

3   aware that there were no tests, blood tests or anything

4   that would substantiate the emaciated conditions of the

5   horses and that's caused by starvation; is that right?

6     A.   Correct.

7     Q.   And the opinion -- I just want to clarify --

8   when you went to the Court on the 22nd, your key fact

9   was Dr. Horton's statement, wasn't it?

10    A.   Yes.

11    Q.   And when you said "neglect" it was because

12  they didn't bring the horses in soon enough.

13    A.   Correct.

14    Q.   If you would look at Exhibit K.

15         MR. CAMPBELL:  And for the record, Your

16  Honor, this is in the Court file already.  It's the

17  summons and complaint issue.

18    Q.   This is one for let's see, Ron Swift; is that

19  correct?

20    A.   Correct.

21         MR. CAMPBELL:  And it's already in the

22  record, but I'd ask for the admission of -- move for

23  the admission of Defendant's Exhibit K, which is the

24  summons and complaint. The original one that's already

25  signed.

447

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

      Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER, and
ASHLEIGH OLDS,

      Defendants.

---

## ORDER

---

      Plaintiffs were prosecuted under Colorado state animal cruelty statutes for the alleged

maltreatment of horses under their care, a jury found them not guilty, and Plaintiffs filed the

present action against the officers who were involved in the investigation resulting in their

prosecution and the veterinarian enlisted to assist those officers.   Before this Court are

veterinarian Ashleigh Olds' ("Dr. Olds") motions to dismiss (ECF No. 31) and for summary

judgment (ECF No. 61).   Also before the Court is Officers Cindy Hardey, Bobbi Priestly, Monte

Gore and Sheriff Fred Wegener's (the "Park County Defendants") motion for judgment on the

pleadings (ECF No. 63), Magistrate Judge Watanabe's recommendation thereon (ECF No. 90),

and three separate motions for summary judgment (ECF Nos. 64, 65, 66).   The Court also has

before it Plaintiffs' motion to supplement the record (ECF No. 95) and Plaintiffs' objection to

448

Magistrate Judge Watanabe's striking certain portions of the pre-trial order.   (ECF No. 107.)

## I.   LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569-70 (10th Cir. 1994).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).   Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial.   *See 1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.   *Anderson*, 477 U.S. at 248.   In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the non-moving party.   *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted). However, "[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if

2

the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant."

*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (quoting *Jenkins v. Wood*, 81 F.3d 988,

990 (10th Cir. 1996)).

If a movant properly supports a motion for summary judgment, the opposing party may not

rest on the allegations contained in her complaint, but must respond with specific facts showing a

genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007)

(holding that "[t]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact") (citation omitted).

Only admissible evidence may be considered when ruling on a motion for summary

judgment. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation

omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment

motion); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

Affidavits must be based on personal knowledge and must set forth facts that would be admissible

evidence at trial. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and

citation omitted). "Conclusory and self-serving affidavits are not sufficient." *Id.* The Court

will not consider statements of fact, or rebuttals thereto, which are not material or are not

supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3). "[O]n a

motion for summary judgment, it is the responding party's burden to ensure that the factual dispute

is portrayed with particularity, without depending on the trial court to conduct its own search of the

record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and

450

citation omitted).   The Court is "not obligated to comb the record in order to make [Plaintiff's]

arguments for [her]."   *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

Further, Local Rule 7.1(e) provides that "[e]very citation in a motion, response or reply shall

include the specific page or statutory subsection to which reference is made."   D.C. Colo. L. Civ.

R. 7.1(e).

## B.     Judgment on the Pleadings

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is governed by the

same standards as those employed on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).   *Atlantic*

*Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).   Rule 12(c),

as with Rule 12(b)(6), requires a complaint to be dismissed if it does not plead "enough facts to

state a claim to relief that is plausible on its face."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).   "A pleading that offers labels and conclusions or a formulaic recitation of the elements of

a cause of action will not do.   Nor does a complaint suffice if it tenders naked assertions devoid of

further factual enhancement."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation

marks and citation omitted).   As in a motion to dismiss, the Court is bound to "accept the

well-pleaded allegations of the complaint as true and construe them in the light most favorable to

the non-moving party."   *Realmonte v. Reeves*, 169 F.3d 1280, 1283 (10th Cir. 1999).   Likewise,

if inferences must be drawn, the Court must draw them in the non-movant's favor.   *Gee v.*

*Pacheco*, 627 F.3d 1178, 1183 (10th Cir. 2010).      However, "when legal conclusions are involved

in the complaint 'the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to [those] conclusions. . . ."*Khalik*, 671 F.3d at 1190 (quoting *Iqbal*, 556

4

U.S. at 678). "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will

disregard conclusory statements and look only to whether the remaining, factual allegations

plausibly suggest the defendant is liable." *Id.*

The Tenth Circuit Court of Appeals has held "that plausibility refers to the scope

of the allegations in a complaint: if they are so general that they encompass a wide

swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims

across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d

1188, 1191 (10th Cir. 2012) (internal quotation and citation omitted). The Tenth Circuit has

further noted "that the nature and specificity of the allegations required to state a plausible claim

will vary based on context." *Id.* (Internal quotation and citation omitted.) Thus, the Tenth

Circuit "concluded the *Twombly/Iqbal* standard is 'a middle ground between heightened fact

pleading, which is expressly rejected, and allowing complaints that are no more than labels and

conclusions or a formulaic recitation of the elements of a cause of action, which the [Supreme

C]ourt stated will not do.'" *Id.* (citation omitted.)

## C.     Review of the Magistrate Judge's Recommendation

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of

Civil Procedure 72(b)(3) requires that the district court judge "determine *de novo* any part of the

magistrate judge's [recommendation] that has been properly objected to." In conducting his

review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive

further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P.

72(b)(3). An objection to a recommendation is proper if it is filed timely in accordance with the

452

Federal Rules of Civil Procedure and specific enough to enable the "district judge to focus

attention on those issues – factual and legal – that are at the heart of the parties' dispute." *United*

*States v. 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Thomas v. Arn*, 474 U.S.

140, 147 (1985)).   In the absence of a timely and specific objection, "the district court may review

a magistrate's report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165,

1167 (10th Cir. 1991) (citations omitted); *see also* Fed. R. Civ. P. 72 Advisory Committee's Note

("When no timely objection is filed, the court need only satisfy itself that there is no clear error on

the face of the record in order to accept the recommendation.").

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts as recited below are based on adequate citations to the record which would be

admissible at trial.   The facts are recited in a light most favorable to the non-moving parties.

Plaintiffs Swift and Hatlee work together on a property known as Echo Valley Ranch,

where Swift also lives.   (ECF No. 62-7, Swift Dep. at 6:11-15, 10:10-11:10; ECF No. 62-8,

Hatlee Dep. at 19:2-13.)   In addition to the horses that Plaintiffs themselves own and care for,

Plaintiffs sought to provide care and boarding for other horses, to provide riding lessons and to

train horses as part of their business.   (ECF No. 62-8, Hatlee Dep. at 18:20 -19:3.)   Swift is also

part owner of the Bailey Feed Store and Hatlee does work as a hay broker.   (ECF No. 66-11, Swift

Dep. at 49:11-50:25; ECF No. 62-8, Hatlee Dep. at 18:21-22.)   Two of the horses that were in

Plaintiffs' care in February, 2012 were Little Feather and her colt, Bear, and these horses were the

subject of an animal abuse case pending in Routt County against Hatlee's ex-wife.   (ECF No.

62-8, Hatlee Dep. at 157:9-11, 207:6-18; ECF No. 62-9, Park Cnty. Continuation Sheet at 3.)   In

6

453

connection with that pending case, on February 13, 2012, Routt County officer Dawn Smith went to Echo Valley Ranch to conduct a welfare check on those horses.  (*Id.*)

During Officer Smith's visit, accompanied by Officer Del Valle, she learned that Little Feather had died the previous month and observed Bear in "deplorable" condition.  (*Id.*) Officers Smith and Del Valle also observed six other horses in similarly rough condition.  (*Id.*) As a result of this visit, the Routt County officers ordered the seizure of Bear and reported the condition of the other six horses to Officer Priestly of the Park County Sheriff's Office.  (*Id.*; ECF No. 62-1, Olds Dep. at 95:10-19.)  The Routt County police officers coordinated to have Park County police officers seize Bear on their behalf.  (*Id.*)  On February 15, 2012, Dr. Olds' clinic, Aspen Creek Veterinary Hospital, was contacted by Routt County police officers requesting that she take Bear into her possession following his seizure.  (ECF No. 62-1, Olds Dep. at 87:7-91:7.)

The next day, Officer Priestly informed Officer Hardey of the situation at Echo Valley Ranch; Officer Hardey then performed a welfare check on all the horses at Echo Valley Ranch on February 16, 2012.  (ECF No. 62-2, Hardey Dep. at 28:6-19.)  Dr. Olds, and her vet assistant Troy Murdock, also accompanied the officers in order to aid in Bear's seizure on behalf of Routt County.  (ECF No. 62-1, Olds Dep. at 54:9-10; ECF No. 62-2, Hardey Dep. at 29:14-18.)  When Dr. Olds and the others arrived at Echo Valley Ranch, they found Bear extremely thin, covered in urine and manure and unable to rise or stand on his own.  (ECF No. 62-2, Hardey Dep. at 112:20-114:6; ECF No. 62-10, Murdock Dep. at 10:21-11:4.)  Dr. Olds and Officer Hardey also learned at that time that Bear's mother, Little Feather, had died.  (ECF No. 62-9, Park Cnty. Continuation Sheet at 3.)  Dr. Olds and Officer Hardey also observed an emaciated, down, and

7

sore-covered mare named Maggie. (ECF No. 62-1, Olds Dep. at 83:21-84:3; ECF No. 62-2,

Hardey Dep. at 30:10-31:10, 116:7-118:8; ECF No. 69-9, Park Cnty. Continuation Sheet at 4-5.)

The mare was covered in severe pressure sores on her face, shoulders and hips and could not rise

into a sitting position. (*Id.*) It was reported that Maggie perished the following day. (ECF No.

62-9, Park Cnty. Continuation Sheet at 10.) Dr. Olds and Officer Hardey also observed the six

other horses that had been initially reported by Officer Smith: Lena, Chance, Echo, Fiona, River,

and Midnight (the "Six Horses"). The Six Horses were observed by Dr. Olds and Officer Hardey

in dirty pens with empty food bins and empty or frozen-over water buckets, although Plaintiffs

contend that they were in the process of feeding these horses at the time of Dr. Olds' and Officer

Hardey's inspection. (ECF No. 62-1, Olds Dep. at 110:6 – 10; ECF No. 62-2, Hardey Dep. at

32:9-33:5, 119:13-20, 121:6-122:22; ECF No. 62-9, Park Cnty. Continuation Sheet at 5-6.) Swift

also stated to Dr. Olds that several other horses at the ranch had already died that winter. (ECF

No. 62-1, Olds Dep. at 78:20-25.)

