**CASE NO. 16-1065**

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

| | |
|---|---|
| RANDALL J. HATLEE and | ) |
| RONALD L. SWIFT | ) |
| | ) |
| Plaintiffs – Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| ASHLEIGH OLDS, | ) |
| | ) |
| Defendant – Appellant. | ) |

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Raymond C. Moore
D.C. No. 12-cv-02469-RM-MJW

---

**APPELLEE'S SUPPLEMENTAL APPENDIX
VOLUME 1 – PAGES 1-209**

---

JOHN LEBSACK
ADAM GOLDSTEIN
White and Steele, P.C.
600 17TH Street, Suite 600N
Denver, Colorado 80202
(303) 296-2828
jlebsack@wsteele.com
agoldstein@wsteele.com

# TABLE OF CONTENTS

Civil Docket for Case #:  1:13-cv-02469-RM-MJW1 ........................................... 1-6

Plaintiffs' First Amended Complaint and Jury Demand (ECF 22) .................... 7-19

Defendant Olds' Motion to Dismiss Claims (ECF 31)...................................... 20-38

Plaintiffs' Memorandum in Opposition to Defendant Olds' Motion to Dismiss
(ECF 35)................................................................................................................ 39-57

Defendant Olds' Separate Statement of Undisputed Material Facts in Support of
Motion for Summary Judgment (ECF 62)

    Exhibit A (ECF 62-1) ............................................................... 58-87

    Exhibit B (ECF 62-2).............................................................. 88-141

    Exhibit C (ECF 62-3)............................................................ 142-155

    Exhibit D (ECF 62-4) ........................................................... 156-162

    Exhibit E (ECF 62-5)............................................................ 163-165

    Exhibit F (ECF 62-6) ............................................................ 166-170

    Exhibit G (ECF 62-7) ........................................................... 171-209

ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–02469–RM–MJW

Hatlee et al v. Hardey et al

Assigned to: Judge Raymond P. Moore

Referred to: Magistrate Judge Michael J. Watanabe

Case in other court:  Tenth Circuit Court of Appeals, 16–01065

Cause: 42:1983 Civil Rights Act

Date Filed: 09/10/2013

Date Terminated: 02/11/2016

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Randall J. Hatlee**                                      represented by      **Brice A. Tondre**
Brice A. Tondre, P.C.
215 South Wadsworth Boulevard
#500
Lakewood, CO 80226–1566
303–296–3300
Fax: 303–238–5310
Email: briceatondrepc@msn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald L. Swift**                                        represented by      **Brice A. Tondre**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cindy Hardey**                                           represented by      **Andrea M. Bronson**
*TERMINATED: 02/05/2016*                                                       Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303–298–8603
Email: a_bronson@fsf–law.com
*TERMINATED: 06/23/2014*

**Andrew R. McLetchie**
Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303–298–8603
Fax: 303–298–8748
Email: a_mcletchie@fsf–law.com

**Joel James Fulton**

Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303–285–9319
Email: J_Fulton@fsf–law.com

**Timothy Peter Schimberg**
Fowler, Schimberg &Flanagan, P.C.
1640 Grant Street
Suite 150
Denver, CO 80203
303–298–8603
Fax: 303–298–8748
Email: t_schimberg@fsf–law.com

**Defendant**

**Bobbi Priestly**                                    represented by    **Andrea M. Bronson**
*TERMINATED: 02/05/2016*                              (See above for address)
                                                      *TERMINATED: 06/23/2014*

                                                      **Andrew R. McLetchie**
                                                      (See above for address)

                                                      **Joel James Fulton**
                                                      (See above for address)

                                                      **Timothy Peter Schimberg**
                                                      (See above for address)

**Defendant**

**Monte Gore**                                        represented by    **Andrea M. Bronson**
*TERMINATED: 02/05/2016*                              (See above for address)
                                                      *TERMINATED: 06/23/2014*

                                                      **Andrew R. McLetchie**
                                                      (See above for address)

                                                      **Joel James Fulton**
                                                      (See above for address)

                                                      **Timothy Peter Schimberg**
                                                      (See above for address)

**Defendant**

**Fred Wegener**                                      represented by    **Andrea M. Bronson**
*TERMINATED: 02/05/2016*                              (See above for address)
                                                      *TERMINATED: 06/23/2014*

                                                      **Andrew R. McLetchie**
                                                      (See above for address)

**Joel James Fulton**
(See above for address)

**Timothy Peter Schimberg**
(See above for address)

**Defendant**

**Ashleigh Olds**                              represented by    **Adam Joseph Goldstein**
*TERMINATED: 09/29/2015*                                        White &Steele, P.C.
                                                               600 17th Street
                                                               Dominion Towers
                                                               Suite 600N
                                                               Denver, CO 80202–5406
                                                               303–296–2828
                                                               Fax: 303–296–3131
                                                               Email: agoldstein@wsteele.com
                                                               *ATTORNEY TO BE NOTICED*

                                                               **John M. Lebsack**
                                                               White &Steele, P.C.
                                                               600 17th Street
                                                               Dominion Towers
                                                               #600N
                                                               Denver, CO 80202–5406
                                                               303–296–2828
                                                               Fax: 303–296–3131
                                                               Email: jlebsack@wsteele.com
                                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/01/2013 | 22 | 7 | AMENDED COMPLAINT *and Jury Demand* against All Plaintiffs, filed by Randall J. Hatlee, Ronald L. Swift.(Tondre, Brice) (Entered: 11/01/2013) |
| 11/19/2013 | 31 | 20 | MOTION to Dismiss Party *from Amended Complaint* by Defendant Ashley Olds. (Attachments: # 1 Proposed Order (PDF Only))(Lebsack, John) (Entered: 11/19/2013) |
| 12/10/2013 | 35 | 39 | BRIEF in Opposition to 31 MOTION to Dismiss Party *from Amended Complaint* filed by Plaintiffs Randall J. Hatlee, Ronald L. Swift. (Tondre, Brice) (Entered: 12/10/2013) |
| 12/15/2014 | 62 | | STATEMENT re 61 MOTION for Summary Judgment *of Undisputed Material Facts* by Defendant Ashleigh Olds. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M Part 1, # 14 Exhibit M Part 2, # 15 Exhibit M Part 3, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T, # 23 Exhibit U, # 24 Exhibit V)(Lebsack, John) (Entered: 12/15/2014) |

| | | | |
|---|---|---|---|
| | | | *Main Document (Not Attached)* |
| | | 58 | Attachment # 1 *Exhibit A* |
| | | 88 | Attachment # 2 *Exhibit B* |
| | | 142 | Attachment # 3 *Exhibit C* |
| | | 156 | Attachment # 4 *Exhibit D* |
| | | 163 | Attachment # 5 *Exhibit E* |
| | | 166 | Attachment # 6 *Exhibit F* |
| | | 171 | Attachment # 7 *Exhibit G* |
| | | 210 | Attachment # 8 *Exhibit H* |
| | | 266 | Attachment # 9 *Exhibit I* |
| | | 350 | Attachment # 10 *Exhibit J* |
| | | 357 | Attachment # 11 *Exhibit K* |
| | | 368 | Attachment # 12 *Exhibit L* |
| | | 373 | Attachment # 13 *Exhibit M Part 1* |
| | | 386 | Attachment # 14 *Exhibit M Part 2* |
| | | 399 | Attachment # 15 *Exhibit M Part 3* |
| | | 412 | Attachment # 16 *Exhibit N* |
| | | 416 | Attachment # 17 *Exhibit O* |
| | | 457 | Attachment # 18 *Exhibit P* |
| | | 459 | Attachment # 19 *Exhibit Q* |
| | | 472 | Attachment # 20 *Exhibit R* |
| | | 475 | Attachment # 21 *Exhibit S* |
| | | 477 | Attachment # 22 *Exhibit T* |
| | | 482 | Attachment # 23 *Exhibit U* |
| | | 486 | Attachment # 24 *Exhibit V* |
| 12/15/2014 | <u>65</u> | | MOTION for Summary Judgment *re Individual Capacity Claims* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: #<u>1</u> Exhibit A, #<u>2</u> Exhibit B, #<u>3</u> Exhibit C, #<u>4</u> Exhibit D, #<u>5</u> Exhibit E, #<u>6</u> Exhibit F, #<u>7</u> Exhibit G, #<u>8</u> Separate Statement of Undisputed Facts)(Schimberg, Timothy) (Entered: 12/15/2014) |
| | | 489 | *Main Document* |
| | | 499 | Attachment # 1 *Exhibit A* |
| | | 502 | Attachment # 2 *Exhibit B* |

| | | | |
|---|---|---|---|
| | | 505 | Attachment # 3 *Exhibit C* |
| | | 508 | Attachment # 4 *Exhibit D* |
| | | 511 | Attachment # 5 *Exhibit E* |
| | | 514 | Attachment # 6 *Exhibit F* |
| | | 517 | Attachment # 7 *Exhibit G* |
| | | 520 | Attachment # 8 *Separate Statement of Undisputed Facts* |
| 12/15/2014 | <u>66</u> | | MOTION for Partial Summary Judgment *re Damages* by Defendants Monte Gore, Cindy Hardey, Bobbi Priestly, Fred Wegener. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E, # <u>6</u> Exhibit F, # <u>7</u> Exhibit H, # <u>8</u> Exhibit I, # <u>9</u> Exhibit J, # <u>10</u> Exhibit K, # <u>11</u> Exhibit L, # <u>12</u> Exhibit M, # <u>13</u> Exhibit O, # <u>14</u> Exhibit P, # <u>15</u> Exhibit Q, # <u>16</u> Exhibit R, # <u>17</u> Exhibit S, # <u>18</u> Exhibit T, # <u>19</u> Separate Statement of Undisputed Material Facts)(Schimberg, Timothy) (Entered: 12/15/2014) |
| | | | *Main Document (Not Attached)* |
| | | | Attachment # 1 *Exhibit A (Not Attached)* |
| | | | Attachment # 2 *Exhibit B (Not Attached)* |
| | | | Attachment # 3 *Exhibit C (Not Attached)* |
| | | | Attachment # 4 *Exhibit D (Not Attached)* |
| | | | Attachment # 5 *Exhibit E (Not Attached)* |
| | | 525 | Attachment # 6 *Exhibit F* |
| | | | Attachment # 7 *Exhibit H (Not Attached)* |
| | | | Attachment # 8 *Exhibit I (Not Attached)* |
| | | | Attachment # 9 *Exhibit J (Not Attached)* |
| | | | Attachment # 10 *Exhibit K (Not Attached)* |
| | | | Attachment # 11 *Exhibit L (Not Attached)* |
| | | | Attachment # 12 *Exhibit M (Not Attached)* |
| | | | Attachment # 13 *Exhibit O (Not Attached)* |
| | | | Attachment # 14 *Exhibit P (Not Attached)* |
| | | | Attachment # 15 *Exhibit Q (Not Attached)* |
| | | | Attachment # 16 *Exhibit R (Not Attached)* |
| | | | Attachment # 17 *Exhibit S (Not Attached)* |
| | | | Attachment # 18 *Exhibit T (Not Attached)* |
| | | | Attachment # 19 *Separate Statement of Undisputed Material Facts (Not Attached)* |

| 01/20/2015 | 82 | | REPLY to Response to 61 MOTION for Summary Judgment *Statement of Undisputed Material Facts* filed by Defendant Ashleigh Olds. (Attachments: # 1 Exhibit W, # 2 Exhibit X)(Lebsack, John) (Entered: 01/20/2015) |
| | | 535 | *Main Document* |
| | | | Attachment # 1 *Exhibit W (Not Attached)* |
| | | | Attachment # 2 *Exhibit X (Not Attached)* |
| 09/29/2015 | 110 | 570 | ORDER. 31 Motion to Dismiss Party is GRANTED in part and DENIED in part as moot. 61 and 65 Motions for Summary Judgment are GRANTED. 64 Motion for Summary Judgment is DENIED. 66 Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. 95 Motion to Supplement is DENIED. The 90 Recommendation of the United States Magistrate Judge is APPROVED and ADOPTED. 63 Motion for Judgment on the Pleadings is DENIED. 99 Objections to the Recommendation are OVERRULED. 107 Objection to the Order of USMJ Watanabe is DENIED. 102 Motion for Leave is GRANTED. All as indicated in the attached Order. By Judge Raymond P. Moore on 09/29/2015. (athom, ) (Entered: 09/30/2015) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

_____

### PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND
_____

NOW COME the Plaintiffs, Randall J. Hatlee and Ronald L. Swift, by and through their

attorney, Brice A. Tondre, and for their first amended complaint against Defendants named

hereinafter state as follows:

### PARTIES

1.      Plaintiff, Randall J. Hatlee ("Mr. Hatlee"), was at all relevant times engaged in

horse ranching in Park County, Colorado

2.      Plaintiff  Ronald L. Swift ("Mr. Swift") was at all relevant times engaged in horse

ranching in Park County, Colorado.

3.      Defendant Cindy Hardey ("Deputy Hardey") was at all relevant times a law

enforcement officer employed by the Park County Sheriff's Office.

1

4.      Defendant Bobbi Priestly, who held the rank of Sergeant ("Sgt. Priestly"), was at all relevant times a law enforcement officer employed by the Park County Sheriff's Office and was the supervisor of Deputy Hardey.

5.      Defendant Monte Gore, who was the Undersheriff ("Undersheriff "), was at all relevant times a law enforcement officer employed by the Park County Sheriff's Office and was the supervisor of Deputy Hardey and Sgt. Priestley.

6.      Defendant Fred Wegener ("Sheriff Wegener") was at all relevant times the duly elected sheriff of Park County, Colorado. Sheriff Wegener is sued in both his official capacity and his individual capacity. He was involved in the investigation and decisions to seize Plaintiffs' property and prosecute them which are the subject of this action. The office of the sheriff was party to a contract with Plaintiffs which was breached.

7.       Defendant Ashleigh Olds, D.V.M. ("Dr. Olds") is a licensed veterinarian whose baseless statements to the other Defendants, animal cruelty activists and the news media resulted in the seizure of Plaintiffs' property and their prosecution.

## JURISDICTION

8.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1367 in that two of the causes of action alleged herein arise under the laws and constitution of the United States and the other causes of action are so related to the federal  causes of action that they form part of the controversy under Article III of the United States Constitution.

## FACTS COMMON TO ALL CLAIMS

9.      On February 13, 2012, Routt County officer Dawn Smith called Defendant Priestly and reported that, while conducting a follow-up at the Echo Valley Ranch of a matter

2

which resulted in a mare and a colt being brought to Echo Valley Ranch, she noted that seven of the other horses were very thin.

10.     On February 14, 2012, Defendant Priestley informed Defendant Hardey of the report from Routt County officer Smith. Defendant Hardey arranged to do a welfare check of the horses at the Echo Valley Ranch on February 16, 2012.

11.     On February 16, 2012, Defendants Hardey and Olds and Agent Smith arrived at Echo Valley Ranch. Defendant Olds was there to aid Agent Smith with the seizure of Bear and Defendant Hardey was there to conduct a welfare check of the other horses. Defendant Hardey found that seven of the horses were thin and that 34 were in good condition, that one of the seven thin horses was down and under the care of a veterinarian and that the seven thin horses had hay and water available.

12.     Bear was to be transported to Defendant Olds' clinic for evaluation and treatment. Defendant Olds demanded that the seven thin horses be ordered seized by Defendant Hardey and taken to Dr. Olds' clinic for evaluation. Without factual basis or investigation, Defendant Olds stated that the seven thin horses had been starved, mistreated and were suffering from neglect. Defendant Olds made this demand these statements without conducting the requisite evaluation of the horses pursuant to the Henneke Body Condition Scoring System, without interviewing Messrs. Hatlee and Swift with respect to their belief regarding why the seven horses were thin, without contacting the veterinarian for the herd and without developing a differential diagnosis, all of which was below the standard of care for a veterinarian.

13. Dr. Olds statement that the seven thin horses and Bear had been starved, mistreated and were suffering from neglect was below the standard of care for a veterinarian. She failed to

3

establish a differential diagnosis and evaluate each potential cause of the condition of the eight horses. Faced with a herd of 40 horses, 32 of which are in excellent condition, starvation, mistreatment and neglect had to be low on the differential list of any reasonably trained veterinarian. Dr. Olds purports to have ruled out botulism in Bear but did nothing to rule out other toxic causes of the condition of the eight horses. This was below the standard of care for a veterinarian. Making a report to the Park County Sheriff's Office that the eight horses were starved, mistreated and suffering from neglect was without reasonable cause to know or suspect that the statement was true. Ultimately, after reasonable professional investigation, it was determined that the probable cause of the illness of the seven horses was the consumption of toxic weeds.

14.     Dr. Olds was acting under color of state law, to wit C.R.S. §12-64-121, when she made the false statements to the Sheriff's Office.

15.     Dr. Horton, the herd veterinarian, was of the opinion that much more analysis had to be done before a conclusion as to what was causing the condition of the seven horses could be reached.

16.     Defendant Olds' demands were reported to Defendant Priestley who instructed Defendant Hardey to tell Defendant Olds to leave with the horse being seized by Agent Smith.

17.     Defendant Priestly then conferred with Kate Anderson, D.V.M., a Colorado Department of Agriculture veterinarian, Scott Dutcher, chief investigator with the Bureau of Animal Protection, Dr. Britt of Rocky Top Veterinary Services and Defendant Hardey, all of whom agreed that the appropriate thing to do was to issue a notice of warning and leave the seven horses in the care of the Plaintiffs, giving Plaintiffs thirty days to demonstrate that the

horses were not being mistreated. Defendant Hardey did not believe that leaving the horses with Plaintiffs would endanger them and, based upon unanimous agreement, issued the warning.

18.     Defendant Olds was infuriated by the decision to allow the seven horses to remain under the care of Messrs. Hatlee and Swift. After returning to her clinic, Dr. Olds contacted Channel 7 News  and Harmony HorseWorks and made her unsubstantiated claims of animal cruelty for the purpose of generating an outcry from Harmony Horse Works, a major client of Dr. Olds. Her intent was to cause an outcry which would force the Sheriff's Office to seize the seven horses and place them in Dr. Olds' care. Her unsubstantiated claims were broadcast on the evening and night of the day after she made the demand for seizure of the seven horses. Dr. Olds on February 16, 2012 at 4:35 p.m. by e-mail to Defendant Hardey again made the still unfounded statement that the horses were suffering from a "very clear cut case of starvation and malnutrition"

19.     When Harmony HorseWorks became aware of the consensus decision of the Park County Sheriff's Office and the Department of Agriculture, in reliance on the opinions of and at the urging of Defendant Olds, it mounted an outcry demanding that the horses be removed from the management of the Plaintiffs. In the words of Harmony HorseWorks on February 18, 2012, "wait and see what happens after the email blast goes out." This outcry was directed at Defendants Wegener and Gore, the sheriff and undersheriff, who succumbed to the political pressure and asked Defendants Priestly and Hardey to arrange for removal of the six horses from Echo Valley Ranch. One of the horses died on February 16, 2012, from an abscess of the heart which was established by necropsy to not be the result of malnutrition or neglect.

20.     In consideration for agreeing to move the six horses into protective custody, the

Sheriff's Office, acting through Defendants Wegener, Gore, Priestly and Hardey, agreed to allow the horses to remain under the management and control of Plaintiffs for 30 days, thus allowing them to demonstrate that they were not abusing or neglecting the horses. The Sheriff's Office hoped and believed that this agreement would satisfy the activists and relieve it of the need to head off a nasty and potentially violent confrontation.

21.     On February 19, 2012, Defendant Hardey requested that Plaintiffs place the six horses in protective custody. The Plaintiffs agreed to place them in the custody of Kirsten LeBeau.

22.     The protective agreement did not satisfy Harmony HorseWorks, which was emboldened by the unsupported conclusions of Dr. Olds. Harmony HorseWorks continued to cry out for the Park County Sheriff's Office to seize the six horses. Defendant Olds joined in the outcry and advocated prosecution of Plaintiffs for animal cruelty. Defendant Hardey remained of the opinion that leaving the horses with the owners would not endanger them.

23.     On February 21, 2012, Defendant Priestley received a call from Dr. Horton, D.V.M., Plaintiffs' treating veterinarian who told her that it was not clear what caused the weight loss in the six horses and that a lot of testing needed to be done in order to determine the cause.

24.     On February 22, 2012, Defendant Hardey, at the direction of Defendants Wegener Gore and Priestley, who again succumbed to the political pressure, sought and received a warrant to seize the six horses from Plaintiffs. Defendant Hardey's affidavit in support of the request for a warrant was a breach of the protective custody agreement and failed to inform the judge who issued the warrant of material facts. The affidavit failed to inform the judge who issued the warrant: (1) that there was an agreement to leave the horses in the care and custody of the

6

Plaintiffs for 30 days in order to allow them to demonstrate that the horses were not neglected;

(2) that two veterinarians and a Department of Agriculture official agreed that the agreement was

reasonable; (3) that the horses were well treated at the facility where they were housed; (4) that

the horses were not in danger where they were housed; and (5) that the true intent of the seizure

was to silence the protestations of Dr. Olds and Harmony HorseWorks. The judge who presided

over the prosecution of the Plaintiffs found that the omissions were material, made in bad faith

and would have led to refusal to issue the warrant if disclosed to the issuing judge.

     25.     Defendants Priestly, Gore and Wagener, despite their knowledge that seizure of

the horses was not permissible under the facts or the law, directed Defendant Hardey to obtain a

warrant. They undertook this approach in hopes that it would prevent Harmony HorseWorks and

its followers from taking matters into their own hands which they were threatening to do if the

Sheriff's Office did not act to their satisfaction. Said Defendants failed to take the proper course

of prosecuting those who were threatening a breach of the peace. This was an attack on the

innocent to avoid prosecuting the guilty.

     26.     On February 23, 2012, Defendants Hardey and Priestly executed the warrant and

issued summonses charging each Plaintiff with animal cruelty. Both the warrant and the

summonses were without probable cause to believe that the crime of animal cruelty had been

committed.

     27.     Seizure of the six horses deprived Plaintiffs of evidence material to their

avoidance or defense of a charge of animal cruelty.

     28.     During the course of the seizure which was from February 23, 2012 until April 10,

2012, one of the seized horses, Echo, was permanently disabled as a result of being overfed

alfalfa.

29.     During the course of the prosecution of the charges against the Plaintiffs the court

held that the warrant authorizing the seizure of the six horses was in violation of applicable

Colorado law, without probable cause and was procured by bad faith omissions. The court

ordered the horses returned to Plaintiffs and suppressed all evidence which was the fruit of the

seizure.

30.     Throughout the course of the investigation and prosecution the Sheriff's Office

deviated from its usual and customary practice of refusing to disclose the fruits of its

investigation to anyone other than the District Attorney and the defendant. The Sheriff's Office

provided documents to Harmony HorseWorks for fundraising projects and to prepare a

documentary film in which Defendant Olds broadcast her baseless claims and supported the fund

raising efforts of Harmony HorseWorks. This was done for the political benefit of Sheriff

Wagener the District Attorney.

31.     The charges against the Plaintiffs were tried to a jury which found them not guilty.

**FIRST CLAIM FOR RELIEF**

32.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 31 above.

33.     At all times relevant to the claims asserted herein, each Defendant was acting

under color of state law.

34.     The Defendants, acting in concert, obtained a warrant which they used to seize the

six horses owned by Plaintiffs. The warrant was issued without probable cause in that it was

based on material omissions in violation of the Fourth Amendment to the United States

8

Constitution. Obtaining a warrant under these circumstances was a clearly established violation of the Fourth Amendment to the Constitution of the United States.

35.     Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to recover damages caused by the violation of their rights not to have their property unreasonably seized in violation of the Fourth Amendment to the United States Constitution.  Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover their attorney's fees and costs incurred in prosecuting this action.

36.     The unreasonable seizure of Plaintiffs' property severely injured them emotionally and caused them severe humiliation, embarrassment and loss of their good reputation.

37.     As a direct and proximate result of the conduct of the Defendants herein Plaintiffs have suffered emotional injuries, economic and non-economic damages, embarrassment and humiliation and loss of their good reputation.

38.     The conduct of the Defendants was in reckless and callous indifference to Plaintiffs' federally protected rights justifying the award of punitive damages.

**SECOND CLAIM FOR RELIEF**

39.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 38 above.

40.     At all times relevant to the claims asserted herein, each Defendant was acting under color of state law.

41.     The conduct set forth above constitutes malicious prosecution of Plaintiffs by each of the Defendants in that it was done knowing it was without probable cause and was being done for political and economic purposes.  As such, their conduct was malicious. The misconduct reaches constitutional proportions because the Defendants utilized misstatements and

9

omissions of material facts in order to initiate and continue the legal process to attempt to take

Plaintiffs' property and their freedom. It was clearly established that malicious prosecution under

color of state law is a violation of the Fourth Amendment to the Constitution of the United States

42.    The prosecution of Plaintiffs was terminated in their favor on the merits.

43.    Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to recover damages caused by

the violation of their rights not to be maliciously prosecuted on the basis of false statements and

material omissions in violation of the Fourth Amendment to the United States Constitution.

Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover their attorney's fees and costs

incurred in prosecuting this action.

44.    The malicious prosecution of Plaintiffs severely injured them emotionally and

caused them severe humiliation, embarrassment and loss of their good reputation.

45.    As a direct and proximate result of the conduct of the Defendants herein, Plaintiffs

have suffered emotional injuries, economic and non-economic damages and embarrassment,

humiliation and loss of their good reputation.

46.    The conduct of Defendants was in reckless and callous indifference to Plaintiffs'

federally protected rights justifying the award of punitive damages.

### THIRD CLAIM FOR RELIEF

47.    Plaintiffs incorporate by reference the allegations contained in paragraph 1

through 46 above.

48.    On February 19th, 2012, the Park County Sheriff's Office entered into an

agreement with Plaintiffs to place the six horses in protective custody. This agreement was to

protect Plaintiffs and their horses during the thirty days which Plaintiff were given by the Notice

10

of Warning to rectify the condition of the six horses and show that their condition was not due to neglect.

49.     Sheriff Wegener and/or Undersheriff Gore authorized the contract in order to satisfy Dr. Olds and Harmony HorseWorks, silence their outcry, relieve the Sheriff's Office from criticism by them and prevent a breach of the peace which was being threatened.

50.     On February 23, 2013, the agreement was breached by the Park County Sheriff's Office which caused the horses to be seized.

51.     This seizure deprived Plaintiffs of the opportunity to rectify the condition of the six horses and demonstrate that their condition was not caused by neglect.

52.     The breach resulted in the Plaintiffs' horses being seized and the Plaintiffs being charged with animal cruelty, a charge of which they were found not guilty.

53.     As a consequence of the breach, Plaintiffs suffered economic damages.

### FOURTH CLAIM FOR RELIEF

54.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 53 above.

55.     The criminal case was brought against the Plaintiffs and six of their horses seized on the basis of statements made by Defendant Olds which caused an outcry that resulted in the seizure and prosecution. Throughout the prosecution, Defendant Olds pressed the Park County Sheriff's Office and District Attorney to persist in the prosecution despite knowing that her claim that seven horses had been the subject of cruelty was without foundation and was done for her economic benefit. Dr. Olds harbored a grudge against Mr. Swift because he refused her request that he recommend her services to horse owners who patronized his feed store.

