# CASE NO. 16-1065

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

| | |
|---|---|
| RANDALL J. HATLEE and | ) |
| RONALD L. SWIFT | ) |
| | ) |
| Plaintiffs – Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| ASHLEIGH OLDS, | ) |
| | ) |
| Defendant – Appellant. | ) |

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Raymond C. Moore
D.C. No. 12-cv-02469-RM-MJW

---

## APPELLEE'S SUPPLEMENTAL APPENDIX
## VOLUME 2 – PAGES 210-398

---

JOHN LEBSACK
ADAM GOLDSTEIN
White and Steele, P.C.
600 17TH Street, Suite 600N
Denver, Colorado 80202
(303) 296-2828
jlebsack@wsteele.com
agoldstein@wsteele.com

## TABLE OF CONTENTS

Defendant Olds' Separate Statement of Undisputed Material Facts
In Support of Motion for Summary Judgment

Exhibit H (ECF 62-8) ............................................................. 210-265

Exhibit I (ECF 62-9) ............................................................. 266-349

Exhibit J (ECF 62-10) ........................................................... 350-356

Exhibit K (ECF 62-11) ........................................................... 357-367

Exhibit L (ECF 62-12) ........................................................... 368-372

Exhibit M (ECF 62-13) ........................................................... 373-398

# EXHIBIT H

RANDALL HATLEE - JUNE 19, 2014

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
 3    Civil Action No. 13-cv-02469-RM-MJW
 4    RANDALL J. HATLEE
      AND RONALD L. SWIFT,
 5
      Plaintiffs,
 6
      vs.
 7
      CINDY HARDEY,
 8    BOBBIE PRIESTLY,
      MONTE GORE,
 9    FRED WEBENER
      and ASHLEIGH OLDS,
10
      Defendants.
11    -----------------------------------------------------
              VIDEOTAPE DEPOSITION OF RANDALL HATLEE
12                        VOLUME I
                        June 19, 2014
13    -----------------------------------------------------
                             Deposition location:
14                           9998 Havekost Road
                             Conifer, Colorado  80433
15    APPEARANCES:
16        Brice A. Tondre, Esq.
          BRICE A. TONDRE, P.C.
17        215 South Wadsworth Boulevard, #500
          Lakewood, Colorado  80226
18
                                  For the Plaintiffs.
19        John Lebsack, Esq.
          WHITE and STEELE, P.C.
20        Dominion Towers
          600 17th Street, Suite 600N
21        Denver, Colorado  80202
                                  For the Defendant, Olds.
22
23
24
25
```

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

Page 18

1          Q    Oh, okay.  And then the Acord ranch,

2 where was that?

3          A    Right outside of Yampa.

4          Q    Okay.  And what did you do for them?

5          A    Full-time ranch hand.

6          Q    And who was your supervisor or who did

7 you report to?

8          A    Dwayne Acord.

9          Q    Do you know if they're still in the

10 business?

11         A    Not unless you can do it from 6 feet

12 under.

13         Q    Okay.  I'm going to take that as a no.

14         A    No.  He's dead.  He passed.

15         Q    Okay.  Did the family continue the ranch,

16 do you know or...

17         A    I know that the girls continued to ranch

18 for a little bit, I don't know what's going on with

19 them anymore.

20         Q    Okay.  What do you do for a living now?

21         A    Work horses and train them.  I do farrier

22 work, broker hay.

23         Q    And for whom do you work horses?

24         A    Right today, myself.  Up until this

25 happened, anybody that needed horses worked with,

Page 19

1 problem horses, young colts being started.

2          Q    And where did you work out of?

3          A    Echo Valley Ranch.

4          Q    And when you worked horses, did you have

5 an arrangement with Echo Valley Ranch for the use of

6 their property to do that?

7          A    I had an arrangement with Ron, yeah.

8          Q    When you say "Ron," are we talking about

9 Mr. Swift who's here this morning?

10          A    Yes.

11          Q    Okay.  And what was that arrangement?

12          A    I did ranch work to cover my part of what

13 I was using on the ranch.

14          Q    Okay.  So there'd be no exchange of

15 actual dollars, it would be I'll do this for you for

16 the opportunity to make use of your ranch?

17          A    Your world doesn't work in our world.

18          Q    Well, I'm trying to understand your

19 world, that's what I'm doing here this morning.

20          A    If he needed money for anything, I gave

21 it to him.

22          Q    Okay.

23          A    If I needed money for a pack of

24 cigarettes and didn't have it, he'd give it to me.

25          Q    Okay.  That sounds like a cool

Page 157

1        Q   (BY MR. SCHIMBERG) I have seen records

2 where at the time of removal, there were as many as 40

3 horses at Echo Valley Ranch; is that right?

4        A   Yeah, I already testified to that yes,

5 that's right.

6        Q   Okay.  And we testified to the ones that

7 were boarded.  So the rest of them were yours and

8 Swift's and Cook's?

9        A   And friends of mine.  And of course, Bear

10 and Little Feather that belongs to my ex.  And that's

11 about it.

12       Q   Okay.  Good enough.  I just want to get

13 my group here together.  All right.

14            And so do you know what Bill M. pays to

15 keep his horse there or if he does at all?

16       A   Well, he doesn't pay in cash, but he has

17 to put up with me.  So he pays quite a bit.

18       Q   Oh, man.  All right.  So he doesn't pay.

19            Do you know what Lawrence paid to keep

20 his horse out there?

21       A   No.  I don't stick my nose in other

22 peoples' business.  I just don't.

23       Q   You've said that, but I'm just wondering

24 if you knew about him?

25       A   No.  I couldn't tell you.

Page 162

```
 1          Q    And when did it come to your attention
 2  that there was anything wrong with Maggie?
 3          A    The day she was laying in the field.
 4          Q    And when was --
 5          A    February -- do-do-do-do-do.  Hm.
 6  February 12th, 13th, I don't know, sometime right
 7  there.
 8          Q    Of 2012?
 9          A    I believe that -- yeah.
10          Q    How did you become aware that something
11  was wrong?
12          A    She was lying in the field.
13          Q    Okay.  But did you see her first or did
14  somebody --
15          A    Yes, I saw her first.
16          Q    -- say come with me.  All right.  What
17  did you see?  Tell me.
18          A    I saw a horse lying in the field where
19  she shouldn't have been laying.
20          Q    And where was that?
21          A    In the front pasture.
22          Q    And what was wrong about that?
23          A    All the other horses were not standing
24  with her.
25          Q    And what -- why is that significant to
```

Page 188

1          A    I believe these have already been entered
2 once, haven't they?

3               MR. TONDRE:  I don't know.

4               MR. SCHIMBERG:  We have extra now, if so.

5               So this is 52?

6               THE COURT REPORTER:  53.

7          A    I have enough copies of these to choke a
8 horse.

9          Q    (BY MR. SCHIMBERG) Why don't you thumb
10 through Exhibit 53, Randy; and I know there's one of
11 Little Big Man; but I think the others, you can tell
12 me, are pictures of Maggie as she was in the main barn
13 during the time we have just been discussing; is that
14 correct?

15         A    Yes, that's correct.

16         Q    All right.  And this is how she remained
17 from the time you got her to the main barn until the
18 day of her death when you were able to get her up by
19 the use of the Anderson sling, correct?

20         A    Yeah, pretty much, yeah.

21         Q    Okay.  You're not a veterinarian medicine
22 guy, right, not licensed?

23         A    Not licensed, no.

24         Q    All right.  Haven't gone to vet school?

25         A    No.  Not officially.  Three years at

Page 207

1          A    That would be Nellie or Grandma as we

2 affectionately called her.

3          Q    All right.

4          A    She takes care of the babies all the

5 time.

6          Q    All righty.  When did Little Feather come

7 back to -- or come to Echo Valley Ranch?

8          A    Whoa.  I'm going to say December 2010.

9          Q    And what was your understanding of why

10 Little Feather came to Echo Valley Ranch?

11         A    Because my ex-wife was not allowed to

12 keep her where she had her horses boarded.  I knew she

13 couldn't keep it anywhere else, so I offered to help

14 her out and take care of Little Feather and Bear for a

15 year while she took care of her probationary whatever.

16         Q    Because she was charged with animal

17 abuse?

18         A    Yes, she was.

19         Q    Okay.  And when you offered to help her

20 and to -- to take in the horses, to a horseman, does

21 that mean you assume responsibility for that horse for

22 feed, for upkeep, for welfare?

23         A    I knew she wouldn't be able to pay me for

24 the feed.  But to my understanding, she was responsible

25 for -- or they, being Routt County, were responsible

Page 208

1 for vet care and well checks.

2         Q    Well, they were responsible -- let me

3 pick at you a little bit on this, make sure I

4 understand your answer.  They were responsible for

5 payment if vet care was needed; but you would be

6 responsible for determining I got to call a vet?

7         A    Wrong.

8         Q    Okay.

9         A    Those horses were supposed to be vet

10 checked on a regular basis.

11        Q    Oh, by Routt County?

12        A    By Routt County.

13        Q    Okay.

14        A    And within the realms of this

15 unfortunately for Timberline, I got them involved.

16 Because they were my vets of choice.

17        Q    Day-to-day care for the animals was your

18 responsibility?

19        A    Yes.

20        Q    Okay.  Did you have any duty or were you

21 told that you -- were you instructed that you had to

22 make reports or keep in contact with Routt County

23 Sheriff's Office?

24        A    They were supposed to keep in contact

25 with me; not my problem, theirs.

Page 209

```
 1        Q    Okay.  So no, you weren't requested --

 2        A    No.

 3        Q    -- or directed to do so?

 4        A    No.  And they couldn't follow their own

 5 guidelines.  They couldn't contact me.

 6        Q    Okay.  What do you mean by "their own

 7 guidelines"?

 8        A    They were to contact myself or Mr. Swift

 9 whenever they were coming to the ranch.  They couldn't

10 even do that.

11        Q    They just showed up?

12        A    They just showed up.  It's not that

13 difficult, my phone number hasn't changed in eight

14 years.

15        Q    Gadzooks, you want me to call you if I

16 come through on that county road?

17        A    Hey, if you want to stop and play with

18 the horses, give me a call, you're more than welcome.

19        Q    All right.  Well, Brice won't want that,

20 but I was teasing.

21             MR. TONDRE:  Sure, go ahead.

22        Q    (BY MR. SCHIMBERG) All right.

23        A    We can still separate things here.

24        Q    Okay.  I'd be glad to do that.  But let

25 me ask you:  When was the last time you recall Routt
```

Page 213

1 that.

2          Q    Best feed?

3          A    You know, best of everything.  I have
4 been that fortunate.

5          Q    Okay.  All right.  Let's keep talking
6 about Little Feather.  When did Little Feather pass?

7          A    January.

8          Q    Of what year, sir?

9          A    Would have been 2012, I guess.

10          Q    Are you sure?

11          A    Yes.

12          Q    Okay.  Why are you confident?

13          A    Of that?

14          Q    I'm sorry?

15          A    You said "why am I confident of that"?

16          Q    Yeah.

17          A    Because she was still alive when I
18 brought Bear into the barn.  So the next day would have
19 been January 1, 2012.

20          Q    Bear came in the barn New Year's Eve?

21          A    New Year's Eve.

22          Q    All right.  How did Little Feather die,
23 in your opinion?

24          A    Well, it would be my best guess that that
25 horse had some kind of a heart attack, because she was

Page 242

1 yet.

2          Q    So --

3          A    It wasn't the best.  But it damn sure

4 wasn't the worst condition I've seen horses in.

5          Q    Okay.  So there was -- there was feces

6 and urine in that stall at the time?

7          A    Sure, the horse had been in the stall for

8 six hours, there's going to feces and urine in it.

9          Q    All right.  Did you take it upon

10 yourself, and I don't know if monitor is the word or

11 watch Bear's stool as it was up in the -- in the stall?

12          A    Of course, it's standard practice, yeah.

13          Q    Okay.  You know that, I don't.  That's

14 why I asked.

15          A    No.  It's standard practice.

16          Q    And what did you notice?

17          A    It was not really normal, it was looser,

18 but not diarrhea.

19          Q    Okay.  Was Bear recumbent for any

20 significant period of time when you brought him up and

21 put him in the stall?

22          A    What do you call a really significant

23 period of time?

24          Q    A full day?

25          A    Oh, no.  The longest he ever got to lay

Page 243

1 down was a couple hours.

2          Q    Okay.

3          A    And that was just -- I let him lay there

4 and rest for a couple of hours and then I would go in

5 and get him up.

6          Q    Okay.  Have you seen Bear since the

7 removal from the property?

8          A    Just the dog-and-pony show at the trial.

9          Q    Okay.  Other than that?

10          A    Nope.

11          Q    What did you observe at the dog-and-pony

12 show at the trial when you looked at Bear?

13          A    Honestly?

14          Q    Yeah.  You're under oath.  Hopefully,

15 you've been honest all day.

16          A    I saw a pretty good mountain horse that's

17 wrecked, as far as I'm concerned.

18          Q    And what do you mean by that?

19          A    He has got no manners at all.

20          Q    Keep going.  Keep talking.  Tell me what

21 that means to you.

22          A    I watched Eugene Ferraro try and lead

23 that horse around in a circle, and I watched that horse

24 lead him.  Now you can call it what you want, but you

25 put a grade pen on the end of that leash and let it

Page 257

1 body scored Midnight?

2          A    Yeah.

3                (Whereupon, Deposition Exhibit

4 No. 57 was marked for identification by the

5 reporter.)

6          Q   (BY MR. SCHIMBERG) Okay.  I've handed

7 you -- or our court reporter has handed you Exhibit 57,

8 I believe?

9          A    Yeah.

10         Q    Okay.  Got one for John, got one for

11 Brice.

12               And are these photographs of Midnight?

13         A    As far as I can tell, yes.

14         Q    And are they taken at the Echo Valley --

15 Echo Valley Ranch?

16         A    Yep.

17         Q    All right.  I'll represent to you that

18 these are Park County photographs of the 16th of

19 February, 2012.  All right?

20         A    Uh-huh.

21         Q    Is this how you remember seeing Midnight

22 on February 16th of 2012?

23         A    I'm not going to say those pictures are

24 accurate.

25         Q    What's inaccurate about them?  There's

Page 259

1 photograph in a certain way.  And so I'm asking you if

2 you know one who took it, and you don't?

3          A    I don't.

4          Q    And two, if they had any --

5          A    And I don't know if they had any

6 training.

7          Q    Okay.  Well, let's look at the very first

8 photograph of Exhibit 57.  Do you think that's

9 inaccurate of how Midnight looked in -- in February?

10         A    Inaccurate?

11         Q    Yeah.

12         A    Yeah, to a degree, yeah.

13         Q    In what way?

14         A    She's standing, it looks like she's

15 standing somewhat head shot to me.  I know she was

16 skinny.  I never denied that.  But was she in trouble?

17 No.  Was she about to fall over dead?  Not even close.

18 You know, so no, I'm not willing to accept any of this

19 because it's bullshit.  Those horses were sick.  They

20 weren't starved.  They were sick.  Was she going to die

21 right then?  No, she wasn't.

22         Q    If you would leaf through to the fifth

23 page of 57, Randy.

24             MR. LEBSACK:  I'm sorry, which page?

25 Okay.  I got it.

Page 277

1 No. 59 was marked for identification by the

2 reporter.)

3          Q   (BY MR. SCHIMBERG) I've just handed you

4 Exhibit 59, that I think is a series of photographs of

5 Lena; but if it's not, you're going to tell me, please.

6          A   Every one but the last one.

7          Q   Okay.  And let me just go to the last

8 one.  Oh, the one that is identified as No. 20, and it

9 says "another horse on the ranch"?

10          A   Yes.

11          Q   Who is that by -- out of curiosity, if

12 you know?

13          A   That is our sorrel stallion, Trouble.

14          Q   You say ours, you're meaning, you, Swift,

15 Cook?

16          A   It's Ron's stallion, but he's -- Ron has

17 the paperwork on him, but...

18          Q   All right.  Same thing ours, meaning the

19 ranch?

20          A   Yep.

21          Q   The third page in, sir, can we tell who's

22 poking his head, his or her, over the back?

23          A   I was kind of questioning that when I was

24 looking at that.  And if you go to --

25

Page 279

1          MR. SWIFT:  I'm going -- I'm pretty sure

2 we had Nelo already sold.  And we had Pretty up there.

3          THE DEPONENT:  You want my glasses?

4 Because that ain't got enough plate to be Pretty.

5          Q   (BY MR. SCHIMBERG) All right.  For my

6 purposes I want to talk about Lena for crying out loud.

7 But thank you all the same.

8          A   All right.

9          Q   After looking at Exhibit 59, the

10 photographs of Lena, do you think these are true and

11 accurate; or do you have the same criticism of these

12 photographs that you did with the one we talked about?

13         A   I have the same criticisms of any of your

14 photographs.

15         Q   Okay.  I'm going to keep asking you,

16 though, just so we can get it on the record.  Okay?

17         A   Right.

18         Q   So do you think the first page, the cover

19 sheet of Exhibit 59, does not do Lena justice in terms

20 of her body condition as of February 16, 2012?

21         A   No.  Not really, no.

22         Q   In what way, sir?

23         A   Her stance is making her pop more.  She

24 had more meat on her than that.  And just -- along with

25 her Henneke Scoring System and so on, you look at the

Page 280

1 neck on that horse standing in that picture, that horse

2 still had plenty of neck, she wasn't sunken.

3          Q    So you think this horse was in the

4 acceptable range, even if thin?  Would you -- would

5 you -- well, let me stop.

6               Would you agree with me that this horse

7 looks thin?

8          A    Yes, of course, that horse looks thin.

9          Q    But since you brought up the scoring

10 system again, you think this is within the acceptable

11 range of thin?

12         A    I would say that any of those horses

13 knowing what we had known at that point, had been left

14 alone would have come back just fine.

15         Q    With the feed and grain supplement that

16 you had been providing?

17         A    Yes.

18         Q    Okay.

19         A    I believe we pretty well had walked

20 through the worst part of it.  And we were on the

21 uphill swing with all of them.

22         Q    The third page in, sir, with Pretty or

23 whomever it is in the background.  Same question I had

24 with the photograph and the prior horse, do you know

25 what that mark is that I'm assuming the photographer

Page 282

```
 1          Q    The third page?

 2          A    The third page.

 3          Q    Okay.  Let's go farther back to the other

 4 one that shows if it's Pretty in the background, I

 5 think it's the fifth page.  But in the lower right-hand

 6 corner we can see a Bates stamp that ends in 87 are you

 7 with me?

 8          A    Yeah.

 9          Q    Okay.  You think this shows a horse thin

10 but within the acceptable range?

11          A    I've never denied that those horses were

12 thin.

13          Q    No.  But my question was thin but within

14 acceptable range?

15          A    I would say she was closer to a 3 than a

16 2, yeah.  Because she still had good weight in her neck

17 and she still had good weight on her ass.  Her tail

18 head wasn't pronounced, which is why you don't see

19 pictures of her tail head.  Not that most of them know

20 where a tail head is.

21          Q    You better tell me, so I make sure I

22 know.

