# CASE NO. 16-1065

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

| | |
|---|---|
| RANDALL J. HATLEE and<br>RONALD L. SWIFT | ) |
| | ) |
| | ) |
| Plaintiffs – Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| ASHLEIGH OLDS, | ) |
| | ) |
| Defendant – Appellant. | ) |

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Raymond C. Moore
D.C. No. 12-cv-02469-RM-MJW

**APPELLEE'S SUPPLEMENTAL APPENDIX
VOLUME 3 – PAGES 399-617**

JOHN LEBSACK
ADAM GOLDSTEIN
White and Steele, P.C.
600 17TH Street, Suite 600N
Denver, Colorado 80202
(303) 296-2828
jlebsack@wsteele.com
agoldstein@wsteele.com

1

## TABLE OF CONTENTS

Defendant Olds' Separate Statement of Undisputed Material Facts in
Support of Motion for Summary Judgment

(ECF 62-15) ...................................................................................... 399-411

Exhibit N (ECF 62-16) ....................................................................... 412-415

Exhibit O (ECF 62-17) ....................................................................... 416-456

Exhibit P (ECF 62-18) ........................................................................ 457-458

Exhibit Q (ECF 62-19) ....................................................................... 459-471

Exhibit R (ECF 62-20) ........................................................................ 472-474

Exhibit S (ECF 62-21) ........................................................................ 475-476

Exhibit T (ECF 62-22) ........................................................................ 477-481

Exhibit U (ECF 62-23) ........................................................................ 482-485

Exhibit V (ECF 62-24) ........................................................................ 486-488

Defendants Wegner, Gore, Priestly and Hardey's Motion for Summary
Judgment Re:  Individual Capacity Claims (EFC 65) ................................... 489-498

Exhibit A (ECF 65-1) .......................................................................... 499-501

Exhibit B (ECF 65-2).......................................................................... 502-504

Exhibit C (ECF 65-3)........................................................................... 505-507

Exhibit D (ECF 65-4) .......................................................................... 508-510

Exhibit E (ECF 65-5).......................................................................... 511-513

Exhibit F (ECF 65-6) .......................................................................... 514-516

Exhibit G (ECF 65-7) ........................................................................ 517-519

Separate Statement of Undisputed Material Facts Re:  Defendants
Wegner, Gore, Priestly and Hardey's Motion for Summary
Judgment Re:  Individual Capacity Claims ......................................... 520-524

Motion for Partial Summary Judgment Regarding Damages

Exhibit F (ECF 66-6) ........................................................................ 525-534

Defendant Olds' Separate Reply Statement of Undisputed Material Facts
In Support of Motion for Summary Judgment (ECF 82) .............................. 535-569

Order (ECF 110) ............................................................................. 570-617

**17. LENA PAINT MARE**



**18. LENA PAINT MARE**



Appellate Case: 16-1065     Document: 01019641232     Date Filed: 06/20/2016     Page: 4

Date Filed: 06/20/2016    Page: 5

Document: 01019641232

Appellate Case: 16-1065

**19. LENA PAINT MARE**



**20. ANOTHER HORSE ON THE RANCH**





PARK CTY DEFS_001857



PARK CTY DEFS_001858



Haltes
Depo
6/19/2014 63

PARK CITY DEF'S 00850





PARK CTY DEFS_001855



406





PARK CTY. DEFS_001853

CITY DEFS_001856



Hatler
6/23/2014 75

PARK C_____00186

Appellate Case: 16-1063   Document: 01019641232   Date Filed: 06/20/2016   Page: 16



PARK CTY DEFS_001853

411

# EXHIBIT N

⚠ You forwarded this message on 2/17/2012 3:45 PM.
Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Cindy Hardey**

| | | | |
|---|---|---|---|
| **From:** | aolds@aspencreeklac.com [aolds@aspencreeklac.com] | **Sent:** | Thu 2/16/2012 4:35 PM |
| **To:** | Cindy Hardey | | |
| **Cc:** | | | |
| **Subject:** | letter of statement | | |
| **Attachments:** | 📄 animal control letter.pdf(1MB) | | |

Officer Hardey:

I have attached a letter with a summary of the findings today. Hopefully this will useful in obtaining an order to seize the remaining horses and/or get permission to euthanize the down mare. If she dies, I would recommend a necropsy at CSU to confirm whether she died of starvation vs. botulism. The little gelding that we took today is doing OK, although he went down in the trailer and was too weak to get up when he got to the hospital. We had to run IV fluids, iv dextrose, calcium, and hydrate him for several hours before we could assist him to a standing position. He appears very hungry and has ben eating non-stop since he got here. His blood work shows extreme anemia among other problems. He is not showing any signs of botulism and to me appears to be a very clear cut case of starvation and malnutrition.

Ashleigh Olds, DVM
Aspen Creek Veterinary Hospital
Conifer, Co
www.aspencreeklac.com

PARK CTY DEFS_000933

Ashleigh Olds Diedrich
Aspen Creek Veterinary Hospital
23605 Oehlmann Park Rd
Conifer, CO 80433
(303) 697-4864
www.aspencreekac.com

February 16, 2012

To whom it may concern:

Today I was asked by Park County Animal Control and Routt County Animal Control to attend the seizure of a 2 year old gelding.  The gelding was located at Echo Valley Ranch in Bailey, Colorado at the time of seizure.

On arrival, the gelding was laying down in a very dark and filthy stall.  He did not appear able to rise on his own despite encouragement.  The footing in the stall was thick with manure, urine and mud.  He was caked in manure and mud.  His body condition score was 1/9 on the Henneke scale.  I estimate his weight at 500 lbs.  After multiple attempts to get him to stand, I was called away to examine another very thin horse that was recumbent in the upper area of the same barn.  When I returned, a ranch hand had gotten this gelding up and had him tied to a truck.  He was then loaded into a trailer and transported to Aspen Creek Veterinary Hospital for further evaluation and treatment.  During the trailer ride, the horse layed or fell down from weakness and rode the rest of the way down in the trailer.  On arrival at the vet hospital, he was too weak and uncoordinated to stand on his own.  He was lifted and carried into a stall  Bloodwork revealed severe anemia, elevated white blood cell count, dehydration, low calcium levels, and various other abnormalities.  After treatment with IV fluids, IV dextrose, IV calcium, IV antibiotics, and intramuscular vitamin injections (vitamin B complex and Vitamin E/selenium) my staff was able to assist the gelding to a standing position.  He has shown great interest in food and water since arrival and has a voracious appetite.  At this time my professional assessment is that the gelding is suffering from extreme malnutrition and starvation.  He is not showing any signs of botulism or other neurological disorder.  He is extremely small for his age, likely as a result of malnutrition.  As a result of suspected starvation he is at risk for death due to "re-feeding syndrome" which can cause heart failure, kidney failure, and sudden death as a starved animal is returned to normal nutrition.  On a long term basis he is at risk for orthopedic joint disease and cartilage disruption (OCD, bone cysts, etc.) due to improper nutrition during his prime growing years.

It is worth noting that during the examination of the property, an adult female horse was recumbent in the upper area of the barn.  This was a black mare. She was roughly a body condition score 1/9.  She had been down since Saturday (5 days) per the owner.  When we initially arrived, Ron Swift indicated to the animal control officers that the horse was dead.  When I examined her I noted that she was breathing.  He then admitted that she had been down for 5 days.  He claims that she could sit up and drink and eat every two hours, but I was unable to get her into a sternal or sitting position.  The mare was covered in severe pressure sores on her face, shoulders, and hips.  She could paddle her legs and struggle to move,

but could not even get into a sitting position. She had reduced tail tone, but normal eyelid tone, tongue tone, and facial tone. The owner claimed that she was being "treated" for either tick paralysis or botulism. I asked what the treatment was, and he indicated that there was no treatment. He claimed to be rolling the mare every 2 hours from side to side. My personal opinion on examination of the horse is that she was not necessarily showing any evidence of botulism or tick paralysis, but more likely is suffering from malnutrition and starvation. I also believe that a horse that is recumbent should either be euthanized or transported to a hospital facility for more intensive care such as anti-inflammatories, IV fluids and nutritional support, antibiotics, wound care for the pressure sores, and intermittent slinging. A horse that remains down for days on end is a severe risk for aspiration pneumonia, dehydration, sepsis from pressure sores, lung collapse, colic, and many other complications.

There were also two other adult horses on the property that were extremely thin. One was a sorrel and white paint mare. She had a frozen water tank and no food in her pen on arrival. I would grade her body condition score a 1.5/9. There was another black mare in another pen who also had frozen water, no food in her pen, and a body condition score of 1.5/9.

In a separate pen there were 4 yearling foals. There was a chestnut, a grulla, a bay, and a palomino of unknown sexes. They all ranged from a 1.5-2/9 body condition score. They did not have any feed in their pen and their water tank was frozen.

In my opinion these horses all appear to be suffering from starvation and malnutrition. The owner did not seem to acknowledge the severity of the problem, which is concerning to me that anything will be done to help them. There was very little hay noted on the property at the time of exam, and no feed in any of the pens despite it being 11:00 am. The owner noted that they hadn't had breakfast yet. All of the horses nickered and whinnied as we walked by as if hungry. I have grave concerns for the remaining thin horses, as Ron Swift admitted that several other horses had already died.

If you have any further questions regarding this matter, please feel free to contact me.

Sincerely,

Ashleigh Olds Diedrich, DVM

# EXHIBIT O

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 13-cv-02469-RM-MJW

_____

RANDALL J. HATLEE and
RONALD L. SWIFT,

    Plaintiffs,

              vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE,
FRED WEGENER and
ASHLEIGH OLDS,

    Defendants.

--------------------------------------------------------

     DEPOSITION OF ALLYSON RENÉ HORTON, DVM
            March 27, 2014

--------------------------------------------------------
                    Deposition location:
                    9998 Havekost Road,
                    Conifer, Colorado 80433


ALSO PRESENT:   Jennifer R. Edwards, Esq.
               (For Dr. Horton)
               Randall Hatlee
               Ronald Swift
               Ashleigh Olds, DVM

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 36

1          A.    Correct.

2          Q.    Had you ever provided veterinarian

3    services for any of these horses prior to

4    February 20th of 2012?

5          A.    Yes.

6          Q.    Which ones?

7          A.    As these records that we have been

8    going over indicate, we had seen Echo.  We had seen

9    Midnight.  We had seen River and Chance.  Some of

10   those horses were patients that day we did four

11   castrations.

12         Q.    You left out Fiona and Lena.  So does

13   that mean that prior to February 20, 2012, you had

14   not provided any veterinarian services for Fiona or

15   Lena?

16         A.    To the best of my recollection, that is

17   true.

18         Q.    And that is true for Timberline Equine,

19   both of you?

20         A.    Yes.

21         Q.    When was the last time before

22   February 20, 2012, that you, Timberline, had provided

23   any veterinarian services for Chance?

24         A.    I couldn't say off the top of my head.

25         Q.    Would that be the castration?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 37

 1          A.    I couldn't say off the top of my head.
I would have to go search all the records to find
that day.

 4          Q.    Okay.  I have them in chronological
order, so they would be somewhere between -- based on
all the documents that have been produced --

 7          A.    Uh-huh.

 8          Q.    -- so between pages 1 and page 16.
Would you review those and tell me when was the last
time shown by those records that Timberline had
provided any veterinary services for Chance?  And
let's -- I'll try to be efficient about it.

13                There's four horses that you saw on
February 20th that you had seen before.  You just
mentioned Chance, Echo, River, and Midnight.  So as
you are going through there, if you see a treatment
for any of those horses, let me know.

18          A.    That, I can tell you off the top of my
head the most recent for any of those would have been
Midnight for dental issues.  I don't recall the date.

21          Q.    Okay.  Can you go to the page for that.

22          A.    If I could find it.

23          Q.    Okay.  How about page 11?

24          A.    That is the dental visit for Midnight
dated 9/24/2010.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 38

1          Q.    So was there any veterinary service

2     that Timberline provided to Midnight between

3     September 24, 2010, and February 20, 2012?

4          A.    Not that I recall.

5          Q.    Okay.  Now, the treatment that

6     Timberline provided for Chance, Echo, and River would

7     have been sometime before September 24th of 2012 --

8     2010, excuse me, September 24, 2010; is that right?

9          A.    Well, like I just said, other than the

10    castration, I don't recall.

11         Q.    Look at page 12.

12         A.    Okay.

13         Q.    And page 13.  Those pages show the

14    castrations that were done in October of 2010.

15         A.    Yes.

16         Q.    And those castrations include Chance

17    and River?

18         A.    Yes.

19         Q.    So between October of 2010 and going up

20    to the Jefferson facility in February -- on

21    February 20th of 2012, did Timberline provide any

22    veterinary services for Chance or River?

23         A.    It does not appear that we did.

24         Q.    Now, there's one other horse that's

25    listed on page 16 at the February 20, 2012, that is

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 39

 1    not shown on either the Midnight eating problem or

 2    these castrations, and that's Echo.  See on page 16

 3    where it has Echo?

 4            A.    Uh-huh.

 5            Q.    Had you seen Echo or had Timberline

 6    provided veterinary services for Echo before

 7    February 20, 2012?  I think you said before that you

 8    did, but I just want to follow up because we haven't

 9    seen that in the records.

10            A.    Yes, you have.  We did a surgical

11    procedure on Echo for a mandibular fracture.

12            Q.    Okay.

13                  MS. EDWARDS:  Page 9.

14                  MR. SCHIMBERG:  9.

15            A.    Apparently page 9.

16            Q.    (BY MR. LEBSACK) I'm sorry.  Yes.

17    Page 9, August 2, 2010, is that the treatment for

18    Echo?

19            A.    One of them, yes.

20            Q.    So between that date August 2, 2010,

21    and the blood work that you did or the blood testing

22    samples -- excuse me, the blood samples that you took

23    on February 20, 2012, did Timberline provide any

24    veterinary services for Echo?

25            A.    Not that I recall.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 40

```
 1              Q.    Let's get back to page 16.  Does this
    have some notes of your exam?
 2
 3              A.    Yes.
 4              Q.    On that date -- so in addition to
    taking some blood samples, you did do a physical
 5
    exam?
 6
 7              A.    I did.
 8              Q.    And this has notes of that?
 9              A.    It does.
10              Q.    Were those horses severely emaciated as
11  of that date?
12              A.    Body conditions scores indicated horses
13  that were extremely thin, some of them more than
14  others.
15              Q.    And let's just go through each horse
16  and read into the record what your body condition
17  score was for each of the horses on February 20,
18  2012.
19              A.    All right.  We can -- do you want the
20  entire exam findings or just the body condition
21  scores?
22              Q.    The findings that would relate to --
23              A.    Thank you.
24              Q.    -- the skinniness of the horses.  So if
25  there is something besides body score that relates to
```

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 41

1    that, tell me that, but if it's just the body score,

2    just give me that.

3            A.    Chance was body scored using the

4    Henneke body conditions scoring system not modified.

5    I scored him a one out of nine.  I also found that he

6    evidenced neurologic signs.

7            Q.    What are those signs?

8            A.    I have noted here he had decreased tail

9    tone and decreased peroneal reflex, prolonged placing

10   of his hind limbs, weakness in the hind end on tail

11   pull, and he was suffering from tachycardia and a

12   holodiastolic crescendo murmur.

13           Q.    Okay.  Is that all the findings on

14   Chance that would relate to his body condition?

15           A.    I think those are pertinent to his body

16   condition, yes.

17           Q.    What about Echo; what are the findings

18   there on body condition?

19           A.    I have noted here a heart rate of 60,

20   which is tachycardic for a horse at rest, also a four

21   out of six holodiastolic musical murmur localized

22   over the heart base, body condition two out of nine.

23           Q.    You mentioned some neurologic issues

24   with Chance.  Did you note any as to Echo?

25           A.    No.

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 42

1          Q.    I see right there it says no neural

2     deficit noted for Echo.

3          A.    Yes.

4          Q.    Okay.   Fiona, what were the body

5     condition reports there?

6          A.    Her body condition score is noted to be

7     a two out of nine.

8          Q.    Any other findings about her

9     skinniness?

10          A.    She also evidenced a diastolic murmur.

11          Q.    Did she have any neural deficits?

12          A.    It is noted that she did not.

13          Q.    Okay.   What are the findings on River?

14          A.    River was scored between a one and a

15     two out of nine on the Henneke scale.

16          Q.    Any neural deficit?

17          A.    None noted.

18          Q.    Any other findings as to her

19     skinniness?

20          A.    The only other possible abnormality

21     observed was frequent urination.   Whether that

22     related or not is unclear.

23          Q.    Is River male or female?

24          A.    River is male.   He was castrated along

25     with Chance and Echo -- or not Echo, excuse me.   Echo

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 43

```
 1    was not boarded.
 2              Q.   Flip the page to Lena.  What were the
 3    body score findings on Lena?
 4              A.   Lena's body condition score I put as a
 5    one to two out of nine.
 6              Q.   Any other findings about her
 7    skinniness?
 8              A.   She also was tachycardic with a heart
 9    rate of 72, a resting heart rate of 72.
10              Q.   And what's normal?
11              A.   It varies, but in general anywhere from
12    the mid to high 30s to the mid to high 40s in beats
13    per minute.
14              Q.   And then Lena also had no neurological
15    abnormalities?
16              A.   She is marked as neuro within normal
17    limit.
18              Q.   What were the findings about Midnight?
19              A.   Midnight scored as a three out of nine.
20              Q.   Any other findings about Midnight's
21    skinniness?
22              A.   No, nothing relevant.
23              Q.   And Midnight's neurological findings
24    were within normal limits?
25              A.   Within normal limit.
```

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 44

1              Q.    So that score of three out of nine,
2       that is still below the acceptable number for a
3       horse; is that correct?
4              A.    It is thin.
5              Q.    And is one the lowest that you go?
6              A.    Yes.  The scale is from one to nine.
7              Q.    Okay.  Let's keep going, and I promise
8       we will try to move faster through these documents.
9                    Is 18 the bill for that work that you
10      did on February 20th?
11             A.    Yes, it appears to be.
12             Q.    What about page 19, is that the same
13      thing.
14             A.    It appears to be.
15             Q.    So you billed Mr. Hatlee for the horses
16      that he owned, and you billed Ms. Swift and Ms. Cook
17      for the horses they owned?
18             A.    Yes.
19             Q.    Okay.  Pages 20 through 27, are those
20      lab results?
21             A.    Not exactly.
22             Q.    What are they?
23             A.    These are forms from IDEXX Laboratories
24      indicating transport of the blood samples after being
25      picked up at our office to the D-lab at Colorado

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 74

 1    records.  I can't imagine what it would be, but I
 2    just want to be inclusive.
 3              A.    No.   These are our records.
 4              Q.    Okay.
 5                    (Whereupon, Deposition Exhibit No. 3
 6    was marked for identification by the reporter.)
 7              Q.    (BY MR. LEBSACK) Look at Exhibit 3.   Is
 8    that a CV for you?
 9              A.    No.   It's a resumé.
10              Q.    I'm sorry.  And is this up to date?
11    And if it's not up to date, if you could just explain
12    what information needs to be added to make it up to
13    date.
14              A.    It is not up to date.
15              Q.    Okay.  Did you happen to bring with you
16    a current resumé?
17              A.    No.
18              Q.    What --
19              A.    This is relatively current.
20              Q.    So is there anything specific that
21    needs to be changed on this to make it up to date?
22              A.    At present, I am not president of
23    Timberline Equine Veterinary Services.   I am vice
24    president.
25              Q.    And is Dr. Burton the president?

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 75

```
 1          A.    Yes, she is.

 2          Q.    Any other changes that you see on that

 3    that we need to make in order to make it up to date?

 4          A.    I have been reaccredited by USDA as of

 5    the end of November of last year.

 6          Q.    So that says August of 2012, so that

 7    should now say November 2013?

 8          A.    Yes.

 9          Q.    Any other changes to make it up to

10    date?

11          A.    I don't believe so.

12          Q.    Is Timberline still exclusively a

13    mobile veterinary practice?

14          A.    Yes.

15          Q.    And the practice consists of you and

16    Dr. Horton?

17          A.    I'm Dr. Horton.

18          Q.    I'm sorry, Dr. Burton.

19          A.    Yes.

20          Q.    I misspoke.

21                Are you still a member of the American

22    Veterinary Association?

23          A.    I don't know.  I don't know if I have

24    paid my dues to be current at the moment or not.

25    They may be a bit tardy.
```

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 77

```
 1    that day?
 2         A.    I would have to peruse the record to
 3    say with certainty whether I had seen any of those
 4    horses belonging to any of those owners because those
 5    are not the only owners.
 6         Q.    All right.  Let me modify the question.
 7    Any horses at Echo Valley Ranch owned by Mr. Hatlee
 8    or Mr. Swift?
 9         A.    I would still have to peruse the record
10    and see if I had seen them within the previous
11    12 months.
12         Q.    We just did that, didn't we, through
13    Exhibit 1?
14         A.    Uh-huh.
15         Q.    So --
16              MR. SCHIMBERG:  Is that a yes?
17         Q.    (BY MR. LEBSACK) Didn't we just peruse
18    the records in Exhibit 1 relating to those horses?
19              MS. EDWARDS:  Objection to the form.
20    The question is a little bit confusing.
21         Q.    (BY MR. LEBSACK) What I'm getting at is
22    I'm asking you about whether you had a
23    veterinarian-client-patient relationship.  If I use
24    the abbreviation VCPR, you know what that means?
25         A.    Yes.
```

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 78

1          Q.    Did you have a VCPR with any of the

2    horses owned by Mr. Hatlee or Mr. Swift at Echo

3    Valley Ranch as of February 16, 2012?

4          A.    Yes.

5          Q.    Which ones?

6          A.    We had previously seen Chance, River,

7    Echo, Midnight, just to name a few.   There are

8    oftentimes when we see horses casually, so it can be

9    difficult to differentiate between a professional...

10         Q.    So is it your testimony that of the six

11   horses that were involved in the -- taking the blood

12   work that you did have a VCPR on those horses as of

13   February 2012?

14         A.    We had previously had that.

15   Technically that requires seeing the horse every

16   12 months.   That time period was longer than

17   12 months.

18         Q.    Okay.  So as of February 2012, you did

19   not have a VCPR with the horses -- I forget the

20   names, Echo, Midnight, River, Chance, Fiona, and

21   Lena?

22         A.    Not in the strictest technical sense of

23   the phrase.

24         Q.    Not in the sense of the veterinary

25   medical ethics of the American Veterinary Medical

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 79

1    Association, correct?

2              A.    Not to the letter.

3              (Whereupon, Deposition Exhibit No. 4

4    was marked for identification by the reporter.)

5              Q.    (BY MR. LEBSACK)  Exhibit 4.  Is that a

6    copy of the statement of ethics regarding VCPRs from

7    the American Veterinary Medical Association, to the

8    best of your knowledge?

9              A.    It is one, yes.

10             Q.    This is the one that pertains to the

11   VCPR, right?

12             A.    Apparently this is the one available on

13   AVMA.  It is not the only professional organization

14   in the world.

15             Q.    But that's the association you belong

16   to?

17             A.    I also belong to AAEP.

18             Q.    Okay.  But this appears to be the

19   ethics principles for the VCPR at least based on the

20   American Veterinary Medical Association, correct?

21             A.    Yes.

22             Q.    Okay.  In your veterinary education,

23   did you ever hear the phrase, "When you hear hoof

24   beats, you should look for horses and not zebras"?

25             A.    I have heard that in and outside of

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 85

1              MS. EDWARDS:  Objection, form.

2              MR. TONDRE:  Foundation.

3         Q.   (BY MR. LEBSACK) Go ahead.

4         A.   That these horses would have benefitted

5    from intensive attempts to correct their weight loss

6    sooner either through medical attention or extra feed

7    or at least investigation.

8         Q.   So you believe that regardless of what

9    was going on with these horses, the owners waited too

10   long before seeking assistance from a vet?

11             MR. TONDRE:  Objection, form and

12   foundation.

13             MS. EDWARDS:  Objection.

14             THE DEPONENT:  I never know if that

15   means I should answer or not.

16             MS. EDWARDS:  You can go ahead and

17   answer.

18        A.   Yes.  I believe that the horses had

19   deteriorated past a point where assistance should

20   have been sought.

21        Q.   (BY MR. LEBSACK) Don't you agree that

22   the horses showed signs that were at least consistent

23   with starvation or malnutrition?

24        A.   You are equating starvation and

25   malnutrition.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 86

1        Q.    Okay.   Let me separate them out.   What

2   is the difference, from your standpoint, between the

3   terms so I phrase my question right?

4        A.    At least in my understanding,

5   starvation has an implication that food is being

6   denied.   Malnutrition can be a medical condition.

7   You can provide all the food you want and the animal

8   still would not thrive.

9        Q.    Do you agree that those horses showed

10  signs that were consistent with starvation as you

11  just defined it?

12              MR. TONDRE:   Objection, foundation.

13       A.    As I indicated, I would not be able to

14  conclude definitively that it was the denial of food

15  versus a medical condition.

16       Q.    (BY MR. LEBSACK) That was not my

17  question.   My question was whether you saw signs that

18  were consistent with starvation?

19              MR. TONDRE:   Objection, foundation.

20       A.    I saw signs that the horses were too

21  thin.   I did not see signs that told me that I could

22  say it was because of A, B, or C.

23       Q.    (BY MR. LEBSACK) But weren't those

24  signs that the horses were too thin, isn't that

25  consistent with starvation?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 87

1              MR. TONDRE:  Objection, form,

2    foundation, argumentative, and asked and answered.

3              A.    Starved horses are too thin.  That is

4    all I can tell you.  These horses were too thin.

5    That is -- that is a sign of starvation.

6              Q.    (BY MR. LEBSACK) Have you ever

7    encountered any other horses that you diagnosed as

8    having a bracken fern problem?

9              A.    No.

10             Q.    Did you learn about bracken fern when

11   you were -- well, let me ask this:  Your background

12   and knowledge about bracken fern, where does that

13   come from?

14             A.    That comes from toxicology education as

15   part of professional school.  It was taught by a

16   Dr. Anthony Knight.

17             Q.    At CSU?

18             A.    The author of this book.

19             Q.    So you are holding up a book.  Can I

20   just read the edition into the record.  So this is "A

21   Guide to Plant Poisoning of Animals in North

22   America," by Anthony T. Knight and Dr. Richard G.

23   Walter.  And it's an edition -- copyright 2001.  So

24   you had this -- you've gained some information from

25   that book?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 101

1    nerves are not functioning.

2              Q.    (BY MR. LEBSACK) So if -- you can have

3    paralysis of one limb and not the others, right?

4              A.    Yes.

5              Q.    Right.  So you could have paralysis of

6    the hindquarters but not the front legs, right?

7              A.    Correct.

8              Q.    But when you use the term paralysis,

9    that means an inability to move that limb at all,

10   right?

11             A.    Yes.

12             Q.    So did you at any time on any of the

13   horses that you can talk about, did you ever observe

14   paralysis?

15             A.    I observed -- paralysis is one end of

16   the spectrum.  I observed a different portion of the

17   spectrum.

18             Q.    What spectrum did you observe?

19             A.    Paresis.

20             Q.    So you never actual observed any of

21   those horses that had a condition as extreme as

22   paralysis, but you did observe horses that had

23   paresis?

24             A.    Yes.

25             Q.    And paresis means what?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 102

1          A.    Weakness.

2          Q.    And which horses and when did you

3    observe have signs of paresis?

4          A.    That would be Chance on 2/20.  I think

5    it was 2012.

6          Q.    Up at the Lebeau?

7          A.    Yes.

8          Q.    Okay.  You noted -- I think you noted

9    when we were talking about the records that -- let me

10   start from scratch.  Did any of those horses show

11   signs of anemia?

12         A.    Grossly, yes.

13         Q.    What do you mean grossly?

14               THE DEPONENT:  Can I have the original

15   records?

16               MR. TONDRE:  Signs of what?

17               MR. LEBSACK:  Anemia.

18               MR. TONDRE:  Anemia.

19         A.    See if I can find it.  Blood tests that

20   were ordered by Dr. Heckendorf did reveal that these

21   horses were suffering from significant anemia.

22   However, there was evidence at the time that

23   suggested that that was the case in a subjective way.

24               Here we go.  Blood -- there were blood

25   drops on the page of my original notes that contained

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 103

1    so few blood cells that they are hard to recognize as

2    blood.

3            Q.    Okay.  So you are holding up -- what is

4    the date of that?

5            A.    2/20/12.

6            Q.    Let me just find the page in this

7    Exhibit 1 that relates to that.  Is it this page?

8            A.    Yes.

9            Q.    Okay.  So you are looking at your

10   original copy of Deposition Exhibit 1, page 16?

11           A.    Uh-huh.

12           Q.    And your original had a couple of blood

13   spots on it?

14           A.    Yes.

15           Q.    And did you take those samples at the

16   time or -- I mean, those drops on there, how did that

17   happen?

18           A.    That happened when I was transferring

19   the blood from the syringe to the red-top tube.

20           Q.    Is that part of the test to put it on

21   the paper like that?

22           A.    No.

23           Q.    It's just inadvertent?

24           A.    Just dripped there.

25           Q.    And you are drawing a conclusion from

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 104

1       the blood spots on the paper?

2               A.    It's not a normal appearance for blood.

3               Q.    Did you notice that at the time?

4               A.    (Nodding.)

5               Q.    You are nodding your head?

6               A.    Yes.  Yes.  I did notice that it

7       seemed, for lack of a better term, anemic.

8               Q.    So your impression was -- from what you

9       saw of the animals on the 20th when you saw their

10      blood that you could tell from that that they were

11      anemic?

12              A.    I suspected.

13              Q.    Okay.  And then the lab test confirmed

14      it?

15              A.    Yes.

16              Q.    So let's go to the lab test.  I think

17      if you could -- Exhibit 1 there in front of you.  I

18      think they are starting with page 30.  Is this the

19      lab report from those blood samples that you took on

20      February 20th?

21              A.    That -- that's a chem.  That is not a

22      CBC.

23              Q.    Is the CBC in here someplace?

24              A.    Let me look.

25              Q.    How about page 36?

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 106

1          A.    Hemoglobin is a component of red cells,
2    so if the red cells -- if there aren't enough red
3    cells, then the hemoglobin will be low.
4          Q.    So anemia was a problem with all of
5    these horses, correct?
6          A.    I believe that they -- I would have to
7    peruse the record, but I believe --
8          Q.    Let's just go through it.  Page 36,
9    that's Echo, and she had a problem with anemia,
10   right?
11         A.    Lena also is flagged as low.
12         Q.    Well, Echo first, page 36, she had
13   anemia, right?
14         A.    Yes.
15         Q.    And Lena on page 37, she had anemia?
16         A.    Yes.
17         Q.    Page 37, Midnight, she had anemia?
18         A.    Yes.
19         Q.    Page 39, River, he had anemia?
20         A.    Borderline, equivocal, yes or no.
21         Q.    But right on the borderline of having
22   anemia?
23         A.    Yes.
24         Q.    And page 40, Chance, he had anemia?
25         A.    Yes.

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 107

1      Q.    And page 41, Fiona, she had anemia?

2      A.    Yes.

3      Q.    Can anemia be caused by starvation?

4            MR. TONDRE:  Objection, foundation.

5      A.    I would surmise that prolonged

6    malnutrition will result in anemia.