　　While Officer Hardey was at Echo Valley Ranch on February 16, 2012, Officer Priestly

spoke to Swift by phone. (ECF No. 62-3, Priestly Dep. at 45:10-23.) Swift indicated to Officer

Priestly that the Six Horses and Maggie were under veterinary care. (*Id.*) In addition, Hatlee

told Officer Hardey that he and Swift were working with their regular veterinarians at Timberline

Equine Veterinarian Services ("Timberline Equine") and were taking the steps that they were

advised to take in regards to all of the sick horses. (ECF No. 62-8, Hatlee Dep. at 444:1-4.)

Officer Hardey also spoke on the phone that day with Plaintiffs' regular veterinarian at Timberline

Equine, Dr. Horton. (ECF No. 62-2, Hardey Dep. at 100:13-101:3, 103:1-25.) Based on that

8

455

conversation, Officer Hardey believed that all of the sick horses that she had observed that day were then under the care of Timberline Equine. (*Id.*) However, it was later discovered that, as of February 16, 2012, several of the sick horses had not in fact been receiving veterinary treatment from Timberline Equine. (ECF No. 62-9, Park Cnty. Continuation Sheet at 7.)

Based on her observations, Dr. Olds suspected that Bear, Maggie, and the Six Horses were victims of starvation and malnutrition. (ECF No. 62-6, Olds Aff. at ¶ 18.) She discussed her suspicions with Officer Hardey at the scene and suggested that these horses also be seized along with Bear. (ECF No. 62-1, Olds Dep. at 45:16-46:10.)

Based on her observations while at Echo Valley Ranch, Officer Hardey made the decision to issue Plaintiffs a State Notice of Warning (the "Notice of Warning") as to all the horses that appeared to be underweight. (ECF No. 62-9, Park Cnty. Continuation Sheet at 7; ECF No. 67-1, Feb. 16, 2012 Notice of Warning.) The Notice of Warning stated that Plaintiffs would "have a month from today to gain HEALTHY weight on the 6 horses" and warned that "Animal Control will be doing routine visits every two days for the next two to three weeks to monitor 'Maggie' black Drum Mare, and all 6 horses in question." (*Id.*) The Notice of Warning further admonished that if Plaintiffs failed to rectify the condition of these horses that they would be charged. (*Id.*)

Dr. Olds loaded Bear into a trailer and transported him to her clinic. After returning to her clinic, Dr. Olds emailed a report to Officer Hardey memorializing her observations. (ECF No. 62-1, Olds Dep. at 69:10-23; ECF No. 62-16, Feb. 16, 2012 Dr. Olds Email and Report.) When Bear arrived at Aspen Creek Veterinary Clinic on February 16, 2012, he could not stand and

9

needed to be lifted out of the trailer. (ECF No. 62-19, Murdock Dep. at 22:13-24:23.) Bear was

fed and placed on an IV and responded quickly to this treatment that consisted largely of basic feed

and water. (ECF No 62-6, Olds Aff. at ¶ 19.) He soon was able to stand on his own and

displayed a healthy appetite soon after his arrival at the clinic. (*Id.*; ECF No. 62-19, Murdock

Dep. at 22:13-24:23.)

  Although the parties dispute how the public became aware of the sickly horses at Echo

Valley Ranch, shortly after February 16, 2012 the Park County Sheriff's Department began

receiving significant numbers of telephone calls and emails about the horses from members of the

public who had been upset by a story that had been broadcast on Channel 7 news regarding the

horses at Echo Valley Ranch. (ECF No. 68-2, Park Cnty. Continuation Sheet at 10; ECF No.

62-9, Park Cnty. Continuation Sheet at 10.) Officer Gore became concerned over statements

made by anonymous callers about an attempt to rescue the horses and suggested moving the horses

to an undisclosed location in an effort to diffuse the situation. (ECF No. 68-2, Park Cnty.

Continuation Sheet at 10.) On February 19, 2012, Plaintiffs agreed to move the Six Horses to

another location. (*Id.*) To that end, a written agreement (the "Protective Custody Agreement")

was drafted by Officer Priestly that was signed by Officer Hardey and both Plaintiffs. (*Id.*; ECF

No. 62-21, Feb. 19, 2012 Protective Custody Agreement.) The horses were then transported from

Echo Valley Ranch and placed in the temporary custody of Kirsten LeBeau. (ECF No. 62-2,

Hardey Dep. at 44:3-10.)

  Officer Hardey continued her investigation even after the horses were moved on February

19, 2012. Specifically, on February 22, 2012, Officer Hardey spoke to Plaintiffs' veterinarian,

457

Dr. Horton.  (ECF No. 62-9, Park Cnty. Continuation Sheet at 26-28.)  Both Dr. Horton and Dr.

Burton of Timberline Equine had provided veterinary services to Plaintiffs at various points in

time.  Specifically, Timberline Equine had gone to Echo Valley Ranch on February 11 and 13,

2012 to provide veterinary services for Maggie.  (*Id.* at 27.)  Although Timberline Equine had

provided veterinary services for Maggie in the days leading up to her death, the last time

Timberline Equine had previously seen or treated any of the Six Horses was: Fiona – never; Lena –

never; Echo – August 2010; Midnight – September 2010; River – October 2010; Chance – October

2010.  (*See Id.*; ECF No. 62-17, Horton Dep. at 36:2-39:25.)  Timberline Equine had no

veterinarian-client-patient relationship with the Six Horses as of February 16, 2012, although they

were called upon to treat the horses on February 20, 2012 following the Notice of Warning being

issued and after the horses had been placed in protective custody.  (*See* ECF No. 62-17, Horton

Dep. at 77:21-79:2, 40:15-44:6, 101:20-102:7, 149:7-151:23.)  When Dr. Horton observed the

Six Horses on February 20, 2012 after they had been moved from Echo Valley Ranch, she found

the horses to be extremely thin and grossly anemic, which findings were later confirmed through

testing.  (ECF No. 62-17, Horton Dep. at 102:8-104:15, 106:4-107:6.)

Dr. Horton reported to Officer Hardey on February 22, 2012 that "[r]egardless of why the

horses were thin . . . someone should have noticed and at least called and started the investigation

earlier."  (ECF No. 62-9, Park Cnty. Continuation Sheet at 32.)  Dr. Horton stated her belief that

"those horses were let go far too long."  (*Id.* at 33.)  At her deposition in connection with the

present lawsuit, Dr. Horton further stated that the "horses would have benefitted from intensive

attempts to correct their weight loss sooner, either through medical attention or extra feed or at

11

least investigation." (ECF No. 62-17, Horton Dep. at 85:4-7.) Dr. Horton further stated her

belief "that the horses had deteriorated past a point where assistance should have been sought" and

that they would have "benefitted from veterinary intervention much sooner." (*Id.* at 85:18-20,

112:21-113:11.) Following her conversation with Dr. Horton on February 22, 2012, Officer

Hardey made the decision to charge Plaintiffs with animal cruelty and to seize the Six Horses.

(ECF No. 62-2, Hardey Dep. at 107:6-108:21, ECF No. 62-9, Park Cnty. Continuation Sheet at

11.)

On February 22, 212, a warrant was issued for the seizure of the Six Horses, which were

seized that day by the Park County Sheriff's Department. (ECF No. 66-1, Feb. 22, 2012 Warrant

and Affidavit; ECF No. 62-4, Gore Dep. at 21:14-17.) The warrant was supported by an affidavit

from Officer Hardey. (*Id.*) Shortly thereafter, Officer Hardey served Plaintiffs with a summons

and complaint charging them each with three counts of misdemeanor animal cruelty. (ECF No.

62-24, Feb. 23, 2012 Summons, Feb. 24, 2012 Summons.) The charges in the complaint against

Swift and Hatlee only concerned the Six Horses and not Bear or Maggie. (*Id.*) Several months

later, the charges were amended by the Park County District Attorney's Office to include a charge

of animal cruelty for Plaintiffs' alleged cruelty to Bear prior to Routt County's February 16, 2012

seizure. (ECF No. 62-2, Hardey Dep. at 109:16-110:6.)

On April 10, 2012, at a motions hearing held in connection with the then pending criminal

matter against Plaintiffs, Park County Court Judge Brian Green found that there was no probable

cause to issue a warrant to seize the Six Horses because they were not in imminent danger as of

February 22, 2012. (ECF No. 65-5, Apr. 10, 2012 Motions Hearing at 65:22-66:4.) Judge Green

459

did find, however, that there was probable cause to believe the horses had been subject to animal

cruelty prior to February 22, 2012.   (*Id.*)   At a subsequent hearing on December 3, 2012, Judge

Green further found that the affidavit submitted by Officer Hardey in support of the warrant had

contained material omissions regarding whether the horses were in imminent danger and therefore

suppressed evidence obtained in the course of that seizure.   (ECF No. 68-9, Dec. 3, 2012 Motions

Hearing at 175:6-176:7.)   Judge Green reiterated at the December hearing that there was probable

cause to believe that Plaintiffs had committed animal cruelty prior to February 22, 2012.   (ECF

No. 65-6, Dec. 3, 2012 Motions Hearing at 173:23-174:7.)   Plaintiffs' horses were returned to

them on April 11, 2012.

Eventually the charges against Plaintiffs were tried to a jury that found them not guilty.

Following their acquittal, Plaintiff's brought the present lawsuit against the named Defendants.

In their First Amended Complaint (ECF No. 22) Plaintiffs seek redress against all Defendants

under 42 U.S.C. § 1983, alleging that the faulty warrant that allowed the Park County Sherriff's

Department to seize the Six Horses was in violation of Plaintiffs' Fourth Amendment rights

against unreasonable search and seizure.   Plaintiffs also bring claims against all Defendants for

malicious prosecution in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 and

also what appears to be a malicious prosecution claim against Dr. Olds under state law.   Finally,

Plaintiffs bring a contract claim under the February 19, 2012 Protective Custody Agreement,

alleging that it was breached when the Six Horses were improperly seized.