11

56.     Defendant Olds' statements were false and unfounded and therefore without probable cause.

57.     Defendant Olds was motivated by malice in that her motive was other than to bring justice to persons she thought had committed a crime. She was economically motivated.

58.     The criminal case ended in favor of the Plaintiffs.

59.     As a direct and proximate result of Defendant Olds' conduct Plaintiffs suffered economic and non-economic damages, embarrassment, humiliation and loss of their good reputation.

60.     The conduct of Defendant Olds was willful, wanton and reckless justifying the award of punitive damages.

WHEREFORE, Plaintiffs prays that the Defendants be cited to appear and answer herein and that upon trial of this matter Plaintiffs be awarded judgment for the damages found by the trier of fact, both compensatory and punitive, that they be awarded their attorney's fees and costs incurred in prosecuting this action, pre and post judgment interest allowed by law and that they be granted such other and further relief as the Court deems appropriate in the circumstances.

**PLAINTIFF DEMANDS TRIAL TO A JURY GUARANTEED BY THE CONSTITUTION OF THE UNITED STATES AND PRESERVED BY RULE 38 F.R.C.P.**

/s/ Brice A. Tondre
_____

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado   80226
Telephone:  303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true an correct copy of the foregoing was served on counsel for the Defendants this 1st day of November, 2013, addressed as follows:

Timothy P. Schimberg
t_schimberg@fsf-law.com

Andrea M. Bronson
a_bronson@fsf-law.com

John Lebsack
jlebsack@wsteele.com

/s/ Brice A. Tondre
_____

13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE
FRED WEBENER and
ASHLEIGH OLDS,

Defendants

---

### DEFENDANT OLDS' MOTION TO DISMISS CLAIMS AGAINST HER IN AMENDED COMPLAINT

---

Defendant Ashleigh Olds ("Dr. Olds"), through her counsel John Lebsack, moves to dismiss the claims against her in the Amended Complaint [*Docket #22*] for failure to state a claim pursuant to Fed.R.Civ.P. 12(6).  In support, Dr. Olds states:

### I.   SUMMARY

This case arises from criminal charges of animal cruelty to six horses owned by plaintiffs. Dr. Olds is a licensed veterinarian.  The other defendants worked for the Park County Sheriff. Plaintiffs were charged with animal cruelty but acquitted.  Plaintiffs now claim that Dr. Olds made improper statements to the Sheriff's Office and caused a public outcry that led to seizure of their horses and prosecution for animal cruelty.

1

The amended complaint asserts the same four claims against all defendants.  In summary, those claims are (1) violation of 42 U.S.C. §1983 because of improper seizure of horses based on a defective warrant, (2) violation of 42 U.S.C. §1983 because of malicious prosecution for animal cruelty, (3) breach of contract by the Park County Sheriff's Office; and (4) a state law malicious prosecution claim against Dr. Olds alleging that she made false statements which caused an outcry that pressured the Sheriff's Office and District Attorney into charging plaintiffs with animal cruelty.

Each claim fails to state a claim for relief against Dr. Olds.  The first and second claims are barred by the doctrine of qualified immunity.  The third claim fails because Dr. Olds was not a party to the contract.  The fourth claim fails because the pleading fails to allege facts that would avoid operation of a Colorado statute that creates a presumption that Dr. Olds acted in good faith, C.R.S. § 12-64-121(1) (2013).

Dr. Olds filed a motion to dismiss the original complaint [*Docket #1, #11*].  Within the time allowed for an amendment without leave of court, plaintiffs filed an amended complaint [*Docket #22*].  Because the amended complaint supersedes the original complaint, it is not necessary for the Court to consider the first motion to dismiss.  The instant motion addresses the operative claims against Dr. Olds.

## II.   ALLEGATIONS OF AMENDED COMPLAINT

The following allegations of the amended complaint are pertinent to the claim against Dr. Olds [*Docket #22*].  She is a licensed veterinarian (¶7).  The other defendants are employees of the Park County Sheriff's Office (¶¶3-6).  Plaintiffs allege that Dr. Olds made "baseless statements" to the other defendants, animal cruelty activists, and the news media, resulting in the

seizure of six horses from plaintiffs and prosecution of plaintiffs for animal cruelty (¶6, ¶24, ¶26).

There is no allegation that Dr. Olds was an employee or agent of Park County, or that she provided any law enforcement or prosecutorial services. Instead, the allegation is that Dr. Olds acted in her personal capacity in providing veterinarian services (¶12, ¶13). But the allegation is not that Dr. Olds provided those services to, or at the request of, Park County. Rather, the allegation is that Dr. Olds did so to "aid" an officer from Routt County. Plaintiffs allege that Dr. Olds was at the plaintiffs' ranch on February 16, 2012 "to aid Agent Smith with the seizure of Bear." (¶11) Agent Smith was an officer from **Routt** County who three days earlier (February 13) had conducted "a follow-up at the Echo Valley Ranch of a matter which resulted in a mare and a colt being brought to Echo Valley Ranch…."[1] (¶9). Office Smith, three days earlier, had seen that seven horses at the ranch were "very thin." (¶9) There is no allegation that Routt County seized anything from plaintiffs or that Routt County prosecuted them; plaintiffs allege that Park County did the seizure (¶34) and the prosecution (¶41).

Officer Smith reported her observation of February 13 to Sergeant Priestly of the Park County Sheriff's Office (¶9). Sergeant Priestly told Deputy Hardey of the Park County Sheriff's Office, and Deputy Hardey then arranged to do a welfare check of the horses (¶10). That occurred on February 16, 2012, and plaintiffs describe the purpose of the visit to their ranch as follows: "Defendant Olds was there [Echo Valley Ranch] to aid Agent Smith with the seizure of

---

[1] The amended complaint does not specifically identify "Echo Valley Ranch" as the plaintiffs' ranch in Park County, but there is only one "ranch" referred to in the pleading, and plaintiffs state they are "engaged in horse ranching in Park County, Colorado." (¶1, ¶2)

3

Bear and Defendant Hardey was there to conduct a welfare check of the other horses." (¶11)
Deputy Hardey, like Officer Smith before her, found that seven horses were "thin." (¶11)

Although plaintiffs do not allege Dr. Olds was at the ranch to assist the Park County
authorities, they allege that Dr. Olds demanded that Deputy Hardey take this action: "that the
seven thin horses be ordered seized by Defendant Hardey and taken to Dr. Olds' clinic for
evaluation." (¶12)  The reason for this alleged demand was Dr. Olds' statement that the horses
"had been starved, mistreated and were suffering from neglect." (¶12)  Plaintiffs allege that
making this statement was "below the standard of care for a veterinarian." (¶13)

This alleged statement is also the basis for plaintiffs' allegation that Dr. Olds was acting
under color of state law.  Plaintiffs allege that "Dr. Olds was acting under color of state law, to
wit C.R.S. §12-64-121, when she made the false statements to the Sheriff's Office." (¶14)  This
Colorado statute, discussed in more detail below, requires a veterinarian, if she encounters
suspected animal cruelty while attending or treating an animal, to report that to local authorities.
The amended complaint does not allege that the statement itself was the action that violated
28 U.S.C. §1983; it alleges that the statement *led* to seizure of property and prosecution that
violated §1983.  Although plaintiffs allege the statement was false, there is no claim based on the
statement per se, only on the actions that allegedly resulted from the statement (seizure and
prosecution).

Plaintiffs next allege that the "demands" by Dr. Olds were reported to Defendant
Sergeant Priestley, who instructed Deputy Hardey to tell Dr. Olds "to leave with the horse being

seized by Agent Smith [of Routt County]." (¶16).[2]  That is, the statement by Dr. Olds at the ranch did not cause Park County itself to take any action beyond allowing Dr. Olds to leave with the horse that Routt County was seizing (¶11, ¶12, ¶16).

That is the end of allegations in the amended complaint concerning Dr. Olds' actions or statements at the ranch.  The allegations then turn in a different direction:  that Dr. Olds was involved in creating a public outcry to force the Park County Sheriff's Office to seize the seven "thin" horses that were still at the ranch (¶18, ¶19).  There is nothing in these allegations that Dr. Olds acted under color of state law.  Instead, plaintiffs allege that Dr. Olds, after returning to her clinic, "contacted Channel 7 News and Harmony HorseWorks and made her unsubstantiated claims of animal cruelty for the purpose of generating an outcry from Harmony HorseWorks, a major client of Dr. Olds."  (¶18)

Plaintiffs then allege there was an outcry demanding removal of the horses from plaintiffs, but they do not allege that Dr. Olds mounted the outcry.  Rather, they allege that "When Harmony HorseWorks became aware of the consensus decision of the Park County Sheriff's Office and the Department of Agriculture [to leave the seven horses at the ranch], in reliance on the opinions of and at the urging of Defendant Olds, it [Harmony HorseWorks] mounted an outcry demanding that the horses be removed from the management of the plaintiffs."  (¶19)  That is, plaintiffs do not allege that Dr. Olds mounted the outcry, only that she urged another person to mount an outcry, and that person relied on Dr. Olds' opinions.  Plaintiffs then allege that Park County officials "succumbed to the political pressure" and decided to take

---

[2] There are a total of seven horses involved in the case.  (¶¶11-12).  One was named Bear and was to be seized during the first visit to plaintiff's property by Dr. Olds and Deputy Hardey on February 16 (¶11).  Six other horses were seized on February 23 pursuant to a warrant (¶¶20-21).

the horses from plaintiffs and put them into protective custody (¶19).  Plaintiffs allege Harmony

HorseWorks was not happy with protective custody and continued to "cry out" for the Park

County Sheriff's Office to seize the horses (¶22).  Plaintiffs allege that Dr. Olds "joined in the

outcry and advocated prosecution of Plaintiffs for animal cruelty."  (¶22)  That is, the allegation

is that Dr. Olds joined in the political pressure on the sheriff's office.

The next step, according to plaintiffs, was a warrant for seizure of the horses.  This

happened on February 22, 2012, when members of the sheriff's office "who again succumbed to

the political pressure" directed Deputy Hardey to obtain a warrant for seizure of the horses (¶24).

Plaintiffs do not allege that Dr. Olds was involved in obtaining the warrant.  Rather, they allege

that the affidavit failed to inform the judge of several things, including "that the true intent of the

seizure was to silence protestations of Dr. Olds and Harmony HorseWorks" (¶24).

There is no allegation that Dr. Olds was involved in executing the warrant or in preparing

the summons charging plaintiffs with animal cruelty (¶26).  Nor is there any allegation that

Dr. Olds was involved in the prosecution of those charges (¶29, ¶30).  The only allegation that

Dr. Olds did anything during the prosecution concerns a documentary film "in which Defendant

Olds broadcast her claims and supported the fund raising efforts of Harmony HorseWorks"

(¶30).

Based on these factual allegations, the amended complaint then states four claims:  (1) a

claim against all defendants under §1983 alleging the warrant violated the Fourth Amendment;

(2) a claim against all defendants under §1983 based on malicious prosecution; (3) a breach of

contract claim alleging the sheriff's department breached its agreement with plaintiffs to place

the horses in protective custody; and (4) a state law malicious prosecution claim against

Dr. Olds.   Each claim will be addressed separately below.

### III.   STANDARD FOR MOTION TO DISMISS

A plaintiff's claim must be "plausible on its face" in order to survive a motion to dismiss.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 ("[W]e do not require heightened fact

pleading of specifics, but only enough facts to state a claim for relief that is plausible on its

face.").  "The concept of 'plausibility' at the dismissal stage refers not to whether the allegations

are likely to be true; the court must assume them to be true.  The question is whether, if the

allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief

under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188,

1191-92 (10th Cir. 2009) (citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)).

The Supreme Court later clarified the plausibility rule:

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant is
> liable for the misconduct alleged.  The plausibility standard is not akin to a
> 'probability requirement,' but it asks for more than a sheer possibility that
> a defendant has acted unlawfully.  Where a complaint pleads facts that are
> 'merely consistent with' a defendant's liability, it 'stops short of the line
> between possibility and plausibility of 'entitlement to relief.''

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (U.S.

2009) (citations omitted). "Determining whether a complaint states a plausible claim for relief

will…be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Id.* at 1950.

Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which

allow "the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* at 1949. The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 1949-51. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 1950.

The court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1940.

## IV.   ARGUMENT: AMENDED COMPLAINT FAILS TO STATE PLAUSIBLE CLAIMS AGAINST DR. OLDS

### A.   No Valid §1983 Claim Against Dr. Olds Based on Seizure of Horses

The first claim is based on 42 U.S.C. §1983 as applied to the seizure of the horses:

34. The Defendants, acting in concert, obtained a warrant which they used to seize the six horses owned by Plaintiffs. The warrant was issued without probable cause in that it was based on material omissions in violation of the Fourth Amendment to the United States Constitution. Obtaining a warrant under these circumstances was a clearly established violation of the Fourth Amendment to the Constitution of the United States.

8

This claim against Dr. Olds fails for two reasons.  First, the factual allegations do not support a claim that is "plausible on its face" that Dr. Olds committed any act under color of state law in regard to the issuance of the warrant.  Second, even if one assumes she acted under color of state law, she is protected by qualified immunity.

**No Action by Dr. Olds Under Color of State Law**.  This claim against Dr. Olds fails because individual liability under §1983 must be based on personal involvement in the alleged constitutional violation.  *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  Section 1983 "is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266 (1994).

Dr. Olds did not obtain the warrant; the sheriff's department did.  There is no allegation that she acted as agent or employee of the Park County Sheriff's Department in regard to the warrant or anything else.  Her only alleged involvement with the official duties of any sheriff's office was *Routt* County, not Park County (¶11, "Defendant Olds was there to aid Agent Smith").  There is no allegation that Dr. Olds performed any law enforcement or prosecutorial actions.  She is only alleged to have provided veterinary services at the ranch, and after leaving the ranch she supposedly contacted a television station and Harmony HorseWorks, making "unsubstantiated claims of animal cruelty for the purpose of generating outcry from Harmony HorseWorks…."  (¶18)  The veterinary services at the ranch do not support a §1983 claim based on a subsequent seizure of the horses; the seizure was based on an affidavit by Deputy Hardey.  There is no allegation that Dr. Olds was involved in preparing or submitting the affidavit; her only alleged connection to the affidavit is by omission—that the affidavit failed to point out that the true intent of the seizure was to silence the protestations of Dr. Olds and others.  (¶24)

The only express allegation of state action by Dr. Olds refers to C.R.S. § 12-64-121.

(¶14)  That statute provides that if a veterinarian encounters a case of animal cruelty, she has a duty to report it to local authorities:

> A licensed veterinarian who, during the course of attending or treating an animal, has reasonable cause to know or suspect that the animal has been subjected to cruelty in violation of section 18-9-202, C.R.S., or subjected to animal fighting in violation of section 18-9-204, C.R.S., shall report or cause a report to be made of the animal cruelty or animal fighting to a local law enforcement agency or the bureau of animal protection.

C.R.S. § 12-64-121(1) (2013).[3]  If this reporting is assumed to be action under color of law, then plaintiffs still must show their constitutional rights were violated by the report.  They do not make that allegation.  Their claim is that the seizure of horses violated their rights.  A report under the statute is not a seizure.  Arguably a report can lead to a seizure of property or prosecution *by others*, but the report itself did not violate any constitutional rights.  A false report of animal cruelty to local authorities does not involve a constitutional deprivation.  *Brayman v. United States*, 96 F.3d 1061, 1066 (8th Cir. 1996) ("it is well established that defamation or injury to reputation by itself does not state a constitutional deprivation")

---

[3] The crime of animal cruelty includes the following: "A person commits cruelty to animals if he or she knowingly, recklessly, or with criminal negligence…deprives of necessary sustenance,… allows to be housed in a manner that results in chronic or repeated serious physical harm,…or otherwise mistreats or neglects any animal, or causes or procures it to be done, or, having the charge or custody of any animal, fails to provide it with proper food, drink, or protection from the weather consistent with the species, breed, and type of animal involved, or abandons an animal."  C.R.S. 18-9-202(1)(a) (2013).

Plaintiffs also misconstrue the statute as creating state action.  The statute does not authorize any action on behalf of the government—it requires action by a private citizen (a report to authorities).  Plaintiffs' claim twists the statute as saying, "if a veterinarian observes animal cruelty, the veterinarian shall seize the affected animals."

The allegation is that Dr. Olds was involved in applying political pressure on the sheriff's office to seize the horses—but expressing one's First Amendment rights does not qualify as action under color of state law for purposes of §1983.  The alleged outcry was not done from an official position, but as a private citizen.  This claim fails for lack of a plausible claim that the warrant was somehow caused by actions that Dr. Olds took under color of state law.  "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law.  42 U.S.C. § 1983.  Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983."  *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (U.S. 2012), citing *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).  *Filarsky* illustrates why there was no state action here.  In *Filarsky*, a municipality hired a private attorney to investigate an employment issue:  "Filarsky was an experienced employment lawyer who had previously represented the City in several investigations."  132 S. Ct. at 1660.  Here, there is no allegation that Park County hired Dr. Olds to do anything, and even assuming that Dr. Olds performed veterinary services at the ranch at the request of a state entity, she didn't seize anything.

There is no plausible claim that any conduct by Dr. Olds was fairly attributable to the state.  Under the allegations, her appearance at the ranch was not for Park County, and her subsequent actions were to apply political pressure on the sheriff's office.

11

**Qualified Immunity Applies to Dr. Olds.**  Regardless of the lack of state action, this claim also fails because of qualified immunity.  Assuming for argument that Dr. Olds acted under color of state law, she is nonetheless entitled to qualified immunity from civil liability unless her actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039; 97 L. Ed. 2d 523; 531 (U.S. 1987).

There is no basis to contend that a reasonable person would have known that Dr. Olds' actions violated clearly established statutory or constitutional rights.  At most, plaintiffs have alleged that she made a false report of animal cruelty and then participated in an effort to apply political pressure on the sheriff's office to seize the horses.  If this was a violation of the plaintiffs' rights, it was not a violation of clearly established rights of which a reasonable person would have known.  Qualified immunity is determined based on an objective standard, and bare allegations of malice are insufficient to survive a motion to dismiss.  *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  There is nothing in the amended complaint that would support a conclusion that Dr. Olds violated any clearly established law.  *Pearson v. Callahan*, 129 S. Ct. 808, 816, 129 S. Ct. 808; 172 L. Ed. 2d 565, 573 (2009) ("the court must decide whether the right at issue was 'clearly established' at the time

of defendant's alleged misconduct"); *Stanton v. Sims*, 2013 U.S. LEXIS 7773 (U.S. Nov. 4, 2013) ("existing precedent must have placed the statutory or constitutional question beyond debate").

**B.     No Valid §1983 Claim Against Dr. Olds Based on Malicious Prosecution**

For the same reasons discussed in the previous section (lack of state action and qualified immunity), the claim against Dr. Olds under §1983 for malicious prosecution also fails.  Like the §1983 claim based on the warrant, the malicious prosecution claim fails because of the lack of any factual allegation indicating that Dr. Olds acted under color of state law in regard to the prosecution of the criminal charges against the plaintiff.  In this claim, plaintiffs allege that each defendant was acting under color of law (¶40), but they offer no facts to support that conclusory statement against Olds, except by incorporation of their earlier allegation that Dr. Olds was acting under state law "to wit C.R.S. §12-64-121" (¶14).  As discussed in the previous section, this reporting statute does not create state action; moreover, a false report of animal cruelty does not involve a constitutional deprivation.  *Brayman, supra*; *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257 (10th Cir.. 2007) ("when addressing § 1983 malicious prosecution claims, we use the common law elements of malicious prosecution as the 'starting point' of our analysis; however, the ultimate question is whether plaintiff has proven the deprivation of a constitutional right").

Also as discussed, the allegation is that Dr. Olds was at the ranch to aid Routt County, not Park County; after that, her alleged actions were to apply political pressure on the sheriff, not to act under color of state law.

### C.   No Breach of Contract Claim Against Dr. Olds

The third claim for relief is for breach of contract, but it does not allege that Dr. Olds was a party to the contract (¶¶47-53).  The only alleged contract was between plaintiffs and the Park County Sheriff's Office:  "On February 19th, 2012, the Park County Sheriff's Office entered into an agreement with Plaintiffs to place the six horses in protective custody."  (¶48)  The only alleged breach was by the sheriff's office:  "On February 23, 2013, the agreement was breached by the Park County Sheriff's Office which caused the horses to be seized."  (¶50).

Because Dr. Olds was not a party to the contract, this claim against her should be dismissed.

### D.   State Law Malicious Prosecution Claim Fails

The fourth claim for relief (¶¶54-60) is for malicious prosecution under Colorado common law.  *Hewitt v. Rice*, 154 P.3d 408, 411 (Colo. 2007).  The basis of the claim is this paragraph:

> 55.   The criminal case was brought against the Plaintiffs and six of their horses seized on the basis of statements made by Defendant Olds which caused an outcry that resulted in the seizure and prosecution. Throughout the prosecution, Defendant Olds pressed the Park County Sheriff's Office and District Attorney to persist in the prosecution despite knowing that her claim that seven horses had been the subject of cruelty was without foundation and was done for her economic benefit.  Dr. Olds harbored a grudge against Mr. Swift because he refused her request that he recommend her services to horse owners who patronized his feed store.

14

The claim does not identify the precise "statements" at issue; but by incorporation, the claim adopts allegations made earlier in the pleadings.  Those allegations are that Dr. Olds made "statements" to the Park County Sheriff's Office that the plaintiffs' horses were "starved, mistreated and were suffering from neglect." (¶12, ¶13)

These statements are privileged under Colorado law.  Colorado law imposes both duties and protections for licensed veterinarians in regard to reporting animal cruelty.  Quoted above is the statutory provision requiring veterinarians to report suspected animal cruelty cases to local authorities.  C.R.S. § 12-64-121(1) (2013).

Corresponding to this duty to report is immunity for making such reports in good faith:

> A licensed veterinarian who in good faith reports a suspected incident of animal cruelty or animal fighting to the proper authorities in accordance with subsection (1) of this section shall be immune from liability in any civil or criminal action brought against the veterinarian for reporting the incident.

C.R.S. § 12-64-121(4) (2013).  That section also creates a presumption of the veterinarian's good faith:

> In any civil or criminal proceeding in which the liability of a veterinarian for reporting an incident described in subsection (1) of this section is at issue, the good faith of the veterinarian shall be presumed.

To apply this statutory immunity, there are three elements:  (1) Dr. Olds must be a licensed veterinarian (2) who reported in good faith (3) a suspected incident of animal cruelty or animal fighting (4) to the proper authorities.  The amended complaint alleges the first and third these

elements:  Dr. Olds is a licensed veterinarian, her alleged statements concerned an incident of animal cruelty, and she made statements to the Park County Sheriff's Office.

As for the second element of applying the immunity, the factual allegations do not overcome this presumption of good faith.  In identifying the parties, the amended complaint alleges that Dr. Olds made "baseless statements" to the Sheriff's office that resulted in the prosecution (¶7).  Later the amended complaint gives details about what Dr. Olds allegedly said. Plaintiffs allege that while she was at plaintiffs' ranch on February 16, Dr. Olds said "the seven thin horses had been starved, mistreated and were suffering from neglect."  (¶12)  The Sheriff's office did not seize the horses and charge the plaintiffs because of this statement.  As plaintiffs allege, Deputy Hardey decided on February 16 to leave the horses with the plaintiffs for 30 days (¶17).  The decision to seize and charge happened several days later.  The warrant to seize the horses was issued on the basis of the Hardey affidavit prepared on February 22 but there is no allegation that Dr. Olds was involved in preparing that affidavit (¶24).  To the contrary, plaintiffs allege that the affidavit was prepared at the direction of the Sheriff, Undersheriff, and Sergeant. (¶24)

The only allegations relating to whether Dr. Olds had a good faith basis for the report are that she "harbored a grudge against Mr. Swift" (¶55) and "was economically motivated."  (¶57) These conclusory allegations are apparently aimed at satisfying the element of a malicious prosecution claim under Colorado law that the "defendant's statement against plaintiff was motivated by malice towards the plaintiff."  CJI-Civ. 17:1.  These allegations do not overcome the statutory presumption of good faith.

Under the *Iqbal* plausibility test, the complaint must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The amended complaint has no facts that justify an inference that Dr. Olds' report of animal cruelty was not in good faith.

## V.   CONCLUSION

For these reasons, the Court should dismiss the claims against Dr. Olds in the amended complaint pursuant to Fed.R. Civ.P. 12(6).

s:/John Lebsack
John Lebsack
WHITE AND STEELE, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, Colorado  80202
(303) 296-2828
Fax No.:  (303) 296-3131
jlebsack@wsteele.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 19th day of November, 2013, a true and correct copy of the foregoing was e-served via CM/ECF to the following:

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado  80226
*briceatondrepc@msn.com*

Timothy P. Schimberg
Fowler Schimberg & Flanagan, P.C.
1640 Grant St., Ste. 300
Denver, CO  80203
*t_schimberg@fsf-law.com*

s/Becky Kongs
Becky Kongs
WHITE AND STEELE, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO  80202
Telephone:  (303) 296-2828
Fax:  (303) 296-3131
bkongs@wsteele.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE
FRED WEBENER and
ASHLEIGH OLDS,

Defendants

_____

**ORDER GRANTING DEFENDANT OLDS' MOTION TO DISMISS CLAIMS
AGAINST HER IN AMENDED COMPLAINT**

_____

THIS MATTER having come before the Court on Defendant Olds' Motion to Dismiss

Claims Against Her in Amended Complaint and the Court being advised,

ORDERS that the claims against Dr. Ashleigh Olds are hereby DISMISSED pursuant to

Fed.R.Civ.P. 12(6).

Dated this _____ day of November, 2013.

BY THE COURT

_____
United States Magistrate

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,
vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants.

_____

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT OLDS' MOTION
TO DISMISS CLAIMS AGAINST HER IN AMENDED COMPLAINT**

_____

NOW COME the Plaintiffs, Randall J. Hatlee and Ronald L. Swift, by and through their

attorney, Brice A. Tondre, and for their memorandum in opposition to Defendant Olds' motion

to dismiss claims against her in amended complaint [#31] state as:

**I. INTRODUCTION**

Defendant Ashleigh Olds ("Dr. Olds") is a doctor of veterinary medicine licensed to

practice by the State of Colorado. Dr. Olds' baseless statements to the other Defendants, animal

rights activists and the news media resulted in the seizure of Plaintiffs' property and their

prosecution. (Amended Complaint [#22] para. 7).

The questions presented by Dr. Olds' motion to dismiss [#31] are:

A.  Was Dr. Olds acting under color of state law?

1

B.  Have Plaintiffs adequately pled claims that Dr. Olds conduct was a violation of the Fourth Amendment to the United States Constitution.

C.  Is Dr. Olds entitled to assert the defense of qualified immunity to the claims pursuant to 42 U.S.C. §1983?

D.  Is Dr. Olds entitled to assert the defense of good faith immunity to the claims pursuant to 42 U.S.C. §1983?

E.  Have Plaintiffs adequately pled a claim that Dr. Olds conduct constitutes the common law tort of malicious prosecution?