23          A    It's where the tail starts.

24          Q    Okay.  That's what I would have guessed

25 but --
```

Page 298

1 anymore?

2          A    No.

3                   MR. TONDRE:   This is Exhibit 61?

4                   MR. SCHIMBERG:   Yes.   And I think now

5 we've identified it as two photographs of Fiona,

6 correct?

7          A    Yes.

8          Q    (BY MR. SCHIMBERG) All right.   And I'll

9 share with you these were taken at the ranch

10 February 16, 2012.   Okay?

11         A    Correct.

12         Q    All right.   Now this captures at least a

13 little bit the circular pen, correct?

14         A    The round pen, the pen behind, and the

15 loafing shed also.

16         Q    What is a loafing shed?

17         A    It is a three-sided shed that horses are

18 allowed to get in and get shelter.

19         Q    Okay.   Do you think the photographs, the

20 two pages of Exhibit 61, fairly depict the condition of

21 Fiona in February of 2012?

22         A    No.   Not really.

23         Q    In what way, sir?

24         A    Just supposes the chosen views on her.

25 You look at the videotapes we have of her three days

Page 310

1          A    Yeah, he was pretty well staying up with

2 Fiona.

3                MR. SCHIMBERG:   Okay.

4                (Whereupon, Deposition Exhibit

5 No. 63 was marked for identification by the

6 reporter.)

7          Q   (BY MR. SCHIMBERG) We'll stop with Echo,

8 how does that sound to you?

9          A    Whatever.   It's up to you.

10         Q    Some people want to get -- can you go

11 through the series of photographs we've marked as

12 Exhibit 63 and identify the main subject of these

13 photographs.

14         A    The first one is Echo.

15         Q    Okay.   The second page?

16         A    The second page is Echo and River's butt.

17 The third page is Echo with Chance standing next to him

18 and then River.

19               The last page is Echo with River behind

20 him.

21         Q    Do you think these photographs fairly

22 depict the condition, body condition of Echo in

23 mid-Feb-  -- mid-February, 2012, sir?

24         A    No.

25         Q    In what way?

Page 312

1        A    He was born July 4, 2010.  I think.  I
2 think, yeah, I think he was born July 4, 2010.

3        Q    Okay.  So in your mind, does this show a
4 horse at that age thriving?

5        A    That shows a horse at that age recovering
6 from being sick.

7        Q    Okay.  So that tells me at some point you
8 thought Echo was sick?

9        A    I already testified that I thought all
10 those horses were sick.  I knew they were sick.

11       Q    When did you start to -- when did you
12 arrive at the conclusion that Echo was sick?

13       A    Nearing January.

14       Q    So after -- after the time that Echo was
15 brought up?

16       A    After the time that Echo was brought up,
17 no question he was sick, because he continued to drop
18 weight.  And did it rapidly.

19       Q    How rapidly?

20       A    I -- like 14 days rapidly.

21       Q    How much weight do you think Echo loss
22 within that 14 days?

23       A    100 pounds.

24       Q    Really?

25       A    I would guess, yeah.  75 to 100 pounds.

Page 313

1          Q    And did you do anything different with

2 Echo when Echo was showing this drop of weight than you

3 did with any of the other horses?

4          A    At that point, we had gone to free choice

5 grass hay.

6          Q    For everybody or just Echo?

7          A    For the ones that we thought were sick.

8          Q    And who was that?

9          A    River, Chance, Echo, Fiona, Midnight, and

10 Lena.  I mean, they pretty well all had free choice

11 grass hay, you can see grass hay in the pictures.

12          Q    Which picture shows that to me?

13          A    That picture you got your hand on right

14 there, look right behind his butt.  He's standing in

15 hay.

16          Q    Okay.  Same with the second?

17          A    With the pictures of Fiona.

18          Q    Actually, let's -- let's stick with Echo,

19 because that's where I'm at.

20          A    Okay.

21          Q    The second page?

22          A    Still hay there.

23          Q    Okay.

24          A    And as soon as we fed, there would be

25 more hay there.

Page 353

1          A    Mold.

2          Q    Okay.

3          A    Generally, I mean, you can't -- you have

4 to bust every bale open to see your weed count, but you

5 look at the outside to see what kind of weed count you

6 might see.

7          Q    Okay.  Of the horses that are at issue in

8 our case, plus Maggie and Bear, it seemed from my notes

9 from your testimony last week that you had observed

10 that each one had gotten thin out in the pasture; is

11 that correct?

12         A    That's correct.

13         Q    Okay.  And two you brought up,

14 regardless, because of their age; would that be true?

15         A    They were starting to show signs, but

16 basically because they were showing signs of their age.

17         Q    When did it occur to you that your horses

18 were sick as opposed to just thinning, if you did?

19         A    Bear was definitely sick, which was the

20 main clue to sickness being within those horses.  And

21 then just the rest of the stuff that led with it, the

22 fact that they were up and being fed extra and still

23 losing weight.  It was a real good clue.

24         Q    Okay.  And since you didn't weigh them, I

25 assume that your determination that they continued to

Page 354

1 lose weight was an eyeball or a visual assessment by

2 you?

3          A    Yes.

4          Q    Okay.

5          A    Hands-on visual assessment.

6          Q    And then did you gradually over time

7 introduce a supplemental feed to them as you observed

8 them?

9          A    You are going to have to explain your

10 "supplemental feed."

11          Q    Well, when you brought them up, then you

12 gave them some grain; did you not?

13          A    Yes.

14          Q    Okay.  And that's over and above what

15 they would have gotten out in the pasture, correct?

16          A    Correct.

17          Q    That's what I meant by supplementing

18 their regular feed.

19          A    As soon as I take them up, they start

20 getting supplemented with grain.

21          Q    Okay.  Let's talk about the events of

22 February 13, 2012.  All right?

23          A    Okay.

24          Q    You got it in your mind what happened

25 that day?

Page 355

1          A     Take your shot at it, I'll see where I'm

2 at.

3          Q     Yeah, let me see.  You know, if you ask

4 me what I was doing February 13th, I might not know.

5 So did you ever meet Dawn Smith from Routt County when

6 she came to Echo Valley Ranch?

7          A     On the 13th?

8          Q     Well, let's start with any time.

9                True to form here, guys.  Hello.

10               (Interruption.)

11               THE VIDEOGRAPHER:  The time is

12 approximately 9:25 a.m., and we're now off the record.

13               (Recess was taken from 9:25 a.m. to

14 9:36 a.m.)

15               THE VIDEOGRAPHER:  Stand by, everyone.

16               The time is approximately 9:36 a.m. and

17 we're back on the record.

18               Q  (BY MR. SCHIMBERG) I'm going to switch

19 gears on you, sir, by virtue of the fact that I left my

20 exhibits at home this morning and they've now been

21 delivered.

22               Let's go back to that sequence that we

23 were using at the conclusion of our first get-together

24 going through the photographs of the horses and you

25 telling me the experience in late 2011 or early 2012.

Page 356

1 Okay?

2         A    Okay.

3         Q    All right.   And let's talk about

4 Midnight.   Midnight came up when, what did you tell me

5 when you brought Midnight up?

6         A    I brought Midnight up early, like,

7 October, November.

8         Q    Yeah.   Your answers to interrogatories

9 says Midnight was brought into the pen in

10 November 2011.

11        A    Yep.

12        Q    All right.   And Midnight was one that you

13 had brought up in the past or was --

14        A    Yes.

15        Q    Okay.   But you also noticed Midnight

16 getting thin out in the pasture?

17        A    Yes.

18        Q    All right.   And when you brought Midnight

19 up, what did you do in terms of anything special for

20 Midnight?

21        A    Brought her up, put her in a pen.   She

22 received hay and grain and water.

23        Q    Okay.   Anything different than that?

24        A    No.

25        Q    Okay.   And was Midnight -- I think I

Page 357

1 could probably pull the photographs here.  But refresh

2 my memory, is Midnight with anyone else, any other

3 horse?

4          A    In the pens?

5          Q    Yes.

6          A    No.  They were all individual pens in

7 those days.

8          Q    And when you say "in those days," what do

9 you mean?  I thought there was a pen with the babies in

10 them?

11          A    There was a pen with the babies in them.

12 And then we had 12 individual pens, 10 or 12 individual

13 pens.

14          Q    Okay.  And where in terms of the barn was

15 Midnight's pen?

16          A    She was down in that run of pens, what --

17 within 100 foot of the barn, 150 feet of the barn.

18          Q    Did we talk about Midnight?

19          MR. LEBSACK:  I'm trying to remember.

20          A    Yes, we did talk about Midnight.

21          Q    (BY MR. SCHIMBERG) All right.  Then we

22 don't have to talk about Midnight anymore.

23          A    Okay.  It's up to you.

24          MR. SCHIMBERG:  This can be off the

25 record.

Page 358

1              (Recess was taken from 9:39 a.m. to

2 9:40 a.m.)

3              MR. SCHIMBERG:  All right.  We're back

4 on.

5              THE VIDEOGRAPHER:  Stand by just a sec.

6 The time is approximately 9:40 a.m., and we're back on

7 the record.

8              THE DEPONENT:  He's a little dangerous

9 over there, be careful.

10             MR. SCHIMBERG:  No doubt.

11        Q   (BY MR. SCHIMBERG) All right.  I got you

12 off track because we've already spoken about Midnight

13 and Lena and Fiona and Echo.  So let me talk to you a

14 little bit about Chance in the same sort of sequence of

15 things.  When did Chance come up?

16        A   Chance came up the first part of January.

17        Q   And why did Chance come up, same reason?

18        A   He was starting to show thin, young

19 enough for him to come in.

20        Q   And where did Chance, what pen did Chance

21 get placed in?

22        A   Chance went to the round pen with Fiona

23 and Echo.

24        Q   And feedwise, did you do anything

25 different with Chance than what we've talked about with

Page 359

1 the others?

2          A   We had brought -- put another horse in so

3 I increased the hay in the round pen, added another

4 feed pen, and he got his grain every day.

5          Q   Okay.  So by your estimation of the

6 amount that Chance was getting was equal to that of the

7 other babies in the pen, round pen?

8          A   Yes.

9          Q   Okay.  But other than that, I'm talking

10 about actual feed provided specifically to Chance,

11 anything different than the other babies?

12          A   No.  They were all on the same grain

13 regimen.

14          MR. SCHIMBERG:  Okay.

15          (Whereupon, Deposition Exhibit

16 No. 72 was marked for identification by the

17 reporter.)

18          THE DEPONENT:  Thank you.

19          MR. SCHIMBERG:  What's your second one,

20 John?  Third one.

21          Q   (BY MR. SCHIMBERG) Okay.  Well, we've

22 marked and put before you, sir, Exhibit 72.  Can you

23 identify the first photograph on 72?

24          A   That would be Chance.

25          Q   And in the round pen?

Page 360

1        A    Yes.

2        Q    Okay.  Do you see the shelters or what

3 would you call those behind --

4        A    Those are loafing sheds, yes.

5        Q    I'm sorry?

6        A    They're a loafing shed.

7        Q    All right.  And that loafing shed

8 directly behind would be used for what reason?

9        A    The horses had access to it 24/7 to get

10 out of the weather.

11       Q    Okay.  Now is your opinion that Chance is

12 just thin here or is -- is there more to it than thin?

13       A    Chance was sick.

14       Q    Okay.

15       A    He was -- he was thin.  We've never

16 denied it, the colts were thin.

17       Q    Okay.

18       A    He was sick.

19       Q    And at this time, you're making phone

20 calls to various veterinarian acquaintances asking

21 questions, correct?

22       A    I was making phone calls to a lot of

23 people.

24       Q    Okay.

25       A    Not just vets.

Page 380

1        Q    Okay.  And how do you keep it even?

2        A    By trimming it and filing it.

3        Q    What?

4        A    His hoof.

5        Q    Okay.  Does she assist you on that, or is

6 that something you do on your own?

7        A    That's something I do.  I'm the farrier,

8 she's the vet.

9        Q    Okay.  Let's go to River.  When did you

10 bring River up?

11       A    End of January, end of February sometime.

12       Q    Okay.  And River was how old at the time?

13       A    He would have been -- I guess a

14 3-year-old at the time.

15       Q    Okay.  And what was it about River's

16 condition that you brought him up in January or

17 February of 2012?

18       A    He was getting skinny.

19       Q    Okay.  Anything beyond getting skinny?

20       A    No.

21       Q    And I forget, what did River have its --

22 his own pen or was he locked in?

23       A    River was put into the round pen with the

24 rest of the babies.

25       Q    That's right.  And in terms of feed and

Page 382

1 that while he's still dropping weight and he shouldn't

2 be, or he's not moving correctly, it's just a series of

3 steps that you normally go through as a rancher and

4 horseman.

5          Q    Okay.  And when you went through that

6 process you've just described in terms of River, was

7 there anything different that you did when you

8 determined River was sick as opposed to needed some

9 food and supplementation?

10         A    No.  Because we had already been working

11 through the issues with Bear; and as a rancher, you

12 just automatically go with -- okay, this is what we're

13 fighting and this is what we're doing and this is where

14 we're at as far as the steps.  And until it's deemed

15 necessary to take more steps, you stay with your plans.

16              MR. SCHIMBERG:  Time for more photos.

17              (Whereupon, Deposition Exhibit

18 No. 75 was marked for identification by the

19 reporter.)

20         Q    (BY MR. SCHIMBERG) All right.  Now we're

21 up to what exhibit, sir?

22         A    75.

23         Q    All right.  And who do we see in

24 Exhibit 75?

25         A    That's River.

Page 414

1 important to me.

2        Q    Okay.  So you don't know what her opinion

3 was, if she had one?

4        A    Nor did I care.

5        Q    I get that.  But I -- I just need an

6 answer to my question.  Did she share her opinion with

7 you?

8        A    She might have.

9        Q    But you don't recall?

10       A    I don't recall.

11       Q    All right.  That's all we need to

12 establish.

13            Now were you present at Echo Valley Ranch

14 when she made a visit in early 2012?

15       A    Are you talking about the February -- I

16 think it was 12th or 13th visit?

17       Q    Yeah.  That's the only one I'm aware of.

18       A    That's the only one I'm aware of and no,

19 I was not present.

20       Q    What do you understand, if anything,

21 occurred on that day?

22       A    She came and talked to Ron at the ranch

23 and checked on Bear; and as an after-fact, we found

24 that she had made a complaint with Park County Animal

25 Control.

Page 424

1 Dr. Olds or her assistant?

2          A    Probably not.

3          Q    Okay.  And why do you think probably not?

4          A    Honestly?

5          Q    Well, yeah.

6          A    Because I don't think much of Dr. Olds as

7 a vet.

8          Q    Okay.  The conversation that you think

9 you had but can't remember the specifics of, would that

10 have been outside the barn?

11         A    Yes.

12         Q    Bear was in a stall inside the barn?

13         A    Yes.

14         Q    Okay.  And what happened next?  Just walk

15 me through, please.

16         A    I went into the barn, Bear was down.  I

17 at that point took steps to get him positioned and

18 ready to stand.

19         Q    And was anyone with you at that point?

20         A    Dr. Olds and her assistant had come in, I

21 told them to leave him alone.  That I would get him up.

22         Q    Were you surprised that Bear was down

23 when you walked in?

24         A    No.  He had been down, up and down since

25 we brought him into the barn.  So why would it surprise

Page 435

1 it.

2                    All right.   And then you think as much as

3 150 yards away was the Swift flatbed pickup, correct?

4          A    Correct.

5          Q    And you're drawing a circle up by the

6 main barn?

7          A    Uh-huh.

8          Q    And off into this margin with an arrow,

9 why don't we put Swift vehicle or truck or flatbed.

10          A    (Complied.)

11          Q    All right.   Thanks for doing that.

12          A    Okay.

13          Q    Now who walked Bear from Ron's vehicle to

14 Dr. Olds' vehicle?

15          A    Dr. Olds and her assistant.

16          Q    Okay.   And did you observe any problems

17 in that transport?

18          A    No.   I was a little distracted with all

19 the other crap going on.

20          Q    What's "all the other crap" that you

21 specifically recall going on or just tell me.

22          A    If my memory serves me right, I ran back

23 upstairs and checked on Maggie real quick because I

24 knew I had to get the chores done.

25          Q    What chores did you need to do?

Page 436

1       A    Our morning chores.

2       Q    Which were?

3       A    Feeding and getting water run.

4       Q    Okay.

5       A    And breaking ice, everything that goes
6 with raising horses.

7       Q    So the water containers in the pens
8 needed to be refreshed, correct?

9       A    Some of them needed to be refreshed, some
10 of them needed to be broke.

11      Q    Because they were covered with ice?

12      A    Correct.

13      Q    All right.  And let's walk through the
14 pens; and you tell me what pens needed to have the
15 water troughs broken, if you recall?

16      A    Probably the majority of the pens except
17 for the stallions' tank, because that's ever-flow
18 water, constant-flow water.  I know I had to refresh
19 the babies tank, because I was having them drink it
20 down so I could scrub it out.  And I'm sure there was
21 probably one or two others that I would do that with.
22 That's a normal practice, they're not all filled at the
23 same time.

24      Q    Did you do that particular chore while
25 Dr. Olds and her assistant and Cindy Hardey and the two

Page 443

1 of that trial or are you going by memory sitting there?

2          A    Going by memory.

3          Q    Okay.

4          A    I've already lived it once, why would I

5 do it twice?

6          Q    All right.  Let's go back.  You said that

7 there was some more conversation you had with my

8 client, Ms. Hardey, correct?

9          A    Yes.

10          Q    Okay.  And walk me through that.

11          A    Just basic conversation that yeah, we

12 know the horses are sick; yes, we knew the horses were

13 skinny; yes, we were doing what was right; we had

14 talked with our vets; and we were taking the steps that

15 we were advised by our vets.

16          Q    And when you said that, that you were

17 taking the steps as advised by your vets, you're

18 talking about Timberline?

19          A    Yes.

20          Q    And as I understand it, Timberline

21 actually came out and evaluated and was treating which

22 horse?

23          A    Maggie.

24          Q    Maggie, correct?

25          A    Correct.

Page 444

1          Q    But if I understood your testimony, you

2    were telling Cindy Hardey that you and Ron were

3    following the advice given by Timberline in regards to

4    all the horses?

5          A    In regards to the sick horses, yes.

6          Q    Okay.   To the sick horses?

7          A    Yes.

8          Q    That's a good point.   All right.

9               What was Cindy's response to any of that

10   if you have any specific recollections?

11         A    She -- Cindy was doing her job from where

12   I stood, talking to Bobbi, talking to state vets,

13   making an evaluation, and doing her job.

14         Q    Okay.   Did you overhear any of her

15   conversations that she was having by telephone?

16         A    No.   Not really.

17         Q    Okay.   Do you have any facts that she was

18   actually talking to state people on her phone from the

19   Echo Valley Ranch that day?

20         A    I believe she was talking to Bobbi who

21   was in turn talking to vets and they were back and

22   forth.

23         Q    All right.   Very good.   Now on that day,

24   you were issued a notice of warning, correct?

25         A    Correct.

Page 445

1        Q    And you told Ms. Hardey to put that in

2 your truck, because you were going to -- about to do

3 your chores, correct?

4        A    We were going to start doing the chores,

5 yes.

6        Q    All right.  In her deposition Friday, we

7 marked the notice of warning as Exhibit 67; is that

8 correct?

9        A    I have no idea what that Lakewood

10 Colorado stuff is up on top of it, but...yeah, it looks

11 pretty well correct to me.

12       Q    That's the piece of paper that you recall

13 being placed in -- in your truck?

14       A    Yep.

15       Q    Okay.  I don't have the original, but I

16 have a carbon if you want to compare the two.

17       A    No.  That's okay, that's fine.

18       Q    Okay.  Now, did you have any -- it

19 doesn't sound like, and correct me if it's wrong, if

20 it's incorrect, that you and Cindy did not have any

21 direct communication about the specifics in this

22 warning of notice that day?

23       A    She told us she was going to write it out

24 before she left and that she would be checking on the

25 horses every couple of days and we had 30 days to start

Page 452

1        Q    Yes, sir.

2        A    Went to doing our chores and went on with

3  forward plans for Maggie and so on.

4        Q    All right.  At some point, you get

5  together with Ms. Hardey, do you not, and sign off on a

6  written agreement?

7        A    Yes.

8        Q    Okay.  When did that occur?

9        A    19th.

10        Q    All right.  Now you're pretty confident

11  about that?

12        A    You bet.

13        Q    And you're right, but I'm kind of

14  interested in was there something about the 19th that

15  sticks out in your memory that you equate with an

16  agreement between Ron Swift and the LeBeaus?

17        A    Yeah, I moved my horses to LeBeau's.

18        Q    I'm sorry?

19        A    I moved my horses to LeBeau's.

20        Q    Now in Ms. Hardey's deposition on Friday,

21  we marked a document as Exhibit 68; and why don't you

22  tell me if you can identify that for me, sir.  I got

23  these all out of order just so you know.

24        A    This was brought to LeBeaus' place by

25  Sergeant Priestly after we got there with the horses.

Page 453

1        Q    Okay.  And does it put in print your

2 verbal understanding made sometime before you moved the

3 horses?

4        A    Pretty well, yeah.

5        Q    Okay.  Can you think of anything that's

6 missing out of this document that you understood

7 previously?

8        A    From my understanding, you know, we

9 weren't being charged.

10       Q    At that time?

11       A    It was being asked of us to -- to diffuse

12 a situation with threats that had been being received

13 by the sheriff's department of people coming onto our

14 property and taking our animals.

15       Q    All right.  That's -- that's the stuff I

16 need to find out about leading up to this.  But

17 let's -- let's stay with 68.  Ms. Priestly brought this

18 to the LeBeau property?

19       A    No.

20       Q    Who did?

21       A    Yeah, Bobbi did, yeah, Ms. Priestly

22 brought it, yea.

23       Q    All right.  And then we're going to work

24 backwards.

25       A    Okay.

Page 454

1        Q    But at the time this was signed, that is

2 your signature; isn't it?

3        A    Yes, it is.

4        Q    Pretty good, I can even read it.

5        A    That's amazing.

6        Q    Yeah.  And it's dated 2/19/2012, right?

7        A    Correct.

8        Q    All right.  And you guys signed off on

9 this at the LeBeau property?

10        A    Correct.

11        Q    After the time you and Ron had moved your

12 horses down to her property?

13        A    Correct.

14        Q    All right.  Now let's talk about what led

15 up to that -- to that.  Was there a conversation with

16 Cindy Hardey that preceded the -- the signing of

17 Exhibit 68?

18        A    Yes.  There was.

19        Q    Where did that occur?

20        A    At the feed store.

21        Q    Okay.  Who was present?

22        A    Me and Ron, Cheryl, Helen, the state

23 troopers wandered in and left.

24        Q    The barber?

25        A    The barber, you bet.  I believe at one

Page 476

1          A    Not well, but yeah, I mean, you know, far

2   enough before this time period.

3          Q    Okay.  All right.  Were you involved in

4   that or is it a Ron and Dr. Olds thing?

5          A    Was I involved in it?  I mean, they were

6   the ones talking; but as I testified before, I don't

7   believe that she's a good vet.  I've had things happen

8   on this mountain that came out of her vet clinic that

9   weren't right, had no reason to be that way, and you

10  know, I'll stick by my opinions.

11         Q    Well, that's fine.  And I'm going to let

12  Mr. As- -- Mr. Lebsack, her attorney, ask you followup

13  questions on that, but that is the source of what you

14  referred to when you said "ill feelings" on

15  February 16 --

16         A    Yes.

17         Q    -- 2012?

18         A    You bet.

19         Q    Okay.  It wasn't anything about what you

20  observed her and her assistant doing that day?

21         A    Yes and no.  She had overstepped her

22  boundaries with Maggie.  She knew that horse was under

23  vet care.  She had no business looking at that horse,

24  she had no business looking at a horse on that place

25  except for Bear, period.  Had no right to walk around

Page 477

1 that property.  Had no reason to stick her nose in my

2 business, period, as far as I'm concerned.

3          Q    Well, did you ever ask her if she was

4 walking around to stop walking around and attend to

5 Bear and leave it at that?

6          A    I was letting Cindy do her job.  Does it

7 mean I agree with it?  No.  Do I know that she was

8 asked in a professional manner or status?  No.  I

9 don't.

10         Q    Okay.

11         A    But she knows that she had hard feelings

12 with Ron professionally, she never should have stepped

13 foot on that ranch.  Ever.  Routt County, she should

14 have turned them down.

15         Q    I see.  All right.  I'm going to let John

16 follow up.

17         A    That's fine.  That's just my belief.

18         Q    That's fine.

19         A    What I believe in.

20         Q    Well, I'm the guy that asked.  But I want

21 to just walk through sequentially then we're still out

22 at Kirt LeBeau's place, all right?

23         A    Okay.

24         Q    And you left off with my questions about

25 what horses showed signs of neurological issues.  And

Page 571

1 but...

2          Q    Bear spent the previous winter in the

3 pasture?

4          A    Bear spent -- no, Bear wasn't alive the

5 previous winter.

6          Q    December of '10, you got him?

7          A    December of '10 I got him.

8          Q    So I'm talking about the winter of '10,

9 '11, when you got him in '10, in December of '10

10 through the rest of that winter, did he --

11          A    He was in pasture.

12          Q    He was in the pasture and didn't come

13 into the pens, correct?

14          A    No.  He didn't.  Not to the best of my --

15 I don't remember bringing him in.

16          Q    And Maggie had not been into -- brought

17 into the pens in prior years, had she?

18          A    No.  No.

19          Q    And we've talked about some of the signs

20 that you saw in these horses.  But the reason for each

21 of them that you brought them in was because they were

22 getting too thin out in the pasture?

23          A    They were showing weight loss, yes.

24          Q    And the other problems that you saw later

25 that you talked about, crossing, and things like that,

Page 572

1 none of that had happened yet by the time you were

2 looking at them in pasture; is that right?

3          A    Like I said, when they're in pasture, I

4 looked at them and check them when I'm feeding and so

5 on.  When they're in the pens, I get to pay a little

6 bit more attention to them because they're right there.

7          Q    But the only problem you noticed with

8 them in the pasture was that they were too thin?

9          A    That they were starting to drop weight,

10 and it was time to bring them in.

11               And not to interrupt you, but I hope

12 everybody's windows are up in their cars.

13               MR. TONDRE:  Is it raining?

14               THE DEPONENT:  It's fetching to come.

15               MR. SWIFT:  No.  It's raining right now.

16               THE DEPONENT:  Is it?

17          Q    (BY MR. LEBSACK) On the horses that you

18 brought in in this period of 2011, 2012, do you think

19 they weighed more or less on February 16th than when

20 you brought them into the pens?

21          A    They weighed less on February 16th than

22 when I brought them in.

23          Q    Timberline was out to Echo Valley to look

24 at one horse, Maggie, and only Maggie, during the

25 period December 2011, January 2012, February 2012,

Page 581

1 anything about that?

2          A   No.  I don't.

3          Q   The water tanks in the pens outside,

4 there were -- were there metal water tanks?

5          A   Metal and plastic or Rubber Maid tanks,

6 whatever you want to call that, polymer tanks.

7          Q   Were they self-heating?

8          A   No.

9          Q   So they would freeze at night during the

10 wintertime?

11         A   They could, yes.

12         Q   And did you have to carry the water out

13 by buckets?

14         A   No.

15         Q   How did you get the water out to them?

16         A   I have a hose system.

17         Q   That doesn't freeze?

18         A   Well, it doesn't freeze, you can run the

19 water, take the hose, put it back in the barn, get it

20 back out.  Run it -- no.  It doesn't freeze.

21         Q   All right.  So you have a hose system

22 that you put the hose back in the barn?

23         A   Yeah.

24         Q   So how much water was in the tanks, in

25 the outside pens, when Cindy Hardey and the group came

Page 582

1 out on the 16th of February?

2        A    It depends which tank you're talking

3 about.  There's you know, like 14 tanks.  Some of them

4 were, you know, like right down to the last drink so I

5 could scrub them out then because it was their turn.

6        Q    So that means like an inch or two of

7 water?

8        A    Yeah.  A few inches of water under the

9 ice.

10        Q    And then others had more water?

11        A    Yes.

12        Q    But all of them had some ice in it?

13        A    Had some water in them.  Yeah, they were

14 checked the night before.

15        Q    So to make them drinkable by a horse,

16 you'd have to go out and break the ice?

17        A    Right.

18        Q    And I saw a reference to somebody seeing

19 you go out with a hammer or with a hatchet to break

20 ice?

21        A    Uh-huh.

22        Q    Is that what you did that day on the

23 16th?

24        A    Yeah, and then I finished the job after

25 everybody left.  Because I use a pitchfork to take the

Page 583

1 broken ice out.

2          Q    The horses inside the barn, their water

3 does not freeze?

4          A    No.

5          Q    I take it that the way that you check on

6 the horses in the pastures is to do that while you're

7 feeding the animals?

8          A    Yes.

9          Q    The incident that you talked about -- or

10 the -- I don't know if "incident" is the right word,

11 the truck of Bruce Carpenter, the semi, do you remember

12 that?

13         A    I remember that incident.  But it's not a

14 semi.

15         Q    Tell -- tell me what happened.

16         A    The same thing I already told you once.

17 I went to get hay off the truck probably because Ron

18 gave me a call and said hey, I talked to Bruce, the

19 truck is here, it's broke down, grab X amount of bales,

20 Bruce is coming by to get paid.

21         Q    Okay.  So this was while Bruce's truck

22 was parked someplace near Bailey?

23         A    Parked behind the Kum & Go.

24         Q    And were they regular-size bales?

25         A    I believe so, but I honestly couldn't

Page 603

1          A    Okay.

2          Q    And you talked about how you were in the

3 barn with Bear and then some of the people went

4 upstairs to Maggie?

5          A    Everybody.

6          Q    Including you?

7          A    No.  I stayed in the barn.

8          Q    All right.  So everybody but you --

9          A    Right.

10          Q    -- moved upstairs from Bear, and you

11 stayed with Bear the whole time and never went up to

12 see Maggie; is that right?

13          A    Not until after I had Bear up and out,

14 no.

15          Q    So after you got Bear out of the barn

16 tied up to Mr. Swift's flatbed pickup, at that point,

17 then you went up?

18          A    At some point, I went and checked on

19 Maggie, yes.

20          Q    Now, was there a point when Cindy Hardey

21 and Dr. Olds went out to look at the horses in the

22 pens?

23          A    Yes.

24          Q    Were you with them when that happened?

25          A    Yeah, as far as I know, yeah, unless they

Page 604

1 made a trip without me; but the trip that I went with

2 them, yes.

3          Q    What do you remember about that trip?

4 What do you remember them doing?

5          A    Looking at the horses in the pens.

6          Q    And who was in the group?