7            Q.    (BY MR. LEBSACK) Are you aware of any

8    horses that died at Echo Valley Ranch?

9      A.    Yes.

10           Q.    Tell me what you know about those

11   horses.

12           A.    There was a horse named Twister that

13   was found injured with a broken humerus, had to be

14   euthanized.  There were also too extremely geriatric

15   geldings that passed away, and another horse

16   belonging to an associate of Mr. Swift's that was

17   found down and was only conscious for a few more

18   moments.  I was called out.  He was already dead.  We

19   ascertained that he had slipped on ice and suffered a

20   skull fracture.

21           Q.    Did any of these happen in the year

22   before February of 2012?

23           A.    I don't recall the exact dates.

24           Q.    Are those the only horse deaths that

25   you can recall at Echo Valley?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 109

1         A.    I believe we discussed it and primarily

2    because there is a known association between a higher

3    risk of botulinum toxicity and the use of big bales,

4    and people were interested in the vaccine, so...

5         Q.    So would the vaccine do anything for

6    the horses that were already having problems?

7         A.    Unlikely.

8         Q.    It would be for the horses who were not

9    yet having problems?

10        A.    Correct.

11        Q.    Like you'd take a smallpox vaccination

12   in order not to get it rather than to treat you if

13   you have smallpox, right?

14        A.    Correct.

15        Q.    Same type of thing.  So the vaccination

16   is not any part of a treatment for some horse who's

17   already having problems with botulism?

18        A.    Vaccines by and large are preventative.

19        Q.    Okay.  Have you ever ruled out

20   starvation as a potential cause for the skinny

21   condition of these horses?

22        A.    I have never ruled it out as a

23   contributor.

24        Q.    I was asking questions about those lab

25   tests, and I want to go back to those for a second.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 112

1          A.    That is correct.

2                MR. LEBSACK:  You know, I'm going to go

3    ahead and mark my own copy of this page from the Park

4    County records.  I know that I asked her to look at

5    it, and I don't want to have an incomplete record

6    here.  So let me go back and mark that one.

7                (Whereupon, Deposition Exhibit No. 5

8    was marked for identification by the reporter.)

9                MR. TONDRE:  Is that Exhibit 5?

10               MR. LEBSACK:  It is.

11               MR. TONDRE:  Does it have a trial

12   number?

13               MR. LEBSACK:  (Handing.)

14               MR. TONDRE:  68.

15         Q.    (BY MR. LEBSACK) So is Exhibit 5 that

16   page from the Cindy Hardey records that you looked at

17   before in regard to that phone call?

18         A.    Yes, it is.

19         Q.    Okay.  That's my only copy, so I'll put

20   that one into the record.

21               Do you agree that the bottom line truth

22   is that these horses were let go far too long?

23               MR. TONDRE:  Objection, foundation.

24         A.    I believe these horses would have

25   benefitted from veterinary intervention much sooner.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 113

1          Q.    (BY MR. LEBSACK) Do you remember ever
2    telling anybody that the bottom line truth is that
3    these horses were let go far too long?
4                MR. TONDRE:  Objection, foundation.
5          A.    I believe I said that to Officer
6    Hardey.
7          Q.    (BY MR. LEBSACK) And that was your
8    opinion at the time?
9          A.    It was.
10          Q.    And it's still your opinion today?
11          A.    It is.
12          Q.    Were you aware of any plans to take any
13    horses from Echo Valley Ranch to CSU for treatment,
14    live animals, not necropsies or anything like that?
15          A.    Not technically from Echo Valley Ranch,
16    from the Van Pullen residence.
17          Q.    What do you know about that?
18          A.    We -- upon discovery of the diastolic
19    heart murmurs, we had spoken to the cardiology
20    service at CSU and had made tentative arrangements to
21    send at least one animal up for thorough examination,
22    including an echocardiogram.
23          Q.    Which animal was that; do you know?
24          A.    Chance.
25          Q.    Because he was in the worst shape?

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 149

1          A.    You mean about this or just in general?

2          Q.    No.   Maybe afterward we can talk in

3     general.

4                Does your practice -- do you have any

5     staff or is it only you and Dr. Burton?

6          A.    It is only Dr. Burton and myself.

7          Q.    Okay.   I want to go back and talk about

8     the exam that you did of the six horses at issue on

9     February 20th.

10         A.    Okay.

11         Q.    And that was out at Lebeau's ranch?

12         A.    I know it as the Van Pullen residence,

13    but it appears that it is the same location.

14         Q.    I think it is the same.   And you did an

15    exam of all six of the horses that day?

16         A.    Yes.

17         Q.    And you scored them with some type of

18    score system?

19         A.    Henneke score, yes.

20         Q.    Will you just explain what is the

21    Henneke scoring system, and what it is you do to

22    reach the score?

23         A.    The Henneke scoring system is an

24    attempt to quantify a subjective assessment of a

25    horse's body mass condition, in other words, its

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 150

1    state of nourishment by evaluating the amount of

2    flesh over certain points of the frame, the crest of

3    the neck, the ribs, at the tail head, the rump.  It

4    is a numerical score from one to nine; one being

5    extremely thin, five being ideal, and nine being

6    extremely obese.  Each numeric score in the scoring

7    system according to research done by Purina

8    represents about 45 pounds of bodyweight in the

9    average sized riding horse, which is approximately

10   1,000 pounds, 1,100 pounds normal body weight.

11              Ideal is five out of nine.  Acceptable

12   is a broader range, generally four to seven.

13              Q.   And how do you reach the number?  What

14   do you do?

15              A.   That is a bit variable.  When horses

16   are in summer coat, the degree of flesh overlying the

17   skeletal structure is readily apparent.  When horses

18   are in winter coat, the winter coat can be deceiving.

19   It can hide a degree of, for lack of a better term,

20   emaciation.  So you would visually inspect the horse

21   and note whether flesh over these key points is

22   present at all, present in moderation, present in

23   excess.  And if the horse has a thick hair coat, it's

24   recommended to actually put your hands on the horse

25   and feel for flesh over the bony prominences.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 151

1          Q.    With these horses, do you think that
2    the winter coat as you have described had any effect
3    on being able to score them?
4          A.    I feel confident that my score was
5    accurate despite the fact that they had winter coats.
6          Q.    Okay.  And do you recall what you
7    scored each of those horses -- you know, I think
8    that's actually page 16.  It may be --
9          A.    I can look.
10          MR. SCHIMBERG:  Page 16, I think.
11          A.    This would be more than sufficient.
12          Q.    (BY MS. BRONSON) It's Exhibit 1 on page
13    16.
14          A.    And I'm assuming you want me to go
15    ahead and list them.
16          Q.    Yeah.  That would be -- yes.
17          A.    Chance was scored at one out of nine.
18    Echo was scored at two out of nine.  Fiona at two out
19    of nine.  River, one to two out of nine.  Lena, one
20    to two out of nine.  And Midnight, three out of nine.
21          Q.    And this, I'm assuming, is not the
22    first time you had scored horses?
23          A.    No.
24          Q.    And do you always follow the Henneke
25    score --

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 160

1          Q.    (BY MS. BRONSON) It was not -- it

2    didn't necessarily have anything to do with the

3    treatment of the horses except to check for botulism?

4          A.    It was my understanding that he was

5    acting in his official capacity to -- for the state

6    veterinarian's office to go through all the motions

7    that it should.

8          Q.    Okay.  And you received the results

9    after the horses were already seized?

10         A.    We did.

11         Q.    Okay.

12         A.    The university seemed to be confused

13   about whose results they were.

14         Q.    Okay.

15         A.    They actually belonged to the state

16   veterinarian's office.  They sent them to us.  They

17   billed us for them.

18         Q.    Did you have to pay them or did you

19   send it on?

20         A.    No.

21         Q.    And you discussed earlier that on

22   February 22, 2012, you had a phone conversation with

23   Cindy Hardey, a second conversation.

24         A.    Thereabouts.

25         Q.    And you recall speaking with her that

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 162

1          Q.    Okay.  And this was quoted earlier, but

2    I'll put it in again for the record, that you said to

3    Cindy Hardey, "My professional opinion is that

4    regardless of what's causing those horses to be thin,

5    someone should have noticed and sought assistance for

6    them."

7          A.    Yes.

8          Q.    And that is still your opinion?

9          A.    Yes, it is.

10         Q.    Someone should have noticed their

11   condition and called you up far before they did?

12         A.    Us, someone else.  The horses were

13   needing attention.

14         Q.    Okay.  And it's true that Cindy

15   Hardey's not a vet.  She doesn't have a doctorate in

16   veterinarian medicine.

17         A.    That is true.

18         Q.    And you knew that in --

19         A.    Yes.

20         Q.    But you knew that it was part of her

21   job to contact you for your professional opinion?

22         A.    Yes.

23         Q.    As the vet who had recently examined

24   these animals, these six horses.

25         A.    Okay.

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 192

1          THE DEPONENT:  No.  I quack.

2          (Whereupon, a brief discussion was had

3   off the record.)

4          Q.   (BY MR. TONDRE) You may have answered

5   this and I just have forgotten the answer.  How long

6   have you provided veterinary services to Mr. Hatlee

7   and Mr. Swift?

8          A.   I don't recall the date of the first

9   time that we treated any horses out there, but I

10  believe it was sometime in 2009.

11         Q.   So you had two or three years'

12  experience with them prior to the incident that

13  brings us here today, correct?

14         A.   Correct.

15         Q.   Now, in your practice, can you give me

16  an estimate as to what percentage of your clients

17  have operations similar to Mr. Hatlee and Mr. Swift?

18         MS. BRONSON:  Object to form,

19  foundation.

20         A.   Less than 1 percent.

21         Q.   (BY MR. TONDRE) How would you

22  characterize the other 99 percent?

23         A.   They typically are folks who have a

24  fairly limited number of horses, maybe one, two,

25  three horses, for a couple, for a family.  They

AVERY WOODS REPORTING SERVICE, INC. (303) 825-6119

ALLYSON RENE HORTON, DVM - MARCH 27, 2014

Page 194

1    have contact with the Routt County people?  Was that

2    2010 or 2011?

3              A.    I would have to look.

4              Q.    Please do.

5              A.    Let's see if that is in these exhibits

6    or the other.  The first dated invoice that I have

7    for those two horses is dated 3/1/11.

8              Q.    Now, prior to first providing services

9    to those two Routt County horses, what discussions

10   were you involved in regarding the request for

11   services.  What were you requested to do?

12             A.    By Routt County?

13             Q.    Yes, ma'am.

14             A.    Routt County's stipulation for the case

15   was that Bear be castrated.  A veterinarian in

16   Steamboat Springs had declined to do the surgery.

17   Then they wanted routine wellness checks to monitor

18   that the horses were in good condition.  As I recall,

19   they wanted them checked about every 90 days.

20             Q.    Did you ever provide a 90-day report?

21             A.    We did do the exams and did provide

22   that information to Routt County.

23             Q.    How many times did you provide a 90-day

24   report?

25             A.    I don't recall.

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

Page 248

1          A    No.

2          Q    Okay.  Have you had any meetings or

3    discussions with anybody about Maggie or any of the

4    other horses involved in this case?

5          A    No.  I have not.

6          Q    Okay.  Let me just try to get to the

7    issues.

8               In front of you is a package of documents

9    that we have marked as Deposition Exhibit No. 17.  Is

10   that a complete copy of all the records of Timberline

11   Equine regarding Maggie?  And just for your background,

12   this is a complete copy of everything that your

13   attorney sent to me.

14         A    To the best of my knowledge, it is as

15   complete as -- as we can achieve.

16         Q    Okay.  In the lower right-hand corner, I

17   put a number and a circle around it to indicate the

18   page number of that exhibit.  That's only on the

19   original; so if counsel want to add that, you can

20   follow that along.  I didn't have a chance to copy that

21   with the numbers on it.

22              So I wanted to ask you first about

23   something that was in a previous exhibit that we looked

24   at.  I'm going to show you Exhibit 6 that we looked at

25   at your first deposition.  Do you remember this

Page 249

1 exhibit?

2          A    Yes.

3          Q    And this exhibit is an email that you

4 wrote; is that right?

5          A    Yes.

6          Q    And in the first few paragraphs, it talks

7 about events of February 11, 2012, involving Maggie.

8 Do you see that?

9          A    Uh-huh.  Yes.

10          Q    And I don't see any notes in

11 Exhibit 17 --

12          A    No.

13          Q    -- from February 11th, is that --

14          A    Those have been lost or misplaced.  This

15 email constitutes our medical record for that visit.

16          Q    Okay.  So there's nothing else about your

17 visit on February 11th except for this Exhibit 6?

18          A    No.  The invoice somehow did not survive,

19 but the information that's contained is in this email.

20          Q    All right.  Let's go back to Exhibit 17.

21 Is page 1 of that exhibit, is that the only

22 contemporaneous notes of your visit to see Maggie on

23 February 13th?

24          A    Yes.

25          Q    What are the other pages behind this,

Page 274

1          Q    I know you've talked about phone calls

2 before; but just to kind of see if it jogs your memory,

3 do you recall any phone calls after the 13th until you

4 learned that she had died?

5          A    Numerous, numerous phone calls.  Too

6 numerous to distinguish.

7          Q    Regarding Maggie?

8          A    Regarding Maggie, and in both directions.

9 We called them and they called us.

10          Q    Can you kind of give me the gist of what

11 the phone calls were?

12          A    Just how she's doing or, you know, she's

13 basically -- people report she's eating really well

14 this meal or she's eating better than she did last

15 time, last time we fed her, or she's starting to move,

16 she's starting to look like she wants to stand up.

17              We discussed at length actually the

18 appropriateness of a sling for her situation.  And

19 although Helen and Mr. Swift and the group of people

20 who were involved in her care were very eager to get a

21 sling for her, we advised against it at that point.

22          Q    So throughout the whole time of these

23 phone calls, she was still laying down and could not

24 stand up?

25          A    Correct.

Page 275

1        Q    Why did you not recommend a sling?

2        A    Because a sling is appropriate for a

3 horse that can support at least part of their own

4 weight.  Slings are problematic, and a horse that

5 cannot stand at least partially on their own is better

6 off being managed down.

7        Q    What's your recollection of whether

8 Maggie's overall condition changed after the 13th?

9        A    She continued to improve; and after a few

10 days with the assistance of a sling, she was able to

11 stand and support her own weight.

12        Q    But then she died, right?

13        A    She died very suddenly.

14        Q    So she was -- as far as you recall, she

15 was getting better, getting better, getting better, and

16 then died suddenly?

17        A    Yes.

18        Q    Did you become aware that her condition

19 had taken a turn for the worst before she died?

20        A    She did not take a turn for the worst

21 before she died.  She was standing on her feet and

22 eating when she died.  She had what we describe as --

23 or would appear to be a sudden cardiac death.

24        Q    And where's -- what's the course of this

25 information you were just saying that she was standing

Page 276

1 and eating and --

2         A    I was called on that Friday night and

3 this information was related to me, and I went out to

4 the ranch and looked at her.  And she was in the sling

5 right in front of where her food had been placed at an

6 appropriate height for her and she was dead as a door

7 nail.

8         Q    Hm.  So let me just recap.  You had

9 numerous phone calls with Mr. Swift and Mr. Hatlee

10 between the 13th and that --

11        A    I don't believe we ever spoke with Randy

12 on the phone about Maggie.

13        Q    So it was just Mr. Swift?

14        A    Sometimes Helen.

15        Q    Okay.  So Mr. Swift and Ms. Cook?

16        A    Yes.

17        Q    Numerous phone calls between the 13th and

18 the following Friday?

19        A    Correct.

20        Q    Friday's the date of death.

21        A    Correct.

22        Q    As far as you understood, Maggie is

23 getting better throughout that whole course; and then

24 suddenly on Friday, you got a call that she was dead?

25        A    Correct.

Page 277

1         Q    Was the postdeath visit the first time

2  you had been at Echo Valley Ranch since the 13th?

3         A    Yes.

4         Q    Did you know that she was up in a sling

5  before you went out there?

6         A    Yes.

7         Q    You'd been consulted about that?

8         A    Yes.

9         Q    So who gave you the information that

10 that -- about the circumstances of her death?

11        A    Mr. Swift.

12        Q    And what exactly did he tell you?

13        A    He told me that he was on -- he was on

14 watch, he was with her, keeping an eye on her.  She was

15 being watched, pretty much continually, around the

16 clock she had someone attending her.  He had gone to

17 get a cup of coffee, came back; she was dead.

18        Q    I've got this mental picture of what a

19 sling is but I have no idea whether it's right.  So

20 could you please describe what a horse sling is like?

21        A    There are several different brands.  If

22 I'm not mistaken, she was in an Anderson sling which

23 consists of a large metal tripod that is assembled to

24 provide a hoist point above the horse.  And a -- the

25 actual sling is a very heavy -- heavy-duty material

Appellate Case: 16-1065    Document: 01019641232    Date Filed: 06/20/2016    Page: 62

# EXHIBIT P

LAKEWOOD, CO 80215-5894

## NOTICE of WARNING

Case Number: _2012000142_  Date: _2-16-2012_  Time: _10:00_ ☑ a.m./p.m.

Warning Issued To: _Ron Swift_    Tele: _303-908-2957_

Driver's License: _____    Date of Birth: _____

Address: _Fern Valley Ranch_    S.S.# _____

City: _Bailey_    State: _Co_  Zip: _80421_

Animal Description: _Th-BRD Grizzle Horse Dog_    ___  F ___ M ___

Animal Name: _Quarterhorse "Magie" (down Horse)_  Cat  ___  F ___ M ___

_Sorrel, Bay, Palomino, Grulla_    Horse  _X_  F _X_ N _X_

_BRA = Quarter horse/Ther BRD Middleweight Paint Th-BRD_  Other  ___  F ___ M ___

Our agent has discovered that you are allowing to exist or contributing
to a condition which could constitute a violation of Colorado law.  To
avoid further action, this condition must be corrected by _/ /_

The violation found by the agent was:

____ "Abandon" means the leaving of an animal without adequate provisions for the
animal's proper care by its owner, the person responsible for the animal's care
or custody, or any other person having possession of such animal.

____ "Mistreat or Mistreatment" means every act or omission which causes, or
unreasonably permits the continuation of unnecessary or unjustifiable pain or
suffering.

____ "Neglect" means failure to provide food, water, protection from the elements,
or other care generally considered to be normal, usual, and accepted for an
animal's health and well-being consistent with the species, breed, and type of
animal.

_X_ Other _there are the 4 yearlings that score visually a 1.5 on Henneke Body s_

Action Necessary to Comply: _bra + midnight score visually a 1.5 on Henneke Body s_
_you will have a month from today to gain HEALTHY weight on the 6 horses. Animal control_
_will be doing random visits every two days for the next two weeks to monitor "Magie" Back_
_Bone Mare, and all 6 horses in question. If there is an issue with any horse Animal Control w_
_be advised (notified) immediately. If you fail to rectify the condition in question of the Animals you_
_may be give_

Our Agent will do a follow up visit on or about: _3 / 16 / 2012_

Thank you for your cooperation in this matter. Note. Animal Control will be Monitoring
the health of Animals every 2 day for the next 2 weeks

Posted to Door _X_  Issued in Person _X_  Date _2 / 16 / 2012_ Time: _1220hrs_ a.m./p.m.

### SIGNATURE BOX

INVESTIGATOR: _C. Hanly  9523_ _____    _PCSO_
                          Signature              ISSUING AGENCY

TELEPHONE: _719-836-4380_

RECIPIENT OF NOTICE: _____
                            Signature

_49_

## This is a legal document

docN: BAPWARN
Distribution: White-Recipient  Yellow-Issuing Agency  Pink-State Office
Swift, Ronald 12M44, Hatlee, Randall 12M44
Discovery 49

458

# EXHIBIT Q

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE
and RONALD L. SWIFT,

Plaintiffs,

vs.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
and ASHLEIGH OLDS,

Defendants.
------------------------------------------------------------
DEPOSITION OF AMY MURDOCK
July 25, 2014
------------------------------------------------------------
                         Deposition location:
                         9998 Havekost Road
                         Conifer, Colorado   80433

APPEARANCES:

    Brice A. Tondre, Esq.
    BRICE A. TONDRE, P.C.
    215 South Wadsworth Boulevard, #500
    Lakewood, Colorado   80226

                              For the Plaintiffs.

    John Lebsack, Esq.
    WHITE and STEELE, P.C.
    Dominion Towers
    600 17th Street, Suite 600N
    Denver, Colorado   80202

                              For the Defendant, Olds.

Page 4

1                          AMY MURDOCK,

2 being first duly sworn to state the truth, the whole

3 truth, and nothing but the truth, testified under oath as

4 follows:

5                          EXAMINATION

6 BY MR. TONDRE:

7          Q    State your name for the record, please.

8          A    My name is Amy Christine Murdock.

9          Q    And your occupation?

10         A    I'm a veterinarian.

11         Q    When did you graduate from veterinary

12 school?

13         A    In 2007.

14         Q    Where did you go to veterinary school?

15         A    Washington State.

16         Q    And since 2007, what -- where have you

17 been practicing?

18         A     In 2007, I practiced in the state of

19 Arizona for two years; I practiced in the state of

20 Idaho for two years; and then for the last three and a

21 half years, I've been practicing in the state of

22 Colorado.

23         Q    What was the nature of your practice in

24 Arizona?

25         A    It was a mixed animal practice.  Some

Page 5

1 horses, some cattle, some dogs, cats, birds, large

2 cats, lions, tigers, yeah -- that's it.

3          Q   And what was the nature of your practice

4 in Idaho?

5          A   I worked at an emergency small animal

6 clinic as well as -- as mainly as a general

7 practitioner for small animals.

8          Q   And when -- when you moved to Colorado,

9 did you go to work for anyone?

10          A   I worked for Aspen Creek Veterinary

11 Clinic, specifically Dr. Ashleigh Olds.

12          Q   And how long did you -- were you employed

13 by Aspen Creek or were you --

14          A   Yes.

15          Q   -- a shareholder?

16          A   No.  I was -- I'm -- I was an associate

17 practitioner for Aspen Creek; so yes, I was an employee

18 there.

19          Q   And how long did you remain with that

20 practice?

21          A   From -- let's see.  Almost three years.

22 I left there in March of this year.

23          Q   Why did you leave?

24          A   Um.  I was unhappy with my employment

25 there and found a different job doing something that

Page 15

1        A    That's fine.

2        Q    What was your first involvement of any

3 kind with Spencer?

4        A    The first time that I saw Spencer was

5 when Dr. Olds brought him to Aspen Creek in her horse

6 trailer.

7        Q    And prior to Dr. Olds arriving with

8 Spencer, had you heard anything about Spencer or any --

9 any events at the Echo Valley Ranch?

10        A    Before she arrived, I believe she called

11 and said that she was bringing a horse in for

12 hospitalization.  But I had not heard of anything

13 before she brought the horse in.

14        Q    Now, when the horse arrived, who was with

15 Dr. Olds?

16        A    My ex-husband, Troy Murdock.

17        Q    Who else -- who was -- who, in addition,

18 to you, Dr. Olds, and your former husband were present

19 at the clinic when Spencer arrived?

20        A    Brian Diedrich was there, another

21 veterinarian, Dr. Shannon Harland, was there.  And

22 several other technicians, I can't recall specifically.

23        Q    Do you recall approximately what time of

24 day that it was?

25        A    I would say midday.  No.  I don't recall

Page 20

1        A    No.  He told me when they got there.

2        Q    All right.  Did he talk to them first?

3        A    Probably.

4        Q    Was -- why was Barbara Wright there?

5        A    I don't know.

6        Q    Was she involved in the conversation with

7 the Channel 7 News reporter?

8        A    Yes.

9        Q    Was anyone else involved in the

10 conversation with the Channel 7 News reporter?

11       A    Just Brian Diedrich.

12       Q    So it was you, Brian, and Barbara Wright,

13 correct?

14       A    And the reporter.

15       Q    And the report -- was it John Ferraro?

16       A    Probably.

17       Q    Did you feel bullied?

18            MR. LEBSACK:   Form.

19       A    No.  I didn't feel bullied.  But I did

20 not want to talk to the news.  I was told by Brian that

21 I needed to represent Aspen Creek and that there wasn't

22 another veternarian available, so I had to talk to

23 Channel 7 News.  I was told to talk about the case,

24 what I saw, and what I had heard.

25            Q    (BY MR. TONDRE) Had you heard that Spencer

Page 22

1 was on -- he was -- he was on the floor of the trailer.

2          Q   (BY MR. TONDRE) Do you have an opinion as

3 to whether he was -- it was appropriate to trailer

4 Spencer?

5              MR. LEBSACK:   Form.

6          A   Yes, I think it was appropriate to

7 trailer Spencer.

8          Q   (BY MR. TONDRE) And what do you base that

9 opinion on?

10         A   Hm.   The fact that he didn't appear

11 harmed by the trailer ride.   He -- he got better while

12 in Aspen Creek's care.

13         Q   Well, how do you explain the fact that he

14 could walk 150 yards to the trailer, could get up at

15 As- -- at Echo Valley; but once he got to Aspen Creek

16 after sustaining a fall in the trailer, he couldn't get

17 up?

18             MR. LEBSACK:   Form.

19             MR. SCHIMBERG:   Join.

20         A   I wasn't aware that he walked to the

21 trailer at As- -- at Echo Valley Ranch.   And I don't

22 believe he was unable to stand because of a fall in the

23 trailer.

24         Q   (BY MR. TONDRE) But you don't know, do

25 you?

Page 23

1          MR. LEBSACK:  Objection to form.

2          A    That was a question you wanted me to

3 answer?

4          Q   (BY MR. TONDRE) Well, to what do you

5 attribute his inability to walk after taking --

6          A    He was very --

7          MR. LEBSACK:  Hold on.  Wait until he is

8 done.

9          Q   (BY MR. TONDRE) -- after taking a fall in

10 the trailer?

11          A    He was weak and had a poor body condition

12 score.

13          Q    Did his condition change from the time he

14 left Echo Valley Ranch and the time he got to Aspen

15 Creek?

16          MR. LEBSACK:  Form.

17          A    Well, since I wasn't at Echo Valley

18 Ranch, I can't tell you if his condition changed.  I

19 can tell you what happened after he arrived at Aspen

20 Creek.  He was weak, he could not stand up; once we fed

21 him, once we gave him IV fluids, he did stand up; and

22 he never went back down again.  That's what I can tell

23 you.

24          But I was not at Echo Valley Ranch.  I

25 can't tell you about his condition at Echo Valley Ranch

Page 24

1 because I wasn't there.

2          Q   (BY MR. TONDRE) But you can tell me there

3 was no evidence of any effort made to keep him from

4 falling in the trailer; is that correct?

5          MR. LEBSACK:   Form.

6          A   There weren't any ropes, there wasn't

7 anything in the trailer other than shavings and the

8 horse.

9          Q   (BY MR. TONDRE) And you can't tell me how

10 deep the shavings were?

11         A   No.

12         MR. HATLEE:   Take a break.   I need to

13 talk to you.

14         MR. TONDRE:   Hang on a second.

15         Okay.

16         Q   (BY MR. TONDRE) Did any veterinarian other

17 than you on February 18, 2012, speak to Channel -- to

18 Channel 7 News?

19         MR. LEBSACK:   You said the 18th, is that

20 the date you meant?

21         MR. SCHIMBERG:   Yes.

22         MR. SWIFT:   16th.

23         MR. TONDRE:   That's the date.

24         MR. LEBSACK:   Okay.   So --

25         MR. HATLEE:   16th.

Page 28

1  at a human hospital.

2           Q    Had he done security before that?

3           A    Not to my knowledge, no.

4           Q    Did you tell the Channel 7 reporter that

5  as of the time you spoke to him Spencer was doing

6  better?

7           A    Yes.

8           Q    In what respect was he doing better?

9           A    He was eating, he was drinking, he was

10  standing on his own.

11          Q    The day following his arrival -- or the

12  day following his arrival at the clinic, could he stand

13  up without assistance?

14          A    Yes.

15          Q    So he could get up on his own?

16          A    Uh-huh.

17               MR. LEBSACK:  Is that a yes?

18          A    Yes.

19          Q    (BY MR. TONDRE) How quickly after he was

20  moved out of the trailer was he able to get up on his

21  own?

22          A    Within 12 hours.

23          Q    All right.  And during that 12 hours,

24  what care and treatment was he provided?

25          A    He was given food and water.  Dr. Olds

Page 29

1 put in an IV catheter, was giving IV fluids, and I

2 believe that she drew blood.

3          Q    Was he on a refeeding diet?

4          A    That I don't know.

5          Q    Do you know what a refeeding diet is?

6          A    No.

7          Q    What discussions did you have with

8 Barbara Wright regarding the horses at Echo Valley

9 Ranch when you were together with her speaking to the

10 news -- to the television reporter?

11         A    She told me to tell -- tell the reporter

12 what I saw and what I had heard.  That was all the

13 discussion that we had.

14         Q    Did it seem to you that she had come to

15 the clinic in anticipation of the news being there?

16         A    She didn't have any animals at the

17 clinic, so that is what I assumed.

18         Q    All right.  Had you had contact with

19 Barbara Wright before that?

20         A    She was a client at our clinic.  So the

21 only contact I had was indirect treatment of one of her

22 animals.

23              MR. TONDRE:  Let's take a break.  I need

24 to find a document.

25              (Recess was taken from 9:48 a.m. to

Page 44

1 stall, we put grass hay in front of him, and he started

2 eating.

3          Q    No.   But my question was:   Was this prior

4 to any vitamin supplement being provided to him?

5          A    Yes, before any treatment.   We put hay in

6 front of him and he started eating.

7          Q    I understand that you did not make a

8 determination or a diagnosis of Little Big Man, slash,

9 Spencer because it wasn't your case, correct?

10          A    Correct.

11          Q    Did you come to know what that -- what

12 the determination was, if any, while Little Big Man was

13 at the facility?

14          A    Yes.   It was determined that he was

15 malnourished.

16          Q    All right.

17          A    Was not -- was starved.

18          Q    By the information you saw and what you

19 observed there from Little Big Man, did you disagree

20 with that opinion?

21               MR. TONDRE:   Objection.   Foundation.

22          A    No.   I agreed with that.

23          Q    (BY MR. SCHIMBERG) Okay.   What elements of

24 that diagnosis did you agree with; or what made you

25 disagree with that diagnosis, put another way?

Page 45

1          A    Just based on the observation that he

2 came in down; when he left, he appeared normal in terms

3 of being able to walk, being able to be a normal horse,

4 pasture pet, I don't think --

5          Q    Okay.

6          A    -- that he was going to be used for any

7 riding or anything like that.  When he came in, he ate,

8 I don't ever think I saw him stop eating, and he only

9 improved in the time that I saw him.

10         Q    Okay.  Just by your body language, this

11 is where this question arises is the discussion you had

12 with Mr. Tondre about the way Little Big Man walked and

13 you guys focused in on his back legs.  Do you remember

14 that exchange?

15         A    Yes.

16         Q    All right.  And it seemed like you were

17 sort or struggling with how to describe that.  Let me

18 ask it at different way, and see if I can walk out of

19 here understanding what you observed.

20         A    Okay.

21         Q    With the condition that you observed to

22 include when Little Big Man would first get up, his

23 hind legs would cross, and then you described some --

24 you could see some skin movement, et cetera.  Did you

25 think that was a neurological issue or problem?

# EXHIBIT R

Page 1 of 2

---

ⓘ You replied on 2/16/2012 4:24 PM.