13

460

## III. ANALYSIS[1]

### A. Dr. Olds' Motion for Summary Judgment

In Dr. Olds' motion for summary judgment, she argues that she was not acting under color of state law at any time and so cannot be held liable under 42 U.S.C. § 1983. Alternatively, Dr. Olds argues that even if she could be found to have acted under color of state law, she would be entitled to assert qualified immunity. As to Plaintiffs' malicious prosecution claim, Dr. Olds argues that she is entitled to statutory immunity by virtue of C.R.S. § 12-64-232(4), which precludes liability for reports of suspected animal cruelty made under that statute and attaches a presumption of good faith to those reports. Even without this statutory immunity, Dr. Olds' alternatively argues that Plaintiffs' malicious prosecution claim fails because they cannot prove a lack of probable cause. The Court addresses each of these arguments in turn.

### 1. Was Dr. Olds acting under color of state law?

"To state a cause of action under 42 U.S.C. § 1983 for an alleged violation of the Fourteenth Amendment and provisions of the Bill of Rights incorporated into the Fourteenth Amendment, the challenged conduct must constitute state action." *Scott v. Hern*, 216 F.3d 897, 906 (10th Cir. 2000) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930-32 (1982); *Pino v.*

---

[1] Plaintiffs have filed a "Motion to Supplement the Record with Respect to Summary Judgment Motions Number 61, 64, 65 and 66." (ECF No. 95.) This motion does more than merely seek to supplement the record, but rather asks that Plaintiffs be granted permission to re-brief their responses to each of these motions for summary judgment or, alternatively, to file sur replies to each motion. The motion attaches additional proposed exhibits that would be submitted in addition to the proposed new responses, but does not include the proposed responses themselves as exhibits to the motion. The Court notes that Plaintiffs never sought an extension of time in which to file their original responses to the motions for summary judgment and that the responses they did file contain dozens of pages of briefing and dozens of exhibits in support. Plaintiffs have not provided the Court with an adequate basis upon which to permit them to re-brief responses to four separate motions for summary judgment and their motion is denied.

461

*Higgs*, 75 F.3d 1461, 1464 (10th Cir. 1996)).   Stated differently, a claim under § 1983 must

adequately allege deprivation of a constitutional right committed under "color of state law."   *Am.*

*Mfrs. Mut. Inc. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).   "[T]he under-color-of-state-law

element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or

wrongful."   *Id.* at 50 (internal quotation marks and citation omitted).   However, the Tenth Circuit

has determined that a "private individual's conduct" may be actionable under § 1983 where that

individual's conduct is "fairly attributable to the state."   *Scott*, 216 F.3d at 906 (quoting *Pino*, 75

F.3d at 1465).   An individual's conduct is fairly attributable to the state when the following

occurs:

> First, the deprivation must be caused by the exercise of some right or privilege
> created by the State or by a rule of conduct imposed by the State or by a person for
> whom the state is responsible.   Second, the private party must have acted together
> with or . . . obtained significant aid from state officials or engaged in conduct
> otherwise chargeable to the State.

*Id.* (quoting *Pino* 75 F.3d at 1465) (alterations in original).

Courts applying the above stated test have admonished that "[a] private individual does not

engage in state action simply by availing herself of a state procedure."   *Id.* (physician's

submission of an affidavit leading to plaintiff's detention not considered "state action": physician

"did 'nothing more than provide information which' [the district attorney] and the county judge

'considered in making their independent judgments'") (citation omitted); *Pino*, 75 F.3d at 1463-65

(private therapist did not exercise "some right or privilege" or act under a "rule of conduct" created

by state law when therapist advised police that plaintiff should be hospitalized, resulting in

plaintiff's hospitalization); *Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.

15

462

1987) (complaining to a police officer about an individual's conduct does not constitute state

action simply because the officer arrests that individual following questioning). Further, "the

mere furnishing of information to police officers who take action thereon does not constitute joint

action under color of state law which renders a private actor liable under § 1983." *Lee v. Town of

Estes Park*, 820 F.2d 1112, 1115 (10th Cir. 1987) (citing *Benavidez v. Gunnell*, 772 F.2d 615, 618

(10th Cir. 1983) ("We know of no case in which the report of a state crime is action under color of

state law under § 1983.")).

     Here, Dr. Olds provided an oral and written report, as was her obligation under C.R.S. §

12-64-121(1), notifying the Park County Sheriff's Office that she had assessed that animal cruelty

was occurring at Echo Valley Ranch. As the above cited case law makes clear, notifying the

police that a crime is suspected to be taking place does not constitute action under color of state

law for purposes of § 1983. *Scott*, 216 F.3d at 906; *Carey*, 823 F.2d at 1404; *Lee* 820 F.2d at

1115; *Benavidez*, 772 F.2d at 618.

     In response, Plaintiffs argue that Dr. Olds' report "was not necessary" but was merely a

"publicity stunt" designed to drum up business for Dr. Olds' veterinary clinic. (ECF No. 67 at 3.)

Plaintiffs also argue that Dr. Olds' report to the Park County Sheriff's Office, as well as her

"demand" to Officer Hardey that the Six Horses be seized on February 16, 2012, was below the

reasonable standard of care for a veterinarian and did not follow the diagnosis protocol of Dr.

Olds' own veterinary clinic. (ECF No. 67 at 4-5.) Plaintiffs further argue that Dr. Olds was part

of an alleged "public outcry" that created pressure on the Park County Sheriff's Office to seize the

horses. Finally, Plaintiffs argue that the alleged "pressure" generated by the "public outcry"

<div align="center">16</div>

eventually caused the Park County Defendants to agree to Dr. Olds' demands that they seize the

horses.   Plaintiffs argue that this forced compliance by the Park County Defendants created a

conspiracy among all these Defendants to violate Plaintiffs' constitutional rights and thus makes

Dr. Olds a state actor.

As to Plaintiffs' argument that Dr. Olds' report was an unnecessary "publicity stunt," this

argument makes no sense as the oral and written report in question was made directly to the Park

County Sheriff's Office and garnered no publicity in and of itself.   (ECF No. 62-1, Olds Dep., at

69:10-23; ECF No. 62-2, Hardey Dep., at 112:6-11; ECF No. 62-6, Olds Aff., at ¶ 10; ECF No.

62-16, Feb. 16, 2012 Email.)   Dr. Olds sent the February 16, 2012 email at Officer Hardey's

request and in conformity with her obligations under state law, and Plaintiffs have not pointed to

any record evidence that would convert this action into one taken under color of state law.

Plaintiffs argument that Dr. Olds' diagnosis fell below a reasonable standard of care also fails, as it

similarly does nothing to show that Dr. Olds was acting under color of state law.   *See Scott*, 216

F.3d at 907 ("the use of a state procedure does not become state action simply because the person

using the procedure is a licensed professional").   Likewise, Plaintiffs' contention that Dr. Olds

created a "public outcry" would not constitute action under color of state law.   Even assuming

that Plaintiffs' contentions are true that Dr. Olds encouraged other members of the public to speak

out against Plaintiffs, such action would amount to no more than private

conduct—communications by a private citizen to other private citizens—that is not actionable

under § 1983.   *Scott*, 216 F.3d at 906 (citing *Pino*, 75 F.3d at 1465).

As to Plaintiffs' attempt to establish state action by showing a conspiracy among Dr. Olds

17

and the Park County Defendants, the Tenth Circuit has required plaintiffs seeking to assert § 1983

claims under a joint-action theory to show that the "private party is a 'willful participant in joint

action with the State or its agents.'" *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442,

1453 (10th Cir. 1995) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). A plaintiff must

"present facts tending to show agreement and concerted action" between the private citizen and

state officials. *Scott*, 216 F.3d at 907 (citing *Sooner Prods. Co. v. McBride*, 708 F.2d 510, 512

(10th Cir. 1983). By contrast, a joint action claim under § 1983 will not lie where "the record

indicate[s] that the police officers had made an independent decision to make the challenged

arrest." *Gallagher*, 49 F.3d at 1454; *Carey*, 823 F.2d 1402 (joint action test not met where record

contained no evidence that alleged unconstitutional arrests "resulted from any concerted action,

whether conspiracy, prearranged plan, customary procedure, or policy that . . . allowed a private

party to exercise state power"); *Lee*, 820 F.2d at 1115-17 (Tenth Circuit declined to apply joint

action doctrine "where a private party is simply reporting suspected criminal activity to state

officials who then take whatever action they believe the facts warrant").

Here, despite Plaintiffs' ardent attestations to the contrary, the record does not contain

sufficient evidence to create a material issue of fact as to whether any of the Park County

Defendants were influenced by Dr. Olds' actions with respect to the decision to apply for a warrant

to seize the Six Horses. Nor is there sufficient evidence to create a material issue of fact as to

whether the so called "public outcry" had any influence on the decision to prosecute Plaintiffs on

animal cruelty charges. To the contrary, Officer Hardey initially declined to seize the Six Horses

on February 16, 2012 despite Dr. Olds' requests that the horses be seized. Although it does

18

appear that the Park County Sheriff's Office did respond to the public reaction to the condition of

the horses at Echo Valley Ranch, that response was not to seize the horses pursuant to a warrant

but to have the horses placed in protective custody, which was done with the assent of Plaintiffs.

(ECF No. 62-4, Gore Dep., at 9:16-11:14; ECF No. 62-21, Feb. 19, 2012 Agreement.)  It was only

after further investigating the matter and obtaining a separate opinion from Plaintiffs' regular

veterinarian, Dr. Horton of Timberline Equine, that Officer Hardey made the independent decision

to apply for a warrant to have the horses seized.  The record indicates that it was this discussion

with Dr. Horton that led Officer Hardey to the decision to seek a warrant to seize the horses, (ECF

No. 62-2, Hardey Dep. at 107:6 – 108:21, ECF No. 62-9, Park Cnty. Continuation Sheet at 11), not

Dr. Olds' suggestions and not public pressure.  Plaintiffs have not pointed to any evidence that

would tend to show that it was the latter two reasons that lead to the seizure of the Six Horses.

　　　As to the decision to prosecute Plaintiffs under animal cruelty charges, Plaintiffs have

similarly presented no evidence indicating that there was any connection between Dr. Olds'

actions and the decision by District Attorney Thom LeDoux to prosecute Plaintiffs in the criminal

case then pending against them.  Nor have Plaintiffs presented any evidence showing that Dr.

Olds had any contact, direct or otherwise, with the District Attorney's Office.  Instead, an

affidavit submitted by the Park County Defendants in their separate motion for summary judgment

shows that District Attorney LeDoux made the decision to prosecute Plaintiffs based on his own

"independent professional opinion . . . that there was sufficient evidence of animal cruelty/neglect

[and] that there was a reasonable likelihood of conviction."  (ECF No. 65-7, LeDoux Aff., at ¶¶

7-8.)