F.  Was Dr. Olds' conduct a contributing cause of the seizure of Plaintiffs' property and their prosecution?

## II. STANDARD OF REVIEW

All well-pleaded factual allegations of the amended complaint must be accepted as true, all reasonable doubts and inferences must be resolved in the Plaintiffs' favor and the amended complaint must be viewed in the light most favorable to the Plaintiffs. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 249 (2009).

Plaintiffs' claims against Dr. Olds are supported by well-pleaded facts which nudge them across the line from conceivable to plausible. The facts provide a clear basis for subjecting Dr. Olds to liability under 42 U.S.C. §1983. Under applicable law discussed hereinafter she is clearly acting under color of state law.

In this jurisdiction the Court typically does not dismiss a complaint without giving the plaintiff an opportunity to amend. *Hall v. Bellmon*, 935 F.2d 1106, 1109-1111 (10th Cir. 1991).

## III. RELEVANT ALLEGATIONS OF THE AMENDED COMPLAINT

2

Set forth hereafter are the relevant paragraphs of the amended complaint [#22] set forth in full text and numbered as in the amended complaint.

1.      Plaintiff, Randall J. Hatlee ("Mr. Hatlee"), was at all relevant times engaged in horse ranching in Park County, Colorado

2.      Plaintiff  Ronald L. Swift ("Mr. Swift") was at all relevant times engaged in horse ranching in Park County, Colorado.

3.      Defendant Cindy Hardey ("Deputy Hardey") was at all relevant times a law enforcement officer employed by the Park County Sheriff's Office.

4.      Defendant Bobbi Priestly, who held the rank of Sergeant ("Sgt. Priestly"), was at all relevant times a law enforcement officer employed by the Park County Sheriff's Office and was the supervisor of Deputy Hardey.

5.      Defendant Monte Gore, who was the Undersheriff ("Undersheriff "), was at all relevant times a law enforcement officer employed by the Park County Sheriff's Office and was the supervisor of Deputy Hardey and Sgt. Priestley.

6.      Defendant Fred Wegener ("Sheriff Wegener") was at all relevant times the duly elected sheriff of Park County, Colorado. Sheriff Wegener is sued in both his official capacity and his individual capacity. He was involved in the investigation and decisions to seize Plaintiffs' property and prosecute them which are the subject of this action. The office of the sheriff was party to a contract with Plaintiffs which was breached.

7.       Defendant Ashleigh Olds, D.V.M. ("Dr. Olds") is a licensed veterinarian whose baseless statements to the other Defendants, animal cruelty activists and the news media resulted in the seizure of Plaintiffs' property and their prosecution.

## FACTS COMMON TO ALL CLAIMS

9.      On February 13, 2012, Routt County officer Dawn Smith called Defendant Priestly and reported that, while conducting a follow-up at the Echo Valley Ranch of a matter which resulted in a mare and a colt being brought to Echo Valley Ranch, she noted that seven of the other horses were very thin.

10.      On February 14, 2012, Defendant Priestley informed Defendant Hardey of the report from Routt County officer Smith. Defendant Hardey arranged to do a welfare check of the horses at the Echo Valley Ranch on February 16, 2012.

11.      On February 16, 2012, Defendants Hardey and Olds and Agent Smith arrived at Echo Valley Ranch. Defendant Olds was there to aid Agent Smith with the seizure of Bear and Defendant Hardey was there to conduct a welfare check of the other horses. Defendant Hardey found that seven of the horses were thin and that 34 were in good condition, that one of the seven thin horses was down and under the care of a veterinarian and that the seven thin horses had hay and water available.

12.      Bear was to be transported to Defendant Olds' clinic for evaluation and treatment. Defendant Olds demanded that the seven thin horses be ordered seized by Defendant Hardey and taken to Dr. Olds' clinic for evaluation. Without factual basis or investigation, Defendant Olds stated that the seven thin horses had been starved, mistreated and were suffering from neglect. Defendant Olds made this demand [and] these statements without conducting the requisite evaluation of the horses pursuant to the Henneke Body Condition Scoring System, without interviewing Messrs. Hatlee and Swift with respect to their belief regarding why the seven horses

4

were thin,  without contacting the veterinarian for the herd and without developing a differential

diagnosis, all of which was below the standard of care for a veterinarian.

13. Dr. Olds statement that the seven thin horses and Bear had been starved, mistreated

and were suffering from neglect was below the standard of care for a veterinarian. She failed to

establish a differential diagnosis and evaluate each potential cause of the condition of the eight

horses. Faced with a herd of 40 horses, 32 of which are in excellent condition, starvation,

mistreatment and neglect had to be low on the differential list of any reasonably trained

veterinarian. Dr. Olds purports to have ruled out botulism in Bear but did nothing to rule out

other toxic causes of the condition of the eight horses. This was below the standard of care for a

veterinarian. Making a report to the Park County Sheriff's Office that the eight horses were

starved, mistreated and suffering from neglect was without reasonable cause to know or suspect

that the statement was true. Ultimately, after reasonable professional investigation, it was

determined that the probable cause of the illness of the seven horses was the consumption of

toxic weeds.

14. Dr. Olds was acting under color of state law, to wit C.R.S. §12-64-121, when she

made the false statements to the Sheriff's Office.

15. Dr. Horton, the herd veterinarian, was of the opinion that much more

analysis had to be done before a conclusion as to what was causing the condition of the

seven horses could be reached.

16. Defendant Olds' demands were reported to Defendant Priestley who instructed

Defendant Hardey to tell Defendant Olds to leave with the horse being seized by Agent Smith.

17. Defendant Priestly then conferred with Kate Anderson, D.V.M., a Colorado

5

43

Department of Agriculture veterinarian, Scott Dutcher, chief investigator with the Bureau of

Animal Protection, Dr. Britt of Rocky Top Veterinary Services and Defendant Hardey, all of

whom agreed that the appropriate thing to do was to issue a notice of warning and leave the

seven horses in the care of the Plaintiffs, giving Plaintiffs thirty days to demonstrate that the

horses were not being mistreated. Defendant Hardey did not believe that leaving the horses with

Plaintiffs would endanger them and, based upon unanimous agreement, issued the warning.

18.     Defendant Olds was infuriated by the decision to allow the seven horses to remain

under the care of Messrs. Hatlee and Swift. After returning to her clinic, Dr. Olds contacted

Channel 7 News and Harmony HorseWorks and made her unsubstantiated claims of animal

cruelty for the purpose of generating an outcry from Harmony Horse Works, a major client of

Dr. Olds. Her intent was to cause an outcry which would force the Sheriff's Office to seize the

seven horses and place them in Dr. Olds' care. Her unsubstantiated claims were broadcast on the

evening and night of the day after she made the demand for seizure of the seven horses. Dr. Olds

on February 16, 2012 at 4:35 p.m. by e-mail to Defendant Hardey again made the still unfounded

statement that the horses were suffering from a "very clear cut case of starvation and

malnutrition"

19.     When Harmony HorseWorks became aware of the consensus decision of the Park

County Sheriff's Office and the Department of Agriculture, in reliance on the opinions of and at

the urging of Defendant Olds, it mounted an outcry demanding that the horses be removed from

the management of the Plaintiffs. In the words of Harmony HorseWorks on February 18, 2012,

"wait and see what happens after the email blast goes out." This outcry was directed at

Defendants Wegener and Gore, the sheriff and undersheriff, who succumbed to the political

6

pressure and asked Defendants Priestly and Hardey to arrange for removal of the six horses from

Echo Valley Ranch. One of the horses died on February 16, 2012, from an abscess of the heart

which was established by necropsy to not be the result of malnutrition or neglect.

20.     In consideration for agreeing to move the six horses into protective custody, the

Sheriff's Office, acting through Defendants Wegener, Gore, Priestly and Hardey, agreed to allow

the horses to remain under the management and control of Plaintiffs for 30 days, thus allowing

them to demonstrate that they were not abusing or neglecting the horses. The Sheriff's Office

hoped and believed that this agreement would satisfy the activists and relieve it of the need to

head off a nasty and potentially violent confrontation.

21.     On February 19, 2012, Defendant Hardey requested that Plaintiffs place the six

horses in protective custody. The Plaintiffs agreed to place them in the custody of Kirsten

LeBeau.

22.     The protective agreement did not satisfy Harmony HorseWorks, which was

emboldened by the unsupported conclusions of Dr. Olds. Harmony HorseWorks continued to cry

out for the Park County Sheriff's Office to seize the six horses. Defendant Olds joined in the

outcry and advocated prosecution of Plaintiffs for animal cruelty. Defendant Hardey remained of

the opinion that leaving the horses with the owners would not endanger them.

23.     On February 21, 2012, Defendant Priestley received a call from Dr. Horton,

D.V.M., Plaintiffs' treating veterinarian who told her that it was not clear what caused the weight

loss in the six horses and that a lot of testing needed to be done in order to determine the cause.

24.     On February 22, 2012, Defendant Hardey, at the direction of Defendants Wegener

Gore and Priestley, who again succumbed to the political pressure, sought and received a warrant

to seize the six horses from Plaintiffs. Defendant Hardey's affidavit in support of the request for a warrant was a breach of the protective custody agreement and failed to inform the judge who issued the warrant of material facts. The affidavit failed to inform the judge who issued the warrant: (1) that there was an agreement to leave the horses in the care and custody of the Plaintiffs for 30 days in order to allow them to demonstrate that the horses were not neglected; (2) that two veterinarians and a Department of Agriculture official agreed that the agreement was reasonable; (3) that the horses were well treated  at the facility where they were housed; (4) that the horses were not in danger where they were housed; and (5) that the true intent of the seizure was to silence the protestations of Dr. Olds and Harmony HorseWorks. The judge who presided over the prosecution of the Plaintiffs found that the omissions were material, made in bad faith and would have led to refusal to issue the warrant if disclosed to the issuing judge.

25.     Defendants Priestly, Gore and Wagener, despite their knowledge that seizure of the horses was not permissible under the facts or the law, directed Defendant Hardey to obtain a warrant. They undertook this approach in hopes that it would prevent Harmony HorseWorks and its followers from taking matters into their own hands which they were threatening to do if the Sheriff's Office did not act to their satisfaction. Said Defendants failed to take the proper course of prosecuting those who were threatening a breach of the peace. This was an attack on the innocent to avoid prosecuting the guilty.

26.     On February 23, 2012, Defendants Hardey and Priestly executed the warrant and issued summonses charging each Plaintiff with animal cruelty. Both the warrant and the summonses were without probable cause to believe that the crime of animal cruelty had been committed.

27.     Seizure of the six horses deprived Plaintiffs of evidence material to their avoidance or defense of a charge of animal cruelty.

28.     During the course of the seizure which was from February 23, 2012 until April 10, 2012, one of the seized horses, Echo, was permanently disabled as a result of being overfed alfalfa.

29.     During the course of the prosecution of the charges against the Plaintiffs the court held that the warrant authorizing the seizure of the six horses was in violation of applicable Colorado law, without probable cause and was procured by bad faith omissions. The court ordered the horses returned to Plaintiffs and suppressed all evidence which was the fruit of the seizure.

30.     Throughout the course of the investigation and prosecution the Sheriff's Office deviated from its usual and customary practice of refusing to disclose the fruits of its investigation to anyone other than the District Attorney and the defendant. The Sheriff's Office provided documents to Harmony HorseWorks for fundraising projects and to prepare a documentary film in which Defendant Olds broadcast her baseless claims and supported the fund raising efforts of Harmony HorseWorks. This was done for the political benefit of Sheriff Wagener [and] the District Attorney.

31.     The charges against the Plaintiffs were tried to a jury which found them not guilty.

34.     The Defendants, acting in concert, obtained a warrant which they used to seize the six horses owned by Plaintiffs. The warrant was issued without probable cause in that it was based on material omissions in violation of the Fourth Amendment to the United States

9

47

Constitution. Obtaining a warrant under these circumstances was a clearly established violation of the Fourth Amendment to the Constitution of the United States.

41.     The conduct set forth above constitutes malicious prosecution of Plaintiffs by each of the Defendants in that it was done knowing it was without probable cause and was being done for political and economic purposes.  As such, their conduct was malicious. The misconduct reaches constitutional proportions because the Defendants utilized misstatements and omissions of material facts in order to initiate and continue the legal process to attempt to take Plaintiffs' property and their freedom. It was clearly established that malicious prosecution under color of state law is a violation of the Fourth Amendment to the Constitution of the United States

42.     The prosecution of Plaintiffs was terminated in their favor on the merits.

55.     The criminal case was brought against the Plaintiffs and six of their horses seized on the basis of statements made by Defendant Olds which caused an outcry that resulted in the seizure and prosecution. Throughout the prosecution, Defendant Olds pressed the Park County Sheriff's Office and District Attorney to persist in the prosecution despite knowing that her claim that seven horses had been the subject of cruelty was without foundation and was done for her economic benefit. Dr. Olds harbored a grudge against Mr. Swift because he refused her request that he recommend her services to horse owners who patronized his feed store.

56.     Defendant Olds' statements were false and unfounded and therefore without probable cause.

57.     Defendant Olds was motivated by malice in that her motive was other than to bring justice to persons she thought had committed a crime. She was economically motivated.

58.     The criminal case ended in favor of the Plaintiffs.

## IV. ARGUMENT AND AUTHORITY

**A.  Dr. Olds was acting under color of state law.**

As alleged in the Amended Complaint and admitted in the motion to dismiss, Dr. Olds

purports to have been acting as she did pursuant to the mandate of C.R.S. §13-64-121which

provides in relevant part:

> (1) A licensed veterinarian who, during the course of attending or treating an animal, has reasonable cause to know or suspect that the animal has been subjected to cruelty in violation of section 18-9-202…shall report or cause a report to be made of the animal cruelty…to a law enforcement agency or the bureau of animal protection.

> (2) A licensed veterinarian shall not knowingly make a false report of animal cruelty…to a local law enforcement agency or to the bureau of animal protection.

> (3) A licensed veterinarian who wilfully violates the provisions of subsection (1) or (2) of this  subsection commits a class 1 petty offense, punishable as provided in section 18-1.3-503 C.R.S.

> (4) A licensed veterinarian who in good faith reports a suspected incident of animal cruelty…to the proper authorities in accordance with subsection (1) of this section shall be immune from liability in any civil or criminal action brought against the veterinarian for reporting the incident. In any civil or criminal proceeding in which the liability of a veterinarian for reporting an incident described in subsection (1) of this subsection is at issue, the good faith of the veterinarian shall be presumed.

This section mandates reporting and gives the reporting veterinarian immunity if the

report is made in good faith. The report is not the act of citizen informant. It is the act of a co-

actor with animal control officers.

Veterinarians are a prime source for detection of animal cruelty. Because of their

education, training and experience they are well equipped to reach a scientific conclusion that an

animal had probably been subjected to cruelty. As such they are part of the investigative team

charged with the responsibility of detecting and prosecuting animal cruelty and thus an

11

investigative arm of the state. The "reasonable cause" requirement of the statute requires that the veterinarian make an informed decision, not an unsupported guess. Reasonable cause is the same as probable cause.

Agent Smith merely reported to Defendant Priestly that she saw 7 skinny horses when she was at the ranch. Priestly requested that Defendant Hardey investigate. Hardey investigated and after discussing her findings with Priestly, two veterinarians and a state animal cruelty investigator, a consensus decision was reached that the horses were not in danger and that Plaintiffs should be given 30 days to show that the horses were sick, not mistreated.

What we have here is one investigative arm which believed that further investigation was necessary and another which was advocating seizure and prosecution without probable cause to believe that a crime had been committed. Because of the public outcry which Dr. Olds was able to incite, the unsupported allegations of Dr. Olds were accepted by the Sheriff's Office Defendants who believed further investigation was necessary. Due to the public pressure incited by Dr. Olds, a conspiracy to seize and prosecute without probable cause was formed, thus making Dr. Olds a state actor.

The facts clearly demonstrate that Dr. Olds was not acting in good faith and did not have reasonable cause to suspect animal cruelty.

Animal Control Officer Dawn Smith from the Routt County Sheriff's Department visited Echo Valley Ranch to perform a check on Bear, a horse under Routt County's care and custody. Officer Smith reported to Defendant Priestly that during her visit to the ranch she noticed seven very thin horses.

On February 16, 2012, Defendant Hardey went to the ranch to do a welfare check. On

12

that same date Officer Smith, accompanied by Dr. Olds, went to the ranch for the purpose of

seizing Bear and taking it to Dr. Olds' clinic for evaluation and treatment.

While on the ranch Dr. Olds noted that seven of the horses were thin and that one was

down and under the care of a veterinarian. Without any evaluation, examination or investigation

of the seven horses Dr. Olds stated that the seven horses had been starved, mistreated and

neglected and demanded that Defendant Hardey seize the seven horses and take them to Dr. Olds

clinic for evaluation and treatment. Defendant Hardey communicated the demand to Defendant

Priestly who instructed Defendant Hardey to tell Dr. Olds to take Bear and leave the premises.

Dr. Olds had no reasonable basis to know or suspect that the seven horses had been

subjected to cruelty. In fact, Dr. Olds' demand was below the standard of care for a veterinarian.

She did not even begin to develop a differential diagnosis before making her unfounded claims

of criminal conduct by the Plaintiffs.

Defendant Hardey evaluated the seven horses, noted they had food and water available,

and noted that the other 34 horses on the ranch were in good condition. Defendant Hardey

advised Defendant Priestly, two veterinarians and an animal control investigator of her findings.

They reached a consensus decision that the horses were safe and to leave the horses in the care

and custody of the Plaintiffs.

The consensus decision to leave the horses in the care and custody of the Plaintiffs

infuriated Dr. Olds. After she learned of the consensus decision Dr. Olds again told Defendant

Hardey that the horses were suffering from a very clear cut case of starvation and malnutrition.

After her demands were again refused, Dr. Olds embarked on a campaign to bring

pressure to bear on the Sheriff's Office in order to cause the horses to be seized and the Plaintiffs

to be prosecuted. Dr. Olds broadcast her unfounded claims over Chanel 7 News and encouraged Harmony HorseWorks to embark upon a public outcry that the horses be seized and the Plaintiffs be prosecuted. Based upon Dr. Olds opinion and request, Harmony HorseWorks embarked upon a publicity campaign which was successful. There were threats to take Plaintiffs' horses away from them and threats to injure Plaintiffs.

Defendants Priestly, Gore and Wagener, despite their knowledge that seizure of the horses was not permissible under the facts or the law, directed Defendant Hardey to obtain a warrant. They undertook this approach in hopes that it would prevent Harmony HorseWorks and its followers from taking matters into their own hands which they were threatening to do if the Sheriff's office did not act to their satisfaction. Said Defendants failed to take the proper course of prosecuting those who were threatening a breach of the peace. This was an attack on the innocent to avoid prosecuting the guilty.

The threats which caused the Defendants Hardey, Priestly, Gore and Wagener to seize the horses and institute prosecution of the Plaintiffs were a direct outgrowth of the unfounded claims of Dr. Olds and her promotion of the public campaign which led to their action.

The Sheriff's Office succumbed to the pressure and obtained the Plaintiff's agreement to move the horses. When that did not quell the public outcry, the Sheriff's Office breached its contract with the Plaintiffs by seizing the horses and instituting prosecution of Plaintiffs.

The Defendants Hardey, Priestly, Gore and Wagener agreed to the demands of Dr. Olds in order to quell the public outcry, despite any legal basis to do so. This constitutes a conspiracy between them and Dr. Olds to violate Plaintiffs' rights under the Fourth Amendment.

The warrant to seize the horses was obtained through material omissions. It was later

14

determined that the warrant was illegal. The jury acquitted the Plaintiffs of the charges of animal cruelty.

Dr. Olds is considered to have been acting under color of state law under the joint participation theory announced in *Lugar v. Edmondson Oil Company, Inc.*, 457 U.S. 922 (1982) and/or the conspiracy theory announced in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) and discussed further in *Dennis v. Sparks*, 449 U.S. 24 (1980) and *Tower v. Glover*, 467 U.S. 914 (1984).

In *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) the Court reviewed the theories under which private individuals are considered to be state actors. The relevant discussion is found at 1453-1457 under the heading "Joint Action". Cited in the discussion is *Wagenmann v. Adams*, 829 F.2d 196, 209-211 (1st Cir. 1987) which affirmed a finding that a private citizen was a state actor because of evidence that he exerted influence over of the police investigation which led to the illegal arrest and incarceration.

Each member of the conspiracy is liable for all of the overt acts performed by all members of the conspiracy. Hence, Dr. Olds is responsible for procuring issuance of the warrant and commencement of the prosecution.

Here Dr. Olds incited a public campaign designed to cause the other Defendants to seize the horses and prosecute the Plaintiffs. In the words of Harmony HorseWorks on February 18, 2012, "wait and see what happens after the email blast goes out." The basis for the email blast was the unfounded statement of Dr. Olds that the horses were suffering from a very clear cut case of starvation and malnutrition which the Sheriff's office was doing nothing about.

The public campaign incited by Dr. Olds caused the other Defendants to agree to Dr.

Olds' unfounded demands. Thus the Joint Action began.

**B.  Plaintiffs have pled a plausible constitutional claim.**

There can be no doubt that procuring a warrant with an affidavit which fails to disclose material facts is a violation of the Fourth Amendment. *DeLoach v. Bevers*, 922 F.2d 618, 621-622 (10th Cir. 1990); *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991).

There also can be no doubt that malicious prosecution by state actors is a violation of the Fourth Amendment. *Pierce v. Gilchrist*, 359 F.3d 1279 (2004).

Dr. Olds knew by virtue of her training and experience as a veterinarian that without investigation her allegations of animal cruelty were unfounded. The other Defendants also knew the allegations were unfounded which is the reason for the agreement to evaluate the horses for 30 days while they remained in Plaintiffs' custody and care. Therefore, all Defendants knew that there was no reasonable basis to seize the horses or prosecute the Plaintiffs without completion of an investigation. Dr. Horton, Plaintiffs' veterinarian, was of the opinion that much more analysis had to be done before a conclusion as to what was causing the condition of the seven horses could be reached.

 Failure to complete the investigation was a violation of the Fourth Amendment. *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010); *Cortez v. McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007).

Dr. Olds asserts that she cannot be held liable for a violation of the Fourth Amendment and common law malicious prosecution because she did not and could not obtain a warrant or commence a prosecution.

Her assertion is debunked by *Pierce v. Gilchrist*, 359 F.3d 1279, 1291-1294 (10th Cir.

16

2004) which points out that §1983 applies "not only to a person who 'subjects' but also to any person who 'causes to be subjected'…any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

An action for malicious prosecution can be brought against the one who procures the issuance of a warrant or the institution of a prosecution as well as the one who institutes them. Restatement, Second, Torts: § 653.

Dr. Olds did, in fact, cause the warrant to be issued and the prosecution to be commenced by the publicity campaign based upon her unfounded statements that the horses had been starved, mistreated and neglected.

### C. Dr. Olds is not entitled to qualified immunity.

Dr. Olds claims she is entitled to assert a qualified immunity defense. She relies on *Filarsky v. Delia,* 132 S.Ct. 1657 (2012). Filarsky was an attorney hired by a fire department to conduct an investigation of the conduct of an employee. The court held he was entitled to qualified immunity because the nature of his engagement was similar to part time employment.

The nature of Dr. Olds' involvement is far different from that of Filarsky. The other Defendants were co-conspirator of Dr. Olds who acted in a fashion purposely calculated to cause the other Defendants to seize Plaintiffs' horses and prosecute them. Dr. Olds accomplished the conspiracy by inciting public outcry for the seizure and prosecution. This is not a situation which situates Dr. Olds for the same immunities as an employee of the Sheriff's Office. Hence, *Wyatt v. Cole*, 504 U.S. 158,168-169 (1992) which denies applicability of qualified immunity to the private actor, is the appropriate authority. It holds that private persons who conspire with state officials to violate constitutional rights are not entitled to a qualified immunity defense.

17

**D. Dr. Olds is not entitled to statutory immunity.**

The statutory immunity granted by C.R.S. §13-64-121 does not apply to §1983 claims.

*See, Martinez v. California*, 444 U.S. 27, 284 n.8 (1980); *Howlett v. Rose*, 496 U.S. 356, 376-77

(1990); *Felder v. Casey*, 487 US. 131, 139 (1988).

Nor does the statutory immunity require dismissal of the common law malicious

prosecution claim. The facts alleged support the conclusion that there was not a good faith basis

for Dr. Olds' accusations.

**E.  Dr. Olds is not sued for breach of contract.**

Dr. Olds is not sued for breach of contract.

## V. CONCLUSION

It is respectfully submitted that, based on the foregoing, the motion to dismiss must be

denied.

/s/ Brice A. Tondre
_____
Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado   80226
Telephone:  303-296-3300
Facsimile: 303-238-5310
briceatondrepc@msn.com

ATTORNEY FOR PLAINTIFF

18

## CERTIFICATE OF SERVICE

I hereby certify that on this the 10th day of December, 2013, a true and correct copy of the foregoing document was electronically  filed with the Clerk of Court using the CM/ECF system which will send notification of the filing to the following:

Timothy P. Schimberg
t_schimberg@fsf-law.com

Andrea M. Bronson
a_bronson@fsf-law.com

John Lebsack
jlebsack@wsteele.com


/s/ Brice A. Tondre
_____

19

# Exhibit A

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
        CASE NO. 13-cv-02469-RM-MJW
 3      _____
 4      RANDALL J. HATLEE and
        RONALD L. SWIFT,
 5
             Plaintiffs,
 6
                        vs.
 7
        CINDY HARDEY,
 8      BOBBIE PRIESTLY,
        MONTE GORE,
 9      FRED WEGENER and
        ASHLEIGH OLDS,
10
             Defendants.
11
        ----------------------------------------------------
12
             DEPOSITION OF ASHLEIGH OLDS, DVM, DABVP-Equine
13                       March 25, 2014
14      ----------------------------------------------------
                                    Deposition location:
15                                  600 17th Street,
                                    Suite 600N
16                                  Denver, Colorado 80202
17
18
        ALSO PRESENT:  Randall Hatlee
19                     Ronald Swift
20
21
22
23
24
25
```

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 4

```
 1              ASHLEIGH OLDS, DVM, DABVP-Equine,
 2    being first duly sworn to state the truth, the whole
 3    truth and nothing but the truth, testified on oath as
 4    follows:
 5                        EXAMINATION
 6    BY MR. TONDRE:
 7              Q.    State your name, please.
 8              A.    Ashleigh Olds.
 9              Q.    And your present occupation?
10              A.    Veterinarian.
11              Q.    When did you graduate from veterinary
12    school?
13              A.    2002.
14              Q.    From where did you graduate?
15              A.    I graduated from the University of
16    California at UC Davis.
17              Q.    And your undergraduate studies were
18    what and where?
19              A.    Equine science in the honor's program
20    at Colorado State University.
21              Q.    What generally did equine science
22    include in its curriculum?
23              A.    At Colorado State University?
24              Q.    Yeah.
25              A.    General horse management, equine
```

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 5

```
 1    nutrition, equine reproduction; business management;

 2    hard sciences like biology, chemistry, organic

 3    chemistry; statistics, a number of other electives.

 4              Q.    Did you do any postgraduate studies

 5    following graduation from UC Davis?