7          A    Boy.  Me, Ron, Cindy, Dr. Olds, the

8 female deputy.  Other than that, I couldn't be sure.

9          Q    Is that when you took the hammer and

10 broke the ice?

11          A    It could be, yeah.  It could be that I

12 saw the tanks backed up and grabbed the hatchet and

13 followed along and broke ice as I went, just kind of

14 getting a step ahead of my chores.

15          Q    Do you remember anything that anybody

16 said during that walk through the pens or -- not

17 through, but you know, next to the pens?

18          A    Not really specifically, no.

19          Q    Did anybody say anything about the ice?

20          A    They might have.  Not that I would give a

21 shit about it.

22          Q    Do you remember anything said?

23          A    No.

24          Q    Do you remember anybody asking what --

25 what's the deal with these horses?

Page 619

1          Q    How long have you had a driver's license?

2          A    Three or four years, three years I guess

3 because I'm not off my SR22; or at least I'm still

4 paying it.

5          Q    I am sorry, I didn't --

6          A    I'm still paying my SR22.

7          Q    What is that?

8          A    What is that?

9          Q    Yeah, what's an SR22?

10         A    SR22 is an insurance you have to carry

11 when you lose your license and then get it back.

12         Q    So up until three years ago, your

13 Colorado license was suspended?

14         A    Yes.

15         Q    Other than February 16th of 2012, have

16 you ever talked to Dr. Olds?

17         A    No.

18         Q    Have you ever had occasion to hear

19 anything that she said at any other time?  I know she

20 testified at the trial.  But other than --

21         A    No.

22         Q    -- Echo Valley --

23         A    No.

24         Q    -- February 16th, and the trial, have you

25 ever heard anything that Dr. Olds said?

Page 620

1          A    No.  I don't believe.

2          Q    And you expressed some opinions today

3 about her qualification -- qualifications as a vet.

4          A    In my opinion, yes.

5          Q    And is that based on her treatment of any

6 of your animals?

7          A    Not of my animals, no.

8          Q    Whose animals is it based on?

9          A    People that I know in this area.

10         Q    And who are they?

11         A    In all fairness to them, I don't think

12 it's right to say their name because they're not a part

13 of this case.

14         Q    Well, I want to find out the basis for

15 what your opinion is about Dr. Olds.  So if it's

16 somebody who was a customer of Dr. Olds and the

17 specific situation, I want to know the specifics of

18 the --

19         A    Marlee called me, and I can't tell you

20 Marlee's last name, had a horse that had been gelded up

21 at Aspen Creek, get over there, take a look, pulled

22 about 7 foot of gauze out of his ball sac.

23         Q    Do you know when that was?

24         A    No.  I don't remember when that was.

25         Q    Before 2012?

Page 624

1          Q    -- that ever went to Echo Valley?

2          A    No.

3          Q    And were you satisfied with the work that

4  those two Aspen Creek people did on those two

5  occasions?

6          A    On those.  I wasn't there when Dr. Olds

7  was out for Emmy, she ended up down at surgery at

8  Littleton.

9          Q    For the colic?

10         A    For colic, I believe that was.

11         Q    And what about the other occasion?

12         A    The other mare, I helped Ron doctor for a

13  while after the vet had been out; and she's doing fine,

14  she's one of the horses I take hunting.

15         Q    So as far -- as far as you know, you were

16  satisfied with the services by Aspen Creek on that

17  other situation where there was a male vet?

18         A    On that mare, yes.

19         Q    And this situation with Emmy and the

20  colic, that's the only time you know of that Dr. Olds

21  was ever out to As- -- to Echo Valley?

22         A    That's the only one I know of.  That's

23  the only one that I know of.

24         Q    After February 16th of 2012, did you ever

25  have any contact with anybody at Aspen Creek?

Page 625

1          A    No.  I see you have a note card.  Do we

2 need to take a break for his?

3               MR. LEBSACK:  Yeah, the tape is running

4 out.  So we need to take a ten-minute break.

5               THE DEPONENT:  Take five.

6               THE VIDEOGRAPHER:  The time is now

7 approximately 4:55 p.m.  We're now off the record.

8               (Recess taken from 4:55 p.m. to

9 5:07 p.m.)

10              THE VIDEOGRAPHER:  The time is

11 approximately 5:07 p.m., and we're back on the record.

12              MR. SCHIMBERG:  Didn't know you knew so

13 much, did you?

14         Q    (BY MR. LEBSACK) Do you have any

15 information about who contacted the press after this

16 incident on the 16th?

17         A    No.

18         Q    Were you ever contacted by anybody in the

19 press?

20         A    Me personally, no.

21         Q    Yeah.  Mr. Swift was?

22         A    Yes.

23         Q    And I -- Mr. Schimberg may have asked

24 this question, and I apologize if he, did but:  Did you

25 personally get any of these phone calls or pressuring

# EXHIBIT I

## Arrestees - Suspects - Offenders

| Person # | Person Type CITE/RELEASE | Person Name HATLEE, RANDALL J | | | Date of Birth 7/23/1959 | Age 52 | |
|---|---|---|---|---|---|---|---|
| x | Race | Ethnicity | | | DL # 942200421 | State | |
| Hair | | Eyes | Height | Weight | SSN | | |

| Home Address 47 OVERLOOK LN | | | City BAILEY | State CO | Zip 80421 | Home Phone (720) 341-4036 | |
|---|---|---|---|---|---|---|---|
| Employer Name | | | | | Occupation | | |
| Business Address | | | City | State | Zip | Phone | |

CRIME COMMITTED
[TYPE] M
[SECTION/SUBSECTION] 18-9-202
[DESCRIPTION] CRUELTY TO ANIMALS
[STATUTE CODE / ID] STATE  M1
[COUNTS] 1

## Additional Case Data

| Case NO. 2012000142.9 | Title | | Case Type | | Court File Date |
|---|---|---|---|---|---|
| Case Group | OCA No. | Case Manager PRIESTLY, BOBBI J 9522 | | | Assign Date 05/29/2012 11:29 |
| Crime Report No. | | Lead Procecutor | | | |

| pies Sent To | Case Status CLOSED | Clearance NOT APPLICABLE  [DATE] 03/04/2013 | | Disposition VALID  [DATE] 03/04/2013 | |
|---|---|---|---|---|---|
| Reviewed By | | Reviewd By Date | | | |
| Consolidation File No. | Prosecutor | | Further Action | | |

## Narrative Data

| No. | Description | Author |
|---|---|---|
| | 2012000142.9 | PRIESTLY, BOBBI J |

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | 2012000142 |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | 2/16/2012 |

On February 14, 2012, at approximately 11:00AM, in Park County, Colorado, Sergeant B. Priestly called me on my cellular telephone on my day off and advised me that she had received a telephone call from a Routt County Animal Officer. The officer identified herself as:

**RP- Dawn Smith (Routt County Animal Control)**

Smith also sent Sgt. Priestly an email on February 16, 2012. Smith's email reads:

- "Sheriff Wiggins, On February 13, 2012, Deputy DelValle and I traveled to Park County to follow up on an animal abuse case. The horses we were to check on were being kept at Echo Valley Ranch and cared for by Ron Swift and Randy Hatlee. Upon arriving at the property we were met by Swift who informed us one of the horses, "Little Feather" had passed away five weeks previous. He had failed to mention this during our three phone conversations that week arranging the visit. Swift took me to see "Bear" the other horse we were there to evaluate. Bear's condition was deplorable. He scored a 1 on the Henneke Body Scale, emaciated. His living conditions were unkempt and smelled strongly of ammonia. Swift stated this was due to his girlfriend's recent heart attack. He also stated the vets from Timberline Equine Vet had told him there was Botulism in his hay and that was why the horses were thin. There were at least six other horses on the property in similar condition. Swift stated three of those had the bad hay and the other three had just gotten thin in the pasture. Upon returning to Routt County I spoke with Dr. Gotchey at Steamboat Vet Hospital. Dr. Gotchey agreed with our Body Condition Score and doubted the Botulism claim. He stated horses will die quickly of Botulism; it does not make them sick for a prolonged period of time. Dr. Gotchey also stated it looked like Bear had not grown more than a couple of inches between the ages of six months and almost 2 years. This is a sign of ongoing neglect. We did report the situation to Deputy Bobbi Priestly at the Park County Sheriff's Office on February 13, 2012. Please see the attached photos of Bear. Thank you, Dawn Smith, Routt County Sheriff's Office, Animal Safety Deputy ACO 2 3, 970-846-6538."

Sgt. Priestly said there were seven horses at the Echo Valley Ranch, 1640 Park County Road 70, Bailey, Park County, Colorado, that were scored a health condition score of 2 using the Henneke Body Score Technique. 1 being emaciated and 5 being ideal. The mare and colt on the ranch were reported as being emaciated if not diseased. At that point I advised Sgt. Priestly that I would be scheduling a welfare check on all animals on the ranch. The Echo Valley Ranch is care taken by a male party identified as:

**S- Ron Swift (DOB 07/17/1942)**

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| Initial Offense Classification | Subject | Case Report Number |
|---|---|---|
| | | **2012000142** |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | Date of Report |
| | | **2/16/2012** |

On February 16, 2012, at approximately 7:30AM, Deputy B. Sears asked me if I wanted to meet a Veterinarian at the Bailey Substation at 9:00AM, for Routt County. Deputy Sears said the veterinarian was going to be seizing a colt, per court order at the Echo Valley Ranch and needed an officer from our county to company her. I scheduled Park County Sheriffs Corporal J. Plutt and Deputy N. Hanning to accompany me with the court documents for removal of the colt.

At approximately 9:00AM, Doctor Ashleigh Olds, D.V.M. arrived at the Bailey Substation. From there Dr. Olds and I cleared the Bailey Substation and responded to a near by parking lot and waited for Cpl. Plutt and Deputy Hanning's arrival. At approximately 9:50AM, Cpl. Plutt and Deputy Hanning arrived and we all responded to 1640 Park County Road 70, Bailey, Colorado, also known as Echo Valley Ranch.

Upon arrival I spoke with Swift. I advised Swift I was there because Routt County had gotten a court order to remove one of the colts on his property. I also told Swift that I had received a complaint from Smith stating he had seven horses at a health score of a 2, using the Henneke Body Scoring Technique. I asked Swift if I could take Dr. Olds to see the colt. Swift took Dr. Olds, her assistant and I to the colt that was located in the low level of the barn. The colt was lying in the horse stall and was unable to get up off the ground. A male party that worked at the ranch was in the horse stall with the colt trying to get the colt to stand on his feet. The male party identified himself as:

### S- Randall Hatlee (DOB 07/23/1959)

While Hatlee and Dr. Olds where trying to get the colt named Bear- aka "Little Big Man", (Bay/ dark brown in color,) to stand on his feet, I asked Cpl. Plutt to take pictures of all the horses on the property. After asking Plutt to take pictures of the horses I walked back to where the colt was laying. While in the lower level of the barn I heard a loud stomp on the upper level floor. I asked Swift what that noise was Swift advised me that he had his Drum Mare named "Maggie", upstairs lying down on a pad and wood chips because she was really sick. I asked Swift if I could go see "Maggie". Swift took Cpl. Plutt, Dr. Olds and I up to the upper part of the barn. While in the upper part of the barn I observed "Maggie" lying on a pad with wood chips under the pad. "Maggie" was skinny and had wounds all over her body from being stuck on the ground and not being able to get off of the ground. Cpl. Plutt took pictures of "Maggie" (see attached pictures.) The wounds were located on "Maggie's" left and right side of her body and on "Maggie's" head (see attached pictures.) I did a visual body score on "Maggie", scoring "Maggie" at a 2.5 to a 3, using the Henneke Body Score Technique. I have been certified in Cruelty to Animal Investigations for over six years and have had over 4000 hours of training to include experience in the field of rating animals using the Henneke Body Score Technique.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

I asked Swift why "Maggie" was so sick. Swift said he did not know why "Maggie" was lying in the pasture on February 10, 2012, when he noticed her. Swift said that Hatlee and he went out to the pasture made a lift to get the horse off the ground and pulled her to the barn. Swift said he called the Veterinarian Dr. Horton, from the Timberline Equine Veterinary Services, and had her come to the ranch to see what was wrong with "Maggie." I asked Swift to call Dr. Horton on his person cellular so I could speak with her about "Maggie." While on the telephone with Dr. Horton I asked her when she had received a telephone call from Swift in reference to "Maggie" being down. Dr. Horton said she had received a telephone call from Swift on February 11, 2012, and responded solo. Dr. Horton felt that "Maggie" had a disease or had a neurological problem.

I told Dr. Horton that I was not comfortable with leaving "Maggie" just lying in the barn. Dr. Horton said she gave Swift and Hatlee instructions for "Maggie" and if at any time the horse appeared to be going down hill from there then they needed to put "Maggie" down, (humanely euthanize.) I asked Dr. Horton if she would email me a statement of everything she did medically on "Maggie." Dr. Horton believed "Maggie" could possibly have Botulinum Toxicity (a poison that attacks the neurological system) or Tic Paralysis. Dr. Horton gave Swift and Hatlee de-wormer and had Hatlee place an order for medication to help with the Botulinum Toxicity.

After speaking with Dr. Horton I walked back to the barn where I observed the colt to be standing outside of the barn tied to the truck located on the driveway. Dr. Olds and her assistant untied "Bear" from the truck and walked him to their trailer where "Bear" was placed.

When Dr. Olds returned from loading "Bear," Dr. Olds looked at me and asked if we could speak in private. Dr. Olds and I walked over to the side of the barn and she expressed her feeling about "Maggie." Dr. Olds felt that Maggie was suffering and she needed to be humanely euthanized. I told Dr. Olds that I had spoken to Dr. Horton about the horses' condition and Swift was aware of her condition. If Swift needed to humanely euthanized "Maggie" he would. Dr. Olds asked me if I had seen the condition of the other horse located on the ranch. Dr. Olds and I walked down to the lower level of the barn where the outside corrals were located and the other horse could be viewed.

I observed a horse named "Lena, (Swift's horse)" Lena was very emaciated her bones were protruding on her Withers, Loin, Point of hip and Tail head (see attached pictures.) I visually scored "Lena" at a 2 to 2.5 using the Henneke Body Score Technique. "Lena" was a Sorrel Paint Mare, white and orange brown in color.

I then walked over to a horse that I could see on the other side of the driveway. The horses name was "Midnight, (Swift's horse)" "Midnight" was very emaciated her bones were protruding on her Withers, Loins. Point of hip and Tail head (see attached pictures.) I visually scored "Midnight" at a 2 to 2.5 using the Henneke Body Score Technique. "Midnight" was a Breeding Stock Mare, brown in color. The brown is so dark she might be mistaken as black.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

68

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

There were other horses in corrals next to the horses listed but they were not emaciated, or skinny for that matter. Dr. Olds and I walked to the far outside corral located at the back of the ranch. There were four yearlings in the corral. Their names were as follows:

"Fiona, (Swift's horse)" – Palomino, Grade Filly gold in color. "Fiona" was very emaciated her bones were protruding on her Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "Fiona" at a 1.5 to 2 using the Henneke Body Score Technique.

"Echo, (Hatlee's horse)" – Grullo, Grade Stud brown and grey in color. "Echo" was very emaciated his bones were protruding on his Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "Echo" at a 1.5 to 2 using the Henneke Body Score Technique.

"River, (Hatlee's horse)" – Bay, Grade Gelding black and brown in color. "River" was very emaciated his bones were protruding on his Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "River" at a 1.5 to 2 using the Henneke Body Score Technique.

"Chance, (Hatlee's horse)" – Sorrel, Grade Gelding brown in color. "Chance" was very emaciated his bones were protruding on his Wither, Loins, Point of hip and Tail head (see attached pictures.) I visually scored "Chance" at a 1.5 to 2 using the Henneke Body Score Technique.

I asked Swift how old his colts and fillies were, he replied that they were around one to two years of age. I asked Swift why they were so skinny he said he believed there was something going on with all of his horses. Swift believed the horses all had Botulinum Toxicity. While I was speaking to Swift about his horses I was approached by Dr. Olds and she suggested I remove all the horses from the Ranch.

After Dr. Olds left the ranch I responded back to where "Maggie" was located. Cpl. Plutt, Deputy Hanning, Swift and Hatlee were trying to get "Maggie" to roll over. Cpl. Plutt and I took a rope that had been placed on "Maggie's" legs and pulled the rope until "Maggie" was rolled over. Once "Maggie" was rolled over Hatlee and I placed grain bags behind "Maggie." "Maggie could not hold herself up. Hatlee gave "Maggie" some grain and water. "Maggie" drank the water and ate her grain.

Swift and Hatlee advised me that they feed "Maggie" every two hours and have been rolling her over every two hours as requested by Dr. Horton. I decided to fill out a "State Notice of Warning" for all the horses in question. Which I issued to Swift and Hatlee regarding the poor health and welfare of some of their horses.

| | | | |
|---|---|---|---|
| Officer's Signature & Number | Supervisor's Initials & Date | | |
| C. Hardey 9523 | | Page _____ of _____ | |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
| --- | --- | --- |
| | | 2012000142 |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

The State Notice of Warning Stated:

- There are four yearlings that scored a 1.5 using the Henneke Body Score Technique.
- Lena and Midnight scored visually at a 1.5 on the Henneke Body Score Technique.
- You will have a month from today to gain HEALTHY weight on the 6 horses.
- Animal Control will be doing routine visits every two days for the next two to three weeks to monitor "Maggie" black Drum Mare, and all 6 horses in question.
- If there is an issue with any horse Animal Control will be advised (notified.)
- If you fail to rectify the Condition of the Animals in question you maybe charged.
- Note, Animal Control will be monitoring the health of all animals every 2 days for the next 2 weeks.

While filling out the State Notice of Warning, Swift and Hatlee advised me that they needed to go feed the rest of the herd. I asked Swift and Hatlee where they would like me to put the State Notice of Warning. Hatlee stated I could just set the State Notice of Warning in the driver seat of his truck. I signed the State Notice of Warning and because either Swift or Hatlee were present I placed their copy on the driver seat of Hatlee's truck and cleared the residence.

At approximately 4:00PM, I received an email from Dr. Olds. Dr. Olds was successful in getting "Bear" to her facility and had to give "Bear" I.V- fluid before she could get "Bear" out of the trailer. According to Dr. Olds "Bear" had fallen down in the trailer while transporting him to the clinic.

Dr. Old email reads:

- **"Officer Hardey: I have attached a letter with a summary of the findings today. Hopefully this will useful in obtaining an order to seize the remaining horses and/or get permission to euthanize the down mare. If she dies, I would recommend a necropsy at CSU to confirm whether she died of starvation vs. botulism. The little gelding that we took today is doing OK, although he went down in the trailer and was too weak to get up when he got to the hospital. We had to run IV fluids, Iv dextrose, calcium, and hydrate him for several hours before we could assist him to a standing position. He appears very hungry and has been eating non-stop since he got here. His blood work shows extreme anemia among other problems. He is not showing any signs of botulism and to me appears to be a very clear cut case of starvation and malnutrition." (See attached documents for further information.)**

I also received an email from Dr. Horton reference the condition of "Maggie. Dr. Horton stated she did not examine the six other horses on the ranch at the time she was called out. Dr. Horton was only there to tend to "Maggie."

| Officer's Signature & Number | Supervisor's Initials & Date | |
| --- | --- | --- |
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

70

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

Dr. Horton's email reads:

- "**Dear Officer Hardey, Ron Swift is a regular client of Timberline Equine Veterinary Services. We were first summoned to examine Maggie, a 3 to 4 year old black Shire cross mare, for this condition on Saturday afternoon, 2/11/12. Dr. Burton was unavailable for this call, so I responded solo. Approaching the ranch, I saw Maggie down in the pasture amidst a group of people and vehicles. Maggie was attempting to rise but was unable to succeed. On exam, I found Maggie alternating between right lateral and sternal recumbency. Heart rate was noted to be within normal limits, but irregular in rhythm, suggesting a marked sinus arrythmia and potentially second degree AV block. Respiratory rate was initially elevated at approximately 40, but later slowed significantly to 12 to 18. Mucous membranes were pale pink and moist and CRT was less than 2 seconds. Temperature was 98.0. Her mentation alternated between BAR (bright, alert, responsive) and sommnolent. When not exhibiting sommnolence, she demonstrated a vigorous appetite and normal cranial nerve function, including tongue retraction. Maggie demonstrated some motor function of her forelimbs, but with a flaccid character that was clearly abnormal. Hypotonia was noted in all four limbs. Tail tone, anal tone and perineal reflex were all noted to be present, but decreased. Muscle tremors were noted in the right brachium and left thigh. Body condition score was noted to be 2/9. No signs of external trauma were noted. The owner and several others were attempting to lift Maggie with the aid of a small tractor, which I stopped immediately, owing to the risk of an improper lift resulting in injury to the patient. During my observations, Maggie ceased attempting to rise and came to prefer right lateral recumbency. At this point, my presumptive diagnosis was botulinum toxicity, predicated primarily on the flaccid paresis/paralysis and the relatively normal mentation. Underlying my assessment of my exam findings and observations was knowledge of two other strikingly similar cases in the near vicinity in recent weeks and the fact that two of these animals were fed hay from big round and/or square bales, which are known to present an increased risk of botulinum contamination. Horses are exquisitely sensitive to botulinum toxin making it all but impossible to definitively confirm due to low levels of the toxin in blood and GI contents. The only treatment for botulism is nursing care, time and hope. Antitoxin is available, but without a definitive diagnosis, the risks may exceed any potential benefits. On my advice and with my assistance, Maggie was moved out of the snow and into the barn on a sled. Owner was advised to place Maggie on deep bedding and to turn her every 2 hours. He was advised to provide alfalfa hay and water ad libitum. Owner asked repeatedly about lifting Maggie in a sling, which I discouraged owing to not only the logistical difficulty of properly and safely operating a sling, but also serious complications associated with pressure points created by the sling. Maggie's size exacerbates these complications.**"

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | 2/16/2012 |

Dr. Horton's email continues:

- "Furthermore, slings are really only appropriate when an animal is able to support some of their own weight,and this was not the situation with Maggie. I advised that it would be best to attempt to manage her "down". Other differential diagnosis included, in no particular order; 1. mosquito bourne encephalitides (WEE, EEE, WNV) 2. tick paralysis 3. EHV 4. Rabies 5. trauma 6. malnutriton 7. myopathies 8. Wobbler syndrome 9. hypocalcemia 10. Toxic plant ingestion. None were an obvious or convincing match to the clinical picture Maggie presented. Owner called frequently with updates on Maggie's condition, indicating improvement in alertness and the ability to urinate and defecate. He reported that she was resting in sternal recumbency at least half of the time. The above summarizes events of Saturday, February 11, 2012. A. R. Horton, DVM, MS. Subsequent to this, attempts were made to gather further information from colleagues at the State Veterinarian's office, Colorado State University and Littleton Equine Medical Center as well as references. Consideration was given to testing, but due to a combination of the costly nature of testing and the lack of sensitive and specific tests available for many of the conditions on the list of differentials, none has been performed as yet. Mr. Swift called on Monday, describing Maggie moving her limbs while laying on her side. On further questioning, she was alert and seemed oriented to Mr. Swift after these episodes, but there was some concern that he could have observed seizure activity. Because of this concern, both of us went to the ranch to re-examine Maggie. Maggie was on deep wood shavings with bales of hay placed around her and a heat lamp overhead. She had a temperature of 100.8, a pulse of 48 with pronounced sinus arrhthmia and a respiratory rate of approximately 20. Gut sounds were normally present. Mucous membranes were pink and moist with a normal CRT. She could still retract her tongue. Her attitude was quiet and she was somewhat somnolent, but she has been eating and drinking. Her anal tone was decreased to absent. She had passed a normal quantity of soft manure. The soft character of the stool was attributed to the change in her diet to alfalfa hay. A single spot of normal-colored urine was present in the bedding, and she was not dribbling urine. We did observe the limb motion described by the owner and concluded that it was not pathologic, but simply an attempt to get comfortable, and probably indicated a need to be turned. We also discussed the inevitability of bedsores and made some suggestions to mitigate that eventuality.Consultations with colleagues did not yield any new avenues to pursue, as the general assessment was that the signs did not fit particularly well with any one diagnosis. Tick paralysis, however, was not mentioned by any of our colleagues. Interestingly, consultation of a toxicology reference did confirm that tick paralysis does occur in horses and the clinical signs were quite consistent with Maggie's. It was also noted by Mr. Swift that Bear, another horse on the ranch that had shown similar signs, had begun to improve after being coincidentally dewormed with ivermectin, which would have affected any parasite taking a blood meal."

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
| --- | --- | --- |
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | 2/16/2012 |

Dr. Horton's email continues:

- "Given these circumstances, the decision was made to treat for tick paralysis with ivermectin and Equi-Spot, a topical permethrin product. In the meantime, Maggie has shown more inclination to move her limbs. Given this change, attempts were made to arrange for a sling to be brought to the property with the intent of determining if Maggie could support even a portion of her weight. If she can, the sling can be used to intermittently. If not, she must continue to be managed down. Euthanasia has not been recommended at this point due to the fair prognosis of tick paralysis. The appearance of bed sores is not unexpected, nor are they evidence of abuse or neglect, and steps are being taken to treat this problem. A.R. Horton DVM, MS, Fay Burton, DVM."

During the next few days I had received numerous telephone calls reference the welfare of the horse. There were several concerned citizens that felt I should have removed the horses because the concerned citizens felt the horses were going to die (see attached emails.) Channel 7News was called and a report was given reference the welfare of the horse. Park County did not have anything to do with the initial channel 7News articles or News Paper articles, but later, a Press Release was issued by Under Sheriff M. Gore.

On February 17, 2012, at approximately 8:00AM, I received a telephone call on my personal cellular telephone from Swift telling me that "Maggie" was standing and they had placed "Maggie" in a big animal sling. I responded to the Echo Valley Ranch immediately following the telephone call. Upon arrival I observed "Maggie" to be standing on her own, she was eating and drinking (see attached picture.) Hatlee advised me that they had put "Maggie" in a sling to prevent her from falling if she couldn't hold her own weight, and standing on all four legs.

Later that night at approximately 8:30PM, I received a telephone call from Swift on my personal cellular telephone. Swift was calling to tell me that "Maggie" had passed away (died.) I asked Swift what the time of death was and he stated, "5:00PM." Swift advised me that Dr. Horton had been called and she was making arrangements to take "Maggie" to Colorado State University to be tested. "Maggie" was going to have a necropsy done on her to find out the cause of death. I asked Swift to call me and advised me when "Maggie" was taken to CSU.

On February 18, 2012, at approximately 1:00PM, I received a telephone call from Swift on my personal cellular telephone advising me that "Maggie" had been taken to CSU and Dr. Horton would call me on my personal cellular telephone to tell me what the test result came back as.

| Officer's Signature & Number | Supervisor's Initials & Date | |
| --- | --- | --- |
| C. Hardey 9523 | | Page ____ of _____ |

Rev. 6/98
N

Form: PCSO-

13

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | | Case Report Number |
|---|---|---|---|
| | | | **2012000142** |
| Initial Offense Classification | | Subject | Date of Report |
| **Cruelty to Animals** | | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

During the course of the day, I had received over ten telephone calls from concerned citizens and due to the amount of public attention, I had to get Under Sheriff M. Gore involved. Swift advised me that he was getting threats on his feed store. I had also spoken the Dr. Horton that day and she advised me that she was receiving threats from concerned citizens at her clinic.

On February 19, 2012, at approximately 12:30PM, the decision was made to remove the horses from the Echo Valley Ranch and place the horses into protective custody. I had spoken to Sergeant B. Priestly and we made arrangements to take the horses to an undisclosed location. The female party that resided at that residence identified herself as:

### IP- Kirstin LeBeau (DOB 08/05/1972)

I asked both Swift and Hatlee if they were ok with moving the horse. I felt at that time, the decision to move the horses was in the best interest of both the owners and the horses. After a long discussion Swift and Hatlee agreed to move the horses. Hatlee advised me that "Chance" was not doing well. Hatlee stated that Chance was unable to stand on his own. Hatlee said he was uncomfortable moving "Chance" but he would do what I asked.

At approximately 3:00PM, I responded to the Echo Valley Ranch with Swift and Hatlee. "Midnight," "Lena," "Fiona," "Echo," "River" and "Chance" were loaded into two trailers (Swift and Hatlee personally transported) nd brought the horses to 1401 Park County Road 77, Jefferson, Colorado. At the time of arrival, approximately ɔ:00PM, Sgt. Priestly was already on scene ready to help. LeBeau moved her personal horses to a pasture and we put the horses in an enclosed arena. Once the horses were settled, Sgt. Priestly and I cleared the residence and went home.

On February 20, 2012, I called Dr. Horton to see if she had any information with the results on "Maggie." Dr. Horton said "Maggie" died from an abscess in her Aorta, which caused blood to go else where in her body other than her heart. I also spoke with Sgt. Priestly and she said that the disease sounded like a genetic defect in her heart.

On February 22, 2012, at approximately 10:00AM, I called Dr. Horton on the telephone. I asked Dr. Horton if she had received any further information on the horses. Dr. Horton said she had gone to 1401 Park County Road 77, and took blood work on the six horses. Dr. Horton said some of the blood results showed that all the horses were anemic and some had a high white blood count. A few of the horses also had fast heart rates. I asked Dr. Horton if all the results she gave me would result in being emaciated. Dr. Horton said, "No." Dr. Horton felt the horses were left out to pasture for too long without being supplemented with other food and that is how they got skinny. At that point I made the decision to write a warrant to seize the six horses and hay samples from Echo Valley Ranch. I will be charging Swift and Hatlee with Cruelty to Animals. Each party will be charged with three counts based on the three horses that each owned.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

74

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| Case Report Number |
|---|
| **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

At approximately 11:00AM, I wrote two search warrant affidavits. One was for the hay located at the Echo Valley Ranch and the other for the six horses located at 1401 Park County Road 77, in Jefferson, Colorado (see attached.) Deputy District Attorney Steve Sullivan reviewed and approved the affidavits and warrants. At approximately 4:45PM, I took the affidavits and warrant over to the Park County Court House where an Eleventh Judicial District Judge signed the warrants.