**Cindy Hardey**

| | | |
|---|---|---|
| **From:** | F BURTON [horseydoc@msn.com] | |
| **To:** | Cindy Hardey | **Sent:** Thu 2/16/2012 3:04 PM |
| **Cc:** | | |
| **Subject:** | 4 yr old Blk Drum mare Echo Valley Ranch | |
| **Attachments:** | | |

Dear Officer Hardey,

Ron Swift is a regular client of Timberline Equine Veterinary Services. We were first summoned to examine Maggie, a 3 to 4 year old black Shire cross mare, for this condition on Saturday afternoon, 2/11/12. Dr. Burton was unavailable for this call, so I responded solo. Approaching the ranch, I saw Maggie down in the pasture amidst a group of people and vehicles. Maggie was attempting to rise but was unable to succeed. On exam, I found Maggie alternating between right lateral and sternal recumbency. Heart rate was noted to be within normal limits, but irregular in rhythm, suggesting a marked sinus arrhythmia and potentially second degree AV block. Respiratory rate was initially elevated at approximately 40, but later slowed significantly to 12 to 18. Mucous membranes were pale pink and moist and CRT was less than 2 seconds. Temperature was 98.0. Her mentation alternated between BAR (bright, alert, responsive) and somnolent. When not exhibiting somnolence, she demonstrated a vigorous appetite and normal cranial nerve function, including tongue retraction. Maggie demonstrated some motor function of her forelimbs, but with a flaccid character that was clearly abnormal. Hypotonia was noted in all four limbs. Tail tone, anal tone and perineal reflex were all noted to be present, but decreased. Muscle tremors were noted in the right brachium and left thigh. Body condition score was noted to be 2/9. No signs of external trauma were noted. The owner and several others were attempting to lift Maggie with the aid of a small tractor, which I stopped immediately, owing to the risk of an improper lift resulting in injury to the patient. During my observations, Maggie ceased attempting to rise and came to prefer right lateral recumbency.

At this point, my presumptive diagnosis was botulinum toxicity, predicated primarily on the flaccid paresis/paralysis and the relatively normal mentation. Underlying my assessment of my exam findings and observations was knowledge of two other strikingly similar cases in the near vicinity in recent weeks and the fact that two of these animals were fed hay from big round and/or square bales, which are known to present an increased risk of botulinum contamination. Horses are exquisitely sensitive to botulinum toxin making it all but impossible to definitively confirm due to low levels of the toxin in blood and GI contents. The only treatment for botulism is nursing care, time and hope. Antitoxin is available, but without a definitive diagnosis, the risks may exceed any potential benefits. On my advice and with my assistance, Maggie was moved out of the snow and into the barn on a sled. Owner was advised to place Maggie on deep bedding and to turn her every 2 hours. He was advised to provide alfalfa hay and water ad libitum. Owner asked repeatedly about lifting Maggie in a sling, which I discouraged owing to not only the logistical difficulty of properly and safely operating a sling, but also serious complications associated with pressure points created by the sling. Maggie's size exacerbates these complications. Furthermore, slings are really only appropriate when an animal is able to support some of their own weight, and this was not the situation with Maggie. I advised that it would be best to attempt to manage her "down".

Other differential diagnosis included, in no particular order; 1. mosquito bourne encephalitides (WEE, EEE, WNV) 2. tick paralysis 3 . EHV  4. Rabies 5. trauma 6. malnutriton 7. myopathies  8. Wobbler syndrome  9. hypocalcemia  10. Toxic plant ingestion. None were an obvious or convincing match to the clinical picture Maggie presented.

Owner called frequently with updates on Maggie's condition, indicating improvement in alertness and the ability to urinate and defecate. He reported that she was resting in sternal recumbency at least half of the time.

The above summarizes events of Saturday, February 11, 2012.

A. R. Horton, DVM, MS

Subsequent to this, attempts were made to gather further information from colleagues at the State Veterinarian's office, Colorado State University and Littleton Equine Medical Center as well as references.

Consideration was given to testing, but due to a combination of the costly nature of testing and the lack of sensitive and specific tests available for many of the conditions on the list of differentials, none has been performed as yet.

Mr. Swift called on Monday, describing Maggie moving her limbs while laying on her side. On further questioning, she was alert and seemed oriented to Mr. Swift after these episodes, but there was some concern that he could have observed seizure activity. Because of this concern, both of us went to the ranch to re-examine Maggie.

Maggie was on deep wood shavings with bales of hay placed around her and a heat lamp overhead. She had a temperature of 100.8 , a pulse of 48 with pronounced sinus arrhithmia and a respiratory rate of approximately 20. Gut sounds were normally present. Mucous membranes were pink and moist with a normal CRT. She could still retract her tongue. Her altitude was quiet and she was somewhat somnolent, but she has been eating and drinking. Her anal tone was decreased to absent. She had passed a normal

---

https://owa.parkco.us/exchange/CHardey/Inbox/4%20yr%20old%20Blk%20%20Drum%2...    2/18/2012

PARK CTY DEFS_000931

quantity of soft manure. The soft character of the stool was attributed to the change in her diet to alfalfa hay. A single spot of normal-colored urine was present in the bedding, and she was not dribbling urine. We did observe the limb motion described by the owner and concluded that it was not pathologic, but simply an attempt to get comfortable, and probably indicated a need to be turned. We also discussed the inevitability of bedsores and made some suggestions to mitigate that eventuality.

Consultations with colleagues did not yield any new avenues to pursue, as the general assessment was that the signs did not fit particularly well with any one diagnosis. Tick paralysis, however, was not mentioned by any of our colleagues.
Interestingly, consultation of a toxicology reference did confirm that tick paralysis does occur in horses and the clinical signs were quite consistent with Maggie's. It was also noted by Mr. Swift that Bear, another horse on the ranch that had shown similar signs, had begun to improve after being coincidentally dewormed with ivermectin, which would have affected any parasite taking a blood meal.

Given these circumstances, the decision was made to treat for tick paralysis with ivermectin and Equi-Spot, a topical permethrin product.

In the meantime, Maggie has shown more inclination to move her limbs. Given this change, attempts were made to arrange for a sling to be brought to the property with the intent of determining if Maggie could support even a portion of her weight. If she can, the sling can be used to intermittently. If not, she must continue to be managed down. Euthanasia has not been recommended at this point due to the fair prognosis of tick paralysis. The appearance of bed sores is not unexpected, nor are they evidence of abuse or neglect, and steps are being taken to treat this problem.

A.R. Horton DVM, MS

Fay Burton, DVM

PARK CTY DEFS_000932

Appellate Case: 16-1065    Document: 01019641232    Date Filed: 06/20/2016    Page: 80

# EXHIBIT S

This is an agreement between Ronald Swift, Kirsten Le Beau and the Park County Sheriff's Office regarding six horses that are involved in a current case.

These six horses have not been confiscated, seized, or surrendered. These six horses have been moved from Echo Valley Ranch and placed in Protective Custody only.
Ronald Swift will be responsible for all cost of care for these horses including feed, and veterinarian care and Park County is not liable for any costs related to the care of these horses while they are in Protective Custody.

The six horses removed from Echo Valley Ranch are described as:

Ron 1- "Midnight" Breeding Stock Paint Mare- 13/14 Years old.
Ron 2- "Lena" Sorrel Paint Mare
Ranch 3- "Echo" Grullo Grade Gelding
Randy 4- "River" Bay Grade Gelding
Randy 5- "Chance" Sorrel Grade Gelding- SICK
Ron 6- "Fiona" Palomino Grade Filly

*If test results from Necropsy on Drum Mare indicate starvation was a factor in mares death charges may be filed against horse owners and at risk horses may be impounded at a later date if no other contributing factors are present other than neglect.*

Date 2-19-2012

Deputy Cindy R Hanley 9523

Owner Randall S Hatlee

Owner R Swift

Owner _____

Owner _____

Caretaker _____

Caretaker _____

56

Swift, Ronald 12M44, Hatlee, Randall 12M43   33/124
Discovery 56

# EXHIBIT T

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
        CASE NO. 13-cv-02469-RM-MJW
 3      _____

 4     RANDALL J. HATLEE and
       RONALD L. SWIFT,
 5
            Plaintiffs,
 6
                      vs.
 7
       CINDY HARDEY,
 8     BOBBIE PRIESTLY,
       MONTE GORE,
 9     FRED WEGENER and
       ASHLEIGH OLDS,
10
            Defendants.
11
       ------------------------------------------------
12
                DEPOSITION OF FAY ELIZABETH BURTON, DVM
13                      April 16, 2014

14     ------------------------------------------------
                              Deposition location:
15                            9998 Havekost Road,
                              Conifer, Colorado 80433
16

17
       ALSO PRESENT:   Jennifer R. Edwards, Esq.
18                     (For Dr. Burton)
                       Randall Hatlee
19                     Ronald Swift