<div align="center">19</div>

Even if this Court were to accept Plaintiffs' dubious contention that Dr. Olds was responsible for creating a "public outcry" that was directed towards the Park County Sheriff's Office, and that the Park County Defendants reacted to that "public outcry" by seizing the Six Horses and having Plaintiffs prosecuted, this fact pattern still would not trigger liability under the joint action doctrine. The joint action doctrine requires that the unconstitutional action be founded upon "*agreement* and *concerted action*" between private citizens and state officials. *Scott*, 216 F.3d at 907 (emphasis added). That concerted action may take the form of a "conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Carey*, 823 F.2d at 1404. Here, the record before the Court does not show any overt or implied "agreement [or] concerted action" between Dr. Olds and the Park County Sheriff's Office. *Scott*, 216 F.3d at 907. To the contrary, the record indicates, and Plaintiffs themselves assert, that Dr. Olds' request that the Six Horses be seized was initially rejected by the Park County Defendants. Even assuming that the Park County Defendants ultimately decided to seize the Six Horses based on their perception of public pressure, that would still not constitute "agreement and concerted action" with Dr. Olds – the connection between Dr. Olds' actions, the public reaction to the information disseminated by Dr. Olds, and the Park County Defendants' actions taken in reaction to the public response is simply too attenuated to fit within the joint action doctrine. *Scott*, 21 F.3d at 907. Plaintiffs have not pointed to any case law where a court employed this doctrine when presented with facts containing such a tenuous causal chain, nor has this Court located any such case law.

20

And still further, even assuming some amorphous form of joint action between Dr. Olds and the Park County Defendants, that action would nonetheless remain divorced from a conspiracy to wrongly seize property or prosecute Plaintiffs when the undisputed facts are that Dr. Olds held the belief that animal cruelty was occurring. Plaintiffs challenge to Dr. Olds' position is akin to a malpractice challenge. Plaintiffs claim that her belief was unreasonable or below the standard of care for a veterinarian. Assuming the facts supported this contention, it falls short of establishing the conspiracy alleged.

Plaintiffs have failed to create a material issue of fact as to whether Dr. Olds was acting under color of state law and their § 1983 claims against her therefore fail. Because the Court finds that Dr. Olds was not acting under color of state law, it need not address the issue of whether Dr. Olds could assert qualified immunity.

2. <u>Is Dr. Olds entitled to statutory immunity with respect to Plaintiffs' state claim for malicious prosecution?</u>

As to the remaining state law claim against Dr. Olds for malicious prosecution, Dr. Olds argues that she would be entitled to statutory immunity pursuant to C.R.S. § 12-64-121(4), which specifies that licensed veterinarians who report suspected animal cruelty are "immune from liability in any civil or criminal action brought against the veterinarian for reporting the incident." The statute further provides that "the good faith of the veterinarian shall be presumed" in any criminal or civil proceeding against the veterinarian for reporting the incident. *Id.* In response, without citation to the record or to any documentary evidence, Plaintiffs state that the "facts alleged" are sufficient to rebut the statute's presumption of good faith. (ECF No. 67 at 10.)

21

468

The Court finds Plaintiffs' argument inadequate and dismisses Plaintiffs' state claim of

malicious prosecution against Dr. Olds on the grounds that she enjoys statutory immunity. C.R.S.

§ 12-64-121(4). Plaintiffs mere assertion that the "facts alleged" would be sufficient to rebut Dr.

Olds' argument provides the Court with absolutely no guidance upon which to reach a principled

decision based on either the facts in the record or applicable law. Further, Dr. Olds' motion is one

for summary judgment – to withstand this motion Plaintiffs "must do more than refer to allegations

of counsel contained in a brief . . . ." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022,

1024 (10th Cir. 1992). "Rather, sufficient evidence (pertinent to the material issue) must be

identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated

therein." *Id.* (citing *Celotex*, 477 U.S. at 324). "Without a specific reference, 'we will not search

the record in an effort to determine whether there exists dormant evidence which might require

submission of the case to a jury.'" *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir.

1995) (declining to consider "unsubstantiated allegations" in the absence of specific citations to

the record) (quoting *Thomas*, 968 F.2d at 1025). Indeed, "[j]udges are not like pigs, hunting for

truffles buried in briefs." *Id.* (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.

1991)). Plaintiffs have offered neither evidence nor case law in support of their argument and this

Court will not do the work for them. [2]

---

[2] Even if the Court were to find that Dr. Olds was not entitled to statutory immunity with respect to certain
aspects of Plaintiffs' claims that go beyond the report she issued to the Park County Sheriff's Office, such
as Plaintiff's contention that Dr. Olds took steps to create public pressure on the Park County Sheriff's
Office, the result would be no different. Even if this Court were to engage in the analysis of whether these
actions outside of the report would constitute malicious prosecution, Plaintiffs' claim still fails on the
grounds that Plaintiffs are unable to show that the prosecution occurred without probable cause. *Hewitt v.
Rice*, 154 P.3d 408, 411 (Colo. 2007); *Thompson v. Hiwan Ridge Dev. Co., Inc.*, 84 P.3d 496, 503 (Colo.
2004); *Lounder v. Jacobs*, 205 P.2d 236, 238-39 (Colo. 1949). The District Attorney in charge of

## B. Dr. Olds' Motion to Dismiss

In her motion to dismiss (ECF No. 31) Dr. Olds points out that the breach of contract claim in

Plaintiffs' First Amended Complaint should be dismissed as against her because she was not a party to the

Protective Custody Agreement, and Plaintiffs confirm this in their response. (ECF No. 35 at 18.) Dr.

Olds' motion to dismiss is thus granted in part and the contract claim is dismissed as against her. In all

other respects Dr. Olds' motion to dismiss essentially duplicates the arguments contained in her summary

judgment motion, and seeks identical relief. Thus, the Court denies Dr. Olds' motion to dismiss, in part, as

moot as to all other issues.

## C. Police Officers' Motion for Summary Judgment on Plaintiffs' Contract Claim

The Park County Defendants have filed a separate motion for summary judgment on

Plaintiffs' breach of contract claim, arguing that the Protective Custody Agreement entered into

between Plaintiffs and the Park County Sherriff's Office on February 19, 2012 lacked

consideration. (ECF No. 64.) The Protective Custody Agreement essentially outlined the

contours of the agreement between Plaintiffs and the Park County Sherriff's Department that

Plaintiffs would pay for the Six Horses to be placed in protective custody with a third party,

---

prosecuting Plaintiffs in the criminal case against them has filed an affidavit in this case stating that he
believed that there was probable cause to pursue a criminal conviction against Plaintiffs. (ECF No. 65-7,
LeDoux Aff., at ¶¶ 8-11.) *See Montgomery Ward and Co. v. Pherson*, 272 P.2d 643, 645 (Colo. 1954).
Further, the judge overseeing the criminal case against Plaintiffs also made the legal finding that probable
cause did exist that Plaintiffs had engaged in the crime of animal cruelty. (ECF No. 65-5, Apr. 10, 2012
Motions Hearing, at 65:22-66:4). And on the facts presented, this Court concludes that there is no material
dispute as to the existence of probable cause. (ECF No. Park Cnty. Continuation Sheet at 5-6 (Officer
Hardey's observations of the Six Horses in extremely emaciated condition with empty food containers and
frozen over water containers), 7 (report from Timberline Equine that the Six Horses were not under their
care), 33 (Dr. Horton's report to Officer Hardey that the Six Horses "were let go far too long" and were
extremely underweight); *see generally* ECF No. 62-2, Hardey Dep. (stating Officer Hardey's observations
of the Six Horses' underweight physical condition.)) As the Colorado Supreme Court has held, "[t]he
existence of probable cause is alone sufficient to relieve a defendant of a charge of malicious prosecution."
*Montgomery Ward and Co.*, 272 P.2d at 645. Probable cause clearly existed in this case.

23

470

Kristen Lebeau, and that the Park County Sherriff's Office's would not have the horses

"confiscated, seized, or surrendered." (ECF No. 64-1, February 19, 2012 Protective Custody

Agreement.) Specifically, the Protective Custody Agreement provides that "Ronald Swift will be

responsible for all cost of care for these horses including feed, and veterinarian care and Park

County is not liable for any costs related to the care of these horses while they are in Protective

Custody." (*Id.*) That agreement further states that "[i]f test results . . . indicate starvation was a

factor in mares['] death[,] charges may be filed against horse owners and at risk horses may be

impounded at a later date if no other contributing factors are present other than neglect." (*Id.*)

 The Park County Defendants argue that the Protective Custody Agreement lacks

consideration "because it does not require a return promise from the [Park County Sherriff's

Office], require the [Park County Sherriff's Office] to act, or require a forbearance from the [Park

County Sherriff's Office]." (ECF No. 64 at 3.) Plaintiffs respond by reference to the February

16, 2012 Notice of Warning issued by Officer Hardey. Plaintiffs contend that the Notice of

Warning was a contract that allowed Plaintiffs thirty days to put weight on their horses and, on the

other hand, allowed "Animal Control" the right to enter the property from time to time without a

warrant to inspect the horses. Plaintiffs argue that the Notice of Warning contract "merged" with

the Protective Custody Agreement, and that the two contracts together provided valuable

consideration to all parties involved. (ECF No. 70.)

 Under Colorado law, the necessity that consideration exist in an enforceable contract is

indeed a legal requirement, yet the doctrine has been greatly limited through decades of case law

developed by the Colorado Supreme Court, which "has long held that any benefit to a promisor or

24

47/

any detriment to a promisee at the time of the contract—no matter how slight—constitutes

adequate consideration." *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo.

2011) (en banc) (citing *W. Fed. Sav. & Loan Ass'n of Denver v. Nat'l Homes Corp.*, 167 Colo. 93,

103 (1968)).   The Colorado Supreme Court, which this Court is bound to follow when

interpreting Colorado state law, has determined that a court evaluating a disputed contract "need

only find some consideration, regardless of its relative value" to support the enforceability of that

contract.   *Id.*   That court has determined that "[e]xcept in extreme circumstances, such as those

involving allegations of unconscionability, a court should not judge or attempt to assess the

adequacy of the consideration."   *Id.* (citing *Freudenthal v. Espey*, 45 Colo. 488, 497-500 (1909)).

Consideration may take the form of "some right, interest, profit, or benefit accruing to one party, or

some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other."

*Id.* (quoting *Jones v. Jones*, 1 Colo.App. 28, 32 (Colo. App. 1891)).

As an initial matter, Plaintiffs' contention that the February 16, 2012 Notice of Warning

"merged" with the Protective Custody Agreement is rejected by this Court.   Plaintiffs cite to no

case law in support of this contention, nor do they provide any principled reason—or any reason at

all—as to why the doctrine of merger would apply here.   Nevertheless, the Court finds that

Plaintiffs' contract claim survives the Park County Defendants' motion for summary judgment.