 6              A.    I did.  I did an internship at the

 7    University of Illinois at Champaign-Urbana

 8    specializing in equine medicine and surgery.

 9              Q.    How long of a course was that?

10              A.    One year.

11              Q.    Did you get any sort of degree or

12    certification?

13              A.    That -- did not specifically, no.

14              Q.    Do veterinarians have something akin to

15    certifications?

16              A.    Yes.

17              Q.    What certifications?

18              A.    There is a number of board

19    certifications.

20              Q.    Do you hold any board certifications?

21              A.    I do.

22              Q.    What board certifications?

23              A.    The American Board of Veterinary

24    Practitioners, specifically in equine medicine and

25    surgery.
```

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 6

1          Q.     When were you certified by that board?

2          A.     In December of 2013.

3          Q.     What are the qualifications for being a

4     member of that board?

5          A.     It's a very rigorous process of a

6     number of factors, including a large number of

7     continuing education credits; you have to get written

8     endorsements by other board-certified professional

9     veterinarians endorsing you for it.  You have to do

10    two extensive case reports that get reviewed and

11    approved.  And then you have to pass a two-day

12    written and practical examination.

13         Q.     What did you do after your year at

14    University of Illinois?

15         A.     I went into private practice.

16         Q.     Where?

17         A.     The first practice I worked at was

18    called Range View.  It was an equine-only practice in

19    Colorado Springs.

20         Q.     Range?

21         A.     Range View.

22         Q.     Range View.

23                And how long were you with that

24    practice?

25         A.     I was there for a year.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 7

```
 1              Q.    And after that, what did you do next?

 2              A.    I worked at Golden Animal Hospital.

 3              Q.    What was the nature of that practice?

 4              A.    It was a mixed-animal practice, but I

 5    specifically did equine and large animal.

 6              Q.    How long were you in that practice?

 7              A.    Roughly four years.

 8              Q.    And after that?

 9              A.    I opened my own practice.

10              Q.    What is the name of that practice?

11              A.    Aspen Creek Veterinary Hospital.

12              Q.    What is the nature of the practice?

13              A.    The practice is currently a

14    mixed-animal practice.

15              Q.    What percentage is horses?

16              A.    Percentage of the practice or

17    percentage that I work on?

18              Q.    Percentage of the practice to start

19    with.

20              A.    I would say the percentage of the

21    practice is probably 60 to 70 percent horses.

22              Q.    What about your practice personally?

23              A.    I would say 95 percent horses

24    personally.

25              Q.    What percentage of the work that the
```

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 23

1    ago.

2              Q.    Do you remember the name of the

3    prosecutor?

4              A.    No.

5              Q.    What is your involvement with animal

6    rights organizations?

7              A.    I don't have any involvement with

8    animal rights organizations.

9              Q.    Aren't you the vet for Harmony

10   HorseWorks?

11             A.    Harmony HorseWorks is a horse

12   sanctuary, and I provide them with veterinary care.

13   That is the extent of our relationship.

14             Q.    Is it an animal rights organization?

15             A.    Not to my knowledge.

16             Q.    What do you call an animal rights

17   organization?

18             A.    I would consider PETA to be an animal

19   rights organization.

20             Q.    How long have you been providing

21   services to Harmony HorseWorks?

22             A.    I have provided veterinary services

23   for, I would guess, ten years.

24             Q.    It's a 501(c)3) charitable

25   organization, right?

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 45

```
 1      I wanted to look up, I'm sure that I would look at

 2      the various university publications on -- a lot of

 3      the university's vet colleges have extension agencies

 4      that publish information about different toxic

 5      plants.

 6              MR. LEBSACK:  Brice, we have been going

 7      for a little over an hour.  Can we take a break when

 8      you get to a point?

 9              MR. TONDRE:  You bet.

10              MR. LEBSACK:  Not necessarily -- now is

11      okay?

12              MR. TONDRE:  Sure.

13              MR. LEBSACK:  Okay.

14              (Whereupon, a recess was taken from

15      11:04 a.m. to 11:17 a.m.)

16          Q.   (BY MR. TONDRE) Did you form an opinion

17      as to how long it had taken the horses at Echo Valley

18      Ranch to reach the state you complained about?

19              MR. LEBSACK:  Objection to the form.

20              MS. BRONSON:  Join.

21          A.   I didn't -- when you say -- I can

22      comment as to whether I made an assessment as to how

23      long it took the horses to get there, but I didn't

24      complain about anything to anybody.  I was asked to

25      make an opinion by Park County Sheriff's Department
```

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 46

1     Animal Control.

2              Q.    (BY MR. TONDRE) When did they ask you
3     to make an opinion?

4              A.    At various points in time.

5              Q.    How about on February 16th; did they
6     ask you to make an opinion?

7              A.    Sure.   Yeah.   They said what is your
8     general assessment.

9              Q.    And who asked you?

10             A.    Cindy Hardey.

11             Q.    All right.   And what was your opinion
12    as to how long it took the horses to get there?

13             A.    I don't know if she asked me how long
14    it took them to get there on that day.   I think she
15    just asked me for my general assessment for the
16    horses.

17             Q.    Did you ever form an opinion as to how
18    long it took the horses to reach that condition?

19             A.    I would say that based on my
20    understanding and my reading that you couldn't -- I
21    certainly couldn't pinpoint it, but I would say on
22    average 30 to 90 days minimum.

23             Q.    What do you look at to assess whether
24    there is any neurological problems with a horse?

25             A.    Sure.   There is a lot of things you can

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 54

1    privilege, you can't instruct her not to answer.

2                    MR. LEBSACK:   I certainly can.   There

3    are other grounds under Rule 30, and that's what I'm

4    invoking.

5                    MR. TONDRE:   No, there are not.

6            Q.   (BY MR. TONDRE) Who was the person from

7    your clinic that accompanied you to the Echo Valley

8    Ranch?

9            A.   It was a vet assistant named Troy

10   Murdock.

11           Q.   And I don't think I heard his name.

12           A.   No.   He doesn't currently work for me.

13           Q.   Is he related to Anna Murdock?

14                    MR. LEBSACK:   Amy, you mean?

15                    MR. TONDRE:   Amy Murdock.

16           A.   They were married at the time.

17           Q.   (BY MR. TONDRE) Where is he now?

18           A.   I'm not certain of his current

19   employment.

20           Q.   Well, where was he the last time you

21   knew where he was?

22           A.   My understanding was he was working as

23   a security guard at one of the hospitals in Denver.

24           Q.   Did you attend the April 7th fundraiser

25   in Evergreen?

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 69

```
 1              A.    She wasn't there.   Dawn Smith was never
 2       there.
 3              Q.    So I misunderstood you.   So Barbara
 4       Wright was there when you arrived with Spencer?
 5              A.    Correct.
 6              Q.    Was she there when you called Cindy
 7       Hardey and urged her to seize the remainder of the
 8       horses?
 9                    MS. BRONSON:   Object to form.
10              A.    I didn't ever call Cindy Hardey and
11       urge her to seize the horses, to my knowledge.
12              Q.    (BY MR. TONDRE) Did you send her an
13       email that afternoon at 4 p.m.?
14              A.    I did send her an email.
15              Q.    Did you urge her to seize the horses?
16              A.    I wouldn't say that I urged her to
17       seize the horses.
18                    MS. BRONSON:   Object to form.
19              A.    They had asked me for my professional
20       assessment because they wanted to seize the horses,
21       and they -- I believe it said, "Hopefully this will
22       be useful to you if you try to seize the horses," or
23       something to the effect.
24              Q.    (BY MR. TONDRE) When did you learn that
25       they had made the decision to leave the horses where
```

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 70

1    they were?

2          A.    My understanding when I left the

3    property was that they were going to leave the horses

4    where they were and that they were going to try to

5    obtain a veterinarian, a third opinion veterinarian,

6    to come to the site to make an assessment before they

7    took any further steps.   That was -- so I don't -- I

8    don't know that it ever was clear at any one point in

9    time that for sure they weren't seizing the horses,

10   but I -- when I left on February 16th, I knew that

11   they were not taking them on that day.

12         Q.    You demanded that they seize those

13   horses while you were on the farm, didn't you?

14               MS. BRONSON:   Object to form.

15         Q.    (BY MR. TONDRE) Or on the ranch.

16         A.    I don't know how I could demand that

17   they seize the horses.   They asked me my professional

18   opinion, and I expressed concern about the horses,

19   and I was in support of them if they wanted to seize

20   the horses.

21         Q.    (BY MR. TONDRE) You are not aware that

22   Cindy Hardey said that you demanded that they

23   remove -- seize the horses?

24         A.    I have seen Cindy Hardey's report, and

25   I don't agree with the factual nature of it.

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 78

1    where --

2                    MR. LEBSACK:   Hold on.   Let him ask a

3    question.

4                    THE DEPONENT:   Okay.

5            Q.   (BY MR. TONDRE) What were the clinical

6    signs?

7            A.   Well, weight loss.

8            Q.   There were 14 with weight loss?

9            A.   There were 8 horses with weight loss,

10   and we were told -- Mr. Swift told me when we were on

11   the property, and Dr. Burton informed my practice

12   manager, that five to six horses had already died.

13           Q.   When?

14           A.   Which one?

15           Q.   When had five or six horses actually

16   died?

17           A.   When was I told that or when did the

18   horses die?

19           Q.   When did they die?

20           A.   I don't know.   I was told that by

21   Mr. Swift and Burton that five to six horses had

22   already died within the recent several months was my

23   understanding.

24           Q.   Mr. Swift told you that?

25           A.   He did.   That's in my report.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 81

1    12:03 p.m. to 1:04 p.m., and Mr. Schimberg was not

2    present.)

3           Q.   (BY MR. TONDRE) Dr. Olds, at 4 o'clock

4    on February 16, 2012, you sent an email to Cindy

5    Hardey; is that correct?

6           A.   I believe that's correct, yes.

7           Q.   And in that sent email, you -- did you

8    tell Cindy Hardey that you hoped that the information

9    you were providing that afternoon would be useful in

10   obtaining an order to seize the remaining horses and

11   get permission to euthanize the downed mare?

12          A.   If you wouldn't mind, just to refresh

13   my memory, provide me with what you are reading off

14   of, and I would be happy to confirm that.

15          Q.   I'm reading your email --

16          A.   Sure.  That's fine.

17          Q.   -- which is on page 70 of the Park

18   County defendant's disclosures.

19          A.   So I said hopefully this will be useful

20   in obtaining an order to seize the remaining horses

21   and/or permission to euthanize the downed mare.

22   Cindy Hardey had asked me to write that report

23   because she had indicated to me that she did want to

24   seize the horses and that that might be useful for

25   her.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 82

1          Q.    And you say the "remaining horses."
2    What is that in reference to?
3          A.    Maggie the downed horse, and then
4    there's six additional varying underweight horses on
5    the property.
6          Q.    You weren't advocating the taking of
7    all 40 horses, were you?
8          A.    No.
9          Q.    Now, before we broke for lunch, you
10   said that the horses were in imminent danger of
11   death.  Which ones did you have reference to?
12              MR. LEBSACK:  Objection to the form.
13              MS. BRONSON:  Join.
14              MR. LEBSACK:  And I'm not sure -- I
15   don't remember her saying that.
16              MR. TONDRE:  She did.  I was shocked,
17   but...
18          A.    I said my understanding is to get a
19   warrantless seizure in the State of Colorado, you
20   just have to make a case that the animals are in
21   imminent danger of death.
22              MR. LEBSACK:  So I don't care what she
23   said.  The record will show what she said, but when
24   you say that she said that, what horses are you
25   referring to, I think that is not supported by the

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 83

```
 1    record, so...
 2                  THE DEPONENT:  Well, Maggie was.
 3                  MR. LEBSACK:  Ask a different question
 4    if you would, please.
 5                  Q.  (BY MR. TONDRE) Did you believe any of
 6    the horses were in imminent danger of death?
 7                  A.  I did.
 8                  Q.  Which ones did you believe were in
 9    imminent danger of death?
10                  A.  Maggie was certainly in imminent danger
11    of death.
12                  Q.  Any others?
13                  A.  And she did die.  You know, after that
14    point in time, I did not have the opportunity to see
15    the horses again.  I would say based on how -- how
16    severely emaciated they were and how ill Spencer and
17    Maggie were, you know, I had concerns about the other
18    horses.  But I wouldn't have said on 2/16 whether I
19    could make an assessment about that, but certainly
20    Maggie appeared to be in imminent danger of death.
21                  Q.  And what was causing her to be in
22    imminent danger of death?
23                  A.  Well, I think the facts support that.
24    She died so she was in imminent danger of death.  She
25    was recumbent, severely emaciated, and she wasn't
```

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 84

1    receiving any sort of supportive care.  She wasn't

2    receiving any antibiotics or IV fluids or parenteral

3    nutritional support.

4          Q.    You thought she needed to be euthanized

5    right on the spot, didn't you?

6                MR. LEBSACK:   Objection to the form.

7          A.    To clarify, my statements at the

8    time -- and I will stand by them to this day -- was

9    that I strongly recommended that she get diagnostic

10   testing to try to determine what was wrong with her

11   and transport her to a hospital facility where she

12   could receive appropriate care.  And if that wasn't

13   going to be done, the most humane thing to do would

14   be to euthanize her.  And I offered to help transport

15   her to any facility that Mr. Swift wanted to get

16   appropriate care, which he declined.

17         Q.    Were you aware she was scheduled to go

18   to CSU the next day?

19         A.    I don't believe she ever was

20   transported to CSU other than after she died.

21         Q.    Are you aware she was scheduled to go

22   to CSU the next day?

23         A.    No.  Nobody said anything about

24   transporting her to CSU.

25         Q.    Who were you to be making suggestions

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 87

```
 1     the horse was on any medications or antibiotics, and
 2     she indicated that it was not.  We asked if the horse
 3     was receiving or had had any diagnostic testing such
 4     as blood tests, fecal tests, or any hay testing done
 5     on the property, and she indicated that it had not
 6     been done.
 7               Q.   From whom did you receive a request to
 8     go to Echo Valley Ranch?
 9               A.   From Routt County and Harmony
10     HorseWorks.
11               Q.   Who contacted you first?
12               A.   I'm not sure because the contact went
13     through my front office.  I was initially just asked
14     if we would be willing to care for a horse that Routt
15     County was impounding, which I agreed to.
16               Q.   Is it correct that you were -- you
17     assisted in the recovery of a 2-year-old bay gelding
18     from Echo Valley Ranch, Colorado, on behalf of
19     Harmony HorseWorks?
20               MR. LEBSACK:  Objection to the form.
21               MS. BRONSON:  Join.
22               A.   My understanding is we were there on
23     behalf of Routt County, and that Harmony HorseWorks
24     was coordinating the care of the horse because they
25     were going to be the eventual caretakers of the horse
```

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 88

 1    when he was discharged from the hospital.

 2            Q.    (BY MR. TONDRE) What was your first

 3    contact with anyone regarding -- when was your first

 4    contact with anyone regarding getting involved with

 5    the seizing of the horse?

 6                  MR. LEBSACK:  Could you clarify.  You

 7    mean her personally or her office?

 8                  MR. TONDRE:  Her personally.

 9                  MR. LEBSACK:  Okay.

10            Q.    (BY MR. TONDRE) When did you find out

11    you were going to Echo Valley Ranch?

12            A.    I didn't find out I was going to Echo

13    Valley Ranch specifically until we were en route to

14    Echo Valley Ranch.

15            Q.    Oh, so you just jumped in the car and

16    you didn't know where you were going?

17                  MR. LEBSACK:  Don't answer the

18    question.

19            Q.    (BY MR. TONDRE) Maybe to Dairy Queen.

20                  MR. LEBSACK:  Don't answer the

21    question.

22            Q.    (BY MR. TONDRE) Come on.  Give me a

23    break.

24                  MR. LEBSACK:  Don't answer the

25    question.

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 89

1             Ask the next one.

2        Q.   (BY MR. TONDRE) You were sitting in a

3    car and you didn't know where you were going; is that

4    right?

5        A.   Correct.  We were instructed to meet at

6    the Bailey substation, and we were not informed of

7    where we were going.

8        Q.   Who instructed you to go to the Bailey

9    substation?

10            MR. LEBSACK:  Objection to the form.

11            MR. TONDRE:  What's wrong with the

12   form?

13            MR. LEBSACK:  Your connotation of

14   instructed.

15            MR. TONDRE:  Read it back.

16            MR. LEBSACK:  She said -- okay.

17            MR. TONDRE:  Read back her answer.

18            (Whereupon, the answer beginning at

19   page 89, line 5, was read by the reporter.)

20            MR. LEBSACK:  I withdraw the objection.

21       Q.   (BY MR. TONDRE) Who instructed you?

22       A.   Dawn Smith from Routt County instructed

23   me to meet at the Bailey substation.

24       Q.   And when did she instruct you to meet

25   at the Bailey substation?

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 90

```
 1              A.    My understanding and recollection was

 2    it was either the afternoon prior to or the morning

 3    of the 16th, because prior to that, I was under the

 4    impression that Park County was going to bring the

 5    horse to me and that we were only going to care for

 6    it at our facility, which is what I initially agreed

 7    to.  And I did not know where the horse was coming

 8    from, and I did not know who had possession of the

 9    horse.  At some point between when I agreed to care

10    for the horse and the 16th, we were informed that we

11    needed -- I was informed through my office through

12    Routt County that the Bailey officers wanted me to

13    accompany them to take possession of the horse.  And

14    it was only the morning of the 16th when we -- and I

15    say "we."  I don't remember who in my office.  I

16    don't know if it was me personally or my receptionist

17    called the Bailey substation to confirm the time, and

18    they said, "You are bringing the horse trailer,

19    right?"  And that was the very first that I knew that

20    they expected me to transport the horse.

21              Q.    Did you have any information regarding

22    the condition of the horse?

23              A.    I did.

24              Q.    What information did you have regarding

25    the condition of the horse?
```

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 91

1        A.    Dawn Smith had sent me pictures of him

2    that she had taken and advised me that she thought he

3    was in very poor shape, and she was very concerned

4    that he would not survive the trip to Steamboat and

5    that she was very concerned that he was going to need

6    significant medical care, and that was all that I

7    knew.

8        Q.    What provisions did you make -- well,

9    let me step back.

10            When you were informed that morning

11   that you needed to trailer the horse to your

12   hospital, who went with you?

13       A.    Troy Murdock.

14       Q.    All right.  Now, what provisions did

15   you make for the safe transport of a very sick horse?

16       A.    We had a fully stocked vet truck with

17   us, and we put a deep bed of shavings into the

18   trailer floor.

19       Q.    What did you do to keep the horse from

20   falling while trailering over a rough road that goes

21   from the ranch to Bailey?

22       A.    Right.  A normal healthy horse

23   shouldn't fall down in a trailer, so there are no

24   provisions that you would make -- need to make to

25   make them stand up.  We have a panel that the horses

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 95

```
 1    the only way that the colt was going to get medical
 2    care was to get him off of that property.  That's
 3    what I was tasked with that day.  And the best place
 4    for that colt to get care was in a hospital facility,
 5    and the only way of transporting him there was in a
 6    horse trailer.  I, in my professional opinion,
 7    believe it was very reasonable to continue to
 8    transport him to the hospital facility because my
 9    only other option would have been to leave him there.
10           Q.    (BY MR. TONDRE) And what was wrong with
11    the option of leaving him there?
12           A.    Because --
13                 MR. LEBSACK:  Objection to the form.
14                 Go ahead.
15           A.    -- there was a warrant to remove him
16    from the property, and I was tasked by Routt County
17    Animal Control with the assistance of Park County
18    Animal Control to remove him from the property, so it
19    was not an option to leave him there.
20           Q.    (BY MR. TONDRE) What -- did you tell
21    Dawn Smith that it was dangerous for him to be
22    transported?
23           A.    I don't believe that the trailer ride
24    from Echo Valley Ranch to my hospital facility was
25    dangerous for him.  Dawn Smith had feared the 5-hour
```

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 96

1    trailer ride to Steamboat would be dangerous for him.

2    That was her concern.

3            Q.    Why did she feel that it would be

4    dangerous to ride to Steamboat?

5                 MR. LEBSACK:   Objection to the form.

6            A.    You would have to ask Dawn Smith why

7    she was concerned.

8            Q.    (BY MR. TONDRE) What did she tell you

9    about why she was worried about transporting the

10   horse to Steamboat?

11           A.    All that I was made aware was that he

12   was extremely thin and suspected that he was

13   suffering from starvation and that he was very weak.

14           Q.    What is your understanding of why -- if

15   you have one, what was your understanding of why the

16   horses were moved from Echo Valley Ranch to the

17   Lebeau facility?

18           A.    All that I could do would be to

19   speculate based on press releases, so I mean I was

20   not involved in that decision-making process

21   whatsoever.

22           Q.    My question is very simple.   What is

23   your understanding -- what was your understanding in

24   February 2012 --

25           A.    Sure.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 98

1          Q.    (BY MR. TONDRE) Do you recall they were

2    moved because they were afraid of violence towards

3    the horses and owners?

4                MR. LEBSACK:   Don't answer the

5    question.

6                THE DEPONENT:   Okay.

7          Q.    (BY MR. TONDRE) Did you ever hear that?

8          A.    I don't -- I don't recall specifically

9    hearing that, no.

10         Q.    All right.

11         A.    If it was in the press release, then I

12   read it.  If it wasn't in the press release, then I

13   have no knowledge of that.

14         Q.    Other than your discussions with your

15   veterinarian assistant, Mr. Murdock, and Barbara

16   Wright and Cindy Hardey, did you have any discussions

17   with anyone else regarding Spencer on that day?

18         A.    I certainly discussed him with

19   Dr. Murdock and Dr. Harland, who were both there

20   assisting with his care, and all of the veterinarian

21   technicians and assistants who were there assisting

22   with his care.

23         Q.    How did the horses fare that were --

24   that remained at Echo Valley Ranch?

25         A.    Which horses specifically are you

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 99

1      referring to?

2              Q.    The six horses that you wanted

3      impounded.

4              A.    Are you excluding Maggie then from

5      that?

6              Q.    I'm sorry?

7              A.    You are excluding Maggie?  You are not

8      asking about Maggie?

9              Q.    Maggie died the next day, didn't she?

10             A.    It's my understanding.

11             MR. LEBSACK:  So the question is the

12     six horses that were removed from the ranch later.

13             A.    So my understanding, any knowledge that

14     I have of the remaining -- the other six horses that

15     were removed, is solely based on the press releases

16     and potentially reading through some of Dr. Toll's

17     reports that are already entered into evidence.  I

18     didn't have anything to do with those horses after

19     they -- the 16th.

20             Q.    (BY MR. TONDRE) You testified about

21     them, didn't you?

22             A.    I was asked about their appearance on

23     the day of the 16th.  And my understanding is that

24     those horses gained a significant amount of weight in

25     the care of wherever they were being cared for.

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 100

1          Q.    Well, where were they being cared for?

2          A.    My understanding is they were being

3    cared for at the Harmony Center for Horses and that

4    Littleton Equine Medical Center was supervising their

5    care.

6          Q.    And they were also cared for at Echo

7    Valley Ranch, weren't they?

8          A.    I don't have any personal knowledge of

9    that.

10          Q.    Well, they were at Echo Valley Ranch

11    when you were there, right?

12          A.    Correct.

13          Q.    You understand they were moved to

14    Lebeau's place on the 23rd of February, right?

15          A.    Right.

16          Q.    Or the 19th of February.  Then you

17    understand that they were seized and moved to a

18    facility where Littleton was taking care of them,

19    right?

20          A.    Right.

21          Q.    And then you were aware that the judge

22    ordered them brought back to Echo Valley Ranch,

23    right?

24          A.    Correct.

25          Q.    How did they do at Echo Valley Ranch?

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 104

1   in weight and that the horses for the most part

2   gained a significant amount of weight under the care

3   that they received in that interim before they were

4   returned.

5           Q.   (BY MR. TONDRE) How did they do after

6   they were returned?

7           A.   I don't know.

8           Q.   You haven't read anything about that?

9           MR. LEBSACK:   Hold on.   She just said,

10  "I don't know."  All right?   So can we move on?

11          Q.   (BY MR. TONDRE) The next question is --

12  there is a difference between knowing and reading --

13  have you read anything about how they did?

14          A.   At some point in time I may have read

15  some follow-up reports, but I can't remember any

16  specific details.   I didn't have anything

17  specifically to do with those horses after 2/16/12,

18  so I have no way of knowing the current status of

19  those horses unless it's been released publicly.

20          Q.   Did you have any involvement with the

21  adoption of Spencer by the Ferraros?

22          A.   Involvement in the sense that I cared

23  for Spencer, and I was aware that Shelly Ferraro

24  wanted to adopt Spencer.

25          Q.   How did you become a -- who handled the

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 105

1    adoption?

2            A.    Routt County -- the Routt County brand

3    inspector, Harmony HorseWorks, and the Jefferson

4    County brand inspector.

5            Q.    The what?

6            A.    The Jefferson County brand inspector.

7            Q.    Oh.

8            A.    So the Routt County brand inspector was

9    involved.  The Jefferson County brand inspector was

10   involved.  Dawn Smith in Routt County in my

11   understanding signed the horse over to Shelly

12   Ferraro, but I didn't personally have anything to do

13   with that transaction.

14           Q.    Normally, what is -- what -- does that

15   involve buying the horse?

16           A.    I don't believe any money exchanged

17   hands.  I believe it was considered an adoption.

18           Q.    It seems to me that -- when did you

19   first communicate with her regarding Spencer?

20           A.    I'm not certain which day it was, but I

21   believe it was the 17th or 18th of February, 2012.

22   The Ferraros had a horse being hospitalized in our

23   facility, and she saw Spencer in a stall next to her

24   horse.

25           Q.    At that point in time, did she express

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ASHLEIGH OLDS, DVM, DABVP-EQUINE - MARCH 25, 2014

Page 110

```
 1          A.   Sure.

 2               MR. LEBSACK:   Objection to the form.

 3          A.   So you are asking me my professional

 4     opinion why some of the horses were more affected

 5     than the other horses?

 6          Q.   (BY MR. TONDRE) Were all of them

 7     affected?

 8          A.   Well, I don't know.   Of the horses that

 9     I was allowed to see, I know eight of them were

10     severely emaciated.

11          Q.   Why were only eight of the 40 -- if

12     that's the number --

13          A.   Sure.   Sure.

14          Q.   Why were only eight of the 40 affected?

15          A.   So...

16               MS. BRONSON:   Form, foundation.

17          A.   So just to clarify, I didn't have the

18     opportunity to examine the rest of the horses, so I

19     can't confidently say they weren't affected.   But if

20     you wanted to say hypothetically they weren't

21     affected, there is a condition called equine winter

22     starvation syndrome where horses fed poor quality hay

23     or whatever, poor quality feed, struggle to maintain

24     their body temperature in the winter, and some horses

25     would be more affected than others.   Typically young,
```

# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.
-----------------------------------------------------------
            DEPOSITION OF CINDY HARDEY
                  June 20, 2014
-----------------------------------------------------------
                        Deposition location:
                        9998 Havekost Road
                        Conifer, Colorado   80433

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado   80226

                        For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado   80202

                        For the Defendant, Olds.

Page 4

```
 1                    CINDY HARDEY,

 2 being first duly sworn to state the truth, the whole

 3 truth, and nothing but the truth, testified under oath as

 4 follows:

 5                    EXAMINATION

 6 BY MR. TONDRE:

 7          Q    State your name, please.

 8          A    Cindy Hardey.

 9          Q    And your present occupation?

10          A    Homemaker.

11          Q    What's your educational background?

12          A    Graduated high school.

13          Q    When?

14          A    1999.  And have my diploma in

15 cosmetology, 2001.