On February 23, 2012, at approximately 9:00AM, Deputy B. Sears and I responded to the Echo Valley Ranch. Upon arrival Deputy Sears gave Swift the warrant to seize samples of hay. I asked Swift if Hatlee was present. Swift said he did not know where Hatlee was. At the time of arrival Swift was feeding his horse with another male party at the ranch. I advised Swift that I was going to be seizing his horses and taking a few samples of hay. I told Swift that I knew he had given me permission to take some hay to be tested but I had protocol I had to follow so I obtained a warrant. I told Swift I would be charging him and Hatlee with Cruelty to Animals. Swift asked me, "Why, you haven't got any of the test results back on any of the horses?" I told Swift I had spoken to his veterinarian Dr. Horton, and she said that the results would not show there was a disease making the horses skinny. Dr. Horton felt Swift had left his horses out to pasture too long before pulling them from the herd to supplemental feed. I understood that he pulled the six horses from the herd and brought them up to provide separate corrals to be fed separately, but he waited too long. I filled out the Cruelty to Animals summons and told Swift he was being charged with three counts of Cruelty to Animals. I advised Swift that he had the option to bond the horses or he could owner surrender the horses. Swift refused to sign the summons and did not make a decision on the three horses that were his. I wrote refused to sign on the summons. I gave Swift his blue copy of the summons and his Financial Bonding paper work (see attached copies.) I told Swift that he had ten days to decide if he was going to pay the bond. If he failed to pay the bond by the tenth day the horses would by default become the property of the Park County Sheriffs Office. I told Swift it would cost 8.00 dollars a day for each of the three horses and it would be 720.00 dollars a month for three horses. I also advised Swift that he would be responsible for the veterinarian care given to his horses. Swift was not happy but took his paper work and went back to feed the rest of his animals.

After giving Swift his paper work I went over to the hay located near the main ranch house. I took three hay samples from three different hay bales. The first sample of hay taken was from big square bale located on a trailer. I placed the hay in a brown paper Evidence bag. The second sample was taken from a big square hay bale located on the ground. I placed the hay in a brown paper Evidence bag. The third hay sample was taken from a small green hay bale located near the fence of the main ranch house. I placed the hay sample in a brown paper Evidence bag (see attached results). After getting my samples I left the ranch and responded to the Park County Sheriffs Office, in Fairplay, Colorado.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

75

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

Upon arrival at the Park County Sheriffs Office, I hooked up the horse trailer to my patrol vehicle. Under Sheriff Gore, Sgt. Priestly and I responded to 1401 Park County Road 77, Jefferson, Colorado. Upon arrival Under Sheriff Gore gave LeBeau the warrant for the six horses. I explained to LeBeau that after speaking with Dr. Horton reference the six horses I had made the decision to seize the horses. LeBeau did not want to take the warrant and put the warrant on a peace of wood attached to the side of the indoor arena. At that time Sgt. Priestly and I loaded the six horses into our horse trailers. All horses loaded well except for "Chance." "Chance was the last horse to be loaded. When Loading "Chance" he collapsed in the trailer and was unable to get up. Sgt. Priestly and I rushed "Chance" to the Park County Sheriffs Office where four Park County Jail personal came out and helped us get "Chance" back to his feet. Once "Chance" was back on his feet Sgt. Priestly and I responded to the horse rescue facility. The trip was slow but after three hours of driving all horses made it the facility safely.

Upon arrival Dr. Toll and six different people were waiting for us outside the facility. The Manager of the Facility identified herself as:

### IP- Debbie (Manager of Rescue Facility)

All horses were examined by Dr. Toll. I palpated all six horses and scored them using the Henneke Body Score Technique. I scored the horses at a 1 to 1.5 (see attached score sheet.) All horses were weighed and numbered with necklaces so they could be identified. After all six horses were put in their stalls with food and water we left.

On February 24, 2012, at approximately 9:00AM, Hatlee met me at the Bailey Substation. Upon arrival I gave Hatlee his summons for Cruelty to Animals and his Financial Bonding paper work. I explained to Hatlee that he had two options. He could bond his three horses or he could owner surrender them. I told Hatlee that he had ten days to bond his three horses. If Hatlee failed to bond his three horses on the tenth day then the horse by default would be the property of the Park County Sheriffs Office. I told Hatlee it would cost 8.00 dollars a day for three horses and it would be 720.00 dollars a month for three horses. I also advised Hatlee that he would be responsible for the veterinarian care given to his horse. Hatlee believed very strongly that there was something going on in this county. Hatlee felt that his horses were sick not neglected. Hatlee requested I not remove "Chance" because he would not be able to make another horse trailer ride. I told Hatlee that I would take good care of "Chance." I asked Hatlee to sign his summons for Cruelty to Animals (see attached.) Hatlee refused to sign. I wrote refused to sign on the summons and gave Hatlee his blue copy. Hatlee told me I was not in my right to remove his horse from Lebeau's property. I told Hatlee that I had a warrant for the property the horse were on which gave me the right to remove the horses. I asked Hatlee if he was going to bond his horses Hatlee could not answer that question. I gave Hatlee his Finical Bonding paper work. After Hatlee received all his paper work he cleared the Bailey Substation.

| Officer's Signature & Number | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|
| C. Hardey 9523 | | |

Rev. 6/98
N

Form: PCSO-

76

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ron and Hatlee, Randal** | **2/16/2012** |

I issued Summons # **45132** and **45134**, to **Swift** and **Hatlee** for the following charges:

1. **Colorado Revised Statue 18-9-202(1)(a)**      **Cruelty to Animals**      **1st Offense**

On March 1, 2012, at approximately 12:00PM, Hatlee responded to the Park County Court House and paid the Financial Bonding for the bond of his three horses and the bond of Swifts horses. I have nothing further to report at this time. Further action may follow.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

77

STATE OF COLORADO )
                       )
,OUNTY OF PARK    )

AFFIDAVIT FOR
A SEARCH
WARRANT

In support of the issuance of a SEARCH WARRANT to search:

To remove samples of hay from five hay bales, known as, 1640 Park County Road 70, Bailey, Park County, Colorado, ALSO KNOWN AS, T08 R72 S01 NW4; ECHO VALLEY RANCH II, S2NW4, N2SW4, SW4SW4 1-8-72, NE4NE4, N2SE4NE4 11-8-72, NW4NW4, N2SW4NW4 12-8-72, R576352 CB03 16009 16008 45783, CONSERVATION EASEMENT: Information obtained from the Park County Assessors Office, belonging to **Ronald Swift.**

I, Park County Code Enforcement Deputy Cindy Hardey, am a Deputy Sheriff for the Park County Sheriff's Office, and have been employed with this office since 2003. I have been a Code Enforcement Officer for over 8 years, and have over 4000 hours as a Commissioned Agent with the State of Colorado. I, Deputy C. Hardey, being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On February 14, 2012, at approximately 11:00AM, in Park County, Colorado, Sergeant B. Priestly called me on my cellular telephone on my day off and advised me that she had received a telephone call from a Routt County Animal Officer. The officer identified herself as:

### RP- Dawn Smith (Routt County Animal Control)

gt. Priestly said there were seven horses at the Echo Valley Ranch that were scored at a 2 using the Henneke Body Score Technique, on a scale from 1 to 9, 1 being emaciated and 5 being ideal. The mare and colt on the ranch were reported as being emaciated if not diseased. At that point I advised Priestly that I would be scheduling a welfare check on all animals on the ranch. The Echo Valley Ranch located at 1649 Park County Road 70, Bailey, Park County, Colorado, is care taken by a male party identified as:

### S- Ronald Swift

On February 16, 2012, at approximately 7:30AM, Deputy B. Sears asked me if I wanted to meet a Veterinarian at the Bailey Substation at 9:00AM, from Routt County. Sears said the veterinarian was going to be seizing a colt at the Echo Valley Ranch and needed an officer from our county to accompany her. I scheduled Corporal J. Plutt and Deputy N. Hanning to accompany me with the court documents for removal of the horse.

At approximately 9:00AM, Doctor Ashleigh Olds DVM arrived at the Bailey Substation. Olds and I cleared the Bailey Substation and responded to the Rustic Square and waited for Plutt and Hanning's arrival. At approximately 9:50AM, Plutt and Hanning arrived and all unites cleared the Rustic Square. All unites responded to Echo Valley Ranch.

Upon arrival I observed six very emaciated horses. I visually scored the horses to be a 1 to 1.5 using the Henneke Body Score Technique. There were four horses located in the back corral. I asked Swift how old the horses were and he stated the horses were one to two years of age. The yearling's (Echo, River, Chance and Fiona), had a heated water trough full of water and hay in the lean-to. Their Spinous process, Tailhead  inbones), Ribs and Hook bones were projecting prominently. I also observed two a mares (Midnight and Lena), in separate corrals with heated water trough full of water and hay on the ground. The horses were also visually scored as 1 to 1.5 using the Henneke Body Score Technique. Their Spinous process, Tailhead

7 8

(pinbones), Ribs and Hook bones were projecting prominently. I asked Swift why his horses were so skinny. Swift believed the horses were suffering from a disease or a neurological disorder.

Swift said he feeds the horses two times a day and had given all of his horses their shots for the year. The colt named "Chance" is not well and could possibly die. I spoke with Swift's veterinarian Doctor Horton, from imberline Equine Veterinarian Hospital, who believes that Swift waited to long to rectify the problem and could have avoided the situation. I believe if Swift had noticed the horses' condition sooner they would not be in the condition they are in today. Based on the above statement I believe the horses were neglected.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following:  All of the inside and outside structures on the property and seize **"Midnight"- Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grullo Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade Gelding horse, "Fiona"- Palomino Grade Filly horse,** located on the property.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following: All of the inside and outside structures to remove samples of hay from five hay bales.

The property to be searched for, and seized if found, is:
- ( )     Stolen or embezzled OR
- **(X)**     Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
- **(X)**     Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_____
AFFIANT

Subscribed and sworn to before me this ____ day of _____, 199___.

_____
JUDGE

79

IN THE COMBINED COURTS
COUNTY OF PARK                                                    SEARCH WARRANT
STATE OF COLORADO

.HE PEOPLE OF THE STATE OF COLORADO

TO:    THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT
OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO,
GREETINGS:

WHEREAS, Park County Code Enforcement Deputy Cindy Hardey, has made an affidavit and complaint for
the issuance of a search warrant.

To remove samples of hay from five hay bales, known as 1640 Park County Road 70, Bailey, Park County
Colorado, ALSO KNOWN AS, T08 R72 S01 NW4; ECHO VALLEY RANCH II, S2NW4, N2SW4, SW4SW4
1-8-72, NE4NE4, N2SE4NE4 11-8-72, NW4NW4, N2SW4NW4 12-8-72, R576352 CB03 16009 16008 45783,
CONSERVATION EASEMENT: Information obtained from the Park County Assessors Office.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the
issuance of a Search Warrant for the reason or reasons marked below:

        The property to be searched for and seized if found is:
        ( )    Stolen or Embezzled OR
        (X)    Designed or intended for use or which is or has been used as a means of committing a criminal
               offense or the possession of which is illegal, OR
        (X)    Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:

And you will search for five hay bales located on the property and remove samples from the hay bales located
on the property.

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them
until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State;
and that you further file a report with this Court inventorying the goods and things which were seized or
reporting that nothing was so found and seized.

Done this _____ day of _____ 199___.
                              BY THE COURT



                              _____
                              JUDGE



*80*

IN THE COMBINED COURTS
COUNTY OF PARK                                                      SEARCH WARRANT
STATE OF COLORADO

THE PEOPLE OF THE STATE OF COLORADO

TO:   THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT
OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO,
GREETINGS:

WHEREAS, Park County Code Enforcement Deputy Cindy Hardey, has made an affidavit and complaint for
the issuance of a search warrant.

Horses were moved on February19, 2012, at approximately 4:00PM, with owners permission and assisted by
Park County Animal Control to location known as: 1401 Park County Road 77, Jefferson, Park County,
Colorado, 80453, ALSO KNOWN AS, T08 R75 S16 NW4, SLASH 6, LOT 06: Information obtained from the
Park County Assessors Office.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the
issuance of a Search Warrant for the reason or reasons marked below:

    The property to be searched for and seized if found is:
    ( )    Stolen or Embezzled OR
    (X)    Designed or intended for use or which is or has been used as a means of committing a criminal
           offense or the possession of which is illegal, OR
    (X)    Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:

And you will search for:  **"Midnight"- Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse,
"Echo"- Grullo Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade
Gelding horse, "Fiona"- Palomino Grade Filly horse,** located at said property, and will seize **"Midnight"-
Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grullo Grade Gelding
horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade Gelding horse, "Fiona"- Palomino
Grade Filly horse,** located on the property.

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them
until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State;
and that you further file a report with this Court inventorying the goods and things which were seized or
reporting that nothing was so found and seized.

Done this _____ day of _____ 199___.
                      BY THE COURT

                                _____
                                JUDGE

*81*

STATE OF COLORADO )         AFFIDAVIT FOR
          )           A SEARCH
COUNTY OF PARK  )          WARRANT

ı support of the issuance of a SEARCH WARRANT to search:

Horses were moved on February19, 2012, at approximately 4:00PM, with owners permission and assisted by
Park County Animal Control to location known as: 1401 Park County Road 77, Jefferson, Park County,
Colorado, 80453, ALSO KNOWN AS, T08 R75 S16 NW4, SLASH 6, LOT 06: Information obtained from the
Park County Assessors Office.

**Kirsten Le Beau.**

I, Park County Code Enforcement Deputy Cindy Hardey, am a Deputy Sheriff for the Park County Sheriff's
Office, and have been employed with this office since 2003. I have been a Code Enforcement Officer for over 8
years, and have over 4000 hours as a Commissioned Agent with the State of Colorado. I, Deputy C. Hardey,
being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On February 14, 2012, at approximately 11:00AM, in Park County, Colorado, Sergeant B. Priestly called me on
my cellular telephone on my day off and advised me that she had received a telephone call from a Routt County
Animal Officer. The officer identified herself as:

**RP- Dawn Smith (Routt County Animal Control)**

Sgt. Priestly said there were seven horses at the Echo Valley Ranch that were scored at a 2 using the Henneke
Body Score Technique, on a scale from 1 to 9, 1 being emaciated and 5 being ideal. The mare and colt on the
ınch were reported as being emaciated if not diseased. At that point I advised Priestly that I would be
scheduling a welfare check on all animals on the ranch. The Echo Valley Ranch located at 1649 Park County
Road 70, Bailey, Park County, Colorado, is care taken by a male party identified as:

**S- Ronald Swift**

On February 16, 2012, at approximately 7:30AM, Deputy B. Sears asked me if I wanted to meet a Veterinarian
at the Bailey Substation at 9:00AM, from Routt County. Sears said the veterinarian was going to be seizing a
colt at the Echo Valley Ranch and needed an officer from our county to accompany her. I scheduled Corporal J.
Plutt and Deputy N. Hanning to accompany me with the court documents for removal of the horse.

At approximately 9:00AM, Doctor Ashleigh Olds DVM arrived at the Bailey Substation. Olds and I cleared the
Bailey Substation and responded to the Rustic Square and waited for Plutt and Hanning's arrival. At
approximately 9:50AM, Plutt and Hanning arrived and all unites cleared the Rustic Square. All unites
responded to Echo Valley Ranch.

Upon arrival I observed six very emaciated horses. I visually scored the horses to be a 1 to 1.5 using the
Henneke Body Score Technique. There were four horses located in the back corral. I asked Swift how old the
horses were and he stated the horses were one to two years of age. The yearling's (Echo, River, Chance and
Fiona), had a heated water trough full of water and hay in the lean-to. Their Spinous process, Tailhead
(pinbones), Ribs and Hook bones were projecting prominently. I also observed two a mares (Midnight and
Lena), in separate corrals with heated water trough full of water and hay on the ground. The horses were also
ˋsually scored as 1 to 1.5 using the Henneke Body Score Technique. Their Spinous process, Tailhead
(pinbones), Ribs and Hook bones were projecting prominently. I asked Swift why his horses were so skinny.
Swift believed the horses were suffering from a disease or a neurological disorder.

*82*

Swift said he feeds the horses two times a day and had given all of his horses their shots for the year. The colt named "Chance" is not well and could possibly die. I spoke with Swift's veterinarian Doctor Horton, from Timberline Equine Veterinarian Hospital, who believes that Swift waited to long to rectify the problem and could have avoided the situation. I believe if Swift had noticed the horses' condition sooner they would not be in the condition they are in today. Based on the above statement I believe the horses were neglected.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following:  All of the inside and outside structures on the property and seize **"Midnight"- Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grullo Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade Gelding horse, "Fiona"- Palomino Grade Filly horse,** located on the property.

The property to be searched for, and seized if found, is:
- ( ) Stolen or embezzled OR
- (X) Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
- (X) Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_____

AFFIANT

ubscribed and sworn to before me this ____ day of _____, 2012____.

_____

JUDGE

*83*

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Ron Swift** | **02-16-2012** |

On February 16, 2012 at approximately 9:00am Deputy Hanning and I assisted Park County Animal Control to seize a horse out at Echo Valley Ranch outside of Bailey, Colorado. Accompanying AC Officer Hardey was two other professionals dealing with horses I arrived on scene and walked up to a male party. The male party was verbally identified as:

### IP/Ron Swift (DOB 07-17-1942)

I looked into an open door in the barn for officer safety. I announced myself and heard a male party state he was inside the stall. I walked into the barn and observed a male party pulling the tail of a horse upward of what I call a "baby" horse. The male party was verbally identified as:

### IP/ Randy Hatlee (DOB 07-23-1959)

I observed bloody sores on the babies' front left leg. I asked Randy what happened to the horse. He stated that it "fell" on the concrete. The baby looked very skinny. I could see bones perturbing from underneath the skin on the back end of the horse. The horse was lying down and appeared to be having trouble standing up. I then heard loud knocking on the ceiling above us. Randy stated another horse was upstairs in the barn and that she was sick.

I asked Officer Hardey to come into the barn to look at the condition of the horse. Officer Hardey and the horse professionals assessed the horse's condition. Randy stated the horse has, "Botulism". I walked upstairs with Officer Hardey to look at the other horse condition. Inside the barn I observed a black colored horse lying down. The horse was lying in sawdust and some type of pad. As I got closer to the horse I could start to see multiple open bleeding sores all over the horse's body. The horse appeared to be extremely skinny. I could see the see bones perturbing from underneath the skin on the back end of the horse as well.

I started to take pictures of the horse and horses around the barn area. Located outside by the barn were at lease six other horses that appeared to be skinny. Six out of the eight water trough were frozen and the horses could not drink. The horses were locked in a pen so they could not gain access to water other than their frozen trough.

Both Ron and Randy stated that they take "good care" of their horses. Ironically enough while we were there, Randy busted the ice with a small axe and started to feed and water the horses. Also, while I was there I observed a goose with a deformed wing that appeared to be broken.

Being the fact that Deputy Hanning and I were on scene for almost two hours, I offered Deputy Hanning and my assistance to help Ron and Randy move the horse that appeared to be extremely sick since Randy stated that he moves the horse over every two hours. Randy accepted our help. Randy placed a rope on the front legs and a rope on the back legs. He then started up a small tractor and placed the "bucket" down on the ground. He then started to push the horse with the "bucket" portion of the tractor.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| J. Plutt # 9110 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

84

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification **Cruelty to Animals** | Subject **Ron Swift** | Date of Report **02-16-2012** |

Once he moved the horse with the bucket (for an unknown reason) he told us to start pulling the rope. At the time it seemed inhumane to do this to a horse that is so helpless. Ultimately it was for the best interest of the horse, I was told so it would not get blood clots in its legs. Once we pulled the horse over, it flopped over as if it was deceased. The horse was unresponsive as we pulled it with the ropes and turned it over.

The horse had similar bloody sores on the opposite side, but not near as many as the prior side. Randy then forced the horse to sit up by pulling the horses halter. Randy then stated, "Aren't you going to take a picture of her sitting up and eating?" I took a picture of the horse sitting up, however, what the picture does not show is several 50 pound bags a feed or seed propping the horse up on the back side. Yes, the horse was sitting up eating, but not without being propped up.

On Friday February 17, 2012 I downloaded the pictures onto a CD. See attached photos for further information.

END OF REPORT.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| J. Plutt # 9110 | | Page _____ of _____. | |

Rev. 6/98
N

Form: PCSO-

85

**PARK COUNTY SHERIFF'S OFFICE**
CONTINUATION SHEET

| | | Case Report Number |
| --- | --- | --- |
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

On February 13, 2012 at approximately 3:29 PM, 2012, I received a telephone call on my cellular telephone from Robin Bode at the Bailey substation. Robin stated that an officer from Routt County Sheriff's Office had stopped by and requested to speak to me about some horses at the Echo Valley Ranch in Bailey, Colorado.

The telephone was given to the officer and she introduced herself to me as:

### RP/ Animal Control Officer Dawn Smith

Officer Smith stated she was in Park County conducting follow-up on the case from Routt County at the Echo Valley Ranch. She was checking the welfare on the mare and colt that was brought down over a year ago and she was concerned about some of the horses at the ranch. She had learned that the mare from the cruelty case in Routt County had died five or six weeks ago and the colt from the case was in very bad condition.

Seven of the other horses on the property were a body score of two or less on the Henneke Body Condition Scoring System in her opinion. There was a mare on the property that was down and in extremely bad condition. The owners were stating the mare was suffering from Botulism according to their veterinarian. The veterinarian treating the mare was from Timberline Equine and she was planning on calling them after we were done on the telephone. Four of the thin horses were very young and three horses were in the pasture. Officer Smith stated she could not leave without reporting the condition of the horses. I advised Smith that I would have a Deputy check the horses and thanked her for the information.

On February 14, 2012 I advised Deputy Cindy Hardey about the call I received from Officer Smith. Deputy Hardey stated she would handle the call and make arrangements to check the horses. Deputy Hardey contacted me and stated that she had received a call and she would be doing a welfare check on the horses at the Echo Valley Ranch on February 16, 2012. The horses at the ranch were owned or under the care of two male parties indentified as:

### RO/ Ronald Swift (07-17-1942)
### &
### RO/ Randall J. Hatlee (07-23-1959)

I arrived at the Lake George substation on February 16, 2012 at approximately 7:21 AM. Upon arrival I received a telephone call from the Sheriff and he stated he had just forwarded me some photographs and emails about a couple of horses at the Echo Valley Ranch. I advised the Sheriff that Deputy Hardey would be responding to the ranch and checking the welfare of the animals later in the morning. I then received a call from Deputy Hardey stating that Routt County would be executing a Search warrant and seizing the colt named "Bear". I advised Deputy Hardey that I would be forwarding some photographs of the colt and emails that the Sheriff had received from Routt County. I advised Deputy Hardey to call if she needed help I would be out on another cruelty investigation in Lake George and available by cellular telephone.

| Officer's Signature & Number | Supervisor's Initials & Date | |
| --- | --- | --- |
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

*86*

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

I received a call from Deputy Hardey stating that some of the horses on the property were in good condition and others were in a compromised condition. Deputy Hardey was most concerned a bout a Drum Mare named "Maggie" that was down and unable to rise. This horse was currently under veterinarian care and had been prior to our arrival according to Deputy Hardey. The veterinarian that was treating the horse identified as "Maggie" was Dr. Horton, DVM and Dr. Burton, DVM both certified doctors of veterinarian medicine and co-owners of Timberline Equine Veterinary Services. I was advised the horse had been down since February 10, 2012 and the owner had called his veterinarian's immediately to treat the horse.

Deputy Hardey stated that the other horses on the property that were thin were four young horses between one and two years of age. The three colts and one filly were all scored visually at 1.5 or 2 the Henneke Body Condition Scoring System by Deputy Hardey. The Henneke Body Condition Scoring System is an objective system used by palpating six areas on a horse for deterioration of muscle mass and or atrophy of fatty tissue. The score of "1"; is described as extremely emaciated and no fatty tissue can be palpated the horse is in danger of death. A score of "9" is described as; extremely fat and obese and could also be in danger of death. Deputy Hardey stated that the," Babies looked bad and they were very thin." I was also told that a mare named "Midnight" who was approximately thirteen years old and her daughter another mare named "Lena" were thin as well. The two older mares were scored visually by Deputy Hardey at a 2 or a 2.5.

Deputy Hardey advised me that Swift had hay and water available for the horses and she had spoken with his veterinarian Dr. Horton about "Maggie". I was told the other veterinarian that was at the ranch a Dr. Ashley Olds, DVM that was assisting Routt County in seizing the colt was certain the horses on the property were being mistreated and suffering from nothing more than neglect.

Deputy Hardey advised me that according to Dr. Horton, DVM she was concerned that "Maggie" was suffering from some medical illness such as Tic Paralysis, Botulism Toxicity, or a neurological condition. Dr. Horton did confirm that she was contact by Swift to treat the horse named "Maggie" on February 11, 2012. Dr. Olds, DVM was almost demanding according to Deputy Hardey and insistent on Park County seizing all of the horses. I advised Deputy Hardey to have Dr. Olds leave with the horse they were ask remove under court order.

I contacted **Dr. Kate Anderson, DVM with Colorado Department of Agriculture, State Veterinarians Office** on her cellular telephone. I explained the facts as I understood them to Dr. Anderson, DVM. She stated that if the owner had his veterinarian caring for the horse that was down and tests were being run she was comfortable with us just monitoring the situation for now. I also contacted **Scot Dutcher, Chief Investigator with the Bureau of Animal Protection** and advised him of the case our agency was investigating.

I then placed a telephone call to another independent veterinarian that our office has used in other cases. I contacted **Dr. Britt, DVM with Rocky Top Veterinary Services.** DR. Britt, DVM agreed with Dr. Anderson, DVM and stated that if the owner was treating the horse that was down that was an educational step in the right direction. Dr. Britt stated to see what some of the test results were before we took immediate action. Dr. Britt,

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page ___ of ___ |

Rev. 6/98
N

Form: PCSO-

*87*

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| Case Report Number |
| --- |
| 2012000142 |

| Initial Offense Classification | Subject | Date of Report |
| --- | --- | --- |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | 02-13-2012 |

DVM offered to look at some photographs of the downed mare and give any additional ideas if possible. DR. Britt, DVM told me that he had two Botulism Toxicity cases in the Guffey area and according to him those cases are not very common.

I called Deputy Hardey back and asked her what she thought she should do in this case. Deputy Hardey stated that she was concerned the horse named "Maggie" was suffering and needed to be euthanized. Deputy Hardey also stated she was comfortable based on the information I had relayed from Dr. Anderson, DVM, DR. Britt, DVM and Scot Dutcher with serving a State Notice of Warning. She was going to monitor the horses and leave them in the care of the owners at this point.

Deputy Hardey stated that Swift was asking to speak with me on her telephone about the horse named "Maggie". I spoke with Swift about the horses on the telephone at that time briefly. I asked Swift why the young horses were in such bad shape and Swift stated that he did not bring them in soon enough. Swift said, "You caught me on the babies Bobbi I screwed up, Helen had a heart attack and I have had a lot going on and I blew it." I asked him if "Maggie" was suffering and if she needed to be put down. Swift stated that he would put her down if he needed to. Swift said, "She still eats and drinks, she still has fight in her and as long as she has fight I will fight along side of her, you know me Bobbi I will do the right thing here." I was advised by Swift that something was going on with his herd, "Midnight" was thin and she always loses weight in the winter and I was well aware of that. His veterinarians think there is some disease problem but it is not a starvation issue. I asked Swift what the sores were all over "Maggie's" body and he explained it me that the sores were pressure sores from lying down. He stated that the veterinarian said it was just like "bed sores" that elderly people get from not being able to get up. That is why the doctors asked the horse be moved every two hours.

Deputy Hardey stated she had Corporal Jenny Plutt take several photographs and she would meet with me after she completed a State Notice of Warning. The agreement was the six horses that were standing would be checked weekly and expected to show signs of improvement within a thirty day period. The downed mare known as "Maggie" while under veterinarian care would also be monitored by Park County Animal Control every other day. Any changes in the horses' conditions were to be reported to authorities immediately.

I contacted Scot Dutcher again and asked him about the possibility of the horses having Botulism and he advised me that typically if a horse had Botulism it hits them hard and the horse will die as a result of the toxin. I confirmed this with Dr. Britt on the two cases he tried to treat the previous year. Dr. Britt stated the two cases he saw the horses were not thin; the horses tongue was flaccid. Dr. Britt explained that Botulism Toxicity causes the horse to lose control of the muscles it needs to chew and swallow. The horse will drool not only from its mouth but also from the nostrils. The horse will also seem weak all over. In advanced stages the horse will collapse and begin jerking its legs as if trying to run while lying down. Death soon follows the later stages. The horse in this case has some similar symptoms. Dr. Britt stated he was supportive of leaving the horses at the property and officials monitoring to care of the animals, until some of the test results were in.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