20

21

22

23

24

25
```



FAY E. BURTON, D.V.M.                              April 16, 2014
HATLEE vs. HARDEY                                            12

1    right now that would need to be added to this to

2    bring it up to date?  I mean, I can see a date of

3    2012 on the second page, so it's at least produced as

4    of that date.  Is there anything that would need to

5    be added since 2012 to make this up to date?

6           A.    Oh, I suppose there might be, but --

7           Q.    Can you think of --

8           A.    -- it should be relatively recent.  No,

9    I can't think of anything.

10          Q.    That would have to be added to make it

11   current is what you are saying?

12          A.    Yeah.  I can't think of anything at the

13   moment.

14          Q.    You're currently affiliated with

15   Timberline Equine?

16          A.    Yes.

17          Q.    And is that a corporation or a

18   partnership or LLC or --

19          A.    Corporation.

20          Q.    And what is your position with the

21   corporation?

22          A.    Currently president and, I believe,

23   perhaps secretary or something to that effect.

24          Q.    Is that corporation owned by you and

25   Dr. Horton?



FAY E. BURTON, D.V.M.                                    April 16, 2014
HATLEE vs. HARDEY                                              111

1    the horse is underweight?

2              A.    Usually, not always.

3              Q.    And with these -- I understand that you

4    did not do any of this exam on any of these horses

5    until April 2012.

6              A.    That sounds about right.

7              Q.    April 12, 2012, from the...

8                    What's an average weight for a horse?

9              A.    It would vary.  But typically when you

10   are discussing the average horse, it's about 1,000

11   pounds.  It will vary with breed.  It matters whether

12   it's a pony, a horse, a draft, or a donkey.

13             Q.    And the body -- is the body condition

14   difference the 45 pounds between each one, two,

15   three, four regardless of whether it's a small horse,

16   large horse, pony, all what you just listed?

17             A.    That would be an exception.  I think

18   when Purina did that research, I think it was on your

19   average thousand-pound horse.

20             Q.    Okay.  How long have you been providing

21   veterinary services for Mr. Swift and Mr. Hatlee's

22   horses?

23             A.    The first horses that belonged to

24   either of those were probably 2010.

25             Q.    Had you been out to Echo Valley Ranch



FAY E. BURTON, D.V.M.                                April 16, 2014
HATLEE vs. HARDEY                                              112

1    before that for other horses?

2            A.    I believe we had, yeah.

3            Q.    Did you know either of them before they

4    contacted you?

5            A.    No.

6            Q.    And you had gone through earlier with

7    Mr. Lebsack that you had seen four of the horses in

8    2010.  I think it's Midnight, Chance, River, and

9    Echo, and I didn't see any records in Exhibit 1 that

10   had to do with either Fiona or Lena from prior to

11   Dr. Horton's visit of February 20, 2012.  Are you

12   aware of seeing them at all prior to --

13           A.    I don't think so.  Lena would be the

14   only possible.  I'm not 100 percent sure.

15           Q.    Would there be records of that in your

16   file?

17           A.    Yeah.

18           Q.    Had you -- so it's safe to say --

19           A.    Yeah.

20           Q.    So it's safe to say that you had not

21   treated Lena or Fiona --

22           A.    I don't think so.

23           Q.    Did you ever examine any of the six

24   horses at issue in this case without Dr. Horton being

25   present?



# EXHIBIT U

IN THE COMBINED COURTS
COUNTY OF PARK
STATE OF COLORADO

FILED IN COMBINED COURT

FEB 2 3 2012

PARK COUNTY, COLORADO

12 PS 03

SEARCH WARRANT

THE PEOPLE OF THE STATE OF COLORADO

TO:   THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT
OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO,
GREETINGS:

WHEREAS, Park County Code Enforcement Deputy Cindy Hardey, has made an affidavit and complaint for
the issuance of a search warrant.

Horses were moved on February19, 2012, at approximately 4:00PM, with owners permission and assisted by
Park County Animal Control to location known as: 1401 Park County Road 77, Jefferson, Park County,
Colorado, 80453. ALSO KNOWN AS, T08 R75 S16 NW4, SLASH 6, LOT 06: Information obtained from the
Park County Assessors Office.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the
issuance of a Search Warrant for the reason or reasons marked below:

The property to be searched for and seized if found is:
( )      Stolen or Embezzled OR
(X)      Designed or Intended for use or which is or has been used as a means of committing a criminal
         offense or the possession of which is illegal, OR
(X)      Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:

And you will search for:  "Midnight"- Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse,
"Echo"- Grullo Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" -- Sorrel Grade
Gelding horse, "Fiona"- Palomino Grade Filly horse, located at said property, and will seize "Midnight"-
Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grullo Grade Gelding
horse, "River"- Bay Grade Gelding horse, "Chance" -- Sorrel Grade Gelding horse, "Fiona"- Palomino
Grade Filly horse, located on the property.

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them
until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State;
and that you further file a report with this Court inventorying the goods and things which were seized or
reporting that nothing was so found and seized.

Done this _____day of __Feb__ 199___ 2012
                                    BY THE COURT

                                    JUDGE

COURT
SEAL

60

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 60

37/129

STATE OF COLORADO )                                              AFFIDAVIT FOR
                 )                                                 A SEARCH
COUNTY OF PARK   )                                                 WARRANT

In support of the issuance of a SEARCH WARRANT to search:

Horses were moved on February19, 2012, at approximately 4:00PM, with owners permission and assisted by Park County Animal Control to location known as: 1401 Park County Road 77, Jefferson, Park County, Colorado, 80453, ALSO KNOWN AS, T08 R75 S16 NW4, SLASH 6, LOT 06: Information obtained from the Park County Assessors Office.

**Kirsten Le Beau.**

I, Park County Code Enforcement Deputy Cindy Hardey, am a Deputy Sheriff for the Park County Sheriff's Office, and have been employed with this office since 2003. I have been a Code Enforcement Officer for over 8 years, and have over 4000 hours as a Commissioned Agent with the State of Colorado. I, Deputy C. Hardey, being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On February 14, 2012, at approximately 11:00AM, in Park County, Colorado, Sergeant B. Priestly called me on my cellular telephone on my day off and advised me that she had received a telephone call from a Routt County Animal Officer. The officer identified herself as:

**RP- Dawn Smith (Routt County Animal Control)**

Sgt. Priestly said there were seven horses at the Echo Valley Ranch that were scored at a 2 using the Henneke Body Score Technique, on a scale from 1 to 9, 1 being emaciated and 9 being ideal. The mare and colt on the ranch were reported as being emaciated if not diseased. At that point I advised Priestly that I would be scheduling a welfare check on all animals on the ranch. The Echo Valley Ranch located at 1649 Park County Road 70, Bailey, Park County, Colorado, is care taken by a male party identified as:

**S- Ronald Swift**

On February 16, 2012, at approximately 7:30AM, Deputy B. Sears asked me if I wanted to meet a Veterinarian at the Bailey Substation at 9:00AM, from Routt County. Sears said the veterinarian was going to be seizing a colt at the Echo Valley Ranch and needed an officer from our county to accompany her. I scheduled Corporal J. Plutt and Deputy N. Hanning to accompany me with the court documents for removal of the horse.

At approximately 9:00AM, Doctor Ashleigh Olds DVM arrived at the Bailey Substation. Olds and I cleared the Bailey Substation and responded to the Rustic Square and waited for Plutt and Hanning's arrival. At approximately 9:50AM, Plutt and Hanning arrived and all unites cleared the Rustic Square. All unites responded to Echo Valley Ranch.

Upon arrival I observed six very emaciated horses. I visually scored the horses to be a 1 to 1.5 using the Henneke Body Score Technique. There were four horses located in the back corral. I asked Swift how old the horses were and he stated the horses were one to two years of age. The yearling's (Echo, River, Chance and Fiona), had a heated water trough full of water and hay in the lean-to. Their Spinous process, Tailhead (pinbones), Ribs and Hook bones were projecting prominently. I also observed two a mares (Midnight and Lena), in separate corrals with heated water trough full of water and hay on the ground. The horses were also visually scored as 1 to 1.5 using the Henneke Body Score Technique. Their Spinous process, Tailhead (pinbones), Ribs and Hook bones were projecting prominently. I asked Swift why his horses were so skinny. Swift believed the horses were suffering from a disease or a neurological disorder.

'61

Swift, Ronald 12M44, Hattee, Randall 12M43
Discovery 6 P

38/129

Swift said he feeds the horses two times a day and had given all of his horses their shots for the year. The colt named "Chance" is not well and could possibly die. I spoke with Swift's veterinarian Doctor Horton, from Timberline Equine Veterinarian Hospital, who believes that Swift waited to long to rectify the problem and could have avoided the situation. I believe if Swift had noticed the horses' condition sooner they would not be in the condition they are in today. Based on the above statement I believe the horses were neglected.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following: All of the inside and outside structures on the property and seize "Midnight"-Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grulla Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade Gelding horse, "Fiona"- Palomino Grade Filly horse, located on the property.

The property to be searched for, and seized if found, is:
    ( )    Stolen or embezzled OR
    (X)    Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
    (X)    Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_____
AFFIANT

Subscribed and sworn to before me this ___ day of _____ , 2012

_____
JUDGE

62

Swift, Ronald 12M44, Hatlee, Randall 12M43
Discovery 62

# EXHIBIT V

UNIFORM SUMMONS & COMPLAINT OR PENALTY ASSESSMENT FOR COUNTY ORDINANCE AND RESOLUTION VIOLATIONS

12 M44

| USFS Contact | CB# 7012010142 | Gaming Contact | Traffic Accident ( )Yes (X)No | Injuries Involved ( )Yes (X)No | No. 45132 |

| Defendant (Last Name) Swift | (First) Ronald | (Middle) L | Date of Birth Mo. Day Yr. 7-7-1942 | Age | ( )Traffic (X)Penal | Violation Mo. Day Yr. 2-16-2012 |

| Defendant's Address 11410 Park County Road 70 | City Fairplay Co. | State | Zip Code 80421 | Direction of Travel N S E W | Approx. Time of Violation 10:00 AM |

| Driver's License Number and Type 92277-6808 | State CO | Race W | Sex M | Height 5'10 | Weight/Hair 155 Brn | Eyes Brn | Home Telephone 303 908-2957 | Business Telephone |

| Employer Name Rancher / Retired | Employer Address | Occupation | | County PARK | No. 54 |

| Vehicle License Number and Type | State | Year | Make | Model | Type of Body Style | Approximate Location of Violation, State of Colorado ( )On Elk Valley Ranch | NRVC |

| Vehicle Color (Top/Bottom) | VIN | | ( ) At Intersection With: |

**YOU ARE SUMMONED AND ORDERED TO APPEAR TO ANSWER CHARGES AS STATED BELOW IN:**   SURCHARGE $ _____   TOTAL FINES $ _____

PARK COUNTY COURT At: 300 4TH STREET In: FAIRPLAY, COLORADO ON May 15 2012 AT 9:00A M

| Section | Park County Res. 04-01 | Comm. Code | Fine | Pts. | | Section | Park County Res. 04-01 | Comm. Code | Fine | Pts. |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ 237(2) | Driver failed to use safety belt | 575 | | 0 | | ☐ 1409(3) | Failed to show proof of insurance upon request | 957 | sum | 4 |
| ☐ 237(2) | Passenger failed to use safety belt | 960 | | 0 | | ☐ 603(1) | Failed to observe/disregarded traffic control device | 300 | | 4 |
| ☐ 236(2) | Failed to use child restraint | 574 | | 0 | | ☐ 1401 | Reckless driving | 140 | sum | 8 |
| ☐ 703 | (Disregarded/failed to stop as required at) stop sign at through highway | 319 | | 4 | | ☐ 1402 | Careless Driving | 141 | sum | 4 |
| ☐ 1007 (1) (a) | Failed to drive in a single lane (weaving) | 223 | | 3 | | ☐ 1409(2) | Operated an uninsured motor vehicle on a public roadway | 956 | | 4 |
| ☐ 202(1) | Drove a (defective / unsafe) vehicle | 542 | | 2 | | ☐ 1005(3) | Passed on left when prohibited by signs / markings | 199 | | 4 |
| ☐ 903(1) | Failure to signal | 432 | 5/5 | 2 | | ☐ 201(4) | Driver's vision obstructed through required glass | 452 | | 0 |
| ☐ 1008(1) | Following too close | 142 | | 4 | | ☐ 1101 (1) | Speeding ____ mph in ____ mph zone | | | |
| ☐ 1101 (3) | Speeding too fast for conditions | 007 | | 3 | | ☐ 1005 (2)(a) | Passed on (hill / curve) when view was obstructed | 197 | | 4 |

| ☐ Park Co. Res. 95-11   8 (a)  Dog running at large    15(a)  Barking Dog | | | Code | Fine | Surcharge | Pts |
| ☐ Park Co. Res. 04-01    (X) State Charges | | | | | | |

3 - Counts Cruelty to Animals
(CRS 18-9-202 (1)(a))

* Horses not lien. fed *
A person commits cruelty to animals if knowingly or
negligently he recklessly, or with criminal negligence over
drives, overloads or (deprives of necessary sustenance)

Dispo Sah
49
Hatlee

RECEIVED
FEB 27 2012

PARK COUNTY SHERIFFS OFFICE

| SUMMONS | PENALTY ASSESSMENT |
| WITHOUT ADMITTING GUILT, I HEREBY PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED ABOVE (SEE REVERSE SIDE) | WITHOUT ADMITTING GUILT, I AGREE TO COMPLY WITH THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS SUMMONS OR PENALTY ASSESSMENT. |
| DEFENDANT SIGNATURE  Refuse to Sign | DEFENDANT SIGNATURE |

The aforementioned offense(s) was (were) committed by the defendant in my presence, or I have reasonable grounds for believing that said offense(s) was (were) committed in fact by the defendant, in the County of Park, State of Colorado, on or about the date and time specified above, contrary to the above specified section(s) of the Model Traffic Code or other specified ordinance or resolution and the peace and dignity of the people. I hereby certify that a copy of this summons and complaint was duly served upon the defendant according to law.

PEACE OFFICER C. Hardy  ID NO. 9523  DATE SERVED 2-23-2012  COMPLAINANT Scott Hardy
WARNING: FAILURE TO APPEAR IN RESPONSE TO THIS SUMMONS AND/OR PAY FINE AS ORDERED MAY RESULT IN THE ISSUANCE OF A WARRANT FOR YOUR ARREST.

Swift, Ronald, 12M44, Hatlee, Randall 12M45    487

Discovery 1

Page: 92
THIS IS A LEGAL DOCUMENT - READ BOTH SIDES
Date Filed: 06/20/2016   Document: 01019641232   Appellate Case: 16-1065
DISPOSITION / D.A.

UNIFORM SUMMONS & COMPLAINT OR PENALTY ASSESSMENT FOR COUNTY ORDINANCE AND RESOLUTION VIOLATIONS   Hatlee  12M43

| USFS Contact | CR# 2013000 1612 | Gaming Contact | Traffic Accident ( ) Yes ( X ) No | Injuries Involved ( ) Yes ( X ) No | No. **45134** |

| Defendant (Last Name) | (First) | (Middle) S | Date of Birth Mo. Day Yr. 7-31-83 | Age | ( ) Traffic ( X ) Penal | Violation Mo. Day Yr. 2-16-2012 |

| Defendant's Address | City | State CO | Zip Code | Direction of Travel N S E W | Approx. Time of Violation |

| Driver's License Number and Type | State | Race | Sex | Height | Weight | Hair | Eyes | Home Telephone | Business Telephone |

| Employer Name | Employer Address | | Occupation | County PARK | No. 54 |

| Vehicle License Number and Type | State | Year | Make | Model | Type of Body Style | Approximate Location of Violation, State of Colorado ( ) On Scro Valley Ranch | NRVC |

| Vehicle Color (Top/Bottom) | VIN | | ( ) At Intersection With: |

Page: 93   Date Filed: 06/20/2016   THIS IS A LEGAL DOCUMENT - READ BOTH SIDES   Document: 01019641232   Appellate Case: 16-1065

YOU ARE SUMMONED AND ORDERED TO APPEAR TO ANSWER CHARGES AS STATED BELOW IN:

SURCHARGE $ _____ TOTAL FINES $ _____

PARK COUNTY COURT At: 300 4TH STREET, In: FAIRPLAY, COLORADO  ON May 15  20 12 AT 9:00 AM

| Section | Park County Res. 04-01 | Comm. Code | Fine | Pts. | Section | Park County Res. 04-01 | Comm. Code | Fine | Pts. |
|---|---|---|---|---|---|---|---|---|---|
| ☐ 237(2) | Driver failed to use safety belt | 575 | | 0 | ☐ 1409(1) | Failed to show proof of insurance upon request | 957 | sum | 4 |
| ☐ 237(2) | Passenger failed to use safety belt | 960 | | 0 | ☐ 603(1) | Failed to observe/disregarded traffic control device | 300 | | 4 |
| ☐ 238(2) | Failed to use child restraint | 574 | | 0 | ☐ 1401 | Reckless driving | 140 | sum | 8 |
| ☐ 703 | (Disregarded/failed to stop as required at) stop sign at through highway | 319 | | 4 | ☐ 1402 | Careless Driving | 141 | | 4 |
| ☐ 1007 (1) (a) | Failed to drive in a single lane (weaving) | 223 | | 3 | ☐ 1409(2) | Operated an uninsured motor vehicle on a public roadway | 956 | | 4 |
| ☐ 202(1) | Drove a (defective / unsafe) vehicle | 542 | | 2 | ☐ 1005(3) | Passed on left when prohibited by signs / markings | 199 | | 4 |
| ☐ 903(1) | Failure to signal | 433 | 5 | 2 | ☐ 201(4) | Driver's vision obstructed through required glass | 452 | | 0 |
| ☐ 1008(1) | Following too close | 142 | | 4 | ☐ 1101 (1) | Speeding ____ mph in ____ mph zone | | | |
| ☐ 1101 (3) | Speeding too fast for conditions | 007 | | 3 | ☐ 1005 (2)(a) | Passed on (hill / curve) when view was obstructed | 197 | | 4 |

| ☐ Park Co. Res. 95-11   8 (a)  Dog running at large   15(a)  Barking Dog | | Code | Fine | Surcharge | Pts |
| ☐ Park Co. Res. 04-01   ☐ State Charges |

8 - Counts Cruelty to Animals
CRS 18-9-202 (1)(a)

* times not being fed/water *

A person commits cruelty to Animals if he or she
knowingly, recklessly, or with criminal negligence
over drives, over loads or (deprives of necessary sustenance)

| SUMMONS | PENALTY ASSESSMENT |
| WITHOUT ADMITTING GUILT, I HEREBY PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED ABOVE (SEE REVERSE SIDE). | WITHOUT ADMITTING GUILT, I AGREE TO COMPLY WITH THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS SUMMONS OR PENALTY ASSESSMENT. |
| DEFENDANT SIGNATURE | DEFENDANT SIGNATURE  FEB 27 2012 |

RECEIVED  FEB 27 2012

PARK COUNTY SHERIFFS OFFICE

DISPOSITION / D.A.

The aforementioned offense(s) was (were) committed by the defendant in my presence, or I have reasonable grounds for believing that said offense(s) was (were) committed in fact by the defendant, in the County of Park, State of Colorado, on or about the date and time specified above, contrary to the above specified section(s) of the Model Traffic Code or other specified ordinance or resolution and the peace and dignity of the people. I hereby certify that a copy of this summons and complaint was duly served upon the defendant according to law.

PEACE OFFICER _____   ID NO. 0543   DATE SERVED 2-21-2012   COMPLAINANT _____

WARNING: FAILURE TO APPEAR IN RESPONSE TO THIS SUMMONS AND/OR PAY FINE AS ORDERED MAY RESULT IN THE ISSUANCE OF A WARRANT FOR YOUR ARREST.   4/04

Swift, Ronald 12M44, Hatlee, Randall 12M43   488

Discovery 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.        13-cv-02469-RPM-MJW

RANDALL J. HATLEE,
RONALD L. SWIFT,

Plaintiffs,


v.


CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
ASHLEIGH OLDS,

Defendants.

---

**DEFENDANTS WEGENER, GORE, PRIESTLY AND HARDEY'S MOTION FOR
SUMMARY JUDGMENT RE: INDIVIDUAL CAPACITY CLAIMS**

---

Defendants, Cindy Hardey, Bobbi Priestly, Monte Gore, and Fred Wegener, by and through

their attorney, Timothy P. Schimberg of Fowler, Schimberg & Flanagan, P.C., file their Motion to

Dismiss Re: Individual Capacity Claims, as follows:

## I.        <u>INTRODUCTION</u>

The issue presented by this Motion is whether these Defendants are entitled to judgment

as a matter of law because they did not personally participate in the alleged deprivation of

Plaintiffs' constitutional rights.  The Plaintiffs in this case claim that they are entitled to millions

of dollars in damages because six of their emaciated horses were held for seven weeks and because

they chose to defend a misdemeanor animal cruelty trial regarding the maltreatment of their horses.

Following the misdemeanor trial, which consisted in large part of a battle of the "experts,"

Plaintiffs were found not guilty.   Plaintiffs mistake the verdict as one of innocence.  In this case, Plaintiffs seek a pound of flesh against law enforcement officers at the Park County Sheriff's Department because that agency was involved in the investigation of the animal cruelty case in which the Plaintiffs were defendants.    The undisputed material facts demonstrate that these Defendants did not have the requisite degree of personal participation to give rise to Section 1983 liability.  These Defendants are entitled to judgment as a matter of law.

## II.   SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiffs assert two individual capacity claims against these Defendants.  First, Plaintiffs claim that the seizure of their horses violated the Fourth Amendment.  *See* First Amended Complaint at First Claim for Relief, ¶¶ 33-38.  This claim is based upon Plaintiffs allegations that there were material omissions from the affidavit is support of the warrant, which was executed by Animal Control Officer Hardey.  *Id*.  Hardey denies these claims, but is not moving for summary judgment regarding this claim.[1]  Defendants Wegener, Gore, and Priestly are entitled to summary judgment regarding the Fourth Amendment claim because they did not participate in the execution of the affidavit that supported the application for a search warrant.

Second, Plaintiffs claim that Defendants maliciously prosecuted them in violation of § 1983 for animal cruelty.  *See* First Amended Complaint at Second Claim for Relief, ¶¶ 40-46.  These Defendants did not personally participate in the decision to prosecute.  Instead, this was the District Attorney's decision.  Therefore, these Defendants are entitled to judgment as a matter of law regarding the malicious prosecution claim.

---

[1] If Plaintiffs prevail, the damages recoverable against Hardey regarding this claim are less than $5,000 for the reasons set for the in the contemporaneously filed Motion for Partial Summary Judgment Regarding Damages.

### III.     STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On February 23, 2012, a warrant issued for the seizure of six of Plaintiffs' horses. *See* Exhibit A, Warrant and Affidavit.

2.      The warrant was supported by an affidavit from Animal Control Officer Cindy Hardey. *Id.*

**A.     Undersheriff Gore Did Not Participate In Drafting the Affidavit**

3.      Undersheriff Gore has been the Undersheriff of Park County since 2005. *See* Exhibit B, Gore's Deposition at 7.

4.      Undersheriff Gore was not involved in the decision to file animal cruelty charges against Mr. Hatlee or Mr. Swift. *Id.*

5.      Undersheriff Gore was not involved in the drafting of the Affidavit that Cindy Hardey executed in order to obtain a search and seizure warrant. *Id.* at 8.

6.      Undersheriff Gore is not Cindy Hardey's immediate supervisor. *See id.* at 23.

7.      Undersheriff Gore is not responsible for disciplining Cindy Hardey. *Id.*

**B.     Sheriff Wegener Did Not Personally Participate**

8.      Sheriff Wegener is the duly elected Sheriff of Park County and has been for 16 years. *See* Exhibit C, Deposition of Wegener at 4.

9.      Sheriff Wegener's role regarding the investigation of Plaintiffs was minimal and involved communicating with Sheriff Wiggins from Routt County and directing Sergeant Bobbi Jo Priestly to look into claims of animal cruelty regarding Plaintiffs. *See id.* at 8.

10.     The Sheriff was not involved in the decision to seize the horses. *See id.* at 13.

**C.     Sergeant Priestly Did Not Personally Participate**

11.     Sgt. Priestly has worked as Animal Control Officer at the Park County Sheriff's Department for 12 years and is currently the senior Animal Control Officer.  *See* Exhibit D, Deposition of Priestly at 4.

12.     Priestly did not review Hardey's affidavits in support of the search and seizure.  *Id.* at 22.[2]

13.     Priestly testified that Hardey made the decision to seize the horses.  *Id* at 89.

**D.      The County Court Finds That There Was Probable Cause to Believe Plaintiffs Committed a Crime, But That There Was No Probable Cause to Believe That the Horses Were In Imminent Danger**

14.     On April 10, 2012, at an "animal bond hearing" a County Court judge found that there was no probable cause to detain the horses because the horses were not imminent danger, but there was probable cause to believe the horses suffered from animal cruelty.  *See* Exhibit E, Animal Bond Hearing at p. 65 lines 22 to page 66 line 4.

15.     At that same hearing, the County Court judge suggested that there may have been material omissions from Officer Hardy's affidavit regarding whether the horses were in danger, but made clear that there was nevertheless probable cause to believe Plaintiffs' committed animal cruelty.  *Id.*

16.     At a later hearing on December 3, 2012, the County Court judge found that the affidavit contained material omissions regarding whether the horses were in imminent danger and therefore suppressed evidence obtained that were the fruits of that seizure.  *See* Exhibit F, December 3, 2012 Hearing Transcript at 173 lines 23 – p. 174 line 7.

---

[2] At a hearing on December 3, 2012, discussed below, Hardey testified that Priestly reviewed the affidavit.  In deposition, Hardey testified that her earlier testimony was erroneous and Priestly did not review the affidavit.  These Defendants submit that the clarification stands unrefuted.

17.     Again, however, at the December 3, 2012, the County Court Judge stated that there was still probable cause to believe Plaintiffs committed animal cruelty.  *Id.*

18.     Plaintiffs' horses were returned to them on April 11, 2012.

19.     Undisputed Facts Nos. 10-21 from the Motion for Partial Summary Judgment Regarding Damages are specifically incorporated herein.

## IV.     SUMMARY JUDGMENT STANDARD

This Court is familiar with the standard of review governing a motion for summary judgment.

## V.     THESE DEFENDANTS DID NOT PERSONALLY PARTICIPATE IN THE ALLEGED CONSTITUTIONAL VIOLATIONS

To the extent that the Plaintiffs are attempting to assert a claim against Defendants Wegener, Gore and Priestly based upon supervisory authority, the Supreme Court has found no merit in a theory that mere knowledge and acquiescence constitute supervisory liability.  In *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009), the court rejected the argument that a supervisor's *mere knowledge* of his subordinate's discriminatory purpose amounts to a violation of the Constitution.  Knowledge and acquiescence does not amount to the supervisor's own alleged misconduct.  Thus, an individual's action and the requisite culpable state of mind must both be plausibly shown through the factual allegations in a complaint to avoid dismissal.  *Id.* at 676-77. Defendants Wegener, Gore and Priestly submit that the First Amended Complaint suffers from the very defects that *Iqbal* precludes from going forward.  *Iqbal* requires a heightened personal involvement threshold before supervisory liability can arise.  *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) acknowledges that individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation in such a context.  There is no such

available evidence to the Plaintiffs in this case. Defendants Wegener, Gore and Priestly did not personally participate in the drafting or submission of the affidavit in support of the search/seizure warrant. Similarly, a component of personal participation is also a component of qualified immunity as it relates to whether or not a clearly established right exists or has been violated. *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). There is both a lack of specificity in the First Amended Complaint and a lack of record evidence to support a constitution claim against Defendants Wegener, Gore and Priestly.

Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation. *Foote v. Spiegel*, 118 F.3d 1416, 1423-24 (10th Cir. 1997). In order for liability to arise under § 1983, a defendant's direct personal responsibility for the deprivation must be established. *See Trujillo v. Williams*, 465 F.3d 1210, 1228 (10th Cir. 2006). Thus, personal participation is the essential allegation under § 1983 claim. *See Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (citing the *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976); *Ruark v. Solano*, 928 F.2d 947, 950 (10th Cir. 1991)). Supervisor status by itself is insufficient to support liability under § 1983. *Id.* (citing *Rizzo v. Goode*, 423 U.S. 362, 376 (1976)).

There is no concept of strict supervisor liability under § 1983. *Serna v. Colorado Dept. of Corrections*, 445 F.3d 1146, 1151 (10th Cir. 2006). To establish supervisor liability under § 1983, a plaintiff must show that the supervisor's subordinates violated the Constitution ***and*** an affirmative link exists between the constitutional deprivation and the supervisor's personal participation, his exercise of control or direction, or failure to supervise. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). To establish a § 1983 violation by a supervisor the plaintiff must, at a minimum, establish a deliberate and intentional act on the part of the defendant to violate

plaintiff's legal rights. *See Kemp v. Lawyer*, 846 F.Supp.2d 1170, 1175 (D.Colo. 2012) (citing

*Dodds v. Richardson*, 614 F.3d 1185 (10th Circuit, 2010); *Myers v. Koopman*, 2011 WL 650328

(D.Colo. 2011). In *Kemp*, Judge Babcock summarized the test as follows:

> Thus, to demonstrate that supervisor has violated the Plaintiff's constitutional right
> in failing to train, in order to establish individual liability under § 1983 – a plaintiff
> must show: 1) that an underlying *violation* of his constitutional rights; 2) that the
> supervisor-defendant's personal involvement *caused* the misconduct complained
> of; and 3) that the supervisor-defendant acted with the state of mind "or *intent*"
> required to establish he committed a constitutional violation; specifically, at a
> minimum, establish a deliberate and intentional act on the part of a defendant to
> violate the plaintiff's legal rights. *Id.* (emphasis in original).

### A.     These Defendants Did Not Personally Participate In the Alleged Fourth Amendment Violation

Application of the legal principles set forth immediately above to the undisputed facts is

straight forward. The undisputed facts show that Wegener, Gore, and Priestly did not personally

review the affidavit that was submitted in support of the warrant. They cannot be held liable under

§ 1983 for any material omissions in that warrant. The question then becomes whether any of

them can be held liable as supervisors. Under the test enunciated by Judge Babcock in *Kemp,* they

cannot. Plaintiffs cannot prove either the second or the third elements of the *Kemp* test. Plaintiffs

cannot show that any of these Defendants' personal involvement caused the omissions from the

affidavit. Moreover, there is no evidence whatsoever of intent. Therefore, Defendants Wegener,

Gore, and Priestly cannot be held individually liable under § 1983 for the alleged material

omissions from the affidavit in support of the warrant.

### B.     The District Attorney Decided To Prosecute Plaintiffs

This argument is addressed in Defendants contemporaneously filed Motion for Partial

Summary Judgment re: Damages, which is specifically incorporated herein by reference. For all

of the reasons discussed in that Motion, these Defendants are entitled to judgment as a matter of law regarding that claim.  Mr. LeDoux's Affidavit is attached for the court's convenience.  Exhibit G.

The principal player in carrying out a prosecution is not a police officer, but the prosecutor. *See Taylor v. Meacham,* 82 F.3d 1556, 1563 n.8 (10th Cir. 1996) (quoting *Albright v. Oliver,* 510 U.S. 266, 279 n.5 (1994), Ginsburg, J. concurring)).  Accordingly, an officer does not proximately cause a malicious prosecution because the independent decisions of the prosecutor in bringing the charge and the Court in issuing an indictment or warrant constitutes superseding causes that break in  the chain of causation.  *See Calvert v. Ediger,* 415 Fed. Appx. 80, 2011 WL 754839, *3 (citing *Taylor, supra* at 1564).

Officers are not shielded from liability if a causal connection can be established demonstrating that the prosecutor and the Court's actions were not truly independent causes.  *See Pierce v. Gilchrist,* 359 F.3d 1279, 1292-93 (10th Cir. 1994).  Under *Gilchrist,* officers can be liable from malicious prosecution if they conceal or misrepresent material facts to the prosecutor whose judgment is influenced by the statements.  *See Calvert, supra*. (discussing *Gilchrist*). If a plaintiff can demonstrate that the prosecutor's decision to prosecute was influenced by the omissions, then the plaintiff can state a cause of action under § 1983 for malicious prosecution. *Id*.  However, in this case, the Plaintiffs cannot meet this burden based on District Attorney LeDoux's Affidavit.

## VI.   **CONCLUSION**

In summary, the individual capacity claims against Wegener, Gore, and Priestly for the alleged Fourth Amendment violations should be dismissed because none of them personally

participated in authoring the affidavit that gives rise to these claims.  Additionally, the malicious

prosecution claims against all of the Defendants should be dismissed.  These damages were caused

by the prosecutor's decision to prosecute and not any of the conduct of these Defendants.

Accordingly, Wegener, Gore, and Priestly are entitled to judgment as a matter of law regarding all

of the individual capacity claims.  Additionally, Hardey is entitled to summary judgment regarding

the malicious prosecution claim.

Respectfully submitted this 15th day of December, 2014.

*(Original signature on file at the offices of Fowler,
Schimberg & Flanagan, P.C.)*

*/s/ Timothy P. Schimberg*

Timothy P. Schimberg

FOWLER, SCHIMBERG & FLANAGAN, P.C.
1640 Grant Street, Suite 150
Denver, Colorado 80203
(303) 298-8603

ATTORNEY FOR DEFENDANTS CINDY
HARDEY, BOBBI PRIESTLY, MONTE GORE,
AND FRED WEGENER

### CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2014, I caused a true and correct copy of the foregoing **DEFENDANTS WEGENER, GORE, AND PRIESTLY'S MOTION TO DISMISS INDIVIDUAL CAPACITY CLAIMS** to be filed and served via ICCES upon following:

Brice A. Tondre, Esq.
Brice A. Tondre, P.C.
215 S. Wadsworth Blvd., Ste. 500
Lakewood, CO 80226-1566
briceatondrepc@msn.com
***Attorney for Plaintiffs***

John M. Lebsack, Esq.
White and Steele, P.C.
600 17th Street, Ste. 600N
Denver, CO 80202
jlebsack@wsteele.com
***Attorney for Defendant Ashleigh Olds***

*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*

*/s/ Kala Cyganiewicz*

10

498

IN THE COMBINED COURTS
COUNTY OF PARK
STATE OF COLORADO

| FILED IN COMBINED COURT | 12 PS 03 |
| FEB 2 2 2012 | SEARCH WARRANT |
| PARK COUNTY, COLORADO | |

THE PEOPLE OF THE STATE OF COLORADO

TO:   THE SHERIFF, UNDERSHERIFF, DEPUTY SHERIFF, AND ALL LAW ENFORCEMENT
OFFICERS AUTHORIZED TO EXECUTE SEARCH WARRANTS IN THE STATE OF COLORADO,
GREETINGS:

WHEREAS, Park County Code Enforcement Deputy Cindy Hardey, has made an affidavit and complaint for
the issuance of a search warrant.

Horses were moved on February19, 2012, at approximately 4:00PM, with owners permission and assisted by
Park County Animal Control to location known as: 1401 Park County Road 77, Jefferson, Park County,
Colorado, 80453, ALSO KNOWN AS, T08 R75 S16 NW4, SLASH 6, LOT 06: Information obtained from the
Park County Assessors Office.

AND WHEREAS, the affidavit of the applicant seems proper and it appears that probable cause exists for the
issuance of a Search Warrant for the reason or reasons marked below:

The property to be searched for and seized if found is:
( )       Stolen or Embezzled OR
(X)       Designed or intended for use or which is or has been used as a means of committing a criminal
          offense or the possession of which is illegal, OR
(X)       Would be material evidence in a subsequent criminal prosecution.

WE THEREFORE COMMAND YOU, with the necessary and proper assistance to enter and search:

And you will search for:  "Midnight"- Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse,
"Echo"- Grullo Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade
Gelding horse, "Fiona"- Palomino Grade Filly horse, located at said property, and will seize "Midnight"-
Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grullo Grade Gelding
horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade Gelding horse, "Fiona"- Palomino
Grade Filly horse, located on the property.

And if the same or any part thereof is found, that you seize the goods and things found and safely keep them
until further order of this Court or until they are admitted into any criminal proceedings by a Court of this State;
and that you further file a report with this Court inventorying the goods and things which were seized or
reporting that nothing was so found and seized.

Done this 22 day of Feb 2012
99
                                         BY THE COURT

                                         JUDGE

COURT
SEAL

PARK COUNTY COMBINED COURTS
STATE OF COLORADO

EXHIBIT
A
tabbies
499

STATE OF COLORADO )                                                    AFFIDAVIT FOR
                  )                                                      A SEARCH
COUNTY OF PARK    )                                                      WARRANT

In support of the issuance of a SEARCH WARRANT to search:

Horses were moved on February19, 2012, at approximately 4:00PM, with owners permission and assisted by
Park County Animal Control to location known as: 1401 Park County Road 77, Jefferson, Park County,
Colorado, 80453, ALSO KNOWN AS, T08 R75 S16 NW4, SLASH 6, LOT 06: Information obtained from the
Park County Assessors Office.
                          **Kirsten Le Beau.**


I, Park County Code Enforcement Deputy Cindy Hardey, am a Deputy Sheriff for the Park County Sheriff's