Following the exceedingly broad and inclusive standard established under Colorado Supreme

Court jurisprudence regarding the doctrine of consideration, the Court finds that the contract at

issue here would satisfy this forgiving standard.   The Protective Custody Agreement provides that

the Six Horses "have not been confiscated, seized, or surrendered" by the Park County Sherriff's

472

Office, but rather have been "placed in Protective Custody only." (ECF No. 64-1, Feb. 19, 2012

Protective Custody Agreement.) Whether dubbed a "right, interest, profit, or benefit accruing to"

Plaintiffs or a "forebearance, detriment, loss, or responsibility given, suffered, or undertaken" by

Defendants, this statement is sufficient to identify legally sufficient consideration. *Lucht's*

*Concrete Pumping*, 255 P.3d at 1061. The Protective Custody Agreement goes on to specifically

designate Swift as "responsible for all cost of care" for the horses and absolve the Park County

Sherriff's Office from any liability for their care while they are in protective custody. (ECF No.

64-1, Feb. 19, 2012 Protective Custody Agreement.) Again, whether construed as an obligation

undertaken by Plaintiffs or a benefit conferred upon the Park County Sherriff's Office, this meting

out of costs would constitute valid consideration under the broad provisions of Colorado law.

*Lucht's Concrete Pumping*, 255 P.3d at 1061. While this Court need not even assess the

adequacy of consideration in a contract absent "[e]xtreme circumstances, such as those involving

allegations of unconscionability," here it is clear on the face of the Protective Custody Agreement

that sufficient consideration would exist to create an enforceable contract among the parties. *Id.*

(citing *Freudenthal*, 45 Colo. at 497-500). The Court thus rejects the Park County Defendants'

argument that the Protective Custody Agreement lacks consideration and denies its motion for

summary judgment on Plaintiffs' contract claim.


**D.      Park County Defendants' Motion for Summary Judgment on**

**Plaintiffs' Individual Capacity Claims**

26

473

The Park County Defendants have moved for summary judgment on Plaintiffs' two claims brought under 42 U.S.C. §1983 against those Defendants in their individual capacity, arguing that they had no personal involvement in the alleged violations of Plaintiffs' constitutional rights. (ECF No. 65.)  First, Officers Priestly, Gore and Wegener claim they lacked any personal involvement as to Plaintiffs' claim that their Fourth Amendment rights were violated when the Six Horses were wrongfully seized pursuant to the warrant issued on the basis of Officer Hardey's allegedly deficient affidavit.[3]  Second, all of the Park County Defendants claim they lacked any personal involvement as to Plaintiffs' claim that Plaintiffs' Fourth Amendment rights were violated because they were subject to malicious prosecution.  For the reasons explained below, the Court grants the Park County Defendants' motion in full.

A plaintiff must show personal involvement in a constitutional violation as to each defendant against whom a claim is asserted.  *Pahls v. Thomas*, 718 F.3d 1210, 1231-32 (10th Cir. 2013); *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997).  Where a plaintiff alleges multiple state actors were individually responsible for the deprivation of his constitutional rights, that plaintiff may not overcome his burden of showing that each defendant violated his constitutional rights by "analyz[ing] defendants' liability as a collective whole" because, as the Tenth Circuit has held, such generalized argument "does not comport with the requirements for imposing personal liability on government officials under § 1983 . . . ."  *Pahls*, 718 F.3d at 1231.  Stated simply, "[l]iability under § 1983 . . . requires personal involvement."  *Id.* (citing *Iqbal*, 556 U.S. at 676). To establish personal involvement, a plaintiff "must establish that *each* defendant caused" that

---

[3] The Court notes that Officer Hardey does not move for summary judgment as to this claim.  (ECF No. 65 at 2.)

474

plaintiff's constitutional rights to be violated and this Court "must conduct a differentiated

analysis" as to the particular acts of each individually named defendant. *Id.*; *see also Foote*, 118

F.3d at 1423-24 ("Individual liability under § 1983 must be based on personal involvement in the

alleged constitutional violation."); *Trujillo v. Williams*, 465 F.3d 1210, 1227-28 (10th Cir. 2006)

(same); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (same).

1.    Plaintiffs' Fourth Amendment claims regarding the warrant issued to seize the Six
      Horses

Regarding Plaintiffs' Fourth Amendment claim relating to the allegedly unconstitutional

seizure of Plaintiffs' horses, Officers Gore, Priestly and Sheriff Wegener argue that they were not

involved in the drafting of the affidavit, signed by Officer Hardey, that ultimately led to the

warrant that was issued to seize the Six Horses.   In support, these Defendants cite to deposition

testimony from each of them affirming the same.   Specifically, deposition testimony from Officer

Gore states that he did not have any involvement with the drafting of Officer Hardey's affidavit.

(ECF No. 65-2, Gore Dep. at 8:2-5.)  Sherriff Wegener likewise testified at deposition that he had

a general practice of leaving animal control matters in the hands of the officers in the animal

control division, and further that he had no role in the training of Officer Hardey.   (ECF No. 65-3,

Wegener Aff. at 8:5-10, 13:16-21.)   Defendants cite to a redacted transcript of Officer Priestly's

deposition in support of the contention that she had no involvement in the affidavit's creation, yet

the exhibit cited to does not contain testimony supporting this contention.  (*See* ECF No. 65-4,

Priestly Dep.)  However, deposition testimony from Officer Hardey does confirm that Officer

Priestly did not review the affidavit, but was merely aware of its existence.   (ECF No. 68-7,

28

475

Hardey Dep. at 15:23-16:4, 66:17-67:24.)

In opposition, Plaintiffs cite primarily to a Park County Sheriff's Office record of a February 21, 2012 teleconference among Officers Priestly and Gore, Sheriff Wegener and Dr. Horton of Timberline Equine. (ECF No. 68-1, Park Cnty. Continuation Sheet, at 10-12.) Plaintiffs claim that it was this call that was the impetus for seeking a warrant, and that the Court should infer that the allegedly improper warrant must have been designed during this phone call. Alternatively, Plaintiffs argue that it was these Defendants' duty to train Officer Hardey to properly draft affidavits in support of applications for warrants. Because these Defendants failed to properly train Officer Hardey, so Plaintiffs argue, "the entity is liable." (ECF No. 71 at 3.) Plaintiffs also argue that the Park County Defendants' alleged breach of the Protective Custody Agreement also resulted in the violation of Plaintiffs' constitutional rights. (*Id.* at 4.)

As to Plaintiffs' claim that the alleged breach of the Protective Custody Agreement violated Plaintiffs' constitutional rights, this claim fails as Plaintiffs do not provide any then-extant, clearly established constitutional right that would have been violated by the mere breach of that agreement. *Morris*, 672 F.3d at 1191.

Regarding Plaintiffs' argument that Officer Gore, Officer Priestly and Sheriff Wegener were involved in the creation of Officer Hardey's affidavit by virtue of the fact that they were all on the same February 21, 2012 phone call with Dr. Horton, this evidence is insufficient to create a material issue of fact that would survive summary judgment. Even viewed in the light most favorable to Plaintiffs and with all reasonable inferences drawn in Plaintiffs' favor, the fact that these Defendants, along with Dr. Horton, were on a phone call together simply cannot lead to the

476

conclusion that these Defendants then orchestrated a plan to have Plaintiffs' horses illegally seized

through the use of an improperly drafted affidavit in a warrant application. Even if the Court were

to grant the inference in Plaintiffs' favor that the affidavit was in fact discussed by Gore, Priestly

and Wegener, that inference does not prove Plaintiffs' point. The crux of Plaintiffs' claim is that an

affidavit was submitted to the court in order to allegedly seize Plaintiffs' property without

probable cause. Even were this Court to grant Plaintiffs the inference that the affidavit was

discussed, putting aside the reasonableness of that inference, Plaintiffs would still require the

further inference that these Defendants were also aware that the affidavit would be created with

material omissions. While the Court is obligated to grant *reasonable* inferences to Plaintiffs as

non-movants, it would be an utterly *unreasonable* inference to find that Officers Gore, Priestly and

Sheriff Wegener were aware of the material omissions that Officer Hardey would include in the

affidavit and were therefore co-conspirators to an alleged plot to seize Plaintiffs' horses through an

improperly secured warrant, and the Court declines to grant Plaintiffs that inference.

Regarding Plaintiffs' argument that supervisor liability based on the failure to train Officer

Hardey led to the violation of Plaintiffs' constitutional rights, there are a number of reasons why

this response fails. The most obvious is that the First Amended Complaint contains no allegation

or claim of liability based on a failure to supervise or to train. Instead, it alleges only direct and

concerted action by the Defendants. (*See generally*, ECF No. 22.) It hardly needs to be said that

it is not a proper response to a summary judgment challenge to sidestep the evidentiary deficiency

by attempting to create a factual dispute with respect to matters having neither connection nor

relevance to the claims alleged.

30

477

Even if the supervisor liability matter were considered on the merits, Plaintiff's

failure-to-train theory of liability would fail. The Tenth Circuit has made clear that "[j]ust as §

1983's plain language doesn't authorize strict liability, it doesn't authorize *respondeat superior*

liability." *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010). In *Dodds v. Richardson*,

614 F.3d 1185 (10th Cir. 2010), *cert denied*, 131 S.Ct. 2150 (2011), the Tenth Circuit stated that "§

1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates,

implements, or in some other way possesses responsibility for the continued operation of a policy

the enforcement (the defendant-supervisor or her subordinates) of which subjects, or causes to be

subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Id.* at 1199

(citations and quotations omitted). The Tenth Circuit further elaborated that, in order to succeed

in a § 1983 suit against a defendant-supervisor, a plaintiff must prove the following:

> (1) the defendant promulgated, created, implemented or possessed responsibility
> for the continued operation of a policy that (2) caused the complained of
> constitutional harm, and (3) acted with the state of mind required to establish the
> alleged constitutional deprivation.

*Id.* at 1199-1200 (citing *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)). As with

any other § 1983 claim, "the plaintiff must establish a deliberate, intentional act on the part of the

defendant to violate the plaintiff's legal rights." *Porro*, 624 F.3d at 1327-28 (citations, quotations

and alterations omitted). "Simply put, there's no special rule of liability for supervisors. The

test for them is the same as the test for everyone else." *Id.* Courts within this district have

applied the *Dodds* test in the specific context of a claim that the supervisor failed to train his or her

subordinate. *Kemp v. Lawyer*, 846 F.Supp.2d 1170 (D. Colo. 2012) (no failure-to-train § 1983

liability where plaintiff's allegations amounted to mere speculation that police officers under

31

478

defendant sheriff's supervision habitually engaged in warrantless searches and seizures); *Myers v. Koopman*, No. 09-cv-02802-REB-MEH, 2011 WL 650328 (D. Colo. Feb. 11, 2011).