16          Q    What have -- what employment have you had

17 between graduation from high school and your present

18 occupation as homemaker?

19          A    Pharmacy technician at Safeway.

20          Q    Anything else?

21          A    Yes, I worked for Park County Animal

22 Control.

23          Q    For what?

24          A    Park County Animal Control.

25          Q    How long did you work for Park County?
```

Page 5

```
 1        A    Nine and a half years.

 2        Q    Which years were those?

 3        A    From 2003 to 2012.

 4        Q    When in 2012 did you leave Park County?

 5        A    I believe it was June 14th.

 6        Q    Why did you leave?

 7        A    I was unhappy.

 8        Q    What were you unhappy about?

 9        A    I just was unhappy.  I didn't feel the

10 love for my job anymore, so I just decided to quit.

11        Q    Any particular thing cause you to fall

12 out of love with your job?

13        A    No.  I just been there almost ten years

14 and it was time for a change.

15        Q    Okay.  How did you get interested in

16 animal control?

17        A    My husband was Park County Sheriff's

18 deputy, and I had friends that were animal control

19 working for the sheriff's office and they suggested I

20 should apply.

21        Q    Your husband was a sheriff's deputy?

22        A    Yes.

23        Q    Is he still?

24        A    No.

25        Q    When did he leave?
```

Page 6

1        A    The same year, 2012, I don't know the

2   month.

3        Q    What does your husband do now?

4        A    He is a police officer for Idaho Springs.

5        Q    What training did you receive in

6   connection with becoming an an- -- well, let me -- were

7   you employed by the Park County Sheriff's Office?

8        A    Yes.

9        Q    And when was your first day of

10  employment?

11       A    March 3, 2003.

12       Q    Did you receive any training before March

13  the 3rd, 2003, with respect to animal control?

14       A    No.

15       Q    You're not post-certified, are you?

16       A    No.

17       Q    Do you hold any sort of certification or

18  did you?

19       A    For?

20       Q    For animal control?

21       A    I had cruelty to animals certification,

22  horse handling.

23       Q    And where did you receive that

24  certification?

25       A    Jefferson County Fairgrounds.

Page 28

1          Now, I'm going to ask you some questions;

2 and any time you feel like you need to refer to your

3 report in order to answer them, feel free to do that.

4          A    Okay.

5               MR. SCHIMBERG:   Thank you.

6          Q    (BY MR. TONDRE)  With respect to -- when

7 was the first time you heard anything about a matter

8 involving horses at the Echo Valley Ranch?

9          A    On the 14th.

10         Q    And what did you hear?

11         A    Sergeant Priestly advised me she'd gotten

12 an email saying that there were seven horses that were

13 in poor condition and that I needed to do a welfare

14 check.

15         Q    And when did you do -- or did you do a

16 welfare check?

17         A    Yes.

18         Q    When did you do a welfare check?

19         A    On the 16th.

20         Q    And did anyone accompany you on -- that's

21 February 16th, right?

22         A    Correct.

23         Q    Did anyone accompany you on the

24 February 16th welfare check?

25         A    Deputy Plutt and Deputy Hanning.

Page 29

1          Q    Are they -- why did they accompany you?

2          A    Because Routt County needed paperwork

3 served.  And I'm not post-certified and so the deputies

4 had to serve that paperwork to Mr. Hatlee, Mr. Swift.

5          Q    They were both post-certified?

6          A    Correct.

7          Q    Who else was present during the course of

8 your visit to the ranch?

9          A    Dr. Olds.

10          Q    Anyone else?

11          A    And her assistant.

12          Q    Do you remember who the assistant was?

13          A    I do not.

14          Q    What was your understanding why Dr. Olds

15 was on the premises?

16          A    She was removing the colt, Bear, from the

17 property for Routt County or as requested by Routt

18 County.

19          Q    What discussions did you have with

20 Dr. Olds regarding the Routt County horse?

21          A    She just --

22          MR. SCHIMBERG:  At what point, that

23 morning, that day?

24          MR. TONDRE:  Yeah.

25          MR. SCHIMBERG:  Sorry.

Page 30

1          Q   (BY MR. TONDRE) Let me step back.   How

2 long were you on the ranch on that occasion?

3          A   I cannot recall time frame.

4          Q   What's your best estimate?

5          A   An hour.

6          Q   And of that one hour, how long was

7 Dr. Olds there?

8          A   Maybe 45 minutes.   Maybe 30 minutes.   She

9 was not there the whole time.

10          Q   Okay.   What did you do when you arrived?

11          A   When I arrived, I had Deputy Plutt and

12 Deputy Hanning or Corporal Plutt and Deputy Hanning

13 give the paperwork that needed to be given to Swift and

14 Hatlee.   I advised them that the reason why they were

15 there was because Bear was going to be given to

16 Dr. Olds.   And I asked if we could go see the colt, and

17 I was taken to that.

18              And while I was under -- while I was in

19 the stall with Bear, I heard a stomp on the top floor

20 of the barn.   I asked what that noise was, they told me

21 it was their drum mare, Maggie.   I asked if I could go

22 see her.

23              I was taken up to see her, and I noticed

24 that she was not doing well.   I asked what had

25 happened.   And was told that she had fallen in the

Page 31

1 pasture and they couldn't get her up.  They had also

2 called Dr. Horton in reference to Maggie.

3                 I called Dr. Horton, and Dr. Horton said

4 she had been -- she had seen Maggie and given them

5 instructions and how to take care of Maggie.  Within

6 that time, I asked if I could go look at the other

7 horses on the property or the ones that were up in the

8 stalls.  I was given permission.  Dr. Olds accompanied

9 me.  We went around and looked at six more horses and

10 pictures were taken.

11                 Within that time, Bear was loaded into

12 Dr. Olds' trailer.  She left.  And I explained to Ron

13 and Randy that I felt the horses were not in good

14 shape.  I informed them I was going to be giving them a

15 state notice of warning; I did, and then they went back

16 to feeding their animals, and then I left.  Reader's

17 Digest version.

18                 Q    Did you ask Dr. Olds to accompany you to

19 look at the other horses?

20                 A    I don't think I asked her to, but she

21 did.

22                 Q    How sure are you you didn't ask her?

23                 A    I cannot remember.

24                 Q    What do you recall her saying to you, if

25 anything -- well, first of all how, many horses did you

Page 32

1  go look at?

2           A    I looked at six.

3           Q    Including Maggie or in addition to

4  Maggie?

5           A    In addition to Maggie.

6           Q    And other than Dr. Olds, did anyone

7  accompany you?

8           A    No.

9           Q    Now at some point you had Deputy Pludd or

10  Plutt photograph the six animals.  Was that after you

11  looked at them?

12          A    Yes.

13          Q    Did you give him any instructions as to

14  how you wanted them photographed?

15          A    Her.  Corporal Plutt.

16          Q    Oh her, okay.

17          A    Yes.  No.

18          Q    How long would you estimate you spent

19  looking at those six horses?

20          A    Fifteen minutes.

21          Q    And during that 15 minutes what, if any,

22  statements did Dr. Olds make?

23          A    She told me the horses were very skinny,

24  they looked like they had not been fed and that I

25  needed to remove them.

Page 33

1          Q    And what?

2          A    I needed to remove them.

3          Q    The six horses were Echo, River, Chance,

4 Fiona, Midnight, and Lena; is that correct?

5          A    Correct.

6          Q    And those six horses had heated water,

7 troughs full of water and hay available to them,

8 correct?

9          A    No.

10         Q    Turn to page 82.

11         A    I guess I need to ask, at the time I was

12 there, is that what you're asking?

13         Q    Is it correct that your report says:

14 "The yearling's Echo, River, Chance, and Fiona had a

15 heated water trough full of water and hay in the

16 lean-to."

17              I also observed two mares, Midnight and

18 Lena, in separate corrals with heated water -- heated

19 water trough full of water and hay on the ground; did

20 you write that?

21         A    I did.

22         Q    You wrote that shortly after making your

23 observations at the ranch, correct?

24         A    This search warrant is for the removal of

25 the horses, and that would have been on the 22nd.   So

Page 35

1          Q   (BY MR. TONDRE) And you're also reporting

2 as of February 16th you observed two mares, Midnight

3 and Lena, in separate corrals with heated water troughs

4 full of water, hay on the ground, you reported that on

5 February 16th, correct?

6               MR. LEBSACK:  Object to the form.

7               MR. SCHIMBERG:  Join.

8          A   Yes.

9          Q   (BY MR. TONDRE) You're saying that's not

10 true?

11         A   Am I saying that's not true?  No.

12         Q   That is true, isn't it?

13         A   Yes.

14         Q   They had water and feed on February 16th,

15 when you were there, correct?

16               MR. SCHIMBERG:  Object to form.  Go

17 ahead.

18         A   The -- yes.

19         Q   (BY MR. TONDRE) And later on -- I want to

20 understand, let me see if I can find it.  Page 69, the

21 third to the last paragraph, the last sentence, you

22 report, "While I was speaking to Swift about his horses

23 I was approached by Dr. Olds and she suggested I remove

24 all the horses from the ranch."

25         A   Yes.

Page 36

1        Q    Did she have reference to all 40 horses?

2        A    Yes.

3        Q    And what did -- what did she suggest be

4 done with the horses?

5             MR. SCHIMBERG:  Object to form.

6        Q    (BY MR. TONDRE) Be moved to her clinic?

7             MR. SCHIMBERG:  Go ahead.

8             MR. LEBSACK:  Same objection.

9        A    No.

10        Q    (BY MR. TONDRE) What did she suggest?

11        A    She didn't really suggest a location.

12 She just suggested I remove them.

13        Q    Did you tell Bobbi Priestly that Dr. Olds

14 was demanding and insistent that Park County seize all

15 of the horses?

16        A    Yes.

17        Q    And did -- why did you use the word

18 "demanding"?

19        A    In my perception, that's what she was

20 doing.

21        Q    And what did -- what did Bobbi Priestly

22 tell you to do?

23        A    She asked me what I wanted to do.

24        Q    And what did you tell her?

25        A    I had spoken to Dr. Horton, and I was not

Page 37

1 comfortable removing the horses at that time.

2          Q    Did she tell you to tell Dr. Olds to

3 leave?

4          A    No.

5          Q    Turn to page 87.  Specifically the last

6 sentence of the third to the last paragraph, Bobbi

7 Priestly states:  I advised Deputy Hardey to have

8 Dr. Olds leave with the horse they were -- they were

9 asked to remove under court order."

10          Do you deny she told you that?

11          A    I don't remember.

12          Q    Did -- now, when did you talk to

13 Dr. Horton, while you were on the ranch?

14          A    Yes.

15          Q    And what do you recall of that

16 conversation?

17          A    I -- I recall asking her what was going

18 on with Maggie and the horses.  And she said that she

19 had been out a week before, I believe, and that she'd

20 given a plan to Hatlee and Swift as to what they were

21 supposed to do with Maggie and at any point in time

22 that they felt Maggie's condition was not savable, that

23 they would humanely euthanize her.

24          Q    Now during the course of your visit, did

25 you have occasion to have input from any source

Page 40

1          A    No.

2               MR. TONDRE:   Mark that as the next

3 number.

4               (Whereupon, Deposition Exhibit

5 No. 67 was marked for identification by the

6 reporter.)

7               MR. TONDRE:   What is it?

8               THE COURT REPORTER:   67.

9          Q   (BY MR. TONDRE) I've handed you what has

10 been marked as Exhibit 67.   What is that?

11         A    A state notice of warning.

12         Q    And did you prepare that?

13         A    I did.

14         Q    And was this prepared pursuant to a

15 consensus decision among you, Bobbi Priestly,

16 Dr. Anderson, Dr. Britt, and Mr. Dutcher?

17         A    No.

18         Q    They had nothing to do with it?

19         A    No.

20         Q    They didn't know you were doing it?

21         A    Sergeant Priestly knew I was doing it.

22         Q    Did Mr. Dutcher, Dr. Britt, and

23 Dr. Anderson concur that the horses should be left

24 where they were?

25               MR. SCHIMBERG:   Object to form.   Go

Page 43

1                    MR. TONDRE:  Okay.  Exhibit No. -- what

2  is it?

3                    THE COURT REPORTER:  It's 69.

4                    MR. TONDRE:  69.

5                    MR. LEBSACK:  Really?  No.  It's 68.

6                    THE COURT REPORTER:  Sorry.  It's 68.

7                    THE DEPONENT:  This one?

8                    MR. TONDRE:  Yeah.

9                    THE DEPONENT:  68.

10            Q    (BY MR. TONDRE) What is Exhibit 68?

11            A    It is -- I'm going to say a contract that

12  Sergeant Priestly drew up really fast, actually

13  not really fast.  She was going to her substation when

14  she drew it up, stating that the horses would be

15  removed to a secure location for safety and that all

16  parties agreed.

17            Q    What was the safety issue that caused

18  Exhibit No. 68?

19            A    I felt the horses -- it was in the best

20  interests of the horses to be removed, diffused (sic)

21  the situation with concerned citizens, and put them in

22  a location that nobody knew.

23            Q    What were you fearful of?

24            A    I was -- I just wanted to diffuse the

25  situation, the threats, the phone calls.  I really

Page 44

1 wanted the horses just to be in a location where I knew

2 nothing would happen.

3          Q    Who selected the location?

4          A    I was asked by Kirstin LeBeau if it would

5 be all right if she take the horses.  I then called

6 Sergeant Bobbi Priestly and asked if that's something

7 we could do.  Mr. Swift and Mr. Hatlee also agreed

8 Ms. LeBeau's location would be suitable.  And then we

9 all just kind of made that decision, Sergeant Priestly

10 agreed.

11         Q    Were you fearful for the safety of

12 Mr. Swift and Mr. Hatlee?

13         A    Well, of course.  But my main concern was

14 the horses.

15         Q    Were there threats to kill the horses?

16         A    I do not recall.

17         Q    Well, what -- what was it that -- you had

18 a 30-day agreement in place, right?

19         A    Yes.

20         Q    Three days later, you present -- you ask

21 Hatlee and Swift to agree to move the horse to an

22 undisclosed location, right?

23         A    Yes.

24         Q    What was it -- it had to be something

25 pretty serious to result in moving those horses under

Page 45

1 those circumstances, didn't it?

2          A    Well, the amount of phone calls the

3 sheriff's office was getting, the amount of phone calls

4 Ron Swift was getting, and I just really wanted to

5 diffuse the situation.  There was no one phone call

6 that asked -- you know, that prompted me to move them.

7 I just really wanted them out of Park County or not out

8 of Park County but, you know, in a -- a disclosed

9 location.

10          Q    Were you fearful of criminal violence?

11          A    It crossed my mind.

12          Q    And what caused that to cross your mind?

13 I understand you're saying diffuse the situation.  I

14 want to understand what the situation was you were

15 diffusing.

16          A    The phone calls, the threats.

17          Q    And who was receiving the phone calls and

18 the threats?

19          A    All parties involved.

20          Q    That would be who?

21          A    The Park County Sheriff's Office, Ron

22 Swift at his work.

23          Q    Do you recall going to the Echo Valley

24 Ranch and advising Mr. Swift, Mr. Hatlee, and Helen

25 Cook that the news media had become involved and they

Page 49

1        A    Yes.

2        Q    Did you hear any discussion -- how often

3 did you go to the sheriff's office?

4        A    Every day.

5        Q    Did you hear any discussion about

6 prosecuting these threatening vigilantes?

7             MR. LEBSACK:  Object to form.

8             MR. SCHIMBERG:  Object to form.  Go

9 ahead.

10       A    No.

11       Q    (BY MR. TONDRE) Does Park County kind of

12 like those westerns your husband watches?

13            MR. SCHIMBERG:  Object to form, Brice.

14            MR. LEBSACK:  Object to form.

15       A    I don't have a comment on that.

16       Q    (BY MR. TONDRE) All right.  Did you make

17 any visits to Echo Valley Ranch to check the horses

18 between February 16th and February 19th when they were

19 removed to the LeBeau place?

20       A    No.

21       Q    Did the condition of the horses change

22 between February 16th and February 19th?

23       A    No.

24       Q    Was it safe to transport them?

25       A    Safe to transport them?  Yeah.  Yes.  It

Page 50

1 was safe to transport them, although Chance was not

2 doing well at that time.

3          Q    And what steps were taken to protect

4 Chance during the transfer?

5          A    I did not transport them.  Mr. Hatlee

6 transported them.  I followed behind them.  Mr. Swift

7 and Mr. Hatlee loaded them into their trailer.  They

8 had full control of the transportation of their animals

9 and the loading of their animals.  I just observed and

10 followed them to the secure location.

11          Q    Did Mr. Hatlee ride in the trailer with

12 Chance?

13          A    I don't remember.

14          Q    On the issue of transport, was -- was

15 Bear fit for transport when Ashleigh Olds transported

16 him?

17               MR. LEBSACK:  Object to form.

18               MR. SCHIMBERG:  Join.  Go ahead.

19          A    My perception, no.

20          Q    (BY MR. TONDRE) You did become aware,

21 didn't you, that the horse fell while being

22 transported?

23          A    Yes.

24          Q    And that Ashleigh Olds took no steps to

25 prevent him from falling?

Page 56

1          A    No.

2          Q    Have you since learned what her

3 reputation is?

4          A    No.

5          Q    While the horses were at LeBeau's place,

6 did you make any visits?

7          A    No.

8          Q    How long were the horses at LeBeau's

9 place, three days?

10         A    Roughly.

11              (Whereupon, Deposition Exhibit

12 Nos. 69 and 70 were marked for identification by

13 the reporter.)

14         Q    (BY MR. TONDRE) What is Exhibit No. 69?

15         A    A search warrant.

16         Q    And does it have attached to it your

17 affidavit?

18         A    Yes.

19         Q    And what is Exhibit 70?

20         A    A search warrant.

21         Q    And does it have attached to it your

22 affidavit?

23         A    Yes.

24         Q    All right.  Is the affidavit with respect

25 to both warrants identical?

Page 66

1 operation?

2          A    No.

3          Q    The horses you were raised with, the

4 three, what were they used for?

5          A    Roping, 4H, family use.

6          Q    Sort of pets?

7          A    Yep.

8               MR. SCHIMBERG:   I thought you were a

9 barrel racer all this time.

10              THE DEPONENT:   I tried.

11              MR. SCHIMBERG:   Did you?

12              THE DEPONENT:   I did.

13          Q   (BY MR. TONDRE) How was it?

14          A    It didn't pan out very well.

15          Q    Wasn't your cup of tea?

16          A    Nope.

17          Q    You prepared the seizure application,

18 correct?

19          A    Yes.

20          Q    And it was approved by Priestly, correct?

21          A    No.

22          Q    You also reviewed -- well, did you review

23 the application for the two warrants with anybody?

24          A    Yes.

25          Q    Who?

Page 67

1           A    Steve Sullivan.

2           Q    Did you testify in the motions hearing

3 held on December 3, 2012, that you reviewed the search

4 warrant with your supervisor, Officer Priestly?

5           A    Yes.

6           Q    Was that false?

7           A    I think the term review is false.

8           Q    It's your word.

9           A    Huh?

10          Q    It's your word.

11          A    Yeah.  She was advised that I was doing

12 the search warrants.  But the actual review of the

13 search warrants before I could give it to a judge was

14 reviewed by Steve Sullivan.  And I can't exactly

15 remember if she looked them over or not.  But I do know

16 Steve Sullivan approved them to go to the judge.

17               So if my testimony says yes, then yes,

18 she did.  But I cannot remember.  Because she pretty

19 much oversees everything I do.

20          Q    Did Steve Sullivan make any suggestions

21 to you?

22          A    If he did, it was probably grammar.

23 Usually, I am sent back to the sheriff's office to fix

24 something and I don't remember what, if any.

25          Q    Now, at the time that you reviewed the

Page 69

1          Q    Did he ask you any questions?

2          A    No.

3          Q    Did he have a file that he was reviewing

4 in connection with the materials you presented him?

5          A    No.

6          Q    What did you present him, the affidavit?

7          A    Both.  The search warrant and the

8 affidavit.

9          Q    Anything else?

10         A    No.

11         Q    Did the -- were the concerned -- did it

12 come to your attention the concerned citizens were

13 critical of Mr. Sullivan's handling of the case?

14         A    I don't think so, no.

15         Q    Did there come a time when Mr. Sullivan

16 was taken off the case and replaced by Mr. LeDoux?

17         A    I don't know.

18              MR. SCHIMBERG:  Object to form,

19 foundation.

20         Q    (BY MR. TONDRE) What involvement did you

21 have with the case after obtaining the search and

22 seizure warrants?

23         A    What involvement?

24         Q    Yes, ma'am.

25         A    I responded with Sergeant Priestly and

Page 70

1 Undersheriff Gore to LeDoux's (sic) residence.   I

2 helped load the horses up; myself and Sergeant Priestly

3 took the horses to the facility.  I think it's Harmony

4 HorseWorks, I can't -- I can't remember the name of it.

5 I helped unload.  I helped put the horses in their

6 stalls.  And then after that, we left.

7         Q   And after that, what involvement did you

8 have with the case?

9         A   After I was told to return the horses, I

10 got a trailer; I myself went to that facility, loaded

11 both -- or both -- all of the horses up and returned

12 them back to their owners.  And then after that, I was

13 in charge of welfare checks every Wednesday until I was

14 removed.  And then after that, nothing.

15         Q   Did -- did it come to your attention that

16 the concerned citizens were critical of the fact that

17 your visits were announced rather than unannounced?

18         A   Yes.

19         Q   And who were those concerned citizens

20 that --

21         A   I do not know.

22         Q   Did you find that offensive that they

23 were concerned about you announcing yourself?

24         A   No.

25         Q   Every Wednesday you went to Echo Valley

Page 81

1          Q    Now, going back to February 16th, did you

2   have contact with Dr. Olds after she left the ranch?

3          A    I requested -- or -- I don't.  I need to

4   refer to my report.

5          Q    Please do.

6               MR. SCHIMBERG:  You bet.

7          Q    (BY MR. TONDRE)  Page 70.

8          A    Thank you.  Yes, she sent me an email on

9   Bear and what she had to do to get him to stand in the

10  trailer.  And her perception of the whole matter.  But

11  I did not verbally speak to her, just an email.

12         Q    In your report on page 70, it says that:

13  "At approximately 4 p.m., I received an email from

14  Dr. Olds."

15              According to Dr. Olds, Bear had fallen

16  down in the trip.  "Dr. Olds' email reads:"

17              MR. SCHIMBERG:  Yeah, you lost me there.

18              THE DEPONENT:  Right here.

19              MR. LEBSACK:  Page 70.

20              MR. SCHIMBERG:  Oh, okay.

21              MR. TONDRE:  Page 70.

22              MR. SCHIMBERG:  Yeah.

23         Q    (BY MR. TONDRE)  Is the complete content of

24  Dr. Olds' email reported in your -- set forth in total

25  in your report?  It says:  See -- "See attached

Page 93

1                    EXAMINATION

2 BY MR. LEBSACK:

3        Q    Ready?  My name is John Lebsack, I

4 represent Dr. Olds.  And the first thing I want to try

5 to do is go through this Exhibit 66 which has the --

6 you know, the sheriff's department documents and try to

7 get some more information about the dates of when you

8 prepared various pages and just the process of how you

9 do this.

10             So the first pages I'd like you to look

11 at in Exhibit 6 -- 66, are pages 66 through 77.  And

12 all of those pages have a date of report in the upper

13 right-hand corner that says 2/16/2012.  Do you see

14 that?

15       A    Yeah.

16       Q    But if you look back at for example, page

17 77, you're talking about events that happened after

18 that because you mention something that happened on

19 March 1st.  So how is -- how are these dated and when

20 do you actually prepare this in terms of, you know, the

21 events you're discussing?

22       A    The time in which I open the report or --

23 the date of the offense is the date of report and I

24 start the report then.  And the reason why there are

25 different dates on different pages is because I'm still

1 writing the report.

2              And then at the end of it, it says

3 further action may follow, and that's when I finish the

4 report; but the date of report is 2/16 and that's when

5 I initiated or opened it.

6         Q    Okay.  Is there a date that actually

7 shows when you typed this, or do you type it as you go?

8         A    I type it as I go.

9         Q    All right.  So this is --

10        A    It's like an everyday thing.

11        Q    So this is on a computer?

12        A    Yes.

13        Q    It's a document on your computer?

14        A    Yes.

15        Q    And you from day to day will make --

16        A    I add --

17        Q    -- additions to it --

18        A    Yes.

19        Q    -- until you reach the point you finish

20 it and they you say --

21        A    Further action.

22        Q    -- nothing further -- or further action

23 may follow?

24        A    Yeah, correct.

25        Q    Okay.  So these pages 66 through 77, you

Page 95

1 would have finished that on March 1, 2012, or some day

2 after that?

3          A    Yes.

4          Q    Okay.  Now, take a look at pages 103

5 through 111.  Are also pages of a report that you

6 prepared?

7          A    Yes.

8          Q    And this has a date of report 2/23/2012.

9 Is there a reason why this is dated that date rather

10 than the original?

11         A    Because it's a supplement.  Where it says

12 Case Report No. 2012000142.5.  The date of that report

13 is the 23rd.  It's when I opened -- I don't even know.

14 This is the -- I think this is the request to amend

15 the -- to add a charge and also bonding.  And that 2/23

16 is the date in which this report started.

17         Q    So you start --

18         A    And everything after that, is -- if

19 there's dates that change, then that's why, but it's a

20 supplemental to the original report.

21         Q    So these pages 103 through 111, these

22 would go through at least April 25, 2012?

23         A    Yeah.

24         Q    And bear with me.  There's another one.

25 Page 94 through 101.

1        A    It's the same.

2        Q    This is also a supplemental report?

3        A    Yeah, point 3.

4        Q    What's the point mean?

5        A    Well, the initial report is actually the

6 2012000142.  And every report pulled after that, is

7 point 1, point 2, point 3.  And those are all

8 supplements, because that was the initial case holder.

9 So anybody who has a part in the case has to pull

10 supplement and attach it to that initial report.

11       Q    So if Sergeant Priestly she would add

12 a --

13       A    She did add point 1.

14       Q    And the next one you did?

15       A    The next person would be point 2.

16       Q    We talked over each other, but you said

17 exactly what I was trying to guess -- to ask.  So these

18 pages 94 through 101 would be information that you

19 entered covering the period February 22nd through

20 March 17th?

21       A    Yes.

22       Q    And then at page 114, that is your next

23 report?

24       A    Yes.

25       Q    And that one's called point 6?

Page 97

1          A    Correct.

2          Q    And your report -- the point 6 report

3 goes from pages 114 through 116, or does it include

4 117?

5          A    It includes 117, but there's nothing on

6 it.

7          Q    Okay.  And then there's one more on page