| --- | --- | --- | --- |
| Sgt. B. Priestly #9522 | | Page _____ | of _____ |

Rev. 6/98

N

Form: PCSO-

88

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Dr. Britt stated he would be glad to go and examine the horse. The only thing he would suggest he would give the owner would be if the mare was not standing on her own within twenty-four to forty –eight hours he would recommend euthanasia.

I asked Dr. Britt about the possibility of Tic Paralysis and he was reserved about this even being a possibility. He stated he has never seen a case in Colorado, but that does not mean anything. He felt the time of the year was a factor and ticks are usually out in the spring season not the winter. I asked what the symptoms of Tic Paralysis are and he stated coordination loss, which would lead to paralysis of the legs and chest muscles.

On February 17, 2012 I was contacted by Deputy Hardey and advised that "Maggie" was deceased and that Timberline Equine Veterinary Services had arranged a necropsy with Colorado State University. The necropsy was to determine the horse's cause of death.

On February 19, 2012 I received a telephone call from Under sheriff Gore at my residence. The Under sheriff advised me that he had received several telephone calls from the Public Information Officer for State of Colorado's Department of Agricultures Office. He was very concerned for the safety of the owners of the horses and the horses themselves. The Under sheriff stated that he had been on the telephone all morning and the emails and telephones calls were very concerning to him. He asked if I could make arrangements to move the horses. I advised the Under sheriff that I would see if the owners would agree to move the horses into rotective custody on a temporary basis.

Deputy Hardey contacted Swift and Hatlee and they did agree to move the horses. I completed a written agreement that was signed by Hatlee, Swift and Deputy Hardey. This agreement was turned over to Deputy Hardey and has been placed in the case file.

The horses were moved from the Echo Valley Ranch and transported by Swift and Hatlee. The horses were moved to a private ranch in Park County and housed in an enclosed barn. The horses were provided with veterinarian care by Timberline Equine Veterinary Services while at this location. I assisted with unloaded the horses and accessing them once they were taken off of the trailers. I noticed that the younger horses back legs were quivering when they walked. The horses were given hay and water before we left the area. Hatlee was concerned about one of the young colts named "Chance". Hatlee advised us that the colt had been collapsing frequently and that he was unable to rise on his own.

On February 21, 2012 at approximately 10:30 AM, I received a call from Dr. Horton, DVM. Dr. Horton called and stated that she had some preliminary results on the necropsy that was done on "Maggie". I recorded a portion of this conversation (see attached audio disk). Under sheriff Monte Gore and Sheriff Fred Wegener were both in the office for the conversation with Dr. Horton.

Dr. Horton stated:

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

*84*

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Rabies was the first thing that was tested for and that test came back negative. The spinal cord was removed and there was a lesion found. This was an abnormality according to Dr. Horton. Dr. Horton stated that the death of this horse was not the owners fault.

The most significant thing was an abscess in the wall in the heart. The abscess was blocking the blood flow and new channels were being made to allow blood flow. There was a infection in the bones. She would contact Deputy Hardey with the final results.

Dr. Horton stated she would do a blood draw on the other six horses. If the weakness persists it could be an electrolyte problem. The colt named "Chance" was showing some neurological symptoms such as cranial nerve functions and sensory functions and no reaction to nostril sensations. He was given a Body Condition Score 1/9 and a heart murmur was found.

On the mare named "Midnight" she scored her at a 3/9. "Echo" was scored at a 1/9, "Fiona" was 2/9, "River" was 1/9, and "Lena" was a 1 or 2/9. The fact was all of these horses were too thin and Swift was told that. She was contacted to first respond to the ranch and treat "Maggie" on February 11, 2012. When she went out to the location to do the blood draw on the other six horses the caretaker told her the horses were urinating frequently in small amounts. Dr. Horton stated she did not observe this herself while she was there. The care taker also advised her that "Chance" was leaning on his left side and again she stated that she did not observe 'his on her visit.

Dr. Horton stated that she was in no hurry to jump to conclusions in this case as it is not a clear cut case at all. However, if an owner sees that horses are experiencing rapid weight lose it is their responsibility to contact a veterinarian rather than just letting it go.

I asked Dr. Horton if she cared for the younger horses at all. She advised me that she had castrated a couple of them a year or two ago and she had seen them visually when they were tiny babies. That was the only treatment she had provided. She stated that she was informed that a couple of the babies were rescued from a feedlot and she thought "Chance" may one of those babies.

I asked Dr. Horton if she had anything to do with treating the colt that was seized and the mare (mother of that colt) that had died. Dr. Horton stated that she had not seen the colt recently or the mare. She said that her practice was contacted by Routt County Animal Control to oversee their care when they arrived in Park County and to castrate the colt. The last time they had seen the horses was on June 28, 2011. Routt County Animal Control was placed on a No Service basis due to failure to pay.

Dr. Horton stated she went to treat and examine "Maggie" by herself on February 11, 2012 and Dr. Burton and her both went to check the horse on February 13, 2012. Dr. Horton stated that the other horses were not even evident to her on the day the colt was seized. She never even saw them at all and she wanted that to be made perfectly clear.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

90

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

I asked Dr. Horton if she felt getting the hay at the Echo Valley Ranch tested would be a good idea and she stated that she thought that would be helpful.

Sheriff Wegener had one question for Dr. Horton. He asked if she thought Swift did not call a vet sooner because he was an older rancher and he thought he could take care of things himself. Dr. Horton told the Sheriff that she felt that would fit Swift. Dr. Horton stated that Swift had a lot of confidence in his experience as a horseman, he has some strongly held values as to how they should be doctored and what is appropriate. She also said that Swift was going through some very difficult personal circumstances and he was very overwhelmed. Dr. Horton stated that with these issues it is still not an excuse to notice horses with body conditions this low.

Dr. Horton then asked about death threats and harassing phone calls. She stated that she had received some harassing telephone calls from a lady named Shelly Ferrero. Dr. Horton stated she does not read Pinecam and she was basically told if she wanted any clients in the area she would convince Swift to relinquish the horses. She was under the impression that Shelly had some connection to Dr. Ashley Olds and Aspen Creek Large Animal Clinic. She called Dr. Olds and advised her that she had not seen the colt that was seized for several months but, she wanted to pass on any information she had on the seized colt. She advised Dr. Olds that Swift had told her the colt had needed assistance standing up for four to six weeks prior to having been seized. Dr. Horton stated she had no idea who had custody of the horse or who was responsible for the horse. The Sheriff told her to report the harassing telephone calls to the proper authorities. Dr. Horton told us that in her opinion she believed that this case was at fork in the road. She believed the horses would need to have further diagnostic testing done which would be expensive or the horses should be euthanized. Swift was not going to be able to afford all of the diagnostic testing that needed to be done.

On February 23, 2012 I assisted Deputy Cindy Hardey in removing the six horses named on a search warrant from a property located at 1401 Park County Road 77. We had no issues in loading any of the horses except one colt named "Chance". He went down in the trailer which means he collapsed when we tried to load him into the trailer. This is the same colt that was sick and was collapsing daily. After all the horses were loaded we responded immediately to the Park County Jail to get blankets and see if we could get the colt up with some assistance with extra man power. After approximately fifteen minutes we were able to get the colt up and standing on all four legs. We left the county and responded to a undisclosed location to meet a veterinarian.

Upon arrival to the facility where the six horses will be kept and cared for, we met the veterinarian who will be caring for the horses while in our custody. The veterinarian identified herself as:

**IP/ Dr. Lois Toll, DVM**

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

The horses were all unloaded safely, weighed, photographed, palpated and scored, given a number for identification purposes, examined thoroughly, and measured to see how many hands each horse was. I wrote down the findings on each horse:

**Chance- ID# 85- 465 Lbs.- 2 Yrs.- 13.2 HH-  Approx. 200 Lbs under weight- Gelding**

**Echo- ID# 89- 405 Lbs- 1 Yr- 13 ½ HH- Approx. 100 Lbs. underweight- Stud**

**River- ID# 88- 525 Lbs- 2 Yrs.- 13.2 HH- Approx. 125 Lbs. underweight- Gelding**

**Fiona- ID# 87- 505 Lbs.- 2Yrs.- 13.1 ½ HH- Approx. 135 underweight- Filly**

**Midnight- ID#83- 783 Lbs. – 16/18 Yrs.- 15.3 HH- Approx. 220 underweight- Mare**

**Lena- ID#78- 690 Lbs.- 8/9 Yrs. -??HH- Approx. 110-150 Lbs. underweight- Mare**

After the horses were turned over to this facility I received several emails and calls with progress reports n the conditions of the horses. All of these correspondences were turned over to Deputy Hardey. The only call that I received and I personally called Deputy Hardey about was on March 05, 2012 at 12:31 PM. I was told that "Chance" was able to get up for the first time on his own with out any assistance. This had occurred twelve days after the horses were seized by the Park County Sheriff's Office. The only real change in the horses care was food and water, antibiotics to fight an infection in "Chances" case according to the care center.

On March 12, 2012 at 2:15 PM, I received a call from the center and I was told that "Chance" had returned from the clinic and was doing very well. He had responded well to the antibiotics' and was not collapsing any more. I was advised that all the horses had been weighed again on March 08, 2012 and "Midnight' was wormed on March 06, 2012. "Midnight" was the only one not thriving and gaining, but according to the veterinarian this was not uncommon when an older horse is "loaded with parasites."

The weights were as follows:

**Lena- 737- gained 47 pounds in 15 days**

**Midnight-793- gained 10 pounds 15 days**

**Fiona- 563-gained 58 pounds in 15 days**

**River – 587- gained 72 pounds in 15 days**

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

92

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall J.** | **02-13-2012** |

Echo- 455- gained 50 pounds in 15 days

Chance-522- gained 57 pounds in 15 days

There is no other information at this time.  Case still pending.

| Officer's Signature & Number | Supervisor's Initials & Date | Page ____ of __ __ |
|---|---|---|
| Sgt. B. Priestly #9522 | | |

Rev. 6/98
N

Form: PCSO-

93

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.3** |
| Initial Offense Classification **Cruelty to Animals** | Subject **Swift, Ronald and Hatlee, Randall** | Date of Report **3/07/12** |

On February 22, 2012AM, at approximately 11:000AM, I called a female party on the telephone and asked her if she could give me her professional opinion on the horses I put into protective custody. The female party identified herself as:

### IP- Dr. A. R. Horton, DVM, MS
### (Timberline Equine Veterinarian Services)

I recorded the conversation for documentation purposes. Dr. Horton's conversation with me was as follows:

- Dr. Horton: "Timberline Equine this is Dr. Horton."
- CH: "Hi Dr. Horton, this is Deputy Hardey from the Park County Sheriffs Office."
- Dr. Horton: "Hello how are you?"
- CH: "I am good how are you?"
- Dr. Horton: "Doing okay, what can we help you with?"
- CH: "Have you got any results back on the blood work yet?"
- Dr. Horton: "Ah no I have not even sent it up. I left a message for Dr. Duncan yesterday asking how she wanted those transported so that they end up going directly to her."
- CH: "Okay."
- Dr. Horton: "And I have not yet heard back."
- CH: "Okay, um I need to ask you a question. When you get those test results back whether they say the horses have something or not, um would that result in the emaciation of all those horses or do you feel that he just waited a little to long before he pulled them from the herd to start feeding them more?"
- Dr. Horton: "Well, Um, I don't mean to be equivocal."
- CH: "Right no I just want your professional; opinion."
- Dr. Horton: "My professional opinion is that um, regardless of what's causing those horses to be thin, um, someone should have noticed and sought assistance for them."
- CH: "Okay, sooner?"
- Dr. Horton: "Sooner."
- CH: "Okay, yeah that is my feeling as well."
- Dr. Horton: "And I, we do have, I'm not sure that the blood is going to tell us anything."
- CH: "Okay."
- Dr. Horton: "Right now the State Veterinarians Office wants the blood tested I think just mostly so they can demonstrate to the public that they are looking into this in an earnest way."
- CH: "Okay."
- Dr. Horton: "And people want tests of something."
- CH: "Right they want proof."

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ | |

Rev. 6/98
N

Form: PCSO-

94

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | 2012000142.3 |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | 3/07/12 |

- Dr. Horton: "So they are paying for the test on the blood, and um, I am fairly certain they won't find Botulism Toxin, but we are checking into it anyway."
- CH: "Okay."
- Dr. Horton: "Um, I talked to Ron this morning he is willing to send at least one of the horses that has the heart murmur up to cardiology to have them evaluate it."
- CH: "Okay."
- Dr. Horton: " Um, which I was about to give a call and give them a heads up that he would be calling and it was this case bluh bluh bluh. But I am a little bit conflicted the one that I am most interested in information on is Chance."
- CH: "Right."
- Dr. Horton: "But I think the trip might be a little hard on him."
- CH: "Right, because he keeps wanting to stay down verses standing, right?"
- Dr. Horton: "Um, that's what I hear. When I saw him he was up. Um, and he was you know not neurologically normal. Now if we could get him in a trailer with some bedding and ship him up there down."
- CH: "Um Hum."
- Dr. Horton: "Um, I would be happy with that."
- CH: "Okay."
- Dr. Horton: "Um, I really don't want to. And frankly you know if the trip is to much for him, and he ends up dying of a result of it then probably he wasn't meant to make it anyway."
- CH: "Right."
- Dr. Horton: "And then his remains are up there and also he could have a post mortem."
- CH: "Okay."
- Dr. Horton: "So I'm trying to decide which horse that I think should go and um, so forth. But yeah I don't think the blood is going to let Ron completely off the hook. Regardless of why the horses were thin, um, someone should have noticed and at least called and started the investigating earlier."
- CH: "Okay yeah that was my thought process too."
- Dr. Horton: "And you know I have tried to make sure that everyone in a position of authority that I have talked to is also aware of mitigating circumstances."
- CH: "Okay."
- Dr. Horton: "Helens' heart attack, as I understand it Ron was suffering from pneumonia while he was trying to deal with Helen."
- CH: "Right."

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ | |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.3** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **3/07/12** |

- Dr. Horton: "Um so forth and so on, but um, yeah um sadly that's the bottom line truth. Those horses were let go to far to long."
- CH: "Okay, alright that's what I thought as well I just wanted a professional opinion on it."
- Dr. Horton: "Well I'll have to agree. Like I said regardless of what the cause is, and in speaking to Carol Heckendorf from the State Veterinarians Office yesterday, he made an interesting observation that in the last two to three weeks he's had a hard time keeping weight on his horses."
- CH: "Right."
- Dr. Horton: "He's um, I don't know if your familiar with him but he lives in Evergreen."
- CH: "Yes."
- Dr. Horton: "And he just distributed extra demands on them because of the weather."
- CH: "Right."
- Dr. Horton: "Even though he is feeding his horses, um, extra amounts of very good quality feed. There still loosing weight."
- CH: "Okay."
- Dr. Horton: "So you know what ever that's worth."
- CH: " All right well I guess if you figure out which horse is going up jot me a phone call or and email, an email works too."
- Dr. Horton: "Okay."
- CH: "What ever is easiest for you, you have my cell phone number."
- Dr. Horton: "Yep."
- CH: "And I will make record of it. I think today I am going to go up and take some samples of his hay so we can send it off, just to cover that."
- Dr. Horton: "Yep."
- CH: "Angle of it."
- Dr. Horton: "As I understand it, it was not this batch of hay that they were eating when this all began."
- CH: "Okay."
- Dr. Horton: "I maybe mistaken on that."
- CH: "No, because I think you're right because when I responded um, the bales that were at the front of the property hadn't been touched."
- Dr. Horton: "Um Hum."
- CH: "It's like they just brought them in. Um, but I am still going to just, because there are other horses on the property. Just to be safe."
- Dr. Horton: " I, I, think it's a hoop we have to jump through, um, practically given public hurore that has erupted."
- CH: "Okay well I guess if you hear anything let me know and I will do the same."
- Dr. Horton: "Alright thanks a bunch."
- CH: "Thank you, bye bye."

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

96

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.3** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **3/07/12** |

On March 7, 2012, at approximately 9:30PM, I received the original copy of the veterinarian bill from Littleton Equine Medical Center. The veterinarian bill was in the amount of $1,723.50 dollars (see attached.) This was for the medical care of Midnight, Lena, Fiona, River, Echo and Chance from the day of the seizure on February 23, 2012 to February 29, 2012. On March 22, 2012 I received an email from Littleton Equine Medical Center it was the veterinarian bill to date for all the horses (see attached.) The veterinarian bill was for the hospitalization of "Chance" plus examinations for all the horses from March 1, 2012 to March 14, 2012. I will be requesting the full amount of the veterinarian bill paid by the owners of the horses with their restitution on March 23, 2012.

At approximately 10:00AM, I received an email from Sergeant B. Priestly reference a change in court hearing on the Financial Bond paper work. The owners of the horses do not agree with the bond amount and had their lawyer request a Financial Bond hearing change. The owners of the horses are identified as:

### RO- Ronald Swift (DOB 07-17-1942)
### RO- Randal Hatlee (DOB 07-23-1959)

Swift and Hatlee's lawyer is identified as:

### IP- Darrel L. Campbell

The Finical Bond hearing change was scheduled for March 27, 2012, at 3:30PM, (see attached request and ⌐mail.) I will not be able to attend the Financial Bond hearing because I will be out of town that week. At approximately 2:19PM, I sent District Attorney Steve Sullivan and Debra Mclimans, Clerk of Courts for Park County, an email requesting a change in the date the Financial Bonding was to be seen by the court. The email reads:

- **"To whom this may concern, I will be out of town from March 24, 2012 until April 3, 2012. I will not be able to attend the Financial Bond hearing for Ron Swift and Randal Hatlee on March 27, 2012. Thank you for your time, Deputy C. Hardey, Park County Code Enforcement Division, 719-836-4380."**

The Financial Bond hearing was rescheduled for the week of April 10, 2012.

On March 8, 2012, at approximately 1:57PM, I received an email from Sgt. Priestly. The email was documentation of the weight taken on the day the horses were seized along with weight taken of the horses on March 1, 2012 (see attached.) Also attached were pictures of the horses taken on March 1, 2012 (see attached pictures'.) I also received the hay sample results from Cumberland Valley Analytical Services (see attached results.) The bill for the Hay testing is in the amount of $93.00 dollars. I will be requesting the full amount of the bill in restitution (see attached bill.)

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.3** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **3/07/12** |

The horses' weights are listed as follows:

- # 78 "Lena" -2/23/2012 (690lbs) 3/1/2012 (728lbs.)

- # 83 "Midnight" -2/23/2012 (783lbs) 3/1/2012 (809lbs.)

- # 85 "Chance" -2/23/2012 (465lbs) 3/1/2012 (486lbs.)

- # 87 "Fiona" -2/23/2012 (505lbs) 3/1/2012 (540lbs.)

- # 88 "River" -2/23/2012 (525lbs) 3/1/2012 (564lbs.)

- # 89 "Echo" -2/23/2012 (405lbs) 3/1/2012 (427lbs.)


On March 10, 2012, at approximately 1:39PM, I received an email from Sgt. Priestly in reference to an email she had received from a female party. The email was sent to the female party from Campbell. The female party identified herself as:

### IP- Kate Anderson,
**(DVM- PACFA/BAP, Administrator, Colorado Department of Agriculture)**

Anderson's email reads:

- **"Bobbi, please find the attached letter and information sent to me by the attorney for Mr. Swift and Mr. Hatlee pursuant to case #2012000142. Let me know if you have questions. Thanks, Kate N. Anderson, DVM, ACFA/BAP Administrator, Colorado Department of Agriculture, 700 Kipling Street, STE 4000, Lakewood, CO 80215, 303-239-4168, 303-239-4164 fax."**


The letter sent to Anderson from Campbell reads:

- Dear Sir/Madam.
- This firm represents Ronald L. Swift and Randall J. Hatlee, the Defendants in the above referenced animal cruelty actions.
- I am writing concerning the ongoing treatment of the six horses that were seized from the Defendants at the Echo Valley Ranch in Bailey, Colorado on February 23, 2012.

| Officer's Signature & Number | Supervisor's Initials & Date | Page ____ of ____ |
|---|---|---|
| C. Hardey 9523 | | |

Rev. 6/98
N

Form: PCSO-

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.3** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **3/07/12** |

- The attached report from the owners' treatment veterinarians, A.R. Horton, DVM, MS, dated February 28, 2012, Confirms that the horses have been subjected to numerous test in the ongoing efforts to determine what is causing the horse to lose weight.
- The tests to date confirm that the horses are suffering from anemia, which is indicative of a failure to process protein in the feed.
- Testing also revealed heart murmurs. It is my understanding that neither of these conditions is typically associated with deprivation of feed or necessary sustenance.
- Until the cause of their horses' health problems is determined, the owners are concerned for the balance of the herd at Echo Valley Ranch.
- Since time is of the essence, a copy of Dr. Horton's report dated February 28, 2012, is being forwarded with the hope the summary of testing conducted to date will allow the Animal Protection Bureau and its veterinarians to pursue treatment without repeating the efforts by other veterinarians.
- Prior to seizure, the subject horses were scheduled for testing at the veterinary teaching hospital at the Colorado State University.
- Since CSU is one of the premier veterinary schools in the nation, Mr. Swift and Mr. Hatlee request that the Bureau of Animal Protection as soon as possible, arrange for the horses to be transported to CSU for study and diagnosis.
- The specialized expertise of the CSU veterinary hospital staff is required in this case.
- Without such treatment, the horses may die without the health problems being diagnosed, leaving the remaining herd and other horses/livestock vulnerable to this debilitating disease.
- On another note, this letter will confirm that Mr. Swift and Mr. Hatlee have my permission to speak directly with the Bureau of Animal Protection concerning the care and condition of their horses.
- As experienced horsemen with personal knowledge of the circumstances involving the subjects' horse, direct communication should be more productive than relaying the information and requests through counsel.
- I would encourage all parties to communicate freely in this collaborative effort to save theses animals.
- Dear Randy,
- As per my exam of Chance, River, Echo (Blue), Fiona, Dash, Lena and Midnight of 2/20/12, I determined that in addition to very low body condition scores Chance and Echo demonstrated what I assessed to be grade 4/6 holodiastolic murmurs and tachycardia.
- Fiona demonstrated a grad 2/6 diastolic murmur and tachycardia, Lena demonstrated tachycardia.
- Consultation with Dr. Adams at the Carpology service at the veterinary teaching hospital at CSU revealed no known association between low body condition scores and diastolic murmur.
- Blood work on theses patients indicates a significant degree of anemia, which is the likely cause of, or is a contributor to the noted tachycardia.
- With all due respect to my esteemed colleague who is the current attending veterinarian, it would be my advice and recommendation that these horses exhibiting diastolic heart murmurs be evaluated by the cardiology service as the James L. Voss Veterinary Teaching Hospital in Fort Collins, Co.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98                                                                                     Form: PCSO-
N

*99*

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.3** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **3/07/12** |

- In Particular, it is my professional opinion that investigation of these murmurs warrants a full echocardiogram.
- Arrangements for theses exams to be performed were being made when seizure of the animals took place.
- I feel the best chance at a proper and accurate understanding of theses murmurs and any potential role they play in these animals' condition requires following through with that diagnostic plan.

I received the original copy of the letter on March 14, 2012, at approximately 10:00AM. At approximately 1:58PM, I received another email from Sgt. Priestly reference a concerned citizen. The concerned citizen is identified as:

### IP- Shelly Ferraro

Ferraro is the new owner of "Bear," AKA "Little Big Man," and now is known as "Spencer". Ferraro was frustrated with the way the Park County Sheriffs Office was handling the situation with "Spencer" and the six horses seized. (See attached pictures and emails) I plan on charging the party who was responsible for taking care of "Spencer" at the time of the seizure. I am still trying to figure out the situation with Routt County. I also received an email from a male party reference the pictures of "Spencer" now in comparison to what he looked like in February, 2012. "Spencer" was being loaded into a trailer and taken to his new home. The male party is identified as:

### IP- Scot Dutcher
### (Chief, Bureau of Animal Protection, Colorado Department of Agriculture)

On March 16, 2012, at approximately 8:00AM, I received an email from Deputy D. Hannigan on my work email reference a News Release on "Spencer." The News Release was on Channel 7News (see attached News Release.)

On March 17, 2012, I printed off all of my emails from a female party that were sent to me on March 14, 2012, through March 16, 2012. I had emailed the female party on March 14, 2012, asking her if she would send me via email everything she had on Little Big Man, "Spencer." The female party is identified as:

### IP- Ashleigh Olds, DVM
### (Aspen Creek Veterinarian Hospital)

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | | Case Report Number |
|---|---|---|---|
| | | | **2012000142.3** |
| Initial Offense Classification | Subject | | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | | **3/07/12** |

I asked Dr. Olds if she could email me the veterinarian notes of all her documentation because I had planned or charging the party responsible for taking care of Little Big Man, "Spencer" with Cruelty to Animals.  On March 14, 2012, I received the letter to Dawn Smith (Routt County)  from Dr. Olds and Little Big Man's, "Spencer's Botulism report (see attached documents.) On March 15, 2012, I received via email of Little Big Man's "Spencer's" going to his new home pictures (see attached pictures with email.)  I also received via email of Little Big Man's, "Spencer's" CDC (detailed Lab results) day #1 documentation and Little Big Man's, "Spencer's" Electrolytes day #1 documentation (see attached documentation.) On March 16, 2012, I received via email of Little Big Man's, "Spencer's" Chemistry report (see attached document.) I have nothing further to report at this time. Further action to follow.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

101

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.4** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to animals** | **Swift, Ron** | **02-23-12** |

On February 23, 2012 at approximately 9:00am, I was on duty when I received a request from Animal Control Deputy C. Hardy to assist with serving a warrant. I followed Deputy C. Hardy to the Echo Valley Ranch in Bailey, CO. When we arrived I met with a male party known to me as:

**S / Ron Swift (07-17-42)**

I served Swift the search warrant, and Deputy C. Hardy stated that she no longer needed a Deputy with her.

END OF REPORT

| Officer's Signature & Number | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|
| B. Sears #9163 | | |

Rev. 6/98                                                                                           Form: PCSO-
N

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.5** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **2/23/2012** |

On February 16, 2012, at approximately 9:50AM, a horse was seized from 1640 Park County Road 70, near Bailey in Park County, Colorado, 80421; also known as Echo Valley Ranch. The care takers of the ranch were identified as:

**S- Ronald Swift (07/17/1942)**
**S- Randall Hatlee (07/23/1959)**

A female party had called Sergeant B. Priestly on February 14, 2012, to advise her that she had responded to 1640 Park County Road 70, and saw the condition of the horse (" Bear" now known as "Spencer") that the female party had placed at the Ranch in December of 2010. The female party identified herself as:

**RP- Dawn Smith (Routt County Animal Control Officer)**

Smith advised Sgt. Priestly that she had a court order to remove "Spencer" from Echo Valley Ranch. There was a previous case in Routt County of Cruelty to Animals. "Spencer" and his mother were the animals in question. Routt County took the two horses to Echo Valley Ranch to be taken care of in December of 2010. Hatlee was the ex-husband of the woman that was charged for Cruelty to Animals in Routt County.

On February 16, 2012, Corporal J. Plutt and I responded to 1640 Park County Road 70 with a veterinarian from Aspen Creek Veterinarian Services, located in Conifer, Colorado. The veterinarian identified herself as:

**IP- Ashleigh Olds (Aspen Creek Veterinarian Services)**

Upon arrival Cpl. Plutt gave Swift and Hatlee the court order from Routt County to remove "Spencer" from Echo Valley Ranch. Looking at "Spencer" he was in poor condition. "Spencer" was lying in the barn stall in mud, manure and urine. "Spencer" was unable to stand on his own. Hatlee and Dr. Olds' assistant had to help "Spencer" to his feet and walked him to the trailer. I took pictures of "Spencer" (see attached.) While on the premises Dr. Olds also did a visual examination on a down horse named "Maggie" the horse had been seen by Swift's personal veterinarian identified by Swift as:

**IP- Dr. Horton (Timberline Equine Veterinarian Services)**

Maggie was lying in the upper part of the barn unable to stand on her own and had several wounds from rolling around on the ground. Dr. Olds was not happy about "Maggie's" condition and suggested "Maggie" be humanely euthanized. When Dr. Olds was done visually examining "Maggie" she loaded "Spencer" into the trailer and took "Spencer" to her facility to be examined.

Later that day Dr. Olds emailed me with details on "Spencer's" stability. Dr. Olds said the two year old gelding was unable to stand on his own. The gelding laid or had fallen down during the transport. Dr. Olds said the (veterinarian staff) administered I.V. fluids to "Spencer" when they got "Spencer" out of the trailer.

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| C. Hardey 9523 | | | Page _____ of _____ | |

Rev. 6/98
N

Form: PCSO-

*103*

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| | | Case Report Number<br>**2012000142.5** |
|---|---|---|
| Initial Offense Classification<br>**Cruelty to Animals** | Subject<br>**Swift, Ronald and Hatlee, Randall** | Date of Report<br>**2/23/2012** |

Dr. Olds email reads:

- "Officer Hardey: I have attached a letter with a summary of the findings today. Hopefully this will useful in obtaining an order to seize the remaining horses and/or get permission to euthanize the down mare. If she dies, I would recommend a necropsy at CSU to confirm whether she died of starvation vs. botulism. **The little gelding that we took today is doing OK, although he went down in the trailer and was too weak to get up when he got to the hospital. We had to run IV fluids, Iv dextrose, calcium, and hydrate him for several hours before we could assist him to a standing position. He appears very hungry and has been eating non-stop since he got here.** His blood work shows extreme anemia among other problems. He is not showing any sign of botulism and to me appears to be a very clear cut case of starvation and malnutrition. Ashleigh Olds, DVM, Aspen Creek Veterinary Hospital, Conifer, CO, www.aspencreeklac.com."