Office, and have been employed with this office since 2003. I have been a Code Enforcement Officer for over 8
years, and have over 4000 hours as a Commissioned Agent with the State of Colorado. I, Deputy C. Hardey,
being duly sworn upon oath, swear that the following facts are true and correct to the best of my knowledge.

On February 14, 2012, at approximately 11:00AM, in Park County, Colorado, Sergeant B. Priestly called me on
my cellular telephone on my day off and advised me that she had received a telephone call from a Routt County
Animal Officer. The officer identified herself as:

                    **RP- Dawn Smith (Routt County Animal Control)**

Sgt. Priestly said there were seven horses at the Echo Valley Ranch that were scored at a 2 using the Henneke
Body Score Technique, on a scale from 1 to 9, 1 being emaciated and 5 being ideal. The mare and colt on the
ranch were reported as being emaciated if not diseased. At that point I advised Priestly that I would be
scheduling a welfare check on all animals on the ranch. The Echo Valley Ranch located at 1649 Park County
Road 70, Bailey, Park County, Colorado, is care taken by a male party identified as:

                              **S- Ronald Swift**

On February 16, 2012, at approximately 7:30AM, Deputy B. Sears asked me if I wanted to meet a Veterinarian
at the Bailey Substation at 9:00AM, from Routt County. Sears said the veterinarian was going to be seizing a
colt at the Echo Valley Ranch and needed an officer from our county to accompany her. I scheduled Corporal J.
Plutt and Deputy N. Hanning to accompany me with the court documents for removal of the horse.

At approximately 9:00AM, Doctor Ashleigh Olds DVM arrived at the Bailey Substation. Olds and I cleared the
Bailey Substation and responded to the Rustic Square and waited for Plutt and Hanning's arrival. At
approximately 9:50AM, Plutt and Hanning arrived and all unites cleared the Rustic Square. All unites
responded to Echo Valley Ranch.

Upon arrival I observed six very emaciated horses. I visually scored the horses to be a 1 to 1.5 using the
Henneke Body Score Technique. There were four horses located in the back corral. I asked Swift how old the
horses were and he stated the horses were one to two years of age. The yearling's (Echo, River, Chance and
Fiona), had a heated water trough full of water and hay in the lean-to. Their Spinous process, Tailhead
(pinbones), Ribs and Hook bones were projecting prominently. I also observed two a mares (Midnight and
Lena), in separate corrals with heated water trough full of water and hay on the ground. The horses were also
visually scored as 1 to 1.5 using the Henneke Body Score Technique. Their Spinous process, Tailhead
(pinbones), Ribs and Hook bones were projecting prominently. I asked Swift why his horses were so skinny.
Swift believed the horses were suffering from a disease or a neurological disorder.

Swift said he feeds the horses two times a day and had given all of his horses their shots for the year. The colt named "Chance" is not well and could possibly die. I spoke with Swift's veterinarian Doctor Horton, from Timberline Equine Veterinarian Hospital, who believes that Swift waited to long to rectify the problem and could have avoided the situation. I believe if Swift had noticed the horses' condition sooner they would not be in the condition they are in today. Based on the above statement I believe the horses were neglected.

THEREFORE, your affiant respectfully requests a search warrant be issued to search the above described location for the following:  All of the inside and outside structures on the property and seize "Midnight"- Breeding Stock Paint Mare horse, "Lena"- Sorrel Paint Mare horse, "Echo"- Grullo Grade Gelding horse, "River"- Bay Grade Gelding horse, "Chance" – Sorrel Grade Gelding horse, "Fiona"- Palomino Grade Filly horse, located on the property.

The property to be searched for, and seized if found, is:
   ( )    Stolen or embezzled OR
   (X)    Designed or intended for use, or which is or has been used as a means of committing a criminal offense, or the possession of which is illegal, OR
   (X)    Would be material evidence in a subsequent criminal prosecution.

Further affiant sayeth naught.

_____
AFFIANT

Subscribed and sworn to before me this ___ day of Feb_____, 2012

_____
JUDGE

Page 7

1    leadership, law enforcement as a PIO, management,

2    strategic planning, leadership.  Pretty much the whole

3    gamut.

4            Q   What -- what was involved in -- did you

5    have to -- did you have to attend any sort of course of

6    study in order to obtain your post certification?

7            A   Yes.

8            Q   What -- what did you attend?

9            A   The law enforcement training academy in

10   Golden.

11           Q   When did you do that?

12           A   1992.

13           Q   And that was what, nine months, six

14   months?

15           A   Something along those lines.

16           Q   And when did you become undersheriff?

17           A   Towards the end of 2005.

18           Q   Until you became post certified, you were

19   involved with jail facilities?

20           A   Correct.  And I also went to a detention

21   officer academy, I think in 1991 or 1981.

22           Q   What involvement did you have in the

23   decision to file animal cruelty charges against

24   Mr. Hatlee and Mr. Swift?

25           A   I don't think I had any involvement of --

EXHIBIT

B
502

MONTE GORE - JUNE 24, 2014

Page 8

1    in the filing of the charges.

2              Q    What, if any, involvement did you have in

3    the drafting of the affidavit that Cindy Hardey did in

4    order to obtain a -- a seizure and search warrant?

5              A    None.

6              Q    As you know, there was some testimony

7    this morning about a telephone call you made to Bobbi

8    Priestly on February the 19th.  We're going to hand you

9    an exhibit that has been marked Exhibit 66, you can

10   look at this if it makes any difference to you or not.

11             But on page 89 of that exhibit, it says:

12   "On February 19, 2012 I received a telephone call from

13   Under sheriff Gore at my residence.  The Under sheriff

14   advised me that he had received several -- several

15   telephone calls from the Public Information Officer for

16   the State of Colorado's Department of Agriculture

17   Office."

18             It's the -- the fourth paragraph on that

19   page.

20             MR. SCHIMBERG:  Yeah, just so you know,

21   Brice, because you were reading, we were getting our

22   way to 89.

23             A    Yeah, if you can start over again.

24             MR. TONDRE:  Sure.

25             MR. SCHIMBERG:  Or just focus us.

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

MONTE GORE - JUNE 24, 2014

Page 23

1          Q   So who made the decision that it was safe

2    to move that horse?

3          A   That decision was made by Sergeant

4    Priestly, and I supported that decision.

5          Q   And what was your basis that supported

6    that -- for supporting that decision?

7          A   I have faith in Sergeant Priestly based

8    on my experience with her.  She knows what she's doing,

9    she's competent, and I trust her.

10          Q   Who's in charge in the sheriff's

11    department of handling disciplinary matters with

12    respect to employees of the sheriff's department?

13          A   Well, that would depend on the employee

14    of the sheriff's office.

15          Q   I'm speaking specifically with respect to

16    Cindy Hardey, who would be responsible for disciplining

17    for misconduct?

18               MR. SCHIMBERG:  Let me object to form.

19    Go ahead and answer.

20          A   That would be her immediate supervisor in

21    this case.

22          Q   (BY MR. TONDRE) That would be Bobbi

23    Priestly?

24          A   Sergeant Priestly, that's correct.

25          Q   And she's the person designated by the

AVERY WOODS REPORTING SERVICE, INC.   (303) 825-6119

FRED WEGENER - JULY 24, 2014

Page 4

1                        FRED WEGENER,

2     being first duly sworn to state the truth, the whole

3     truth, and nothing but the truth, testified under oath as

4     follows:

5                         EXAMINATION

6     BY MR. TONDRE:

7             Q     State your name for the record, please.

8             A     Fred Wegener.  W-e-g-e-n-e-r.

9             Q     And your present occupation?

10            A     Sheriff, Park County.

11            Q     How long have you been Sheriff for Park

12    County?

13            A     I'm in my 16th year.

14            Q     You're presently involved in a campaign

15    for another term, correct?

16            A     Another term, that's correct.

17            Q     I want to concentrate on the office as it

18    existed in 2012 since that's what brings us here.  So

19    I'll be directing my attention to that area.

20                  Did you do anything in preparation for

21    your deposition?

22            A     Talked to my legal counsel.

23            Q     Did you read any documents, depositions,

24    or things of that nature?

25            A     The affidavit that was filed in federal

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6

EXHIBIT

C   505

FRED WEGENER - JULY 24, 2014

Page 8

1    and the firearms through the department.

2            Q    Now, was Cindy Hardey in 2011 and 2012 an

3    employee of the sheriff's office?

4            A    Yes.

5            Q    Who was responsible for training her in

6    the preparation of search warrant affidavits?

7            A    Her supervisor would have covered that

8    during her FTO.

9            Q    And that would be Sergeant Priestly?

10           A    Correct.

11           Q    Does -- did the sheriff's office in 2012

12   have an internal affairs section?

13           A    Yes.

14           Q    And who was involved in that?

15           A    It would -- well, it depends on what

16   subdivision the complaint is out of.  So it's like --

17   I'll have either Captain Bonnelycke or Captain Muldoon

18   will take care of those -- like I said, depending upon

19   what division they come from.

20           Q    Who would be responsible for conducting

21   an internal affairs investigation of an animal control

22   officer?

23           A    It would either have been Captain Muldoon

24   or Captain Bonnelycke.

25           Q    All right.  And what precipitates an

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6119

FRED WEGENER - JULY 24, 2014

Page 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          Q   Were you involved in any respect in the

17   decision to seize the horses?

18          A   No.  Huh-uh.  Not to -- not to seize

19   them.  I usually leave all the animal control stuff to

20   that division there.  They're very good at what they

21   do.

22

23

24

25

1                    BOBBI JO PRIESTLY,

2     being first duly sworn to state the truth, the whole

3     truth, and nothing but the truth, testified under oath as

4     follows:

5                         EXAMINATION

6     BY MR. TONDRE:

7              Q    State your name, please, ma'am.

8              A    Bobbi Jo Priestly.

9              Q    And your occupation?

10             A    I'm the sergeant of the Animal Control

11    Division for Park County --

12             Q    And how long -- I'm sorry.

13             A    I'm sorry.  -- for the Park County

14    Sheriff's Office.

15             Q    How long have you held that position now?

16             A    It will be 13 years in January, so about

17    12 and a half years.

18             Q    What's your educational background?

19             A    Just high school.  I don't have any

20    college education, sir.

21             Q    And where did you graduate from high

22    school?

23             A    South Park High School here in Fairplay.

24             Q    And when did you graduate?

25             A    1983.

AVERY WOODS REPORTING SERVICE, INC.  (303) 825-6

EXHIBIT
D 508

BOBBI PRIESTLY - JUNE 24, 2014

Page 22

1    form of the question.

2              Q   (BY MR. TONDRE) Yes.

3                   MR. SCHIMBERG:  Legal conclusion.  You

4    can answer as an animal control.

5              A   Sufficient evidence and facts based on --

6    well, it would be sufficients -- sufficient facts

7    based -- that there's a crime that has been committed,

8    it would be sufficient fact that there has been a crime

9    or -- that's what probable cause is.

10             Q   (BY MR. TONDRE) Is it --

11             A   Sufficient facts.

12             Q   I'm sorry, I interrupted you.

13             A   Go ahead.

14             Q   Is it enough to have a feeling that a

15   crime was committed?

16                  MR. SCHIMBERG:  Object to form.

17             A   No.  Go ahead.

18             Q   (BY MR. TONDRE) Are you familiar with the

19   holdings in the 10th Circuit Court of Appeals requiring

20   the requirement that a thorough investigation be made

21   before seeking a search and seizure warrant?

22                  MR. SCHIMBERG:  Object to form.  Go

23   ahead.

24             A   Yes.

25             Q   (BY MR. TONDRE) Did you provide any

BOBBI PRIESTLY - JUNE 24, 2014

Page 89

1    were moved to a private ranch in Park County and housed

2    in an enclosed barn.  The horses were provided with

3    veterinarian care by Timberline Equine Veterinary

4    Services while at this location." What's -- what's the

5    basis for your statement?  How did you know that?

6              A    Because that's what I was told.

7              Q    Other than this visit to LeBeau's on the

8    19th, did you at any other time prior to the seizure of

9    the horses go to the LeBeau place?

10             A    Reference this case?

11             Q    Yes.

12             A    No.

13             Q    You say:  "Hatlee was concerned about one

14   of the young colts named 'Chance.'"  Did you look at

15   that colt?

16             A    Yes.

17             Q    And what did he tell you caused him

18   concern?

19             A    I don't recall.

20             Q    You say:  He told you that the colt had

21   been collapsing frequently and that he was unable to

22   rise on his own.

23                  Do you remember that?

24             A    I do.

25             Q    Do you remember being concerned that the

ORIGINAL

AGREN BLANDO COURT REPORTING & VIDEO INC.

1

COMBINED COURT, COUNTY OF PARK, STATE OF COLORADO

CASE NO. 2012 M 43 AND 2012 M 44, DIV. A

_____

REPORTER'S TRANSCRIPT (Motions Hearing)

_____

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

     Plaintiff,

v.

RONALD L. SWIFT,

     Defendant.

_____

    The above-entitled matter came on for hearing

on Tuesday, April 10, 2012 at 11:01 a.m. before the

HONORABLE BRIAN L. GREEN, County Judge.

APPEARANCES:

FOR THE PLAINTIFF:     STEVE SULLIVAN

FOR THE DEFENDANT:     DARREL CAMPBELL

ALSO PRESENT:     RONALD L. SWIFT
                         CINDY HARDY
                         ANIMAL CONTROL OFFICER

EXHIBIT

E 511

AGREN BLANDO COURT REPORTING & VIDEO INC.

65

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   ruling on whether or not neglect took place.   The Court

23   does find that the officer had probable cause to

24   believe that the animals suffered from animal cruelty,

25   but the Court finds that the animal control officer did

AGREN BLANDO COURT REPORTING & VIDEO INC.

66

1    not have probable cause to believe that the animals

2    would suffer ongoing animal cruelty and would be

3    endangered if they were left in the care of the

4    Defendants, specifically due to the fact the Defendants

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Court Reporting   Videography   Digital Reporting   Transcription   Scanning   Copying
Denver (303) 296 - 0017 Boulder (303) 443 - 0433  Colorado Springs (719) 635 - 8328 Greeley (970) 356 - 3306

513

AGREN BLANDO COURT REPORTING & VIDEO INC    ORIGINAL

1

DISTRICT & COUNTY COURT, COUNTY OF PARK,
STATE OF COLORADO

CASE NO. 2012 M 000043, DIV. A
CASE NO. 2012 M 000044, DIV. A

---

REPORTER'S TRANSCRIPT (Motions Hearing)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

RANDALL J. HATLEE, and RONALD L. SWIFT,

    Defendants.

---

    The above-entitled matter came on for hearing

on Monday, December 3, 2012 at 9:56 a.m. before the

HONORABLE BRIAN LOUIS GREEN, County Judge.


APPEARANCES:

FOR THE PLAINTIFF:    THOMAS K. LEDOUX

FOR THE DEFENDANT:    DARRELL LEE CAMPBELL

ALSO PRESENT:    RANDALL J. HATLEE
                   RONALD L. SWIFT
                   CINDY HARDY



EXHIBIT

F 514

AGREN BLANDO COURT REPORTING & VIDEO INC

173

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          For those non-attorneys present, just to

24   clarify, I still believe there was probable cause to

25   suspect the defendants committed the act of animal

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

515

AGREN BLANDO COURT REPORTING & VIDEO INC

174

1    cruelty.  That does not equate to authorizing seizure

2    of the horses.  That's why the horses were ordered to

3    be returned.  That's why charges can still go forward,

4    but if the state engages in an unlawful seizure, they

5    can't benefit by admitting evidence of that at trial.

6    That's the essence of the Court's ruling today.  Thank

7    you.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

516

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.      13-cv-02469-RM-MJW

RANDALL J. HATLEE,
RONALD L. SWIFT,

Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
ASHLEIGH OLDS,

Defendants.

---

## AFFIDAVIT OF THOM K. LEDOUX

---

I, the undersigned Affiant, Thom K. LeDoux, being first duly sworn upon my oath, hereby states as follows:

1.      I currently serve as the District Attorney for the 11th Judicial District - State of Colorado. I am serving my second term as the elected District Attorney for the 11th Judicial District - State of Colorado.

2.      I graduated from the University of Colorado, School of Law in 2002 and became licensed to practice law that year. Starting in 2003, I worked as an intern in the District Attorney's Office for the 11th Judicial District, State of Colorado. I then served as a Deputy District Attorney in the District Attorney's Office of the 10th Judicial District in Pueblo, CO from 2003 through 2006. In 2006 I became a Deputy District Attorney in the 11th Judicial District. I was subsequently promoted to the position of Chief Deputy District Attorney of the 11th Judicial District, State of Colorado. I was elected District Attorney in November, 2008. I have served in that capacity up to the present time. I served as the elected President of the Colorado District Attorney's Council from 2012 to 2013.

3.      I served in the capacity of District Attorney for the 11th Judicial District - State of Colorado in 2012-13.



**EXHIBIT**

**G**

517

4.     In the spring, 2012, I was aware of the prosecution of *People of the State of Colorado* v. *Randall Hatlee*, 12M43 and *People* v. *Ronald Swift*, 12M44, pending in the Combined Court, County of Park, State of Colorado.

5.     I was personally aware of the results of a hearing held April 10, 2012 in the above referenced matters held before the Honorable Brian L. Green, Park County Judge. That hearing was handled on behalf of the People by Deputy District Attorney Steve Sullivan.

6.     I became personally aware that the Honorable Brian L. Green, at the April 10, 2012 hearing found that Animal Control Officer Cindy Hardey had probable cause to believe that the animals that were the subject of the cases, owned by Messrs. Swift and Hatlee, suffered from animal cruelty. I also became personally aware that the Court found that there was not probable cause to believe that the animals would suffer ongoing cruelty and ordered that the animals be returned to the care of Mr. Swift and Hatlee.

7.     Soon after the April 10, 2012 hearing described above, I made the decision to take responsibility for further prosecution of both case numbers 12M43 and 12M44 involving Messrs. Swift and Hatlee.

8.     Based upon my review of the case file and applicable law, it was my independent professional opinion, as the duly elected District Attorney of the 11th District, that there was sufficient evidence of animal cruelty/neglect that there was a reasonable likelihood of conviction.

9.     In the course of the pre-trial litigation the Honorable Brian L. Green ruled that certain information was omitted from the affidavit in support of the search/seizure warrant and, as a result, suppressed some of the evidence gathered with the search warrant. The Court's ruling did not change my opinion that there was sufficient evidence of animal cruelty/neglect and that there was a reasonable likelihood of conviction, even without considering the suppressed evidence.

10.     As an elected official of the State of Colorado and the 11th Judicial District, and as an officer of the court, if I did not believe that there was a reasonable likelihood of conviction, I would have not continued to prosecute the case.

11.     Following the closing arguments of the jury trial I believed that there was a very good chance that the jury's verdict would be guilty. I still believe that probable cause existed and that there was sufficient evidence to support prosecution and convictions.

12.     The decision to continue prosecution of the case following the April 10, 2012 hearing referenced above, was not affected in any way by the Park County Sheriff's Office or any of its employees, nor was it affected by any horse advocacy group of individuals that were following the case. The decision to continue the prosecution was based upon the facts and law and were consistent with my office's ethical duties to the People of the State of Colorado, as well as my own independent professional judgment.

2

**FURTHER AFFIANT SAYETH NAUGHT.**

DATED: 12/15/14

Thom K. LeDoux
District Attorney
11th Judicial District -- State of Colorado

STATE OF COLORADO    )
                     )  ss.
COUNTY OF *FREMONT*   )

    SUBSCRIBED AND SWORN to before me this 15th day of December, 2014, in the County of *FREMONT*, State of Colorado, by Thom K. LeDoux.

    WITNESS my hand and official seal.

    My commission expires: _____3-1-17_____

_____
Notary Public

PAMELA MANDEL
NOTARY PUBLIC
STATE OF COLORADO

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.        13-cv-02469-RPM-MJW

RANDALL J. HATLEE,
RONALD L. SWIFT,

Plaintiffs,


v.


CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER,
ASHLEIGH OLDS,

Defendants.

---

**SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE:
DEFENDANTS WEGENER, GORE, PRIESTLY AND HARDEY'S MOTION FOR
SUMMARY JUDGMENT RE: INDIVIDUAL CAPACITY CLAIMS**

---

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 1. On February 23, 2012, a warrant issued for the seizure of six of Plaintiffs' horses. *See* Exhibit A, Warrant and Affidavit. | | |
| 2. The warrant was supported by an affidavit from Animal Control Officer Cindy Hardey. *Id.* | | |
| 3. Undersheriff Gore has been the Undersheriff of Park County since 2005. *See* Exhibit B, Gore's Deposition at 7. | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 4. Undersheriff Gore was not involved in the decision to file animal cruelty charges against Mr. Hatlee or Mr. Swift. *Id.* | | |
| 5. Undersheriff Gore was not involved in the drafting of the Affidavit that Cindy Hardey executed in order to obtain a search and seizure warrant. *Id.* at 8. | | |
| 6. Undersheriff Gore is not Cindy Hardey's immediate supervisor. *See id.* at 23. | | |
| 7. Undersheriff Gore is not responsible for disciplining Cindy Hardey. *Id.* | | |
| 8. Sheriff Wegener is the duly elected Sheriff of Park County and has been for 16 years. *See* Exhibit C, Deposition of Wegener at 4. | | |
| 9. Sheriff Wegener's role regarding the investigation of Plaintiffs was minimal and involved communicating with Sheriff Wiggins from Routt County and directing Sergeant Bobbi Jo Priestly to look into claims of animal cruelty regarding Plaintiffs. *See id.* at 8. | | |
| 10. The Sheriff was not involved in the decision to seize the horses. *See id.* at 13. | | |
| 11. Sgt. Priestly has worked as Animal Control Officer at the Park County Sheriff's Department for 12 years and | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| is currently the senior Animal Control Officer. *See* <u>Exhibit D</u>, Deposition of Priestly at 4. | | |
| 12.  Priestly did not review Hardey's affidavits in support of the search and seizure.  *Id*. at 22. | | |
| 13.  Priestly testified that Hardey made the decision to seize the horses.  *Id* at 89. | | |
| 14.  On April 10, 2012, at an "animal bond hearing" a County Court judge found that there was no probable cause to detain the horses because the horses were not imminent danger, but there was probable cause to believe the horses suffered from animal cruelty.  *See* <u>Exhibit E</u>, Animal Bond Hearing at p. 65 lines 22 to page 66 line 4. | | |
| 15.  At that same hearing, the County Court judge suggested that there may have been material omissions from Officer Hardy's affidavit regarding whether the horses were in danger, but made clear that there was nevertheless probable cause to believe Plaintiffs' committed animal cruelty.  *Id*. | | |
| 16.  At a later hearing on December 3, 2012, the County Court judge found that the affidavit contained material omissions regarding whether the horses were in imminent danger and | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
| --- | --- | --- |
| therefore suppressed evidence obtained that were the fruits of that seizure. *See* Exhibit F, December 3, 2012 Hearing Transcript at 173 lines 23 – p. 174 line 7. | | |
| 17.  Again, however, at the December 3, 2012, the County Court Judge stated that there was still probable cause to believe Plaintiffs committed animal cruelty. *Id.* | | |
| 18.  Plaintiffs' horses were returned to them on April 11, 2012. | | |
| 19.  Undisputed Facts Nos. 10-21 from the Motion for Partial Summary Judgment Regarding Damages are specifically incorporated herein. | | |

Respectfully submitted this 15th day of December, 2014.

*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*

*/s/ Timothy P. Schimberg*

Timothy P. Schimberg

FOWLER, SCHIMBERG & FLANAGAN, P.C.
1640 Grant Street, Suite 150
Denver, Colorado 80203
(303) 298-8603

ATTORNEY FOR DEFENDANTS CINDY HARDEY, BOBBI PRIESTLY, MONTE GORE, AND FRED WEGENER

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of December, 2014, I caused a true and correct copy of the foregoing **SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS RE: DEFENDANTS WEGENER, GORE, PRIESTLY AND HARDEY'S MOTION FOR SUMMARY JUDGMENT RE: INDIVIDUAL CAPACITY CLAIMS** to be filed via the ECF system, with notice of same being electronically served to the following:

Brice A. Tondre, Esq.                        John M. Lebsack, Esq.
Brice A. Tondre, P.C.                         White and Steele, P.C.
215 S. Wadsworth Blvd., Ste. 500             600 17th Street, Ste. 600N
Lakewood, CO 80226-1566                      Denver, CO 80202
***Attorney for Plaintiffs***                    ***Attorney for Defendant Ashleigh Olds***


*(Original signature on file at the offices of Fowler, Schimberg & Flanagan, P.C.)*

*/s/ Kala Cyganiewicz*
_____

5

2 13-12





EXHIBIT

F

525

Appellate Case: 16-1001   Document: 01019641232   Date Filed: 06/20/2016   Page: 131



Appellate Case: 16-1065 Document: 01019641232 Date Filed: 06/20/2016 Page: 132



Appellate Case: 16-1065   Document: 01019641232   Date Filed: 07/20/2016   Page: 134

Appellate Case: 16-1065   Document: 01019641232   Date Filed: 06/20/2016   Page: 135



Appellate Case: 16-1065   Document: 01019041132   Date Filed: 06/20/2018   Page: 136





Appellate Case: 16-1048   Document: 01019641232   Date Filed: 06/20/2016   Page: 139

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02469-RM-MIW

RANDALL I. HATLEE and
RONALD L. SWIFT

Plaintiffs,

vs.

CINDY HARDEY,
BOBBIE PRIESTLY,
MONTE GORE
FRED WEGENER and
ASHLEIGH OLDS,

Defendants

_____

**DEFENDANT OLDS' SEPARATE REPLY STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

_____

Defendant Ashleigh Olds, DVM, DABVP-Equine ("Dr. Olds"), through her counsel John

Lebsack, submits this Separate Reply Statement of Undisputed Material Facts in Support of

Motion for Summary Judgment, pursuant to Practice Standards (Civil Cases), Section

IV(B)(2)(c).

Movant's Reply Supporting Statement:

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 1.   Ashleigh Olds, DVM, DABVP-Equine ("Dr. Olds") is a licensed veterinarian. <br> #22, ¶ 7 <br> **Ex A**, Deposition of Ashleigh Olds, at 4:7-10 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 2.  Dr. Olds is board certified by the American Board of Veterinary Practitioners in equine medicine and surgery.  **Ex A**, at 5:20-6:12 | | |
| 3.  Dr. Olds is the owner of the Aspen Creek Veterinary Hospital.  Approximately 95% of her practice focuses on horses.  **Ex A**, at 7:8-24 | | |
| 4.  Dr. Olds has no formal involvement with any animal rights organizations.  **Ex A**, at 23:5-19 | Denied, she was the veterinarian for Barbara Wright and Harmony Horse Works who arranged for her to accompany Deputy Smith to seize Bear. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).  **Ex A**, at 23:5-19 [#62-1, p. 7] states:  (1) Dr. Olds has no involvement with animal rights organizations, and (2) Harmony Horse Works is a horse sanctuary, not an animal rights organization.  The request for Dr. Olds to go to Echo Valley Ranch came from Routt County and Harmony Horse Works; Dr. Olds is not sure who called first because the contact went through her front office.  **Ex A** 87:7-15 [#62-1, p. 18].  Dr. Olds was accompanied to Echo Valley Ranch by people from the Park County Sheriff's Office, not by Deputy Smith of Routt County.  Facts 10, 19, 26-29 below. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 5. Defendants Hardey, Gore, Priestly and Wegener worked for the Park County Sheriff's Office.<br><br>**Ex B**, Deposition of Cindy Hardey, at 4:20-5:5;  6:5-11<br><br>**Ex C**, Deposition of Bobbi Priestly, at 4:7-17;  7:6-8:8;  48:18-24<br><br>**Ex D**, Deposition of Monte Gore, at 4:7-20<br><br>**Ex E**, Deposition of Fred Wegener, at 4:7-13 | | |
| 6. Dr. Olds is not and never was an employee or agent of Park County.<br><br>**Ex F**, Affidavit of Ashleigh Olds, at ¶ 3 | | |
| 7. Dr. Olds' involvement in this matter began on February 15, 2012 when she was asked if her clinic would be willing to care for a horse named Bear that Routt County was impounding.<br><br>**Ex A**, at 87:7-91:7;  95:10-19<br><br>**Ex F**, at ¶ 4 | She was asked by Barbara Wright. | The response does not deny the stated fact.  Plaintiffs do not give a pinpoint citation for their additional statement, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The request for Dr. Olds to go to Echo Valley Ranch came from Routt County and Harmony Horse Works; Dr. Olds is not sure who called first because the contact went through her front office.  **Ex A** 87:7-15 [#62-1, p. 18] |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 8.  Plaintiff Swift lives on property known as Echo Valley Ranch, located in Park County.<br><br>**Ex G**, Deposition of Ronald Swift, at 6:3-15;  10:10-11:10 | | |
| 9.  Plaintiff Hatlee works with Swift at Echo Valley Ranch.<br><br>**Ex H**, Deposition of Randall Hatlee, at 18:20-19:13 | | |
| 10. Dr. Olds' lone visit to Echo Valley Ranch in connection with this matter occurred on February 16, 2012.<br><br>**Ex F**, at ¶ 5 | | |

4

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 11. As of February 16, 2012, Plaintiffs Hatlee and Swift owned several horses that they were caring for at Echo Valley Ranch. Plaintiffs' horses included six overly-skinny horses named Lena, Chance, Echo, Fiona, River and Midnight (hereinafter referred to as "The Six Horses"). **Ex G**, at 256:5-257:3; 258:21-259:18 **Ex H**, at 279:18-280:8; 282:11-12; 443:12-13 **Ex I**, Park County Sheriff's Office file, at pp. 68-69 (document authenticated at **Ex B**, at 93:10-97:12; **Ex C**, at 119:3-120:25) | There were approximately 40 horses on the ranch. Other than The Six Horses they were in good condition. Exhibits 1 and 2. | The response does not deny stated fact. Plaintiffs do not give a pinpoint citation for their additional statement, contrary to Practice Standard IV(B)(2)((b)(ii). Nothing in Exhibits 1 or 2 says there were approximately 40 horses on the ranch. Nothing in the exhibits says that other than the Six Horses the rest were in good condition. To the contrary, Exhibit 1 [#68-1, p. 2] states that Bear was "unable to get up off the ground"; Maggie "was skinny, had wounds all over her body from being stuck on the ground." Exhibit 2 states that Maggie "was down an unable to rise" [#68-1, p. 7]; "Maggie was suffering and needed to be euthanized" [#68-1, p. 9] |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 12. Horses owned by others were also present under Plaintiffs' care at Echo Valley Ranch on February 16, 2012, including a overly-skinny and down mare named Maggie and an overly-skinny and down horse named Bear (a/k/a Little Big Man, n/k/a Spencer).[1]<br><br>**Ex H**, at 157:6-11<br><br>**Ex I**, at p. 66-68 | | |
| 13. Maggie, Bear, and The Six Horses were skinny and too thin on February 16, 2012.<br><br>**Ex A**, at 78:9-12;  82:4-5<br><br>**Ex B**, at 31:24-33:5;  119:13-20; 113:16-115:3<br><br>**Ex F**, at ¶ 6<br><br>**Ex G**, at 191:7-22; 193:2-21; 227:18-228:22;  255:18-261:3; 402:2-14<br><br>**Ex H**, at 259:7-16;  280:6-8; 282:9-12;  312:3-313:11; 353:7-354:5;  355:18-360:18; 380:9-20;  443:6-15; 571:19-572:22<br><br>**Ex I**, at pp 67-70<br><br>**Ex J**, deposition of Troy Murdock, at 14:1-19 | | |
| 14. **Ex K** , photos of Maggie taken on February 16, 2012 (photos authenticated at **Ex F**, at ¶ 7;  **Ex H**, at 188:9-15; **Ex I**, at pp. 67, 84-85) | | |

---

[1] "Bear" has been known by several different names, including "Little Big Man" and "Spencer." For simplicity, the horse is referred to herein as "Bear."

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 15. **Ex L**, photos of Bear taken on February 16, 2012 (photos authenticated at **Ex F**, at ¶ 8) | | |
| 16. **Ex M**, photos of The Six Horses taken at Echo Valley Ranch on February 16, 2012 (photos authenticated at **Ex B**, at 32:9-17; **Ex H**, at p. 257:6-16; 277:3-6; 298:3-7; 310:10-14; 359:21-24; 382:23-25; **Ex F**, at ¶ 9; **Ex I**, at pp. 67, 84-85) | | |
| 17. Bear (and his mother, Little Feather) were the subject of an animal abuse case pending in Routt County against Plaintiff Hatlee's ex-wife.<br><br>**Ex H**, at 207:6-18<br>**Ex I**, at p. 66 | | |
| 18. Bear and Little Feather were cared for by Plaintiffs at Echo Valley Ranch.<br><br>**Ex H**, at 208:17-209:12 | | |
| 19. On February 13, 2012, Deputies DelValle and Smith of the Routt County Sheriff's Office went to Echo Valley Ranch to do a welfare check on Bear and Little Feather.<br><br>**Ex H**, at 414:13-25<br>**Ex I**, at p 66 | | |
| 20. Upon arrival, Deputies DelValle and Smith learned that Little Feather was dead, and they observed Bear in "deplorable" condition.<br><br>**Ex I**, at p 66 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 21. The horse named "Little Feather" had died in January of 2012<br><br>**Ex H**, at p. 213:5-21 | | |
| 22. Deputies DelValle and Smith also observed The Six Horses on the property in similar condition.<br><br>**Ex I**, at p 66 | | |
| 23. As a result of Deputies DelValle and Smith's February 13, 2012 visit, Routt County (i) ordered the seizure of Bear; and (ii) reported The Six Horses to the Park County Sheriff's Office.<br><br>**Ex A**, at p. 95:10-19<br>**Ex I**, at p 66-67 | | |
| 24. On February 15, 2012, Dr. Olds was called and asked if she would accept and care for a horse being seized by Routt County.  The horse was Bear.<br><br>**Ex A**, at 87:7-91:7 | | |
| 25. Later on February 15 or February 16, 2012, Dr. Olds was asked if she would bring her trailer, accompany the Park County officers that were seizing the horse on Routt County's behalf, and then transport the horse from the scene to her hospital.<br><br>**Ex A**, at 87:7-91:7 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 26. Dr. Olds agreed to transport and then care for the horse, and on February 16, 2012, she met with Park County Officials at the Bailey Substation accompanied by her vet assistant Troy Murdock.  It wasn't until then that Dr. Olds learned that Bear was being seized from Echo Valley Ranch.<br><br>**Ex A**, at 54:6-10;  87:7-91:7 | | |
| 27. Deputies Plutt and Hanning of the Park County Sheriff's Office went to Echo Valley Ranch on February 16, 2012 to serve the Routt County seizure warrant.<br><br>**Ex B**, at 28:23-29:18<br>**Ex I**, at p. 67 | | |
| 28. Dr. Olds and her vet assistant Troy Murdock went to Echo Valley Ranch on February 16, 2012 to take possession of Bear after his seizure.<br><br>**Ex A**, at 89:24-91:22<br>**Ex B**, at 28:23-29:18<br>**Ex J**, at 8:10-9:11;  10:7-16 | | |
| 29. Park County Animal Control Officer Cindy Hardey went to Echo Valley Ranch on February 16, 2012 to perform a welfare check on The Six Horses that had been reported a few days earlier by Routt County Officer Smith.<br><br>**Ex B**, at 28:6-29:8<br>**Ex I**, at p. 66-67 | | |

9

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 30. When Dr. Olds and the others arrived at Echo Valley Ranch, they found Bear down in his stall in the barn, extremely thin, covered in urine/manure and unable to stand on his own.<br><br>**Ex B**, at 112:20-114:6<br>**Ex I**, at p. 67<br>**Ex J**, at 10:21-11:4<br>**Ex N**, February 16, 2012 e-mail from Dr. Olds to Cindy Hardey, at p . 000934 (document authenticated at **Ex B**, at 106:5-20;  **Ex F**, at ¶ 10) | | |
| 31. On February 16, 2012, Bear appeared emaciated to Officer Hardey, who believed that his small size was likely as a result of malnutrition.<br><br>**Ex B**, at 114:22-115:2; 115:24-116:6 | | |
| 32. Hatlee and Swift concede that Bear was too thin and had difficulty getting up on his own.<br><br>**Ex G**, at 166:2-10;  170:3-15; 171:5-7;  172:2;  174:15-18; 191:7-22;  402:2-14<br>**Ex H**, at 242:19-243:5; 282:11-12;  424:16-25 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 33. Dr. Olds and Officer Hardey next saw an emaciated, down, and sore-covered mare named "Maggie." The mare was covered in severe pressure sores on her face, shoulders and hips and could not even get into a sitting position.<br><br>**Ex A**, at 83:21-84:3<br>**Ex B**, at 30:10-31:17;  32:10-33:5;  116:7-118:8<br>**Ex I**, at p. 67-68<br>**Ex N**, at p. 000934-000935 | | |