As an initial matter, Plaintiffs' argument that the "entity is liable" where a failure to train is evident is irrelevant to the consideration of whether any of the Park County Defendants would be liable in their individual capacities. (ECF No. 71 at 5.) The distinction between individual capacity claims (i.e. claims against the individual officers) and official capacity claims (i.e. claims against the institution) are not mere formality but rather make clear the principle that liability does not attach to an individual under § 1983 without actual proof that the individual's own conduct caused a violation of the plaintiff's constitutional rights. Here, Plaintiffs have not pointed to any evidence that would create a material issue of fact as to whether Officers Priestly, Gore or Sheriff Wegener's alleged failure to train amounts to "a deliberate, intentional act . . . to violate the plaintiff's legal rights." *Porro*, 624 F.3d at 1327-28; *Dodds*, 614 F.3d at 1200. Plaintiffs have not presented any evidence indicating that any Defendant "promulgated, created, implemented or possessed responsibility for the continued operation of a policy" for the construction of warrant applications or any training related thereto. *Dodds*, 614 F.3d at 1199. Indeed, Plaintiffs have failed to establish a material issue of fact as to any element of the *Dodds* test and their claim under § 1983 based on the alleged failure to train Officer Hardey is rejected by the Court.[4]

    2.   Plaintiffs' Fourth Amendment claims regarding the Park County Defendants' alleged malicious prosecution

---

[4] In a separate objection, (ECF No. 107), Plaintiffs challenge Magistrate Judge Watanabe striking a sentence from the Pretrial Order (ECF No. 106) containing Plaintiffs claim that "there was a failure to train Hardey and a ratification of Hardey's conduct." Because this Court holds that Plaintiffs' failure-to-train claim is not pled, it also overrules this objection.

The Park County Defendants argue that they are entitled to summary judgment on Plaintiffs' § 1983 claim under a malicious prosecution theory because these Defendants were not involved in the decision to prosecute Plaintiffs. (ECF No. 65 at 7-8.) In support, the Park County Defendants submit an affidavit of District Attorney LeDoux stating that "[b]ased upon my review of the case file and applicable law, it was my independent professional opinion . . . that there was sufficient evidence of animal cruelty/neglect [and] that there was a reasonable likelihood of conviction." (ECF No. 65-7, LeDoux Aff. at ¶ 8.) LeDoux's affidavit goes on to state that, subsequent to the April 10, 2012 court ruling in which the Judge Green ruled that material information had been omitted from Officer Hardey's affidavit, that court's ruling "did not change my opinion that there was sufficient evidence of animal cruelty/neglect and that there was a reasonable likelihood of conviction . . . ." (*Id.* at ¶ 9.) The affidavit further states that "[t]he decision to continue prosecution of the case following the April 10, 2012 hearing . . . was not affected in any way by the Park County Sheriff's Office or any of its employees . . . ." (*Id.* at ¶ 12.)

Plaintiffs do not directly address this argument in their brief filed in opposition to Defendants' motion, but appear to incorporate by reference the opposition papers Plaintiffs filed in response to Defendants' motion for summary judgment regarding damages. (ECF No. 68.) In that brief, Plaintiffs paint a colorful picture that District Attorney LeDoux was facing re-election in 2012 and was being opposed by the Park County Sheriff's Office for not prosecuting enough cases and was also being criticized by the public for not responding more forcefully in the prosecution of the criminal case against Plaintiffs. (*Id.* at 10-11.) Plaintiffs argue that, as a result of this public

scrutiny and political pressure, District Attorney LeDoux succumbed to the demands of the Park County Sheriff's Office and continued his prosecution of Plaintiffs on animal cruelty charges "though he knew he could not win it."   (*Id.* at 11.)

In their opposing statement of undisputed material facts submitted in response to the Park County Defendants' motion for summary judgment regarding damages, Plaintiffs cite to three documents in support of their contention that "[t]he evidence indicates that the District Attorney took the case to trial for political reasons and because he was pressured to do so."   (ECF No. 72-3 at 2.)   The first document is a copy of an email chain among Dr. Olds and Officer Gore in which Officer Gore reports to Dr. Olds that he and other officers would meet with their "county attorney to analyze a strategy for going forward."   (ECF No. 68-4, Apr. 11, 2012 Emails.)   The second document is a copy of an email chain among Officers Priestly, Gore and other individuals in which Officer Priestly is critical of the judge's ruling at the April 10, 2012 motions hearing that the Six Horses would be returned to Plaintiffs and an unnamed individual responds to that email asserting that "[p]ressure to the court must be applied . . . ."   (ECF No. 68-4, April 11, 2012 Emails.)   The third document is an affidavit signed by Hatlee stating that, at the conclusion of his criminal trial, he overheard District Attorney LeDoux state that this would be the last time that he "would allow himself to be pressured into trying a case he knew he could not win."   (ECF No. 68-8, Hatlee Aff.)

First, none of these documents lend any support to Plaintiffs' assertion that District Attorney LeDoux was facing political pressure in his attempts to be re-elected, nor do these documents give any indication that the Park County Sheriff's Office was opposed to his re-election.   As to the email chain between Dr. Olds and Officer Gore, Officer Gore's mere

34

481

statement that he would work with the "county attorney to analyze a strategy for going forward" is a far cry from giving any indication that he would put pressure on District Attorney LeDoux to prosecute a case against his will, and the Court declines to add that artificial gloss to this statement. Likewise, the email chain among Gore and other undisclosed recipients does not give any indication that any Park County Officer Defendant would take any actions seeking to force District Attorney LeDoux's hand regarding the prosecution of Plaintiffs in the criminal matter or even that any Defendant would have the means to do so. Although one unnamed respondent to Officer Priestly's email states that pressure should be applied to *the court* in that case—*not District Attorney LeDoux*—this anonymous participant's statement does nothing to create a material issue of fact as to the interactions between District Attorney LeDoux and any of the Park County Defendants. The affidavit created by Hatlee not only fails to prove Plaintiffs' point because it does not indicate *who* District Attorney LeDoux was allegedly being pressured by, but also fails on the separate grounds that it is hearsay evidence that cannot be considered by the Court on a motion for summary judgment. *Jaramillo,* 427 F.3d at 1314.

At the end, Plaintiffs' argument amounts to mere rhetoric without factual support. As this is a motion for summary judgment, Plaintiffs may not rest on the allegations contained in their complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harriss,* 550 U.S. 372, 380 (2007). Likewise, to withstand a motion for summary judgment, Plaintiffs "must do more than refer to allegations of counsel contained in a brief . . . ." *Thomas,* 968 F.2d at 1024. "Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit

35

482

incorporated therein." *Id.* (citing *Celotex*, 477 U.S. at 324). Because Plaintiffs have not presented any record evidence that would create a material issue of fact that would need to be resolved at trial, and in light of the Park County Defendants' affidavit from District Attorney LeDoux refuting Plaintiffs' argument, the Court grants the Park County Defendants summary judgment on the § 1983 claims made against them in their individual capacities.

**E.     Motion for Judgment on the Pleadings on Plaintiffs' Official Capacity Claims**

The Park County Defendants have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) as to claims brought against Sherriff Wegener in his official capacity. (ECF No. 63.) Magistrate Judge Watanabe entered a Report and Recommendation on January 23, 2015 finding that Defendants' motion should be denied on the grounds that the First Amended Complaint alleges specific decisions and actions taken by Sherriff Wegener that, because of his status as a policymaker, would constitute the official policy of the Park County Sheriff's office and subject it to §1983 liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-84 (1986); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211-12 (10th Cir. 2007); *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007).

The Court concludes that Magistrate Judge Watanabe's analysis was thorough and sound, and that there is no clear error of law or abuse of discretion. The Court therefore adopts the Recommendation in full and incorporates its contents into this Order.

Defendants filed an objection to the Report and Recommendation (ECF No. 99) arguing that the Magistrate Judge misapplied the pleading standards for evaluating motions under Fed. R.

483

Civ. P. 12(c). Specifically, Defendants contend that Plaintiffs' allegations were conclusory in nature and, pursuant to *Twombly* and *Iqbal*, should not have been accepted as true by the magistrate judge in his analysis. On its *de novo* review of this issue pursuant to Defendants' properly raised objection, the Court finds that the magistrate judge correctly applied the pleading standard set forth in *Twombly* and *Iqbal* in analyzing Defendants' motion.

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is subject to the same standards that apply to motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Atlantic Richfield Co.*, 226 F.3d at 1160. A court ruling on a motion under this Rule is bound to accept the facts alleged in the complaint as true "even if doubtful in fact," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "grant all reasonable inferences from the pleadings in favor of the" non-moving party. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (quoting *Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006). Only factual allegations are to be accepted as true; allegations of bare legal conclusions are discarded from the Court's analysis. *Kansas Penn Gaming, LLC. v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

As pointed out by the magistrate judge, the First Amended Complaint makes several allegations that Sheriff Wegener knowingly directed and ordered unlawful conduct, which in turn resulted in the violation of Plaintiffs' constitutional rights. Specifically, the First Amended Complaint contains allegations that Sherriff Wegener was "involved in the investigation and

37

decisions to seize Plaintiffs' property and prosecute them . . . ."  (ECF No. 22 at ¶6.)  The First

Amended Complaint states that Sheriff Wegener "succumbed to the political pressure" created by

a so-called public outcry "and asked Defendants Priestly and Hardey to arrange for removal of the

six horses" from Echo Valley Ranch.  (*Id.* at ¶19.)  The First Amended Complaint states that

Sheriff Wegener directed Defendant Hardey to seek a "warrant to seize the six horses from

Plaintiffs" which warrant was later found to be improper.  (*Id.* at ¶¶24, 25.)  Finally, the First

Amended Complaint alleges that documents relating to the investigation of Echo Valley Ranch

were provided to a non-profit horse sanctuary for the purpose of a fundraising campaign and the

creation of a documentary, all for the supposed political gain of Sheriff Wegener.  (*Id.*at ¶30.)