8 118, that's point 7, that's also a report by you?

9          A    Correct.

10         Q    And to the best of your knowledge, are

11 those all of the reports that you did?

12         A    To the best of my knowledge, yes.

13         Q    Let me ask you some questions as we go

14 through some of these pages.  Look at page 67, please.

15 Right after the name Randall Hatlee in bold, and it

16 says:  "While Hatlee and Dr. Olds were trying to get

17 the colt named Bear a/k/a Little Big Man, bay, dark

18 brown in color, to stand on his feet, I asked Corporal

19 Plutt to take pictures of all the horses on the

20 property."

21              Why did you do that?

22         A    Because I was -- why did I do that?

23 Because I was only person and I needed help's.  So I

24 asked --

25         Q    So you --

Page 100

1        Q    And then you went upstairs to check on

2 Maggie?

3        A    Yes.

4        Q    And Dr. Olds came up there too?

5        A    Yes.

6        Q    And then from upstairs where did you go?

7        A    I don't remember.

8        Q    Did you -- you did look at the horses in

9 the pens outside by the door?

10       A    Yes.

11       Q    And that was after you saw Maggie, right?

12       A    Yes.

13       Q    At what point was there the phone call to

14 Dr. Horton?  It was after you saw Maggie, right?

15       A    Yes, definitely after I saw Maggie, but

16 I'm not sure if it was before I went and looked at the

17 other horses or after.

18       Q    Did you speak personally to Dr. Horton?

19       A    I did.

20       Q    And based on your conversation with her,

21 was it your impression that she was treating all the

22 horses that you looked at?

23       A    Yes.

24       Q    So your decision that day was based on

25 your assumption from talking to Dr. Horton that the

Page 101

1 horses that you had been looked -- looking at were

2 under the care of Timberline vets?

3          A    It did play a factor, yes.

4          Q    And did you report that -- that fact to

5 Sergeant Priestly?

6          A    I did.

7          Q    And is it fair to say that when you and

8 Priestly talked back and forth that your discussion was

9 you had the -- the vets at Timberline who were

10 treating, and you had a conflicting opinion from

11 Dr. Olds about the welfare of horses?

12          A    Yes.

13          Q    And you didn't know which -- which way

14 you should go because you had two conflicting opinions

15 from vets?

16          A    Yes.

17          Q    And was there discussion about getting --

18 I'm going to use a tie breaker, but what I mean is to

19 get another opinion from a vet in order to decide which

20 way to go?

21          A    Not at that time.

22          Q    Was there a discussion later --

23          A    Yes.

24          Q    -- about that?  When did that happen?

25          A    Not necessarily which way to go.  I

Page 103

1                Was it your understanding from

2 talking to Dr. Horton that the only horse that she

3 did actually treat at Echo Valley among the ones

4 that you looked at was Maggie?

5            A    At what -- what conversation with

6 Dr. Horton?

7            Q    The phone conversation that day, the 16th

8 of February, while you were there at the scene?

9            A    She --

10           Q    Do you want me to rephrase it?

11           A    Yes, please.

12                MR. SCHIMBERG:   Yeah.

13           Q   (BY MR. LEBSACK) When --

14           A    Please.

15           Q    When you talked on the phone with

16 Dr. Horton from Echo Valley, on the 16th, was it your

17 understanding that the only horse that she'd actually

18 been out to see and treat in person was Maggie?

19           A    No.

20           Q    What was your understanding?

21           A    That she'd been out to see all of them.

22           Q    And was this based on what Dr. Horton

23 told you?

24           A    Yes.

25           Q    Did Mr. Swift say anything along those

1 lines?

2          A    I don't remember.

3          Q    What about Mr. Hatlee?

4          A    I don't remember.

5          Q    Was it your impression that what Dr. Olds

6 was saying about trying to take some action about the

7 horses there at the ranch, Echo Valley on the 16th,

8 that was because of concern for the welfare of the

9 horses?

10              MR. TONDRE:  Objection.  Form.

11         A    Let me see if I understand what you are

12 saying.

13         Q    (BY MR. LEBSACK) Did it appear to you that

14 what she was asking for was because of a concern she

15 had for the horses?

16         A    Yes.

17         Q    And she had told you that it appeared to

18 her that the horses had been mistreated?

19         A    Yes.

20         Q    And that was your belief too, wasn't it?

21         A    I don't know if "mistreated" would be the

22 word I would use.

23         Q    What would you use?

24         A    Neglected.

25         Q    Because of their skinny condition?

Page 105

1          A    Yes.

2          Q    Anything about their condition that you

3 felt represented neglect?

4          A    No.

5          Q    What about the conditions of the stall

6 that Bear was in?

7               MR. TONDRE:  Objection.  Form.

8          A    Yeah.  There was lots of muck where Bear

9 was.

10          Q   (BY MR. LEBSACK) Did you think that was

11 neglect at that point?

12          A   Well, the fact that he was lying in it

13 and it was caked on him, yes.

14          Q   You were asked some questions about an

15 email, so let me show you a document.  Can we mark that

16 one.

17               (Whereupon, Deposition Exhibit

18 No. 71 was marked for identification by the

19 reporter.)

20               MR. TONDRE:  Is it Exhibit 71?

21               MR. SCHIMBERG:  Sorry, John.  Brice, this

22 is what I was talking about, this is still a part of

23 the report, it just came in a different section.

24               MR. LEBSACK:  This is -- I take it back.

25 I've handed you the wrong one, give me that one back.

Page 106

1 I've given you the wrong email.  Sorry.  I didn't mean

2 to give you that one.

3                MR. SCHIMBERG:  Which one did you want to

4 give us?

5                MR. LEBSACK:  I wanted to give you the

6 first one.  This one.

7                (Whereupon, Deposition Exhibit

8 No. 71 was re-marked for identification by the

9 reporter.)

10                MR. LEBSACK:  That's the one.

11                MR. SCHIMBERG:  You want to go to court

12 reporting school?

13                THE DEPONENT:  No.

14         Q   (BY MR. LEBSACK) Is Exhibit 71 the email

15 that you quote in your report?

16         A   Yes.

17         Q   And is Exhibit 71, the second and third

18 pages, is that the attached document to the email that

19 you reference in your report?

20         A   Yes.

21         Q   Could you turn back to Exhibit 66.  And

22 turn to page 74.  Toward the bottom of that, you say,

23 like on February -- it's the last paragraph:  "On

24 February 22 at approximately 10 a.m. I called

25 Dr. Horton on the telephone."

Page 107

1          Do you see that?

2     A    Yes.

3     Q    If you look at page 94, is page 94, 95,

4 and 96 a transcript of that phone call?

5     A    Yes.

6     Q    And according to your note, Dr. Horton

7 told you, this is on the bottom of page 74, Dr. Horton,

8 I'm reading from it, quote, Dr. Horton felt the horses

9 were left out to pasture for too long without being

10 supplemented with other food and that is how they got

11 skinny, end quote.

12          That statement is based on the contents

13 of this phone conversation, right?

14     A    Yes.

15     Q    And then it goes on to say, you say, in

16 your report, quote, at that point, I made the decision

17 to write a warrant to seize the six horses and hay

18 samples from Echo Valley Ranch.  I will be charging

19 Swift and Hatlee with cruelty to animals.  Each party

20 will be charged with three counts based on the three

21 horses that each owned, close quotes.

22          So does that indicate that your decision

23 to issue the warrants and to issue charges was made on

24 February 22nd?

25     A    Yes.

Page 108

1          Q     And that decision was based on the

2  information that Dr. Horton gave in that phone call?

3          A     Yes.

4                MR. SCHIMBERG:   Object to form by the

5  way.

6          Q     (BY MR. LEBSACK) So it was based in part

7  on what Dr. Horton gave you in that phone conversation?

8          A     Yes.

9          Q     But in your analysis was -- was the key

10  fact that Dr. Horton stated her opinion that the horses

11  had been left too long in the pasture?

12          A     My own feelings were of -- that they were

13  left to pasture too long.  And after a licensed vet

14  concurred with my personal feelings on the situation,

15  that is when I decided to.

16          Q     To issue charges?

17          A     Yes.

18          Q     Is that the right term, issue charges?

19          A     Uh-huh.

20          Q     Yes?

21          A     Yes.

22          Q     And then you wrote up the paperwork to --

23  for the charges; is that right?

24          A     Yes.

25          Q     And if you look at page 75, it looks like

Page 109

1 you actually delivered the summons to Mr. Swift on

2 February 23rd?

3          A    Yes.

4          Q    And if you look at page 76, it looks like

5 Mr. Hatlee came to the substation and picked up his

6 summons on February 24th?

7          A    Yes.

8          Q    They're -- at that time was only charges

9 for the six animals and not including Bear; is that

10 right?

11          A    Correct.

12          Q    Do you know when the additional charge

13 was added?

14          A    I don't.  I'd have to refer to my report

15 and pray that it's in there.

16          Q    But there was a supplemental --

17          A    Yes.

18          Q    -- summons that was issued to include

19 Bear?

20          A    Yes.  Well, it wasn't a summons because I

21 would have had to rewrite the summons to Swift and

22 Hatlee -- or actually Hatlee.  It was just an amendment

23 to the court that they add it to the summons.

24          Q    Okay.  But the sequence was

25 February 22nd, you make the decision to -- to file

Page 110

1 charges on the six horses, you actually deliver those

2 summons on the 23rd and the 24th; and then sometime

3 after that, you decide that you had additional

4 information so you are going to add a charge based on

5 Bear?

6          A   Correct.

7          Q   And that additional charge on Bear, that

8 information included information that Dr. Olds gave you

9 about Bear?

10         A   Correct.

11         Q   You were asked a question about Bear and

12 his condition for travel.  And I think you said that

13 you don't think he was ready to travel or fit to

14 travel.  Is that based on information that Dr. Olds

15 gave you about what condition he was in when he arrived

16 at the hospital?

17         A   Yes.

18         Q   When he left, when Bear left, you thought

19 it was okay for him to be transported; didn't you?

20         A   Yes.

21         Q   When he left the ranch, I mean?

22         A   Yes.

23         Q   I think you said that you had one and

24 only one conversation with Dr. Olds; is that right?

25         A   Um --

Page 112

1 later?

2          A    Yes.

3          Q    Okay.  And that's the sum total of all

4 your communication with Dr. Olds with these horses?

5          A    All my communication, yes.

6          Q    Look at page 104 in Exhibit 66, if you

7 would please.  And on this page and several following

8 pages, you quote from the email that Dr. Olds sent

9 you -- sent you which is Exhibit 71 now; is that

10 correct?

11          A    Yes.

12          Q    So the section that reads:  "The Olds

13 statement reads:"  And then you've got a section of

14 bullet points, what that is you've taken the -- the

15 attachment to the email, and you basically broke it

16 down into bullet points?

17          A    Yes.

18          Q    Was that just to clarify --

19          A    Yes.

20          Q    -- each of the points.  Let me ask you

21 about some of these statements that you quoted.  I'll

22 just start with the third bullet, "The gelding," that

23 would refer to Bear, correct?

24          A    Yes.

25          Q    "-- was located at Echo Valley Ranch in

1 Bailey at the time of seizure."  That's correct as far

2 as you know, right?

3          A    Yes.

4          Q    The next statement:  "On arrival, the

5 gelding was laying down in a very dark and filthy

6 stall."

7                Based on your observations, do you agree

8 with that statement?

9          A    Yes.

10          Q    The next statement:  "He did not appear

11 able to rise on his own despite encouragement."  Do you

12 agree based on your own observations with that

13 statement?

14          A    I wasn't present when they tried to stand

15 him up.

16          Q    When you saw Bear, he was down?

17          A    Yes.

18          Q    But nobody was trying to get him up at

19 that point?

20          A    No.

21          Q    So the efforts to get him up occurred

22 after you'd gone up to see Maggie?

23          A    Yes.

24          Q    And the next bullet point says: "The

25 footing in the stall was thick with manure, urine and

Page 114

1 mud."  Based on your observations, is that correct?

2          A   Yes.

3          Q   The next bullet point: "He was caked in

4 manure and mud."  Based on your observations, is that

5 correct?

6          A   Yes.

7          Q   The next statement is:  "His body

8 condition score was 1, slash, 9 on the Henneke scale."

9 Based on your observations, do you agree with that?

10         A   I would say 1.5, but, yes.

11         Q   Next bullet point is:  "I estimate his

12 weight at 500 pounds."  Based on your observations, is

13 that correct?

14         A   I have no idea.

15         Q   You did not estimate his weight, right?

16         A   No.

17         Q   If you could flip to the next page, which

18 is 105.  About the middle of the way down, it says:  At

19 this time my professional assessment is that the

20 gelding was suffering from extreme malnutrition and

21 starvation.

22             I'm going to ask you a slightly different

23 question.  Was it your observation that -- that Bear

24 was emaciated?

25         A   Yes.

Page 115

1          Q    And that was based on what you saw on

2 February 16th?

3          A    Yes.

4          Q    The next statement is in this bullet

5 point:  "He is not showing any signs of botulism or any

6 neurological disorder."

7               Do you have any observations or -- of

8 your own on that issue?

9          A    I do not.

10              MR. SCHIMBERG:  Object to form.

11         A    I'm not a vet.

12              MR. SCHIMBERG:  Form and foundation.  Go

13 ahead.

14         Q    (BY MR. LEBSACK) Do you have expertise in

15 observing botulism?

16         A    No, no.

17         Q    The next statement is:  "He is extremely

18 small for his age, likely as a result of malnutrition."

19 Based on your observations, do you agree with that?

20              MR. TONDRE:  Object to foundation.

21         A    I don't know what his age was at the time

22 exactly.  I do agree on the small.  But not sure on his

23 age.  Every horse is different, every breed, for size.

24         Q    (BY MR. LEBSACK) Do you agree with the

25 statement that his small size is likely as a result of

Page 116

1 malnutrition, or do you know?

2             MR. TONDRE:  Object to foundation.

3        A    Define "size," height size or size in

4 general?

5        Q   (BY MR. LEBSACK) Size in general?

6        A    Yes.

7        Q    Skip down several of them, and the next

8 bullet point I want to ask you about says:  "It is

9 worth noting that during the examination."  Do you see

10 that?

11       A    Uh-huh.

12       Q    It says:  "It is worth noting that during

13 the examination of the property, an adult female horse

14 was recumbent in the upper area of the barn."  Was that

15 also your observation?

16       A    What's "recumbent" mean?

17       Q    I think it means lying down.

18       A    Yes.

19       Q    And that is only because I know what a

20 recumbent bicycle is.

21             MR. SCHIMBERG:  That's how I figured it

22 out too, yeah.

23       Q   (BY MR. LEBSACK) The next bullet point

24 says:  "This was a black mare."  Is that what you saw

25 Maggie was?

Page 117

1          A    Yes.

2          Q    The next one:  "She was roughly a body

3 score condition of a 1, slash, 9."  Based on your

4 observation, is that an accurate body score?

5          A    Yes.

6          Q    The next bullet point says:  "She has

7 been down since Saturday, five days, per the owner."

8 Did you hear that statement made?

9          A    Yes.

10         Q    And who made that statement?

11         A    I don't remember which one.

12         Q    Mr. Hatlee?

13         A    Hatlee -- one of them.  Mr. Hatlee or

14 Mr. Swift.  I do not recall which one.

15         Q    Flip the page to 106.  First bullet point

16 says:  "When we initially arrived, Ron Swift indicated

17 to the Animal Control Officers that the horse was

18 dead."  Did you hear that?

19         A    No.

20         Q    Do you know if anybody else heard that?

21              MR. SCHIMBERG:  Object to form.  Go

22 ahead.

23         A    I don't even know what horse you're

24 talking about.

25         Q    (BY MR. LEBSACK) Let me flip -- flip down

Page 118

1 about six bullet points where it says:  The mare was

2 covered in sever -- I think that is supposed to mean

3 severe pressure sores on her face, shoulders, and hips.

4          Did you observe any pressure sores --

5     A   Yes.

6     Q   -- on Maggie?

7     A   Yes.

8     Q   In the areas of her face, shoulders, and

9 hip?

10    A   Yes.

11    Q   Next bullet point says:  "She could

12 paddle her legs and struggle to move."  Did you observe

13 Maggie do that?

14    A   Yes.

15    Q   The next bullet point says:  "But could

16 not even get into a sitting position."  Is that what

17 you observed?

18    A   Yes.

19    Q   Next bullet point talks about tail tone

20 and eyelid tone.  Are you qualified to say anything

21 about those findings?

22    A   No.

23    Q   Next bullet point says:  "The owner

24 claimed that she was being treated for either tic

25 paralysis or botulism."  Did you hear the owner say

Page 119

1 that?

2          A    I don't recall.

3          Q    Next bullet says:   "I asked what the

4 treatment was, and he," I think that refers to the

5 owner, indicated that there was no treatment."

6                Did you hear either Mr. Hatlee or

7 Mr. Swift make that statement?

8          A    I don't recall.

9          Q    Next bullet point is:   "He claimed to be

10 rolling the mare every two hours from side to side."

11 Did you hear either Mr. Hatlee or Mr. Swift say that?

12         A    Yes.

13         Q    Skip down to the last four.   There's one

14 that says:   "There were also two other adult horses on

15 the property that were extremely thin -- extremely

16 thin."  Did you yourself observe two other adult horses

17 that were extremely thin?

18         A    Yes.

19         Q    These would be in the pens outside?

20         A    Yes.

21         Q    And this -- the next bullet point says:

22 "One was a sorrel and a white paint mare."  Is -- were

23 those the horses you saw?  I'm sorry, I said "horses,"

24 plural --

25         A    Yes, yes.

Page 121

1 the ice?

2          A    I don't remember.

3          Q    Did you hear anybody make any comments

4 about the feeding schedule that day?

5          A    No.  I don't remember.

6          Q    The last bullet point on page 106 says:

7 "I would grade her body condition score as 1.5 out of

8 9."

9          A    Yes.

10         Q    You would agree with that?

11         A    Yes.

12         Q    Keep going on the next page.  Sorry.

13              MR. SCHIMBERG:  You're fine.

14         Q    (BY MR. LEBSACK) It says:  "There was

15 another black mare in another pen that also had frozen

16 water, no food in her pen, and a body condition score

17 of 1.5 out of 9."

18              Let me ask you about that statement.  Do

19 you know which black mare --

20         A    Yes.

21         Q    -- was being referred to?

22         A    Yes.

23         Q    Is that Midnight?

24         A    Yes.

25         Q    And was she in a pen by herself?

Page 122

1          A    Yes.

2          Q    Do you remember, did she have frozen

3 water?

4          A    I don't remember.

5          Q    Do you remember that she had no food in

6 her pen?

7          A    I don't remember.

8          Q    Do you agree with this body condition

9 score for Midnight of 1.5?

10         A    Yes.

11         Q    Then the next bullet point says:  "In a

12 separate pen there were four yearling foals."  Was that

13 your observation?

14         A    Yes.

15         Q    And the next bullet point says:  "There

16 was a Chestnut, a Grullo; a Bay and a Palomino of

17 unknown sexes."  Was that your observation?

18         A    Yes.

19         Q    The next bullet point says:  "They all

20 ranged from 1.5 to 2 out of 9 body condition score."

21              Do you agree with that?

22         A    Yes.

23         Q    Next bullet point says:  "They did not

24 have any feed in their pen and their water tank was

25 frozen."  Was that your observation?

Page 123

1          A    I don't recall.

2          Q    Next statement:  "In my opinion these

3 horses all appear to be suffering from starvation and

4 malnutrition."

5               Do you agree with that?

6               MR. TONDRE:  Objection.  Foundation.

7          A    Yes.

8          Q    (BY MR. LEBSACK) Next bullet point says:

9 "The owner did not seem to acknowledge the severity of

10 the problem."  I'm just going to stop right there.  But

11 the bullet point goes on, but I just want to ask you

12 about that, "The owner did not seem to acknowledge the

13 severity of the problem."  Do you agree with that

14 statement?

15         A    No.

16         Q    Who was it that you believe did

17 acknowledge the severity of the problem?

18         A    They both did.  Hatlee and Swift.

19         Q    And is that the reason why you decided to

20 issue the notice of warning to give them another 30

21 days?

22         A    No.

23         Q    Well, did you think they were going to

24 try to improve the condition of the horses during that

25 30 days?

Page 124

1          A    Did I think they were going to?  Yes.

2          Q    But you later got additional information

3 and decided that you needed to seize the horses?

4          A    Yes.

5               MR. SCHIMBERG:  John, you are entitled to

6 ask questions; but the longer you go, the more homework

7 that Mr. Tondre is doing over there.

8               MR. TONDRE:  He's digging a nice hole,

9 I'll say that.  I'm going to shovel the dirt on top of

10 it.

11              MR. SCHIMBERG:  They're ganging up on us,

12 Cindy.

13              MR. TONDRE:  Seems to be a lot of gangs

14 around.

15              MR. SCHIMBERG:  Especially up here.

16              MR. TONDRE:  Vigilantes.

17              MR. SCHIMBERG:  Are there gangs up here?

18              THE DEPONENT:  I don't know.  I hope not.

19 I think there's teenagers that want to think they are.

20              MR. SCHIMBERG:  Yeah, pull down the

21 trousers do.

22              THE DEPONENT:  Yes.

23          Q    (BY MR. LEBSACK) Let me ask you about your

24 notice of warning, which is Exhibit 67.  You say in

25 there that if the condition of the horses did not

Page 125

1 improve -- well, strike that.  Let me ask it a

2 different way.

3             Is it correct to read this, that if the

4 horses' conditions stayed the same, that you would

5 charge them?

6          A   Yes.

7          Q   So these horses as of the 16th were in an

8 unacceptable condition to you?

9          A   Yes.

10          Q   Maggie and the six that are referenced?

11          A   Yes.

12          Q   The hay samples that you took, you said

13 the hay was on a trailer?

14          A   Yes.

15          Q   And --

16              MR. SCHIMBERG:  Let me object to the

17 characterization, but go right ahead.

18 Characterization.

19          Q   (BY MR. LEBSACK) You said the trailer was

20 parked next to a house?

21          A   Uh-huh.  Yes.

22          Q   And I think you said there were square

23 bales?

24          A   Yes.

25          Q   And you talked about size, but I'd like

# Exhibit C

Appellate Case: 16-1065   Document: 01019641230   Date Filed: 06/20/2016   Page: 145

Page 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.
--------------------------------------------------------
### DEPOSITION OF BOBBI PRIESTLY
June 24, 2014
--------------------------------------------------------

                    Deposition location:
                    825 Clark Street Road
                    Fairplay, Colorado

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226

                          For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202

                          For the Defendant, Olds.

Page 4

1                    BOBBI JO PRIESTLY,

2 being first duly sworn to state the truth, the whole

3 truth, and nothing but the truth, testified under oath as

4 follows:

5                    EXAMINATION

6 BY MR. TONDRE:

7           Q     State your name, please, ma'am.

8           A     Bobbi Jo Priestly.

9           Q     And your occupation?

10          A     I'm the sergeant of the Animal Control

11 Division for Park County --

12          Q     And how long -- I'm sorry.

13          A     I'm sorry.  -- for the Park County

14 Sheriff's Office.

15          Q     How long have you held that position now?

16          A     It will be 13 years in January, so about

17 12 and a half years.

18          Q     What's your educational background?

19          A     Just high school.  I don't have any

20 college education, sir.

21          Q     And where did you graduate from high

22 school?

23          A     South Park High School here in Fairplay.

24          Q     And when did you graduate?

25          A     1983.

Page 7

1              A    I'm sorry?

2                   (Phone ringing.)

3                   MR. SCHIMBERG:   It's a good reminder,

4 isn't it?  Just for the record, Mr. Swift's phone is

5 going off; and now we're all fixing our phones.

6              Q    (BY MR. TONDRE) In 2012, who were the

7 animal control officers in addition to yourself?

8              A    That would be Rebecca Bramlett and Cindy

9 Hardey.

10             Q    Okay.  Now, when you applied for the job,

11 was there a sergeant in charge of animal control?

12             A    No.

13             Q    So was that -- were you the first person

14 to hold that position?

15             A    Yes, sir.

16             Q    And when did you -- when did you achieve

17 the position of sergeant?

18             A    You're testing my memory.

19             Q    Well, close enough.

20             A    I'm going -- I'm going to say I believe

21 that was in 2009, thereabouts, somewhere in 2009.  I

22 can't give you a month.

23             Q    All right.  And did your duties change

24 when you became sergeant?

25             A    No.  Because I was corporal prior to

Page 8

1 that; but my duties have pretty much always been the

2 senior animal control officer, duties didn't really

3 change that much other than I just -- they just gave me

4 stripes basically.  It -- so nothing really changed.

5          Q    When you say -- when did you become

6 senior animal control agent?

7          A    That would have been -- okay.  Let me

8 think.  That would have been in 2006, I believe.  2006.

9          Q    Was that a position you were appointed

10 to, or did it just happen that you were the senior --

11          A    That's exactly what happened.

12          Q    Okay.  And when were you appointed

13 corporal?  Just roughly.

14          A    I believe -- I believe that was in 2008.

15          Q    Okay.  Now, what training did you

16 receive -- well, first of all, let me ask you this:

17 What did you under- -- let me go -- when you applied

18 for the position, what -- what were the qualifications

19 that were required?

20          A    There wasn't really any qualifications to

21 become an animal control officer.  I did go to a school

22 and I -- I went to a 40-hour class with the National

23 Animal Control Association and got my accreditation --

24 my -- my credit -- my accredited certificate from the

25 National Animal Control Association and that was in

Page 45

```
 1        A    Yes, I made a call to Dr. Anderson.

 2        Q    Who is Dr. Anderson?

 3        A    She is the veterin- -- she's one of the

 4 veterinarians for the State of Colorado and she is the

 5 head of PACFA.

 6        Q    Head of what?

 7        A    PACFA.

 8        Q    What is that?

 9        A    Pet Animal Care Facilities Act.

10        Q    Why did you call Dr. Anderson -- well,

11 wait a minute, did you call Dr. Anderson?

12        A    I did.

13        Q    Why did you call her?

14        A    I called to get -- to get her advice and

15 see what she thought as a veterinarian we should do.

16        Q    And you explained to her the facts as you

17 understood them, right?

18        A    I explained that we were told that the

19 horses on the Echo Valley Ranch were under veterinary

20 care, that's what I was told by Mr. Swift when I spoke

21 with him, and asked her what she thought we should do

22 involving the six horses on the property and on Maggie.