Dr. Olds also attached a lengthy statement to her email in regards to the situation with "Spencer" and her thoughts on the statement given by Swift and Hatlee that the horses had Botulism or Tick Paralysis.

Dr. Olds statement reads:

- February 16, 2012, to whom this may concern.

- Today I was asked by the Park County Animal Control and Routt County Animal Control to attend the seizure of a 2 year old gelding.

- The gelding was located at Echo Valley Ranch in Bailey, Colorado at the time of seizure.

- On arrival, the gelding was laying down in a very dark and filthy stall.

- He did not appear able to rise on his own despite encouragement.

- The footing in the stall was thick with manure, urine and mud.

- He was caked in manure and mud.

- His body condition score was 1/9 on the Henneke scale.

- I estimate his weight at 500lbs.

- After multiple attempts to get him to stand, I was called away to examine another very thin horse that was recumbent in the upper area of the barn.

- When I returned, a ranch hand had gotten this gelding up and had him tied to a truck.

| Officer's Signature & Number<br>C. Hardey 9523 | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|

Rev. 6/98                                                                                      Form: PCSO-
N

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.5** |
| Initial Offense Classification **Cruelty to Animals** | Subject **Swift, Ronald and Hatlee, Randall** | Date of Report **2/23/2012** |

Dr. Olds statement continues:

- He was then loaded into the trailer and transported to Aspen Creek Veterinarian Hospital for further evaluation and treatment.

- During the trailer ride, the horse laid or fell down from weakness and the rest of the way down in the trailer.

- On arrival at the vet hospital, he was too weak and uncoordinated to stand on his own.

- He was lifted and carried into a stall.

- Blood work revealed sever Anemia, elevated white blood cell count, dehydration, low calcium levels, and various other abnormalities.

- After treatment with I.V. fluids, I.V. dextrose, I.V. calcium levels, I.V. antibiotics, and intramuscular vitamin injections (Vitamin B complex and Vitamin E/ Selenium) my staff were able to assist the gelding to a standing position.

- He has shown great interest in food and water since arrival and has a voracious appetite.

- At this time my professional assessment is that the gelding is suffering from extreme malnutrition and starvation.

- He is not showing any signs of Botulism or other neurological disorder.

- He is extremely small for his age, likely as a result of malnutrition.

- As a result of suspected starvation he is at risk for death due to 're-feeding syndrome" which can cause heart failure, kidney failure, and sudden death as a starved animal is returned to normal.

- On a long term basis he is at risk for orthopedic joint disease and cartilage disruption (OCD, bone cysts, etc.) due to improper nutrition during his prime growing years.

- It is worth noting that during the examination of the property, an adult female horse was recumbent in the upper area of the barn.

- This was a black mare.

- She was roughly a body condition score 1/9.

- She had been down since Saturday (5 days) per the owner.

| Officer's Signature & Number C. Hardey 9523 | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|

Rev. 6/98
N

Form: PCSO-

105

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
| --- | --- | --- |
| | | **2012000142.5** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **2/23/2012** |

Dr. Olds statement continues:

- When we initially arrived, Ron Swift indicated to the Animal Control Officers that the horse was dead.

- When I examined her I noted that she was breathing.

- He then admitted that she had been down for 5 days.

- He claims that she could sit up and drink and eat every two hours, but I was unable to get her into a sternal or sitting position.

- The mare was covered in sever pressure sores on her face, shoulders, and hips.

- She could paddle her legs and struggle to move.

- But could not even get into a sitting position.

- She had reduced tail tone, but normal eyelid tone, tongue tone, and facial tone.

- The owner claimed that she was being "Treated" for either Tick Paralysis or Botulism.

- I asked what the treatment was, and he indicated that there was no treatment.

- He claimed to be rolling the mare every 2 hours from side to side.

- My personal opinion on examination of the horse is that she was not necessarily showing any evidence of Botulism or Tick Paralysis, but more likely is suffering from malnutrition and starvation.

- I also believe that the horse in recumbent should either be euthanized or transported to a hospital facility for more intensive care such as anti-inflammatory, I.V. fluids and nutritional support, antibiotics, wound care for the pressure sores, and intermittent slinging.

- A horse that remains down for five days on end is at severe risk for Aspiration Pneumonia, Dehydration, Sepsis from pressure sores, lung collapse, Colic and many other complications.

- There were also two other adult horses on the property that were extremely thin.

- One was sorrel and white paint mare.

- She had a frozen water tank and no food in her pen on arrival.

- I would grade her body condition score a 1.5/9.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
| --- | --- | --- | --- |
| C. Hardey 9523 | | Page _____ of _____ | |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.5** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **2/23/2012** |

Dr. Olds statement continues:

- There was another black mare in another pen that also had frozen water, no food in her pen, and a body condition score of 1.5/9.

- In a separate pen there were 4 yearling foals.

- There was a Chestnut, a Grullo, a Bay, and a Palomino of unknown sexes.

- They all ranged from a 1.5-2/9 body condition score.

- They did not have any feed in their pen and their water tank was frozen.

- In my opinion these horses all appear to be suffering from starvation and malnutrition.

- The owner did not seem to acknowledge the severity of the problem, which is concerning to me that, nothing, will be done to help them.

- There was very little hay noted on the property at the time of the exam, and no feed in any of the pens despite it being 11:00AM.

- The owner noted that they hadn't had breakfast yet.

- All of the horses nickered and whinnied as we walked by as if hungry.

- I have grave concerns for the remaining thin horses, as Ron Swift admitted that several other horses had already died.

After receiving all the reports from Dr. Olds and reviewing all the information concerning the health condition of "Spencer" identified to me as a two year old, Grade Quarter horse gelding. I will be submitting this information to the District Attorneys Office and requesting that an additional criminal charge of Cruelty to Animals, CRS 18-9-202 be charged against Swift and Hatlee.

I am requesting full restitution paid to the Park County Sheriffs Office by Swift and Hatlee for the horses in question in the amount of **7,319.75 dollars for the Littleton Animal Hospital bill and boarding fee.**

The Littleton Animal Hospital's Dr. Toll administered medical care to "Midnight", "Lena", "Fiona", "River", "Echo" and "Chance". The horses were seized on February 23, 2012. Attached are the veterinarian bills from Littleton Animal Hospital to date. The bill contains a visual break down of what was administered to the horses at the time of examinations (see attached veterinarian bill.)

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

*l07*

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.5** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **2/23/2012** |

Also attached was an invoice in the amount of **2,272.00 dollars** for the feed and care of all six horses. "Midnight", "Lena", "Fiona", "River" and "Echo" were at an undisclosed location from February 23, 2012, to April 11, 2012. The amount per horse per day was **8.00 dollars** a day equaling **392.00 dollars** per horse. "Chance" was only at the facility from February 23, 2012, to March 2, 2012, which equals nine days, times **the 8.00 dollars** totaling **72.00 dollars**. "Chance" came back from Littleton Animal Hospital to the facility and was at the facility from March 12, 2012, to April 11, 2012. The total boarding fee for "Chance" was **312.00 dollars** (see attached invoice.)

The daily boarding rate includes but not limited to:

- "Individual stalls for each horse with bedding and daily turnout into individual or group pens (depending on the individual horse's needs and veterinarian recommendation.)

- Stalls are cleaned and fresh bedding is added daily.

- Stalls are checked periodically throughout the day and cleaned as needed.

- Horses are fed either grass hay, alfalfa or a combination of grass and alfalfa three to four times a day and grain, based on the veterinarian recommendation."

I received the invoice from a female party identified as:

### IP- Debbie Wilke (Harmony Horse Works, Manager)

Listed on the invoice Wilke documented the weights of "Midnight", "Lena", "Fiona", "River", "Echo", "Chance". Wilke took measurements of the weight of every horse on February 23, 2012, March 1, 2012, March 8, 2012 and March 15, 2012.

The weights of the horses are listed as follows:

| Horse | Initial | 3/01/2012 | 3/08/2012 | 3/15/2012 |
|---|---|---|---|---|
| **Lena** | 690 | 728 | 737 | 753 |
| **Midnight** | 783 | 809 | 793 | 786 |
| **Chance** | 465 | 486 | 522 | 535 |
| **Fiona** | 505 | 540 | 563 | 588 |
| **River** | 525 | 564 | 586 | 595 |
| **Echo** | 405 | 427 | 455 | 468 |

| Officer's Signature & Number | | Supervisor's Initials & Date | |
|---|---|---|---|
| C. Hardey 9523 | | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.5** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **2/23/2012** |

I am also requesting reimbursement for the fuel in the amount of **200.39 dollars** that was used in transporting the horses when the horses were removed from the Echo Valley Ranch, for protective custody on February 18, 2012. Along with, the fuel used in the seizure of the horses on February 23, 2012 (see attached receipts.)

On April 10, 2012, I was advised by Judge Green after losing my Financial Bond hearing to return the horses to Swift and Hatlee as soon as possible. On April 11, 2012, I responded to the Harmony Horse Works and took custody of all six horses. At approximately 5:30PM, the horses were returned to Swift and Hatlee's care. Judge Green advised Swift and Hatlee that I will be allowed to do as many welfare checks on the horses as I deem necessary.

On April 18, 2012, at approximately 10:00AM, I responded to 1640 Park County Road 70 (Echo Valley Ranch.) Upon arrival I met with Swift and Hatlee reference the welfare check I was about to do on there horses. I took pictures of all the horses (see attached pictures.) Prior to responding to 1640 Park County Road 70, I made a check list for all six horses (see attached.)

Check list is as follows:

| | Midnight | Lena | Fiona | River | Echo | Chance |
|---|---|---|---|---|---|---|
| 1. Body Condition Score: (4-18-12) | | | | | | |
| • Withers- | 3 | 4 | 4 | 3 | 3 | 4 |
| • Loin- | 3 | 4 | 4 | 3 | 3 | 3 |
| • Point of hip- | 3 | 4 | 3.5 | 3 | 3 | 3 |
| • Tail head- | 3 | 4 | 4 | 3 | 3 | 3 |
| • Shoulder - | 3.5 | 4 | 4 | 3 | 3 | 3 |
| • Ribs - | 3 | 4 | 4 | 3 | 3 | 3 |
| 2. Weight w/ Weight tape: | 902lbs | 794lbs | 662lbs | 608lbs | 515lbs | 629lbs |
| 3. Hooves: | good | good | good | good | good | good |
| 4. Stall: | dry | dry | dry/wet | wet manure in spots but dry by food | | |
| 5. Water trough: | ½ full | ½ full | ½ full | full | full | full |
| 6. Feed: | Grass Hay / Senior Feed  /  Straight Alfalfa  /  Red Cell  / Vit. E | | | | | |

7. Vaccinations: Will not be giving any of the horses Vaccinations until they know what Dr. Toll has already given.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

109

**PARK COUNTY SHERIFF'S OFFICE**
CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142.5** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **2/23/2012** |

Continuation of Check list:   **Midnight   Lena   Fiona   River   Echo   Chance**

8.  Date seen by Veterinarian:  4-17-2012    4/17/2012    4/17/12    4/17/12    4/17/12

9.  Identified as:  Dr. Burton  ----------------------------------------------------------------

After documenting all of the information I cleared the residence. I will return to 1640 Park County Road 70, every Wednesday at 10:00AM, until I feel I do not need to do welfare checks on the horses.

On April 25, 2012, I responded to 1640 Park County Road 70 (Echo Valley Ranch.) Upon arrival I did my welfare check on all six horses (see attached documentation)

Check list is as follows:      **Midnight    Lena    Fiona    River    Echo    Chance**

1.  Body Condition Score:  **(4-25-12)**

| | | Midnight | Lena | Fiona | River | Echo | Chance |
|---|---|---|---|---|---|---|---|
| a. | Withers- | 3 | 4 | 4 | 3 | 3 | 4 |
| b. | Loin- | 3 | 4 | 4 | 3 | 3 | 3 |
| c. | Point of hip- | 3 | 4 | 4 | 3 | 3 | 3 |
| d. | Tail head- | 3 | 4 | 4 | 3 | 3 | 3 |
| e. | Shoulder - | 3 | 4 | 4 | 3 | 3 | 3 |
| f. | Ribs - | 3 | 4 | 4 | 3 | 3 | 3 |

2.  Weight w/ Weight tape:    930lbs    828lbs    673lbs    628lbs    520lbs    608lbs

3.  Hooves:           good       'good      good      good      good      good

4.  Stall:             dry        dry       dry       dry       dry       dry

5.  Water trough:      full       full      full      full      full      full

6.  Feed:      Grass Hay /   Senior Feed /   Straight Alfalfa   / Vit. E

7.  Vaccinations: Will not be giving any of the horses Vaccinations until they know what Dr. Toll has already given.

| Officer's Signature & Number | | Supervisor's Initials & Date | |
|---|---|---|---|
| C. Hardey 9523 | | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.5** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **2/23/2012** |

Continuation of Check list:    **Midnight    Lena    Fiona    River    Echo    Chance**

8.  Date seen by Veterinarian:  4-17-2012    4/17/2012    4/17/12    4/17/12    4/17/12

9.  Identified as:  Dr. Burton  ---------------------------------------------------------------

After documenting the condition of all six horses I cleared the residence. Further investigation will follow.
Reimbursement

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

# Park County Sheriff's Office
## Restitution Form

To the Park County Court in Fairplay, dated this __**23**__ day of __**February**__, 20 __**12**__.
Pursuant to CRS 16-11-501(1)(2)(j), the Park County Sheriff's Office is requesting restitution in the amount of $ __**3124.70**__ upon conviction, for the prosecution of CRS 42-4-1301 from:

Defendant: __**Ronald Swift**__                DOB: __**07-17-1942**__

Address: __**1640 Park County Road 70**__

City: __**Bailey**__                St: __**CO**__        Zip: __**80421**__

Charges: __**CRS 18-9-202, Cruelty to Animals**__     Case No. __**2012000142**__

## Expense Calculation

| Blood Test | | Breath Test | | Urinalysis | | Photographs | |
|---|---|---|---|---|---|---|---|
| Blood Kit | | Silica Tube | | BAC Analysis | | Postage | |
| Blood Draw | | Mouthpiece | | Drug Analysis | | Copies | |
| Analysis | | Test Card | | Postage | | | |
| Postage | | Postage | | Copies | | | |
| Copies | | Copies | | | | | |
| Subtotal: | $ 0 | | $ 0 | | $ 0 | | $ 0 |

| Administrative | | | | |
|---|---|---|---|---|
| Copies | $ | | **Grand Total:** $ | **3124.70** |
| Extradition Fees | $ | | | |
| Veh. Impound Fees | $ | | | |
| Field Drug Test Kit | $ | | | |
| Other | $ | | | |
| Subtotal | $0 | | | |
| | $ 0 | | | |

> Payable To:   Park County Sheriff's Office
> P.O. Box 27
> Fairplay, CO 80440

Comments: __**Pay to the order of the Park County Sheriffs Office for the reimbursement of Boarding, feed/care, Veterinarian bills and fuel used.**__

## Approval

Sheriff: Fred W. Wegener   __This form produced electronically   //S// Fred W. Wegener__

Deputy District Attorney: Steve Sullivan _____

County Court Judge: Brian Green _____

District Court Judge: Stephen Groome _____

Rev: 4/05                                                Form: PCSO-R

112

# Park County Sheriff's Office
## Restitution Form

To the Park County Court in Fairplay, dated this **23** day of **February**, 20 **12**.
Pursuant to CRS 16-11-501(1)(2)(j), the Park County Sheriff's Office is requesting restitution in
the amount of $ **6667.45** upon conviction, for the prosecution of CRS 42-4-1301
from:

Defendant: **Randall Hatlee**                          DOB: **07/23/1959**

Address: **47 Overlook Lane**

City: **Bailey**                          St: **CO**     Zip: **80421**

Charges: **CRS 18-9-202, Cruelty to Animals**     Case No.  **2012000142**

## Expense Calculation

| Blood Test | | Breath Test | | Urinalysis | | Photographs | |
|---|---|---|---|---|---|---|---|
| Blood Kit | | Silica Tube | | BAC Analysis | | Postage | |
| Blood Draw | | Mouthpiece | | Drug Analysis | | Copies | |
| Analysis | | Test Card | | Postage | | | |
| Postage | | Postage | | Copies | | | |
| Copies | | Copies | | | | | |
| Subtotal: | $ 0 | | $ 0 | | $ 0 | | $ 0 |

| Administrative | | |
|---|---|---|
| Copies | $ | |
| Extradition Fees | $ | |
| Veh. Impound Fees | $ | |
| Field Drug Test Kit | $ | |
| Other | $ | |
| Subtotal | $ 0 | |
| | $ 0 | |

**Grand Total:** $ **6667.45**

Payable To:   Park County Sheriff's Office
P.O. Box 27
Fairplay, CO  80440

Comments: **Pay to the order of the Park County Sheriffs Office for the reimbursement
of the Boarding, feed/care, veterinarian bills and fuel used.**

## Approval

Sheriff: Fred W. Wegener     This form produced electronically   //S// Fred W. Wegener

Deputy District Attorney: Steve Sullivan   _____

County Court Judge: Brian Green   _____

District Court Judge: Stephen Groome   _____

Rev: 4/05                                                                 Form: PCSO-R

113

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| Case Report Number |
| --- |
| **2012000142.6** |

| Initial Offense Classification | Subject | Date of Report |
| --- | --- | --- |
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **5/2/12** |

On April 28, 2012, I printed off all emails pertaining to the case. Please see attached emails.

On May 2, 2012, at approximately 10:00AM, in Park County, Colorado, I responded to 1640 Park County Road 70, (Echo Valley Ranch), and met with two male parties about their horses. I was there to do a welfare check on all of the horses on the property. Like stated in a previous supplemental, I do welfare checks on the six horses every Wednesday to monitor the condition of the horses. I was also asked by Sergeant B. Priestly to do a welfare check on the other horses on the property. Sgt. Priestly said she had received a email from a female party that stated there were six other horses on the property that were skinny. The female party that emailed Sgt. Priestly identified herself via email as:

**RP- Monika Courtney**

Monika's email read:

- **"Thank you for your email. I met a lady named Sherry Lee (Sharon L. Jones) in Conifer who claimed to be a friend of Ron Swift and said he has 6 more horses looking in bad shape up there. She gave me her phone number as I told her to run it by him, that I could help find homes for any of his horses, if need be or he would decide he no longer wants to keep them. Her phone is 303 816 2244 and 303 919 8831. I hope all horses on said property are visible, because I do hear it is huge. Who knows. Thanks for keeping in touch. Monika Courtney."**

The two male parties that I met with on Echo Valley Ranch were identified as:

**S- Ronald Swift**

**S- Randall Hatlee**

Upon arrival I visually examined all six horses starting with Midnight.

- **Midnight's** pen was dry, the water trough was full. Midnight's hooves were trimmed and she had hay on the ground. In using a Forage First weight tape Midnight weighed approximately 930 pounds. Midnight's visual Henneke Body Score was a 3.5. On March 15, 2012, Midnight weighed approximately 786 pounds.
- **Lena's** pen was dry, the water trough was full. Lena's hooves were trimmed and she had hay on the ground. In using a Forage First weight tape Lena weighed approximately 888 pounds. Lena's visual Henneke Body Score was a 4. On March 15, 2012, Lena weighed approximately 753 pounds.
- **Fiona's** pen was dry, the water trough was full. Fiona's hooves were trimmed and she had hay on the ground. In using a Forage First weight tape Fiona weighed approximately 684 pounds. Fiona's visual Henneke Body Score was a 4. On March 15, 2012, Fiona weighed approximately 588 pounds.

| Officer's Signature & Number | Supervisor's Initials & Date | |
| --- | --- | --- |
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142.6** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **5/2/12** |

The welfare check results on the six horses continued:

- **Chance's** pen was dry, the water trough was full. Chance's hooves were trimmed and he had Alfalfa hay on the ground. In using a Forage First weight tape Chance weighed approximately 662 pounds. Chance's visual Henneke Body Score was a 4. On March 15, 2012, Chance weighed approximately 535 pounds.
- **Echo's** pen was dry, the water trough was full. Echo's hooves were trimmed and he had Alfalfa hay on the ground. In using a Forage First weight tape Echo weighed approximately 545 pounds. Echo's visual Henneke Body Score was a 3.5. On March 15, 2012, Echo weighed approximately 468 pounds.
- **River's** pen was dry, the water trough was full. River's hooves were trimmed and he had Alfalfa hay on the ground. In using a Forage First weight tape River weighed approximately 644 pounds. River's visual Henneke Body Score was a 3.5. On March 15, 2012, River weighed approximately 595 pounds.

After visually examining the six horses I took pictures of them (see attached pictures and welfare check forms.) Also see attached welfare check form that was filled out for each horse. After I was done taking pictures of all six horses I took pictures of the remaining horses on the property including a Mule. Note each horse is numbered because I did not have their names (see attached pictures.)

On May 9, 2012, at approximately 10:00AM, I responded to 1640 Park County Road 70, (Echo Valley Ranch) and visually examined all six horses in question.

- **Midnight** visually scored a 3 using the Henneke Body Scoring Technique. Using the Forage First weight tape Midnight weighed approximately 930 pounds. Midnight had a full water trough and grass hay on the ground. There was also grain in a grain bucket located on the green panel that was attached to the pen. Midnight's hooves looked trimmed. There were several manure piles located in her pen, but all in all her pen was dry.
- **Lena** visually scored a 4 using the Henneke Body Score Technique. Using the Forage First weight tape Lena weighed approximately 875 pounds. Lena has a full water trough and grass/alfalfa hay on the ground. Lena's hooves looked trimmed and her pen was dry.
- **Fiona** visually scored a 4 using the Henneke Body Score Technique. Using the Forage First weight tape Fiona weighed approximately 702 pounds. Fiona had a full water trough and grass/alfalfa hay on the ground. Fiona's hooves looked trimmed and she had several manure piles located in her pen. Fiona's pen was very wet.
- **Chance** visually scored a 4 using the Henneke Body Score Technique. Using the Forage First weight tape Chance weighed approximately 678 pounds. Chance had a full water trough that was located to the left of the corral. There was Alfalfa hay on the ground located in the lean to in the corral. Chance's hooves looked trimmed. The front part of the corral was full of manure and a water like substance. The corral was very wet.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| C. Hardey 9523 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142.6** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **5/2/12** |

The welfare check result on the six horses continued:

- **River** visually scored a 4 using the Henneke Body Score Technique. Using the Forage First weight tape River weighed approximately 623 pounds. River had a full water trough that was located to the left of the corral. There was Alfalfa hay on the ground located in the lean to in the corral. River's hooves looked trimmed. The front part of the corral was full of manure and a water like substance. The corral was very wet.
- **Echo** visually scored a 4 using the Henneke Body Score Technique. Using the Forage First weight tape Echo weighed approximately 549 pounds. Echo had a full water trough that was located to the left of the corral. There was Alfalfa hay on the ground located in the lean to in the corral. Echo's hooves looked trimmed. The front part of the corral was full of manure and a water like substance. The corral was very wet.

On May 12, 2012, at approximately 8:00AM, I responded to Conifer, Colorado to meet a female party reference a subpoena that needed to be hand delivered. Upon arrival I spoke with a female party who identified herself as:

### IP- Dr. Fay Burton (Timberline Equine Veterinarian Services)

I explained that I had been asked by the Park County Combined Court to serve the subpoena. Dr. Burton took the subpoena and advised me she would call me on my personal cellular telephone and let me know when she had all the documents ready. I thanked Dr. Burton and cleared the residence.

On May 15, 2012, at approximately 1:00PM, responded to the Park County Combined Court. After court was over I was advised by Sgt. Priestly that I was removed from the case effective immediately. According to Undersheriff M. Gore I was to close to the defendant.

On May 16, 2012, at approximately 10:00AM, Sgt. Priestly and I responded to 1640 Park County Road 70, (Echo Valley Ranch). Sgt. Priestly conducted the examinations for the welfare check. I wrote the scores down on a note pad.

On May18, 2012, at approximately 10:05AM, Dr. Burton met me at the Bailey Substation and personally handed me the paperwork requested on the subpoena (see attached subpoena.)

I have nothing further to report at this time. Further action may follow.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

116

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142.6** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **5/2/12** |

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

117

319

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142.7** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald and Hatlee, Randall** | **5/9/12** |

On May 9, 2012, I called a professor from the Colorado State University. The Professor identified himself as:

**IP- Dr. Dwayne Hamar (CSU Professor)**

I asked Dr. Hamar if he could look over my hay sample results and tell me what the results said. I advised Dr. Hamar that I would attach the result paper work to an email. Dr. Hamar agreed.

On May 10, 2012, at approximately 11:39AM, I received an email (see attached email) from Dr. Hamar reference the test results on the hay, that I removed on February 23, 2012, from 1640 Park County Road 70, Bailey Colorado.

Dr. Hamar's email reads:

- **"From the hay analysis, the hay analyzed is about what you would expect from grass hay. The protein and TDN indicates that it is average to good quality grass hay. Assuming not all moldy, horses should be in good condition if fed about all they would eat."**

At approximately 12:00PM, I advised the Park County District Attorney S. Sullivan that I had received an email from Dr. Hamar explaining to me the explanation of the hay results. D.A. Sullivan requested I ask him if mold in the hay could cause the horses to be emaciated and if there was anything else Dr. Hamar could glean from the est result paper work. At approximately 12:30AM, I sent Dr. Hamar an email requesting more information on the test results, by request of D.A. Sullivan.

As of now I have not received an email with more details from Dr. Hamar. Further request maybe needed.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| C. Hardey 9523 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-16-2012** |

On May 16, 2012 I was notified by Undersheriff, Monte Gore that I was going to be the lead investigator on this case.  Deputy Cindy Hardey would still assist in the case, however because of some accusations of Deputy Hardey possibly being bias when completing the welfare checks on the horses, the Undersheriff thought it would be in the best interest that the case manager be reassigned.  Deputy Hardey had known, Ronald Swift for many years and the public had expressed concerns about the personal relationship between Deputy Hardey and Swift.

On May 17, 2012 Deputy Hardey and I responded to the Echo Valley Ranch, Bailey, Colorado to complete the weekly welfare check.  This date and time had already been previously scheduled by Deputy Hardey.  I arrived at the Echo Valley Ranch at approximately 9:55 AM.  I started my audio recorder and placed it in the breast pocket of my shirt in order to get an accurate account of the visits events (see attached computer disk).  This was the first time I had been to the Echo Valley Ranch property since the start of this case in February 2012.  Upon arrival I observed horses on the property that were in the pasture area on the west side of the ranch houses.  I parked my vehicle in the location that Deputy Hardey said she usually parked.

As I approached the pens that housed the majority of the horses on the property I recognized, **Ronald Swift, Randall Hatlee, and Shelia (Hatlee's Common Law Wife according to Deputy Hardey).**  There were two other male parties near the pens that I did not know but Deputy Hardey acknowledged.  One of the male parties had a weigh tape in his hand and Deputy Hardey stated that he had been assisting in taping the horses ˙ince they had been returned to the custody of the owners.  The male party also taped the horses on this visit, ˌowever I inspected the tape placement and the weight for accuracy on each horse as it was measured and read.  The other male party played no role in the visit other than accompanying us to each horse's pen.  Shelia video taped the entire visit with a small video recorder.  Ronald Swift answered questions about his horses and walked to each pen with us.  Randall Hatlee haltered each horse and held the horse as I palpated, scored, and photographed each of the six horses in question.  Deputy Hardey read the score sheet for an accurate score on each horse and took the score I gave for each of the locations scored on each subject horses.  Deputy Hardey also wrote down the weight of each horse as I confirmed it from the weight tape.

It should be noted that of the six areas scored only five were scored on May 16, 2012.  There was a miscommunication between Deputy Hardey and I.  The neck area on all six horses was scored on the visits conducted on May 24, 2012.  The total score will be put in this report.  Deputy Hardey did total the scores of all five areas and divided by six when she should have been divided by five.  The score indicated below is the actual score with the neck area calculated.

The first horse I observed and checked was the brown mare named "Midnight".  The pen that contained the horse was dry and free of manure.  The water trough was full and there was a grain bucket with a small amount of uneaten grain in it.  The horse was photographed, weighed with a weight tape and weighed approximately **930 pounds.**  I scored the horse at the number I thought to be appropriate from my training and experience as a cruelty investigator.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev.  6/98
N

Form:  PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-16-2012** |

"Midnight" scored a 2 or 3 (with exception to the neck area which scored a 4) on all the areas read to me by Deputy Hardey. **"Midnight's" final Body Condition Score was a 2.8 rounded up to a 3 – Thin.**

   The second horse I observed and checked was the Paint mare named "Lena".   Lena was in the pen next to "Midnight".   The pen was clean and free of manure except for a few small piles of feces.   The pen also had some hay that the horse was still eating.   The water trough was half full and did not have clean water in it.   The horse was photographed, weighed with a weight tape, and weighed approximately **902 pounds.**   I scored the horse in the same manner as the first horse.   The remaining four horses in the case were also scored the same way as the previous two.   "Lena" scored significantly higher in the areas read to me by Deputy Hardey. **"Lena's" final Body Condition Score was a 6- Moderately Fleshy.**

   The third horse I observed and checked was the Palomino filly named "Fiona".   "Fiona" was just moved into this pen according to Swift.   The pen was muddy and the water trough was dirty and did have what appeared to be green moss and algae in the bottom of the trough.   Shelia stated that "Fiona" was just moved there in the morning and that all the pens were going to be cleaned later that day.   The horse was photographed, weighed with a weight tape, and weighed approximately **684 pounds.**   This horse was scored as well. **"Fiona's" final Body Condition Score was a 5.3 rounded down to a 5- Moderate.**

   I then preceded to the last pen that housed the younger colts in this case.   The pen was muddy in areas ~om the recent rain and snow.   There was fresh water for the horses and fresh hay on the ground for the horses .o eat.

   The fourth horse I observed and checked was a horse named "River".   The horse was photographed, weighed with a weight tape, and weighed approximately **655 pounds.**   This horse was scored as well. **'"River's" final Body Condition Score was a 4.5- Between Moderately Thin and Moderate.**

   The fifth horse I observed and checked was a horse named "Echo".   The horse was photographed, weighed with a weight tape, and weighed approximately **570 pounds.**   This horse was scored as well.   **"Echo's" final Body Condition Score was a 4.3 rounded down to a 4- Moderately Thin.**

   The sixth and final horse I observed and checked was a horse named "Chance". The horse was photographed, weighed with a weight tape, and weighed approximately **662 pounds.**   This horse was scored as well.   **"Chance's" final Body Condition Score was a 4.8 rounded up to a 5- Moderate.**

   All the photographs taken on May 16, 2012 have been entered into ATIMS and also burned onto a computer disk (see computer disk).

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly  #9522 | | | Page ____ of ____ | |

Rev. 6/98
N

Form: PCSO-

120

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-16-2012** |

On May 16, 2012 Deputy Cindy Hardey received an email (see attached) from a party who is the new Project Manger at Harmony Equine Center in Franktown, Colorado. This is the place the horses were taken when seized in February 2012. Deb Wilke was the previous manger and has since quit. This party was present when the horses were taken to the equine center and did care for the horses. The party who took her position is male party identified as:

### IP/ Garret Leonard

The email read:

-----Original Message-----
From: Garret Leonard [mailto:gleonard@ddfl.org]
Sent: Wednesday, May 16, 2012 6:59 PM
To: Cindy Hardey
Cc: Duane Adams
Subject: Park County Horses at Harmony Equine Center

"When six Park County horses arrived at The Harmony Equine Center they were extremely underweight, dehydrated and lethargic. There faces were sunken in to the point they looked deformed. One horse in particular, Chance, could not hold himself up. In fact on the way to HEC he laid down in the trailer and had to be helped up upon arrival. You could see every vertebrae on each horse, they had no fat or muscle around there back bone, there hooks and pins were extruding outward. They came off the trailer very weak and stumbling.

After our initial intake, ticks were found on one of the horses named Midnight. In addition every morning for a week and a half it took two to three staff members to hoist a horse named Chance up in a harness to get him to his feet. Weak from his malnutrition and health condition he physically could not manage to get up each morning. Once on his feet he took several minutes to get his balance, walk around and start eating. He had soars on his body from struggling to get up. The amount of care he required forced us to send him to Littleton Large Animal hospital for 24 hour care to give him further assistance as he needed it.

As the weeks went by the horses gained strength, weight and were able to walk and function as healthy horses. They had daily exercise and when they left the facility they actually ran and played like normal horses.

Staff spent time grooming and nurturing each horse back to health and realized they all were having hair loss primarily around their face and some spots on their body. After a skin scrapping was taken it was determined they had ring worm. Each horse was bathed on each area of hair loss daily.

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly #9522 | | | Page _____ of _____ | |

Rev. 6/98
N

Form: PCSO-

[2]

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-16-2012** |

As we were able to clean these areas it was determined they all had lice as well. They left our facility free of lice and ringworm with plenty of energy and starting to look like healthy horses. With a little bit of food and care they all were coming along nicely.

If you have any other questions or need a more formal report we would be happy to do that. Please feel free to contact me if you need anything else."

Garret Leonard
Dumb Friends League
Harmony Equine Center
Project Supervisor
5540 E. Highway 86
Franktown, CO 80116
Mobile (303) 489-5945

I have also included several emails (see attached) received on this case from different individuals and citizens. The emails are dated from May 11, 2012 through May 25, 2012.

On May 24, 2012 at approximately 1:25 PM, I received an email (see attached) from a female party identified as:

### IP/ Shelley Ferraro

The email read:

"This is valuable information on "Little Big Man" and his mother "Little Feather" and **Timberline Vet**s. This is from Deputy Dawn Smith in Routt County. She handled "Little Big Man's and "Little Feather's" case.

Please let me know that you have received this information.

---

**From:** Harmonyhorsewrks@aol.com [mailto:Harmonyhorsewrks@aol.com]
**Sent:** Tuesday, May 01, 2012 9:59 AM
**To:** Shelley@shelleysdesigns.com
**Subject:** SPAM: Copy for you of Dawn's Email

Subj: **Dawn Smith, Routt County Animal Control Email**
Date: 4/30/2012 3:11:36 PM Mountain Daylight Time
From: Harmonyhorsewrks@aol.com

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ | of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-16-2012** |

To: eferraro@businesscontrols.com
*Sent from the Internet (Details)*

-----Original Message-----
Subject: RE: Spencer - Little Big Man
Date: Mon, 30 Apr 2012 13:34:25 -0600
From: Dawn Smith <dsmith2@co.routt.co.us>
To: <Harmonyhorsewrks@aol.com>


Barbara,


Here is some clarification on what happened with Dr. Horton & Dr. Burton;

· Fall of 2010 we required the horse owner to obtain a vet for Little Feather & Spencer

· Our defendant provided us with the information for Timberline Equine, citing she had obtained them as her vets.

· We met with Burton & Horton on Feb 02, 2011 in regards to the two horses, mostly to give background & make sure they didn't get hustled by our defendant

o At that time we told them the court had ordered the defendant to stay current on her vet bills so they should let us know if she had defaulted

· On March 2nd Horton & Burton were out at Swift's place and gelded Spencer they also did overall evaluations of both horses. At that time the horses were in acceptable condition about a 4 on the Henneke scale.

· June 6, 2011 I received an email from Dr Burton informing us our defendant was delinquent in her bills and they would not be extending more services on these two horses until the bill is paid. (this constituted a violation of the deferment and we began an order to revoke.

· On June 29th before the deferment was revoked , I had a medical issue that removed me from work until October, in my absence this issue was not pursued as everyone was very busy with their own cases.

· On January 16, 2012 I requested Timberline Equine go out to evaluate the horses at the expense of the Routt County Sheriff's Office (RCSO).

| Officer's Signature & Number | Supervisor's Initials & Date | Page ____ of ____ |
|---|---|---|
| Sgt. B. Priestly #9522 | | |

Rev. 6/98
N

Form: PCSO-

*123*

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-16-2012** |

·      On January 18, 2012 I received an email from Timberline stating they in no way would go see the horses as Routt County owed them money for prior visits.  They also stated RCSO had hired them not the defendant and that we had not even returned emails to them in regards to making payment on the bill.

·      I had been out of the office for several months so I checked around and no one had gotten a bill, phone call or email from Timberline in regards to this bill.

·      I emailed them back on January 20, 2012 telling them I would be happy to help them get the bill situated if they would just contact me.  I have not heard back from them.

To this day  the Routt County Sheriff's Office has never seen a bill for the horses in question.  I do not even know a gross estimate of what is owed.  To my knowledge and according to our correspondence Timberline Equine had not been out to see the horses since March 2, 2011.

Please let me know if this helps and feel free to share this with Undersheriff Gore and Sgt. Priestly.


*Dawn Smith*

*Routt County Sheriff's Office*

*Animal Safety Deputy*

*Evidence Technician"*

On May 25, 2012, I received an email (see attached) from a female party identified as:

### IP/ Barbara Wright (Harmony HorseWorks)

The email read:

"Attached is a record of my phone call on March 14, 2012 with Mrs. VanPoolen who had the 7 Bailey horses for several days before they were transferred to Harmony Equine Center in Franktown.  Mr. Ferraro asked me to foward this to you.

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly #9522 | | | Page ____ of ____ | |

Rev. 6/98
N

Form: PCSO-

124

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number<br>**2012000142** |
|---|---|---|
| Initial Offense Classification<br>**Cruelty to Animals** | Subject<br>**Swift, Ronald/ Hatlee, Randall** | Date of Report<br>**05-16-2012** |

Barbara Wright
Harmony HorseWorks
*Horse Sanctuary & Therapy Center*
*501(c)(3) Nonprofit Corp.*
13639 Elsie Road
Conifer CO 80433
(303) 816-0766
harmonyhorsewrks@aol.com
www.harmonyhorseworks.com
www.barbarawrightart.com
**MAKE ROOM FOR A HORSE IN YOUR HEART!**

**Harmony HorseWorks is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY
used to heal spooky, anxious and nervous horses and Equestrian Performance Coaching (EPC)
using PEAT energy psychology for the fearful rider. We are a Colorado non-profit corporation in
good standing and a tax exempt 501[c][3] corporation (DLN 17053233026024) since February 23,
2004. FEIN 20-0763702.**

Notes of phone call:
ˉ/14/12
Barbara Wright and Mrs. VanPoolen

I received a blocked and anonymous phone call (the lady would not give her name) from the
woman who had the Bailey horses at her place after they were taken from Swift's property but
before they were moved down to Harmony Equine Center. She had them for about a week and
told me about their sad condition. She took photos of Chance, the skinniest and most at-risk
one) and her little pig sleeping together during the days he was on the ground and unable to
even get up. She gave these photos to Monte Gore and wanted to donate them to the auction
and I should call and ask him for them. **She also told me several times she thought there
were as many as 30 more horses on that 1600 acre property in similar conditions and
there was no way of seeing them from the roads.** She said she could not talk much (although
we were on the phone for about 15 minutes) and suggested she was between a "rock and a hard
place" because she would have to say thing against people. I did not hear her say it, but it
seemed she was acquainted with Swift on friendly terms but also knew she had to do this for
the horses and tell someone. She said that it was about the horses, always about the horses. I
told her that her heart was in the right place and not to worry, that I knew the horses were now
improving from Monte Gore's info.

| Officer's Signature & Number<br>Sgt. B. Priestly #9522 | Supervisor's Initials & Date | Page ____ of ____ |
|---|---|---|

Rev. 6/98
N

Form: PCSO-

125

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-16-2012** |

She said she had drafts and a Bashkir Curly and lived up in the Fairplay area. Her voice sounded familiar to me and I think she might be the same anonymous caller of February 22: " I just saw a post on Pine Cam and I don't think the horses that animal control took from the owner of Bailey Feed are taken to a safe place. I thought I'd let you know. They were sent to a guy in Jefferson who is known to slowly starve his horses and I don't think they should be in charge of these horses."

Monte Gore has the identity of this lady and she told me she told him the same story - that there were as many as 30 starving horses on the Echo Valley Ranch property."

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

126

PARK COUNTY SHERIFF'S OFFICE

CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-18-2012** |

On May 25, 2012 I received the veterinarian records (see attached forms) from Timberline Equine Veterinary Services in relay. The records were requested by subpoena and were given to Deputy Cindy Hardey on May 18, 2012. Included in the records were the following documents:

1) Telephone Communication Log- Dr. Burton received a call from Dr. Lois Toll at approximately 9:45 AM on April 11, 2012. This was a conversation on the care that Dr. Toll had given the Swift and Hatlee horses and Dr. Toll did advise Dr. Burton that horses were to be released to the owners possibly with in a week.

2) Telephone Communication Log- Dr. Burton placed a call to Littleton Equine Medical Center and was put through to Dr. Toll's cell phone at approximately 11:45 AM on April 13, 2012. This was a conversation about medical records and who was the client at LEMC. Dr. Toll advised that she would not release any medical records until she was authorized by Park County Animal Control to do so as PCAC was paying the bills on the horses care. Dr. Burton stated she understood Dr. Toll's position and placed a call to Deputy Hardey requesting that information on April 14, 2012.

3) Telephone Communication Log- 4/14/12 6:20 PM  Ron Swift. Midnight. T=100 degrees. In barn will eat sweet feed and Oats but no interest in SR. or hay. Advise to give 500 # dose Banamine and provide moderate amount sweet feed and oats. Continue to observe. Made appointment for Tuesday 4/17/12 for oral exam and dental evaluation. 4/15/12 Sunday. Received call from Hatlee-he is unable to open email attachments. Ended call because he was attending a colicky horse. ARH received call. 4/15/12 Sunday. FB emailed again, this time cutting and pasting this documents into the body of the email where possible, including a web link for a paper on re-feeding from UCD. One PDF was attached-a photograph of our field notes. 4/17/12. Appointment at ranch at 10 AM. CC-Midnight seems uncomfortable chewing. Also o's report Dr. Toppin wanted recheck BW on midnight and Chance to check liver/kidneys. Drew LTT and RTT from both horses. Will contact Toppin to confirm what we are trying to check-CBC or chem or both. Ron asked about endocarditis-if Chance did indeed have it could it be a cause or could it be related to Maggie. As far as I am aware, there was no evidence found on echo done at LEMC to indicate any valvular endocarditis. The numbers have also resolved. It may be that endocarditis is being considered because no other source has been discovered. However, even after a thorough search, thinks like liver abscesses cannot be 100% ruled out. We also discussed reasons for the horses' weight loss. I mentioned the large size of the group making individuals harder to manage, the need to rely more on hay ad lib than concentrates or oils or probiotics. I also mentioned that hay stored for long periods loses nutritional value, and when you purchase hay from a broker, you can't be sure of this. But if it is fed free choice with mineral block available some of these variables can be mitigated. 4/17/12. Dr. Topping left message-CBC for Chance, chem. for Midnight. 4/18/12 Results.   Interpretation- Midnight has hypercalcemia, severe hypercalcemia and elevation on Bun/Creat. The K should be elevated due to this being a sample taken in the field. She was also sedated for the dental, trimming hooves, so glucose is artificially elevated. Her albumen is ok, glucoses are towards high end. Her Bun, Creat and K/Ca lead to a diagnosis of chronic renal failure. This fits the clinical picture very well given her history of being a chronic poor doer, her intolerance of high

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly | , | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

|27

**PARK COUNTY SHERIFF'S OFFICE**
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-18-2012** |

protein alfalfa and her slow weight gain and poor appetite. Discussed the grave long term- progression with Ron (ARH conversation). Euthanasia should be considered, especially if she simply is no feeling good from day to day. She can probably gain the needed body condition but quality of life is a concern. Chances WBC is increased and reactive lymphocytes are seen. It is likely this is still underlying bacterial infection. Discussed V/S of liver or long-term Abx course. (ARH conversation) 4/18/12 Received "Midnight" chem. panel and "Chance" CBC. Phoned Ron to report results and discuss interpretation. Advised o that chem. panel on "Midnight" indicates chronic renal failure, particularly when considered alongside long standing history of failure to thrive, poor appetite, and recent observation of polypisis advised that long term prognosis is grave and recommended that he strongly consider euthanasia at some point in foreseeable future, advised that current feeding regimen of grass hay and carb based supplement is best recommendation theoretically and gone okay for a couple of hours turn out on grass pasture daily. Owner expressed concern for patient's quality of life. Advised that poor appetite likely due to patient not feeling well. I.E. Quality of life is diminished and will continue to decline irrespective of any improvement on BCS. Also advised Ron as agent for "Chance's" owner that CBC indicates ongoing infection and recommended 3 week course of Unilprim 1 ½ scoop daily. Discussed diagnoses imaging, but as results are unlikely to change TX, these procedures are declined at this time. 12:35 PM 4/13 Randy Hatlee called. Reports Midnight is not eating today. On questioning he reports she is not showing any other abnormal behavior except perhaps seeming distracted or anxious, agitated, pacing. He thought it might be helpful to place Lena near her, so we advised she be placed in the adjacent pen, that he also take her temperature and to call back. 1:30 PM 4/13/12 Received call from Randy. Midnight is eating again. Did not have a working thermometer to take temp. 4/14/12 approximately 1030 AM. Received call from Mr. Swift. Midnight's appetite seems decreased. We were in the middle of a call, so we agreed to stop by the feed store afterwards to speak with him. He thought she seemed depressed, was only nibbling, did not matter what type of food. Above is per ARH. 11:30 AM Spoke with Mr. Swift. He stated he would have a temperature on Midnight this afternoon. He purchased a ring-top thermometer. He stated: He has provided hay and water to all horses, and has given Midnight her senior feed. She has been cleaning up about 75% of it. He feels her appetite is not very strong and although she has always been a picky eater, feels something is not right. Yesterday, when Randy took her out of the pen to some grass. She was too distracted to eat. (I suggested it was possible a large cat was in the area-sometimes horses act that way). He mentioned she likes mashes, so I advised he could give her bran mashes, beet pulp or a combination if she would eat it, and she can have as much of the beet pulp or a combination if she would eat it and she can have as much of the beet pulp as she will eat but she should still have available to her at all times in the pen the hay and senior feed we talked about. I advised him he could also add oil or probiotic to her feed. I requested he get a urine sample from her. She had an elevated creatine, but I was not certain how elevated. A U/A would determine if she was wasting any protein it might explain her lower rate of gain than the others. If normal we could rule it out. Mr. Swift reported that Randy had said Midnight had her teeth floated at LEMC, I told him I was not aware of this. He also stated there were charges on the bill for medication but without a name, and there were pills sent home for Chance, but they were not sure what pills. I advised him we were trying to get records so we could determine that and if it might have any

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly | | | Page ____ of ____ | |

Rev. 6/98
N

Form: PCSO-

128

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | 2012000142 |
| **Initial Offense Classification** | **Subject** | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-18-2012** |

bearing on what we do next as far as Midnight's care was concerned.  Ron also stated he had purchased some 12:12 blocks and all the horses had access to minerals.

4)  **Invoice # 1001-09/24/2010- Dental on Midnight- Chief complaint- Midnight not eating normal-Extraction and reduce Incisor.**

5)  **Invoice #1240 & #885-7/26/2010 &8/2/2010- Anesthesia, General Surgery, and Radiograph- Injury of jaw on Echo.  Removed bone fragments from Echo's right mandible. (I have placed five films taken from the records received into evidence see attached Evidence Sheet).**

6)  **Invoice # 1021- 10/4/2010-Castrations on four horses- Chance and River were two of the horses castrated on this date.  It was noted that both horses had no complications and an uneventful recovery.**

7)  Invoice #1832- 2/20/2012- Billed to Randy Hatlee- For examinations on horses Chance, Echo, and River.  This was after the horses were moved to 1401 Park County Road 77.  **CHANCE-** Heart rate 60 4/6 Holo Diastolic Crescendo Murmur MM=PP/M, CRT <2 BCS 1/9, ↓ Tail Tone, ↓ (unreadable term), prolonged placing hind leg especially left, tail pull bilat weakness  especially left poor placement.  Caretaker reports leaning to left. Not observed during exam.  PLR& Dazzle WNL (within normal limits).  CR ▼ ↓ ? Nostrils.  Skin, coat, and hooves WNL.  **ECHO-** Barh Heart rate 60 4/6 Holo Diastolic Musical Murmur Heart base?  BCS 2/9.  MM= PP/M CKT<2.  Skin, coat, and hooves ok. CRNM-WNL.  No neuro deficit noted.  **RIVER-** Barh- Heart rate 42 MM= PP/M CRT<2, BCS1-2/9, Frequent urination small volume. CRNN= WNL, No neuro deficit noted.  Normal hooves, skin, and coat.

8)  Invoice #1831 - 2/20/2012- Billed to Ron Swift and Helen Cook- For examinations on horses Lena, Midnight, and Fiona.  This was after the horses were moved to 1401 Park County Road 77.  **FIONA-** Barh Heart rate- 60 2/6 Diastolic Murmur.  MM=PP/M.  CRT <2.  BCS 2/9.  CRN= WNL.  No neuro deficit. Skin, coat, and hooves ok.  **LENA-** Barh- Heart rate 72.  MM= PP/M.  CRT <2.  BCS 1-2/9.  Neuro WNL. Skin, coat, and hooves WNL.  **MIDNIGHT-** Barh Heart rate 48.  MM= PP/M.  CRT <2.  BCS 3/9.  Neuro WNL. Skin, coat, and hooves ok.

9)  Chemistry Reports ordered by the State of Colorado- Samples taken on February 25, 2012 on all six horses.

10) Hematology Reports ordered by State of Colorado- Samples taken on February 25, 2012 on all six horses.

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly | | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

129

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-18-2012** |

11) Botulism Testing ordered by State of Colorado, Dr. Carl Heckendorf- Samples taken on February 20, 2012, by Timberline Equine on all six horses. Report came back on March 06, 2012 from Colorado State University stating results **NEGITIVE** for Botulism.

12) Invoice #1922- 4/12/2012- Physical Exam one horse, Brief Exam five horses. "The pervious attending veterinarian, in order to provide a marker for weight tape measurements, has clipped a small section of hair near the highest point of the withers where she had been using a Purina brand weight tape. In order to maintain consistency, a Purina weight tape was used today at the point where the hair has been clipped. As of today, we have not been contacted by Animal Control or any representative of the court. The attending veterinarian has provided a verbal summary of the horses' care. However, we may be missing critical information that may change the following recommendations. We are endeavoring from a court official the status of the horses' ownership. Dr. Burton spoke on the phone with Mr. Swift on 4/11/2012. Temporary feeding instructions were given until the horses could be examined and details might be available regarding the treatment and care given the horses by the attending veterinarian as well as any discharge instructions she felt appropriate. In the interim, Mr. Swift was asked to give ad libitum alfalfa hay to all horses, with Midnight also being provided a senior feed. Mr. Swift also provided Midnight grass hay in addition to the alfalfa due to her known preference for grass hay. Lateral view picture were taken today of all 6 horses. Dr. Horton performed the physical examinations and Dr. Burton took the photos and measured the horses with the weight tape. All horses need their hooves trimmed. **Exam Finding:** **Midnight:** Heart: No Murmur ausculted. Consistent S4, occasional S3. Rate WNL. Weight tape measured at midway between the 910 and 960 marks on the tape. BCS 3.5/9. Dermatophytosis noted. She has both grass hay and alfalfa in her pen, as well as some Senior Glo pellets in a feed pan. On our arrival, she is not eaten. During our visit, she did eat a significant portion of the alfalfa hay. Recommended gentle iodine for the fungal skin infection. MM pink, CRT WNL, LN WNL. **Lena:** Heart WNL. Pulse: 66. BCS 3 to 3.5/9. MM pink, CRT WNL, LN WNL. Weight tape 810. Dermatophytosis noted. Red cell supplement recommended. **Chance:** Weight tape: 590. Warts around right nostril noted, consistent with papillomatosis common to young horses. Pulse 84. S3 heard. RR 44. MM pink, CRT = 2. BCS 3/9. Conscious proprioception is WNL. Tail pull strength has improved, but still some weakness present. Now reactive to CN 5 stimulation. Tail tone present. Perineal reflex present. Red cell recommended. **River:** Weight tape 630. P 72. No murmur assaulted. LN WNL. BCS 3/9. MM pink, moist, CRT less than 2 seconds. Red Cell recommended. **Fiona:** BCS 5/9. P 70. No murmur. MM pink moist, CRT= 2. Red Cell recommended. **ECHO:** Weight midway between 475 and 510 on weight tape. Pot-bellied appearance. Coat is longer than most of the other horses. P72. BCS 3/9. LN WNL. MM pink, moist, CRT less than 2 seconds. Red cell recommended. **Instructions for feeding given 4/12/2012:** **Midnight:** She can be put out to pasture during the day to graze, but she must come back into her pen each evening to be fed. She should have as much hay as she wants (free choice) grass and alfalfa. (She should have some hay left over in her pen each morning). In addition to the hay, she should have 2 full one-pound coffee cans of Senior feed. A dental float suggested. **Fiona:** No special feeding is required, since she has attained a normal body condition score. However, it is recommended that she be fed a grass-alfalfa mi free choice. In addition, she can have a

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly | | | Page _____ | of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
| --- | --- | --- |
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-18-2012** |

moderate amount of grain in order to administer the Red Cell supplement. **Echo, River, Chance, and Lena:** Red Cell supplement per label instructions. Free choice alfalfa hay. Grain may be given in moderate amounts (a one-pound coffee can or regular horse scoop per day) for additional nutrition as well as to administer the Red Cell supplement. · All horses should have access to a Purina/Nature's Essentials 12:12 mineral block. Deworm all horses within the next 10 days with Ivermectin. (Midnight was dewormed while under the attending veterinarian's care, but the timing is uncertain. In the interest of getting all the horses on the same schedule, she can be dewormed with the rest of this group of horses).

13) Invoice # 1923 – 4/17/2012- Brief Exams Midnight and Chance, Dentistry Midnight and Chem. Labs both horses. "Midnight is chewing and opening her mouth wide. Dr. Toppin reportedly wants liver and kidney checked on blood per Mr. Swift. Chance- Dr. Toppin also wanted bloodwork on him. Midnight- Positive response on TMJ even while sedated. Points on 311. Slight points on 411. Slight points 406-407.Incisors – slight wave formation of insisors-202 high, part of 201. 302/3 and 102/3 high. Is mildly interfering with full CT grind. Adjusted- has (unreadable) CT grind/ (unreadable). Uncertain if these adjustments were causing a problem. Might be TMJ, but in light of the signs, judged it best on the side of caution. Will consider said systemic or topical pending blood. She has no (unreadable) No loose teeth, no pulp exposure. ARH trimmed X4 while sedated. Midnight ate half a bale of hay yesterday per Mr. Swift. Drank 15-20g water. Her appetite seems improving. She is shedding. Her wt tape is now closer to the higher end of rage of last measurement. She has Iodine on her coat. Noted 7% iodine on premises-needs to be GENTLE IODINE. Chance-Tachycardia at 88 bpm. No murmur. Slight upward change in wt tape just above 630. Shedding is getting **(missing second page).** Change strong Iodine to Gentle Iodine for Skin use. Obtain urine sample from Midnight tonight or tomorrow.

14) Results from Blood work on Chance and Midnight. Reported to owners on 4/18/2012 at 8:00 PM.

15) Invoice #1914- 4/21/2012- Uniprim 1200gm- Chance Medication.

16) Ranch call for all six horses on 5/14/2012- Re-Check Exam blood work Midnight, Chance, and Echo. Body Condition Scores on 17 horses. "Body Condition Scored all horses in pens- see attached sheet. Echo: cc- Has noted abnormal appearance to front limbs since returned from custody. A-Angular Limb deformities-Carpal Virus, slight Right front digit virus. Recommended (unreadable) trimming & frequent trimming-trim so lands flat. (RF has medial flare.) 1. Corrective Trimming for Echo. 2. With exception of Midnight all horses have attained body condition WNL. 3. Lena, Chance, River, Echo, can go to grass alfalfa mix. **Body Condition Scores on Horses- Midnight-** Weight tape lbs.- 1015- BCS-4-4.5, **Lena-Weight tape - 910 lbs. - BCS- 5, Fiona-** Weight tape- 715 lbs, BCS- 5, HR 43, **Chance-** Weight tape- 715 lbs, BCS 5, **HR 66 no murmur. Echo-** Weight tape-630 lbs, BCS- 5, HR 60. **River-** Weight tape 715 lbs, **BCS 5, HR 45.** Maggie (Magpie) Black and White Paint- BCS-5/9, Beauty Black and White Paint -BCS-6/9, Dusty- Black and White Paint- BCS- 5/9. Jo- Bay-BCS- 6/9, Lucy- Brown, dark-BCS-5/9, Indy- Bay,

| Officer's Signature & Number | | Supervisor's Initials & Date | |
| --- | --- | --- | --- |
| Sgt. B. Priestly | · | | Page ___ of _____ |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
| --- | --- | --- |
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-18-2012** |

medium-BCS- 5/9, Pretty- Palomino-BCS- 5/9, Beau- Tri-Color Overo-BCS- 5/9, Enrich(unknown)-Palomino Stallion-BCS-5/9,Tromble-Red Dunn-BCS-5/9, and Dezzi (Steve Kramer's horse) BCS-5/9.

After reading through the veterinarian records received from Timberline Equine Veterinary Services it is clear that Dr. Burton, DVM and Dr. Horton, DVM did not provide treatment to the subject horses prior to seizure. The only exception would be on the dates of 09/24/2010 when a dental was given to Midnight. 10/15/2009 Influenza Testing on Chance with positive results. 7/26/2010 and 8/2/2010 Echo had a broken jaw and required surgery. The last visit was on 10/4/2010 for the castration of Chance and River. It was stated in court that the horses were under the care of Timberline Equine Veterinary Service. After all the records were obtained through the subpoena it is evident that the horses were not receiving veterinarian care prior to being seized as stated. There is no evidence in the phone records or the medical records in the files received that Mr. Swift or Mr. Hatlee had placed calls or even received calls, other than those mentioned, about the six subject horses prior to April 14, 2012. End of report.

| Officer's Signature & Number | Supervisor's Initials & Date | |
| --- | --- | --- |
| Sgt. B. Priestly | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

132

**PARK COUNTY SHERIFF'S OFFICE**
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-17-2012** |

On May 16, 2012 at 1:31 PM, I received an email (see attached) from a female party identified as **Shelley Ferraro** regarding some photographs and video footage that were taken by another party of the six subject horses. The email read:

"Betty,

I certainly hope you intend to subpoena those pictures and videos. Ms Van Poolen indicated that they would be very damaging to the defense's case. You should get them before they are destroyed by her!"

This email was attached and forwarded from a male party who is Shelley Ferraro's husband **Gene (Eugene) Ferraro**. There is a Confidentiality Warning at the bottom of this email and I did speak with Gene Ferraro on June 07, 2012 and I was given permission to use the emails in this case.

**From:** Gene Ferraro [mailto:eferraro@businesscontrols.com]
**Sent:** Tuesday, May 15, 2012 8:59 PM
**To:** Thom LeDoux; Monte Gore; Betty L. Royse
**Cc:** Harmonyhorsewrks@aol.com; Shelley Ferraro
**Subject:** Echo Valley Horses: Possible New Evidence Discovered

Dear Mr. LeDoux and Under Sheriff Gore:

While at the court house today I ran into Ms. "Curt" (possible first name, Christina) Van Poolen. As you both know, the six Echo Valley Horses which the County seized on February 23, 2012 were secretly transported to her property for safe-keeping until they were transferred to Littleton Large for veterinary care. Ms. Van Poolen revealed to me and several others that she had taken pictures (and a video) of the six horses upon their arrival to her property. She said the horses were in terrible shape and that she was very concerned at the time for their survival. I asked if she'd provide me copies of the images and video. She said she would not provide them to anyone, even if ordered by the court. She said she'd rather go to jail than get involved. She said the images were very disturbing and damaging to the defendants in the case and she wished no one harm, especially the defendants. I pressed her no further.

At approx 6:45 p.m. this evening I called Ms. Van Poolen's husband, Martin (cell 719-836-4821) whom I know. I left a message summarizing my conversation with his wife and indicated that any evidence in her possession should not be destroyed. I indicated that intentional destruction of evidence is a crime and may be punishable as such. I asked that he call me.

I will let you if I hear from him or learn more.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

133

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-17-2012** |

I am cultivating several witnesses who will likely offer testimony that that which Officer Hardy said she saw during her visits to EVR (which she testified to today) was staged for her benefit. I am also aware that someone present at the time Bear/Little Big Man (Spencer) was seized took pictures which may not be in the hands of either the Sheriff's investigators or the DA's office. I am attempting to convince them to surrender them. I will keep you posted.

Eugene F. Ferraro, CPP, CFE, PCI, SPHR

Business Controls, Inc.
5995 Greenwood Plaza Boulevard, Suite 110
Greenwood Village, Colorado 80111
Office: 303.526.7600 | Toll-free: 800.650.7005
Check out our new website: www.BusinessControls.com
Follow us: Facebook | Twitter | LinkedIn | YouTube

*"Insight in an Instant"*

CONFIDENTIALITY WARNING: This e-mail is for the confidential use of the intended recipients only, and may be protected by the attorney work-product privilege. Any unauthorized review, access, copying, ssemination, distribution, or use of the content of this message/information is strictly prohibited by Federal Law. Attempts to intercept this message or distribute it without authorization are in violation of 18 U.S.C. 2511(1) of the Electronic Communications Privacy Act (ECPA). Fines, imprisonment, and/or civil damages may be imposed for violations. Licensed in California, Florida and Illinois. Insured where necessary. PI 21470"

On May 25, 2012 at 5:48 PM, I received an email (see attached)) from **Barbara Wright** regarding the same photographs and video footage. The email read:

"Attached is a record of my phone call on March 14, 2012 with Mrs. VanPoolen who had the 7 Bailey horses for several days before they were transferred to Harmony Equine Center in Franktown.  Mr. Ferraro asked me to foward this to you.

Barbara Wright
**HARMONY HORSEWORKS**
*Horse Sanctuary & Therapy Center*
*501(c)(3) Nonprofit Corp.*
13639 Elsie Road
Conifer CO 80433
(303) 816-0766
harmonyhorsewrks@aol.com

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ | of ____ |

Rev. 6/98
N

Form: PCSO-

134

### PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-17-2012** |

www.harmonyhorseworks.com