| 34. As of February 16, 2012, Maggie had been unable to stand on her own (without the aid of a sling) for approximately five days.<br><br>**Ex B**, at 116:7-117:4<br>**Ex G**, at 241:21-245:13<br>**Ex H**, at 162:1-12<br>**Ex N**, at p. 000934<br>**Ex O**, deposition of Dr. Allyson Horton, at 274:22-275:11<br>**Ex R**, February 16, 2012 e-mail from Dr. Horton to Officer Hardey (document authenticated at **Ex O** at 248:22-249:15) | | |
| 35. Maggie died the next day – February 17, 2012.<br><br>**Ex A**, at 99:4-10<br>**Ex I**, at p. 73<br>**Ex O**, at 276:8-25 | | |

11

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 36. Officer Hardey and Dr. Olds saw The Six Horses at Echo Valley Ranch on February 16, 2012.  The horses were extremely thin.  All six lacked food in their pens, and their water tanks were frozen.<br><br>**Ex A**, at 110:6-10<br>**Ex B**, at 30:10-31:17;  32:10-33:5;  119:13-20;  121:6-122:22<br>**Ex I**, at p. 68-69<br>**Ex J**, at 14:1-19<br>**Ex N**, at p. 000935 | Denied. Deputy Hardey reported that they had hay and water available. Exhibits 1, 2 and 299 p.130. [sic] | The denial applies only to the third sentence of the stated facts (food and water).  The first two sentences are not denied (the Six Horses were extremely thin when Olds and Hardey saw them at Echo Valley on February 16).<br><br>Plaintiffs do not give a pinpoint citation to Exhibits 1 and 2, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>There is no Exhibit "299." If that is a typo that should say "29," Exhibit 29 has no such page 130 [#68-7, pp. 1-9]. |
| 37. Mr. Swift and Mr. Hatlee had brought Bear, Maggie and The Six Horses in from the pasture during the winter of 2011-2012 because they were thin and showing signs of weight loss.<br>**Ex H**, at 571:19-572:22 | | |
| 38. Mr. Swift gave Officer Hardey permission to view The Six Horses during her visit to Echo Valley Ranch on February 12, 2012.<br>**Ex G**, at 190:10–191:22;  192:15 – 23 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 39. Mr. Hatlee did not limit Dr. Olds' movement at the Ranch on February 16, 2012.<br><br>**Ex H**, at 476:19–477:9 | | |
| 40. Mr. Hatlee and Mr. Swift were with Dr. Olds and Officer Hardey when they went to look at The Six Horses on February 16, 2012.<br><br>**Ex H**, at 603:20–604:8 | | |
| 41. Mr. Hatlee and Mr. Swift both admit that The Six Horses were too thin on February 16, 2012.<br><br>**Ex G**, at 191:7-22; 192:2-21; 255:18-261:3<br><br>**Ex H**, at 282:11-12; 571:19-572:22 | | |
| 42. Mr. Hatlee and Mr. Swift admit that there was no food and frozen water tanks in The Six Horses' pens when Dr. Olds and the people from the Park County Sheriff's Office arrived on the morning of February 16, 2012.<br><br>**Ex G**, at 422:22-424:7<br><br>**Ex H**, at 435:20-436:4; 581:24-583:1 | They were in the process of feeding when the animal control contingent arrived and while there Plaintiffs continued feeding.  Exhibit 1 | The response does not deny the stated fact.<br><br>Plaintiffs do not give a pinpoint citation to multi-page exhibit, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>Nothing in Exhibit 1 [#68-1, pp. 2-5] says that Plaintiffs were in the process of feeding when Defendants arrived. |

13

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 43. On February 16, 2012, Mr. Swift told Dr. Olds that several other horses at Echo Valley Ranch had already died.<br>**Ex A**, at 78:9-25<br>**Ex N**, at p. 000935 | | |
| 44. Based on her observations at Echo Valley Ranch on February 16, 2012, Dr. Olds suspected that Bear, Maggie and The Six Horses were victims of starvation and malnutrition.<br>**Ex F**, at ¶ 11<br>**Ex N**, at p. 00934-00935 | Her suspicion was unreasonable and below the standard of care.  Exhibit 26. | The response does not deny the stated fact.<br><br>Plaintiffs do not give a pinpoint citation to a location in the 12 page document [#68-6, pp. 2-13], contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The Park County Judge found there was probable cause to believe the animals suffered from animal cruelty.  [#66-2, at 65:22-24; #66-3, at 173:23-174:7] |
| 45. On February 16, 2012, Dr. Olds believed that Maggie appeared to be in imminent danger of death.<br>**Ex A**, at 83:8-20 | Her belief was unreasonable and below the standard of care.  Exhibits 5, 26 and 34. | The response does not deny the stated fact. Plaintiffs admit Maggie died the next day, February 17. *See* Fact 35 above.<br><br>Plaintiffs do not give a pinpoint citation to multi-page exhibits [#68-1, pp. 20-21, #68-6,  pp. 2-13, #68-9, pp. 2-3], contrary to Practice Standard IV(B)(2)((b)(ii). |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 46. On February 16, 2012, Officer Hardey asked Dr. Olds about her general assessment of the thin horses they saw at Echo Valley Ranch.<br><br>**Ex A**, at 45:16–46:10 | Denied. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii). |
| 47. Dr. Olds reported her suspicions to Officer Hardey at the scene and discussed with her the potential seizure of the horses.<br><br>**Ex A**, at 70:12-20<br>**Ex B**, at 32:21-33:5<br>**Ex I**, at p. 69 | No reasonable basis. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not denied Fact 47. |
| 48. Dr. Olds expressed concern about the horses to Officer Hardey while at Echo Valley Ranch on February 16, 2012.<br><br>**Ex A**, at 70:12-20<br>**Ex B**, at 32:21-25;  104:5-105:1 | No reasonable basis. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not denied Fact 48. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 49. While at Echo Valley Ranch on February 16, 2012, Dr. Olds told Officer Hardey that she believed that the horses had been neglected.<br><br>**Ex B**, at 104:17–105:13 | No reasonable basis. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not denied Fact 49.<br><br>The Park County Judge found there was probable cause to believe the animals suffered from animal cruelty.  [#66-2, at 65:22-24; #66-3, at 173:23-174:7] |
| 50. Officer Hardey believed that Maggie and the six other horses were in an unacceptable condition as of February 16, 2012.<br><br>**Ex B**, at 124:23–125:11 | They were not endangered. Exhibit 29, p.41. | The response does not deny the stated fact.  The fact relates to the "unacceptable condition" of the horses. Plaintiffs admit the horses were skinny and too thin. Facts 13, 13, 41 above. |
| 51. Dr. Olds did not suggest to Officer Hardey that the horses (except for Bear) be moved to her clinic.<br><br>**Ex B**, at 36:3-12 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 52. Officer Hardey decided not to seize The Six Horses on February 16, 2012.  Instead, Officer Hardey issued Plaintiffs a Notice of Warning.<br><br>**Ex B**, at p. 31:11-17;  35:19-37:1; 40:9-13;  124:2-4<br><br>**Ex C**, at 49:25-50:4<br><br>**Ex I**, at p. 69-70<br><br>**Ex P**, Notice of Warning (document authenticated at **Ex B**, at 40:4-19;  **Ex H**, at 444:23-445:5) | | |
| 53. The Notice of Warning issued on February 16, 2012 states "you will have a month from today to gain HEALTHY weight on the 6 horses. . . . If you fail to rectify the Condition of the Animals in question you may be charged."<br><br>**Ex I**, at p. 70<br><br>**Ex P** | | |

17

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 54. While at Echo Valley Ranch on February 16, 2012, Officer Hardey was under the impression that all of the horses she had looked at were under the care of Dr. Horton/Timberline Vets. This understanding played a role in Officer Hardey's decision to issue the Notice of Warning rather than seize the horses.<br><br>**Ex B**, at 100:13–101:6;  103:15-24 | They could be impounded only if endangered.  Deputy Hardey did not consider them to be endangered. | The response does not deny the stated fact.  The fact relates to Officer Hardey's impression about vet care, not about endangerment.<br><br>Plaintiffs' Exhibit 34 confirms this fact.  Timberline wrote:  "The [six] horses were not examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody."  Exhibit 34 [#68-9, p.2].<br><br>Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i).  Dr. Olds disputes Plaintiffs' argument, but Plaintiffs do not deny Fact 54. |
| 55. While Officer Hardey was at the Echo Valley Ranch on February 16, 2012, Officer Priestly spoke to Mr. Swift by phone.  Mr. Swift indicated to Officer Priestly that The Six Horses and Maggie were under veterinary care.<br><br>**Ex C**, at 45:10-23 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 56. Mr. Hatlee told Officer Hardey that "we had talked with our vets and we were taking the steps that we were advised by our vets" in regards to all of the sick horses.<br><br>**Ex H**, at 443:6-444:7 | | |
| 57. Dr. Olds and her assistant loaded Bear into the trailer and left Echo Valley Ranch.<br><br>**Ex B**, at 31:11-12<br>**Ex F**, at ¶ 12 | | |
| 58. When Dr. Olds left Echo Valley Ranch on February 16, 2012, she knew that Park County did not plan to seize The Six Horses that day.<br><br>**Ex A**, at 69:24-70:11 | | |
| 59. Dr. Olds was present at Echo Valley Ranch for approximately 30-45 minutes.<br><br>**Ex B**, at 30:1-9 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
| --- | --- | --- |
| 60. When Bear arrived at Aspen Creek Veterinary Clinic on February 16, 2012, he could not stand and needed to be lifted out of the trailer.<br><br>**Ex Q**, deposition of Dr. Amy Murdock, at 4:7-13;  5:8-22; 15:2-16;  20:25-21:5; 22:13-24:23;  28:8-29:2 | He could stand before his fall during transport. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response does not deny the stated fact regarding Bear's condition upon arrival at the Clinic.<br><br>Further, whether Bear could stand on his own before transport is disputed.  It is undisputed that Bear was down and unable to stand on his own when Dr. Olds first observed him at Echo Valley Ranch on February 16, 2012.  *See* Facts 12, 30, 32.<br><br>Hardey wrote that on February 16, 2012, she found Bear in the barn at Echo Valley Ranch "lying in the horse stall and was unable to get up off the ground.  A male party that worked at the ranch was in the horse stall with the colt trying to get the colt to stand on his feet.  The male party identified himself as … Randall Hatlee."  Ex. 1 [#68-1, at p. 2].<br><br>Mr. Hatlee testified that Bear was down when they walked into the barn.  *See* Fact 32; **Ex H**, at 424:12-25. [#62-8, p. 35] |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 61. Once Aspen Creek Veterinary Clinic fed Bear and give him IV fluids he was able to stand up and never went back down again.<br>**Ex Q**, at 4:7-13;  5:8-22;  15:2-16;  20:25-21:5;  22:13-24:23; 28:8-29:2 | | |
| 62. Based on her observations of Bear, Dr. Murdock agreed with the determination that Bear was malnourished and starved.<br>**Ex Q**, at 44:7–45:9 | | *Plaintiff's Statement [#73-3] omits Fact 62 from the sequence.  The omission throws off the numbering in the Plaintiffs' statement from here to the end.  All of plaintiffs' responses below are moved next to the correct numbers, e.g., Plaintiffs' #62 is moved down one cell to be next to #63, and likewise for all that follow.* |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 63. After being moved to Dr. Olds' hospital, Bear displayed a voracious appetite and quickly recovered, putting on weight and otherwise responding favorably to treatment that largely consisted of basic feed and water.<br><br>**Ex F**, at ¶ 19 | Malnourished is different than being starved. Determination of why they were malnourished was going to take time as advocated by Dr. Olds clinic in Exhibit 12.  Dr. Olds was opposed to taking the time necessary to the making of a reasonable diagnosis.  Drs. Burton and Horton were in the process of a diagnostic analysis when the horses were seized.  Exhibit 17.  When the horses were ordered returned Dr. Olds attacked the competence of the district attorney.  Exhibit 19.  Dr. Olds [sic] persistent pressure to prosecute without scientific basis was unprofessional, unreasonable and malpractice.  Exhibit 26.  HHer [sic] conduct was a violation of the Fourth and Fourteenth Amendments and the reporting statute. | The response does not deny the stated fact, which pertains to Bear's appetite and recovery after he was moved to Dr. Olds' hospital.<br><br>Plaintiffs do not give pinpoint citations, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i).  Dr. Olds disputes Plaintiffs' argument, but Plaintiffs do not dispute Fact #63.<br><br>Nothing in the cited exhibits says that Dr. Olds was opposed to taking more time; nothing says that Dr. Olds exerted any pressure to prosecute without a scientific basis.<br><br>Exhibit 12 [#68-3, p. 4] discusses anemia, not malnutrition.  It was not written by Dr. Olds. |
| 64. Officer Hardey did not speak to Dr. Olds on February 16, 2012 after Dr. Olds left Echo Valley Ranch.<br><br>**Ex B**, at 81:1-11 | | |

22

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 65. On the afternoon of February 16, 2012, Dr. Olds wrote a report memorializing her observations and emailed it to Officer Hardey.<br><br>**Ex A**, at 69:10-23;  81:3-6<br><br>**Ex B**, at 112:6-11<br><br>**Ex F**, at ¶ 10<br><br>**Ex N** | | |
| 66. In the several days that followed, the Park County Sheriff's Department was inundated with telephone calls about the horses from people who were upset over the situation, and as a result Undersheriff Goes became concerned over talk about an attempt to rescue the horses at Echo Valley Ranch.  As a result, he suggested moving the horses to an undisclosed location to try to diffuse the situation.<br><br>**Ex D**, at 9:16-11:14 | | |
| 67. On February 19, 2012, Plaintiffs agreed to move The Six Horses to another location, and Plaintiffs signed a written agreement in this regard.<br><br>**Ex B**, at 43:10-16<br><br>**Ex G**, at 286:22-287:12;  289:8-17;  295:12-296:16<br><br>**Ex H**, at 452:4-454:13<br><br>**Ex S**, February 19, 2012 agreement (document authenticated at **Ex B**, at 43:10-16) | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 68. When the six horses were moved on February 19, 2012, the horses were loaded and transported by Mr. Swift and Mr. Hatlee.<br>**Ex B**, at 49:24–50:10 | | |
| 69. Dr. Olds played no role in the decision to move the horses on February 19, 2012.<br>**Ex A**, at 96:14-21;  100:13-20<br>**Ex B**, at 43:10-45:22<br>**Ex G**, at 299:16-300:12 | Denied. It was her unsupported diagnosis off [sic] starvation which provoked the e-mail blitz and the public outcry. | Plaintiffs do not cite evidence supporting the denial, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not disputed the testimony cited in support of Fact 69. |
| 70. Officer Hardey of the Park County Sheriff's Office continued her investigation even after the horses were moved on February 19, 2012.<br>**Ex I**, at p. 74-75 | | |
| 71. On February 22, 2012, Officer Hardey spoke by telephone to Plaintiffs' veterinarian, Dr. Horton of Timberline Equine Veterinarian Services.<br>**Ex B**, at p. 106:21-107:5<br>**Ex I**, at p. 74, 94-96 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 72. Dr. Horton and Dr. Burton of Timberline Equine Veterinarian Services had provided veterinarian services to Hatlee and Swift at various points in time.<br><br>**Ex O**, at 36:2-39:25;  74:22-75:19;  192:2-10;  194:4-6<br><br>**Ex T**, deposition of Dr. Burton, at 12:14-13:3;   111:20-24 | | |
| 73. After Maggie was found down in the pasture, Timberline came to Echo Valley Ranch to provide veterinary services on two occasions before Maggie's death on February 17, 2012.  Those were on Febuary 11 and 13, 2012.<br><br>**Ex O**, at 248:22-249:19;  276:20-277:3 | | |
| 74. The last time Timberline had previously seen or treated any of The Six Horses was:<br><br>Fiona – Never<br><br>Lena – Never<br><br>Echo – August 2010<br><br>Midnight – September 2010<br><br>River – October 2010<br><br>Chance – October 2010.<br><br>**Ex O**, at 36:2-39:25<br>**Ex T**, at 112:6-22 | | |

25

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 75. Timberline had no veterinarian-client-patient relationship with The Six Horses as of February 16, 2012.<br><br>**Ex O**, at 77:21-79:2 | Denied, there had been telephone contact.  Prior to the seizure, Drs. Burtonn [sic] had instituted a diagnostic plan which was thwarted by the seizure.  Exhibit 17.  The six horses were under their care at the time of seizure. | Exhibit 17 [#68-4, p. 4] says nothing about telephone contact on or before February 16, 2012.  Exhibit 17 does not pertain to Timberline's relationship with the horses on February 16, 2012, which is the date of Fact 75.  Exhibit 17 talks about Timberline's examination of the horses *four days later*.<br><br>Plaintiffs' Exhibit 34 contradicts their denial of Fact 75.  In that exhibit, Timberline denied caring for the Six Horses until after the seizure:  "The [six] horses were not examined (or even seen in passing) by Timberline Equine until after they had been placed in protective custody."  Exhibit 34 [#68-9, p.2]<br><br>In the cited portion of **Ex O**, p. 77:21-79:2 [#62-17, pp. 14-16], Dr. Horton testified she did not have a veterinarian-client-patient relationship with the Six Horses as of February 16, 2012, because she had not seen them for over 12 months. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 76. Dr. Horton physically examined The Six Horses on February 20, 2012, after they were moved from Echo Valley Ranch.<br>**Ex O**, at 40:15-44:6; 101:20-102:7;  149:7-151:23 | | |
| 77. On February 20, 2012, Dr. Horton found The Six Horses to be extremely thin.<br>**Ex O**, at 40:15-44:6; 101:20-102:7;  149:7-151:23 | | |
| 78. During her February 20, 2012 examination, Dr. Horton found The Six Horses to be grossly anemic.  Lab tests later confirmed this.<br>**Ex O**, at 102:9-104:15;  106:4–107:6 | Dr. Olds did not follow the protocol of her clinic regarding analysis of anemia in horses.  Exhibit 12. | Plaintiffs do not dispute the stated fact, which refers to Dr. Horton.  The response refers instead to Dr. Olds.<br><br>Not only did Dr. Horton testify that she found anemia in the Six Horses, she said that prolonged malnutrition will result in anemia.  **Ex O**  at 107: 3-6 [#62-17, p. 25]; **Ex W**, deposition of Dr. Horton, at 116:4-6; 117:9-12<br><br>Dr. Burton of Timberline said anemia is consistent with malnutrition; that malnourishment can cause anemia.  **Ex X**, deposition of Dr. Burton, at 36:17-25; 42:3-5; 94:1-4<br><br>Exhibit 12 [#68-3, p. 4] was not written by Dr. Olds and does not refer to the horses involved in this case. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 79. On February 22, 2012, Officer Hardey called Dr. Horton as part of her ongoing investigation.  The call was recorded and later transcribed.<br><br>**Ex B**, at 106:21-107:4<br><br>**Ex I**, at p. 74, 94-96<br><br>**Ex O**, at 160:21-24 | | |
| 80. During the February 22, 2012 phone call, Dr. Horton told Officer Hardey that Plaintiffs should have sought assistance for The Six Horses sooner.<br><br>**Ex B**, at 106:21-107:14<br><br>**Ex I**, at p. 74, 94-96 | | |
| 81. As shown by the transcript of the February 22, 2012 phone call, Dr. Horton told Officer Hardey that "Regardless of why the horses were thin, someone should have noticed and at least called and started the investigating earlier. . . . Those horses were let go far too long."<br><br>**Ex I**, at p. 95-96 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 82. Dr. Horton testified that "these horses would have benefitted from intensive attempts to correct their weight loss sooner, either through medical attention or extra feed or at least investigation."  Dr. Horton further testified that "I believe that the horses had deteriorated past a point where assistance should have been sought."  Dr. Horton further testified that "I believe these horses would have benefitted from veterinary intervention much sooner."  Dr. Horton further testified that "The bottom line truth is that these horses were let go far too long."  Dr. Horton further testified that "My professional opinion is that regardless of [what caused] those horses to be thin, someone should have noticed and sought assistance for them."<br><br>**Ex O**, at 85:3-20;  112:21-113:11; 162:1-13 | | |
| 83. Dr. Horton opines that the six horses were too thin, which is a sign of starvation.<br><br>**Ex O**, at 86:16–87:5 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 84. Dr. Horton has not ruled out starvation as a cause for the skinny condition of the horses.<br><br>**Ex O**, at 109:19-23 | But, unlike Dr. Olds was following a scientific approach to diagnosis. | The response does not address the stated fact and does not cite to supporting evidence, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). Dr. Olds disputes Plaintiffs' argument, but Plaintiffs have not disputed the testimony cited in support of Fact 84. |
| 85. After speaking with Dr. Horton on February 22, 2012, Officer Hardey decided to charge Plaintiffs with animal cruelty and seize The Six Horses.<br><br>**Ex B**, at 107:6-108:21<br>**Ex I**, at p. 74 ("At that point I made the decision. . . ") | By February 21, 2012, Wegener, Gore, Priestly and Olds were planning for a seizure. Exhibit 13. | The response does not deny the stated fact, which pertains to Officer Hardey's February 22 decision *to charge*. The stated fact does not pertain to *seizure*; it also does not pertain to anyone other than Officer Hardey. Plaintiffs admit that Dr. Olds played no role in the seizure. Facts 91, 92, 94.<br><br>Plaintiffs do not give a pinpoint citation, contrary to Practice Standard IV(B)(2)((b)(ii). |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 86. Officer Hardey's decision to charge Plaintiffs and seize the horses was based on all of her investigation, including the opinion provided by Dr. Horton that the horses were let go far too long.<br><br>**Ex B**, at 107:6-108:21; 123:19-124:4<br>**Ex C**, at 121:5-122:5<br>**Ex I**, at p. 74 | Deputy Hardey knew that Dr. Horton was working on a diagnosis and was not in a hurry to reach a conclusion on this complex case. Exhibits 5, 10 and 17. | The response does not address the stated fact.<br><br>Plaintiffs do not give a pinpoint citation, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>Exhibit 5 [#68-1, pp 20-21] relates only to treatment of Maggie.  Exhibit 5 does not mention The Six Horses.<br><br>Exhibit 10 [#67-2, pp. 10-12] is notes by Sergeant Priestly, not Officer Hardey. The exhibit does not discuss the decision to seize the horses, but it confirms that Dr. Horton believed the owners had not properly cared for the horses. Sergeant Priestly wrote that Dr. Horton "said that Swift is going through some very difficult personal circumstances and he was very overwhelmed.  Dr Horton stated that with these issues it is still not an excuse to notice horses with body condition scores this low."  Exhibit 10 [#68-2, p. 12].<br><br>The basis for the decision to seize the horses is explained in Officer Hardey's report. The report shows it was Dr. Horton's comment about the owners waiting too long that prompted the decision by Officer Hardey to seize the horses and file charges ("At that point [after Dr. Horton's comment] I made |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 87. Officer Hardey obtained a warrant to seize The Six Horses on February 22, 2012.<br><br>**Ex U**, search warrant (document authenticated at **Ex B**, at 56:11-23) | | |
| 88. On or about February 23, 2012, Officer Hardey served Mr. Swift with a summons and complaint charging him with three counts each of misdemeanor animal cruelty. On February 24, 2012, she served a similar summons and complaint on Mr. Hatlee.<br><br>**Ex B**, at 108:25-109:7<br><br>**Ex V**, Two Summonses and Complaints | | |
| 89. The charges issued by Officer Hardey on or about February 22, 2012 only concerned The Six Horses, and not Bear.<br><br>**Ex B**, at 108:12-110:6<br><br>**Ex V** | | |
| 90. Several months later, the charges were amended by the Park County District Attorney's Office to include a charge of animal cruelty for Plaintiffs' alleged cruelty to Bear prior to Routt County's February 16, 2012 seizure.<br><br>**Ex B**, 109:16-110:6 | | |
| 91. The Six Horses were seized by Park County on February 23, 2012<br><br>**Ex D**, at 21:14-17 | | |

32

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 92. Dr. Olds played no part in the drafting, reviewing or approval of the Park County Sheriff's seizure application and affidavit.<br><br>**Ex B**, at 66:17-67:19<br>**Ex F**, at ¶ 13 | | |
| 93. Dr. Olds played no part in the drafting, reviewing or approval of the summonses and complaints issued to the Plaintiffs.<br><br>**Ex F**, at ¶ 14 | | |
| 94. Dr. Olds played no role in the seizure of the horses on February 23, 2012.<br><br>**Ex B**, at 69:20-70:6<br>**Ex C**, at 90:13-20<br>**Ex F**, at ¶ 15<br>**Ex I**, at p. 75-76 | | |
| 95. The Six Horses were never taken to Dr. Olds' facility at any time.<br><br>**Ex F**, at ¶ 16 | | |
| 96. Dr. Olds played no role in the assessment or care of The Six Horses following their seizure.<br><br>**Ex A**, at 98:23-99:25<br>**Ex F**, at ¶ 17 | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response / Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
|---|---|---|
| 97. Dr. Olds in good faith suspected (and continues to suspect) that Bear and The Six Horses were starved and/or neglected by Plaintiffs.<br><br>**Ex F**, at ¶ 18 | Denied. See Exhibits 26 and 34. | Plaintiffs do not give a pinpoint citation to multi-page Exhibits 26 and 34, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br>The Park County Judge found there was probable cause to believe the animals suffered from animal cruelty.  [#66-2, at 65:22-24; #66-3, at 173:23-174:7] |
| 98. Other than on February 16, 2012, Mr. Hatlee has never spoken to Dr. Olds or heard anything she has said.<br><br>**Ex H**, at 619:15-620:1 | | |
| 99. After February 16, 2013, Mr. Hatlee never had any contact with anybody at Aspen Creek Veterinarian Hospital.<br><br>**Ex H**, at 624:24–625:2 | | |
| 100.     Mr. Hatlee has no information about who contacted the press after February 16, 2012.<br><br>**Ex H**, at 625: 14-17 | | |
| 101.     After Bear was nursed back to health, he was adopted by a third party.<br><br>**Ex A**, at 104:20-105:6 | The third party was Shelley Ferraro who was at the clinic when Bear arrived and relied on Dr. Olds [sic] diagnosis of starvation I [sic] making threats and advocating seizure and prosecution. | The response does not address the stated fact and does not cite to supporting evidence, contrary to Practice Standard IV(B)(2)((b)(ii).<br><br> The response is argument, contrary to Practice Standard IV(B)(2)((3)(i). |

DATED this 20th day of January, 2014.

s:/John Lebsack
John Lebsack
Adam Goldstein
WHITE AND STEELE, P.C.
600 17th Street, Suite 600N
Denver, Colorado  80202
(303) 296-2828
Fax No.:  (303) 296-3131
jlebsack@wsteele.com
agoldstein@wsteele.com


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of January, 2014, a true and correct copy of the foregoing was e-served via CM/ECF to the following:

Brice A. Tondre
215 South Wadsworth Blvd., #500
Lakewood, Colorado  80226
briceatondrepc@msn.com

Timothy P. Schimberg
Fowler Schimberg & Flanagan, P.C.
1640 Grant St., Ste. 300
Denver, CO  80203
t_schimberg@fsf-law.com

s/Becky Kongs
Becky Kongs
WHITE AND STEELE, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO  80202
Telephone:  (303) 296-2828
Fax:  (303) 296-3131
bkongs@wsteele.com

569

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 13-cv-02469-RM-MJW

RANDALL J. HATLEE and
RONALD L. SWIFT,

      Plaintiffs,

v.

CINDY HARDEY,
BOBBI PRIESTLY,
MONTE GORE,
FRED WEGENER, and
ASHLEIGH OLDS,

      Defendants.

---

**ORDER**

---

Plaintiffs were prosecuted under Colorado state animal cruelty statutes for the alleged

maltreatment of horses under their care, a jury found them not guilty, and Plaintiffs filed the

present action against the officers who were involved in the investigation resulting in their

prosecution and the veterinarian enlisted to assist those officers.   Before this Court are

veterinarian Ashleigh Olds' ("Dr. Olds") motions to dismiss (ECF No. 31) and for summary

judgment (ECF No. 61).   Also before the Court is Officers Cindy Hardey, Bobbi Priestly, Monte

Gore and Sheriff Fred Wegener's (the "Park County Defendants") motion for judgment on the

pleadings (ECF No. 63), Magistrate Judge Watanabe's recommendation thereon (ECF No. 90),

and three separate motions for summary judgment (ECF Nos. 64, 65, 66).   The Court also has

before it Plaintiffs' motion to supplement the record (ECF No. 95) and Plaintiffs' objection to

Magistrate Judge Watanabe's striking certain portions of the pre-trial order.   (ECF No. 107.)

## I.  LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569-70 (10th Cir. 1994).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).   Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial.   *See 1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.   *Anderson*, 477 U.S. at 248.   In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the non-moving party.   *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted). However, "[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if

2

the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant."
*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (quoting *Jenkins v. Wood*, 81 F.3d 988,
990 (10th Cir. 1996)).

If a movant properly supports a motion for summary judgment, the opposing party may not
rest on the allegations contained in her complaint, but must respond with specific facts showing a
genuine factual issue for trial.   Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007)
(holding that "[t]he mere existence of some alleged factual dispute between the parties will not
defeat an otherwise properly supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact") (citation omitted).

Only admissible evidence may be considered when ruling on a motion for summary
judgment.   *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation
omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment
motion); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).
Affidavits must be based on personal knowledge and must set forth facts that would be admissible
evidence at trial.   *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and
citation omitted).   "Conclusory and self-serving affidavits are not sufficient." *Id*.   The Court
will not consider statements of fact, or rebuttals thereto, which are not material or are not
supported by competent evidence.   Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3).   "[O]n a
motion for summary judgment, it is the responding party's burden to ensure that the factual dispute
is portrayed with particularity, without depending on the trial court to conduct its own search of the
record."   *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and

3

citation omitted).   The Court is "not obligated to comb the record in order to make [Plaintiff's]

arguments for [her]."   *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

Further, Local Rule 7.1(e) provides that "[e]very citation in a motion, response or reply shall

include the specific page or statutory subsection to which reference is made."   D.C. Colo. L. Civ.

R. 7.1(e).

### B.   Judgment on the Pleadings

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is governed by the

same standards as those employed on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).   *Atlantic

Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).   Rule 12(c),

as with Rule 12(b)(6), requires a complaint to be dismissed if it does not plead "enough facts to

state a claim to relief that is plausible on its face."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).   "A pleading that offers labels and conclusions or a formulaic recitation of the elements of

a cause of action will not do.   Nor does a complaint suffice if it tenders naked assertions devoid of

further factual enhancement."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation

marks and citation omitted).   As in a motion to dismiss, the Court is bound to "accept the

well-pleaded allegations of the complaint as true and construe them in the light most favorable to

the non-moving party."   *Realmonte v. Reeves*, 169 F.3d 1280, 1283 (10th Cir. 1999).   Likewise,

if inferences must be drawn, the Court must draw them in the non-movant's favor.   *Gee v.

Pacheco*, 627 F.3d 1178, 1183 (10th Cir. 2010).   However, "when legal conclusions are involved

in the complaint 'the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to [those] conclusions. . . .'" *Khalik*, 671 F.3d at 1190 (quoting *Iqbal*, 556

4

U.S. at 678).  "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable."  *Id*.

The Tenth Circuit Court of Appeals has held "that plausibility refers to the scope of the allegations in a complaint:   if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotation and citation omitted).   The Tenth Circuit has further noted "that the nature and specificity of the allegations required to state a plausible claim will vary based on context."  *Id*.  (Internal quotation and citation omitted.)   Thus, the Tenth Circuit "concluded the *Twombly/Iqbal* standard is 'a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the [Supreme C]ourt stated will not do.'"  *Id*. (citation omitted.)

### C.    Review of the Magistrate Judge's Recommendation

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of Civil Procedure 72(b)(3) requires that the district court judge "determine *de novo* any part of the magistrate judge's [recommendation] that has been properly objected to."   In conducting his review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."   Fed. R. Civ. P. 72(b)(3).   An objection to a recommendation is proper if it is filed timely in accordance with the

5

Federal Rules of Civil Procedure and specific enough to enable the "district judge to focus attention on those issues – factual and legal – that are at the heart of the parties' dispute." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Thomas v. Arn*, 474 U.S. 140, 147 (1985)).   In the absence of a timely and specific objection, "the district court may review a magistrate's report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citations omitted); *see also* Fed. R. Civ. P. 72 Advisory Committee's Note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts as recited below are based on adequate citations to the record which would be admissible at trial.   The facts are recited in a light most favorable to the non-moving parties.

Plaintiffs Swift and Hatlee work together on a property known as Echo Valley Ranch, where Swift also lives.   (ECF No. 62-7, Swift Dep. at 6:11-15, 10:10-11:10; ECF No. 62-8, Hatlee Dep. at 19:2-13.)   In addition to the horses that Plaintiffs themselves own and care for, Plaintiffs sought to provide care and boarding for other horses, to provide riding lessons and to train horses as part of their business.   (ECF No. 62-8, Hatlee Dep. at 18:20 -19:3.)   Swift is also part owner of the Bailey Feed Store and Hatlee does work as a hay broker.   (ECF No. 66-11, Swift Dep. at 49:11-50:25; ECF No. 62-8, Hatlee Dep. at 18:21-22.)   Two of the horses that were in Plaintiffs' care in February, 2012 were Little Feather and her colt, Bear, and these horses were the subject of an animal abuse case pending in Routt County against Hatlee's ex-wife.   (ECF No. 62-8, Hatlee Dep. at 157:9-11, 207:6-18; ECF No. 62-9, Park Cnty. Continuation Sheet at 3.)   In

connection with that pending case, on February 13, 2012, Routt County officer Dawn Smith went to Echo Valley Ranch to conduct a welfare check on those horses.   (*Id.*)

During Officer Smith's visit, accompanied by Officer Del Valle, she learned that Little Feather had died the previous month and observed Bear in "deplorable" condition.   (*Id.*) Officers Smith and Del Valle also observed six other horses in similarly rough condition.   (*Id.*) As a result of this visit, the Routt County officers ordered the seizure of Bear and reported the condition of the other six horses to Officer Priestly of the Park County Sheriff's Office.   (*Id.*; ECF No. 62-1, Olds Dep. at 95:10-19.)   The Routt County police officers coordinated to have Park County police officers seize Bear on their behalf.   (*Id.*)   On February 15, 2012, Dr. Olds' clinic, Aspen Creek Veterinary Hospital, was contacted by Routt County police officers requesting that she take Bear into her possession following his seizure.   (ECF No. 62-1, Olds Dep. at 87:7-91:7.)

The next day, Officer Priestly informed Officer Hardey of the situation at Echo Valley Ranch; Officer Hardey then performed a welfare check on all the horses at Echo Valley Ranch on February 16, 2012.   (ECF No. 62-2, Hardey Dep. at 28:6-19.)   Dr. Olds, and her vet assistant Troy Murdock, also accompanied the officers in order to aid in Bear's seizure on behalf of Routt County.   (ECF No. 62-1, Olds Dep. at 54:9-10; ECF No. 62-2, Hardey Dep. at 29:14-18.)   When Dr. Olds and the others arrived at Echo Valley Ranch, they found Bear extremely thin, covered in urine and manure and unable to rise or stand on his own.   (ECF No. 62-2, Hardey Dep. at 112:20-114:6; ECF No. 62-10, Murdock Dep. at 10:21-11:4.)   Dr. Olds and Officer Hardey also learned at that time that Bear's mother, Little Feather, had died.   (ECF No. 62-9, Park Cnty. Continuation Sheet at 3.)   Dr. Olds and Officer Hardey also observed an emaciated, down, and

7

sore-covered mare named Maggie.   (ECF No. 62-1, Olds Dep. at 83:21-84:3; ECF No. 62-2,

Hardey Dep. at 30:10-31:10, 116:7-118:8; ECF No. 69-9, Park Cnty. Continuation Sheet at 4-5.)

The mare was covered in severe pressure sores on her face, shoulders and hips and could not rise

into a sitting position.   (*Id.*)   It was reported that Maggie perished the following day.   (ECF No.

62-9, Park Cnty. Continuation Sheet at 10.)   Dr. Olds and Officer Hardey also observed the six

other horses that had been initially reported by Officer Smith: Lena, Chance, Echo, Fiona, River,

and Midnight (the "Six Horses").   The Six Horses were observed by Dr. Olds and Officer Hardey

in dirty pens with empty food bins and empty or frozen-over water buckets, although Plaintiffs

contend that they were in the process of feeding these horses at the time of Dr. Olds' and Officer

Hardey's inspection.   (ECF No. 62-1, Olds Dep. at 110:6 – 10; ECF No. 62-2, Hardey Dep. at

32:9-33:5, 119:13-20, 121:6-122:22; ECF No. 62-9, Park Cnty. Continuation Sheet at 5-6.)   Swift

also stated to Dr. Olds that several other horses at the ranch had already died that winter.   (ECF

No. 62-1, Olds Dep. at 78:20-25.)

        While Officer Hardey was at Echo Valley Ranch on February 16, 2012, Officer Priestly

spoke to Swift by phone.   (ECF No. 62-3, Priestly Dep. at 45:10-23.)   Swift indicated to Officer