　　　While the evaluation of whether a complaint sufficiently states a claim for relief is a

"context-specific task," *Iqbal*, 556 U.S. at 679, here it is clear that the allegations in the First

Amended Complaint are sufficient to withstand dismissal under Fed. R. Civ. P. 12(c).  The

allegations repeated above are not conclusory as the Park County Defendants would suggest, but

are all the law requires at the pleading stage as a "short and plain statement of the claim showing

that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 663.  "'[D]etailed

factual allegations' are not required . . . but the Rule does call for sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550

U.S. at 555, 570) (first modification in original).  As pointed out by the magistrate judge,

Defendants chose to move for judgment on the pleadings as to Plaintiffs' official capacity claims,

while moving for summary judgment as to all of Plaintiffs' other claims.  As such, the Court is

proscribed from looking beyond the pleadings when ruling on this motion and, further, must

485

accept all well-pled factual allegations as true. Because the Court finds that the factual allegations as pled in the First Amended Complaint are sufficient to state a claim against Sherriff Wegener in his official capacity, the Park County Defendants' objection is overruled.[5]

The Court observes that the same factual basis upon which Plaintiffs assert their claims against Sheriff Wegener in his official capacity are the same facts upon which Plaintiffs base their claims against Sheriff Wegener in his individual capacity. As described above, Plaintiffs have not presented sufficient evidence to create a material issue of fact as to whether Sheriff Wegener, in his individual capacity, personally took any actions that resulted in the violation of Plaintiffs' constitutional rights. Because the individual capacity claims are in a different procedural context than the official capacity claims, the Court notes the seemingly contradictory conclusion that the same set of facts could result in different outcomes as to claims brought against Sheriff Wegener in his official capacity versus claims brought against him in his individual capacity. To resolve this inconsistency, the Court will allow Sheriff Wegener the opportunity to move for summary judgment on the official capacity claims asserted against him. Sheriff Wegener shall have until 15 days from the date of this Order to file his motion and may file a brief of no longer than 10 pages. Plaintiffs shall have 10 days to respond to this motion and will also be limited to a brief of no more than 10 pages. No further briefing will be allowed on this issue.

---

[5] Defendants have also filed a motion for leave to file a reply brief in support of their objection to the Report and Recommendation and have attached their reply brief to that motion. (ECF Nos. 102, 102-1.) The Court grants Defendants' motion and will consider the attached motion as properly filed, although this does not change the result reached by the Court. Defendants' reply brief argues that Plaintiffs briefing discusses matters that go well beyond the pleadings and should not be considered by this Court in ruling upon Defendants' motion. However, as stated, the Court finds that Plaintiffs' pleadings alone are sufficient to withstand Defendants' motion, and it need not look at the matters outside the pleadings asserted by Plaintiffs.

**F.      The Park County Defendants' Motion for Summary Judgment**

**Regarding Damages**

The Park County Defendants have moved for summary judgment as to several aspects of

Plaintiffs' claims for damages.   These Defendants contend that much of Plaintiffs' alleged

damages were not caused by the alleged violations of their constitutional rights by the Defendants.

These Defendants further argue that the vast majority of Plaintiffs' claimed damages, in the form

of lost profits, fail as a matter of law as being too speculative.   These Defendants also argue that

Plaintiffs' claims for damages stemming from their emotional distress are not supported by

evidence and therefore fail as a matter of law.   Finally, these Defendants argue that Plaintiffs have

not set forth any facts showing that Defendants acted with the "evil motive or intent" or "reckless

or callous indifferen[ce] to the federally protected rights of others" required to recover punitive

damages.   *Smith v. Wade*, 461 U.S. 30, 56 (1983).

"Damages are available for violations of § 1983 'to compensate persons for injuries caused

by the deprivation of constitutional rights.'"   *Makin v. Colorado Dept. of Corrections*, 183 F.3d

1205, 1214 (10th Cir. 1999) (quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978)).   However, that

damages award "must be based on actual injuries . . . ."   *Id.* (citing *Carey*, 435 U.S. at 264).

"[T]he abstract value of a constitutional right may not form the basis for § 1983 damages."

*Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986).   Likewise, "[t]he

deprivation of constitutional rights, standing alone, does not entitle a plaintiff to general damages."

*Taxpayers for the Animas-La Plata Referendum v. Animas-La Plata Water Conservancy Dist.*, 739

F.2d 1472, 1480-81 (10th Cir. 1984).

1.   Damages caused by the Park County Defendants' alleged violation of Plaintiffs'
     constitutional rights

As to the Park County Defendants' contention that there is no causal connection between

Plaintiffs' damages and Defendants' claimed constitutional violations, this argument ultimately

amounts to a dispute over the legitimacy of Plaintiffs' alleged damages and their factual merit.

For example, the Park County Defendants argue that no factual support was offered by Plaintiffs

for their claimed damages relating to the loss in value in the Bailey Feed Store; damages relating to

Plaintiffs' loss of boarders due to negative publicity; damages relating to boarders lost due to the

absence of positive advertising; damages from a loss of foals due to negative publicity; and

damages from a loss of value in two horses from an inability to schedule showings or trainings.

(ECF No. 66 at 7.)   However, the "amount of damages is a finding of fact" as to these issues, not

law, and the Court is not inclined to resolve the extent of the damages resulting from these claimed

losses at the summary judgment stage given the current procedural posture of this case.   *Lippoldt*

*v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006) (quoting *Deasy v. United States*, 99 F.3d 354, 359

(10th Cir. 1996); *Dill v. City of Edmund*, 155 F.3d 1193, 1208-09 (10th Cir. 1998)).   This is

particularly the case here, where the Park County Defendants' arguments amount to a mere factual

dispute that cannot be resolved as a matter of law.

The Park County Defendants also argue that Plaintiffs' alleged damages relating to their

malicious prosecution claims must be calculated separately from the alleged damages relating to

the seizure of the Six Horses pursuant to the allegedly defective warrant.   It is true that damages

on a § 1983 claim may only be recovered for those damages actually caused by the deprivation of

41

the plaintiff's constitutional rights.  *Makin*, 183 F.3d at 1214.  Nonetheless, on the state of the record now before the Court, the damages issue is too muddled to permit summary judgment to enter.  Summary judgment has been granted with respect to all malicious prosecution claims against the Park County Defendants in their individual capacities and against Dr. Olds.  While this claim is still pending against Sheriff Wegener in his official capacity, as described above, Sheriff Wegener will have the additional opportunity to move for summary judgment as to the official capacity claims asserted against him.  In any event, what damages flow solely from either Plaintiffs' malicious prosecution claim, animal seizure claim, or breach of contract claim is difficult to discern from the pleadings or record evidence.  Accordingly, the propriety of damages flowing from the surviving claims will be left for development at trial or future motions.

      2.     Damages from Plaintiffs' alleged lost profits

      The Park County Defendants argue that Plaintiffs' damages claims relating to lost profits fail on the grounds that they are too speculative.  In support, Defendants rely on an order from a Norther District of Illinois court granting a motion *in limine* to exclude evidence of damages with respect to claims that the court found to be too speculative.  *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554 (N.D. Ill. 2008).  This case is inapplicable as it does not rule as a matter of law that certain damages are not ascertainable, but rather concluded as an evidentiary matter that certain damages claims were too remote for evidence in support of those claims to be presented to a jury.  Notably, the court's ruling in that order did not cap the plaintiff's potential recovery as a matter of law, as the Park County Defendants seek to have this Court do in the instant motion.

      Here, the Park County Defendants have pointed out that they received interrogatory

42

489

responses indicating Plaintiffs' "opinions of economic losses" and which set out an estimated

value for each independent loss Plaintiffs claimed to have suffered.   (ECF No. 66-8, Plaintiffs'

Interrogatory Responses at 2-3.)   These estimates are sufficient at this stage in the proceeding to

set forth a material issue of fact that would survive summary judgment.   The "amount of damages

is a finding of fact" that Plaintiffs will have the opportunity to prove by presenting competent

evidence at trial.   *Lippoldt v. Cole*, 468 F.3d at 1220; *Deasy*, 99 F.3d at 359; *Dill*, 155 F.3d at

1208-09.

     3.     <u>Damages from Plaintiffs' alleged emotional distress</u>

     The Park County Defendants next argue that Plaintiffs damages stemming from emotional

distress fail because they are not corroborated by supporting evidence.   Damages under § 1983

may be awarded for mental and emotional distress.   *Carey*, 435 U.S. at 263-64.   "Such damages

'will not be presumed, but they are easily proved by testimony showing the nature and

circumstances of the wrong and its effect on the plaintiff.'"   *Jolivet v. Deland*, 966 F.2d 573, 577

(10th Cir. 1992) (quoting *Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 829 (1st Cir.

1987)).

     Plaintiffs cite to *Dill v. City of Edmond*, 155 F.3d 193 (10th Cir. 1998), and *Koopman v.

Water District No. 1 of Johnson Cnty, Can.*, 41 F.3d 1417 (10th Cir. 1994), for the proposition that

Plaintiffs' claims for non-economic damages can be denied as a matter of law for failure to present

any evidence in support thereof.   However, both cases involved the Tenth Circuit's review of

decisions made by district courts following trial.   Specifically, *Dill* concerned the propriety of

damages awarded to the plaintiff following a bench trial.   In *Koopman*, the Tenth Circuit found

490

that the trial court did not err in refusing to give an instruction to the jury permitting them to award

damages for emotional distress because plaintiff, and no one else, testified to his emotional

condition. In both cases, the result reached depended on the facts submitted and testimony

received at trial. Here, Plaintiffs have submitted sufficient evidence to create a material issue of

fact as to whether they suffered damages in the form of emotional harm. They will be afforded

the opportunity to prove these damages by presenting competent evidence at trial. *Lippoldt*, 468

F.3d at 1220; *Deasy*, 99 F.3d at 359; *Dill*, 155 F.3d at 1208-09.

    4.      Plaintiffs' claim for punitive damages

       The Park County Defendants argue that no evidence has been put forward by Plaintiffs to

show that any Defendant's conduct was undertaken with the evil motive or reckless indifference to

Plaintiffs' constitutional rights as would be required to award punitive damages in a § 1983 case.

As discussed above, the Court has found that none of the Park County Defendants would be liable

in their individual capacities under § 1983 under a theory of malicious prosecution relating to

Plaintiffs' prosecution on animal cruelty charges. Further, as described above, the Court has

found that none of the Park County Defendants—with the exception of Officer Hardey—would be

liable in their individual capacities under § 1983 relating to the seizure of the Six Horses.

Although the § 1983 claims against Sheriff Wegener in his official capacity have not been

dismissed by the Court, these claims are essentially against the municipality which is "immune

from punitive damages under 42 U.S.C. § 1983." *Miller v. City of Mission, Kan.*, 705 F.2d 368,

377 (10th Cir. 1983) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

To the extent Plaintiffs seek punitive damages relating to their claims against Sheriff Wegener in

<p style="text-align:center">44</p>

491

his official capacity, those damages are not permissible and the Park County Defendants' motion for summary judgment is granted as to those damages.

Thus, the only claim upon which Plaintiffs could seek punitive damages at this point is the § 1983 claim brought against Officer Hardey in her individual capacity for her actions applying for a warrant to seize the Six Horses using an affidavit that was later found to contain material omissions.