23             MR. SCHIMBERG:  Listen to his question.

24        A    Okay.

25        Q    (BY MR. TONDRE) My question is:  You
```

Page 48

1        Q    Once in your lifetime?

2        A    Yes.

3        Q    Did you try and call her on February the

4 16th?

5        A    No.

6             MR. SCHIMBERG:  Mr. Tondre, would it be

7 appropriate if we allowed Ms. Priestly to have the

8 exhibit that you're reading from so she can refresh if

9 she needs to.

10            MR. TONDRE:  Yeah, sure.

11            MR. SCHIMBERG:  Okay.  And you're

12 entitled to ask your questions the way you want but --

13            MR. TONDRE:  I think it's Exhibit 65.

14            MR. LEBSACK:  66.

15            MR. TONDRE:  66.  Yeah, it may be

16 helpful.

17       A    Thank you.

18       Q    (BY MR. TONDRE) What did you understand

19 your role to be in this whole scenario that was

20 enveloping or -- or developing in -- on February 16th?

21       A    What was my role?

22       Q    Yes.

23       A    I'm an animal control officer for the

24 Park County Sheriff's Office and Cindy's supervisor.

25       Q    Okay.  And she was looking to you for

Page 49

1 advice as to what to do with the situation, correct?

2          MR. SCHIMBERG:  Object to form.

3     A    She was telling me what the situation

4 was.

5     Q  (BY MR. TONDRE)  Was she asking your

6 advice?

7     A    In some situations.

8     Q    All right.  Now, did you ask for any

9 advice from Ashleigh Olds?

10    A    I did not speak with Ashleigh Olds.

11    Q    Do you know -- did you know Ashleigh Olds

12 at that point in time?

13    A    No.

14    Q    Had you ever called Dr. Anderson before

15 during a wellness check?

16    A    In which case?

17    Q    Any case.

18    A    Oh, yes, absolutely.

19    Q    Is this a common thing you do, call

20 Dr. Anderson and say what do you think, Doc?

21    A    Absolutely.

22    Q    And why do you do that?

23    A    Because we always have a veterinarian's

24 opinion on cases before we do anything.

25    Q    What -- who made the decision to issue a

Page 50

1 warning as opposed to seize the horses?

2          A    Cindy.

3          Q    Did you concur in that decision?

4          A    I supported her, yes.

5          Q    It's fair to say it was a consensus

6 decision of all -- all people consulted except

7 Dr. Olds?

8                MR. LEBSACK:  Object to form.

9                MR. SCHIMBERG:  Object to form.

10         A    Based on the information we had, yes.

11         Q    (BY MR. TONDRE) Now you also contacted

12 Scott Dutcher; is that correct?

13         A    Yes.

14         Q    He's a chief investigator with the Bureau

15 of Animal Protection, correct?

16         A    Yes.

17         Q    And what did you -- what's his

18 background?  Do you have any idea?  It's page 80 -- 87

19 if you want to follow along.

20               MR. SCHIMBERG:  Thank you, Counsel.

21         A    Thank you.

22         Q    (BY MR. TONDRE) What information -- well,

23 let me ask:  What -- what do you understand

24 Mr. Dutcher's background to be?

25         A    Well, I don't know what his schooling is.

Page 90

1 horse was having a neurological problem?

2          A    No.  No.

3          Q    Who made the decision to seize the

4 horses?

5          A    Who made the decision to seize them?

6          Q    Yes, ma'am.

7          A    That would have been Cindy Hardey.

8          Q    Did she consult you?

9          A    Of course.

10          Q    But you relied on her to make the

11 decision?

12          A    Yes.

13          Q    Did you participate in the seizure of the

14 horses?

15          A    Yes.

16          Q    Who was present during the seizure?

17          A    Myself, Cindy Hardey, Undersheriff Go- --

18 Gore, sorry; Kirstin LeBeau, Marteen Van Poolen; and

19 one of their daughters, I don't remember which one of

20 their daughters, the oldest daughter.

21          Q    Why was Mr. Gore there?

22          A    To serve --

23              MR. SCHIMBERG:  Object to form.  Go

24 ahead.

25          A    To serve the search warrant.

Page 119

1              MR. SCHIMBERG:  Is that cool with you,

2 Linda?

3         Q   (BY MR. LEBSACK) The first thing I want to

4 do is make sure I understand how your reports were

5 prepared.

6         A   Okay.

7         Q   Why don't you flip to page 86 in

8 Exhibit 66.

9         A   All right.

10        Q   Is this a page of one of the reports that

11 you personally prepared?

12        A   Yes.

13        Q   And it's got your name typed in in the

14 lower left corner?

15        A   Correct.

16        Q   So in any of the pages in this exhibit

17 where that name -- where your name is in the lower

18 left-hand corner, that would mean something that you

19 personally prepared?

20        A   Correct.

21        Q   So do you actually sit down at the

22 computer and type this up yourself?

23        A   Yes.

24        Q   And I notice that some of the reports

25 discuss events that happened on different days.  So can

Page 120

1 you tell when you actually prepared this if there's --

2 like, for example, page 86, discusses February 13th,

3 and then in the middle of the page, you -- you talk

4 about events the next day, the 14th, and then, you

5 know, there's different days.

6            Do you prepare this as you go through

7 like you did something on the 13th, you type that up;

8 and then on the 14th, you type more up; or how does

9 that work?

10           A   I take notes, tedious notes; and then I

11 sit down, and we complete it after the original event

12 occurs.  And then we do supplementals.  So this report

13 would have gone -- I would have started typing it on

14 the last -- you know, like, the last day -- I would

15 have started it, and then I would have gone like

16 maybe -- started it after the initial case started and

17 then left it open and then gone back.

18           When I submitted it, when you get the

19 first part of the report, this part here, of mine, it

20 will tell you when it's submitted to the DA's office,

21 that's the date I actually turned it in.  So it's kind

22 of -- it's a work in progress if that makes sense.

23           Q   I see.  So this is typed from handwritten

24 notes that you keep as you go through the events?

25           A   Correct.

Page 121

1          Q    Look at -- hold on a second.  I got to

2  find it.  I had the wrong page in my notes, and now I

3  need to --

4               MR. SCHIMBERG:  It happens.

5          Q   (BY MR. LEBSACK) Well let me ask you

6  without the reference to the page:  You testified about

7  the decision to seize the horses and to file charges

8  against Mr. Hatlee and Mr. Swift.

9               Do you recall that?

10         A    Yes.

11         Q    And I think you said that was Officer

12 Hardey's decision?

13         A    Correct.

14         Q    But she consulted with you about making

15 that decision?

16         A    Yes.

17         Q    And did you support her decision?

18         A    Yes.

19         Q    And was it your understanding that she

20 had -- she made that decision based on some new

21 information that you received in talking to Dr. Horton?

22         A    Yes.

23         Q    And in talking to her about making that

24 decision, did you also consider information that you

25 had received in a phone call with Dr. Horton?

Page 122

1          A    Yes.

2          Q    So it was your understanding that the

3  decision was prompted by some recent information that

4  Dr. Horton had provided?

5          A    Correct.

6               MR. GORE:   There is some strong coffee if

7  anybody wants some.

8               MR. SCHIMBERG:   You might want to sit

9  over there.

10          Q    (BY MR. LEBSACK) On page 89, could you

11  turn to that page in Exhibit 66.

12          A    Yes.

13          Q    This is your report, right?

14          A    That's correct.

15          Q    And down in the last paragraph you talk

16  about February 21st getting a call from Dr. Horton.   Do

17  you see that paragraph?

18          A    I do.

19          Q    And this starts a discussion that

20  continues on to the next page about the results of the

21  necropsy.   Do you see that?

22          A    I do.

23          Q    Now if you flip back to page 89, in the

24  last paragraph of that, it says, second sentence:

25  "Dr. Horton called and stated that she had some

# Exhibit D

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER,
and ASHLEIGH OLDS,

Defendants.
------------------------------------------------------------
DEPOSITION OF MONTE GORE
June 24, 2014
------------------------------------------------------------

                         Deposition location:
                         825 Clark Street Road
                         Fairplay, Colorado

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226

                              For the Plaintiffs.
    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202
                              For the Defendant, Olds.

Page 4

1                    MONTE GORE,

2 being first duly sworn to state the truth, the whole

3 truth, and nothing but the truth, testified under oath as

4 follows:

5                    EXAMINATION

6 BY MR. TONDRE:

7          Q    State your name, please, sir.

8          A    Monte Kevin Gore.

9          Q    And your occupation, Mr. Gore?

10         A    I'm the undersheriff of the Park County

11 Sheriff's Office.

12         Q    What are the duties of the undersheriff?

13         A    Basically, I'm second in command, and I

14 supervise all the divisions under -- in the Park County

15 Sheriff's Office.

16         Q    What -- what is involved in your

17 supervision of the animal cruelty division?

18         A    That's one of the divisions under my

19 command, but primarily I leave the animal control

20 issues to Captain Bonnelycke and Sergeant Priestly.

21         Q    What's your educational background?

22         A    Excuse me?

23         Q    What's your educational background?

24         A    I graduated with honors from St. John's

25 University with a 4.0 GPA.  I graduated from the

Page 9

1          Q   (BY MR. TONDRE) Read -- read that

2 paragraph to yourself, and then I'll ask you some

3 questions about it.

4               MR. SCHIMBERG:  Where were you reading?

5          A   Beginning:  "On February 19th"?

6          Q   (BY MR. TONDRE) "On February 19th, 2012 I

7 received a telephone call."

8               MR. SCHIMBERG:  Thanks.

9          A   Okay.

10          Q   (BY MR. TONDRE) Do you recall making

11 that -- or did you make the telephone call referenced

12 there?

13          A   Yes.

14          Q   And do you recall from whom you received

15 telephone calls that promoted you to make this call?

16          A   I was inundated with telephone calls.

17 I'm not specifically sure who all called me.

18          Q   How about emails, were you receiving

19 emails also?

20          A   I was.

21          Q   Did you have -- would they come to the

22 general sheriff's number or was there an animal control

23 number; do you know?

24          A   As I recall, Sergeant Priestly informed

25 me that the animal control folks were being inundated

Page 10

1 with calls.  And were -- were for the most part

2 dysfunctional dealing with the amount of telephone

3 calls that they were receiving.  So I took that as the

4 PIO for the department, I took -- started taking those

5 calls.

6          Q    What's a PIO?

7          A    Public information officer.

8          Q    Oh, okay.  Now, you say you were

9 inundated.  You got any estimate as to how many emails

10 and telephone calls you received?

11          A    A bunch.  More than I've ever received on

12 any other case.

13          Q    Did you get any sense of what the -- I

14 take it the callers and the writers weren't calling to

15 thank you for anything, were they?

16          A    You know, I ended up listening to a lot

17 of folks.  People were very upset over the situation.

18 I diffused a lot of the folks and talked to them, spent

19 hours on the phone.  And as a result of some of that

20 communication, I did become concerned -- as I recall,

21 the most significant thing that I became concerned

22 about was that there was talk or information or

23 statements that there might -- that there was possibly

24 going to be a -- an attempt at horse rescue at the Echo

25 Valley Ranch.

Page 11

1        Q    Did you make any effort to identify the

2 makers of those calls?

3        A    A lot of the folks made anonymous calls

4 and left messages.  A lot of the information that I

5 received, I didn't -- as I recall, I didn't get a

6 serious-type threat.  It was more concern that we

7 needed to avoid a potential problem.

8            That's when I contacted Sergeant Priestly

9 and suggested that she contact Mr. Swift and Hatlee and

10 see if we could move the horses to an undisclosed

11 location.  And I thought that that would diffuse the

12 situation.

13        Q    Did it?

14        A    It did.  Most certainly.

15        Q    Wasn't there an outcry about moving the

16 horses rather than seizing them?

17            MR. SCHIMBERG:  You know, let me object

18 to form.  Go ahead and answer.

19        A    I'm not sure I understand your question,

20 Mr. Tondre.

21        Q    (BY MR. TONDRE) Well, what I'm searching

22 for is did -- did you receive any complaints that --

23 complaints about the fact that the horses had been

24 moved to a secret location rather than seized by the

25 county?

Page 21

1 time.

2          Q    Did you get the impression that he felt

3 he was a better investigator than what the sheriff's

4 department had?

5          A    I -- I recall, I think, him stating that

6 he was a good investigator.  And I think -- well, I do

7 recall something to that effect.

8          Q    Do you recall him saying that he was

9 developing some witnesses who would testify that Hatlee

10 and Swift were staging their place for the weekly

11 welfare visits?

12          A    I vaguely remember something along those

13 lines.

14          Q    When the horses were seized on

15 February 23, 2012, you were present during the course

16 of loading the horses right?

17          A    That's correct.

18          Q    And what took the undersheriff to a

19 seizure like that?

20          A    As I recall, we had a lot of stuff going

21 on in the office that day.  And I think I was asked by

22 Sergeant Priestly to accompany them out there to serve

23 the -- the seizure warrant.

24          Q    Did you participate in the actual loading

25 of the animals?

# EXHIBIT E

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
and RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
and ASHLEIGH OLDS,

Defendants.
-----------------------------------------------------------
                DEPOSITION OF FRED WEGENER
                      July 24, 2014
-----------------------------------------------------------
                        Deposition location:
                        9998 Havekost Road
                        Conifer, Colorado  80433

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226


                        For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202
                        For the Defendant, Olds.

Page 4

1                    FRED WEGENER,

2 being first duly sworn to state the truth, the whole

3 truth, and nothing but the truth, testified under oath as

4 follows:

5                    EXAMINATION

6 BY MR. TONDRE:

7          Q    State your name for the record, please.

8          A    Fred Wegener.  W-e-g-e-n-e-r.

9          Q    And your present occupation?

10         A    Sheriff, Park County.

11         Q    How long have you been Sheriff for Park

12 County?

13         A    I'm in my 16th year.

14         Q    You're presently involved in a campaign

15 for another term, correct?

16         A    Another term, that's correct.

17         Q    I want to concentrate on the office as it

18 existed in 2012 since that's what brings us here.  So

19 I'll be directing my attention to that area.

20              Did you do anything in preparation for

21 your deposition?

22         A    Talked to my legal counsel.

23         Q    Did you read any documents, depositions,

24 or things of that nature?

25         A    The affidavit that was filed in federal

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE
FRED WEBENER and
ASHLEIGH OLDS,

Defendants

---

## AFFIDAVIT OF ASHLEIGH OLDS, DVM, IN SUPPORT OF
## DEFENDANT OLDS' MOTION FOR SUMMARY JUDGMENT

---

STATE OF COLORADO     )
                            ) ss.
COUNTY OF Jefferson   )

The undersigned Ashleigh Olds, DVM, being of lawful age and being duly sworn, states as

follows:

      1.      I am over the age of eighteen and in all ways competent to make this Affidavit.

      2.      I am a veterinarian licensed in Colorado.  I am the owner of the Aspen Creek

Veterinary Hospital.  Approximately 95% of my practice focuses on horses.

      3.      I am not and never have been an employee or agent of the Sheriff's Office of Park

County, Colorado.

4.     My. involvement in matters concerning the horses at issue began on February 15, 2012, when I was asked if Aspen Creek Veterinary Hospital would care for a horse that Routt County was impounding in Park County.

5.     My only visit to Echo Valley Ranch in connection with this matter was on February 16, 2012.

6.     The horses Maggie, Bear, and "The Six Horses" at issue (Lena, Fiona, Echo, Midnight, Chance, and River) were far too thin when I observed them at Echo Valley Ranch on February 16, 2012.

7.     Photographs of Maggie that I recognize as having been taken at Echo Valley Ranch on February 16, 2012 are attached to Defendant Olds' Separate Statement of Undisputed Materials Facts as **Exhibit K**. Those photos accurately depict what I saw at Echo Valley Ranch on February 16, 2012.

8.     Photographs of Bear that I recognize as having been taken on February 16, 2012 are attached to Defendant Olds' Separate Statement of Undisputed Materials Facts as **Exhibit L**. These photos accurately depict what I saw at Echo Valley Ranch on February 16, 2012.

9.     Photographs of The Six Horses that I recognize as having been taken at Echo Valley Ranch on February 16, 2012 are attached to Defendant Olds' Separate Statement of Undisputed Materials Facts as **Exhibit M**. These photos accurately depict what I saw at Echo Valley Ranch on February 16, 2012.

10.     After returning to Aspen Creek Veterinary Hospital, I made additional observations about Bear on February 16, 2012. My observations are memorialized in my February 16, 2012 report and email that I sent to Officer Hardey on the afternoon of February 16, 2012. The report and email are collectively attached to Defendant Olds' Separate Statement of

2

Undisputed Materials Facts as **Exhibit N.** The statements in my February 16, 2012 email and report are incorporated herein by reference, and if called upon to testify at a trial or hearing in this matter, I would testify consistent therewith.

11.     Based on my observations at Echo Valley Ranch on February 16, 2012, I suspected that Maggie, Bear, and The Six Horses were victims of starvation and malnutrition.

12.     On February 16, 2012, my assistant Troy Murdock and I loaded Bear into a trailer and left Echo Valley Ranch.

13.     I played no part in the drafting, reviewing, or approval of the Park County Sheriff's Office's seizure application and affidavit.

14.     I played no part in the drafting, reviewing, or approval of the Park County Sheriff's Office's summons and complaints issued to Plaintiffs for cruelty to animals.

15.     I played no role in the seizure of the Six Horses on February 23, 2012.

16.     The Six Horses were never taken to Aspen Creek Veterinary Hospital at any time. Neither I nor my hospital were ever in possession of The Six Horses in any way.

17.     I played no role in the assessment or care of The Six Horses following their seizure.

18.     Based on my observations at Echo Valley Ranch on February 16, 2012, I believed in good faith (and continue to believe in good faith) that Maggie, Bear, and The Six Horses had been starved and/or neglected by Plaintiffs.

19.     After he was taken to Aspen Creek Veterinary Hospital on February 16, 2012, Bear displayed a voracious appetite and quickly recovered, put on weight and otherwise responded favorably to treatment that largely consisted of basic feed and water.

3

20.     After Bear was nursed back to health at Aspen Creek Veterinary Hospital, he was adopted by a third party.

FURTHER AFFIANT SAYETH NOT.

_____
ASHLEIGH OLDS, DVM


Subscribed and sworn to before me this 15th day of DECEMBER, 2014, by ASHLEIGH OLDS, DVM.

WITNESS my hand and official seal.

_____
Notary Public


My Commission expires:  2 15 2015 .



4

# EXHIBIT G

Page 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
AND RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEBENER
and ASHLEIGH OLDS,

Defendants.
------------------------------------------------------------
VIDEOTAPE DEPOSITION OF RONALD L. SWIFT
VOLUME I/PORTIONS CONFIDENTIAL
June 30, 2014
------------------------------------------------------------
                              Deposition location:
                              9998 Havekost Road
                              Conifer, Colorado  80433
APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado  80226


                              For the Plaintiffs.
    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado  80202
                              For the Defendant, Olds.

Page 6

1                         EXAMINATION

2 BY MR. SCHIMBERG:

3          Q    Here's an easy one for you.   Your name,

4 please.

5          A    Ronald Lee Swift.

6          Q    Have you ever gone by any other names

7 other that Ronald Lee Swift?

8          A    Ron.

9          Q    Okay.   And your date of birth, sir?

10         A    7/7/42.

11         Q    And your current residence address?

12         A    1469 County Road 70, Bailey.

13         Q    And how long have you resided at 1469

14 County Road 70?

15         A    Six years, I believe.

16         Q    And with whom do you reside at the County

17 Road 70 property?

18         A    Right now myself; Helen Cook; her son,

19 Christopher Cook.

20         Q    And how old is Christopher?

21         A    22.

22         Q    How long has Christopher lived at that

23 address?

24         A    About four months, five months.

25         Q    Okay.   Is that seen as a temporary?

Page 10

1 speaking with Mr. Hatlee.  When -- when the owner comes

2 back, is there a separate residence where he --

3          A    There are three houses on the property.

4          Q    Okay.  And does he stay in a separate one

5 from --

6          A    Yes, he does.

7          Q    -- from where you reside?

8          A    Yes.

9          Q    Okay.

10               Mr. Swift, if you would be kind enough to

11 turn to Exhibit 51, and that's the satellite map

12 overview of -- of the ranch at Echo Valley.  Okay.

13          A    Okay.

14          Q    And if it works on this, you can see

15 where Mr. Hatlee had identified the main house.  Do you

16 see that?

17          A    I do.

18          Q    And is that where you reside?

19          A    No, sir.

20          Q    That's where the owner would reside when

21 he's present?

22          A    That is the owner's house, yes.

23          Q    Okay.  And then across the driveway

24 there, what appears to be a drive, is another building,

25 what is that?

Page 11

1        A    That is a smaller house.

2        Q    And is that where you reside?

3        A    No, sir.  It is not.

4        Q    Okay.  And then in the upper right-hand

5 corner is another structure, and I believe Mr. Hatlee

6 identified that as "Ron house"; would that be correct?

7        A    That's correct.

8        Q    Okay.  Thanks.  Now do you own that

9 residence?

10       A    No, sir, I lease it.

11       Q    All right.  From whom?

12       A    The owner of the ranch.

13       Q    And just so we have it for the record?

14       A    Mr. Colwell.

15       Q    All right.  His first name?

16       A    Robert.

17       Q    Okay.  Does -- has Robert indicated to

18 you how long he plans to be in Colorado this summer?

19       A    Until sometime mid-August, I believe,

20 they come and go.

21       Q    Okay.  And when you say "they," does he

22 have -- bring a family with him usually?

23            MR. SCHIMBERG:  My phone.  Sorry about

24 that.

25       A    Well, wait a minute, I'll turn mind off

Page 166

1 in with her.

2          Q    Okay.  What was the next horse that you

3 recall in the -- as the days went on, where you had a

4 concern with their condition?

5          A    I'm thinking we brought Bear in next.

6          Q    And what was -- what did you see in Bear

7 that you thought needed to get --

8          A    Bear couldn't get up.

9          Q    Was recumbent out in the pasture?

10         A    That's what he was.

11         Q    Okay.  Who found Bear in that position?

12         A    Bill.

13         Q    Bill M., I can't think of his last name?

14         A    Bill M.

15         Q    What's his last name?

16         A    Mullen.

17         Q    Mullen.  And tell me the process of how

18 you found out?

19         A    The telephone.

20         Q    Okay.  Were you at the ranch at the time.

21         A    Oh, I was at the ranch.

22         Q    Okay.

23         A    Bill just beat me out.  He had been out

24 hunting, he came back up.  He got down there when I was

25 about out the back door going down to do the morning

Page 170

1          A    -- seemed to be doing well.  So we just

2 left him there with them.

3          Q    Okay.  Did you change anything about

4 feeding Bear?

5          A    At that time, we did not other than his

6 hay, he would have gone on grain that night.  Because

7 we already, I think, fed most of them that -- in the

8 morning.

9          Q    Tell me what you observed as days went on

10 with Bear.

11         A    No.  That day about 3:30, 4:00 in the

12 afternoon, went back out to check on him, he was down

13 in the hay.  But I couldn't get him to get up.  So I

14 made a phone call and got Randy out there, we got him

15 up, moved him inside the barn.

16         Q    And what happened next, as you recall?

17         A    He walked to the barn, walked in the

18 barn.

19         Q    Uh-huh.

20         A    Got him some food, gave him his -- I gave

21 him some grain.  He picked at the grain, that concerned

22 us a little bit.  But we watched it, he -- he found

23 finally did eat all of it, it just took him what I

24 would have thought to be too long a period of time to

25 do it.  Apparently, was fine.  And that's where he

Page 171

1 spent the night.

2          Q    Okay.

3          A    I went back down about 11:00.  He was
4 still up munching on his hay.

5          Q    And what was the next event that caused
6 you some concern with Bear after that first day?

7          A    Couldn't get up the next morning either.

8          Q    Okay.  To a horseman, what's that mean,
9 if anything?

10          A    Considering I hadn't had to deal with the
11 problem before, it was a little confusing.  So I called
12 Timberline and talked to them, told them what was going
13 on, what he was doing.  They gave us some ideas.

14          Q    What do you recall in terms of the ideas
15 they gave you?

16          A    You know, well, keep him up, keep him
17 eating.

18          Q    Anything else?

19          A    That was about it, watch him for 24
20 hours.

21          Q    Over the next 24 hours, anything
22 significant happen with Bear?

23          A    No.  The problem he seemed to have was
24 that he was fine as long as he was standing up or
25 moving around.

Page 172

1        Q    Uh-huh.

2        A    Once he laid down, he couldn't get up.

3 We started questioning something neurological from the

4 standpoint that if you sit and watch him, when he tried

5 to get up, he could come up on his front end, back end

6 wouldn't get -- wouldn't move.  And he'd lay back

7 down -- not lay down, he would stay up in a sternal

8 position, and he would sit there and look at his rear

9 legs specifically like somebody who has some kind of a

10 muscular dystrophy.  And if you watch them they'll be

11 walking around, their leg stops, and if they don't go

12 flat on their face, the first thing they instinctively

13 look down at that leg like I told you to move, you

14 didn't move, what the hell is going on.

15             So that was kind of a -- just a

16 supposition thing.

17        Q    And the time period was that -- when in

18 January or February did you start noticing this?

19        A    Probably about the 3rd we started looking

20 for a reason why, because any kind of a nerve thing

21 that he had had, you know, that was temporary should

22 have started wearing off.

23        Q    And what did you do as -- in response?

24        A    Discussed it with the my vets.

25        Q    What vet?

Page 174

1 will be fine.

2          Q    Was this the first time you had heard of

3 any potential involving botulism?

4          A    With these specific horses?

5          Q    Yeah.

6          A    Yes.

7          Q    Okay.

8          A    I had heard of botulism.

9          Q    Yeah.

10          A    I had never dealt with it.  So...

11          Q    You -- you read my question correctly.  I

12 meant in terms of your horses, this is the first time

13 you heard anybody suggest botulism as a potential?

14          A    Yes.

15          Q    All right.  Let's keep walking through

16 Bear's history through January of 2012 then.  What's

17 the next significant event that you recall?

18          A    He kept losing weight.

19          Q    Okay.  Had Bear, to your observation,

20 lost weight when you observed Bear for the first time

21 out in the pasture?

22          A    Pens on him; yes, he had.  I would not

23 say it was a dangerous loss of weight at that point.

24          Q    But he had lost some?

25          A    He had lost some.

Page 190

1          A    Let's go to periodically because a

2 direct exam- -- memory of exactly what happened when,

3 is -- is probably not going to be quite right.  But --

4          Q    Okay.  Let's do the best we can.

5          A    I know we went down to see Bear.

6          Q    All right.  Here's an example what I'll

7 do to you.  The con- -- the initial conversation with

8 Hardey was up at her vehicle?

9          A    Yes.

10          Q    All right.  And then you recall being

11 with whom when you went down to see Bear?

12          A    Well, I know at some point Cindy was down

13 there, and I was down there, Cindy was down there,

14 Dr. Olds was there, I can't remember whether Randy was

15 there at that particular time or not.

16          Q    Okay.  And what do you recall about that?

17          A    They couldn't get him up.

18          Q    Did you assist?

19          A    No.  I just let them try.

20               MR. LEBSACK:  I'm sorry?

21               THE DEPONENT:  I said no, I did not

22 assist, I just let them try.

23               MR. LEBSACK:  Thank you.

24          Q    (BY MR. SCHIMBERG) Is there a reason you

25 didn't assist?

1          A   I wasn't asked.

2          Q   Was that the only reason?

3          A   Yep.

4          Q   Okay.  And by the "they," who do you

5 recall, Dr. Olds, Cindy Hardey, anyone else?

6          A   I don't recall.

7          Q   Okay.  What do you recall happening next?

8          A   Well, we went out to look at the other

9 horses, Randy told them he'd get Bear up, which he did,

10 walked him out of the barn, tied him to the back of my

11 truck, gave him his morning grain.

12          Q   Okay.  When you say went out to look at

13 the other horses --

14          A   I told Cindy, I said, we've got skinny

15 horses, but they're up at the barn, I'd be glad to show

16 them to you.

17          Q   Okay.  That's all I meant as opposed to

18 horses out in the pasture.  It's the ones that you had

19 brought in --

20          A   Okay.

21          Q   -- is that correct?

22          A   Yes.

23          Q   Okay.  I want to make sure I get this.

24 So at some point, you asked Mr. Hatlee to tend to Bear?

25          A   No.  I did not.

Page 192

1        Q    All right.   How did it work?

2        A    Mr. Hatlee just said I'll get Bear up and

3 bring him out.

4        Q    Oh, he was there by that time; is that

5 correct?

6        A    Yes.

7        Q    All right.   Was anybody with Mr. Hatlee

8 or stay back there with him?

9        A    He didn't need any help.

10       Q    That may be true.   But --

11       A    No.

12       Q    -- did you notice anybody staying back

13 with him?

14       A    I did not.

15       Q    And you and Cindy and who else went up to

16 look at the horses in the pens -- in the -- yeah, pens.

17       A    You know, I don't know.   I just don't

18 know.   Cindy was the one that asked me about it, I told

19 her, I said, come on, I'll show you.   Now whether

20 Dr. Olds was following along there, I don't know at

21 that particular time.

22       Q    Fair enough.   How about Mr. Murdock?

23       A    I have no idea what he was doing.

24       Q    Okay.   And so you and Cindy anyway walk

25 up in-between the pens?

Page 193

1          A    Yep.

2          Q    All right.  And tell me about your

3 conversation as you're walking, looking at the pens.

4          A    I told her exactly what we were doing

5 with them, that I had contacted the vet, that we were

6 doing what we were told to do.  And that we were sure

7 they were sick, we just weren't sure what it was.

8          Q    And what do you recall her saying?

9          A    She made notes.

10         Q    Do you remember her saying to you at the

11 pens anything like Ron, you just can't have horses in

12 this condition?

13         A    I seriously doubt that.

14         Q    You don't recall a statement, anything

15 like that?

16         A    No.

17         Q    All right.

18         A    No.  I'm sure we discussed the fact they

19 were -- they were skinny and -- and -- but it must be a

20 lawyer thing because I'm not able to remember exact

21 conversations three or four years ago.

22         Q    It's not a lawyer thing other than to

23 ask.

24         A    Oh, okay.

25         Q    That part I would agree with.  And I

Page 227

1          Q    On the 17th?

2          A    Yep.

3          Q    Okay.  And what was going on the 17th, or

4 what happened on the 17th?  I didn't mean to get

5 sloppy.

6          A    She merely told us that she understood

7 the media had gotten ahold of it.

8          Q    Okay.

9          A    And that we should make no comment.

10         Q    All right.  And did you consider that as

11 a friendly suggestion or -- or how did you take that,

12 if you had a reaction at all?

13         A    Well, at the time, I think we took it as

14 an okay, we're not going to make any comments from

15 either side.  We found out later that since the

16 sheriff's office couldn't keep from commenting we

17 better.

18         Q    Okay.  And that resulted in this

19 interview with TheFlume?

20         A    Yes, it did.

21         Q    Okay.  Let me point your direction about

22 halfway down in the left-hand side.  And there's a

23 quote attributed to you, sir:  "I've never" -- "I've

24 never ever seen anything that made a horse lose weight

25 this quick and not be able to put weight back on."

Page 228

1           Did you make that comment?

2      A    He says I did.

3      Q    Well, do you remember making a comment?

4      A    I think Mr. Hatlee and I both made that

5 comment to several people prior to animal control ever

6 showing up.  Some of the other horse people, we were

7 looking through some answers and we -- something --

8 something to that nature.

9      Q    Okay.

10     A    The exact word-for-word, I couldn't swear

11 to.

12     Q    Yeah, but substantively --

13     A    Yes, the substance is fine.

14     Q    -- it's accurate.

15          All right.  Now did you have any

16 particular horse in mind when you made this comment

17 because it says:  "that made a horse lose weight," or

18 did you --

19     A    No --

20     Q    You kind of --

21     A    -- we were talking as a general group of

22 them.

23     Q    Okay.  There's one I wanted to ask you

24 about, I had it highlighted, but I can't remember where

25 it is.  Oh, it's the paragraph right above, Mr. Swift,

Page 241

1          A    Nellie.

2          Q    Nellie still with you?

3          A    Yes, sir.  She's a lifer.

4          Q    Do you keep a file on vet bills?

5          A    No.

6          Q    In terms of medical records, veterinary

7 records, would you keep them or would you just rely

8 upon Timberline to have a set?

9          A    I would rely on Timberline if I needed

10 them.

11         Q    Yeah.

12         A    If I couldn't rely on Timberline, I would

13 be looking for a new vet.

14         Q    Are you?

15         A    No, sir.

16         Q    There came a time, I think it was the

17 17th, is that when she passed?  That's what my little

18 time line shows.

19         A    I think that would be true.

20         Q    Okay.  And Hardey has it in her report.

21 You guys got her up on all fours, correct?

22         A    She was standing.

23         Q    Okay.  With the assistance of a sling?

24         A    An Anderson lift.

25         Q    Lift?

Page 242

1        A    Lift.

2        Q    All right.  And where did you get that

3 lift?

4        A    Rocky Mountain Horse Rescue.

5        Q    Okay.  I have no idea, is that a real

6 chore, is that hard to get a horse up using an Anderson

7 lift?

8        A    Well, after you get the app- -- the --

9 excuse me -- the apparatus assembled and the -- and I

10 don't know whether you would even call it a sling, but

11 I guess it's kind a term that they use.  It's kind of a

12 canvas frame, underneath the horse --

13        Q    Uh-huh.

14        A    -- which was probably the hardest thing

15 to do with a horse of that size; no, it's all done

16 mechanically.

17        Q    Hydraulic or something you turn?

18        A    No.  It's something you turn.

19        Q    All right.

20        A    It's with something called a chain pull,

21 if I remember.

22        Q    So you get her up.  About what time of

23 day is she up?

24        A    If I recall right, it was about 2 a.m.

25        Q    Really?  Okay.  So 2 a.m. who's there,

Page 243

1 who's getting her up?

2          A    Mr. Hatlee, Maarten Van Poolen,

3 Ms. LeBeau was there.

4          Q    Here's a dumb one for you.  Why would you

5 get her up at 2 in the morning as opposed to the

6 evening before or the next -- when the sun came up?

7          A    Because we had the lift available at that

8 time.

9          Q    Okay.

10          A    That's when we got it up there was about

11 midnight.

12          Q    I see.

13          A    Made no difference because we were going

14 to 7 to 24, 24, 24 hours, and nobody slept for a week.

15 I will say -- I'm not going to say nobody slept.  But

16 we did it; pieces here and there, but somebody was with

17 that mare --

18          Q    And did that --

19          A    -- constantly.

20          Q    And did that include Mr. Van Poolen and

21 Ms. LeBeau?

22          A    Actually, they came specifically to help

23 us.  They went -- Maarten went down and got the lift

24 with his truck, brought it up, and they helped get her

25 up.  We had more than ample help as far as watching and

189

Appellate Case: 16-1065   Document: 01019641230   Date Filed: 06/20/2016   Page: 192

Page 244

1 working with the mare most of the time, so they lived

2 further away than anybody else.

3          Q    Did you have any experience with having

4 to go through this process before?

5          A    With an Anderson lift?

6          Q    Yes.

7          A    No, sir.

8          Q    Okay.

9          A    Had not needed one before.

10         Q    First time?

11         A    Yep.

12         Q    All right.  Now where I'm a little

13 confused in reading my client's report is were you able

14 to get her up and was she able to walk on her own at

15 any time during that day?

16         A    Was she able to walk?

17         Q    Did she walk?

18         A    She did not walk.

19         Q    Okay.

20         A    But -- we had her up.  She was supporting

21 her own weight on her legs which would indicate to me

22 that she could have walked.  She stomped her front

23 feet, her back feet, so she had movement in all of her

24 feet.

25              But from the time she was up, you just

Page 245

1 released the pressure on the sling enough so that it's

2 underneath them, if she wants to relax into it, because

3 she can't stand on her legs, she can.  If you take it

4 off from her, then, if she has that problem, she's

5 going to be down and you're back to stressing --

6 stressing her and a hell of a lot of work to get her

7 up.  So we did not take the sling away from her in

8 that -- actually, it was less than a 24-hour period.

9 So...

10          Q    So you got her up, she's self-supporting

11 to the degree you've just described.  But she's

12 stationary in one spot?

13          A    Yep.

14          Q    All right.  Got the picture.

15          A    Right in front of the door so she could

16 look outside.

17          Q    On the upper barn?

18          A    In the upper barn.  And then she had this

19 nice table that we set up so she could have her grain

20 and her hay and water right there on it.

21          Q    Okay.

22          A    And drink and eat at her convenience,

23 which she did.

24          Q    Did she seem to enjoy it?  Not just the

25 food but being up?

Page 255

1 is, Mr. Swift.  I don't have my numbering up to that.

2          A    I think this is 66.  Okay.

3          Q   (BY MR. SCHIMBERG) Let's see if I can

4 direct you.  Because they're a lot of different numbers

5 here in these exhibits.

6              All right.  In the lower right-hand

7 corner if you get into the substance of the report

8 itself, you'll see a series of numbers.  Believe me

9 if -- if you turn about ten pages into that exhibit.

10          A    Oh, about ten pages.

11          Q    Yeah.

12          A    Okay.

13          Q    Go -- go 15 or so, it doesn't matter, I'm

14 going to direct you -- it's easy to direct you after

15 that.  Okay.  Stop right there.  You see in the lower

16 right?

17          A    78.

18          Q    All right.  Go back 10 now to 68, if you

19 would.

20          A    Okey-doke.  We're on 68.

21          Q    All right.  Thanks.

22              Now, this is my client, Cindy Hardey's

23 report.  Okay.  And I'm going to ask you if you agree

24 or disagree with her assessment of the horses that were

25 brought up.  And if you look down to the second

Page 256

1 paragraph from the bottom, it starts with:  "I observed

2 a horse named Lena."

3              Are you with me?

4        A    I am.

5        Q    All right.  It says:  "I observed a horse

6 named Lena, Lena was very emaciated."

7              Let me stop right there.  Do you agree

8 with that assessment?

9        A    Do I agree with it?

10       Q    Yeah, as of February 16, 2012.

11       A    I don't know that I agree with it, but...

12 it's kind of an indefinitive (sic) sentence, isn't it?

13       Q    Well, how would you describe --

14       A    She was thin.

15       Q    All right.  Thin works for you.

16              You think very emaciated is too strong?

17       A    Well, I think since -- since we have no

18 indication of what Cindy would think would be emaciated

19 versus very emaciated versus thin versus -- I don't

20 know that I can say.

21       Q    Well --

22       A    To her obviously it was.

23       Q    All right.

24       A    Okay.  That's -- the only thing that

25 sentence means.

Page 257

1        Q    All right.  I'm just asking you if you

2 agree or disagree.

3        A    I think the horse was thin.

4        Q    It goes on to say:  "her bones were

5 protruding on her Withers Loin, Point of hip, and Tail

6 head."  Do you agree with that?

7        A    Well, I think her hips were protruding,

8 yes.

9        Q    Do you disagree with her assessment that

10 bones were protruding -- protruding from the other

11 areas?

12        A    You have trouble with that word, don't

13 you?

14        Q    Yes.

15        A    Yeah, I don't know that her bones were

16 protruding that badly.

17        Q    Okay.  We've heard a lot from a lot of

18 witnesses thus far on this Henneke Body Score or body

19 conditioning scoring system?

20        A    Uh-huh.

21        Q    All right.  Do you profess to have any

22 ability to body score a horse pursuant to the Henneke?

23        A    Let me say -- let me say I read the

24 Henneke system --

25        Q    Okay.

Page 258

1          A    -- cover to cover.   Okay.

2          Q    Yes.

3          A    Cannot be done visually.

4          Q    Okay.   Hardey admits that her scoring was

5 visual.   Do you see that?

6          A    I'm well aware of that.

7          Q    Okay.   Well, read along with me.   "I

8 visually scored Lena to 2 to a 2.5."   Would you agree

9 with a visual score of 2 to 2.5?

10         A    I would not.

11         Q    All right.   What would -- what would you

12 score Lena at?

13         A    Visually?

14         Q    Yes.

15         A    I wouldn't do it.   It's not the way the

16 system was designed.

17         Q    All right.   The next paragraph, the

18 second sentence starts with:   "The horse's name was

19 Midnight."   Are you with me?

20         A    Yes, sir, I can read quite well.

21         Q    All right.   Well, I just want to make

22 sure we're reading the same place.   "Midnight was very

23 emaciated."   Do you agree with that?

24         A    No.   I agree she was thin.

25         Q    All right.   Do you think "very emaciated"

Page 259

1 is too strong?

2          A   I think if you can define "very

3 emaciated" in words that have a definite meaning, I

4 will answer that question.

5          Q   Well, okay.  Let's go on to her

6 description of what led her to say it was "very

7 emaciated."  Her bones were protruding -- protruding on

8 her Withers, Loins, Point of hip and Tail head.

9               Do you agree with that?

10          A   I don't know, could you read it again?  I

11 think her hips were visible.

12          Q   Okay.  Do you disagree with the other

13 portions of the body?

14          A   She was thin.  Okay.  There was too much

15 backbone showing, I never dis- -- we've never denied

16 any of this, okay.  Okay.  They were thin.  The

17 question is why they were thin, that we've denied, not

18 whether they were.

19          Q   Bear with me.  And you would -- I take it

20 respond the same, that because you're not supposed to

21 visually score under Henneke, that you wouldn't venture

22 a score yourself?

23          A   I would question why you use a system

24 that you don't use properly that you don't do anything

25 with.

Page 260

1        Q    All right.  But am I correct you would

2 not venture a score?

3        A    You're right.  I would not.

4        Q    All right.  I'm going to ask you the same

5 thing, so we can just move right along.  The next page,

6 lower right-hand corner, it says 69.

7        A    You will get the same response on all

8 four horses on that same page.

9        Q    And those four horses are Fiona, Echo,

10 River, and Chance, correct?

11       A    That is right.

12       Q    And in each one of those horses, Hardey

13 assesses as very emaciated, correct?

14       A    Yep.

15       Q    And she points to bones that were

16 protruding on each of those horses as the basis for her

17 comment, correct?

18       A    That's what she does.

19       Q    Okay.  And your answer, if I ask you if

20 you agree or disagree, would be exactly the same that

21 you gave?

22       A    Pretty much.

23       Q    Well, is there any difference?

24       A    Oh, I don't think that Fiona was anywhere

25 close to protruding nearly as bad as she thinks she

Page 261

1 was.

2          Q   Okay.  Anything else?

3          A   No.

4          MR. SCHIMBERG:  I didn't know if you were

5 done reading?

6          Gentlemen, I just got an urgent message

7 that I had to call my office.  Could you give me that

8 accommodation, I will be very quick.

9          THE VIDEOGRAPHER:  The time is

10 approximately 4:29 p.m., and we're now off the record.

11          (Recess was taken from 4:29 p.m. to

12 4:44 p.m.)

13          THE VIDEOGRAPHER:  Stand by.  And the

14 time is approximately 4:44 p.m., and we're back on the

15 record.

16          MR. SCHIMBERG:  We are back on the

17 record, Mr. Swift.  And we have talked during the

18 break, and we have all decided to conclude the

19 deposition for today.  We thank you for your patience

20 and endurance today, and we will get back together for

21 another half day.

22          THE DEPONENT:  Okay.

23          MR. SCHIMBERG:  Okay.

24          THE VIDEOGRAPHER:  This concludes the

25 June the 30th, 2004 video deposition of Ronald Swift.

Page 286

1          Q    Okay.  Tell me what you do recall, if

2 anything, about the conversation that actually led up

3 to being given a notice of warning.

4          A    As I recall there wasn't a lot of

5 conversation.  What she told me was that since she had

6 come out on a complaint she was required to leave that

7 notice and what the notice said.

8          Q    And was there any discussion about

9 whether you agreed with that or didn't agree with that?

10          A    I don't know whether there was a

11 discussion about agreeing or disagreeing, I just told

12 her she was welcome to come out whenever she felt she

13 needed to come out.

14          Q    What do you recall the notice of warning

15 obligating you to do?

16          A    Continue doing what we were told or we

17 were doing.

18          Q    Which was?

19          A    Taking care of the animals, working to

20 solve the problem we had with them, and get weight back

21 on them.

22          Q    At some point, you signed off on an

23 agreement to have the horses removed from Echo Valley

24 Ranch and down to Ms. LeBeau and Mr. Poolen's (sic)

25 facility; is that correct?

Page 287