www.barbarawrightart.com
**MAKE ROOM FOR A HORSE IN YOUR HEART!**

**Harmony HorseWorks is the home of Wright-ESCT™ EQUINE STRESS CONTROL THERAPY used to heal spooky, anxious and nervous horses and Equestrian Performance Coaching (EPC) using PEAT energy psychology for the fearful rider.  We are a Colorado non-profit corporation in good standing and a tax exempt 501[c][3] corporation (DLN 17053233026024) since February 23, 2004.   FEIN 20-0763702."**


"Notes of phone call:
3/14/12
Barbara Wright and Mrs. VanPoolen

I  received a blocked and anonymous phone call (the lady would not give her name) from the woman who had the Bailey horses at her place after they were taken from Swift's property but before they were moved down to Harmony Equine Center.  She had them for about a week and told me about their sad condition.  She took photos of Chance, the skinniest and most at-risk one) and her little pig sleeping together during the days he was n the ground and unable to even get up.  She gave these photos to Monte Gore and wanted to donate them to the auction and I should call and ask him for them.  **She also told me several times she thought there were as many as 30 more horses on that 1600 acre property in similar conditions and there was no way of seeing them from the roads.**  She said she could not talk much (although we were on the phone for about 15 minutes) and suggested she was between a "rock and a hard place" because she would have to say thing against people.  I did not hear her say it, but it seemed she was acquainted with Swift on friendly terms but also knew she had to do this for the horses and tell someone.  She said that it was about the horses, always about the horses.  I told her that her heart was in the right place and not to worry, that I knew the horses were now improving from Monte Gore's info.

She said she had drafts and a Bashkir Curly and lived up in the Fairplay area.  Her voice sounded familiar to me and I think she might be the same anonymous caller of February 22:  " I just saw a post on Pine Cam and I don't think the horses that animal control took from the owner of Bailey Feed are taken to a safe place.  I thought I'd let you know.  They were sent to a guy in Jefferson who is known to slowly starve his horses and I don't think they should be in charge of these horses."

Monte Gore has the identity of this lady and she told me she told him the same story - that there were as many as 30 starving horses on the Echo Valley Ranch property."

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page ____ of ____ |

Rev.  6/98
N

Form:  PCSO-

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-17-2012** |

On May 17, 2012 at approximately 8:02 AM, I placed a telephone call to a female party known to me as **Kirsten LeBeau (08/05/1972)**. I asked Kirsten if she was going to be home as I had some questions to ask her about some photographs and video footage that she had. Kirsten stated that she would be home and agreed to meet with me at her residence located at 1401 Park County Road 77, Jefferson Colorado 80456. I arrived at LeBeau's residence at approximately 9:15 AM.

Upon arrival I asked Kirsten what photographs and video footage did she have that everyone was talking about? Kirsten stated that it was the video she had taken when Deputy Hardey, Undersheriff Gore, and I had responded with a warrant to seize the six horses from her property. Kirsten stated that the footage was taken when she sat on the floor with her phone, while the horses were being loaded. I told her that I remembered her doing this when the horses were removed from her property on February 23, 2012. I asked Kirsten how she knew the people that told me she had the pictures and video of the horses owned by Swift and Hatlee. I was advised that her husband and her had built a fence for Shelley and Gene Ferraro a couple of years ago and that is how they originally met them. Kirsten stated that she did not want to be involved in the case and she was only concerned about the horses. I agreed with her. Kirsten stated that the video was damaging to Swift and she was friends with him. I told her I understood that and I did not need the video footage or the photographs from her. I told her that I was there when the horses were seized and I could testify to the conditions of the horses at that time.

After talking for approximately a half an hour (Kirsten's husband) came into the room. This party is known to me as:

### IP/ Maarten VanPoolen (11/18/1956)

Maarten stated the Mr. Ferraro left a message on his telephone. The telephone was put on speaker and I listened to the message. The message was in reference to the photographs and video footage taken by Kirsten. It referenced the fact that if the evidence was destroyed Kirsten may be charged with a felony. I recorded this message with my digital voice recorder. This message was transferred to a computer disk (see attached disk.) I advised Maarten and Kirsten that my main concern in this case is the welfare of the horses and that is all I am in interested in taking care of. While we were talking Kirsten left the kitchen area and returned with her cellular telephone and stated she had received a message from a female party named **Ingrid with a telephone number of 303-868-4490.** This message was from a mutual friend of Shelley Ferraro's and Kirsten's. Ingrid stated that Shelley was on a rampage and was going to have Kirsten subpoenaed about the horses. Ingrid also stated that if Kirsten destroyed the video and photographs Shelley told her it would be a felony and she just wanted Kirsten to have a heads up. I recorded this message with my digital voice recorder. This message was transferred to a computer disk (see attached disk.) Kirsten asked if anyone else would receive a copy of the photograph's and video footage if she released it to me. I advised her I would have to give a copy to the District Attorney's Office and the Defense Counsel would get a copy through discovery. Kirsten was not satisfied with that and pressed me further asking if the Ferraro's would be able to get a copy of the footage. I advised her that the disks would not be available to any another source.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ | of _____ |

Rev. 6/98
N

Form: PCSO-

**PARK COUNTY SHERIFF'S OFFICE**

CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-17-2012** |

Kirsten opened the photographs and showed me the pictures she had and also some of the video footage on the cellular telephone. Kirsten stated she would allow me to have a copy of the information she had and we agreed that I would see if could figure out a way to get the information off of the Verizon cellular device. We agreed to meet again on May 21, 2012 at approximately 9:30 AM.

On May 21, 2012 at approximately 8:30 AM, I placed a call to Kirsten and left a message asking for a call back. I received a call from Maarten at approximately 10:03 AM advising me that Kirsten had gone to Salida, Colorado to do a fencing job. Maarten stated that she had her cellular telephone and I should try and call her on that. I placed a call and left a message on Kirsten's cellular telephone requesting a call back. Kirsten did call me back approximately an hour later and stated she had forgotten that we had an appointment to meet. We agreed to meet in Salida and have lunch around 12:00 PM.

I met Kirsten at a restaurant in Salida and we tried to transfer the information from the SIM card (memory card) in her cellular telephone to my cellular telephone. We were unsuccessful in doing this, so it was decided that after lunch we would go to the local Verizon Store and have the clerk assist in the transfer. During lunch Kirsten stated that Maarten and her were experiencing some financial difficulties as of late. According to Kirsten, Ron Swift had received approximately 300 bales of hay from them and they had not received any payment. Kirsten stated that she had given the hay to Swift, because she did not want the horses to go hungry nd that was her only concern. Kirsten also advised me that she could not afford to keep giving Swift hay. She ᴜid not know what to do about the situation as Swift was a long time friend. Kirsten stated she would not be able to purchase hay for her horses until she received payment from Swift for the hay he had gotten and she was not going to be able to give him anymore.

After lunch Kirsten and I went to the local Verizon Store to transfer the footage to my SIM card. The clerk at the store stated that since my Verizon cellular telephone was not a Smart Telephone the transfer would not work and we would need to download the information to a computer. We left the store and Kirsten stated that she would take her telephone to Denver, Colorado and have the information put on a thumb drive device and she would give me the device the following week.

On May 30, 2012 Kirsten arrived at the Park County Sheriff's Office at approximately 10:40 AM. I met her in the lobby and she gave me a black PNY 8G ATTACHE thumb drive device with all the video footage and photographs from her cellular telephone. Kirsten asked, "This will not get into Shelley Ferraro's hands right"? I advised her I would download the information onto a DVD and the device would be booked into evidence.

Kirsten then stated that she thought I should know a few things about the case that she had heard. Kirsten told me, "Cindy is playing both sides of the fence and I think you should know that she is telling Ron everything." Kirsten also informed me that Swift and Hatlee plan on, "Fucking with Animal Control this week and not being there when you call to come see the horses." I asked her what she meant by that statement and she said that Ron was going to say he was going to be gone Wednesday and Thursday and Randy was going to

| Officer's Signature & Number | | Supervisor's Initials & Date | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | | Page ____ of ____ |

Rev. 6/98

N

Form: PCSO-

137

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-17-2012** |

say he was busy on Thursday and Friday.  Kirsten stated she told them the horses would still be there.  I advised Kirsten that I did weekly checks and the only thing I was aware of was Swift had an appointment on May 30, 2012.  Kirsten left the Sheriff's Office and I thanked her for supplying the information.

I spoke with Kelly Belsher from Information Services with Park County and asked her to transfer the information from the thumb drive to a DVD (se attached disk) for me.  Belsher was able to download the information and the photographs were transferred into ATIMS.  That is all the information I have at this time.  End of supplemental report.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly  #9522 | | Page _____ of _____ |

Rev.  6/98
N

Form:  PCSO-

138

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/Hatlee, Randall** | **05-24-2012** |

On May 24, 2012 at approximately 3:00 PM, I met with **Dr. Lois Toll, DVM from Littleton Equine Medical Center** in Bailey, Colorado. Dr. Toll was asked to respond and check on the horses that belong to **Ronal Swift and Randall Hatlee** again at my request. Before we responded to the Echo Valley ranch Dr. Toll handed me her report and some photographs (see attached) from the initial examine done on February 27, 2012.

The report read:

May 23, 2012

To Whom It May Concern,

"I examined the horses known as Midnight, Lena, Fiona, River, Chance, and Echo on February 27, 2012. They continued to be under my care until April 14, 2012. All six horses were gravely underweight. Echo and Chance had heart murmurs and Lena's heart rhythm was accelerated.

Of greatest concern initially was Chance. At 365 pounds and a body score of 1, he was profoundly emaciated. His blood work reflected an infection and anemia. He was started on antibiotics but he was so weak, he was unable to rise unassisted. He was transported to the hospital for 24 hour care. His heart was elevated and the antibiotics were changed. Most importantly he was fed small frequent feedings. He responded well; had the strength to rise, and his murmur resolved. It took several more weeks for the anemia to resolve.

Echo's auscuable heart abnormalities resolved within the week and he gained weight steadily. The treatment plan for Echo was purely dietary. Fiona and River also responded to a consistent diet.

Lena's tachycardia also slowly resolved over the course of the first week. Again; consistent feeding was the only treatment plan.

Midnight experienced the most difficult recovery. She had internal parasites and required dental work to help her chew properly. Blood work was performed when she was the only horse that did not gain weight, which reflected chronic renal disease. Her diet was then changed and she responded well.

All the horses were treated for ecto parasites and fungal disease.

The problems exhibited by this herd of horses can all be attributed to the effects of starvation. The long term repercussions of starvation on major organs, like kidneys and hearts, can be profound and is still too soon to fully evaluate. Any time a horse is reduced to a body score of 2 or less, they are at significant risk for organ failure."

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| Sgt. B. Priestly #9522 | | | Page _____ of _____ | |

Rev. 6/98
N

Form: PCSO-

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift, Ronald/Hatlee, Randall** | **05-24-2012** |

Sincerely Yours,

Lois Toll DVM
Littleton Equine Medical Center

Dr. Toll also supplied four photographs of Echo two taken on February 27, 2012 and two taken on April 06, 2012. She also supplied six photographs of Chance two taken on February 27, 2012, two taken on April 04, 2012, one taken on March 05, 2012 and one taken on April 06, 2012.  There is no other information at this time. End of supplemental.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

140

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-24-2012** |

On May 24, 2012 at approximately 3:00 PM, I met with **Dr. Lois Toll, DVM from Littleton Equine Medical Center** in Bailey, Colorado. Dr. Toll was asked to respond and check on the horses that belong to **Ronald Swift and Randall Hatlee** again at my request. Deputy Hardey was assisting me that day and we arrived at the ranch at approximately 3:12 PM. Dr. Toll was going to do the checks on the horses that day and I was going to record only the weights of the six horses on two separate weight tapes. Dr. Toll advised the owners that she was going to use a Purina Weight Tape because that was the tape she had used to weigh the horses while under her care. I wanted to continue to use the Forage First Weight Tape to be consistent in my records. I recorded the welfare check with my audio recorder and a copy of the disk has been included (see attached.)

I noticed that Hatlee had a pistol in an unstrapped holster on his belt. I asked Deputy Hardey if that was a common practice, I had not noticed it before, on her pervious visits to the ranch. Deputy Hardey stated she had never noticed Hatlee with a weapon on his belt before. I took some photographs of the horse pens at the ranch and all the pens were clean and dry. I have entered the photos into ATIMS and also burned them onto a CD (see attached.)

| | | | |
|---|---|---|---|
| **Midnight-** | **Forage First- 930** | **Purina- 1025** | **Heart Rate- N/A** |
| **Lena-** | **Forage First- 861** | **Purina- 950** | **Heart Rate- 48** |
| **Fiona-** | **Forage First- 664** | **Purina- 730** | **Heart Rate- 52** |
| **Chance-** | **Forage First- 673** | **Purina- 715** | **Heart Rate- 60** |
| **River-** | **Forage First- 673** | **Purina- 725** | **Heart Rate- 44** |
| **Echo-** | **Forage First- 555** | **Purina- 590** | **Heart Rate- 44** |

On June 06, 2012 at approximately 10:48 AM, I arrived at Echo Valley Ranch to conduct a follow-up on the horses. I had Deputy Bramlett with me to assist in documenting the scores while I scored the horses. I had my digital audio recorder on and recorded my visit (see attached CD.) I took photographs of the six subject horses and the photographs have been entered into ATIMS. I also been burned the photographs onto the same disk as the visit from May 24, 2012.

| | FF Tape | Neck | Rib | Withers | Loin | Tailhead | Shoulder | Total Body Score |
|---|---|---|---|---|---|---|---|---|
| **Midnight-** | 959 | 4 | 3 | 3 | 3 | 3 | 3 | 3.2 |
| **Lena-** | 914 | 7 | 8 | 6 | 6 | 6 | 6 | 6.5 |

| Officer's Signature & Number | | Supervisor's Initials & Date | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | | Page ____ of ____ |

Rev. 6/98
N

Form: PCSO-

141

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | Case Report Number |
|---|---|
| | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **05-24-2012** |

| | FF Tape | Neck | Rib | Withers | Loin | Tailhead | Shoulder | Total Body Score |
|---|---|---|---|---|---|---|---|---|
| Fiona- | 708 | 5 | 6 | 5 | 5 | 6 | 4 | 5.2 |
| Chance- | 708 | 4 | 5 | 5 | 5 | 5 | 6 | 5 |
| River- | 732 | 4 | 6 | 5 | 4 | 5 | 4 | 4.6 |
| Echo- | 608 | 4 | 5 | 4 | 5 | 5 | 4 | 4.5 |

The horses had all gained weight and were improving; even Midnight the older mare with medical issues was putting weight on. I advised Swift and Hatlee that I would only score the horses and take photographs monthly since the horses were improving with each visit. There was hay and water available for the horses in the pens and Swift asked if he could turn Fiona out on pasture. I advised Swift that would be fine and I would call him when I would be back out for the next visit. End of report.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

142

## PARK COUNTY SHERIFF'S OFFICE
CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/ Hatlee, Randall** | **06-14-2012** |

On June 14, 2012 at approximately 10:48 AM, I responded to the Echo Valley Ranch to conduct a welfare check on the six horses that belong to **Ronald Swift and Randall Hatlee.** I recorded the welfare check with my audio recorder and a copy of the disk has been included (see attached.) This visit was very short and only took approximately ten minutes to do. I did not take and photographs and I did not score the horses on this visit. The horses had food and water available to them. I did advise the owners that I would be back around the first part of July to do a full inspection of the horses. Swift did advise that he would be putting Fiona out to pasture in two or three days. I was also advised that the warts were being treated on the three colts.

On June 03, 2012 at approximately 10:38 AM, I arrived at Echo Valley Ranch to conduct a follow-up on the horses. I had Deputy Bramlett with me to assist in documenting the scores while I scored the horses. I had my digital audio recorder on and recorded my visit (see attached CD.) I took photographs of the six subject horses and the photographs have been entered into ATIMS. I also been burned the photographs onto a CD (see attached.)

| | FF Tape | Neck | Rib | Withers | Loin | Tailhead | Shoulder | Total Body Score |
|---|---|---|---|---|---|---|---|---|
| **Midnight-** | 974 | 5 | 4 | 3 | 3 | 4 | 3 | 3.7 |
| **Lena-** | 924 | 7 | 8 | 7 | 6 | 7 | 6 | 6.8 |
| **Fiona-** | 762 | 6 | 7 | 6 | 6 | 7 | 5 | 6.2 |
| **Chance-** | 758 | 5 | 6 | 5 | 5 | 6 | 7 | 5.7 |
| **River-** | 782 | 5 | 8 | 6 | 6 | 6 | 5 | 6 |
| **Echo-** | 630 | 4 | 5 | 6 | 5 | 6 | 5 | 5.2 |

The next scheduled visit would be in August 2012. End of report.

| Officer's Signature & Number | Supervisor's Initials & Date | | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

143

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/Hatlee, Randall** | **08-07-2012** |

On August 07, 2012 at approximately 9:30 AM, I arrived at Echo Valley Ranch to conduct a follow-up on the horses. I had Deputy Bramlett with me to assist in documenting the scores while I scored the horses. I was unable to take photographs of the six subject horses because the battery in my digital camera was dead. All of the horses were in good condition. Only Fiona and Lena were in pens and the rest of the horses were out on pasture.

| | FF Tape | Neck | Rib | Withers | Loin | Tailhead | Shoulder | Total Body Score |
|---|---|---|---|---|---|---|---|---|
| **Midnight-** | 1003 | 5 | 4 | 4 | 3 | 3 | 4 | 3.8 |
| **Lena-** | 874 | 6 | 8 | 6 | 6 | 5 | 6 | 6.2 |
| **Fiona-** | 744 | 6 | 8 | 7 | 6 | 6 | 7 | 6.6 |
| **Chance-** | 794 | 7 | 8 | 6 | 5 | 7 | 7 | 6.6 |
| **River-** | 774 | 7 | 8 | 7 | 6 | 6 | 5 | 6.5 |
| **Echo-** | 639 | 5 | 4 | 5 | 5 | 4 | 4 | 4.5 |

It should be noted that on **Supplemental 2012000142.13** I made an error on the date I scored the horses. It stated it was June 03, 2012 and the correct date was July 03, 2012. The next welfare check will be in October 2012. End of report.

| Officer's Signature & Number | Supervisor's Initials & Date | |
|---|---|---|
| Sgt. B. Priestly #9522 | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

144

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |

| Initial Offense Classification | Subject | Date of Report |
|---|---|---|
| **Cruelty to Animals** | **Swift, Ronald/Hatlee, Randall** | **10/01/2012** |

On October 01, 2012 at approximately 9:21 AM, I arrived at Echo Valley Ranch to conduct a follow-up on the horses. I had Deputy Stolhand with me to assist in documenting the scores while I palpated the horses. I had my digital recorder with me and the recorded the visit. I have burned the recording on a CD (see attached) and have included it in this case. I took photographs of the six subject horses and have entered the photographs into ATIMS. Five of the six horses were in acceptable condition. "Midnight" the older black mare had lost approximately one hundred pounds. Swift stated that he had brought the mare in from pasture at the veterinarian's recommendation. Although the mare had lost one hundred pounds she was still in an acceptable body condition. Swift stated that he was having blood work done on "Midnight" in approximately two weeks. Below are the scores on the horses.

| | FF Tape | Neck | Rib | Withers | Loin | Tailhead | Shoulder | Total Body Score |
|---|---|---|---|---|---|---|---|---|
| **Midnight-** | 918 | 4 | 2 | 3 | 2 | 3 | 4 | 3 |
| **Lena-** | 834 | 5 | 7 | 6 | 5 | 5 | 6 | 5.6 |
| **Fiona-** | 732 | 6 | 7 | 7 | 6 | 6 | 6 | 6.3 |
| **Chance-** | 794 | 7 | 8 | 6 | 5 | 7 | 7 | 6.6 |
| **River-** | 794 | 7 | 8 | 7 | 6 | 7 | 6 | 6.8 |
| **Echo-** | 673 | 5 | 6 | 6 | 5 | 5 | 5 | 5.3 |

The next welfare check will be in November 2012.   End of report.

| Officer's Signature & Number | Supervisor's Initials & Date | Page _____ of _____ |
|---|---|---|
| Sgt. B. Priestly #9522 | | |

Rev. 6/98
N

Form: PCSO-

145

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **201200142** |
| Initial Offense Classification | Subject | Date of Report |
| **Cruelty to Animals** | **Swift Ronald/ Hatlee, Randal** | **11-13-2012** |

On November 13, 2012 at approximately 9:34 AM, I arrived at Echo Valley Ranch to conduct a follow-up on the horses. I had Deputy Bramlett and Deputy Foltz with me to assist in documentation. I did not have my digital recorder with me during this inspection. The horses were all weighed with the Forage First Weight Tape and the weights were recorded. I took photographs of the six subject horses and have entered the photographs into ATIMS. All six horses had gained weight since the last welfare check. "Midnight" had gained seventy pounds from the last visit and was in better condition. Below are the weights on the horses. The weights in far right column are the weights from the prior month. There is no other information at this time. End of report.

| | FF Tape | |
|---|---|---|
| **Midnight-** | **988** | **(918)** |
| **Lena-** | **847** | **(834)** |
| **Fiona-** | **764** | **(732)** |
| **Chance-** | **821** | **(794)** |
| **River-** | **821** | **(794)** |
| **Echo-** | **684** | **(673)** |

| Officer's Signature & Number | | Supervisor's Initials & Date | |
|---|---|---|---|
| Sgt. B. Priestly #9522 | | | Page _____ of _____ |

Rev. 6/98
N

Form: PCSO-

146

## PARK COUNTY SHERIFF'S OFFICE
### CONTINUATION SHEET

| | | Case Report Number |
|---|---|---|
| | | **2012000142** |
| Initial Offense Classification | Subject | Date of Report |
| **Information Item** | **Swift, Ronald & Hatlee, Randall** | **1/14/2013** |

On January 14, 2012, at approximately 10:00 AM, I arrived at Echo Valley Ranch in Bailey, Colorado to do a follow-up welfare check on the horses belonging to two male parties known to me as:

**RO/Ronald Swift. 7/17/42.**
**RO/Randall Hatlee. 7/23/59.**

I met with Swift and Hatlee who showed me the six horses involved in the cruelty case. The first horse was "Midnight" who was in the barn. The horse was in good condition and Swift advised me that "Midnight" was kept in the barn during the coldest parts of the winter to keep her warm.

Swift then led me to two other horses known to me as "Lena" and "Fiona." I had previously seen these horses on prior welfare checks where the horses were in very good condition. I noticed that the horses had lost some weight since the last welfare check, however because the horses were in such good condition previously, it was not enough weight to be a concern. The horses were still in an acceptable body condition.

We then went to the pasture and checked the three young horses, "Chance," "River" and "Echo." These horses were still in good body condition. I observed all the horses eating fresh hay and that they had plenty of water. There is no further information at this time. End of report.

| Officer's Signature & Number | | Supervisor's Initials & Date | | |
|---|---|---|---|---|
| R. Bramlett   9531 | | | Page _____ of _____ | |

Rev. 6/98
N

Form: PCSO-

*147*

# EXHIBIT J

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
and RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
and ASHLEIGH OLDS,

Defendants.
-----------------------------------------------------------
DEPOSITION OF TROY MURDOCK
July 25, 2014
-----------------------------------------------------------

Deposition location:
600 17th Street
Suite 600 N
Denver, Colorado  80202

APPEARANCES:

Brice A. Tondre, Esq.
BRICE A. TONDRE, P.C.
215 South Wadsworth Boulevard, #500
Lakewood, Colorado  80226

For the Plaintiffs.

John Lebsack, Esq.
WHITE and STEELE, P.C.
Dominion Towers
600 17th Street, Suite 600N
Denver, Colorado  80202

For the Defendant, Olds.

Page 8

1  and treating conditions?

2          A    Me personally?

3          Q    You personally.

4          A    No.  I would have been like about -- you

5  know, born to in my teens.  I would go out with the

6  veterinarian and help them if he needed it.  But I

7  don't diagnose.

8          Q    Did anyone in your family diagnose?

9          A    We used veterinarians.

10         Q    You had occasion to go to Echo Valley

11 Ranch at one point, right?

12         A    Yes.

13         Q    How many times have you been there?

14         A    Once.

15         Q    Do you -- did you prior to that time,

16 know Mr. Hatlee or Mr. Swift?

17         A    No.

18         Q    Do you know anything about them?

19         A    No.

20         Q    What was -- when did you first learn that

21 you were going to Echo Valley Ranch?

22         A    The morning that they told me to hook up

23 the trailer and drive.

24         Q    Were you told what was going to be done?

25         A    No.

Page 9

1        Q    After you were told -- well, first of

2 all, did you hook up the trailer and drive?

3        A    Yes.

4        Q    What time did you leave Aspen Valley --

5 Aspen Creek?

6        A    We would have left between 8:00 and

7 probably 9:00 in the morning.

8        Q    And did anyone accompany you?

9        A    Yes.

10       Q    Who?

11       A    Dr. Olds.

12       Q    What did you and Dr. Olds talk about

13 between the time that you left Aspen Creek and the time

14 you arrived at Echo Valley Ranch?

15       A    She asked me how my night was, I asked

16 her how her night was.  We went ahead and talked about

17 what the weather was going to be like that day, we

18 talked about other plans for the day as what we were

19 supposed to do for work.  We talked about the view that

20 we had as we were driving towards the Bailey area.

21       Q    Did you talk about the tasks you were

22 expected to perform?

23       A    No.

24       Q    Approximately what time did you arrive at

25 Echo Valley Ranch -- Echo, yeah?

1              MR. LEBSACK:  I'm sorry, what?

2              Q   (BY MR. TONDRE) Approximately what time

3 did you arrive at Echo Valley Ranch?

4              A   Probably around 10 in the morning.

5              Q   And how --

6              A   Give or take about two hours.

7              Q   How long were you on the premises of Echo

8 Valley Ranch?

9              A   I'd say probably no more than maybe an

10 hour and a half.

11             Q   What was the first thing you did after

12 you arrived?

13             A   Got out of the truck.

14             Q   And then what did you do?

15             A   Followed the animal control officer and

16 the other deputies down the path.

17             Q   Did you know prior to that occasion, did

18 you have any prior contact with the animal control

19 officer and the deputy?

20             A   That was the first day I met them.

21             Q   And what'd you next do?

22             A   Walked down to the barn that was on the

23 right-hand side of the path.  Mr. Swift came outside.

24 Animal control officers started talking to him, pointed

25 us to the bottom of the barn where the colt was inside,

Page 11

1 walked inside, tried to find my way around the 6 inches

2 or so of mud and manure that was lying all over.

3 Walked back there to the colt, where it was laying in

4 that mud and manure.  Mr. Hatlee was in there.

5          Q    What was Mr. Hatlee doing?

6          A    Standing there.

7          Q    After you walked into the barn, what did

8 you next do?

9          A    Stood there and waited for direction.

10          Q    How long did you sit there waiting for

11 direction?

12          A    I couldn't tell you.  Eventually I went

13 back to the truck to go get a lead rope, a halter, see

14 if I could get the colt up.  By the time I came back,

15 Mr. Hatlee had the colt up and had it walked outside;

16 and he had it tied to the back of a truck.

17          Q    Did you ask him how he got the colt up?

18          A    No.

19          Q    Did he tell you how he got the colt up?

20          A    No.

21          Q    What was the colt doing while he was

22 standing there?

23          A    Eating the food on the back of the truck.

24          Q    Did you see a load of hay bales anywhere

25 in the vicinity?

Page 14

1           Q    And then what?

2           A    Eventually, deputies, animal control

3 officer, me, Dr. Olds, continued down the path around

4 the barn to where all the -- to where all the rest of

5 the horses were kept.  We noticed as we were walking

6 through there was horses that were fat and taken care

7 of, well-fed on the right-hand side, horses that were

8 very thin on the left-hand side.  There was also only

9 about 6 inches of water, maybe less water inside all of

10 the -- all of the water troughs and they were frozen

11 over with ice.

12           Mr. Hatlee said that we had interrupted

13 the morning feeding routine and that's why there was no

14 food or water out there for those horses.  Continued to

15 walk to the back; at the end of the path, there was a

16 round pen, there was approximately six to eight horses

17 standing in there.  We were informed that those horses

18 just came off of pasture.  You could see the ribs on

19 all those horses.

20           There was also no water in those -- in

21 that water trough.  I continued to stand there and just

22 talk privately with the deputies, about nothing in

23 particular, we talked about the day, talked about how

24 their day was going, how my day was going.  I was not

25 privy to any of the conversations between Dr. --

# EXHIBIT K

Appellate Case: 16-1065     Document: 01019641231     Date Filed: 06/20/2016     Page: 151





Olds Disclosure Documents Page 520359

Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 153



Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 154



Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 155



Olds Disclosure Documents Page 523362

## EVIDENCE IMAGES #2012000142

Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 156

**1. MAGGIE, DRUM MARE**



**2. MAGGIE, DRUM MARE**





## EVIDENCE IMAGES #2012000142

**3. MAGGIE, DRUM MARE**



Appellate Case: 16-1065    Document: 01019641231    Date Filed: 06/20/2016    Page: 157

**4. MAGGIE, DRUM MARE**



## EVIDENCE IMAGES #2012000142

**5. MAGGIE, DRUM MARE**



**6. MAGGIE, DRUM MARE**



Appellate Case: 16-1065    Document: 01019641231    Date Filed: 06/20/2016    Page: 158

## EVIDENCE IMAGES #2012000142

**7. MAGGIE, DRUM MARE**



**8. BEAR "LITTLE BIG MAN" COLT**



Page: 159   Date Filed: 06/20/2016   Document: 01019641231   Appellate Case: 16-1065

## EVIDENCE IMAGES #2012000142

**59. MAGGIE, DRUM MARE**



**60. MAGGIE, DRUM MARE**



Page: 160   Date Filed: 06/20/2016   Document: 01019641231   Appellate Case: 16-1065

# EXHIBIT L





Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 164



Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 165



Olds Disclosure Documents Page 552372

# EXHIBIT M



Olds Disclosure Documents Page 494374



Olds Disclosure Documents Page 495

375











Olds Disclosure Documents Page 500

380





Olds Disclosure Documents Page 502

382



Olds Disclosure Documents Page 503



Olds Disclosure Documents Page 504







387



Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 183



390

## EVIDENCE IMAGES #2012000142

**29. MIDNIGHT BREEDING MARE**



**30. MIDNIGHT BREEDING MARE**



## EVIDENCE IMAGES #2012000142

**39. MIDNIGHT BREEDING MARE**



**40. MIDNIGHT BREEDING MARE**



Appellate Case: 16-1065   Document: 01019641231   Date Filed: 06/20/2016   Page: 185

Appellate Case: 16-1065 Document: 01019641231 Date Filed: 06/20/2016 Page: 186







PARK CTY DEFS_001887



PARK CTY DEFS_001886



PARK CTY DEF'S_001987

PARK CTY DEFS_001800

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing **APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME 2**, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with the McAfee AntiVirus Enterprise and McAfee AntiSpyware Enterprise version 8.8.0.1528, Virus Definition File Dated: 6/15/2016 rev 8197 and, according to the program is free of viruses.  In addition, I certify all required privacy redactions have been made.


By:    /S/Becky Kongs_____
       Legal Assistant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME 2** was furnished through (ECF) electronic service to the following on this the 20th day of June, 2016.

Brice A. Tondre
215 S. Wadsworth Blvd, #500
Lakewood, CO 80226-1566

By:    /S/Becky Kongs
       Legal Assistant