Priestly that the Six Horses and Maggie were under veterinary care.   (*Id.*)   In addition, Hatlee

told Officer Hardey that he and Swift were working with their regular veterinarians at Timberline

Equine Veterinarian Services ("Timberline Equine") and were taking the steps that they were

advised to take in regards to all of the sick horses.   (ECF No. 62-8, Hatlee Dep. at 444:1-4.)

Officer Hardey also spoke on the phone that day with Plaintiffs' regular veterinarian at Timberline

Equine, Dr. Horton.   (ECF No. 62-2, Hardey Dep. at 100:13-101:3, 103:1-25.)   Based on that

conversation, Officer Hardey believed that all of the sick horses that she had observed that day were then under the care of Timberline Equine.   (*Id.*)   However, it was later discovered that, as of February 16, 2012, several of the sick horses had not in fact been receiving veterinary treatment from Timberline Equine.   (ECF No. 62-9, Park Cnty. Continuation Sheet at 7.)

Based on her observations, Dr. Olds suspected that Bear, Maggie, and the Six Horses were victims of starvation and malnutrition.   (ECF No. 62-6, Olds Aff. at ¶ 18.)   She discussed her suspicions with Officer Hardey at the scene and suggested that these horses also be seized along with Bear.   (ECF No. 62-1, Olds Dep. at 45:16-46:10.)

Based on her observations while at Echo Valley Ranch, Officer Hardey made the decision to issue Plaintiffs a State Notice of Warning (the "Notice of Warning") as to all the horses that appeared to be underweight.   (ECF No. 62-9, Park Cnty. Continuation Sheet at 7; ECF No. 67-1, Feb. 16, 2012 Notice of Warning.)   The Notice of Warning stated that Plaintiffs would "have a month from today to gain HEALTHY weight on the 6 horses" and warned that "Animal Control will be doing routine visits every two days for the next two to three weeks to monitor 'Maggie' black Drum Mare, and all 6 horses in question."   (*Id.*)   The Notice of Warning further admonished that if Plaintiffs failed to rectify the condition of these horses that they would be charged.   (*Id.*)

Dr. Olds loaded Bear into a trailer and transported him to her clinic.   After returning to her clinic, Dr. Olds emailed a report to Officer Hardey memorializing her observations.   (ECF No. 62-1, Olds Dep. at 69:10-23; ECF No. 62-16, Feb. 16, 2012 Dr. Olds Email and Report.)   When Bear arrived at Aspen Creek Veterinary Clinic on February 16, 2012, he could not stand and

9

needed to be lifted out of the trailer.   (ECF No. 62-19, Murdock Dep. at 22:13-24:23.)   Bear was

fed and placed on an IV and responded quickly to this treatment that consisted largely of basic feed

and water.   (ECF No 62-6, Olds Aff. at ¶ 19.)   He soon was able to stand on his own and

displayed a healthy appetite soon after his arrival at the clinic.   (*Id.*; ECF No. 62-19, Murdock

Dep. at 22:13-24:23.)

Although the parties dispute how the public became aware of the sickly horses at Echo

Valley Ranch, shortly after February 16, 2012 the Park County Sheriff's Department began

receiving significant numbers of telephone calls and emails about the horses from members of the

public who had been upset by a story that had been broadcast on Channel 7 news regarding the

horses at Echo Valley Ranch.   (ECF No. 68-2, Park Cnty. Continuation Sheet at 10; ECF No.

62-9, Park Cnty. Continuation Sheet at 10.)   Officer Gore became concerned over statements

made by anonymous callers about an attempt to rescue the horses and suggested moving the horses

to an undisclosed location in an effort to diffuse the situation.   (ECF No. 68-2, Park Cnty.

Continuation Sheet at 10.)   On February 19, 2012, Plaintiffs agreed to move the Six Horses to

another location.   (*Id.*)   To that end, a written agreement (the "Protective Custody Agreement")

was drafted by Officer Priestly that was signed by Officer Hardey and both Plaintiffs.   (*Id.*; ECF

No. 62-21, Feb. 19, 2012 Protective Custody Agreement.)   The horses were then transported from

Echo Valley Ranch and placed in the temporary custody of Kirsten LeBeau.   (ECF No. 62-2,

Hardey Dep. at 44:3-10.)

Officer Hardey continued her investigation even after the horses were moved on February

19, 2012.   Specifically, on February 22, 2012, Officer Hardey spoke to Plaintiffs' veterinarian,

Dr. Horton.   (ECF No. 62-9, Park Cnty. Continuation Sheet at 26-28.)   Both Dr. Horton and Dr.

Burton of Timberline Equine had provided veterinary services to Plaintiffs at various points in

time.   Specifically, Timberline Equine had gone to Echo Valley Ranch on February 11 and 13,

2012 to provide veterinary services for Maggie.   (*Id.* at 27.)   Although Timberline Equine had

provided veterinary services for Maggie in the days leading up to her death, the last time

Timberline Equine had previously seen or treated any of the Six Horses was: Fiona – never; Lena –

never; Echo – August 2010; Midnight – September 2010; River – October 2010; Chance – October

2010.   (*See Id.*; ECF No. 62-17, Horton Dep. at 36:2-39:25.)   Timberline Equine had no

veterinarian-client-patient relationship with the Six Horses as of February 16, 2012, although they

were called upon to treat the horses on February 20, 2012 following the Notice of Warning being

issued and after the horses had been placed in protective custody.   (*See* ECF No. 62-17, Horton

Dep. at 77:21-79:2, 40:15-44:6, 101:20-102:7, 149:7-151:23.)   When Dr. Horton observed the

Six Horses on February 20, 2012 after they had been moved from Echo Valley Ranch, she found

the horses to be extremely thin and grossly anemic, which findings were later confirmed through

testing.   (ECF No. 62-17, Horton Dep. at 102:8-104:15, 106:4-107:6.)

Dr. Horton reported to Officer Hardey on February 22, 2012 that "[r]egardless of why the

horses were thin . . . someone should have noticed and at least called and started the investigation

earlier."   (ECF No. 62-9, Park Cnty. Continuation Sheet at 32.)   Dr. Horton stated her belief that

"those horses were let go far too long."   (*Id.* at 33.)   At her deposition in connection with the

present lawsuit, Dr. Horton further stated that the "horses would have benefitted from intensive

attempts to correct their weight loss sooner, either through medical attention or extra feed or at

11

least investigation."  (ECF No. 62-17, Horton Dep. at 85:4-7.)  Dr. Horton further stated her belief "that the horses had deteriorated past a point where assistance should have been sought" and that they would have "benefitted from veterinary intervention much sooner."  (*Id.* at 85:18-20, 112:21-113:11.)  Following her conversation with Dr. Horton on February 22, 2012, Officer Hardey made the decision to charge Plaintiffs with animal cruelty and to seize the Six Horses. (ECF No. 62-2, Hardey Dep. at 107:6-108:21, ECF No. 62-9, Park Cnty. Continuation Sheet at 11.)

On February 22, 212, a warrant was issued for the seizure of the Six Horses, which were seized that day by the Park County Sheriff's Department.  (ECF No. 66-1, Feb. 22, 2012 Warrant and Affidavit; ECF No. 62-4, Gore Dep. at 21:14-17.)  The warrant was supported by an affidavit from Officer Hardey.  (*Id.*)  Shortly thereafter, Officer Hardey served Plaintiffs with a summons and complaint charging them each with three counts of misdemeanor animal cruelty.  (ECF No. 62-24, Feb. 23, 2012 Summons, Feb. 24, 2012 Summons.)  The charges in the complaint against Swift and Hatlee only concerned the Six Horses and not Bear or Maggie.  (*Id.*)  Several months later, the charges were amended by the Park County District Attorney's Office to include a charge of animal cruelty for Plaintiffs' alleged cruelty to Bear prior to Routt County's February 16, 2012 seizure.  (ECF No. 62-2, Hardey Dep. at 109:16-110:6.)

On April 10, 2012, at a motions hearing held in connection with the then pending criminal matter against Plaintiffs, Park County Court Judge Brian Green found that there was no probable cause to issue a warrant to seize the Six Horses because they were not in imminent danger as of February 22, 2012.  (ECF No. 65-5, Apr. 10, 2012 Motions Hearing at 65:22-66:4.)  Judge Green

did find, however, that there was probable cause to believe the horses had been subject to animal cruelty prior to February 22, 2012.   (*Id.*)   At a subsequent hearing on December 3, 2012, Judge Green further found that the affidavit submitted by Officer Hardey in support of the warrant had contained material omissions regarding whether the horses were in imminent danger and therefore suppressed evidence obtained in the course of that seizure.   (ECF No. 68-9, Dec. 3, 2012 Motions Hearing at 175:6-176:7.)   Judge Green reiterated at the December hearing that there was probable cause to believe that Plaintiffs had committed animal cruelty prior to February 22, 2012.   (ECF No. 65-6, Dec. 3, 2012 Motions Hearing at 173:23-174:7.)   Plaintiffs' horses were returned to them on April 11, 2012.

Eventually the charges against Plaintiffs were tried to a jury that found them not guilty. Following their acquittal, Plaintiff's brought the present lawsuit against the named Defendants. In their First Amended Complaint (ECF No. 22) Plaintiffs seek redress against all Defendants under 42 U.S.C. § 1983, alleging that the faulty warrant that allowed the Park County Sherriff's Department to seize the Six Horses was in violation of Plaintiffs' Fourth Amendment rights against unreasonable search and seizure.   Plaintiffs also bring claims against all Defendants for malicious prosecution in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 and also what appears to be a malicious prosecution claim against Dr. Olds under state law.   Finally, Plaintiffs bring a contract claim under the February 19, 2012 Protective Custody Agreement, alleging that it was breached when the Six Horses were improperly seized.

III.    **ANALYSIS**[1]

A.    **Dr. Olds' Motion for Summary Judgment**

In Dr. Olds' motion for summary judgment, she argues that she was not acting under color

of state law at any time and so cannot be held liable under 42 U.S.C. § 1983.   Alternatively, Dr.

Olds argues that even if she could be found to have acted under color of state law, she would be

entitled to assert qualified immunity.   As to Plaintiffs' malicious prosecution claim, Dr. Olds

argues that she is entitled to statutory immunity by virtue of C.R.S. § 12-64-232(4), which

precludes liability for reports of suspected animal cruelty made under that statute and attaches a

presumption of good faith to those reports.   Even without this statutory immunity, Dr. Olds'

alternatively argues that Plaintiffs' malicious prosecution claim fails because they cannot prove a

lack of probable cause.   The Court addresses each of these arguments in turn.

1.    <u>Was Dr. Olds acting under color of state law?</u>

"To state a cause of action under 42 U.S.C. § 1983 for an alleged violation of the

Fourteenth Amendment and provisions of the Bill of Rights incorporated into the Fourteenth

Amendment, the challenged conduct must constitute state action."   *Scott v. Hern*, 216 F.3d 897,

906 (10th Cir. 2000) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930-32 (1982); *Pino v.*

---

[1] Plaintiffs have filed a "Motion to Supplement the Record with Respect to Summary Judgment Motions Number 61, 64, 65 and 66."   (ECF No. 95.)   This motion does more than merely seek to supplement the record, but rather asks that Plaintiffs be granted permission to re-brief their responses to each of these motions for summary judgment or, alternatively, to file sur replies to each motion.   The motion attaches additional proposed exhibits that would be submitted in addition to the proposed new responses, but does not include the proposed responses themselves as exhibits to the motion.   The Court notes that Plaintiffs never sought an extension of time in which to file their original responses to the motions for summary judgment and that the responses they did file contain dozens of pages of briefing and dozens of exhibits in support.   Plaintiffs have not provided the Court with an adequate basis upon which to permit them to re-brief responses to four separate motions for summary judgment and their motion is denied.

*Higgs*, 75 F.3d 1461, 1464 (10th Cir. 1996)).   Stated differently, a claim under § 1983 must

adequately allege deprivation of a constitutional right committed under "color of state law."   *Am.*

*Mfrs. Mut. Inc. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).   "[T]he under-color-of-state-law

element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or

wrongful."   *Id.* at 50 (internal quotation marks and citation omitted).   However, the Tenth Circuit

has determined that a "private individual's conduct" may be actionable under § 1983 where that

individual's conduct is "fairly attributable to the state."   *Scott*, 216 F.3d at 906 (quoting *Pino*, 75

F.3d at 1465).   An individual's conduct is fairly attributable to the state when the following

occurs:

> First, the deprivation must be caused by the exercise of some right or privilege
> created by the State or by a rule of conduct imposed by the State or by a person for
> whom the state is responsible.   Second, the private party must have acted together
> with or . . . obtained significant aid from state officials or engaged in conduct
> otherwise chargeable to the State.

*Id.* (quoting *Pino* 75 F.3d at 1465) (alterations in original).

Courts applying the above stated test have admonished that "[a] private individual does not

engage in state action simply by availing herself of a state procedure."   *Id.* (physician's

submission of an affidavit leading to plaintiff's detention not considered "state action": physician

"did 'nothing more than provide information which' [the district attorney] and the county judge

'considered in making their independent judgments'") (citation omitted); *Pino*, 75 F.3d at 1463-65

(private therapist did not exercise "some right or privilege" or act under a "rule of conduct" created

by state law when therapist advised police that plaintiff should be hospitalized, resulting in

plaintiff's hospitalization); *Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.

1987) (complaining to a police officer about an individual's conduct does not constitute state action simply because the officer arrests that individual following questioning).   Further, "the mere furnishing of information to police officers who take action thereon does not constitute joint action under color of state law which renders a private actor liable under § 1983."   *Lee v. Town of Estes Park*, 820 F.2d 1112, 1115 (10th Cir. 1987) (citing *Benavidez v. Gunnell*, 772 F.2d 615, 618 (10th Cir. 1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983.")).

Here, Dr. Olds provided an oral and written report, as was her obligation under C.R.S. § 12-64-121(1), notifying the Park County Sheriff's Office that she had assessed that animal cruelty was occurring at Echo Valley Ranch.   As the above cited case law makes clear, notifying the police that a crime is suspected to be taking place does not constitute action under color of state law for purposes of § 1983.   *Scott*, 216 F.3d at 906; *Carey*, 823 F.2d at 1404; *Lee* 820 F.2d at 1115; *Benavidez*, 772 F.2d at 618.

In response, Plaintiffs argue that Dr. Olds' report "was not necessary" but was merely a "publicity stunt" designed to drum up business for Dr. Olds' veterinary clinic.   (ECF No. 67 at 3.) Plaintiffs also argue that Dr. Olds' report to the Park County Sheriff's Office, as well as her "demand" to Officer Hardey that the Six Horses be seized on February 16, 2012, was below the reasonable standard of care for a veterinarian and did not follow the diagnosis protocol of Dr. Olds' own veterinary clinic.   (ECF No. 67 at 4-5.)   Plaintiffs further argue that Dr. Olds was part of an alleged "public outcry" that created pressure on the Park County Sheriff's Office to seize the horses.   Finally, Plaintiffs argue that the alleged "pressure" generated by the "public outcry"

eventually caused the Park County Defendants to agree to Dr. Olds' demands that they seize the horses.   Plaintiffs argue that this forced compliance by the Park County Defendants created a conspiracy among all these Defendants to violate Plaintiffs' constitutional rights and thus makes Dr. Olds a state actor.

As to Plaintiffs' argument that Dr. Olds' report was an unnecessary "publicity stunt," this argument makes no sense as the oral and written report in question was made directly to the Park County Sheriff's Office and garnered no publicity in and of itself.   (ECF No. 62-1, Olds Dep., at 69:10-23; ECF No. 62-2, Hardey Dep., at 112:6-11; ECF No. 62-6, Olds Aff., at ¶ 10; ECF No. 62-16, Feb. 16, 2012 Email.)   Dr. Olds sent the February 16, 2012 email at Officer Hardey's request and in conformity with her obligations under state law, and Plaintiffs have not pointed to any record evidence that would convert this action into one taken under color of state law. Plaintiffs argument that Dr. Olds' diagnosis fell below a reasonable standard of care also fails, as it similarly does nothing to show that Dr. Olds was acting under color of state law.   *See Scott*, 216 F.3d at 907 ("the use of a state procedure does not become state action simply because the person using the procedure is a licensed professional").   Likewise, Plaintiffs' contention that Dr. Olds created a "public outcry" would not constitute action under color of state law.   Even assuming that Plaintiffs' contentions are true that Dr. Olds encouraged other members of the public to speak out against Plaintiffs, such action would amount to no more than private conduct—communications by a private citizen to other private citizens—that is not actionable under § 1983.   *Scott*, 216 F.3d at 906 (citing *Pino*, 75 F.3d at 1465).

As to Plaintiffs' attempt to establish state action by showing a conspiracy among Dr. Olds

and the Park County Defendants, the Tenth Circuit has required plaintiffs seeking to assert § 1983

claims under a joint-action theory to show that the "private party is a 'willful participant in joint

action with the State or its agents.'"   *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442,

1453 (10th Cir. 1995) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).   A plaintiff must

"present facts tending to show agreement and concerted action" between the private citizen and

state officials.   *Scott*, 216 F.3d at 907 (citing *Sooner Prods. Co. v. McBride*, 708 F.2d 510, 512

(10th Cir. 1983).   By contrast, a joint action claim under § 1983 will not lie where "the record

indicate[s] that the police officers had made an independent decision to make the challenged

arrest."   *Gallagher*, 49 F.3d at 1454; *Carey*, 823 F.2d 1402 (joint action test not met where record

contained no evidence that alleged unconstitutional arrests "resulted from any concerted action,

whether conspiracy, prearranged plan, customary procedure, or policy that . . . allowed a private

party to exercise state power"); *Lee*, 820 F.2d at 1115-17 (Tenth Circuit declined to apply joint

action doctrine "where a private party is simply reporting suspected criminal activity to state

officials who then take whatever action they believe the facts warrant").

        Here, despite Plaintiffs' ardent attestations to the contrary, the record does not contain

sufficient evidence to create a material issue of fact as to whether any of the Park County

Defendants were influenced by Dr. Olds' actions with respect to the decision to apply for a warrant

to seize the Six Horses.   Nor is there sufficient evidence to create a material issue of fact as to

whether the so called "public outcry" had any influence on the decision to prosecute Plaintiffs on

animal cruelty charges.   To the contrary, Officer Hardey initially declined to seize the Six Horses

on February 16, 2012 despite Dr. Olds' requests that the horses be seized.   Although it does

18

appear that the Park County Sheriff's Office did respond to the public reaction to the condition of

the horses at Echo Valley Ranch, that response was not to seize the horses pursuant to a warrant

but to have the horses placed in protective custody, which was done with the assent of Plaintiffs.

(ECF No. 62-4, Gore Dep., at 9:16-11:14; ECF No. 62-21, Feb. 19, 2012 Agreement.)   It was only

after further investigating the matter and obtaining a separate opinion from Plaintiffs' regular

veterinarian, Dr. Horton of Timberline Equine, that Officer Hardey made the independent decision

to apply for a warrant to have the horses seized.   The record indicates that it was this discussion

with Dr. Horton that led Officer Hardey to the decision to seek a warrant to seize the horses, (ECF

No. 62-2, Hardey Dep. at 107:6 – 108:21, ECF No. 62-9, Park Cnty. Continuation Sheet at 11), not

Dr. Olds' suggestions and not public pressure.   Plaintiffs have not pointed to any evidence that

would tend to show that it was the latter two reasons that lead to the seizure of the Six Horses.

      As to the decision to prosecute Plaintiffs under animal cruelty charges, Plaintiffs have

similarly presented no evidence indicating that there was any connection between Dr. Olds'

actions and the decision by District Attorney Thom LeDoux to prosecute Plaintiffs in the criminal

case then pending against them.   Nor have Plaintiffs presented any evidence showing that Dr.

Olds had any contact, direct or otherwise, with the District Attorney's Office.   Instead, an

affidavit submitted by the Park County Defendants in their separate motion for summary judgment

shows that District Attorney LeDoux made the decision to prosecute Plaintiffs based on his own

"independent professional opinion . . . that there was sufficient evidence of animal cruelty/neglect

[and] that there was a reasonable likelihood of conviction."   (ECF No. 65-7, LeDoux Aff., at ¶¶

7-8.)

Even if this Court were to accept Plaintiffs' dubious contention that Dr. Olds was responsible for creating a "public outcry" that was directed towards the Park County Sheriff's Office, and that the Park County Defendants reacted to that "public outcry" by seizing the Six Horses and having Plaintiffs prosecuted, this fact pattern still would not trigger liability under the joint action doctrine.   The joint action doctrine requires that the unconstitutional action be founded upon "*agreement* and *concerted action*" between private citizens and state officials. *Scott*, 216 F.3d at 907 (emphasis added).   That concerted action may take the form of a "conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Carey*, 823 F.2d at 1404.   Here, the record before the Court does not show any overt or implied "agreement [or] concerted action" between Dr. Olds and the Park County Sheriff's Office.   *Scott*, 216 F.3d at 907.   To the contrary, the record indicates, and Plaintiffs themselves assert, that Dr. Olds' request that the Six Horses be seized was initially rejected by the Park County Defendants.   Even assuming that the Park County Defendants ultimately decided to seize the Six Horses based on their perception of public pressure, that would still not constitute "agreement and concerted action" with Dr. Olds – the connection between Dr. Olds' actions, the public reaction to the information disseminated by Dr. Olds, and the Park County Defendants' actions taken in reaction to the public response is simply too attenuated to fit within the joint action doctrine.   *Scott*, 21 F.3d at 907.   Plaintiffs have not pointed to any case law where a court employed this doctrine when presented with facts containing such a tenuous causal chain, nor has this Court located any such case law.

And still further, even assuming some amorphous form of joint action between Dr. Olds and the Park County Defendants, that action would nonetheless remain divorced from a conspiracy to wrongly seize property or prosecute Plaintiffs when the undisputed facts are that Dr. Olds held the belief that animal cruelty was occurring.   Plaintiffs challenge to Dr. Olds' position is akin to a malpractice challenge.   Plaintiffs claim that her belief was unreasonable or below the standard of care for a veterinarian.   Assuming the facts supported this contention, it falls short of establishing the conspiracy alleged.

Plaintiffs have failed to create a material issue of fact as to whether Dr. Olds was acting under color of state law and their § 1983 claims against her therefore fail.   Because the Court finds that Dr. Olds was not acting under color of state law, it need not address the issue of whether Dr. Olds could assert qualified immunity.

2.   Is Dr. Olds entitled to statutory immunity with respect to Plaintiffs' state claim for malicious prosecution?

As to the remaining state law claim against Dr. Olds for malicious prosecution, Dr. Olds argues that she would be entitled to statutory immunity pursuant to C.R.S. § 12-64-121(4), which specifies that licensed veterinarians who report suspected animal cruelty are "immune from liability in any civil or criminal action brought against the veterinarian for reporting the incident." The statute further provides that "the good faith of the veterinarian shall be presumed" in any criminal or civil proceeding against the veterinarian for reporting the incident.   *Id.*   In response, without citation to the record or to any documentary evidence, Plaintiffs state that the "facts alleged" are sufficient to rebut the statute's presumption of good faith.   (ECF No. 67 at 10.)

21

The Court finds Plaintiffs' argument inadequate and dismisses Plaintiffs' state claim of malicious prosecution against Dr. Olds on the grounds that she enjoys statutory immunity.   C.R.S. § 12-64-121(4).   Plaintiffs mere assertion that the "facts alleged" would be sufficient to rebut Dr. Olds' argument provides the Court with absolutely no guidance upon which to reach a principled decision based on either the facts in the record or applicable law.   Further, Dr. Olds' motion is one for summary judgment – to withstand this motion Plaintiffs "must do more than refer to allegations of counsel contained in a brief . . . ."   *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992).   "Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."   *Id.* (citing *Celotex*, 477 U.S. at 324).   "Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'"   *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (declining to consider "unsubstantiated allegations" in the absence of specific citations to the record) (quoting *Thomas*, 968 F.2d at 1025).   Indeed, "[j]udges are not like pigs, hunting for truffles buried in briefs."   *Id.* (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).   Plaintiffs have offered neither evidence nor case law in support of their argument and this Court will not do the work for them. [2]

---

[2] Even if the Court were to find that Dr. Olds was not entitled to statutory immunity with respect to certain aspects of Plaintiffs' claims that go beyond the report she issued to the Park County Sheriff's Office, such as Plaintiff's contention that Dr. Olds took steps to create public pressure on the Park County Sheriff's Office, the result would be no different.   Even if this Court were to engage in the analysis of whether these actions outside of the report would constitute malicious prosecution, Plaintiffs' claim still fails on the grounds that Plaintiffs are unable to show that the prosecution occurred without probable cause.   *Hewitt v. Rice*, 154 P.3d 408, 411 (Colo. 2007); *Thompson v. Hiwan Ridge Dev. Co., Inc.*, 84 P.3d 496, 503 (Colo. 2004); *Lounder v. Jacobs*, 205 P.2d 236, 238-39 (Colo. 1949).   The District Attorney in charge of

### B.   Dr. Olds' Motion to Dismiss

In her motion to dismiss (ECF No. 31) Dr. Olds points out that the breach of contract claim in Plaintiffs' First Amended Complaint should be dismissed as against her because she was not a party to the Protective Custody Agreement, and Plaintiffs confirm this in their response.   (ECF No. 35 at 18.)   Dr. Olds' motion to dismiss is thus granted in part and the contract claim is dismissed as against her.   In all other respects Dr. Olds' motion to dismiss essentially duplicates the arguments contained in her summary judgment motion, and seeks identical relief.   Thus, the Court denies Dr. Olds' motion to dismiss, in part, as moot as to all other issues.

### C.   Police Officers' Motion for Summary Judgment on Plaintiffs' Contract Claim

The Park County Defendants have filed a separate motion for summary judgment on Plaintiffs' breach of contract claim, arguing that the Protective Custody Agreement entered into between Plaintiffs and the Park County Sheriff's Office on February 19, 2012 lacked consideration.   (ECF No. 64.)   The Protective Custody Agreement essentially outlined the contours of the agreement between Plaintiffs and the Park County Sheriff's Department that Plaintiffs would pay for the Six Horses to be placed in protective custody with a third party,

---

prosecuting Plaintiffs in the criminal case against them has filed an affidavit in this case stating that he believed that there was probable cause to pursue a criminal conviction against Plaintiffs.   (ECF No. 65-7, LeDoux Aff., at ¶¶ 8-11.)   *See Montgomery Ward and Co. v. Pherson*, 272 P.2d 643, 645 (Colo. 1954). Further, the judge overseeing the criminal case against Plaintiffs also made the legal finding that probable cause did exist that Plaintiffs had engaged in the crime of animal cruelty.   (ECF No. 65-5, Apr. 10, 2012 Motions Hearing, at 65:22-66:4).   And on the facts presented, this Court concludes that there is no material dispute as to the existence of probable cause.   (ECF No. Park Cnty. Continuation Sheet at 5-6 (Officer Hardey's observations of the Six Horses in extremely emaciated condition with empty food containers and frozen over water containers), 7 (report from Timberline Equine that the Six Horses were not under their care), 33 (Dr. Horton's report to Officer Hardey that the Six Horses "were let go far too long" and were extremely underweight); *see generally* ECF No. 62-2, Hardey Dep. (stating Officer Hardey's observations of the Six Horses' underweight physical condition.))   As the Colorado Supreme Court has held, "[t]he existence of probable cause is alone sufficient to relieve a defendant of a charge of malicious prosecution." *Montgomery Ward and Co.*, 272 P.2d at 645.   Probable cause clearly existed in this case.

23

Kristen Lebeau, and that the Park County Sheriff's Office's would not have the horses

"confiscated, seized, or surrendered."   (ECF No. 64-1, February 19, 2012 Protective Custody

Agreement.)   Specifically, the Protective Custody Agreement provides that "Ronald Swift will be

responsible for all cost of care for these horses including feed, and veterinarian care and Park

County is not liable for any costs related to the care of these horses while they are in Protective

Custody."   (*Id.*)   That agreement further states that "[i]f test results . . . indicate starvation was a

factor in mares['] death[,] charges may be filed against horse owners and at risk horses may be

impounded at a later date if no other contributing factors are present other than neglect."   (*Id.*)

The Park County Defendants argue that the Protective Custody Agreement lacks

consideration "because it does not require a return promise from the [Park County Sheriff's

Office], require the [Park County Sheriff's Office] to act, or require a forbearance from the [Park

County Sheriff's Office]."   (ECF No. 64 at 3.)   Plaintiffs respond by reference to the February

16, 2012 Notice of Warning issued by Officer Hardey.   Plaintiffs contend that the Notice of

Warning was a contract that allowed Plaintiffs thirty days to put weight on their horses and, on the

other hand, allowed "Animal Control" the right to enter the property from time to time without a

warrant to inspect the horses.   Plaintiffs argue that the Notice of Warning contract "merged" with

the Protective Custody Agreement, and that the two contracts together provided valuable

consideration to all parties involved.   (ECF No. 70.)

Under Colorado law, the necessity that consideration exist in an enforceable contract is

indeed a legal requirement, yet the doctrine has been greatly limited through decades of case law

developed by the Colorado Supreme Court, which "has long held that any benefit to a promisor or

any detriment to a promisee at the time of the contract—no matter how slight—constitutes adequate consideration." *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011) (en banc) (citing *W. Fed. Sav. & Loan Ass'n of Denver v. Nat'l Homes Corp.*, 167 Colo. 93, 103 (1968)).   The Colorado Supreme Court, which this Court is bound to follow when interpreting Colorado state law, has determined that a court evaluating a disputed contract "need only find some consideration, regardless of its relative value" to support the enforceability of that contract.   *Id.*   That court has determined that "[e]xcept in extreme circumstances, such as those involving allegations of unconscionability, a court should not judge or attempt to assess the adequacy of the consideration."   *Id.* (citing *Freudenthal v. Espey*, 45 Colo. 488, 497-500 (1909)). Consideration may take the form of "some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other." *Id.* (quoting *Jones v. Jones*, 1 Colo.App. 28, 32 (Colo. App. 1891)).

As an initial matter, Plaintiffs' contention that the February 16, 2012 Notice of Warning "merged" with the Protective Custody Agreement is rejected by this Court.   Plaintiffs cite to no case law in support of this contention, nor do they provide any principled reason—or any reason at all—as to why the doctrine of merger would apply here.   Nevertheless, the Court finds that Plaintiffs' contract claim survives the Park County Defendants' motion for summary judgment. Following the exceedingly broad and inclusive standard established under Colorado Supreme Court jurisprudence regarding the doctrine of consideration, the Court finds that the contract at issue here would satisfy this forgiving standard.   The Protective Custody Agreement provides that the Six Horses "have not been confiscated, seized, or surrendered" by the Park County Sherriff's

25

Office, but rather have been "placed in Protective Custody only." (ECF No. 64-1, Feb. 19, 2012 Protective Custody Agreement.)   Whether dubbed a "right, interest, profit, or benefit accruing to" Plaintiffs or a "forebearance, detriment, loss, or responsibility given, suffered, or undertaken" by Defendants, this statement is sufficient to identify legally sufficient consideration. *Lucht's Concrete Pumping*, 255 P.3d at 1061.   The Protective Custody Agreement goes on to specifically designate Swift as "responsible for all cost of care" for the horses and absolve the Park County Sherriff's Office from any liability for their care while they are in protective custody.   (ECF No. 64-1, Feb. 19, 2012 Protective Custody Agreement.)   Again, whether construed as an obligation undertaken by Plaintiffs or a benefit conferred upon the Park County Sherriff's Office, this meting out of costs would constitute valid consideration under the broad provisions of Colorado law. *Lucht's Concrete Pumping*, 255 P.3d at 1061.   While this Court need not even assess the adequacy of consideration in a contract absent "[e]xtreme circumstances, such as those involving allegations of unconscionability," here it is clear on the face of the Protective Custody Agreement that sufficient consideration would exist to create an enforceable contract among the parties. *Id.* (citing *Freudenthal*, 45 Colo. at 497-500).   The Court thus rejects the Park County Defendants' argument that the Protective Custody Agreement lacks consideration and denies its motion for summary judgment on Plaintiffs' contract claim.

### D.   Park County Defendants' Motion for Summary Judgment on Plaintiffs' Individual Capacity Claims

The Park County Defendants have moved for summary judgment on Plaintiffs' two claims brought under 42 U.S.C. §1983 against those Defendants in their individual capacity, arguing that they had no personal involvement in the alleged violations of Plaintiffs' constitutional rights. (ECF No. 65.)   First, Officers Priestly, Gore and Wegener claim they lacked any personal involvement as to Plaintiffs' claim that their Fourth Amendment rights were violated when the Six Horses were wrongfully seized pursuant to the warrant issued on the basis of Officer Hardey's allegedly deficient affidavit.[3]   Second, all of the Park County Defendants claim they lacked any personal involvement as to Plaintiffs' claim that Plaintiffs' Fourth Amendment rights were violated because they were subject to malicious prosecution.   For the reasons explained below, the Court grants the Park County Defendants' motion in full.

A plaintiff must show personal involvement in a constitutional violation as to each defendant against whom a claim is asserted.   *Pahls v. Thomas*, 718 F.3d 1210, 1231-32 (10th Cir. 2013); *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997).   Where a plaintiff alleges multiple state actors were individually responsible for the deprivation of his constitutional rights, that plaintiff may not overcome his burden of showing that each defendant violated his constitutional rights by "analyz[ing] defendants' liability as a collective whole" because, as the Tenth Circuit has held, such generalized argument "does not comport with the requirements for imposing personal liability on government officials under § 1983 . . . ."   *Pahls*, 718 F.3d at 1231.   Stated simply, "[l]iability under § 1983 . . . requires personal involvement."   *Id.* (citing *Iqbal*, 556 U.S. at 676). To establish personal involvement, a plaintiff "must establish that *each* defendant caused" that

---

[3]  The Court notes that Officer Hardey does not move for summary judgment as to this claim.   (ECF No. 65 at 2.)

plaintiff's constitutional rights to be violated and this Court "must conduct a differentiated

analysis" as to the particular acts of each individually named defendant.  *Id.*; *see also Foote*, 118

F.3d at 1423-24 ("Individual liability under § 1983 must be based on personal involvement in the

alleged constitutional violation."); *Trujillo v. Williams*, 465 F.3d 1210, 1227-28 (10th Cir. 2006)

(same); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (same).

      1.    <u>Plaintiffs' Fourth Amendment claims regarding the warrant issued to seize the Six
Horses</u>

Regarding Plaintiffs' Fourth Amendment claim relating to the allegedly unconstitutional

seizure of Plaintiffs' horses, Officers Gore, Priestly and Sheriff Wegener argue that they were not

involved in the drafting of the affidavit, signed by Officer Hardey, that ultimately led to the