Under federal law in a § 1983 action, a finding of punitive damages requires the defendant's conduct to be "motivated by evil motive or intent" or of a type that "involves reckless or callous indifferen[ce] to the federally protected rights of others." *Smith*, 461 U.S. at 56; *Carlson v. Green*, 446 U.S. 14, 22 (1980). "The focus must be on whether the defendant's actions call for 'deterrence and punishment over and above that provided by compensatory awards.'" *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 462 U.S. at 54). "The fact that a defendant's actions were objectively unconstitutional is not considered when determining whether to award punitive damages." *Id.* "[A]n award of punitive damages requires an assessment of [the defendant's] *subjective* state of mind." *Id.* (quoting *Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989)) (modifications and emphasis in original).

The Court finds that the evidence of record before it is sufficient to create a material issue of fact as to whether Officer Hardey acted with the requisite state of mind necessary to award punitive damages to Plaintiffs. When asked at her deposition if she "believe[d] the horses were endangered if left on the premises of Echo Valley" after she observed their condition on February 19, 2012, Officer Hardey responded that she did not hold that belief. (ECF No. 68-7, Hardey

491

Dep. at 41:21-23.) Indeed, Officer Hardey endorsed the Protective Custody Agreement that gave Plaintiffs thirty days to put weight on their horses by Plaintiffs' own efforts and further specified that they were not being seized at that time. (ECF No. 62-21, Protective Custody Agreement.) These pieces of evidence could lead to the conclusion that Officer Hardey applied for a warrant to have the Six Horses seized despite her belief that they were not in immediate danger as of the time the affidavit was submitted to the court. At this point in the proceedings, there is enough evidence in the record to prevent the Court from finding as a matter of law that punitive damages could not be awarded as against Officer Hardey. The Park County Defendants' motion for summary judgment must therefore be denied as to whether punitive damages may be sought by Plaintiffs against Officer Hardey.

     5.    Further damages development

Notwithstanding the determination above, the Court notes that the propriety of certain damage may be revisited by the parties in the context of motions *in limine* focused more directly on damages flowing from the claims which survive this Order.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED that:

1. Defendant Olds' Motion to Dismiss Claims against Her in Amended Complaint (ECF No. 31) is GRANTED in part, DENIED in part as moot, to wit, Plaintiffs' breach of contract claim is DISMISSED as against Dr. Olds;

2. Defendant Olds' Motion for Summary Judgement (ECF No. 61) is GRANTED;

3. The Recommendation of the United States Magistrate Judge (ECF No. 90) is APPROVED

493

and ADOPTED;

4. Defendants Wegener, Gore, Priestly and Hardey's objections to the Recommendation (ECF No. 99) are OVERRULED;

5. Defendants Wegener, Gore, Priestly and Hardey's Motion for Judgment on The Pleadings Pursuant to Fed. R. Civ. P. 12(c) Regarding Plaintiffs' Official Capacity Claims (ECF No. 63) is DENIED;

6. Defendants Wegener, Gore, Priestly and Hardey's Motion for Summary Judgment Regarding Plaintiffs' Third Claim for Relief (ECF NO. 64) is DENIED;

7. Defendants Wegener, Gore, Priestly and Hardey's Motion for Summary Judgment Re: Individual Capacity Claims (ECF No. 65) is GRANTED;

8. Defendants Wegener, Gore, Priestly and Hardey's Motion for Partial Summary Judgment Regarding Damages (ECF No. 66) is GRANTED in part, DENIED in part, to wit, summary judgment is GRANTED with respect to Plaintiffs' claim for punitive damages against Sheriff Wegener and otherwise DENIED;

9. Plaintiffs' Motion to Supplement the Record with Respect to Summary Judgment Motions Number 61, 64, 65 and 66 (ECF No. 95) is DENIED;

10. Plaintiffs' Objection to the Order of USMJ Watanabe Striking Failure to Train and Ratification Claims from the Final Pretrial Order (ECF No. 107) is DENIED; and

11. Defendants Wegener, Gore, Priestly and Hardey's Motion for Leave to File Reply Brief in Support of their Objection to Report and Recommendation (ECF No. 102) is GRANTED.

The only claims remaining before the Court are claims against Sheriff Wegener in his official

494

capacity under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations relating to (i) the

seizure of the Six Horses and (ii) malicious prosecution; one claim against Officer Hardey in her

individual capacity under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations

relating to the seizure of the Six Horses; and Plaintiffs' breach of contract claim against the Park

County Defendants. Sheriff Wegener shall have until 15 days from the date of this Order to file a

motion for summary judgment regarding the official capacity claims asserted against him and may

file a brief of no longer than 10 pages. Plaintiffs shall have 10 days to respond to this motion and

will also be limited to a brief of no more than 10 pages. No further briefing will be allowed on

this issue.

DATED this 29th day of September, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

48

495

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

## STIPULATION OF DISMISSAL OF ALL CLAIMS AGAINST
## THE PARK COUNTY DEFENDANTS

Now come the Plaintiffs and the Defendants Cindy Hardey, Bobbi Priestly, Monte Gore

and Fred Wegener in both their individual and official capacities and as the Park County

Sheriff's Office and stipulate to dismissal of all claims alleged herein against said Defendants

with prejudice with each party to this stipulation to bear his, her or its own attorney's fees and

costs incurred in the prosecution and defense of the claims which are being dismissed hereby.

This stipulation of dismissal does not have any effect on all of Plaintiffs' claims against

Defendant Ashleigh Olds alleged herein.

1

496

/s/Brice A. Tondre

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado  80226
Telephone: 303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com
ATTORNEY FOR PLAINTIFFS

/s//Timothy P. Schimberg
Timothy P. Schimberg
FOWLER, SCHIMBERG & FLANAGAN,P.C.
1640 Grant Street, Suite 150
Denver, CO 80203
303-298-8603
ATTORNEY FOR DEFENDANTS HARDEY,
PRIESTLY, GORE and WEGENER

## CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of February, 2016 a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of filing to the following.

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre

2

497

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Raymond P. Moore

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

      Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER, and
ASHLEIGH OLDS,

      Defendants.

---

### ORDER

---

      This matter is before the Court *sua sponte* in connection with the Plaintiffs' filing of the Stipulation of Dismissal of All Claims against the Park County Defendants (ECF No. 141, the "Stipulation of Dismissal"). The Stipulation of Dismissal purports to stipulate to the dismissal, with prejudice, of all remaining claims in this action against Defendants Cindy Hardey, Bobbi Priestly, Monte Gore, and Fred Wegener in their individual and official capacities. (*Id.*) The Court also notes that its previous Order of September 29, 2015 dismissed all claims then pending against Defendant Ashely Olds. (ECF No. 110.)

      The Stipulation of Dismissal does not suffice to operate, in and of itself, as a dismissal of all claims in this matter. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii) (permitting voluntary dismissal without a court order by the filing of a stipulation of dismissal only if signed by *all parties* who

have appeared).   However, in light of the parties' agreement as evidenced by that document, the Court will treat the Stipulation of Dismissal as an unopposed motion to dismiss, which the Court hereby GRANTS.

Based on the foregoing, the Court ORDERS:

1.   The claims and causes of action asserted by Plaintiffs against Defendants Cindy Hardey, Bobbi Priestly, Monte Gore, and Fred Wegener in their individual and official capacities are in all respects DISMISSED with prejudice.   Each party shall pay their own costs and fees with respect to these Defendants and the claims asserted against these Defendants.

2.   Defendants' Motion for a One-Day Extension of Time to File a Motion in Limine (ECF No. 125) is DISMISSED as moot.

3.   Defendants' Motion to Strike Plaintiffs' Expert Witness Dr. Jena Questen Pursuant to Fed. R. Civ. P. 26(a)(2)(B) And to Preclude Expert Testimony Pursuant to Fed. R. Evid. 702 (ECF No. 137) is DISMISSED as moot.

4.   The Clerk of the Court is directed to enter JUDGMENT in favor of Defendant Ashley Olds and against Plaintiffs pursuant to the Court's Order of September 29, 2015.   (*See* ECF No. 110.)

DATED this 11th day of February, 2016.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

2

499

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

     Plaintiff,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER, and
ASHLEIGH OLDS,

     Defendants.

---

## FINAL JUDGMENT

---

     In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

     Pursuant to the Orders of Judge Raymond P. Moore entered on September 29,

2015 [Doc. 110] and February 11, 2016 [Doc. 143], it is

     ORDERED that the claims and causes of action asserted by Plaintiffs against

Defendants Cindy Hardey, Bobbi Priestly, Monte Gore, and Fred Wegener in their

individual and official capacities are in all respects DISMISSED with prejudice. Each

party shall pay their own costs and fees with respect to these Defendants and the

claims asserted against these Defendants.  It is

     FURTHER ORDERED that judgment is entered in favor of Defendant Ashley

Olds and against Plaintiffs, Randall J. Hatlee and Ronald L. Swift, pursuant to the

500

Court's Order [Doc. 110] entered on September 29, 2015. It is

Dated at Denver, Colorado this 11th day of February, 2016.

> FOR THE COURT:
> JEFFREY P. COLWELL, CLERK

> By: s/ C. Pearson
>
> C. Pearson
> Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

---

## NOTICE OF APPEAL

---

Notice is hereby given that Randall J. Hatlee and Ronald L. Swift, the Plaintiffs in the

above named case, hereby appeal to the United States Court of Appeals for the Tenth Circuit

from the final judgment entered in this action on the 11th day of February, 2016, entered in favor

of Defendant Ashleigh Olds and against Randal J. Hatlee and Ronald L. Swift, pursuant to the

Court's Order [Doc. 110] entered on September 29, 2015.

1

502

/s/Brice A. Tondre
Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado 80226
Telephone: 303-296-3300
Facsimile: 303-296-3390
briceatondrepc@msn.com
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this the 24th day of February, 2016 a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of filing to the following.

Timothy P. Schimberg
t_schimberg@fsf-law.com

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre

2

503

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that the foregoing Appellants' Appendix-Volume II as submitted in Digital Form is an exact copy of the written document filed with the Clerk, that all required privacy redactions have been made and that it has been scanned for viruses by McAfee's most recent virus screening program updated May 16, 2016.

/s/ Brice A. Tondre_____

## CERTIFICATE OF SERVICE

I hereby certify that on this the 16th day of May, 2016,  a true and correct copy of the foregoing document  was filed with the Clerk of Court using the CM/ECF system which will send notification  of such filing  to the following:

John Lebsack

jlebsack@wsteele.com

/s/ Brice A. Tondre_____