```
 1          A    No.

 2          Q    Okay.  What's your recollection?

 3          A    We signed a protective custody agreement.

 4 It had nothing to do with moving them, we moved them.

 5          Q    All right.

 6          A    We signed that agreement at the location

 7 in Jefferson.

 8          Q    At the --

 9          A    So it was an after-they-had-been-moved

10 fact.

11          Q    Okay.

12          A    Okay.

13          Q    And that's -- good point.  And -- and

14 what I just want to make sure I leave here today is to

15 get everything you recall about what led up to that and

16 how -- how it concluded, okay.  So let's start with do

17 you recall the conversation and where it occurred that

18 eventually led to the horses being moved down to

19 LeBeau/Poolen's (sic) place?

20          A    As I recall, it started with a phone

21 call.

22          Q    From?

23          A    Cindy.

24          Q    To?

25          A    Me.
```

Page 289

1          A    I believe I agreed to meet with her in

2 Bailey --

3          Q    Bless you.

4          A    -- at the feed store.

5          Q    Okay.  To discuss further or what?

6          A    To discuss it.  My original answer was we

7 won't move them.

8          Q    Fair enough.  And so did you meet at the

9 Bailey feed store -- Depot Feed Store?

10         A    We did.

11         Q    Bless you.  And who was there?

12         A    I was there, Cindy was there, Mr. Hatlee,

13 Ms. Cook was there, I believe Cheryl Otto was there.

14         Q    And tell me what you recall, start to

15 finish of that conversation at the feed store.

16         A    All of it, I couldn't tell you.  Bottom

17 line was we agreed to move them.

18         Q    Okay.  Do you recall however, any

19 specifics of any new information or more specific

20 information that Cindy had provided to you?

21         A    Concerning what?

22         Q    Well, you had earlier indicated when you

23 got the initial phone call that she had expressed that

24 there was some concern with some of the folks that had

25 been posting information on the internet.  Do I have

Page 295

1 something different at trial.   Okay?

2           A   Okay.

3           Q   So if I keep after you, it's not to be

4 rude; it's to do my job.   Got it?

5           A   I will let you know when you get rude.

6           Q   All right.   Well, I will try not to.

7 Okay.   I think Mr. Tondre will probably take care of

8 that for you.   All right.

9               So we're at the feed store.   Let's get

10 the context.

11          A   Okay.

12          Q   And it's you and the rest of the folks

13 that you've told me about.   While you're there, do you

14 recall who said what?

15          A   See, here you go with these exact things

16 three years after the fact.

17              At some point --

18              MR. HATLEE:   Sometimes it's a bit much.

19              THE DEPONENT:   Isn't it?

20              We had other people come into the feed

21 store because we were open for business and left.

22          Q   (BY MR. SCHIMBERG) Yeah.

23          A   I believe Ms. Van Poolen had stopped to

24 pick up something.   And I believe her and Ms. Cook were

25 talking, and Ms. Van Poolen said I have a place we can

Page 296

1  put those horses and quarantine them and I will take

2  them.

3          Q    We have not referred to Ms. Van Poolen by

4  that name before, so let me make sure --

5          A    No.  Ms. LeBeau.

6          Q    -- were -- yeah, okay.

7               What's her nickname, I forget already?

8               MR. HATLEE:  Kirt.

9          A    Kirt.

10         Q    (BY MR. SCHIMBERG) Kirt.  All right.  And

11 tell me what happens next.

12         A    We agreed to move the horses to her

13 facility.  I believe she had a discussion with Cindy,

14 Cindy agreed to let her take them.  And I really can't

15 tell you whether Cindy cleared that with Bobbi or not,

16 I assume she did.

17         Q    You don't know for a fact one way or the

18 other?

19         A    No.

20         Q    Okay.  The picture I'm getting is -- is

21 the Pueblo facility respectfully declines when Cindy

22 calls them and at or about the same time there at the

23 feed store, Ms. Van Poolen says, hey, I've got a

24 facility that I can quarantine the animals, why not use

25 my place; is that generally the gist?  Or is that fair?

Page 299

1 pay for that, and how'd that work, if at all?  Was

2 there a discussion, number one?

3          A    Was there a discussion?

4          Q    There at the feed store?

5          A    No.  I don't think so.

6          Q    Okay.  Was there at some point that day

7 when you delivered the horses?

8          A    No.  I don't think so.

9          Q    Okay.

10          A    There wasn't much of a discussion.

11 Mr. Hatlee loaded food into her truck from the feed

12 store, told her what we were feeding -- she wanted to

13 know what we were feeding.  I told her, made sure she

14 had it.  And I believe her comment was I have plenty of

15 hay, not to worry about it.

16          Q    Okay.  Very good.  So when you get down

17 to the Van Poolen property, tell me what you recall

18 about that.

19          A    It was in the evening.

20          Q    Yeah.

21          A    I'm going to guess 5, 6:00.  Because it

22 was dark.  Cindy had followed us over, Bobbi Priestly

23 met us at the facility with her teenaged daughter.  And

24 Bobbi had a protective order -- a protective agreement

25 that she had formulated.

Page 300

 1            The trailers went into the inside arena,

 2 barn, whatever makes it sound good to you.  And the

 3 horses were unloaded.

 4            Q    Anyone else there other than you,

 5 Mr. Hatlee, Priestly, and Hardey?

 6            A    Ms. Cook was there, Ms. Otto was there,

 7 Cindy's daughter -- or Priestly's daughter was there.

 8 And -- I'm going to guess that Kirt's daughter, Hanna,

 9 was there; but I wouldn't swear to it.

10            Q    Okay.

11            MR. HATLEE:  And Peggy.

12            A    Yeah, and Peggy.

13            Q    (BY MR. SCHIMBERG) How old was Kirt's

14 daughter?

15            A    At that time, 13, 14.

16            Q    Okay.  Are you critical that Bobbi

17 Priestly had her teenage daughter with her there?

18            A    Am I?

19            Q    Yeah.

20            A    Well, yes.

21            Q    In what way?

22            A    Well, let's see.  Gee, would you guys

23 please move your horses to some place where -- out of

24 here because we're really afraid these people are going

25 to come out and threaten you and cause a lot of

Page 402

1            A    No.

2            Q    When you brought the horses from the

3  pasture into the barn for Bear and into the pens for

4  the others, at the time you brought them in, they were

5  too skinny in your opinion?

6            A    In my opinion.

7            Q    And did they at that point -- from that

8  point on, did they continue to lose more weight?

9            A    Yes, they did.

10           Q    So they became even skinnier than the

11 point where you thought they were too skinny?

12           A    Yes, that's why we were so concerned

13 about them.  They were getting what we considered to be

14 very ample or more than ample food and losing weight.

15           Q    There was -- you testified about the

16 Routt County bills, and I don't think you answered this

17 question:  Did you ever contact Routt County about the

18 outstanding bill for the vet treatment?

19           A    Why?

20           Q    I'm --

21           A    I mean, that was between them and

22 Timberline.  It had nothing to do with me.

23           Q    So I guess the answer is no, you --

24           A    That would be the answer.

25           Q    On the 16th of February, inside the

Page 422

1 this level because you were planning to clean them?

2          A    That quite possibly could be a reason.

3 The other reason could be that we broke ice the night

4 before and pulled it out of those tanks; and therefore,

5 they needed to be filled the next morning.

6               You almost have to fill water tanks on

7 morning feeding in the wintertime, because we fill them

8 out of a hose.  If you try running water when it's

9 below zero outside, you know what happens.

10         Q    Okay.

11         A    Your hoses freeze up.  In the daytime

12 when you got the sunlight out there, it's a lot easier

13 to do.

14         Q    Do these tanks, Exhibit 95 and

15 Exhibit 94, the water level -- the -- the contents of

16 this is not a suitable amount of water for horses to be

17 kept -- for horses to drink, right?  Was that a bad

18 question?  I think it was.

19         A    It sure was.

20         Q    Let me rephrase it.

21         A    Okay.

22         Q    Exhibit 94 and 95, this doesn't show

23 adequate water for a horse, does it?

24               MR. TONDRE:  Objection.  Foundation.

25         A    Are you asking me if those tanks should

Page 423

1 have been filled up that morning?

2           Q   (BY MR. LEBSACK) In other words, yes.

3           A   Yes, they would have been filled up that

4 morning.

5           Q   So this is not --

6           A   As a matter of fact, they were probably

7 filled up closer to noon because by the time we got rid

8 of animal control and everybody else and could go back

9 to doing what we normally do, they got filled.

10          Q   Okay.   These -- these tanks that you see

11 in these two pictures needed --

12          A   I don't know about those two tanks,

13 because we're not -- I told you, I can't tell you where

14 those two tanks were at.   If there was a tank on the

15 ranch on any morning that had that amount of water in

16 it, it would get filled.

17          Q   Okay.  But these pictures show water

18 tanks that were too low for horses to use, they needed

19 to be filled, right?

20          A   No.   That's not -- now which question do

21 you want me to answer?

22          Q   These tanks, these pictures show water

23 tanks with too little water in them?

24          A   For what?

25          Q   For horses.

Page 424

1          A    Can a -- are you asking me can a horse

2  get a drink out of a tank with that much water in it?

3          Q    I don't want to play games.

4          A    I don't either.

5          Q    So these needed to be filled, right?

6          A    They needed to be filled, that I will

7  agree with.

8          Q    Okay.  So these pictures show water tanks

9  that were not suitable for horses, correct?

10         MR. TONDRE:  I'm going to object to the

11  form of the question.

12         MR. HATLEE:  Don't do it.  I'm telling

13  you right now, don't do it.

14         Q    (BY MR. LEBSACK) Well --

15         A    Try it one more time.  Are they suitable

16  for a horse to drink out of?  Yes.  Are they -- do they

17  need to be left that way and not filled in the morning

18  feeding?  No.  They do need to be filled.  Okay?

19         A horse can drink out of that much water

20  (motioning).

21         MR. SCHIMBERG:  Even though we're

22  videoing could you tell us for our court reporter --

23         THE DEPONENT:  If there's 2 inches of

24  water --

25         MR. SCHIMBERG:  2 inches.

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing **APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME 1**, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with the McAfee AntiVirus Enterprise and McAfee AntiSpyware Enterprise version 8.8.0.1528, Virus Definition File Dated: 6/15/2016 rev 8197 and, according to the program is free of viruses.  In addition, I certify all required privacy redactions have been made.


By:   /S/Becky Kongs_____
      Legal Assistant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME 1** was furnished through (ECF) electronic service to the following on this the 20th day of June, 2016.

Brice A. Tondre
215 S. Wadsworth Blvd, #500
Lakewood, CO 80226-1566

By:   /S/Becky Kongs
      Legal Assistant