warrant that was issued to seize the Six Horses.   In support, these Defendants cite to deposition

testimony from each of them affirming the same.   Specifically, deposition testimony from Officer

Gore states that he did not have any involvement with the drafting of Officer Hardey's affidavit.

(ECF No. 65-2, Gore Dep. at 8:2-5.)   Sherriff Wegener likewise testified at deposition that he had

a general practice of leaving animal control matters in the hands of the officers in the animal

control division, and further that he had no role in the training of Officer Hardey.   (ECF No. 65-3,

Wegener Aff. at 8:5-10, 13:16-21.)   Defendants cite to a redacted transcript of Officer Priestly's

deposition in support of the contention that she had no involvement in the affidavit's creation, yet

the exhibit cited to does not contain testimony supporting this contention.   (*See* ECF No. 65-4,

Priestly Dep.)   However, deposition testimony from Officer Hardey does confirm that Officer

Priestly did not review the affidavit, but was merely aware of its existence.   (ECF No. 68-7,

Hardey Dep. at 15:23-16:4, 66:17-67:24.)

In opposition, Plaintiffs cite primarily to a Park County Sheriff's Office record of a February 21, 2012 teleconference among Officers Priestly and Gore, Sheriff Wegener and Dr. Horton of Timberline Equine.   (ECF No. 68-1, Park Cnty. Continuation Sheet, at 10-12.) Plaintiffs claim that it was this call that was the impetus for seeking a warrant, and that the Court should infer that the allegedly improper warrant must have been designed during this phone call. Alternatively, Plaintiffs argue that it was these Defendants' duty to train Officer Hardey to properly draft affidavits in support of applications for warrants.   Because these Defendants failed to properly train Officer Hardey, so Plaintiffs argue, "the entity is liable."   (ECF No. 71 at 3.) Plaintiffs also argue that the Park County Defendants' alleged breach of the Protective Custody Agreement also resulted in the violation of Plaintiffs' constitutional rights.   (*Id.* at 4.)

As to Plaintiffs' claim that the alleged breach of the Protective Custody Agreement violated Plaintiffs' constitutional rights, this claim fails as Plaintiffs do not provide any then-extant, clearly established constitutional right that would have been violated by the mere breach of that agreement.   *Morris*, 672 F.3d at 1191.

Regarding Plaintiffs' argument that Officer Gore, Officer Priestly and Sheriff Wegener were involved in the creation of Officer Hardey's affidavit by virtue of the fact that they were all on the same February 21, 2012 phone call with Dr. Horton, this evidence is insufficient to create a material issue of fact that would survive summary judgment.   Even viewed in the light most favorable to Plaintiffs and with all reasonable inferences drawn in Plaintiffs' favor, the fact that these Defendants, along with Dr. Horton, were on a phone call together simply cannot lead to the

29

conclusion that these Defendants then orchestrated a plan to have Plaintiffs' horses illegally seized through the use of an improperly drafted affidavit in a warrant application.   Even if the Court were to grant the inference in Plaintiffs' favor that the affidavit was in fact discussed by Gore, Priestly and Wegener, that inference does not prove Plaintiffs' point. The crux of Plaintiffs' claim is that an affidavit was submitted to the court in order to allegedly seize Plaintiffs' property without probable cause.   Even were this Court to grant Plaintiffs the inference that the affidavit was discussed, putting aside the reasonableness of that inference, Plaintiffs would still require the further inference that these Defendants were also aware that the affidavit would be created with material omissions.   While the Court is obligated to grant *reasonable* inferences to Plaintiffs as non-movants, it would be an utterly *unreasonable* inference to find that Officers Gore, Priestly and Sheriff Wegener were aware of the material omissions that Officer Hardey would include in the affidavit and were therefore co-conspirators to an alleged plot to seize Plaintiffs' horses through an improperly secured warrant, and the Court declines to grant Plaintiffs that inference.

Regarding Plaintiffs' argument that supervisor liability based on the failure to train Officer Hardey led to the violation of Plaintiffs' constitutional rights, there are a number of reasons why this response fails.   The most obvious is that the First Amended Complaint contains no allegation or claim of liability based on a failure to supervise or to train.   Instead, it alleges only direct and concerted action by the Defendants.   (*See generally*, ECF No. 22.)   It hardly needs to be said that it is not a proper response to a summary judgment challenge to sidestep the evidentiary deficiency by attempting to create a factual dispute with respect to matters having neither connection nor relevance to the claims alleged.

Even if the supervisor liability matter were considered on the merits, Plaintiff's

failure-to-train theory of liability would fail.   The Tenth Circuit has made clear that "[j]ust as §

1983's plain language doesn't authorize strict liability, it doesn't authorize *respondeat superior*

liability." *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010).   In *Dodds v. Richardson*,

614 F.3d 1185 (10th Cir. 2010), *cert denied*, 131 S.Ct. 2150 (2011), the Tenth Circuit stated that "§

1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates,

implements, or in some other way possesses responsibility for the continued operation of a policy

the enforcement (the defendant-supervisor or her subordinates) of which subjects, or causes to be

subjected that plaintiff to the deprivation of any rights secured by the Constitution."   *Id.* at 1199

(citations and quotations omitted).   The Tenth Circuit further elaborated that, in order to succeed

in a § 1983 suit against a defendant-supervisor, a plaintiff must prove the following:

> (1) the defendant promulgated, created, implemented or possessed responsibility
> for the continued operation of a policy that (2) caused the complained of
> constitutional harm, and (3) acted with the state of mind required to establish the
> alleged constitutional deprivation.

*Id.* at 1199-1200 (citing *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)).   As with

any other § 1983 claim, "the plaintiff must establish a deliberate, intentional act on the part of the

defendant to violate the plaintiff's legal rights."   *Porro*, 624 F.3d at 1327-28 (citations, quotations

and alterations omitted).   "Simply put, there's no special rule of liability for supervisors.   The

test for them is the same as the test for everyone else."   *Id.*   Courts within this district have

applied the *Dodds* test in the specific context of a claim that the supervisor failed to train his or her

subordinate.   *Kemp v. Lawyer*, 846 F.Supp.2d 1170 (D. Colo. 2012) (no failure-to-train § 1983

liability where plaintiff's allegations amounted to mere speculation that police officers under

defendant sheriff's supervision habitually engaged in warrantless searches and seizures); *Myers v. Koopman*, No. 09-cv-02802-REB-MEH, 2011 WL 650328 (D. Colo. Feb. 11, 2011).

As an initial matter, Plaintiffs' argument that the "entity is liable" where a failure to train is evident is irrelevant to the consideration of whether any of the Park County Defendants would be liable in their individual capacities.   (ECF No. 71 at 5.)   The distinction between individual capacity claims (i.e. claims against the individual officers) and official capacity claims (i.e. claims against the institution) are not mere formality but rather make clear the principle that liability does not attach to an individual under § 1983 without actual proof that the individual's own conduct caused a violation of the plaintiff's constitutional rights.   Here, Plaintiffs have not pointed to any evidence that would create a material issue of fact as to whether Officers Priestly, Gore or Sheriff Wegener's alleged failure to train amounts to "a deliberate, intentional act . . . to violate the plaintiff's legal rights."   *Porro*, 624 F.3d at 1327-28; *Dodds*, 614 F.3d at 1200.   Plaintiffs have not presented any evidence indicating that any Defendant "promulgated, created, implemented or possessed responsibility for the continued operation of a policy" for the construction of warrant applications or any training related thereto.   *Dodds*, 614 F.3d at 1199.   Indeed, Plaintiffs have failed to establish a material issue of fact as to any element of the *Dodds* test and their claim under § 1983 based on the alleged failure to train Officer Hardey is rejected by the Court.[4]

2.   Plaintiffs' Fourth Amendment claims regarding the Park County Defendants' alleged malicious prosecution

---

[4] In a separate objection, (ECF No. 107), Plaintiffs challenge Magistrate Judge Watanabe striking a sentence from the Pretrial Order (ECF No. 106) containing Plaintiffs' claim that "there was a failure to train Hardey and a ratification of Hardey's conduct."   Because this Court holds that Plaintiffs' failure-to-train claim is not pled, it also overrules this objection.

The Park County Defendants argue that they are entitled to summary judgment on Plaintiffs' § 1983 claim under a malicious prosecution theory because these Defendants were not involved in the decision to prosecute Plaintiffs.   (ECF No. 65 at 7-8.)   In support, the Park County Defendants submit an affidavit of District Attorney LeDoux stating that "[b]ased upon my review of the case file and applicable law, it was my independent professional opinion . . . that there was sufficient evidence of animal cruelty/neglect [and] that there was a reasonable likelihood of conviction."   (ECF No. 65-7, LeDoux Aff. at ¶ 8.)   LeDoux's affidavit goes on to state that, subsequent to the April 10, 2012 court ruling in which the Judge Green ruled that material information had been omitted from Officer Hardey's affidavit, that court's ruling "did not change my opinion that there was sufficient evidence of animal cruelty/neglect and that there was a reasonable likelihood of conviction . . . ."   (*Id.* at ¶ 9.)   The affidavit further states that "[t]he decision to continue prosecution of the case following the April 10, 2012 hearing . . . was not affected in any way by the Park County Sheriff's Office or any of its employees . . . ."   (*Id.* at ¶ 12.)

Plaintiffs do not directly address this argument in their brief filed in opposition to Defendants' motion, but appear to incorporate by reference the opposition papers Plaintiffs filed in response to Defendants' motion for summary judgment regarding damages.   (ECF No. 68.)   In that brief, Plaintiffs paint a colorful picture that District Attorney LeDoux was facing re-election in 2012 and was being opposed by the Park County Sheriff's Office for not prosecuting enough cases and was also being criticized by the public for not responding more forcefully in the prosecution of the criminal case against Plaintiffs.   (*Id.* at 10-11.)   Plaintiffs argue that, as a result of this public

scrutiny and political pressure, District Attorney LeDoux succumbed to the demands of the Park

County Sheriff's Office and continued his prosecution of Plaintiffs on animal cruelty charges

"though he knew he could not win it."   (*Id.* at 11.)

In their opposing statement of undisputed material facts submitted in response to the Park

County Defendants' motion for summary judgment regarding damages, Plaintiffs cite to three

documents in support of their contention that "[t]he evidence indicates that the District Attorney

took the case to trial for political reasons and because he was pressured to do so."   (ECF No. 72-3

at 2.)   The first document is a copy of an email chain among Dr. Olds and Officer Gore in which

Officer Gore reports to Dr. Olds that he and other officers would meet with their "county attorney

to analyze a strategy for going forward."   (ECF No. 68-4, Apr. 11, 2012 Emails.)   The second

document is a copy of an email chain among Officers Priestly, Gore and other individuals in which

Officer Priestly is critical of the judge's ruling at the April 10, 2012 motions hearing that the Six

Horses would be returned to Plaintiffs and an unnamed individual responds to that email asserting

that "[p]ressure to the court must be applied . . . ."   (ECF No. 68-4, April 11, 2012 Emails.)   The

third document is an affidavit signed by Hatlee stating that, at the conclusion of his criminal trial,

he overheard District Attorney LeDoux state that this would be the last time that he "would allow

himself to be pressured into trying a case he knew he could not win."   (ECF No. 68-8, Hatlee Aff.)

First, none of these documents lend any support to Plaintiffs' assertion that District

Attorney LeDoux was facing political pressure in his attempts to be re-elected, nor do these

documents give any indication that the Park County Sheriff's Office was opposed to his

re-election.   As to the email chain between Dr. Olds and Officer Gore, Officer Gore's mere

statement that he would work with the "county attorney to analyze a strategy for going forward" is a far cry from giving any indication that he would put pressure on District Attorney LeDoux to prosecute a case against his will, and the Court declines to add that artificial gloss to this statement. Likewise, the email chain among Gore and other undisclosed recipients does not give any indication that any Park County Officer Defendant would take any actions seeking to force District Attorney LeDoux's hand regarding the prosecution of Plaintiffs in the criminal matter or even that any Defendant would have the means to do so.   Although one unnamed respondent to Officer Priestly's email states that pressure should be applied to *the court* in that case—*not District Attorney LeDoux*—this anonymous participant's statement does nothing to create a material issue of fact as to the interactions between District Attorney LeDoux and any of the Park County Defendants.   The affidavit created by Hatlee not only fails to prove Plaintiffs' point because it does not indicate *who* District Attorney LeDoux was allegedly being pressured by, but also fails on the separate grounds that it is hearsay evidence that cannot be considered by the Court on a motion for summary judgment.   *Jaramillo,* 427 F.3d at 1314.

At the end, Plaintiffs' argument amounts to mere rhetoric without factual support.   As this is a motion for summary judgment, Plaintiffs may not rest on the allegations contained in their complaint, but must respond with specific facts showing a genuine factual issue for trial.   Fed. R. Civ. P. 56(e); *Scott v. Harriss*, 550 U.S. 372, 380 (2007).   Likewise, to withstand a motion for summary judgment, Plaintiffs "must do more than refer to allegations of counsel contained in a brief . . . ."   *Thomas,* 968 F.2d at 1024.   "Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit

35

incorporated therein." *Id.* (citing *Celotex*, 477 U.S. at 324).   Because Plaintiffs have not

presented any record evidence that would create a material issue of fact that would need to be

resolved at trial, and in light of the Park County Defendants' affidavit from District Attorney

LeDoux refuting Plaintiffs' argument, the Court grants the Park County Defendants summary

judgment on the § 1983 claims made against them in their individual capacities.

### E.   Motion for Judgment on the Pleadings on Plaintiffs' Official Capacity Claims

The Park County Defendants have moved for judgment on the pleadings pursuant to Fed.

R. Civ. P. 12(c) as to claims brought against Sherriff Wegener in his official capacity.   (ECF No.

63.)   Magistrate Judge Watanabe entered a Report and Recommendation on January 23, 2015

finding that Defendants' motion should be denied on the grounds that the First Amended

Complaint alleges specific decisions and actions taken by Sherriff Wegener that, because of his

status as a policymaker, would constitute the official policy of the Park County Sheriff's office and

subject it to §1983 liability.   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-84 (1986);

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211-12 (10th Cir. 2007);

*Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007).

The Court concludes that Magistrate Judge Watanabe's analysis was thorough and sound,

and that there is no clear error of law or abuse of discretion.   The Court therefore adopts the

Recommendation in full and incorporates its contents into this Order.

Defendants filed an objection to the Report and Recommendation (ECF No. 99) arguing

that the Magistrate Judge misapplied the pleading standards for evaluating motions under Fed. R.

Civ. P. 12(c).   Specifically, Defendants contend that Plaintiffs' allegations were conclusory in

nature and, pursuant to *Twombly* and *Iqbal*, should not have been accepted as true by the

magistrate judge in his analysis.   On its *de novo* review of this issue pursuant to Defendants'

properly raised objection, the Court finds that the magistrate judge correctly applied the pleading

standard set forth in *Twombly* and *Iqbal* in analyzing Defendants' motion.

     A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is subject to the same

standards that apply to motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).   *Atlantic Richfield

Co.*, 226 F.3d at 1160.   A court ruling on a motion under this Rule is bound to accept the facts

alleged in the complaint as true "even if doubtful in fact," *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 555 (2007), and "grant all reasonable inferences from the pleadings in favor of the"

non-moving party.   *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (quoting *Park

Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).   Only factual allegations are

to be accepted as true; allegations of bare legal conclusions are discarded from the Court's

analysis.   *Kansas Penn Gaming, LLC. v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense."

*Iqbal*, 556 U.S. at 679.

     As pointed out by the magistrate judge, the First Amended Complaint makes several

allegations that Sheriff Wegener knowingly directed and ordered unlawful conduct, which in turn

resulted in the violation of Plaintiffs' constitutional rights.   Specifically, the First Amended

Complaint contains allegations that Sherriff Wegener was "involved in the investigation and

decisions to seize Plaintiffs' property and prosecute them . . . ."   (ECF No. 22 at ¶6.)   The First

Amended Complaint states that Sherriff Wegener "succumbed to the political pressure" created by

a so-called public outcry "and asked Defendants Priestly and Hardey to arrange for removal of the

six horses" from Echo Valley Ranch.   (*Id.* at ¶19.)   The First Amended Complaint states that

Sherriff Wegener directed Defendant Hardey to seek a "warrant to seize the six horses from

Plaintiffs" which warrant was later found to be improper.   (*Id.* at ¶¶24, 25.)   Finally, the First

Amended Complaint alleges that documents relating to the investigation of Echo Valley Ranch

were provided to a non-profit horse sanctuary for the purpose of a fundraising campaign and the

creation of a documentary, all for the supposed political gain of Sherriff Wegener.   (*Id.*at ¶30.)

While the evaluation of whether a complaint sufficiently states a claim for relief is a

"context-specific task," *Iqbal*, 556 U.S. at 679, here it is clear that the allegations in the First

Amended Complaint are sufficient to withstand dismissal under Fed. R. Civ. P. 12(c).   The

allegations repeated above are not conclusory as the Park County Defendants would suggest, but

are all the law requires at the pleading stage as a "short and plain statement of the claim showing

that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 663.   "'[D]etailed

factual allegations' are not required . . . but the Rule does call for sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550

U.S. at 555, 570) (first modification in original).   As pointed out by the magistrate judge,

Defendants chose to move for judgment on the pleadings as to Plaintiffs' official capacity claims,

while moving for summary judgment as to all of Plaintiffs' other claims.   As such, the Court is

proscribed from looking beyond the pleadings when ruling on this motion and, further, must

accept all well-pled factual allegations as true.   Because the Court finds that the factual

allegations as pled in the First Amended Complaint are sufficient to state a claim against Sherriff

Wegener in his official capacity, the Park County Defendants' objection is overruled.[5]

The Court observes that the same factual basis upon which Plaintiffs assert their claims

against Sheriff Wegener in his official capacity are the same facts upon which Plaintiffs base their

claims against Sheriff Wegener in his individual capacity.   As described above, Plaintiffs have

not presented sufficient evidence to create a material issue of fact as to whether Sheriff Wegener,

in his individual capacity, personally took any actions that resulted in the violation of Plaintiffs'

constitutional rights.   Because the individual capacity claims are in a different procedural context

than the official capacity claims, the Court notes the seemingly contradictory conclusion that the

same set of facts could result in different outcomes as to claims brought against Sheriff Wegener in

his official capacity versus claims brought against him in his individual capacity.   To resolve this

inconsistency, the Court will allow Sheriff Wegener the opportunity to move for summary

judgment on the official capacity claims asserted against him.   Sheriff Wegener shall have until

15 days from the date of this Order to file his motion and may file a brief of no longer than 10

pages.   Plaintiffs shall have 10 days to respond to this motion and will also be limited to a brief of

no more than 10 pages.   No further briefing will be allowed on this issue.

---

[5] Defendants have also filed a motion for leave to file a reply brief in support of their objection to the Report
and Recommendation and have attached their reply brief to that motion.   (ECF Nos. 102, 102-1.)   The
Court grants Defendants' motion and will consider the attached motion as properly filed, although this does
not change the result reached by the Court.   Defendants' reply brief argues that Plaintiffs briefing discusses
matters that go well beyond the pleadings and should not be considered by this Court in ruling upon
Defendants' motion.   However, as stated, the Court finds that Plaintiffs' pleadings alone are sufficient to
withstand Defendants' motion, and it need not look at the matters outside the pleadings asserted by
Plaintiffs.

F.      **The Park County Defendants' Motion for Summary Judgment**

**Regarding Damages**

The Park County Defendants have moved for summary judgment as to several aspects of Plaintiffs' claims for damages.   These Defendants contend that much of Plaintiffs' alleged damages were not caused by the alleged violations of their constitutional rights by the Defendants. These Defendants further argue that the vast majority of Plaintiffs' claimed damages, in the form of lost profits, fail as a matter of law as being too speculative.   These Defendants also argue that Plaintiffs' claims for damages stemming from their emotional distress are not supported by evidence and therefore fail as a matter of law.   Finally, these Defendants argue that Plaintiffs have not set forth any facts showing that Defendants acted with the "evil motive or intent" or "reckless or callous indifferen[ce] to the federally protected rights of others" required to recover punitive damages.  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

"Damages are available for violations of § 1983 'to compensate persons for injuries caused by the deprivation of constitutional rights.'"   *Makin v. Colorado Dept. of Corrections*, 183 F.3d 1205, 1214 (10th Cir. 1999) (quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978)).   However, that damages award "must be based on actual injuries . . . ."   *Id.* (citing *Carey*, 435 U.S. at 264). "[T]he abstract value of a constitutional right may not form the basis for § 1983 damages." *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986).   Likewise, "[t]he deprivation of constitutional rights, standing alone, does not entitle a plaintiff to general damages." *Taxpayers for the Animas-La Plata Referendum v. Animas-La Plata Water Conservancy Dist.*, 739 F.2d 1472, 1480-81 (10th Cir. 1984).

1.   <u>Damages caused by the Park County Defendants' alleged violation of Plaintiffs'</u>

<u>constitutional rights</u>

As to the Park County Defendants' contention that there is no causal connection between

Plaintiffs' damages and Defendants' claimed constitutional violations, this argument ultimately

amounts to a dispute over the legitimacy of Plaintiffs' alleged damages and their factual merit.

For example, the Park County Defendants argue that no factual support was offered by Plaintiffs

for their claimed damages relating to the loss in value in the Bailey Feed Store; damages relating to

Plaintiffs' loss of boarders due to negative publicity; damages relating to boarders lost due to the

absence of positive advertising; damages from a loss of foals due to negative publicity; and

damages from a loss of value in two horses from an inability to schedule showings or trainings.

(ECF No. 66 at 7.)   However, the "amount of damages is a finding of fact" as to these issues, not

law, and the Court is not inclined to resolve the extent of the damages resulting from these claimed

losses at the summary judgment stage given the current procedural posture of this case.   *Lippoldt*

*v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006) (quoting *Deasy v. United States*, 99 F.3d 354, 359

(10th Cir. 1996); *Dill v. City of Edmund*, 155 F.3d 1193, 1208-09 (10th Cir. 1998)).   This is

particularly the case here, where the Park County Defendants' arguments amount to a mere factual

dispute that cannot be resolved as a matter of law.

The Park County Defendants also argue that Plaintiffs' alleged damages relating to their

malicious prosecution claims must be calculated separately from the alleged damages relating to

the seizure of the Six Horses pursuant to the allegedly defective warrant.   It is true that damages

on a § 1983 claim may only be recovered for those damages actually caused by the deprivation of

the plaintiff's constitutional rights.   *Makin*, 183 F.3d at 1214.   Nonetheless, on the state of the record now before the Court, the damages issue is too muddled to permit summary judgment to enter.   Summary judgment has been granted with respect to all malicious prosecution claims against the Park County Defendants in their individual capacities and against Dr. Olds.   While this claim is still pending against Sheriff Wegener in his official capacity, as described above, Sheriff Wegener will have the additional opportunity to move for summary judgment as to the official capacity claims asserted against him.   In any event, what damages flow solely from either Plaintiffs' malicious prosecution claim, animal seizure claim, or breach of contract claim is difficult to discern from the pleadings or record evidence.   Accordingly, the propriety of damages flowing from the surviving claims will be left for development at trial or future motions.

2.   <u>Damages from Plaintiffs' alleged lost profits</u>

The Park County Defendants argue that Plaintiffs' damages claims relating to lost profits fail on the grounds that they are too speculative.   In support, Defendants rely on an order from a Norther District of Illinois court granting a motion *in limine* to exclude evidence of damages with respect to claims that the court found to be too speculative.   *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554 (N.D. Ill. 2008).   This case is inapplicable as it does not rule as a matter of law that certain damages are not ascertainable, but rather concluded as an evidentiary matter that certain damages claims were too remote for evidence in support of those claims to be presented to a jury.   Notably, the court's ruling in that order did not cap the plaintiff's potential recovery as a matter of law, as the Park County Defendants seek to have this Court do in the instant motion.

Here, the Park County Defendants have pointed out that they received interrogatory

42

responses indicating Plaintiffs' "opinions of economic losses" and which set out an estimated

value for each independent loss Plaintiffs claimed to have suffered.   (ECF No. 66-8, Plaintiffs'

Interrogatory Responses at 2-3.)   These estimates are sufficient at this stage in the proceeding to

set forth a material issue of fact that would survive summary judgment.   The "amount of damages

is a finding of fact" that Plaintiffs will have the opportunity to prove by presenting competent

evidence at trial.   *Lippoldt v. Cole*, 468 F.3d at 1220; *Deasy*, 99 F.3d at 359; *Dill*, 155 F.3d at

1208-09.

       3.     <u>Damages from Plaintiffs' alleged emotional distress</u>

The Park County Defendants next argue that Plaintiffs damages stemming from emotional

distress fail because they are not corroborated by supporting evidence.   Damages under § 1983

may be awarded for mental and emotional distress.   *Carey*, 435 U.S. at 263-64.   "Such damages

'will not be presumed, but they are easily proved by testimony showing the nature and

circumstances of the wrong and its effect on the plaintiff.'"   *Jolivet v. Deland*, 966 F.2d 573, 577

(10th Cir. 1992) (quoting *Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 829 (1st Cir.

1987)).

Plaintiffs cite to *Dill v. City of Edmond*, 155 F.3d 193 (10th Cir. 1998), and *Koopman v.*

*Water District No. 1 of Johnson Cnty, Can.*, 41 F.3d 1417 (10th Cir. 1994), for the proposition that

Plaintiffs' claims for non-economic damages can be denied as a matter of law for failure to present

any evidence in support thereof.   However, both cases involved the Tenth Circuit's review of

decisions made by district courts following trial.   Specifically, *Dill* concerned the propriety of

damages awarded to the plaintiff following a bench trial.   In *Koopman*, the Tenth Circuit found

that the trial court did not err in refusing to give an instruction to the jury permitting them to award

damages for emotional distress because plaintiff, and no one else, testified to his emotional

condition.   In both cases, the result reached depended on the facts submitted and testimony

received at trial.   Here, Plaintiffs have submitted sufficient evidence to create a material issue of

fact as to whether they suffered damages in the form of emotional harm.   They will be afforded

the opportunity to prove these damages by presenting competent evidence at trial.   *Lippoldt*, 468

F.3d at 1220; *Deasy*, 99 F.3d at 359; *Dill*, 155 F.3d at 1208-09.

> 4.   Plaintiffs' claim for punitive damages

The Park County Defendants argue that no evidence has been put forward by Plaintiffs to

show that any Defendant's conduct was undertaken with the evil motive or reckless indifference to

Plaintiffs' constitutional rights as would be required to award punitive damages in a § 1983 case.

As discussed above, the Court has found that none of the Park County Defendants would be liable

in their individual capacities under § 1983 under a theory of malicious prosecution relating to

Plaintiffs' prosecution on animal cruelty charges.   Further, as described above, the Court has

found that none of the Park County Defendants—with the exception of Officer Hardey—would be

liable in their individual capacities under § 1983 relating to the seizure of the Six Horses.

Although the § 1983 claims against Sheriff Wegener in his official capacity have not been

dismissed by the Court, these claims are essentially against the municipality which is "immune

from punitive damages under 42 U.S.C. § 1983."   *Miller v. City of Mission, Kan.*, 705 F.2d 368,

377 (10th Cir. 1983) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

To the extent Plaintiffs seek punitive damages relating to their claims against Sheriff Wegener in

44

his official capacity, those damages are not permissible and the Park County Defendants' motion for summary judgment is granted as to those damages.

Thus, the only claim upon which Plaintiffs could seek punitive damages at this point is the § 1983 claim brought against Officer Hardey in her individual capacity for her actions applying for a warrant to seize the Six Horses using an affidavit that was later found to contain material omissions.

Under federal law in a § 1983 action, a finding of punitive damages requires the defendant's conduct to be "motivated by evil motive or intent" or of a type that "involves reckless or callous indifferen[ce] to the federally protected rights of others."   *Smith*, 461 U.S. at 56; *Carlson v. Green*, 446 U.S. 14, 22 (1980).   "The focus must be on whether the defendant's actions call for 'deterrence and punishment over and above that provided by compensatory awards.'" *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 462 U.S. at 54).   "The fact that a defendant's actions were objectively unconstitutional is not considered when determining whether to award punitive damages."   *Id.*   "[A]n award of punitive damages requires an assessment of [the defendant's] *subjective* state of mind."   *Id.* (quoting *Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989)) (modifications and emphasis in original).

The Court finds that the evidence of record before it is sufficient to create a material issue of fact as to whether Officer Hardey acted with the requisite state of mind necessary to award punitive damages to Plaintiffs.   When asked at her deposition if she "believe[d] the horses were endangered if left on the premises of Echo Valley" after she observed their condition on February 19, 2012, Officer Hardey responded that she did not hold that belief.   (ECF No. 68-7, Hardey

Dep. at 41:21-23.)   Indeed, Officer Hardey endorsed the Protective Custody Agreement that gave

Plaintiffs thirty days to put weight on their horses by Plaintiffs' own efforts and further specified

that they were not being seized at that time.   (ECF No. 62-21, Protective Custody Agreement.)

These pieces of evidence could lead to the conclusion that Officer Hardey applied for a warrant to

have the Six Horses seized despite her belief that they were not in immediate danger as of the time

the affidavit was submitted to the court.   At this point in the proceedings, there is enough evidence

in the record to prevent the Court from finding as a matter of law that punitive damages could not

be awarded as against Officer Hardey.   The Park County Defendants' motion for summary

judgment must therefore be denied as to whether punitive damages may be sought by Plaintiffs

against Officer Hardey.

     5.   <u>Further damages development</u>

Notwithstanding the determination above, the Court notes that the propriety of certain

damage may be revisited by the parties in the context of motions *in limine* focused more directly

on damages flowing from the claims which survive this Order.

## IV.   CONCLUSION

Based on the foregoing, it is ORDERED that:

1.   Defendant Olds' Motion to Dismiss Claims against Her in Amended Complaint (ECF No.

31) is GRANTED in part, DENIED in part as moot, to wit, Plaintiffs' breach of contract claim is

DISMISSED as against Dr. Olds;

2.   Defendant Olds' Motion for Summary Judgement (ECF No. 61) is GRANTED;

3.   The Recommendation of the United States Magistrate Judge (ECF No. 90) is APPROVED

and ADOPTED;

4.   Defendants Wegener, Gore, Priestly and Hardey's objections to the Recommendation (ECF No. 99) are OVERRULED;

5.   Defendants Wegener, Gore, Priestly and Hardey's Motion for Judgment on The Pleadings Pursuant to Fed. R. Civ. P. 12(c) Regarding Plaintiffs' Official Capacity Claims (ECF No. 63) is DENIED;

6.   Defendants Wegener, Gore, Priestly and Hardey's Motion for Summary Judgment Regarding Plaintiffs' Third Claim for Relief (ECF NO. 64) is DENIED;

7. Defendants Wegener, Gore, Priestly and Hardey's Motion for Summary Judgment Re: Individual Capacity Claims (ECF No. 65) is GRANTED;

8.   Defendants Wegener, Gore, Priestly and Hardey's Motion for Partial Summary Judgment Regarding Damages (ECF No. 66) is GRANTED in part, DENIED in part, to wit, summary judgment is GRANTED with respect to Plaintiffs' claim for punitive damages against Sheriff Wegener and otherwise DENIED;

9.   Plaintiffs' Motion to Supplement the Record with Respect to Summary Judgment Motions Number 61, 64, 65 and 66 (ECF No. 95) is DENIED;

10. Plaintiffs' Objection to the Order of USMJ Watanabe Striking Failure to Train and Ratification Claims from the Final Pretrial Order (ECF No. 107) is DENIED; and

11. Defendants Wegener, Gore, Priestly and Hardey's Motion for Leave to File Reply Brief in Support of their Objection to Report and Recommendation (ECF No. 102) is GRANTED.

The only claims remaining before the Court are claims against Sheriff Wegener in his official

capacity under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations relating to (i) the

seizure of the Six Horses and (ii) malicious prosecution; one claim against Officer Hardey in her

individual capacity under 42 U.S.C. § 1983 based on alleged Fourth Amendment violations

relating to the seizure of the Six Horses; and Plaintiffs' breach of contract claim against the Park

County Defendants.   Sheriff Wegener shall have until 15 days from the date of this Order to file a

motion for summary judgment regarding the official capacity claims asserted against him and may

file a brief of no longer than 10 pages.   Plaintiffs shall have 10 days to respond to this motion and

will also be limited to a brief of no more than 10 pages.   No further briefing will be allowed on

this issue.

DATED this 29th day of September, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing **APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME 3**, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with the McAfee AntiVirus Enterprise and McAfee AntiSpyware Enterprise version 8.8.0.1528, Virus Definition File Dated: 6/15/2016 rev 8197 and, according to the program is free of viruses.  In addition, I certify all required privacy redactions have been made.


By:     /S/Becky Kongs_____
        Legal Assistant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **APPELLEE'S SUPPLEMENTAL APPENDIX VOLUME 3** was furnished through (ECF) electronic service to the following on this the 20th day of June, 2016.

Brice A. Tondre
215 S. Wadsworth Blvd, #500
Lakewood, CO 80226-1566

By:    /S/Becky Kongs
Legal Assistant